JUDGE RAMOS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

15 CV 02106

| | |
|---|---|
| MEGAN VILLELLA, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>   v.<br><br>CHEMICAL & MINING CO. OF CHILE INC., PATRICIO CONTESSE, PATRICIO DE SOLMINIHAC, and RICARDO RAMOS,<br><br>      Defendants. | **Case No.**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |



RECEIVED
MAR 19 2015
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Megan Villella ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chemical & Mining Co. of Chile Inc., ("SQM" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired SQM securities traded on the New York Stock Exchange ("NYSE") between March 4, 2014 and March 17, 2015, both dates inclusive (the "Class Period").  Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      SQM purports to be the world's largest producer of potassium nitrate, iodine and lithium chemicals. The Company produces specialty plant nutrients, iodine and iodine derivatives, lithium and lithium derivatives, potassium chloride, potassium sulfate and certain industrial chemicals (including industrial nitrates and solar salt).  SQM products are sold in more than 115 countries through its worldwide distribution network, with 88% of sales in 2013 derived from countries outside Chile.  SQM products are mainly derived from mineral deposits found in northern Chile.

3.      SQM Series A and Series B common shares are listed on the Santiago Stock Exchange, while Series B American Depositary Shares ("ADS") have been listed on the NYSE since 1993, under the ticker symbol "SQM."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) money from SQM was channeled illicitly to electoral campaigns for the Independent Democratic Union ("UDI"), Chile's largest conservative party; (2) the Company lacked adequate internal controls

over financial reporting; and (3) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

5.      Chile's Attorney General announced on February 24, 2015 that he would lead the investigation into the escalating bribery and tax evasion scandal involving the financial firm Banco Penta ("Penta" or the "Penta Group"), a corruption scandal which has embroiled numerous politicians across the country's political spectrum.  According to charges later lodged against Carlos Alberto Delano and Carlos Eugenio Lavin, the two Penta founders used fake expense receipts from family members to lower their taxable income and allegedly made illegal payments to parliamentary candidates and a deputy minister.

6.      On February 26, 2015, SQM issued the first of a series of disclosures, which, for the first time, publicly linked the Company to the ongoing UDI contribution scandal and ultimately culminated in the termination of the Chief Executive Officer and resignation of three SQM Board members.  The Company disclosed in a press release that, at the request of the Chairman of the Board of SQM, an extraordinary Board meeting was held to analyze the ongoing political scandal in and the Attorney General's investigation. In such meeting, the Board resolved to establish a special committee comprising of Board members Wolf Von Appen, José María Eyzaguirre Baeza, and Juan Antonio Guzmán Molinari.

7.      Thereafter, on March 11, 2015, Legislator Ernesto Silva and Senator Ivan Moreira resigned as president and vice president of the UDI, respectively, becoming the first political casualties of a campaign finance scandal. Ivan Moreira has admitted receiving "irregular" financing for his campaign.

8.      Also, on March 11, 2015, SQM disclosed that its Board of Directors would meet the next day to evaluate the request by the Public Prosecutor for delivery of certain information pertaining to the alleged bribery scandal.  The next day, on March 12, 2015, the Company issued a press release disclosing that the Board resolved:

- To request an independent report with respect to the request by the Attorney General of Chile, Mr. Sabas Chahuán, in his letter dated March 6, 2015 and received by SQM on March 9, 2015, to voluntarily, and in accordance with relevant laws, provide certain information.

- To schedule another Extraordinary Session of the Board of Directors of SQM for Monday, March 16, 2015, in order to analyze the abovementioned report and to make a decision regarding the voluntary delivery of the requested information.

- The Board of Directors of SQM ratified its willingness to cooperate with the proceedings being led by the Public Prosecutor and confirmed that all of the requested information is ready to be delivered when appropriate.

- To send a letter to the Attorney General of Chile, Mr. Sabas Chahuán, informing him of the above in response to his letter dated March 6, 2015.

9.      On March 16, 2015, the Company announced that it had turned over all of the information requested by the Public Prosecutor in the March 6, 2015 Letter to the Chilean Internal Revenue Service for the last six years, which the Company purported was the proper authority to review such information.  Moreover, the Company also announced that the Board had agreed to terminate CEO Patricio Contesse effectively immediately.  In the prior weeks, Contesse had attempted to block the Company's decision to turn over the documents.

10.      As a result of these partial disclosures, SQM stock consistently traded downward, from a closing price of $26.17 per share on February 25, 2015, to close at $22.10 per share on March 17, 2015, a decline of 15.55% on unusually heavy trading volume during that period.

11.     Finally, on March 18, 2015, SQM issued a press release indicating that the three representatives on its Board from Canadian stakeholder Potash Corporation, SQM Vice Chairman Wayne Brownlee, who also serves as the Chief Financial Officer of Potash Corporation, and directors Jose Maria Eyzaguirre and Alejandro Montero, had resigned the prior day.

