UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN VILLELLA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>– against –<br><br>CHEMICAL & MINING CO. OF CHILE INC., PATRICIO CONTESSE, PATRICIO DE SOLMINIHAC, and RICARDO RAMOS,<br><br>Defendants. | **OPINION AND ORDER**<br><br>15 Civ. 2106 (ER)<br><br>15 Civ. 2884 (ER) |
| LYNN MOLINARO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>– against –<br><br>CHEMICAL & MINING CO. OF CHILE INC., PATRICIO CONTESSE GONZÁLEZ, PATRICIO DE SOLMINIHAC, and RICARDO RAMOS,<br><br>Defendants. | |

Ramos, D.J.:

In March and April of 2015, two putative class actions were brought under the federal securities laws against Chemical and Mining Company of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM") and individual SQM executives. The suits allege that SQM, a large producer and distributor of specialty fertilizers and industrial chemicals, made materially false and misleading statements regarding its business and operations. Specifically, the plaintiffs allege that SQM failed to disclose that funds from its operations were illegally channeled to electoral campaigns and political parties in Chile, that such payments were concealed by fictitious tax receipts filed with Chilean authorities, and that SQM lacked the internal controls to

properly prevent this illicit conduct. As SQM's alleged misrepresentations were disclosed to the public in the course of a wider investigation of corruption in the Chilean political system, the price of SQM shares dropped precipitously.

Pending before the Court are six motions from six distinct SQM shareholders or groups of shareholders. The motions all seek consolidation of the two filed suits. Each movant also seeks appointment as lead plaintiff and approval of the movant's selected counsel as lead counsel. The six movants[1] are: (1) Anton Mandelstam ("Mandelstam") (Doc. 7); (2) Richard Gielata ("Gielata") (Doc. 9); (3) Megan Villella, Sam Villella, and Leroy Robinson ("Villella") (Doc. 12); (4) Marty Sholtis ("Sholtis") (Doc. 15); (5) The Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Tyne and Wear") (Doc. 18); and (6) the Arkansas Public Employees Retirement System ("APERS") (Doc. 20).[2]

For the reasons set forth below, the Court (i) consolidates the two actions, (ii) appoints Tyne and Wear as lead plaintiff, and (iii) approves Tyne and Wear's selected counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel.

---

[1] Although she filed one of the two complaints in this case (15-cv-2884, Doc. 1), Lynn Molinaro never moved for appointment as lead plaintiff and her complaint does not include any specific information detailing her alleged financial losses. Molinaro's counsel, Robbins Geller Rudman & Dowd LLP, is also counsel for Tyne and Wear, another movant seeking appointment as lead plaintiff. Thus, the Court does not consider Lynn Molinaro as a potential lead plaintiff.

[2] All docket references are to case number 15 Civ. 2106, unless otherwise noted.

## I. BACKGROUND

### A. Factual Background[3]

SQM is a producer and worldwide distributor of specialty fertilizers and industrial chemicals, based in Chile. Complaint for Violation of the Federal Securities Laws (15-cv-2106, Doc. 1) ("Villella") ¶¶ 25–26; Complaint for Violation of the Federal Securities Laws (15-cv-2884, Doc. 1) ("Molinaro") ¶ 31. SQM Series B American Depository Shares ("shares") have been listed on the New York Stock Exchange since 1993, under the ticker symbol "SQM." Villella ¶ 3; Molinaro ¶¶ 1–2.

Between June 30, 2010 and November 19, 2014, SQM filed financial reports with the Securities Exchange Commission ("SEC") and issued press releases detailing the company's financial performance, including its revenue, gross margins, and earnings per share. These disclosures included assurances that SQM and its employees were operating in accordance with Chilean laws and regulations, and that SQM had adequate internal controls to properly record legal transactions and to safeguard against illegal transactions. *See* Villella ¶¶ 27–33; Molinaro ¶¶ 32–61. Plaintiffs allege that these statements were materially false and/or misleading, because they failed to disclose: (i) that money from SQM was illegally channeled to bribe Chilean politicians and political parties, (ii) that SQM had filed fictitious tax receipts in order to conceal these bribe payments, (iii) that SQM lacked adequate internal controls over its financial reporting, and (iv) that, as a result, SQM's financial statements were materially false and misleading and not prepared in accordance with applicable accounting principles. *See* Villella ¶ 34; Molinaro ¶ 62.