12.     As a result of this news, shares of SQM fell an additional $3.45 per share, or more than 15.6%, on extremely heavy volume, to close at $18.65 per share on March 18, 2015.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the accompanying Certification purchased SQM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant SQM is one of the largest producers and distributors of specialty plant nutrients, iodine, lithium, potassium-related fertilizers and industrial chemicals in the world. SQM shares are listed on the NYSE under the symbol SQM.

20.     Defendant Patricio Contesse ("Contesse") served as the CEO of SQM at all relevant times until he was abruptly terminated on March 16, 2015.

21.     Defendant Patricio de Solminihac ("Solminihac") has served as the Company's Executive Vice President and Chief Operating Officer at all relevant times.

22.     Defendant Ricardo Ramos ("Ramos") served as the Company's Chief Financial Officer and Business Development Senior Vice President at all relevant times.

23.     The defendants referenced above in ¶¶ 20 – 22 are sometimes referred to herein as the "Individual Defendants."

24.     Defendant SQM and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     SQM, a worldwide company based in Chile and founded in 1968, purports to have a strong global presence in a wide variety of industries and applications through its five business lines: Specialty Plant Nutrition, Iodine and derivatives, Lithium and derivatives, Industrial Chemicals and Potassium.   At its plants in Northern Chile, SQM processes two

precious natural resources: caliche ore and salt brines, which constitute the raw material for SQM's broad product portfolio and which are at the heart of an integrated and flexible production process which enables SQM to obtain at the same time different and complementary natural products, including nitrate derivatives.

26.     Supported by an international commercial and distribution network in over 100 countries, business allies and Joint Ventures, SQM purports to provide, through its main brands, business solutions that contribute to the growth of the businesses of clients around the world.

## Materially False and Misleading
## Statements Issued During the Period

27.     On March 4, 2014, SQM issued a press release announcing earnings for the fourth quarter and year ended December 31, 2013.  The Company reported earnings for the twelve months ended December 31, 2013 of US$467.1 million (US$1.77 per ADR), a decrease from US$649.2 million (US$2.47 per ADR) for the twelve months ended December 31, 2012. Revenues totaled US $2,203.1 million for the twelve months ended December 31, 2013, representing a decrease compared to US$2,429.2 million reported for the twelve months ended December 31, 2012.  The Company also announced earnings for the fourth quarter of 2013, reporting net income of US$69.0 million (US$0.26 per ADR) compared to US$141.8 million (US$0.54 per ADR) for the fourth quarter of 2012.  Revenues totaled US$492.2 million, a decrease compared to US$601.0 million for the fourth quarter of 2012.

28.     On April 28, 2014, the Company filed an annual report for the period ended December 31, 2013 on Form 20-F with the SEC, which was signed by defendant Ramos, and reiterated the Company's previously announced quarterly and year-end financial results and financial position.  In addition, the 2012 Form 20-F contained certifications signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Ramos and Contesse, stating that the

financial information contained in the Form 40-F was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

29.     Moreover, the 2013 Form 20-F stated the following pertaining to the Chilean political environment:

*As we are a company based in Chile, we are exposed to Chilean political risks*

Our business, results of operations, financial condition and prospects could be affected by changes in policies of the Chilean government, other political developments in or affecting Chile, and regulatory and legal changes or administrative practices of Chilean authorities, over which we have no control.

30.     Moreover, the Form 20-F states that "SQM employs its best efforts to ensure such compliance" with relevant tax codes, environmental regulations, labor codes and legal framework, for the jurisdictions within which the Company operates, including, but not limited to, Chile.

31.     On May 20, 2014, SQM issued a press release announcing earnings for the first quarter ending March 31, 2014.  The Company reported earnings for the three months ended March 31, 2014 of US$81.0 million (US$0.31 per ADR), a decrease from US$151.8 million (US$0.58 per ADR) for the three months ended March 31, 2013. Gross Margin reached US$154.8 million (29.0% of revenues) for the three months ended March 31, 2014; a decrease compared to US$238.9 million (38.3% of revenues) for the three months ended March 31, 2013. Revenues totaled US$534.1 million for the three months ended March 31, 2014, representing a decrease compared to US$623.4 million reported for the three months ended March 31, 2013.