---

[3] The following facts are based on the allegations set forth in the Villella Complaint (15-cv-2106, Doc. 1) and the Molinaro Complaint (15-cv-2884, Doc. 1).

On February 24, 2015, the Attorney General of Chile ("AG") announced an investigation of a bribery and tax-evasion scandal involving the financial firm Banco Penta, which "embroiled numerous politicians across the country's political spectrum." Villella ¶ 35; Molinaro ¶ 63. The scheme involved the creation of fake expense receipts used to lower Banco Penta's taxable income, all for the purpose of funding illegal payments to political candidates. *Id.*

Two days later, on February 26, 2015, SQM issued a press release divulging that an extraordinary Board meeting had been held at the request of SQM's Chairman to "analyze" this escalating political scandal. Villella ¶ 36; Molinaro ¶ 64. The Board resolved at the meeting to establish a special committee comprised of three SQM Board members. *Id.* Around the same time, the press started to report that SQM was being investigated by the AG for misconduct similar to Banco Penta's—"using fake invoices and phony services to illegally fund politicians." Molinaro ¶ 64.

During the first week of March 2015, SMQ released its earnings for the final quarter of 2014 and the entire twelve-month period ending December 31, 2014. Villella ¶ 37; Molinaro ¶ 65. The next week, on March 11, 2015, SQM disclosed that its Board would meet the next day to evaluate a request from the Public Prosecutor that SQM deliver accounting records and other information in connection with the investigation into the political-contributions scandal. Villella ¶ 40; Molinaro ¶ 66. After the Board meeting on March 12, 2015, SQM issued a press release stating that the Board resolved (i) to request an independent report with respect to a March 6, 2015 letter from the AG requesting certain information from SMQ, (ii) to schedule another extraordinary Board meeting on March 16, 2015 to analyze the independent report and decide whether to comply with the AG's request, (iii) to ratify its willingness to cooperate with the Public Prosecutor's investigation and request for information, and (iv) to inform the AG of the

4

Board's plan in response to his Mach 6, 2015 letter. *See* Villella ¶ 40; Molinaro ¶ 67. The press release also stated that the three representatives on SQM's Board from Canadian stakeholder Potash ("Potash Directors") had advocated in favor of cooperating with the AG immediately, and that one of those directors had resigned from the previously-formed special committee because of the Board's decision to request an independent report before complying with the AG's request. *See* Molinaro ¶ 68.

On March 16, 2015, SQM announced that it had delivered all of the information requested by the Public Prosecutor to the Chilean Internal Revenue Service ("IRS"). Villella ¶ 41; Molinaro ¶ 69. SQM also announced that its Board had agreed to immediately terminate SQM's CEO, Defendant Patricio Contesse, who had attempted to block the Board's decision to turn the information over to the IRS. *Id.*

As of March 17, 2015, these disclosures had caused SQM shares to drop 15.55% from its price on February 25, 2015. Villella ¶ 42; Molinaro ¶ 70. On March 18, 2015, the Potash Directors announced their resignation from SQM's Board due to the refusal of a majority of the Board to cooperate with the Public Prosecutor, which caused SQM shares to fall an additional 15.6% from the previous day. Villella ¶¶ 43–44; Molinaro ¶¶ 71–73.

In late March and early April 2015, both the Chilean IRS and the Chilean securities regulator initiated proceedings against SQM Board members and representatives, including the individual Defendants here, for violations of the Chilean tax code and securities regulations. On April 6, 2015, a news article reported that SQM had been accused of filing 846 false tax documents and that 144 people connected to SQM had filed "presumed false" documents in exchange for fees. *See* Molinaro ¶¶ 74–78.