32.     On August 26, 2014, the Company issued a press release announcing earnings for the three and six months ended June 30, 2014.  SQM reported earnings for the six months ended June 30, 2014 of US$152.1 million (US$0.58 per ADR), a decrease from US$259.2 million (US$0.98 per ADR) for the six months ended June 30, 2013. Gross Margin reached US$300.2

million (28.4% of revenues) for the six months ended June 30, 2014, lower than US$426.7 million (35.9% of revenues) recorded for the six months ended June 30, 2013. Revenues totaled US$1,056.4 million for the six months ended June 30, 2014, representing a decrease of 11.2% compared to US$1,189.9 million reported for the six months ended June 30, 2013. The Company also announced earnings for the second quarter of 2014, reporting net income of US$71.1 million (US$0.27 per ADR) compared to US$107.4 million (US$0.41 per ADR) for the second quarter of 2013.  Gross Margin for the second quarter of 2014 reached US$145.3 million, lower than the US$187.8 million recorded for the second quarter of 2013.  Revenues totaled US$522.3 million, a decrease of approximately 7.8% compared to the second quarter of 2013, when revenues amounted to US$566.5 million.

33.     On November 18, 2014, the Company issued a press release announcing earnings for the third quarter 2014 and the nine months ended September 30, 2014.  SQM reported earnings for the nine months ended September 30, 2014 of US$218.4 million (US$0.83 per ADR), a decrease from US$398.1 million (US$1.51 per ADR) for the nine months ended September 30, 2013. Gross margin reached US$442.6 million (29.1% of revenues) for the nine months ended September 30, 2014, lower than US$575.2 million (33.6% of revenues) recorded for the nine months ended September 30, 2013. Revenues totaled US$1,522.8 million for the nine months ended September 30, 2014, representing a decrease of 11.0% compared to US$1,710.9 million reported for the nine months ended September 30, 2013. The Company also announced earnings for the third quarter of 2014, reporting net income of US$66.4 million (US$0.25 per ADR) compared to US$138.9 million (US$0.53 per ADR) for the third quarter of 2013. Gross margin for the third quarter of 2014 reached US$142.4 million, lower than the US$148.5 million recorded for the third quarter of 2013. Revenues totaled US$466.4 million, a

decrease of approximately 10.5% compared to the third quarter of 2013, when revenues amounted to US$521.1 million.

34.     The statements referenced in ¶¶ 27 – 33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) money from SQM was channeled illicitly to electoral campaigns for the UDI, Chile's largest conservative party; (2) the Company lacked adequate internal controls over financial reporting; and (3) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Begins To Emerge

35.     Chile's Attorney General announced on February 24, 2015 that he would lead the investigation into the escalating bribery and tax evasion scandal involving the financial firm Banco Penta ("Penta" or the "Penta Group"), a corruption scandal which has embroiled numerous politicians across the political spectrum of the country.  According to the charges later lodged against Carlos Alberto Delano and Carlos Eugenio Lavin, the two Penta founders used fake expense receipts from family members to lower their taxable income and allegedly made illegal payments to parliamentary candidates and a deputy minister.

36.     On February 26, 2015, SQM issued the first of a series of disclosures, which, for the first time, publicly linked the Company to the ongoing UDI contribution scandal and ultimately culminated in the termination of the Chief Executive Officer and resignation of three SQM Board members.  The Company disclosed in a press release that, at the request of the SQM's Chairman of the Board, an extraordinary Board meeting was held to analyze the ongoing political scandal in and the Attorney General's investigation. In such meeting, the Board

resolved to establish a special committee comprising of Board members Wolf Von Appen, José María Eyzaguirre Baeza, and Juan Antonio Guzmán Molinari, to investigate such matters.

37.     On March 3, 2015, the Company issued a press release announcing earnings for the fourth quarter 2014 and the twelve months ended December 31, 2014.  SQM reported earnings for the twelve months ended December 31, 2014 of US$296.4 million (US$1.13 per ADR), a decrease from US$467.1 million (US$1.77 per ADR) for the twelve months ended December 31, 2013. Gross margins reached US$583.0 million (28.9% of revenues) for the twelve months ended December 31, 2014, lower than US$721.5 million (32.7% of revenues) recorded for the twelve months ended December 31, 2013. Revenues totaled US$2,014.2 million for the twelve months ended December 31, 2014, representing a decrease of 8.6% compared to US$2,203.1 million reported for the twelve months ended December 31, 2013. The Company also announced earnings for the fourth quarter of 2014, reporting net income of US$78.0 million (US$0.30 per ADR) compared to US$69.0 million (US$0.26 per ADR) for the fourth quarter of 2013. This comparison is affected by the sale of mining rights to Antofagasta Minerals during the fourth quarter of 2014, which had a onetime, before-tax effect of US$13 million on net income. Gross margin for the fourth quarter of 2014 reached US$140.4 million, lower than the US$146.3 million recorded for the fourth quarter of 2014. Revenues totaled US$491.4 million, a decrease of approximately 0.2% compared to the fourth quarter of 2013, when revenues amounted to US$492.2 million.