**B. Procedural Background**

Plaintiff Megan Villella filed her class-action complaint on March 19, 2015 ("Villella Action"), seeking damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. (Doc. 1). Plaintiff Lynn Molinaro filed her class-action complaint on April 14, 2015 ("Molinaro Action"), seeking damages on the same grounds. (15-cv-2884, Doc. 1). Both the Villella Action and the Molinaro Action are brought against the same four defendants: (i) SQM; (ii) Patricio Contesse,[4] the former CEO of SQM who was terminated on March 16, 2015; (iii) Patricio de Solminihac, SQM's Executive Vice President and Chief Operating Officer; and (iv) Ricardo Ramos, SQM's Chief Financial Officer and Senior Vice President of Business Development. Villella ¶¶ 19–22; Molinaro ¶¶ 23–26. Both actions are brought on behalf of all persons who purchased or otherwise acquired SQM shares on the New York Stock Exchange during the alleged Class Periods. Villella ¶ 1; Molinaro ¶ 1. The Villella Action alleges a Class Period from March 4, 2014 to March 17, 2015, both dates inclusive. Villella ¶ 1. The Molinaro Action alleges a Class Period from June 30, 2010 to March 17, 2015, both dates inclusive. Molinaro ¶ 1.

As required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(A) (2012), Villella's counsel published notice over *Globe Newswire* on March 19, 2015, announcing that a securities class action had been filed against SQM and the individual defendants, and advising SQM shareholders that they had until May 18, 2015 to file a motion for appointment as lead plaintiff. *See* Decl. Jeremy A. Lieberman Supp. Villella Mot. for Consol., Appt. as Lead Pl. & Approval of Counsel (Doc. 14), Ex. A.

---

[4] Villella's complaint refers to "Patricio Contesse," Villella ¶ 20, while Molinaro's complaint refers to "Patricio Contesse González," Molinaro ¶ 24. Both use simply "Contesse" as their short-hand reference, however.

On May 18, 2015, the instant six motions were timely filed in response to the notice. All of the motions seek consolidation of the Villella and Molinaro Actions, and each movant seeks appointment as lead plaintiff and approval of the movant's selected counsel as lead counsel. In response to Tyne and Wear's motion (Doc. 18), two movants filed notices of non-opposition and another movant withdrew her previous motion for lead-plaintiff status. Gielata filed his notice of non-opposition on June 1, 2015 (Doc. 24), APERS filed its notice on June 4, 2015 (Doc. 25), and Villella withdrew her motion on June 5, 2015 (Doc. 27). The three remaining movants are Mandelstam, Sholtis, and Tyne and Wear.

**II. CONSOLIDATION**

Before ruling on the appointment of lead plaintiff and approval of lead counsel, the Court must first decide whether the Villella and Molinaro Actions should be consolidated because they are "substantially the same." *See* 15 U.S.C. § 78u–4(a)(3)(B)(ii) (2012) ("If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not [appoint a lead plaintiff] *until after* the decision on the motion to consolidate is rendered.") (emphasis added).

"Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990). "The trial court has broad discretion to determine whether consolidation is appropriate." *Id.* at 1284–85. "In assessing whether consolidation is appropriate in given circumstances, a district court should

7

consider both equity and judicial economy." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999).

Consolidation is merited here. The Villella and Molinaro complaints include near-identical allegations about the critical events of February and March 2015. *Compare* Villella ¶¶ 35–45, *with* Molinaro ¶¶ 64–73. Both complaints recite similar or identical statements from SQM's SEC disclosures and conclude that the statements were materially false and/or misleading for the same reasons—namely, that the statements failed to disclose that SQM funds were being channeled to Chilean politicians and political parties, that these bribery payments were covered up by fictitious tax filings, and that SQM lacked adequate internal controls over financial reporting. *Compare* Villella ¶¶ 27–38, *with* Molinaro ¶¶ 32–62. Courts in this district "routinely consolidate securities class actions arising from the same allegedly actionable statements," as do the instant two actions. *In re Braskem S.A. Sec. Litig.*, No. 15 Civ. 5132 (PAE), 2015 WL 5244735, at *3 (S.D.N.Y. Sept. 8, 2015) (collecting cases). Both complaints also plead the same two claims—violations of Sections 10(b) and 20(a) of the Exchange Act—against the same four defendants. *Compare* Villella ¶¶ 18–24, 55–71, *with* Molinaro ¶¶ 22–30, 92–102. Thus, "[t]he two cases involve sufficiently overlapping questions of law and fact to justify consolidation." *Faig v. Bioscrip, Inc.*, No. 13 Civ. 6922 (AJN), 2013 WL 6705045, at *1 (S.D.N.Y. Dec. 19, 2013). Furthermore, "[a]ll movants seek consolidation and defendants have not opposed the motion for consolidation—*i.e.*, there is little (if any) potential for prejudice." *In re CMED Sec. Litig.*, No. 11 Civ. 9297 (KBF), 2012 WL 1118302, at *2 (S.D.N.Y. Apr. 2, 2012) (citing *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007)).

There are two minor differences between the two complaints, but neither sways the Court's determination to consolidate. The Molinaro Action asserts a longer Class Period (from

June 30, 2010 to March 17, 2015) than the Villella Action does (from March 4, 2014 to March 17, 2015), and thus includes more allegedly false financial statements and more putative class members.[5] Additionally, the Villella Action's Section 20(a) claim is brought against only the individual SQM executives, while the Molinaro Action's Section 20(a) claim is against both the individual executives and the company itself.  *Compare* Villella ¶¶ 66–71, *with* Molinaro ¶¶ 97–102.  Neither of these differences changes the substantial similar nature of the two actions or mitigates the benefits of consolidation.  *See, e.g.*, *Kaplan*, 240 F.R.D. at 91 ("Differences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation."), *reconsidered on other grounds sub nom. In re IMAX Sec. Litig.*, No. 06 Civ. 6128, 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *see also, e.g.*, *In re CMED*, 2012 WL 1118302, at *2 (same).

Accordingly, the Court consolidates the Villella and Molinaro Actions.  All future filings in this case shall be filed in the 15 Civ. 2016 case number and bear the same caption as that case number.  The Molinaro Action, 15 Civ. 2884, shall be closed.

**III. APPOINTMENT OF LEAD PLAINTIFF**

The PSLRA governs motions for the appointment of lead plaintiffs of putative class actions brought under the federal securities laws.  *See, e.g.*, *In re Braskem*, 2015 WL 5244735, at *4.  The PSLRA instructs the Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing

---

[5] "The Court will use the longest-noticed class period—*i.e.*, [June 30, 2010 through March 17, 2015]—as it encompasses more putative class members." *In re CMED*, 2012 WL 1118302, at *2 (citing *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 402–03 (S.D.N.Y. 2003)).

9

the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i) (2012).  The statute sets forth a rebuttable presumption "that the most adequate plaintiff…is the person or group of persons" that (i) "has either filed the complaint or made a motion in response to" public notice of the filing of the class action, (ii) "has the largest financial interest in the relief sought by the class," and (iii) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." § 78u-4(a)(3)(B)(iii)(I).  This presumption is rebutted "only upon proof by a member of the purported plaintiff class" that the presumptively most-adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." § 78u–4(a)(3)(B)(iii)(II).

All of the parties seeking appointment as lead plaintiff have satisfied the first requirement by filing a timely motion in response to public notice of this suit.

The next, most critical question is which party seeking lead-plaintiff status has the largest financial interest in the relief sought by the putative class.  Courts in this Circuit typically examine four factors to determine a lead plaintiff's financial interest:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.

*Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, No. 14 Civ. 10020 (RMB), 2015 WL 1345931, at *2 (S.D.N.Y. Mar. 19, 2015) (quoting *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 127–28 (S.D.N.Y. 2011)).  "Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant." *In re Braskem*, 2015 WL 5244735, at *4 (collecting cases).

Here, Tyne and Wear claims $4,437,901.65 in financial losses, by far the largest amount of all movants. (Doc. 21, Ex. 2). The other two remaining movants do not claim losses anywhere close: Mandelstam claims $41,384.52 (Doc. 8, Ex. 3), and Sholtis claims $6,338.24 (Doc. 17, Ex. C).[6] The volume of Tyne and Wear's purchases also dwarfs those of the other remaining movants. Tyne and Wear purchased a total of 376,521 shares of SQM during the Class Period and sold 70,844 of those shares during the same time. (Doc. 21, Ex. 2). In contrast, Mandelstam purchased 17,500 shares and sold 15,200 shares during the Class Period (Doc. 8, Ex. 3), while Sholtis bought and sold 37,500 shares during the same time (Doc. 17, Ex. C). Furthermore, Tyne and Wear is the only remaining movant that is an institutional investor, which is "the type of investor Congress prefers as lead plaintiff." *In re Braskem*, 2015 WL 5244735, at *5; *see also, e.g.*, *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) ("[T]he PSLRA was passed…to increase the likelihood that institutional investors would serve as lead plaintiffs in actions such as this one.") (quoting *In re Veeco Instruments, Inc.*, 233 F.R.D. 330, 332–33 (S.D.N.Y. 2005)). The Court is thus easily able to conclude that Tyne and Wear has the largest financial interest here, and notes that movants who withdrew or filed notices of non-opposition agree as much. (*See* Docs. 24, 25, 27 (withdrawing or stating non-opposition in wake of Tyne and Wear's claiming of its financial losses)).

Tyne and Wear must still "satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure" in order to be appointed lead plaintiff. § 78u-4(a)(3)(B)(iii)(I)(cc). Federal Rule of Civil Procedure 23(a) sets forth four requirements for class certification: (1) the class is so numerous that simple joinder is impracticable; (2) there exist questions of fact and law

---

[6] Among those movants who later filed notices of non-opposition or withdrew, APERS claimed by far the largest financial loss, which was $479,561.98. *See* Tyne & Wear's Mem. Further Supp. Mot. Consol., Appoint. Lead Pl., & Approval Lead Counsel (Doc. 26) 3 (comparing the movants' claimed financial losses). Tyne and Wear's claimed losses are nearly ten-times as large as APERS' claimed losses. *Id*.

11

common to the whole class; (3) the claims of the lead plaintiff are typical of the claims of the whole class; and (4) the lead plaintiff and counsel will adequately represent the interests of all class members. *See* Fed. R. Civ. P. 23(a). "When deciding competing motions to be appointed lead plaintiff under the PSLRA, however, a court need not conduct a full analysis of whether the requirements of Rule 23 have been met." *Faig*, 2013 WL 6705045, at *3. "Rather, '[a]t this stage of the litigation, a moving plaintiff must only make a preliminary showing that the adequacy and typicality requirements have been met.'" *Id.* (quoting *Jambay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 120 (S.D.N.Y. 2010)); *see also, e.g.*, *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *6 (S.D.N.Y. May 31, 2012).

"The typicality requirement is satisfied when the class members' claims 'arise [ ] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Peters v. Jinkosolar Holding Co.*, No. 11 Civ. 7133 (JPO), 2012 WL 946875, at *11 (S.D.N.Y. Mar. 19, 2012) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). Tyne and Wear's claims here are typical: They arise from purchases made in reliance on the same alleged misstatements and omissions that the complainants and other movants base their claims on, and they also seek the same relief, based on the same legal theories. *See* Mem. Supp. Tyne & Wear's Mot. for Consol., Appt. as Lead Pl. & Approval of Lead Counsel ("T&W Br.") (Doc. 19) 6. Furthermore, "[n]o party or movant has contested [Tyne and Wear's] typicality." *In re Braskem*, 2015 WL 5244735, at *6.

Tyne and Wear has also made a sufficient showing of adequacy under Rule 23(a)(4). "The adequacy requirement is satisfied where '(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest

in the outcome of the case to ensure vigorous advocacy.'" *Sallustro v. CannaVest Corp.*, No. 14 Civ. 2900 (PGG), 2015 WL 1262253, at *10 (S.D.N.Y. Mar. 19, 2015) (quoting *Kaplan*, 240 F.R.D. at 94).  Tyne and Wear has retained Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), competent and experienced counsel with extensive experience in these types of securities class actions.  *See* T&W Br. 7–8 (noting Robbins Geller's "numerous substantial recoveries in this District on behalf of Shareholders"); *infra* IV.  Furthermore, no party or movant argues that Tyne and Wear has any interests antagonistic to other class members, nor has the Court identified any.  Indeed, Tyne and Wear's high volume of trading throughout the Class Period and its large financial losses, nearly ten times higher than the next-closest movant, will likely motivate it to pursue this litigation vigorously on behalf of all class members.  *See Sallustro*, 2015 WL 1262253, at *10.

As a result of its timely filing, its large financial stake, the typicality of its claims, and the adequacy of its representation, Tyne and Wear is entitled to a presumption that it is the "most adequate plaintiff."  § 78u-4(a)(3)(B)(iii)(I).  That presumption stands unrebutted, because no other class member has come forth with proof that Tyne and Wear "will not fairly and adequately protect the interests of the class" or is subject to "unique defenses" that render it incapable of adequately representing the class.  § 78u–4(a)(3)(B)(iii)(II).  Quite the opposite, in fact, as numerous movants stated their non-opposition or withdrew after reviewing Tyne and Wear's motion.  The Court therefore appoints Tyne and Wear as lead plaintiff.

## IV. APPROVAL OF LEAD COUNSEL

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  § 78u–4(a)(3)(B)(v).  "There is a 'strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection.'"  *Sallustro*, 2015 WL 1262253, at *10 (quoting *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008)).

Tyne and Wear has moved for approval of Robbins Geller as lead counsel.  T&W Br. 7.  After reviewing Tyne and Wear's submission detailing Robbins Geller's track record (Doc. 21, Ex. 4), the Court, like many others in this Circuit before it, concludes that Robbins Geller "is experienced in securities class action litigation and qualified to conduct this lawsuit."  *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 135 (S.D.N.Y. 2014); *see also, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 158 (S.D.N.Y. 2012) ("[C]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purposes of litigating class action lawsuits."); *Sgalambo v. McKenzie*, 268 F.R.D. 170, 174 (S.D.N.Y. 2010) (characterizing Robbins Geller as a "highly competent plaintiffs' firm[ ] with substantial securities class action experience").  Once again, no party or movant has objected to the proposed selection.  Accordingly, the Court approves Robbins Geller as lead counsel.

## V. CONCLUSION

For the aforementioned reasons, the motions to consolidate are GRANTED.  All future filings in this case shall be filed in the 15 Civ. 2016 case number and bear the same caption as that case number.  All related actions subsequently filed in, or transferred to, this District shall be

consolidated into the 15 Civ. 2106 case number, absent order of the Court. The Clerk of the Court is respectfully directed to close the 15 Civ. 2884 case and terminate any pending motions in that case.

Additionally, Tyne and Wear's motion for appointment as lead plaintiff and approval of lead counsel (Doc. 18) is GRANTED. All other movants' motions for appointment as lead plaintiff and approval of lead counsel (Docs. 7, 9, 12, 15, 20) are DENIED. The Clerk of the Court is respectfully directed to terminate the following motions in the 15 Civ. 2106 case: Docs. 7, 9, 12, 15, 18, and 20.

It is SO ORDERED.

Dated:   October 14, 2015
         New York, New York

_____
Edgardo Ramos, U.S.D.J.