38.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading

statements and/or failed to disclose that:  (1) money from SQM was channeled illicitly to electoral campaigns for the UDI, Chile's largest conservative party; (2) the Company lacked adequate internal control over financial reporting; and (2) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

**The Full Truth Emerges**

39.    Thereafter, on March 11, 2015, Legislator Ernesto Silva and Senator Ivan Moreira resigned as president and vice president of the UDI, respectively, becoming the first political casualties of a campaign finance scandal. Ivan Moreira has admitted receiving "irregular" financing for his campaign.

40.    Also on March 11, 2015, SQM disclosed that Board of Directors would meet the next day to evaluate the request by the Public Prosecutor for delivery of certain information pertaining to the alleged contribution scandal.  The next day, on March 12, 2015, the Company issued a press release disclosing that the Board resolved:

- To request an independent report with respect to the request by the Attorney General of Chile, Mr. Sabas Chahuán, in his letter dated March 6, 2015 and received by SQM on March 9, 2015, to voluntarily, and in accordance with relevant laws, provide certain information.

- To schedule another Extraordinary Session of the Board of Directors of SQM for Monday, March 16, 2015, in order to analyze the abovementioned report and to make a decision regarding the voluntary delivery of the requested information.

- The Board of Directors of SQM ratified its willingness to cooperate with the proceedings being led by the Public Prosecutor and confirmed that all of the requested information is ready to be delivered when appropriate.

- To send a letter to the Attorney General of Chile, Mr. Sabas Chahuán, informing him of the above in response to his letter dated March 6, 2015.

The above listed resolutions were approved by the Directors Messrs. Julio Ponce, Wolf von Appen, Juan Antonio Guzmán, Hernán Büchi and Patricio Contesse F.– The Directors Messrs. José María Eyzaguirre and Alejandro Montero were in favor of

providing the information requested by the Attorney General voluntarily and as soon as possible. In consideration of the agreement described above, the Director Mr. José María Eyzaguirre B. resigned from the Committee that was established on February 26, 2015.

41.     On March 16, 2015, the Company announced that it had turned over all of the information requested by the Public Prosecutor in the March 6, 2015 Letter to the Chilean Internal Revenue Service, which the Company purported was the proper authority to review such information.   Moreover, the Company also announced that the Board had agreed to terminate CEO Patricio Contesse effectively immediately.   In the prior weeks, Contesse had attempted to block the Company's decision to turn over the documents.

42.     As a result of these partial disclosures, SQM stock consistently traded downward, from a closing price of $26.17 per share on February 25, 2015, to close at $22.10 per share on March 17, 2015, a decline of 15.55% on unusually heavy trading volume during that period.

43.     Finally, on March 18, 2015, SQM issued a press release indicating that the three representatives on its Board from Canadian stakeholder Potash Corporation, SQM Vice Chairman Wayne Brownlee, who also serves as the Chief Financial Officer of Potash Corporation, and directors Jose Maria Eyzaguirre and Alejandro Montero, had resigned the prior day.

44.     As a result of this news, shares of SQM fell an additional $3.45 per share or more than 15.6% on extremely heavy volume, to close at $18.65 per share on March 18, 2015.

45.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SQM securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SQM securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SQM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SQM;

- whether the Individual Defendants caused SQM to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SQM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SQM securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold SQM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SQM securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SQM securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SQM securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SQM's finances and business prospects.

59.     By virtue of their positions at SQM, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of SQM securities from their personal portfolios.

61.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of SQM, the Individual Defendants had knowledge of the details of SQM's internal affairs.

62.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SQM.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SQM's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for SQM's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning SQM's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SQM securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

63.     During the Class Period, SQM's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SQM securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SQM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of SQM's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

64.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

66.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.    During the Class Period, the Individual Defendants participated in the operation and management of SQM, and conducted and participated, directly and indirectly, in the conduct of SQM's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding SQM's business practices.

68.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SQM's financial condition and results of operations, and to correct promptly any public statements issued by SQM which had become materially false or misleading.

69.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SQM disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SQM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SQM within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SQM securities.

70.    Each of the Individual Defendants, therefore, acted as a controlling person of SQM.  By reason of their senior management positions and/or being directors of SQM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

SQM to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of SQM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

71. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SQM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 19, 2015                    Respectfully submitted,

**POMERANTZ LLP**

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Email:  jalieberman@pomlaw.com
          fmcconville@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I,  *MEGAN VILLELLA*  , make this declaration pursuant

to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the

Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation

Reform Act of 1995.

2.   I have reviewed a Complaint against Chemical & Mining Co. of Chile Inc. ("Chemical &

Mining Co.") and, authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Chemical & Mining Co. securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who

purchased or acquired Chemical & Mining Co. securities during the class period, including providing

testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the

most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in

Chemical & Mining Co. securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have

not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class

as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and

expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

**Executed** _____3/19/15_____
(Date)

_____
(Signature)

_____MEGAN  VILLELLA_____
(Type or Print Name)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 5/15/14 | BUY | 200 | 27.30 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |