UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

MEGAN VILLELLA, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

       vs.

CHEMICAL AND MINING COMPANY OF
CHILE INC., et al.,

                     Defendants.

———————————————————— x

:   Civil Action No. 1:15-cv-02106-ER-GWG
:   (Consolidated)
:
:
:   <u>CLASS ACTION</u>
:
:   CONSOLIDATED COMPLAINT FOR
:   VIOLATION OF THE SECURITIES LAWS
:
:
:
:
:
:   <u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND OVERVIEW ................................................................1

II.   JURISDICTION AND VENUE ......................................................................7

III.  PARTIES ...................................................................................7

IV.   BACKGROUND AND FACTUAL ALLEGATIONS ...........................................9

  A.  An Investigation of Penta Leads to the Investigation of SQM ...............9

  B.  The Attorney General Requests Information from SQM and Issues a
      Search Warrant for Documents Related to Tax Avoidance, False Invoices
      and Bribery by SQM ..............................................................11

  C.  SQM's Board of Directors Fires the Company's 25-Year CEO Contesse;
      Three Directors Resign from the Board Due to Their Inability to Ensure
      SQM's Cooperation with the Public Prosecutor's Investigation ...........14

  D.  SII Files First in Extensive Series of Complaints Against SQM Executives
      Citing Evidence that False Invoices Were Submitted to SQM at
      Solicitation of Friend to Ponce Lerou and Pinochet ........................16

  E.  SQM Admits Former CEO Contesse Authorized Payments of $11 Million
      for Unsupportable Invoices Between 2009 and 2014 ........................17

  F.  SQM Board Members Are Charged with Violating Chilean Securities
      Laws for Failing to Provide Material Information to Investors and Board
      Members Are Fined .................................................................19

  G.  Individuals Admit to Submitting False Invoices to SQM at the Solicitation
      of Prominent UDI and RN Party Politicians ..................................20

  H.  Individuals Admit to Submitting False Invoices to Obtain Illicit Payments
      by SQM to Support Candidacy of Chilean President Bachelet ..............21

  I.  SQM Admits Unpaid Taxes, Unsupported Invoices and Material
      Weaknesses in Internal Controls .................................................22

  J.  Individuals Admit to Submitting False Invoices to Facilitate Illicit
      Payments by SQM to Support Senatorial Candidate Zalaquett ..............26

  K.  SQM CFO Ramos Admits 1,000 Unsupported Payments .....................27

  L.  Chilean Newspaper *El Mostrador* Summarizes Primary Recipients of
      Illicit Funding Via SQM's False Invoice Scheme Known to Date............28

**Page**

M. E-mails Between Former CEO Contesse and Chilean Senator Evidence SQM's Illicit Payments to Chile's Socialist Party .................................................30

N. SQM's Former CEO Contesse Is Placed Under House Arrest .............................31

O. SQM CEO Solminihac Admits No One at SQM Was Aware of Any Services Performed for Invoiced Amounts; SQM CFO Ramos States It Is Unlikely Any Services Were Performed ..................................................................31

P. Former Treasurer of Chile's Socialist Party Admits to Submitting False Invoices to Facilitate Illegal Payments by SQM to Support Presidential Candidacy of Marco Enríquez-Ominami .................................................................32

Q. Public Prosecutor Expands Case Against SQM to Include Illicit Payments of False Invoices by SQM to Fund Politicians Associated with Chile's National Renewal Party and Independent Regionalist Party ................................34

R. SQM's Ad-Hoc Committee Finds that from 2009 through 2014 SQM Lacked Sufficient Internal Controls, Made Unsupported Payments and Improperly Accounted for Such Payments ............................................................35

V. SQM'S KNOWINGLY OR RECKLESSLY FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS ............................................................38

 A. False and Misleading Material Statements and Omissions ...................................38

  1. FY09 Annual Report ....................................................................................38

  2. 1Q10 Press Release, Earnings Call, and Financial Statements..................41

  3. 2Q10 Press Release and Financial Statements...........................................43

  4. 3Q10 Press Release and Financial Statements...........................................44

  5. 4Q and FY10 Press Release and FY10 Annual Report .............................46

  6. 1Q11 Press Release and Financial Statements...........................................49

  7. 2Q11 Press Release and Financial Statements...........................................51

  8. 3Q11 Press Release and Financial Statements...........................................52

  9. 4Q and FY11 Press Release and FY11 Annual Report .............................53

**Page**

10.     1Q12 Press Release and Financial Statements...........................................58

11.     2Q12 Press Release and Financial Statements...........................................59

12.     3Q12 Press Release and Financial Statements...........................................61

13.     4Q and FY12 Press Release and FY12 Annual Report ...........................62

14.     1Q13 Press Release, Earnings Call, and Financial Statements.................66

15.     2Q13 Press Release, Earnings Call, and Financial Statements.................68

16.     3Q13 Press Release, Earnings Call, and Financial Statements.................70

17.     4Q and FY13 Press Release, Earnings Call, Annual Report, and Financial Statements ................................................................................72

18.     1Q14 Press Release, Earnings Call, and Financial Statements.................76

19.     2Q14 Press Release, Earnings Call, and Financial Statements.................77

20.     3Q14 Press Release, Earnings Call, and Financial Statements.................79

21.     FY14 Annual Report ................................................................................81

B.     Reasons Why SQM's Material Statements and Omissions from 2010 to 2015 Were Knowingly or Recklessly False and Misleading ...............................82

    1.     SQM's Legal Compliance Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made .................82

    2.     SQM's Internal Controls Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made .................86

    3.     SQM's Code of Conduct Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made .................88

    4.     SQM's Financial Statements Were Knowingly or Recklessly False and Misleading When Made ...................................................................89

    5.     SQM's Accounting Compliance Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made .........90

**Page**

      6.     SQM's Statements Regarding Corfo's Efforts to Terminate the Salar de Atacama Lease Were Knowingly or Recklessly False and Misleading When Made ........................................................................... 91

VI.    THE TRUTH IS REVEALED CAUSING LOSS/ECONOMIC DAMAGES TO INVESTORS .................................................................................................... 91

VII.   THE INAPPLICABILITY OF STATUTORY SAFE HARBOR TO SQM'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 98

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET ....................................................................................................... 100

IX.    CLASS ACTION ALLEGATIONS .......................................................................... 101

FIRST CAUSE OF ACTION ..................................................................................................... 103

PRAYER FOR RELIEF ............................................................................................................. 104

jury demand ................................................................................................................................ 104

By and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), the Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Lead Plaintiff" or the "Fund") alleges the following against Chemical and Mining Company of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM," the "Company," or "defendant"), upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, but was not limited to, the review and analysis of: (a)  SQM's public filings with the Securities and Exchange Commission ("SEC"); (b) SQM's press releases and other publications disseminated by SQM and related non-parties; (c) news articles and securities analyst reports; (d) other publicly available information concerning SQM, including legal documents filed in the ongoing criminal investigation currently underway in Chile against defendant, as described more fully below; and (e) information readily obtainable on the Internet.  Additionally, Lead Plaintiff utilized the services of various professionals with a wide range of expertise.  Many of the facts supporting the allegations contained herein are known only to SQM or are exclusively within its custody and control.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION AND OVERVIEW

1.     This is a federal securities class action brought on behalf of all persons who purchased SQM American Depositary Shares ("ADSs") traded on the New York Stock Exchange ("NYSE") between June 30, 2010 and June 18, 2015, inclusive (the "Class Period").  Lead Plaintiff seeks to recover damages for violation of the federal securities laws and to pursue remedies under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

- 1 -

2.      The fraud at the epicenter of this action involves political corruption, bribery and tax evasion by the world's largest lithium producer and implicates many of Chile's most powerful heads of business and state.  For a period of at least six years, SQM, one of Chile's largest companies, is alleged to have funneled millions of dollars worth of illegal campaign donations by paying hundreds, and likely thousands, of false invoices to politicians, political parties and politically-connected companies, in order to control the government and gain influence across Chile's political spectrum. As reported by *The New York Times* on April 9, 2015, in an article titled "Chile Joins Other Latin American Nations Shaken by Scandal," the corruption by SQM was longstanding and pervasive, reaching the upper echelons of the Chilean government, including members of current Chilean President Michelle Bachelet's ("President Bachelet") coalition:

> Contributing to the spreading ire over corruption here, a giant mining company [SQM] controlled by Ponce Lerou, the former son-in-law of the Chilean dictator Augusto Pinochet, is embroiled in an investigation over questionable payments to an array of political figures, largely on the right but also to governmental figures and legislators in Ms. Bachelet's coalition of centrists and leftists.

> "All of these revelations at once are throwing the system into shock," said Pablo Collada, the director of Intelligent Citizen, an organization promoting transparency in politics.  "It's like we've realized this is a swamp, and everyone has one foot in the mud."

Indeed, as further reported by *The New York Times* on May 11, 2015, "the political upheaval has effectively derailed [President Bachelet's] future" as she herself acknowledged.  She expects her political career will not carry on beyond her current term: "It's obvious that I will never be a candidate to any position of public representation in politics ever again."

3.      The scandal has had significant ramifications for SQM's investors.  Throughout the Class Period, SQM, through its top executives, consistently represented: it was in compliance with all applicable laws, maintained effective internal controls over the reporting of financial and non-

- 2 -

financial information, had in place a code of business ethics ("code of ethics") and promoted accountability for adherence to that code of ethics, and complied with applicable accounting standards.  All the while, SQM's top executives were illegally financing electoral campaigns, including at least three presidential campaigns, and diverting Company funds to Chilean politicians from major political parties across the ideological spectrum.  To date, SQM's top three executives (former Chief Executive Officer ("CEO") Patricio Contesse ("Contesse"), Chief Financial Officer ("CFO") Ricardo Andrés Ramos Rodriguez ("Ramos") and former Chief Operating Officer ("COO") and current CEO Patricio de Solminihac Tampier ("Solminihac")), as well as five current/former Board of Directors (the "Board") members (Julio Ponce Lerou ("Ponce Lerou"), Hernán Büchi Buc ("Büchi"), Juan Antonio Guzmán Molinari ("Guzmán"), Wolf von Appen Behrmann ("von Appen"), and Patricio Contesse Fica ("Fica") (Contesse's son)) have each been named in complaints filed by Chilean governmental authorities.  Former CEO Contesse has been placed under house arrest and powerful politicians across party lines – including President Bachelet, presidential candidate Marco Enríquez Ominami ("ME-O"), former President Eduardo Frei ("Frei") and family of the former Chilean dictator Augusto Pinochet ("Pinochet") – have been implicated as recipients of SQM's illegal contributions.  Chilean newspaper *El Mostrador* has called the SQM scandal a bomb affecting the country's entire political class.

4.      SQM's illegal use of false invoices to fund politicians was discovered as a result of government investigations into Empresas Penta S.A. (a/k/a Grupo Penta) ("Penta"), one of Chile's largest financial firms, for illegally funding the Unión Demócrata Independiente (the Independent Democratic Union) ("UDI"), a right-wing party founded by an associate of Pinochet.  During the Penta investigations, prosecutors uncovered evidence linking SQM to a similar but broader scheme.

- 3 -

Whereas Penta's illicit payments were limited to a single party, SQM's were made to parties across Chile's political spectrum.

5.      Based on the evidence uncovered during the Penta investigation, a special prosecutor was appointed on February 18, 2015 to commence a formal investigation into SQM.  On February 24, 2015, Chile's Attorney General, Sabas Iván Chahuán Serrás ("Chahuán"), head of the Ministerio Público de Chile (a/k/a La Fiscalía de Chile) (similar to the United States Department of Justice) (the "Public Prosecutor"), personally took over the SQM investigation – the first time that the Attorney General has done so since Chile's criminal procedure reforms more than a decade ago.  On March 6, 2015, Chahuán requested SQM voluntarily provide certain accounting documents from the Company, and on March 16, 2015, he issued a formal search and seizure request (the "request") for SQM's accounting books from 2009 to 2014.  The request set forth alleged violations of Chilean laws criminalizing bribery, the use of false invoices and tax fraud.

6.      In response, SQM fired longtime CEO Contesse and appointed COO Solminihac in his place.  On March 18, 2015, three directors resigned from SQM's Board, stating that they were unable to ensure an adequate internal investigation or SQM's cooperation with the Public Prosecutor's investigation.

7.      In the months that followed, the investigations uncovered substantial evidence supporting the allegations of unlawful payments to politicians using false invoices.  The Chilean tax regulatory agency, the Servicio de Impuestos Internos ("SII"), working under the auspices of the Public Prosecutor's investigation, filed a series of complaints and other pleadings alleging that SQM willfully broke tax laws by using false invoices to facilitate payments to politicians.  The SII complaints and pleadings were supported by declarations, testimonies and documentation from recipients of the payments and others involved in the scheme to funnel money illegally from SQM to

- 4 -

politicians and their associates.  A list of false invoices paid by SQM, as documented in the various pleadings filed to date by Chilean authorities, as well as in the declarations and testimonies of recipients of the illicit payments, is attached hereto as Attachment A.

8.  Moreover, the Chilean securities regulatory agency, the Superintendencia de Valores y Seguros ("SVS"), fined SQM's directors for failing to provide investors with information that could be relevant for investment decisions in a timely and reliable manner, namely information about SQM's illegal scheme of using false invoices to facilitate illicit payments.

9.  Tellingly, the Company has not denied that its use of unsupported invoices resulted in its failure to pay millions of dollars' worth of taxes between 2009 and 2014, inclusive.  Indeed, not only have SQM's chief officers **admitted** to the unsupported invoices and that it was unlikely they reflected any services performed for the Company, but an Ad-Hoc Committee[1] tasked with overseeing an internal investigation has **confirmed** that SQM lacked sufficient internal controls, made payments on invoices that were not supported by services rendered and improperly accounted for such payments.  SQM has also offered to amend its financials and has submitted amendments to its tax returns for fiscal years ("FY") 2009 through 2014, thus admitting that its financials were false and its income underreported by at least $13 million.[2]

---

[1]  The Ad-Hoc Committee was comprised of Board members von Appen, an SQM Board member since 2005; Jose María Eyzaguirre ("Eyzaguirre"), who leads the Mergers & Acquisitions practice at the Chilean law firm Claro & Cía and spent 1987 and 1988 with the New York City office of Shearman & Sterling, the law firm that the Ad-Hoc Committee engaged to assist in the investigation; and Guzmán, an SQM Board member since 2013 and, since April 2015, Chairman of SQM's Board.

[2]  SQM's FY is the same as the calendar year.  SQM's fiscal quarters are abbreviated by quarter and year.  For example, 1Q09 represents first quarter of FY 2009.  Amounts herein are in U.S. dollars ("USD" or "$") unless otherwise specified.  Where amounts have been converted from the Chilean peso ("CLP") to USD, the conversion rate of CLP 634.1 per $1, which was the conversion rate as of June 18, 2015 (the end of the Class Period) as identified by Yahoo! Finance's currency converter, has been used.

- 5 -

10.      As a result of the longstanding and widespread illegal use of false invoices to fund politicians across Chile's political spectrum, the Company's representations to investors and the public regarding its legal compliance, internal controls and code of ethics were materially false and misleading throughout the Class Period.  So, too, were the Company's Class Period financial statements, which, contrary to SQM's Class Period representations, were not prepared in accordance with applicable accounting principles.

11.      As the truth about SQM's use of false invoices to funnel money to government officials began to emerge, the price of SQM ADSs dramatically declined.   As the formal investigation of SQM was announced, documents were requested, and CEO Contesse was fired.  On these disclosures, SQM's ADS price dropped from $26.17 per share on February 25, 2015, to $22.10 per share on March 17, 2015 – a decline of more than 15%.  Prices dropped more than 15% further on March 18, 2015, to $18.65 per share, on news that three SQM directors had resigned from the Company's Board due to their inability to ensure an appropriate investigation or to collaborate effectively with the Public Prosecutor's investigation.  Prices dropped still further in response to news that SQM's lease with Chilean government organization Corporación de Fomento de la Producción de Chile (Production Development Corporation of Chile) ("Corfo") to mine the valuable Salar de Atacama region – the source of 40% of the Company's revenue – had been put at risk at least in part due to the Company's inadequate corporate governance, as revealed by the scandal.  On this news, the ADS price declined more than 13%, from $18.89 per share on June 17, 2015, to $16.39 per share on June 18, 2015.

12.      The investigations of the Public Prosecutor, SII, and SVS are ongoing, as is SQM's dispute with Corfo.  Indeed, media reports on January 12, 2016, indicated that the Public Prosecutor was poised to bring additional charges against Contesse.  As such, factual information that provides

- 6 -

further support for the allegations detailed herein may become known only after the filing of this Complaint.

## II.      JURISDICTION AND VENUE

13.      The claims asserted herein arise under §10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

15.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as a significant portion of defendant's actions, and the actions that gave rise to class damages, took place within this District.

16.      In connection with the acts, conduct and other wrongs alleged in this Complaint, SQM, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

17.      Lead Plaintiff, the Council of the Borough of South Tyneside, Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund, is located in South Shields, Tyne and Wear, England.  The Fund has approximately 125,736 members and 223 employers and its investments are valued at approximately £6.4 billion.  Lead Plaintiff purchased SQM ADSs during the Class Period and was damaged thereby.  As set forth in its certification filed on May 18, 2015 with its Motion for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (Dkt. No. 21), it purchased a total of 376,521 SQM ADSs, sold SQM ADSs on the open

market during the Class Period and suffered damages in excess of $4.4 million as a result of the securities law violations alleged herein.

18.     Defendant SQM is an international non-metallic mining company founded in 1968 and based in Chile.  It produces specialty fertilizers and inorganic industrial chemicals and purports to be one of the world's largest producers and distributors of specialty plant nutrients, iodine and derivatives, lithium and derivatives, potassium and industrial chemicals.  The Company operates and maintains offices globally, including within the United States.  SQM Series A and Series B common shares are listed on the Santiago Stock Exchange, while Series B ADSs have been listed on the NYSE since 1993 under the ticker symbol "SQM."

19.     SQM has a global presence in a wide variety of industries and applications through its five business lines: (i) Specialty Plant Nutrients (fertilizer-type products); (ii) Iodine and Derivatives (used in, among other things, x-ray contrast media, biocides, antiseptics and disinfectants, pharmaceuticals, polarizing films for liquid crystal displays and herbicides); (iii) Lithium and Derivatives (used in, among other things, lubricant greases, dyes, batteries, ceramic enamels and glazes, aluminum and air conditioning); (iv) Industrial Chemicals (including potassium nitrates, sodium nitrate, boric acid and thermal solar salts for a variety of products including glass, explosives for mining and metal treatments); and (v) Potassium (used in, among other things, fertilizers, drilling fluids for the oil industry, glass, enamel glazes, fireworks and gun powders).  At its plants in Northern Chile, SQM processes two precious natural resources, caliche ore and salt brines, from which it purports to be the world's largest producer of industrial sodium and potassium nitrate.

20.     SQM is liable for making false statements and failing to disclose adverse facts known to it about its business and operations.  SQM engaged in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of SQM ADSs as it: (i) deceived the investing public

- 8 -

regarding SQM's business and operations; (ii) artificially inflated the price of SQM ADSs; and (iii) caused Lead Plaintiff and all persons who purchased SQM ADSs during the Class Period (the "Class") to purchase SQM ADSs at artificially inflated prices.

## IV.    BACKGROUND AND FACTUAL ALLEGATIONS

### A.    An Investigation of Penta Leads to the Investigation of SQM

21.    SQM's involvement in bribery and tax avoidance was discovered during a public investigation into one of Chile's largest financial firms, Penta.  On October 9, 2014, Chahuán confirmed that the Public Prosecutor had opened an investigation into Penta for tax crimes, misuse of fee receipts and the creation of false invoices.  The initial investigation led to formal charges against high ranking Penta executives and directors, including its founders Carlos Alberto Délano ("Délano") and Carlos Eugenio Lavín ("Lavín"), for funneling illegal payments to political candidates and officials by creating false expense receipts from family members and others close to the politicians involved.  Délano and Lavín, known as "'the godfathers of the Chilean right,'" have long been politically connected and influential in the Chilean government as senior former officials and financiers of the UDI.[3]

22.    The Penta corruption scandal, which became known as "Pentagate," embroiled numerous politicians.  Prosecutor Carlos Gajardo ("Gajardo") described Penta as "'an economic conglomerate with tax evasion as part of its culture . . . . [f]rom the highest executive down to the

---

[3]    *Chile's right cries foul as graft probe charges hit*, BuenosAiresHerald.com (March 6, 2015), http://www.buenosairesherald.com/article/183620/chile's-right-cries-foul-as-graft-probe-charges-hit (last visited Jan. 14, 2016, 6:00 p.m.).  Jonathan Franklin, *Godfathers of Chilean right charged with tax fraud, bribery and money laundering*, The Guardian (Mar. 4, 2015), http://www.theguardian.com/world/2015/mar/04/chile-right-fraud-bribery-money-laundering-pinochet (last visited Jan. 11, 2016, 4:17 p.m.).

last janitor.'"[4]  On March 7, 2015, prosecutors filed formal charges against ten defendants, including Délano and Lavín, two SII officials and two politicians.  Five of the ten, including Délano and Lavín, were jailed, and two others were placed under house arrest.[5]  On November 27, 2015, Jovina Novoa, a former senator of the UDI party, was found guilty of channeling more than $42,000 in campaign funds from Penta to former presidential candidate Pablo Longueira ("Longueira").  This was the first conviction in the Penta case, and the investigation is ongoing.

23.     During the Penta investigation, prosecutors uncovered evidence that SQM was engaged in a similar scheme to use the payment of false invoices to facilitate illegal political donations.[6]  On January 16, 2015, Gajardo, accompanied by the Policía de Investigaciones (Department of Police Investigations) went to SQM to confiscate certain accounting documents for the period 2009 to 2014 in order to investigate the payments of false invoices by SQM.

24.     On February 17, 2015, the investigation was expanded to include a June 2009 payment made by SQM on a false invoice submitted by the former press aide and chief of staff to Chilean Senator Fulvio Fabrizio Rossi Ciocca ("Rossi").  On February 18, 2015, a special

---

[4]     *See* n.4, *supra*.  All citations are omitted and emphasis added, unless otherwise stated.

[5]     Pascale Bonnefoy, *Executives Are Jailed in Chile Financial Scandal*, N.Y. Times (Mar. 8, 2015), http://www.nytimes.com/2015/03/08/world/americas/executives-are-jailed-in-chile-finance-scandal.html (last visited Jan. 11, 2016, 4:36 p.m.).

[6]     Specifically, on January 9, 2015, the SII filed a criminal complaint in the Octavo Juzgado de Garantía (Eighth Court of Guarantee) ("Guarantee Court") against Chile's former Undersecretary of Mining, Pablo Wagner ("Wagner"), who was one of the defendants officially charged in the Penta investigation, and his sister-in-law, María Carolina de la Cerda ("de la Cerda"), for facilitating the submission of false invoices.  The complaint cited evidence that Wagner and de la Cerda also submitted false invoices to SQM, funneling money to former Mayor of Santiago Joaquín Lavín ("J. Lavín").  On January 29, 2015, J. Lavín's personal secretary, Lorena Espinoz, declared before the Public Prosecutor that in August 2009 she accepted a CLP 2.3 million ($3,627) check in her name from SQM on a false invoice.  De la Cerda admitted to the SII that neither she nor Wagner provided any services related to the invoices in question.

- 10 -

prosecutor, Andrés Montes, was officially appointed to investigate SQM as a separate case from Penta, and Chahuán announced that he would personally oversee the investigation.[7]

25.     In a February 26, 2015 press release, SQM issued its first public statement concerning the Public Prosecutor's investigation.  The Company stated that, at the request of its Chairman of the Board, Ponce Lerou, SQM had convened an extraordinary Board meeting "to analyze the matters that have been divulged by the press in recent weeks and are the subject of ongoing public cases."[8] During the meeting, the Board established an Ad-Hoc Committee to conduct an investigation into the subject of the ongoing public cases.

**B.     The Attorney General Requests Information from SQM and Issues a Search Warrant for Documents Related to Tax Avoidance, False Invoices and Bribery by SQM**

26.     On March 6, 2015, Chahuán sent a formal request to SQM for certain information relating to the investigation into the allegations of diversion of funds and tax avoidance through the payment of false invoices.  On March 9, 2015, the Public Prosecutor visited SQM's offices to request additional specific information relating to the Company's accounting between 2009 and 2014.  On March 11, 2015, Contesse appealed Chahuán's request for information to the Guarantee

---

[7]   Chahuán left office on November 30, 2015, and was succeeded on December 1, 2015 by Jorge José Winston Abbott Charme.

[8]   Ponce Lerou was Chairman of SQM's Board from September 1987 through March 2015, when he announced that he would step down.  Through various of his companies, popularly known as the "Cascadas," he remains the majority shareholder of SQM.  Notably, he is also the former son-in-law of Pinochet. In September 2014, the SVS fined Ponce Lerou a record $70 million in connection with illegal securities trading, including in the shares of SQM.  *See* Matt Craze and Javiera Quiroga, *SQM's Ponce Fined $70 Million in Record Chile Sanctions*, Bloomberg Business (Sept. 2, 2014), http://www.bloomberg.com/news/articles/2014-09-02/sqm-s-ponce-fined-70-million-in-record-chile-sanctions (last visited Jan. 11, 2016, 7:40 p.m.).

Court and sought an injunction blocking the seizure of future information from SQM. The court rejected Contesse's request for an injunction the next day.[9]

27.     On March 12, 2015, SQM issued a press release disclosing that while the Board had resolved to cooperate with the investigation, it was still considering whether to provide Chahuán certain information that had been requested. The press release provided, in relevant part, that SQM's Board had resolved "[t]o request an independent report" with respect to Chahuán's request and hold another meeting "in order to analyze the abovementioned report and to make a decision regarding the voluntary delivery of the requested information . . . when appropriate."

28.     However, the March 12, 2015 press release also revealed that two members of SQM's Board, Eyzaguirre and Alejandro Montero ("Montero"), believed that SQM should voluntarily provide Chahuán all of the information requested as soon as possible, rather than requesting an independent report regarding which of the "certain information" should be provided and "when [might be] appropriate." Further, SQM's March 12, 2015 press release announced that, due to his disagreement with the Board's inaction, Eyzaguirre had resigned from the Ad-Hoc Committee established on February 26, 2015.

29.     On March 16, 2015, Chahuán issued a search warrant against SQM for documents relating to the investigation of crimes committed by Company executives for violating:

- Tax code Article 97 No. 4, which provides for fines and imprisonment for maliciously filing incomplete or false statements or fraudulent procedures to conceal or disguise the true amount of transactions or circumvent taxes owed;

- Penal Code Article 248, which provides for fines and imprisonment for any person that bribes public officials;

- Penal Code Article 470 Nos. 1 and 8, which provide for fines and imprisonment for any person who (a) fraudulently obtained or provided money to third parties against

---

[9]     On March 24, 2015, Chile's Constitutional Court upheld the lower court's decision.

the shareholders' knowledge and against their interest or (b) fraudulently obtained improper benefits from government agencies; and

- Penal Code Article 471 No. 2, which provides for fines and imprisonment for any person who issues false invoices.

30.     In support of the warrant, Chahuán detailed numerous false invoices paid by SQM:

- Payments totaling CLP 7.5 million ($11,828) to de la Cerda in July 2009 via checks in the names of individuals who did not provide services to SQM;

- 26 payments between August 2007 and September 2009 and nine payments between March 2012 and November 2012 to Marisol Toro González ("Toro"), who did not provide services to SQM;

- Eight payments between January 2009 and August 2009 to Osvaldo Francisco Opazo Lira ("Opazo"), husband to Toro, who did not provide services to SQM and passed the money on to the senatorial campaign of Pablo Zalaquett ("Zalaquett");[10]

- Five payments totaling CLP 17.5 million ($27,598) between May 2013 and September 2013 to Asesorías Cristina Zúñiga Paredes EIRL ("Asesorías Cristina Zúñiga"), which did not provide services to SQM and passed the money on to the senatorial campaign of Zalaquett; and

- Three payments totaling CLP 7.5 million ($11,828) between May 2013 and July 2013 to Reactor SpA ("Reactor"), which did not provide services to SQM and passed the money on to the senatorial campaign of Zalaquett.

Chahuán also described a May 23, 2013 email in which Zalaquett's campaign manager Carmen "Coca" de Castro ("de Castro") forwarded information she had received from SQM's attorney Enrique Olivares ("Olivares"), which contained the information necessary to create invoices for submission to SQM, to representatives from the companies Reactor, Asesorías Cristina Zúñiga and Kapital Comunicación Estratégica – none of whom provided any services to SQM.

31.     As the Public Prosecutor began to pull the thread, additional complaints and pleadings, declarations from bribe recipients and facilitators, and admissions by SQM revealed millions more in illegal payments to public figures across Chile's political spectrum.

---

[10]   Zalaquett is a former mayor of Santiago, member of the UDI and a 2013 senatorial candidate.

C.     **SQM's Board of Directors Fires the Company's 25-Year CEO Contesse; Three Directors Resign from the Board Due to Their Inability to Ensure SQM's Cooperation with the Public Prosecutor's Investigation**

32.     On March 16, 2015, SQM issued a press release announcing that SQM's Board had voted unanimously to terminate CEO Contesse.  The press release stated:

> Sociedad Química y Minera de Chile S.A. (SQM) informed that the Company's Board of Directors held an Extraordinary Session today, at which they acknowledged the receipt of a letter sent by the CEO of SQM, Patricio Contesse González, in which he put his position at the will of the Board. ***After deliberating at length and considering the best interest of the Company, the Board agreed to terminate Mr. Contesse's employment contract with SQM***. The Board expressed its gratitude to Mr. Contesse for his over 25 years of service and dedication to the Company.

> In addition, the Board voted unanimously to designate Patricio de Solminihac Tampier as the new CEO of SQM, effective immediately.

33.     On March 17, 2015, analysts at HSBC Global Research issued a report titled "SQM replaces CEO."  The report about SQM's March 16, 2015 press release anticipated "continued uncertainty as to the potential impact of the investigations."

34.     On March 18, 2015, SQM issued a press release indicating that three Board members – Eyzaguirre (who had previously resigned from the Ad-Hoc Committee), Vice-Chairman Wayne R. Brownlee ("Brownlee") and Montero – had resigned from the Board.  Each of the three was an executive at the Potash Corporation of Saskatchewan, Inc. ("Potash") and had been placed on SQM's Board by Potash, SQM's largest noncontrolling shareholder.

35.     In response, on March 18, 2015, analysts at Santander Latin America Equity Research issued a report titled "From Bad To Worse" that expressed concern over the resignation of the Potash Board members: "the resignation of all the [SQM] board members elected by the largest noncontrolling shareholder [Potash], without having official information on the reasons for that measure, [was] a major concern for us in the context of the ongoing investigations."

- 14 -

36.     Later on March 18, 2015, Potash issued a press release explaining that the three Potash executives had resigned from SQM's Board because they could not ensure an adequate investigation of SQM and that their "emphatic requests that SQM fully and voluntarily cooperate with competent authorities" had been "rejected by a majority of the [SQM] board":

> Wayne Brownlee, Alejandro Montero and Jose Maria Eyzaguirre, the three directors who PotashCorp nominated to the SQM board, have resigned.  The Chilean Public Prosecutor has made serious allegations of wrongdoing by SQM and its management. ***PotashCorp and its SQM board representatives have demanded an exhaustive, transparent and independent investigation by the company.  SQM's board has not authorized a review which meets the standards we expect despite consistent efforts by our board representatives. Likewise our board representatives' emphatic requests that SQM fully and voluntarily cooperate with competent authorities, particularly in the case of the request by the Office of the Public Prosecutor for a voluntary delivery of information, have been rejected by a majority of the board***.
>
> ***It has become clear that given our minority and dissident position on the board, we are unable to ensure either that an appropriate investigation is conducted or that SQM collaborate effectively with the Public Prosecutor.  Accordingly, Wayne Brownlee, Alejandro Montero and Jose Maria Eyzaguirre have resigned from the SQM board effective immediately***.

37.     In a March 20, 2015 SEC Form 6-K Report of Foreign Issuer ("Form 6-K"), SQM provided the following information in response to a request by the SVS regarding the steps SQM was taking to investigate allegations of wrongdoing at the Company:

> SQM's Board of Directors constituted an Ad-Hoc Committee in order to immediately investigate and gather all the facts related to what the media has called the "SQM Case."  After concluding the investigation, the Committee will inform SQM's Board of Directors about its conclusions.  The Board of Directors stipulated that the Committee has the resources and budget necessary to perform its work.
>
> The Committee is currently analyzing the information gathered and will issue a Report as soon as possible.
>
> The Committee has requested independent professional consulting services from legal experts, in Chile and the United States of America, and from tax experts in Chile.

- 15 -

The Committee expects to be able to issue the report prior to the realization of the Company's next Ordinary Annual General Shareholders Meeting that should take place in the month of April this year.

The Committee is currently made up by Hernán Büchi B., Juan Antonio Guzmán M., and Wolf von Appen B. – The Committee shall continue performing its functions until issuing the Report.

Although the March 20, 2015 press release represented that SQM expected the Ad-Hoc Committee to issue its report in April 2015, the report, as described more fully below, was not issued until December 15, 2015.

38.     In a March 23, 2015 analyst report titled "The Saga Continues," analysts at Itaú BBA summarized the dispute that resulted in the Potash directors' resignations, calling into question the Company's corporate governance:

It seems that the board was divided on the voluntary disclosure of information to the Chilean Internal Revenue Service (Servicio de Impuestos Internos) requested by the Public Prosecutor, Attorney General Sabas Chahuán. Potash Corp's representatives were in favor of the voluntary disclosure of the requested information, and a conflict ensued following the board's decision against the voluntary disclosure. SQM finally decided to deliver its accounting records for 2009-14 to the Chilean Tax Authority, which officially charged the company with tax offenses.

SQM will probably have to reimburse the government for the invoices in question, but the key issue at this point seems to be the market's perception of the company's corporate governance.

**D.     SII Files First in Extensive Series of Complaints Against SQM Executives Citing Evidence that False Invoices Were Submitted to SQM at Solicitation of Friend to Ponce Lerou and Pinochet**

39.     On March 23, 2015, the SII filed a criminal complaint against Contesse, Solminihac and Ramos, as the legal representatives of SQM, and Roberto Gustavo Guzmán Lyon ("Guzmán Lyon"), Opazo, Toro, Marcello Abraham Rozas López, Michelle Reymond Larraín, Daniel Rozas Reymond, Carlos Gustavo Sepúlveda, Monica Beatriz Gajardo Córdova and José Tomás Hormazabal Caleres.  The complaint alleged violations of Tax code Article 97 No. 4 and Penal Code Article 15 No. 1, which criminalizes participation in tax fraud.

- 16 -

40.     The SII procured declarations from Opazo and Toro, who described being solicited by Guzmán Lyon to submit invoices to SQM despite not having performed any services for the Company.  Opazo further stated that he did not receive payment on any of the false invoices but rather that Guzmán Lyon collected payment on the invoices.  Guzmán Lyon is a close friend and adviser to Ponce Lerou and served as general manager of several of the Cascadas companies through which Ponce Lerou built and maintains his majority stake in SQM.  Guzmán Lyon was also close to Pinochet and advised his family after Pinochet's arrest for human rights violations in London in 1998.  In total, SII revealed details about 64 false invoices paid by SQM, the first dated April 1, 2009 and continuing through April 11, 2014.

**E.     SQM Admits Former CEO Contesse Authorized Payments of $11 Million for Unsupportable Invoices Between 2009 and 2014**

41.     On March 25, 2015, the Public Prosecutor's office conducted a raid on SQM's offices in order to seize computers suspected to contain data about, among other things, the Company's general ledger, journal entries and accounting for the FYs 2009 through 2014.  The search warrant for the raid was authorized and expanded by the Guarantee Court for the investigation of crimes including misappropriation, granting of simulated contracts, bribery, fraud, and the payment of false invoices.

42.     On the same day as the March 25, 2015 raid, SQM filed a Form 6-K with the SEC in which SQM admitted it had identified $11 million in payments made between 2009 and 2014 that may not meet the requirements to be qualified as tax expenses under the Chilean tax code.  Specifically, the Company stated:

> On March 20, 2015, *we identified to the SII approximately US$11 million in payments that originated from the office of our former CEO during the six year period from 2009-2014 that may not meet the requirements to be qualified as tax expenses under the Chilean tax code because of insufficient supporting documentation*.  We have been providing the invoices relating to these payments to

- 17 -

the SII, and have submitted draft amendments to our tax returns. As far as this procedure is concerned, going forward we could be subject to 35% taxes on payments that did not qualify as tax expenses, as well as interest and penalties from the SII.

43.    On March 27, 2015, SQM announced in a Form 6-K filed with the SEC that it had sent a letter to the SVS in response to its request for information regarding SQM's identification of the $11 million in payments lacking sufficient documentation from FYs 2009 through 2014. SQM's response again admitted that former CEO Contesse had not been able to justify the payments and disclosed that his failure to provide an adequate explanation for the payments led to his firing. SQM also revealed that when asked to provide a justification for the payments, Contesse had asserted his right to remain silent in order to avoid self-incrimination. SQM further stated that it had amended its tax returns for 2009 through 2014:

1.    The Company has identified invoices that were issued by third parties and paid by SQM during fiscal years 2009 through 2014, the payment of which could be questioned by the Chilean Internal Revenue Service (Servicio de Impuestos Internos or "SII") for not having sufficient supporting documentation in order to qualify as necessary to generate revenue. The total amount of all of such invoices for this six-year period is approximately US$11 million. As a result, ***SQM has voluntarily approached the SII in order to amend the annual tax returns corresponding to those years***. The SII is currently evaluating such amendments.

2.    ***Mr. Patricio Contesse G.'s failure to provide an explanation to justify such services and payments and the lack of the respective supporting documentation influenced the termination of the employment contract between Mr. Contesse and the Company. As justification for the aforementioned failure to provide an explanation, Mr. Contesse cited his right to remain silent in order to not incriminate himself***.

3.    The identification of invoices mentioned in point 1 above was informed to the Board of Directors of SQM at its meeting held on March 19 of this year, and as a result, the Board instructed the Company to present the aforementioned tax return amendments, which SQM filed with the SII on March 20, 2015.

44.    On March 31, 2015, SQM filed a Form 6-K with the SEC containing further details about the payments at issue that it made from 2009 to 2014, stating that such payments "may not

- 18 -

meet the requirement of being necessary to generate revenue," and thus may have violated the Chilean tax code and subjected SQM to regulatory penalties.  SQM also announced that it was in the process of amending its financial statements from the years 2009 through 2014 and cautioned that the SII's review of the Company was ongoing and may "lead to the identification of further situations that could result in further tax implications."

### F.   SQM Board Members Are Charged with Violating Chilean Securities Laws for Failing to Provide Material Information to Investors and Board Members Are Fined

45.   On April 1, 2015, SQM disclosed that the SVS had filed allegations against the remaining five members of SQM's Board – Ponce Lerou,[11] Büchi, Guzmán, von Appen and Fica – "*for allegedly failing to provide the market with information that could be relevant for investment decisions in a timely and reliable manner*" in violation of Articles 42 and 46 of the Ley de Sociedades Anónimas ("corporations code") for concealing or omitting material information to shareholders, as well as the failure to provide the market with timely, accurate and reliable reporting information deemed important for investment decisions in violation of NCG No. 30 and Articles 9 and 10 of Law 18.045.  The undisclosed information at issue concerned SQM's payments of false invoices for services not rendered from 2009 through 2014 which the SVS stated was essential to the

---

[11]   As noted by a highly regarded Professor of Investigative Journalism at the Universidad Católica de Chile (the Catholic University of Chile) and Director of the Institute of Communication and Image at the Universidad de Chile (University of Chile), María Olivia Mönckeberg, in her recent book, *La Máquina Para Defraudar* ("The Machine to Defraud"), it was not as unexpected that Ponce Lerou, principal owner of SQM, would give money to the UDI for its campaigns. The point of great anger is that he also financed those dealing with Concertación de Partidos por la Democracia (Coalition of Parties for Democracy) ("Concertación") and Nueva Mayoria (New Majority).  The deep rooting in diverse campaigns and politics demonstrates that his "investment" has been part of his overall business strategy.  The book goes on to state that Ponce Lerou and his collaborators used an invoice scheme which constituted a crime of fraud.  María Olivia Mönckeberg, *La Máquina Para Defrauda* loc. 2850 (Oct. 2015) (ebook).

- 19 -

market.  On September 30, 2015, the SVS fined each of the defendants UF 1,000 ($39,368) for the violations alleged.[12]

### G.    Individuals Admit to Submitting False Invoices to SQM at the Solicitation of Prominent UDI and RN Party Politicians

46.    On April 2, 2015, the SII filed a criminal complaint against Contesse, Solminihac and Ramos, as legal representatives of SQM, for the authorization of crimes in violation of Chilean tax code Article 97 No. 4.  The allegations in the complaint were based on information provided by SQM to the SII on March 20, 2015 via amended tax returns, which revealed that SQM paid over 800 false invoices for fictitious services between 2009 and 2014.

47.    The SII obtained declarations from numerous recipients of payments from SQM who declared that they submitted invoices at the request of, among others, UDI politician Cristián Leay Morán; Renovación Nacional (National Renewal Party) ("RN") politician and lawyer Nicholas Monckeberg; Carmen Luz Valdivieso, the longtime adviser to former head of the UDI party, Longueira; and former Chilean Ambassador to Argentina and President of the Chilean Senate Adolfo Zaldívar ("Zaldívar").  The declarants stated repeatedly that they had not provided any services to SQM and had not had any contact with SQM, but instead were solicited to submit false invoices to SQM by the above-named politicians or others and, when SQM paid the invoices, all or most of the money was transferred to those politicians.[13]

48.    During a hearing on April 30, 2015, prosecutors Carmen Gloria Segura, Gajardo and Pablo Norabuena sought to formalize charges against Contesse and several other defendants who had

---

[12]   UF, which stands for Unidad de Fomento, is a Chilean currency unit pegged to the CLP.  According to the Superintendencia de Bancos e Instituciones Financieras Chile, on June 18, 2015, UF 1 was equal to CLP 24,963.

[13]   Chile's Ambassador to Paraguay Alexander Bahamondes resigned on August 9, 2015 as a result of allegations contained in the April 2, 2015 SII complaint.

facilitated or received payments from SQM.  Regarding the magnitude of SQM's scheme, Prosecutor Gajardo stated that *Contesse's activity has generated an institutional crisis in Chile, where his (Gajardo's) vote is not worth as much as Contesse's*.

###### H.   Individuals Admit to Submitting False Invoices to Obtain Illicit Payments by SQM to Support Candidacy of Chilean President Bachelet

49.     On May 11, 2015, the SII filed a criminal complaint against Contesse, Solminihac and Ramos, as legal representatives of SQM for the payment of false invoices, and against Clara de las Mercedes Bensan Jofre ("Bensan") (legal accountant for former President Frei), as the legal representative of Asesores en Gestión Integral Limitada ("Gestión Integral"), and Giorgio Martelli Robba ("Martelli") (former campaign fundraiser for President Bachelet) for maliciously acting in concert to facilitate false invoices.  According to the May 11 complaint, SQM made at least 35 payments to Martelli, totaling at least CLP 430 million ($628,000) between January 11, 2012 and October 8, 2013, in violation of Chilean tax code Article 97 No. 4.

50.     The SII obtained a declaration from Bensan, referenced in the May 11 complaint, which stated that she submitted two false invoices, on October 8, 2009 and February 9, 2010, to SQM for a total of CLP 92.75 million ($146,270).  She declared that she provided this money to Martelli, whom she described as the financial right-hand man of the Concertación.[14]  According to Bensan, Martelli had requested that she submit the false invoices to SQM in order to help finance the 2009 presidential campaign of former President Frei and the 2013 presidential campaign of President Bachelet.[15]

---

[14]   The Concertación is a coalition of center-left political parties whose candidates have won all but one of Chile's presidential elections since the end of Pinochet's dictatorship in 1990.

[15]   On May 6, 2015, President Bachelet announced a change in her cabinet members in response to allegations levied against individuals who submitted false invoices and accepted payment thereon,

51.     While the SII noted in the May 11 complaint that Martelli initially refused to provide testimony in order to avoid self-incrimination, on June 18, 2015, media sources reported that Martelli had subsequently provided testimony in the SQM case.  According to Martelli's testimony, which was given for 30 hours over a period of four days beginning May 27, 2015 and ending June 4, 2015, he obtained funds for President Bachelet's campaign from SQM's wholly-owned subsidiary, SQM Salar S.A.[16]  An article published on January 14, 2016 revealed that Martelli also declared that Jorge Rosenblut, a former appointee in former President Frei's government and fundraiser for President Bachelet, organized meetings with executives and high-ranking members of numerous companies to arrange for an agreed amount each company would contribute to political campaigns. According to the article, Martelli declared that Contesse attended such meetings.

**I.      SQM Admits Unpaid Taxes, Unsupported Invoices and Material Weaknesses in Internal Controls**

52.     On May 18, 2015, SQM filed a Form 20-F Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 ("Form 20-F") for the FY ended December 31, 2014

---

including Minister of the Interior Rodrigo Peñailillo ("Peñailillo"), who submitted invoices to Martelli and received payments from SQM and its subsidiary SQM Salar S.A.  *See* Professor María Olivia Mönckeberg, *La Máquina Para Defraudar* loc. 519 (2015) (ebook).

[16]  On December 27, 2015, Chilean newspaper *La Tercera* published an article identifying individuals with connections to President Bachelet who had received nearly CLP 300 million ($473,111) in payments through Martelli's company, Asesórias y Negocios SpA ("AyN").  The article describes how these individuals, who held various political and governmental positions, ultimately abandoned their important positions once their names became associated with having received these payments.  The article traces the CLP 300 million paid by AyN to the amount of money it received from SQM for purportedly providing advice.  Among the individuals identified as having diverted funds are: Alberto Arenas, former Secretary of the Treasury, and Peñailillo, former Secretary of the Interior.  Notably, Peñailillo declared before Chahuán that he had submitted four invoices to AyN for a total of CLP 16 million ($25,233).  Estela Ortiz, one of President Bachelet's best friends, is reported in the article as having submitted 20 invoices to AyN totaling CLP 32 million ($50,465).  Michell Jorrat, the ex-director of the SII, is reported as having submitted 14 invoices to AyN totaling CLP 15 million ($23,656).

("2014 Annual Report").  In the 2014 Annual Report, SQM acknowledged that it faced numerous

risks as a result of the aforementioned ongoing investigations into the alleged misconduct, admitted

that it paid at least $13 million in unsupported invoices and explained that its former CEO Contesse

had been terminated and three Board members had resigned as a result:

> *"We could be subject to numerous risks as a result of ongoing investigations by the Chilean Internal Revenue Service and the Chilean Public Prosecutor in relation to certain payments made by SQM between the tax years 2009 and 2014*."

<p style="text-align:center">*       *       *</p>

The SII has been conducting tax investigations related to the payment of invoices by companies, including SQM, for services that may not have been properly supported.  The Chilean Public Prosecutor [*Ministerio Público*] has been conducting related inquiries to determine whether such payments may be linked with alleged violations of political contribution laws involving a variety of Chilean companies, including SQM, and government officials.

On February 26, 2015, SQM's Board of Directors resolved to establish an ad-hoc Committee to conduct an internal investigation relating to the issues referred to in the above paragraph and to retain such independent external advice as it deemed appropriate.  The original members of the ad-hoc Committee were José María Eyzaguirre B., Juan Antonio Guzmán M. and Wolf von Appen B.

The ad-hoc Committee has engaged its own lawyers from Chile and the United States and forensic accountants from the United States to assist as it proceeds with its internal review.

On March 12, 2015, José María Eyzaguirre B. resigned from the ad-hoc Committee and his position was subsequently filled by Hernán Büchi B.

**On March 16, 2015, the Board of Directors decided to terminate the employment contract of the Company's former CEO, Patricio Contesse G.  This followed his failure to cooperate with the ad-hoc Committee's investigation**.

**On March 17, 2015, three members of the Board of Directors resigned**, all of whom had been nominated by Potash Corp., one of SQM's two principal shareholder groups.  Potash Corp. issued a press release stating that the directors resigned **because of their concern that they could not ensure that the Company was conducting an appropriate investigation and collaborating effectively with the Public Prosecutor**.

**On March 20, 2015, the Company identified to the SII approximately US$11 million in payments of invoices that may not have been properly supported**

<p style="text-align:center">- 23 -</p>

*by services rendered and therefore may not qualify as tax expenses under the Chilean tax code.  These payments originated from the office of the former CEO during the six-year tax period from 2009 to 2014.*  The statute of limitations under Chilean law for tax claims is up to six years, during which period the former CEO had an annual discretionary budget covering the Company and its subsidiaries of approximately US$6 million.

*On March 23, 2015, the SII*, based on the Income Tax Law (Ley de Impuesto a La Renta), *filed a criminal claim against the Company's former CEO and current CEO and CFO in their capacities as the Company's tax representatives relating to the US$11 million in payments referred to above.*  This and subsequent related claims filed by the SII are subject to review by the Public Prosecutor in order to determine whether to pursue charges against any of the parties in their personal capacities.

*On March 30, 2015, the Company submitted amendments to its tax returns for the 2009 to 2014 tax years and has paid taxes and interest relating to such amended returns totaling approximately US$7 million*.  The aggregate amount was approximately evenly distributed over the six-year period, but as the amounts were inconsequential in each individual year, the Company recorded a provision for the aggregate amount in the "other expenses" line-item of the income statement for the year ended December 31, 2014.

*On March 31, 2015, the SVS filed an administrative claim against five current or former members of the Board of Directors, alleging that they did not release information in a timely manner relating to the payments that are subject to the tax claim referred to above.*

*On April 24, 2015, the Company announced that it had identified up to an additional US$2 million in payments by its subsidiaries during the same six-year tax period that were authorized by the former CEO and that also may have been insufficiently supported*.  On the same date, new members were elected to the Board of Directors at the Annual General Shareholders' Meeting, including three new members that were nominated by Potash Corp., and the ad-hoc Committee was subsequently reconstituted by Board of Directors members Robert A. Kirkpatrick, Wolf von Appen B. and Edward J. Waitzer.

*On April 30, 2015, the Public Prosecutor, after reviewing the claims filed by the SII, informed the Company's former CEO that it was formally investigating allegations that he approved the payment of the invoices that were not properly supported by services rendered and in connection therewith made intentionally false or incomplete declarations or used fraudulent procedures designed to conceal or disguise the true amount of transactions or to circumvent taxes.  If, as a result of the formal investigation, the former CEO is charged and finally adjudicated responsible, the Company may also be subject to the payment of a fine by the Chilean Criminal Court (Octavo Tribunal de Juicio Oral en lo Penal de Santiago)*

- 24 -

***totaling 50% to 300% of the tax paid***. The Company estimates that no provision is needed at this stage. . . .

***On May 11, 2015, the SII filed an additional criminal claim against the former CEO and the current CEO and CFO in their capacities as the Company's tax representatives alleging violations of the Chilean Inheritance and Donations Law*** (Ley sobre Impuesto a Las Herencias, Asignaciones y Donaciones). The claim states that the Company paid two invoices in 2009 and 2010 totaling approximately US$175,000 that are alleged to have been improperly supported. The claim states that these payments should have been classified as donations, and appropriate taxes should have been paid. These payments were accounted for in the amended tax returns filed with the SII on March 30, 2015. This claim is subject to review by the Public Prosecutor in order to determine whether to pursue charges against any of the parties in their personal capacities.

<div align="center">

\*        \*        \*

</div>

The investigation and the inquiries by the Chilean regulatory authorities have not been completed. We cannot predict the outcome or the duration of these investigations. We could be subject to civil, criminal or regulatory proceedings in Chile and we could be subject to civil, criminal or regulatory proceedings outside of Chile, including for violation of U.S. securities or anti-corruption laws. We have been in communications with our regulators in Chile and the United States.

Responding to our regulator's inquiries and any future civil, criminal or regulatory inquiries or proceedings could divert our management's attention from day-to-day operations. Additionally, expenses that may arise from responding to such inquiries or proceedings, our review of responsive materials, any related litigation or other associated activities may be significant. Current and former employees, officers and directors may seek indemnification, advancement or reimbursement of expenses from us, including attorneys' fees, with respect to the current inquiry or future proceedings related to this matter. We may be required to pay material damages or penalties or have other remedies imposed upon us. If, as a result of further investigations, it is determined that our financial statements were materially incorrect, we could be required to restate financial information for prior reporting periods. ***The occurrence of any of the foregoing could materially and adversely affect our business, financial condition, cash flows, results of operations and the prices of our securities.*** However, the Company's management, based on its understanding of the investigation to date, does not believe there will be any additional material impact to the Company's business, financial condition, cash flows or results of operations.

53.     In the 2014 Annual Report, SQM also admitted there was a material weakness in its

internal controls over payments directed by the office of former CEO Contesse:

<div align="center">

- 25 -

</div>

*We recently identified a material weakness in our internal controls over payments directed by the office of the former Chief Executive Officer*.

Our management assessed the effectiveness of its internal control over financial reporting as of December 31, 2014.  The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  *The Company's management has determined that the Company did not maintain effective control over payments directed by the office of the former CEO. Based on the assessment, our management has concluded that as of December 31, 2014, the Company's internal control over financial reporting was not effective. See "Item 15. Controls and Procedures – Disclosure Control and Procedures."*

Although we have initiated steps to remediate the identified material weakness and enhance our internal controls, any failure to implement and maintain such measures or difficulties encountered in their implementation could (i) result in a material misstatement in our financial reporting or financial statements that would not be prevented or detected, (ii) cause us to fail to meet our reporting obligations under applicable securities laws or (iii) cause investors to lose confidence in our financial reporting or financial statements, the occurrence of any of which could materially and adversely affect our business, financial condition, cash flows, results of operations and the prices of our securities.

**J.      Individuals Admit to Submitting False Invoices to Facilitate Illicit Payments by SQM to Support Senatorial Candidate Zalaquett**

54.     On June 19, 2015, the SII amended the April 2, 2015 complaint against Solminihac, Contesse and Ramos, as legal representatives of SQM, to name Zalaquett as a defendant.  The SII stated that its investigations had uncovered that false invoices referenced in the previously filed March 23, 2015 complaint against Solminihac, Contesse and Ramos, as representatives of SQM, were used to pay Zalaquett's outstanding loans incurred during his failed 2013 senatorial campaign in violation of tax code Article 97 No. 4.  As revealed by the SII's investigations, SQM made payments on false contracts with Reactor and Asesorías Cristina Zúñiga in order to eliminate debts owed by Zalaquett to those two companies and increase his net worth.

55.     The SII obtained declarations of the legal representatives of Reactor, Iván Sebastián Correa Hasbún ("Correa"), and Asesorías Cristina Zúñiga, Cristina Zúñiga Paredes ("Zúñiga"), that detailed the illicit scheme.  According to Correa, Reactor invoiced SQM for services not provided in

- 26 -

order to pay off money owed by Zalaquett for digital campaign services to his senatorial campaign starting in or around February 2013. Correa declared that he was contacted by Zalaquett's campaign manager, de Castro, and told to submit invoices to SQM for money Zalaquett owed Reactor. Correa declared that Reactor submitted three invoices to SQM for CLP 2.5 million ($3,943), which represented amounts owed by Zalaquett. Correa submitted the invoices to de Castro and received payment on them from SQM. According to Correa, Reactor did not provide any services to SQM.

56.     Zúñiga, the legal representative of Asesorías Cristina Zúñiga, declared that she, too, submitted invoices to and received payment from SQM for services provided to Zalaquett's senatorial campaign. According to Zúñiga, she received an e-mail on May 23, 2013 from Zalaquett's campaign manager, de Castro, requesting that Zúñiga complete a contract for marketing consultation and communications for Zalaquett's campaign. The contract established that Asesorías Cristina Zúñiga would receive five monthly payments of CLP 3.5 million ($5,520) each starting in May 2013. Zúñiga declared that the electronic file name of the contract was "SQM Contract" and, via e-mail, she was instructed to send the invoices to SQM, although the only contact was with de Castro. Like Correa, Zúñiga stated that she did not provide any services to SQM.

## K.     SQM CFO Ramos Admits 1,000 Unsupported Payments

57.     Also in the June 19, 2015 complaint, the SII noted it had obtained a declaration from SQM CFO Ramos in which he admitted that SQM made 1,000 payments to Reactor and Asesorías Cristina Zúñiga without any consideration of whether they were based on any services rendered. According to Ramos, there was no review or audit of the payments and it was not the responsibility of the person signing off to ensure that the invoices reflected services performed.

L.      **Chilean Newspaper *El Mostrador* Summarizes Primary Recipients of Illicit Funding Via SQM's False Invoice Scheme Known to Date**

58.     On September 2, 2015, Chilean newspaper *El Mostrador* published an article ("*El Mostrador* article") identifying the top recipients of political funding from SQM's illegal scheme of paying false invoices in order to gain influence throughout the entirety of Chile's political system. The article is based on information provided by SQM in the amended tax returns it submitted to the SII – *i.e.*, payments for which SQM admitted there were no reasonable basis for.

(a)     The *El Mostrador* article details approximately CLP 1.3 billion (more than $2 million) in illegal payments to 71 individuals and companies associated with the UDI.  Among the UDI-linked recipients of unsubstantiated payments from SQM were UDI historical secretary Marisol Cavieres, her husband and her children; UDI politician Carlos Sepúlveda Espinoza and his partner Constanza Farías Prieto; the wife of UDI deputy secretary general Javier Macaya; Maximiliano Gutierréz Bellolio, cousin to UDI deputy prime minister Jaime Bellolio; former UDI deputy and current member of the directory for La Fundación Chile Justo (the Just Chile Foundation) Gustavo Alessandri Balmaceda; the children of retired army colonel Mauricio Palacios; and Asesorías IMBC Limitada, owned by Jorge Bussenius, election campaign manager for UDI Senator Ena Von Baer.

(b)     The *El Mostrador* article also details approximately CLP 979 million (more than $1.5 million) in illegal payments to individuals and companies associated with the Partido Demócrata Cristiano (Christian Democratic Party) ("DC").  Among the DC-linked recipients of unsubstantiated payments from SQM were Ventus Consulting, the company owned by the children of DC Senator and party chairman Jorge Pizarro; Gestión Integral, owned by DC accountant Bensan; Rentas Inversiones Servicios y Asesorías Ltda., a company owned by Yaconi Pedro, a close associate of former President Frei; Roberto León Araya, son of a DC deputy member by the same

- 28 -

name; Sonia Elizabeth Jaramillo Villar, who worked in DC administrations in the municipality of Maipú; and Carlos Tudela García, the son of a DC parliamentary adviser.

(c)     The *El Mostrador* article further details approximately CLP 779 million (more than $1.2 million) in illegal payments to individuals and companies associated with the RN.  Among the RN-linked recipients of unsubstantiated payments from SQM were Inversiones Invercob Ltda., a company associated with RN senator Andres Allamand (who has been mentioned as a likely presidential candidate); RN adviser Karole Aliaga Rodríguez; Interior Ministry Official René Ludwig Hormazábal; Carlos Eugenio Castro Castro, former adviser to the RN's former mayor in Santiago; and RN congressional candidate Cristóbal Urruticoechea Rios.

(d)     Moreover, the *El Mostrador* article traces false payments to affiliates of former Chilean President Sebastian Piñera and current President Bachelet, as well as politicians associated with the Partido Por la Democracia (Party for Democracy) ("PPD"), Partido Socialista de Chile (Socialist Party) ("PSC"), the Partido Progresista (Progressive Party) ("PRO"), Partido Regionalista Independiente (Independent Regionalist Party) ("PRI"), and the Partido Radical Socialdemócrata (Social Democrat Radical Party) ("PRSD"), as well as students associated with political campaigns at Pontificia Universidad Católica de Chile in Santiago.

(e)     The chart below depicts some of the information revealed in the September 2, 2015 *El Mostrador* article.  The chart is limited to information that was available to the newspaper as of that date, and does not include false invoices paid by SQM to influence politicians and political parties identified since then.



M.    **E-mails Between Former CEO Contesse and Chilean Senator
Evidence SQM's Illicit Payments to Chile's Socialist Party**

59.     On September 6, 2015, Chilean news outlets reported that Chahuán had uncovered an

August 15, 2012 e-mail from Rossi, in which Rossi thanked Contesse in advance for giving money

to a number of political candidates.  The e-mail, addressed to Contesse, provided him with a list of

candidates that Rossi said reflected their agreement.  The e-mail then listed the names of 32 political

candidates, four of which were elected in October 2012, and corresponding amounts of money

totaling CLP 20 million ($31,541).

60.     On August 23, 2012, SQM attorney Olivares responded to Rossi's e-mail, stating that

Olivares wanted to discuss the list of political candidates on behalf of Contesse.  Rossi e-mailed back

on August 24, 2012, reducing the number of candidates from 32 to 19 and asked about submitting invoices to SQM.  According to the Chilean media articles, ***SQM attorney Olivares admitted to the prosecution that he then made contributions to the political candidates at Contesse's direction***.

### N.    SQM's Former CEO Contesse Is Placed Under House Arrest

61.    On September 14, 2015, the Guarantee Court held a hearing on the Public Prosecutor's August 19, 2015 request to formalize charges against individuals in the SQM case. Chahuán himself presented the Public Prosecutor's argument.  The judge ordered that Contesse and Martelli be placed under total house arrest.   Charges were also formalized against Bensan.

62.    The formalized charges against Contesse concerned the use of false invoices, simulated contracts and the misappropriation of donations.  The formalized charges against Martelli included submitting false invoices to SQM, violating the laws on political donations, simulating contracts and misappropriation between 2009 and 2013.  The formalized charges against Bensan included violations of the laws on political donations and the use of false invoices submitted to SQM between 2009 and 2011, inclusive.

### O.    SQM CEO Solminihac Admits No One at SQM Was Aware of Any Services Performed for Invoiced Amounts; SQM CFO Ramos States It Is Unlikely Any Services Were Performed

63.    On September 22, 2015, the SII filed additional information in support of its previously filed complaints against Contesse, in his capacity as legal representative of SQM Salar S.A., and others for the malicious and fraudulent authorization of various tax crimes.  The SII investigation revealed that from 2012 through 2014, Contesse, in his capacity as a legal representative of SQM  Salar S.A., authorized the submission of 91 additional false invoices for expenses totaling more than CLP 309 million ($488,151) that resulted in SQM intentionally and

unlawfully lowering its income and thus underpaying its taxes in violation of tax code Article 97 No. 4.

64.     Both Solminihac and Ramos provided to SII sworn statements supporting the allegations that numerous invoices issued by SQM were fraudulent.  Solminihac attested that he was unable to confirm whether the payments were for services rendered because they were ordered and approved by Contesse, but that no one Solminihac spoke to was aware of any services performed for these payments.  Ramos declared that it was unlikely that the recipients of SQM's payments had provided any services to the Company.

**P.     Former Treasurer of Chile's Socialist Party Admits to Submitting False Invoices to Facilitate Illegal Payments by SQM to Support Presidential Candidacy of Marco Enríquez-Ominami**

65.     On October 30, 2015, the SII filed another criminal complaint against Contesse, Solminihac and Ramos, as representatives of SQM, alleging that, from June 2009 through February 2010, SQM paid eight false invoices submitted by Alerce Talleres Gráficos S.A. ("Alerce") for a total of CLP 178.5 million ($281,501) in violation of tax code Article 97 No. 4.

66.     In the October 30 complaint, the SII alleged that the SQM payments were used by Alerce to provide services to former Senator and Minister of State Carlos Octavio Ominami Pascual ("Carlos Ominami"), a member of the PSC, and Milton Williams Lee Guerrero ("Lee Guerrero"), the former PSC treasurer and campaign manager for Carlos Ominami.  The payments were used to support the presidential campaign of Carlos Ominami's son and head of the PRO, ME-O.  Lee Guerrero and Carlos Ominami provided declarations before the Public Ministry and the SII, respectively.

67.     In his declaration, Lee Guerrero not only stated that SQM was the source of the money for ME-O's presidential campaign, but also described the secretive manner by which SQM

- 32 -

made the payments.  According to Lee Guerrero, sometime on or before May 2009, Carlos Ominami decided that he would help ME-O's campaign.  Lee Guerrero said that he told Carlos Ominami that ME-O would require approximately CLP 200 million ($315,408) in order for ME-O's campaign to be competitive.  At the end of May 2009, according to Lee Guerrero, Carlos Ominami told him that SQM would pay ME-O's printing expenses and that Lee Guerrero should expect a call from SQM. Lee Guerrero declared that someone from SQM, whose name he did not recall, contacted him and said he would pay Lee Guerrero CLP 160 million ($252,326) in eight monthly payments of CLP 20 million ($31,541) and told Lee Guerrero to make out the invoice to SQM.  Lee Guerrero provided the SII the eight invoices he sent to SQM as well as the invoices for items he purchased from third parties with the money provided by SQM, which included campaign materials for Carlos Ominami, ME-O, members of ME-O's family and other candidates.  Lee Guerrero declared that he knew the acceptance of payments for SQM to pay for a political campaign was improper.

68.    In his declaration, Carlos Ominami stated that Contesse himself agreed to fund ME-O's 2009 senatorial campaign after ME-O visited SQM to meet personally with Contesse.[17]

69.    As of the date of this Complaint, ME-O is being investigated for his participation as an alleged facilitator of false invoices.  Based on testimony provided by ME-O's former advisor Cristián Warner on June 10, 2015, Chilean media outlets reported that ME-O not only met with Contesse at the SQM offices, confirmed by a review of Contesse's meeting book, but also in Brazil on December 3, 2012 and at ME-O's home on July 7, 2014.

---

[17]   On January 13, 2015, Chilean media reported that the SII was seeking to bring charges against Carlos Ominami related to information in the October 30, 2015 complaint for colluding with SQM to help it avoid paying CLP 75 million in taxes.  If found guilty, he could serve between three and ten years in prison.

**Q.     Public Prosecutor Expands Case Against SQM to Include Illicit Payments of False Invoices by SQM to Fund Politicians Associated with Chile's National Renewal Party and Independent Regionalist Party**

70.     At a November 25, 2015 hearing, Chahuán expanded the Public Prosecutor's case by adding six new individual defendants associated with the RN party who received illegal campaign donations from SQM by way of false invoices.[18] During the hearing, Chahuán explained the mechanism by which SQM illicitly channeled approximately CLP 340 million ($536,193) to electoral campaigns by using former RN VP Claudio Eguiluz ("Eguiluz") as a facilitator in 2012 and 2013.

71.     According to the Public Prosecutor, Eguiluz (who, himself received CLP 120 million ($189,245) from SQM for services not rendered) requested that the six newly-named defendants issue 17 phony invoices to SQM.  The Public Prosecutor further stated that Contesse then incorporated the phony invoices as expenses in SQM's fiscal statements of 2013 and 2014, thus lowering the taxable base of the company in violation of tax code Article 97 No .4.

72.     During the November 25 hearing, the court granted the Public Prosecutor's request for three additional months to investigate SQM.

73.     On December 2, 2015, the Public Prosecutor announced the formal investigation of six additional individuals with ties to the centrist political party PRI for violations of tax code Article 97 No. 4. The newly named individuals were Humberto Osvaldo de la Maza Maillet ("Maza Maillet"), former president of the PRI from 2013 to 2015; his nieces María Fernanda Correa Lasa and Carola Monica Correa Lasa; the National Director of the PRI Marcelo Antonio Peñaloza

---

[18]   RN defendants named for the first time during the November 25, 2015 hearing are Alejandra Ibarra Rebollendo, Miguel de Ángeles Sanhueza Herrera, Christian Fuentes Castillo, Alex Cañete Valenzuela, Jorge Daza Aránguiz and Daniel Gutiérrez Fariña.  They are accused of issuing false invoices to SQM between 2012 and 2013.

- 34 -

Villalobos (who was also Maza Maillet's son-in-law) and his sister Marcia Elena Peñaloza Villalobos; and the former governor of Atacama, Julieta Florentian Cruz Figueroa.  The Public Prosecutor identified 25 false invoices paid by SQM between 2010 and 2013 to these PRI-associated defendants.  The false invoices were incorporated as expenses into SQM's financial statements for 2011-2014.

74.     According to the Public Prosecutor, former PRI Senator Zaldívar facilitated the use of phony invoices to drive payments to PRI-connected individuals.  Zaldívar's secretary and the treasurer of the PRI at the time, Gilda Schiaffino ("Schiaffino"), described the process by which Zaldívar allegedly used false invoices to finance the PRI.[19]  According to Schiaffino, Zaldívar contacted SQM directly to seek money.  Then Zaldívar instructed the PRI-associated defendants to prepare false invoices to SQM and send them to Schiaffino via e-mail.  Schiaffino stated that she took the invoices to SQM.  She further declared that, on several occasions, she would accompany these individuals to the bank to verify that the money was being deposited into Zaldívar's account. The Public Prosecutor also referenced having evidence of additional false invoices for persons not yet identified.

### R.   SQM's Ad-Hoc Committee Finds that from 2009 through 2014 SQM Lacked Sufficient Internal Controls, Made Unsupported Payments and Improperly Accounted for Such Payments

75.     On December 15, 2015, SQM filed a Form 6-K with the SEC announcing that it had received the long-awaited report from the Ad-Hoc Committee established on February 26, 2015. Although SQM had represented the Ad-Hoc Committee was established to "immediately investigate and gather all the facts related to what the media has called the 'SQM Case,'" the report addressed only SQM's possible liability in the U.S. under the Foreign Corrupt Practices Act of 1977 ("FCPA").

---

[19]   The Public Prosecutor could not procure testimony from Zaldívar directly; he died in 2013.

Based on the Ad-Hoc Committee's investigation, the report concluded that payments were made on invoices that lacked supporting documentation, that SQM's books did not accurately reflect questioned transactions and that SQM lacked sufficient internal controls over expenses managed by Contesse:

> [F]or FCPA purposes:
>
> (a) ***payments were identified that had been authorized by SQM's former CEO, Mr. Patricio Contesse G., for which the Company did not find sufficient supporting documentation***; (b) no evidence was identified that demonstrates that payments were made in order to induce a public official to act or refrain from acting in order to assist SQM obtain economic benefits; (c) regarding the cost center managed by SQM's former CEO, Mr. Patricio Contesse G., ***it was concluded that the Company's books did not accurately reflect transactions that have been questioned***, notwithstanding the fact that, based on the amounts involved, these transactions were below the materiality threshold defined by the Company's external auditors determined in comparison to SQM's equity, revenues, expenses or earnings within the reported period; and (d) ***SQM's internal controls were not sufficient to supervise the expenses made by the cost center managed by SQM's former CEO*** and that the Company trusted Mr. P. Contesse G. to make a proper use of resources.

76.     While the Ad-Hoc Committee purportedly failed to find evidence demonstrating that the payments were made in order to induce a public official to act or refrain from acting (elements necessary to establish an FCPA violation), it reached that conclusion ***without*** talking to Contesse and without referencing or otherwise addressing ***any*** of the specific allegations lodged by the Public Prosecutor, the SII or the SVS in Chilean courts.

77.     The press immediately noted the absurdity of the Ad-Hoc Committee's conclusion that SQM did not seek to benefit financially from improper payments.  For example, Chilean investigative journalists published an article highlighting the Ad-Hoc Committee's failure to interview Contesse.

- 36 -

78.     The illegal acts perpetrated by SQM's top executives acting on the Company's behalf extended its sphere of influence throughout Chile's political system.  The chart below depicts the reach of SQM's illegal payments, as pled herein.[20]



79.     As the truth began to be revealed, the Company suffered a precipitous decline in the market value of its ADSs.  Lead Plaintiff and other Class members have suffered significant losses

---

[20]   The chart depicts some, but not all, of the allegations pled in §IV.

and damages as SQM's ADSs fell from a Class Period high of $66.60 per share to $16.39 per share by the end of the Class Period.

## V.   SQM'S KNOWINGLY OR RECKLESSLY FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS

80.     Between at least June 30, 2010 and January 20, 2015, SQM knowingly or recklessly made a series of false and misleading statements and omissions, primarily in the Company's SEC filings and press releases.   Among other things, the Company knowingly or recklessly misrepresented: (i) its compliance with the laws and regulations governing its operations; (ii) the sufficiency of its internal controls; (iii) its compliance with a code of ethics consistent with the requirements set out by the SEC; (iv) its revenues and taxes owed; and (v) the compliance of its financial statements with applicable accounting standards.

### A.     False and Misleading Material Statements and Omissions

#### 1.     FY09 Annual Report

81.     On June 30, 2010, SQM filed with the SEC a Form 20-F Annual Report for the FY ended December 31, 2009 ("FY09 Annual Report").  The FY09 Annual Report was issued by SQM, authorized or approved by SQM and executed on SQM's behalf by Contesse and Ramos pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").  The FY09 Annual Report contained materially false and misleading statements and omitted to state facts necessary to make the statements therein not false and misleading.

82.     <u>Legal Compliance Misrepresentations and Omissions</u>: The FY09 Annual Report falsely represented that SQM was in compliance with all applicable laws:

> There are currently no material legal or administrative proceedings pending against the Company with respect to any regulatory matter, except as discussed under

- 38 -

"Safety, Health and Environmental Regulations" below,[21] and we believe that **we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business**.

83.    Internal Controls Misrepresentations and Omissions: The FY09 Annual Report falsely represented that SQM maintained effective internal controls over financial and non-financial reporting:

## ITEM 15. CONTROLS AND PROCEDURES

### *(a)    Disclosure Control and Procedures*

Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report.  Based upon that evaluation, **the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported**.

**The procedures associated to our internal controls are designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported**. . . .

There were no significant changes in our internal controls over financial reporting that occurred during the period covered by this Annual Report that have materially affected, or are likely to materially affect our internal control over financial reporting.

### *(b)    Management's Annual Report on Internal Control Over Financial Reporting*

SQM Management is responsible for establishing and maintaining adequate internal control over financial reporting.  The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the

---

[21]    None of the material legal or administrative proceedings discussed in the "Safety, Health and Environmental Regulations" referenced concerns the use of corporate money to bribe elected officials, the making of payments that were not properly supported by services rendered, or the other allegations that give rise to this action.

- 39 -

reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles.

<p style="text-align:center">*　　　*　　　*</p>

Management assessed the effectiveness of its internal control over financial reporting for the year ended December 31, 2009. The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the assessment, ***SQM management has concluded that as of December 31, 2009, the Company's internal control over financial reporting was effective***.

84.     <u>Code of Conduct Misrepresentations and Omissions</u>: The FY09 Annual Report falsely represented that SQM had adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F:

### ITEM 16B. CODE OF ETHICS

***We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees. Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act***.

No waivers have been granted therefrom to the officers mentioned above.

85.     Item 16B of Form 20-F, incorporated by reference into SQM's code of ethics representation, requires, in relevant part:

(b)     For purposes of this Item 16B, the term "code of ethics" means written standards that are reasonably designed to deter wrongdoing and to promote:

(1)     Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2)     Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

(3)     Compliance with applicable governmental laws, rules and regulations;

(4)     The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and

<p style="text-align:center">- 40 -</p>

(5)     Accountability for adherence to the code.

86.     Financial Misrepresentations and Omissions: The FY09 Annual Report falsely reported **net income of $327.1 million (or $349.4 million under US Generally Accepted Accounting Principles ("GAAP") and paid income tax of $76.5 million (or $75 million under US GAAP)**.

87.     GAAP Compliance Misrepresentations and Omissions: The FY09 Annual Report falsely represented that "**[o]ur Consolidated Financial Statements are prepared in accordance with Chilean GAAP**."

**2.     1Q10 Press Release, Earnings Call, and Financial Statements**

88.     On May 25, 2010, SQM issued a press release titled "SQM Reports Earnings For The First Quarter of 2010." On May 26, 2010, SQM filed with the SEC a Form 6-K Report attaching the press release. The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities. The press release quoted Contesse and was issued and authorized or approved by SQM.

89.     On May 27, 2010, SQM hosted a conference call to discuss the Company's 1Q10 financial results with investors and analysts. Contesse and Patricio Vargas, SQM's VP of Finance and Investor Relations, participated in the call. Analysts representing eight major brokerage houses also participated in and asked questions during the conference call. Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.

As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

90.     On July 21, 2010, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of March 31, 2010 ("1Q10 Financial Statements").  The 1Q10 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

91.     <u>Financial Misrepresentations and Omissions</u>: The May 25, 2010 press release and 1Q10 Financial Statements each falsely reported ***1Q10 earnings of $76.5 million and income tax of $20.7 million***.

92.     <u>IFRS Compliance Misrepresentations and Omissions</u>: The May 25, 2010 press release, May 27, 2010 earnings call, and 1Q10 Financial Statements falsely reported that the 1Q10 Financial Statements were prepared in accordance with International Financial Reporting Standards ("IFRS"):

**2.2     Basis of preparation of interim consolidated financial statements**

Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been ***prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and requirements of the Superintendence of Securities and Insurance***.

***These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized income and expenses and cash flows, which have occurred during the periods then ended***.

*         *         *

***The accounting policies used in the preparation of these consolidated interim and annual accounts comply with each IFRS in force at their date of presentation***.

*         *         *

- 42 -

**2.6     Responsibility for the information and estimates made**

*The information contained in these interim consolidated financial statements is the responsibility of the Company's management who expressly indicate that it has applied all the principles and criteria included in IFRS issued by the International Accounting Standard Board (IASB.).*

### 3.     2Q10 Press Release and Financial Statements

93.     On August 31, 2010, SQM issued a press release titled "SQM Reports Earnings For The First Half Of 2010."  On September 1, 2010, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

94.     On October 26, 2010, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of June 30, 2010 ("2Q10 Financial Statements").  The 2Q10 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

95.     <u>Financial Misrepresentations and Omissions</u>: The August 31, 2010 press release and 2Q10 Financial Statements each falsely reported ***2Q10 net income of $105 million and 1H10 net income of $182.0 million, and 2Q10 income tax of $35.2 million and 1H10 income tax of $56 million***.

96.     <u>IFRS Compliance Misrepresentations and Omissions</u>: The August 31, 2010 press release and 2Q10 Financial Statements falsely reported that the 2Q10 Financial Statements were prepared in accordance with IFRS:

- 43 -

**2.2     Basis of preparation of interim consolidated financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and requirements of the Superintendence of Securities and Insurance.*

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*     \*     \*

*The accounting policies used in the preparation of these consolidated interim and annual accounts comply with each IFRS in force at their date of presentation.*

\*     \*     \*

**2.6     Responsibility for the information and estimates made**

*The information contained in these interim consolidated financial statements is the responsibility of the Company's management who expressly indicate that it has applied all the principles and criteria included in IFRS issued by the International Accounting Standard Board (IASB.).*

### 4.     3Q10 Press Release and Financial Statements

97.     On November 23, 2010, SQM issued a press release titled "SQM Reports Earnings For The First Nine Months Of 2010."  On November 24, 2010, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

98.     On January 10, 2011, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of

- 44 -

September 30, 2010 ("3Q10 Financial Statements").  The 3Q10 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

99.    <u>Financial Misrepresentations and Omissions</u>: The November 23, 2010 press release and 3Q10 Financial Statements each falsely reported ***3Q10 net income of $94.8 million and net income for the first nine months of 2010 of $276.3 million, and 3Q10 income tax of $28.3 million and income tax for the first nine months of 2010 of $84.4 million***.

100.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The November 23, 2010 press release and 3Q10 Financial Statements falsely reported that the 3Q10 Financial Statements were prepared in accordance with IFRS.  The press release reported that SQM "***has adopted International Financial Reporting Standards as the basis for its accounting principles" effective January 1, 2010.***  The consolidated 3Q10 Financial Statements reported that:

**2.2    Basis of preparation of interim consolidated financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and requirements of the Superintendence of Securities and Insurance*.

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended*.

\*        \*        \*

*The accounting policies used in the preparation of these consolidated interim and annual accounts comply with each IFRS in force at their date of presentation*.

\*        \*        \*

- 45 -

**2.6     Responsibility for the information and estimates made**

*The information contained in these interim consolidated financial statements is the responsibility of the Company's management who expressly indicate that it has applied all the principles and criteria included in IFRS issued by the International Accounting Standard Board (IASB.).*

### 5.     4Q and FY10 Press Release and FY10 Annual Report

101.     On March 1, 2011, SQM issued a press release titled "SQM Reports Earnings For 2010."  On March 2, 2011, SQM filed with the SEC a Form 6-K Report attaching the press release. The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

102.     On June 30, 2011, SQM filed with the SEC a Form 20-F Annual Report for the FY ended December 31, 2010 ("FY10 Annual Report").  The FY10 Annual Report was issued and authorized or approved by SQM, and executed on SQM's behalf by Contesse and Ramos pursuant to §§302 and 906 of SOX.

103.     <u>Legal Compliance Misrepresentations and Omissions</u>: The FY10 Annual Report falsely represented that SQM was in compliance with all applicable laws:

> There are currently no material legal or administrative proceedings pending against the Company except as discussed in Item 8.A.7 "Legal Proceedings", in Note 20 of the Consolidated Financial Statements and under "Safety, Health and Environmental Regulations" below,[22] and we believe that ***we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business***.

---

[22]    None of the material legal or administrative proceedings discussed in these sections concerns the illegal use of false invoices to funnel money to politicians, or the other allegations that give rise to this action.

104.   <u>Internal Controls Misrepresentations and Omissions</u>: The FY10 Annual Report falsely represented that SQM maintained effective internal controls over financial and non-financial reporting:

**ITEM 15. CONTROLS AND PROCEDURES**

*(a)      Disclosure Control and Procedures*

Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report.  Based upon that evaluation*, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported*.

*The procedures associated to our internal controls are designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported*. . . .

There were no significant changes in our internal controls over financial reporting that occurred during the period covered by this Annual Report that have materially affected, or are likely to materially affect our internal control over financial reporting.

*(b)      Management's Annual Report on Internal Control Over Financial Reporting*

*SQM Management is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles*.

\*      \*      \*

Management assessed the effectiveness of its internal control over financial reporting for the year ended December 31, 2010.  The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on the assessment, *SQM management has concluded that as of*

- 47 -

*December 31, 2010, the Company's internal control over financial reporting was effective*.

105. <u>Code of Conduct Misrepresentations and Omissions</u>: The FY10 Annual Report falsely represented that SQM had adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F:

### ITEM 16B. CODE OF ETHICS

*We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees. Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act*.

No waivers have been granted therefrom to the officers mentioned above.

106. Item 16B of Form 20-F, incorporated by reference into SQM's code of ethics representation, requires, in relevant part:

(b) For purposes of this Item 16B, the term "code of ethics" means written standards that are reasonably designed to deter wrongdoing and to promote:

(1) Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2) Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

(3) Compliance with applicable governmental laws, rules and regulations;

(4) The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and

(5) Accountability for adherence to the code.

107. <u>Financial Misrepresentations and Omissions</u>: The March 1, 2011 press release and FY10 Annual Report falsely reported that *the Company had 4Q10 net income of $105.8 million and 4Q10 income tax of $21.7 million, and FY10 net income of $382.1 million and FY10 income tax of $106 million*.

- 48 -

108.   <u>IFRS Compliance Misrepresentations and Omissions</u>: The March 1, 2010 press release and FY10 Annual Report falsely reported that the 4Q10 and FY10 Annual Report were prepared in accordance with IFRS.  The press release reported that SQM "***has adopted International Financial Reporting Standards as the basis for its accounting principles" effective January 1, 2010.***  The FY10 Annual Report stated:

### 2.2   Basis of preparation

The ***Company's annual consolidated financial statements have been prepared in accordance with International Financial Reporting Standards*** (hereinafter "IFRS") and represent the integral adoption, explicit, and without reserves of the IFRS as issued by the International Accounting Standards Board (IASB).

***These annual consolidated financial statements reflect fairly the Company's, financial position, results of its operations, comprehensive income, changes in equity and cash flows for the years ended December 31, 2010 and 2009***.

\*        \*        \*

***The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their presentation date***.

\*        \*        \*

### 2.5   Significant accounting judgments, estimates and assumptions

***The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB***.

### 6.   1Q11 Press Release and Financial Statements

109.   On May 24, 2011, SQM issued a press release titled "SQM Reports Earnings For The First Quarter Of 2011."  On May 25, 2011, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the

- 49 -

market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

110.    On July 28, 2011, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of March 31, 2011 ("1Q11 Financial Statements").  The 1Q11 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

111.    <u>Financial Misrepresentations and Omissions</u>: The May 24, 2011 press release and 1Q11 Financial Statements each falsely reported ***1Q11 net income of $111.4 million and income tax of $39 million***.

112.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The 1Q11 Financial Statements falsely reported that they were prepared in accordance with IFRS:

**2.2    Basis of preparation of interim consolidated financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the comprehensive, explicit and unqualified adoption of these international standards as issued by the International Accounting Standards Board (IASB).*

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*        \*        \*

*The accounting policies used in the preparation of these consolidated interim and annual accounts comply with each IFRS in force at their date of presentation*.

\*        \*        \*

- 50 -

### 2.5   Responsibility for the information and estimates made

*The information contained in these interim consolidated financial statements is the responsibility of the Company's management who expressly indicate that it has applied all the principles and criteria included in IFRS issued by the International Accounting Standard Board (IASB.).*

### 7.   2Q11 Press Release and Financial Statements

113.   On August 30, 2011, SQM issued a press release titled "SQM Reports Earnings For The First Half Of 2011."  On August 31, 2011, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

114.   On September 22, 2011, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of June 30, 2011 ("2Q11 Financial Statements").  The 2Q11 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

115.   <u>Financial Misrepresentations and Omissions</u>: The August 30, 2011 press release and 2Q11 Financial Statements each falsely reported *2Q11 net income of $132.2 million and 1H11 net income of $243.6 million, and 2Q11 income tax of $44.4 million and 1H11 income tax of $83.4 million*.

116.   <u>IFRS Compliance Misrepresentations and Omissions</u>: The 2Q11 Financial Statements falsely reported that they were prepared in accordance with IFRS:

- 51 -

2.2     **Basis of preparation**

*The Company's annual consolidated financial statements have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the integral adoption, explicit, and without reserves of the IFRS as issued by the International Accounting Standards Board (IASB).*

*These interim consolidated financial statements reflect fairly the Company's, financial position, results of its operations, comprehensive income, changes in equity and cash flows for the periods ended June 30, 2011 and 2010.*

\*        \*        \*

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their presentation date.*

\*        \*        \*

2.5     **Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

### 8.     3Q11 Press Release and Financial Statements

117.     On November 22, 2011, SQM issued a press release titled "SQM Reports Earnings For The Third Quarter Of 2011."  On November 23, 2011, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

118.     On December 22, 2011, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of September 30, 2011 ("3Q11 Financial Statements").  The 3Q11 Financial Statements were issued

- 52 -

and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

119.   <u>Financial Misrepresentations and Omissions</u>: The November 22, 2011 press release and 3Q11 Financial Statements each falsely reported ***3Q11 net income of $143.2 million and net income for the first nine months of 2011 of $386.9 million, and 3Q11 income tax of $49.3 million and income tax for the first nine months of 2011 of $132.7 million.***

120.   <u>IFRS Compliance Misrepresentations and Omissions</u>:   The 3Q11 Financial Statements falsely reported that they were prepared in accordance with IFRS:

**2.2   Basis of preparation**

*The Company's annual consolidated financial statements have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the integral adoption, explicit, and without reserves of the IFRS as issued by the International Accounting Standards Board (IASB).*

*These interim consolidated financial statements reflect fairly the Company's, financial position, results of its operations, comprehensive income, changes in equity and cash flows for the periods ended September 30, 2011 and 2010.*

\*      \*      \*

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their presentation date.*

\*      \*      \*

**2.5   Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

**9.    4Q and FY11 Press Release and FY11 Annual Report**

121.   On March 6, 2012, SQM issued a press release titled "SQM Reports Earnings For 2011." On March 7, 2012, SQM filed with the SEC a Form 6-K Report attaching the press release.

- 53 -

The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and approved or authorized by SQM.

122.     On March 8, 2012, SQM hosted a conference call to discuss the Company's 4Q11 financial results with investors and analysts.  Contesse, along with Mark Fones, SQM's VP of Finance and Investor Relations, participated in the call.  Analysts representing five major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

123.     On March 20, 2012, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended as of December 31, 2011 ("FY11 Financial Statements").  The FY11 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

124.     On April 27, 2012, SQM filed with the SEC a Form 20-F Annual Report for the FY ended December 31, 2011 ("FY11 Annual Report").  The FY11 Annual Report was issued and authorized or approved by SQM and executed on its behalf by Contesse and Ramos pursuant to §§302 and 906 of SOX.

125.     Legal Compliance Misrepresentations and Omissions: The FY11 Annual Report falsely stated that SQM was in compliance with all applicable laws:

- 54 -

There are currently no material legal or administrative proceedings pending against the Company except as discussed in Note 19 "Lawsuits and other relevant events", of the Consolidated Financial Statements and under "Safety, Health and Environmental Regulations" below,[23] and we believe that *we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business*.

126.   <u>Internal Controls Misrepresentations and Omissions</u>: The FY11 Annual Report falsely represented that SQM maintained effective internal controls over financial and non-financial reporting:

### ITEM 15. CONTROLS AND PROCEDURES

*(a)      Disclosure Control and Procedures*

Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report.  Based upon that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported*.

*The procedures associated to our internal controls are designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported*. . . .

There were no significant changes in our internal controls over financial reporting that occurred during the period covered by this Annual Report that have materially affected, or are likely to materially affect our internal control over financial reporting.

---

[23]   None of the material legal or administrative proceedings discussed in these sections concerns the illegal use of false invoices to funnel money to politicians, or the other allegations that give rise to this action.

- 55 -

*(b)   Management's Annual Report on Internal Control Over Financial Reporting*

*SQM Management is responsible for establishing and maintaining adequate internal control over financial reporting.  The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles.*

\*        \*        \*

Management assessed the effectiveness of its internal control over financial reporting for the year ended December 31, 2011.  The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on the assessment, *SQM management has concluded that as of December 31, 2011, the Company's internal control over financial reporting was effective.*

127.   <u>Code of Conduct Misrepresentations and Omissions</u>: The FY11 Annual Report stated that SQM had adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F:

**ITEM 16B. CODE OF ETHICS**

*We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees.  Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act.*

No waivers have been granted therefrom to the officers mentioned above.

128.   Item 16B of Form 20-F, incorporated by reference into SQM's code of ethics representation, requires, in relevant part:

(b)   For purposes of this Item 16B, the term "code of ethics" means written standards that are reasonably designed to deter wrongdoing and to promote:

(1)   Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2)   Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

- 56 -

(3)      Compliance with applicable governmental laws, rules and regulations;

(4)      The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and

(5)      Accountability for adherence to the code.

129.    <u>Financial Misrepresentations and Omissions</u>: The March 6, 2012 press release, March 8, 2012 conference call, FY11 Financial Statements, and FY11 Annual Report each falsely represented that ***the Company had FY11 net income of $545.8 million***.[24]  The March 6, 2012 press release, March 20, 2012 FY11 Financial Statements, and FY11 Annual Report each falsely represented that ***the Company had FY11 income tax of $179.7 million***.  The March 6, 2012 press release falsely represented that ***the Company had 4Q11 net income of $158.9 million and 4Q11 income tax of $47 million***.

130.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The FY11 Financial Statements and FY11 Annual Report falsely reported that the 4Q11 and FY11 Financial Statements were prepared in accordance with IFRS:

### 2.2      Basis of preparation

The ***Company's annual consolidated financial statements have been prepared in accordance with International Financial Reporting Standards*** (hereinafter "IFRS") and represent the integral adoption, explicit, and without reserves of the IFRS as issued by the International Accounting Standards Board (IASB).

***These annual consolidated financial statements reflect fairly the Company's, financial position, results of its operations, comprehensive income, changes in equity and cash flows for the twelve months ended December 31, 2011 and 2010***.[25]

---

[24]    On the March 8, 2012 conference call, Contesse rounded the represented FY11 net income to $546 million.

[25]    The FY11 Financial Statements represents that the financial statements reflect fairly the "changes in equity and cash flows for the ***nine*** months ended December 31, 2011 and 2010."  The passages are otherwise identical.

*       *       *

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their presentation date*.

*       *       *

**2.5     Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB*.

### 10.     1Q12 Press Release and Financial Statements

131.     On May 29, 2012, SQM issued a press release titled "SQM reports earnings for the first quarter of 2012." On May 30, 2012, SQM filed with the SEC a Form 6-K Report attaching the press release. The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities. The press release quoted Contesse and was issued and authorized or approved by SQM.

132.     On August 22, 2012, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended as of March 31, 2012 ("1Q12 Financial Statements"). The 1Q12 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

133.     <u>Financial Misrepresentations and Omissions</u>: The May 29, 2012 press release and 1Q12 Financial Statements each falsely reported ***1Q12 net income of $150 million and 1Q12 income tax of $52.8 million***.

- 58 -

134.   <u>IFRS Misrepresentations Statements and Omissions</u>:  The 1Q12 Financial Statements falsely reported that they were prepared in accordance with IFRS:

**2.2      Financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)*.

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended*.

\*      \*      \*

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their date of presentation*.

\*      \*      \*

**2.7      Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB*.

**11.      2Q12 Press Release and Financial Statements**

135.   On August 29, 2012, SQM filed with the SEC a Form 6-K Report attaching an August 28, 2012 press release titled "SQM Reports Earnings For The First Half Of 2012."  On September 28, 2012, SQM issued the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

- 59 -

136.    On December 7, 2012, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended June 30, 2012 ("2Q12 Financial Statements").  The 2Q12 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

137.    <u>Financial Misrepresentations and Omissions</u>: The August 28, 2012 press release and 2Q12 Financial Statements each falsely reported ***net income of $192.2 million for 2Q12 and $342.2 million for 1H12, and income tax of $63.5 million for 2Q12 and $116.3 million for 1H12***.

138.    <u>IFRS Misrepresentations Statements and Omissions</u>:  The 2Q12 Financial Statements falsely reported that they were prepared in accordance with IFRS:

**2.2    Financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB).*

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*      \*      \*

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their date of presentation.*

\*      \*      \*

**2.7    Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

- 60 -

12.     **3Q12 Press Release and Financial Statements**

139.    On November 20, 2012, SQM issued a press release titled "SQM Reports Earnings For The Third Quarter Of 2012."  On November 21, 2012, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

140.    On December 7, 2012, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended September 30, 2012 ("3Q12 Financial Statements").  The 3Q12 Financial Statements were issued and authorized or approved by SQM.

141.    <u>Financial Misrepresentations and Omissions</u>: The November 20, 2012 press release and 3Q12 Financial Statements each falsely reported ***net income of $165.2 million for 3Q12 and $507.4 million for the 1H12, and income tax of $57.6 million for 3Q12 and $173.9 million for 1H12***.

142.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The 3Q12 Financial Statements falsely reported that they were prepared in accordance with IFRS:

**2.2     Financial statements**

*Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB).*

*These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations,*

- 61 -

*changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended*.

\*       \*       \*

*The accounting policies used in the preparation of these consolidated financial statements comply with each IFRS in force at their date of presentation*.

\*       \*       \*

**2.7     Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB*.

**13.     4Q and FY12 Press Release and FY12 Annual Report**

143.     On March 5, 2013, SQM issued a press release titled "SQM Reports Earnings for 2012."  On March 5, 2013, SQM filed with the SEC a Form 6-K Report attaching the press release. The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

144.     On March 18, 2013, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements as of December 31, 2012, 2011, and 2010, together with management's discussion and analysis of financial condition and results of operations and a discussion of its business ("FY10-12 Financial Statements").  The FY10-12 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

145.     On April 11, 2013, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the year ended December 31, 2012 ("FY12

- 62 -

Financial Statements").  The FY12 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

146.    On April 22, 2013, SQM filed with the SEC a Form 20-F Annual Report for the FY ended December 31, 2012 ("FY12 Annual Report").  The FY12 Annual Report was issued and authorized or approved by SQM, and executed on SQM's behalf by Contesse and Ramos pursuant to §§302 and 906 of SOX.

147.    <u>Legal Compliance Misrepresentations and Omissions</u>: The FY12 Annual Report falsely stated that SQM was in compliance with all applicable laws:

> There are currently no material legal or administrative proceedings pending against us except as discussed in Note 16.1 to our Consolidated Financial Statements and below under "–Safety, health and environmental regulations in Chile,"[26] and we believe that **we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business**.

148.    <u>Internal Controls Misrepresentations and Omissions</u>: The FY12 Annual Report falsely represented that SQM maintained effective internal controls over financial and non-financial reporting:

**ITEM 15. CONTROLS AND PROCEDURES**

*(a)     Disclosure Control and Procedures*

> SQM management, with the participation of the Company's Executive management, including the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report.  Based upon that evaluation, **management with the participation of the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported**.

---

[26]   None of the material legal or administrative proceedings discussed in these sections concerns the illegal use of false invoices to funnel money to politicians, or the other allegations that give rise to this action.

- 63 -

*The procedures associated with our internal controls are designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported*. . . .

There were no significant changes in our internal controls over financial reporting that occurred during the period covered by this Annual Report that have materially affected, or are likely to materially affect our internal control over financial reporting.

*(b)     Management's Annual Report on Internal Control Over Financial Reporting*

*SQM Management is responsible for establishing and maintaining adequate internal control over financial reporting.  The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles.*

\*         \*         \*

Management assessed the effectiveness of its internal control over financial reporting for the year ended December 31, 2012.  The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on the assessment, *SQM management has concluded that as of December 31, 2012, the Company's internal control over financial reporting was effective*.

149.    <u>Code of Conduct Misrepresentations and Omissions</u>: The FY12 Annual Report stated that SQM had adopted and its employees were adhering to a code of ethics adhering to the definition set forth in Item 16B of Form 20-F:

**ITEM 16B. CODE OF ETHICS**

*We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees.  Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act*.

No waivers have been granted therefrom to the officers mentioned above.

150.     Item 16B of Form 20-F, incorporated by reference into its code of ethics representation, requires, in relevant part:

(b)     For purposes of this Item 16B, the term "code of ethics" means written standards that are reasonably designed to deter wrongdoing and to promote:

(1)     Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2)     Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

(3)     Compliance with applicable governmental laws, rules and regulations;

(4)     The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and

(5)     Accountability for adherence to the code.

151.     <u>Financial Misrepresentations and Omissions</u>: The March 5, 2013 press release, FY10-12 Financial Statements, FY12 Financial Statements, and FY12 Annual Report presented false and misleading consolidated financial information for SQM.  The FY10-12 Financial Statements, FY12 Financial Statements, and FY12 Annual Report falsely reported that ***the Company had FY12 net income of $657.4 million and FY12 income tax of $216.1 million***.  The March 5, 2013 press release falsely reported that ***the Company paid 4Q12 income tax of $42.1 million***.[27]

152.     <u>IFRS Compliance Misrepresentations and Omissions</u>: The FY10-12 Financial Statements, FY12 Financial Statements, and FY12 Annual Report falsely reported that the 4Q12 and FY12 Financial Statements were prepared in accordance with IFRS.  The FY10-12 Financial Statements and FY12 Annual Report stated that:

---

[27]   Like the FY10-12 Financial Statements and FY12 Financial Statements, the March 5, 2013 press release reported FY12 income tax of $216.1 million.  The press release also reported 4Q12 net income of $141.8 million and FY12 net income of $649.2 (lower than the FY10-12 and FY12 Financial Statements).

- 65 -

### 2.1    Financial statements

*The consolidated financial statements of Sociedad Química y Minera de Chile S.A. and subsidiaries, have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).*

*The accounting policies used in the preparation of these consolidated Financial Statements* are described below and *comply with each IFRS in force at their date of presentation.*

153.    The FY12 Financial Statements similarly provided that:

### 2.2    Financial statements

*The consolidated annual financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB).*

*These annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*       \*       \*

*The accounting policies used in the preparation of these consolidated and annual accounts comply with each IFRS in force at their date of presentation.*

\*       \*       \*

### 2.7    Significant accounting judgments, estimates and assumptions

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

### 14.    1Q13 Press Release, Earnings Call, and Financial Statements

154.    On May 28, 2013, SQM issued a press release titled "SQM Reports Earnings for the First Quarter 2013."  On May 29, 2013, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated

- 66 -

in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

155.　On May 30, 2013, SQM hosted a conference call to discuss the Company's 1Q13 financial results with investors and analysts.  Solminihac and Fones participated in the call.  Analysts representing four major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

156.　On August 6, 2013, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended March 31, 2013 ("1Q13 Financial Statements").  The 1Q13 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

157.　<u>Financial Misrepresentations and Omissions</u>: The May 28, 2013 press release and 1Q13 Financial Statements each falsely reported ***1Q13 earnings of $151.8 million and income tax of $46.1 million***.

158.　<u>IFRS Misrepresentations Statements and Omissions</u>: The 1Q13 Financial Statements falsely reported that the 1Q13 Financial Statements were prepared on the basis of IFRS:

### 2.2　Financial statements

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, ***have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent***

- 67 -

*the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB).*

*These interim consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*       \*       \*

*The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation.*

\*       \*       \*

**2.7 Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

### 15.    2Q13 Press Release, Earnings Call, and Financial Statements

159.    On August 27, 2013, SQM issued a press release titled "SQM Reports Earnings For The First Half Of 2013."  On August 28, 2013, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

160.    On August 29, 2013, SQM hosted a conference call to discuss the Company's 2Q13 financial results with investors and analysts.  Contesse, Solminihac and Fones participated in the call.  Analysts representing two major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news

- 68 -

organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities

161.    On September 25, 2013, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended June 30, 2013 ("2Q13 Financial Statements").  The 2Q13 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

162.    <u>Financial Misrepresentations and Omissions</u>: The August 27, 2013 press release and 2Q13 Financial Statements each falsely reported *2Q13 net income of $107.4 million and 1H13 net income of $259.2 million, and 2Q13 income tax of $34.1 million and 1H13 income tax of $80.1 million*.

163.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The 2Q13 Financial Statements falsely reported that the 2Q13 Financial Statements were prepared on the basis of IFRS:

**2.2    Financial statements**

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, *have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)*.

*These Consolidated Interim Financial Statements are presented in accordance with IAS 34, Interim Financial Reporting*.

*These interim consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended*.

*       *       *

- 69 -

*The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation.*

\*      \*      \*

**2.6 Significant accounting judgments, estimates and assumptions**

*The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB.*

### 16.    3Q13 Press Release, Earnings Call, and Financial Statements

164.    On November 19, 2013, SQM issued a press release titled "SQM Reports Earnings For the First Nine Months of 2013." On November 20, 2013, SQM filed with the SEC a Form 6-K Report attaching the press release. The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities. The press release quoted Contesse and was issued and authorized or approved by SQM.

165.    On November 21, 2013, SQM hosted a conference call to discuss the Company's 3Q13 financial results with investors and analysts. Contesse and Gerardo Illanes, SQM's VP of Finance and Investor Relations, participated in the call. Analysts representing five major brokerage houses also participated in and asked questions during the conference call. Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

166.    On December 6, 2013, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the period ended September 30, 2013

("3Q13 Financial Statements").  The 3Q13 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

167.    <u>Financial Misrepresentations and Omissions</u>: The November 21, 2013 press release and 3Q13 Financial Statements each falsely reported ***3Q13 net income of $138.9 million and first nine months of 2013 net income of $398.1 million, and 3Q13 income tax of $36.9 million and first nine months of 2013 income tax of $117.1 million.***

168.    <u>IFRS Compliance Misrepresentations and Omissions</u>: The 3Q13 Financial Statements falsely reported that the 3Q13 Financial Statements were prepared on the basis of IFRS:

**2.2     Financial statements**

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, ***have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)***.

***These Consolidated Interim Financial Statements are presented in accordance with IAS 34, Interim Financial Reporting***.

***These interim consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended***.

\*         \*         \*

***The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation***.

\*         \*         \*

**2.6 Significant accounting judgments, estimates and assumptions**

***The information contained in these consolidated financial statements is the responsibility of the Company's management, who expressly indicate that they have applied all the principles and criteria included in IFRS, issued by the IASB***.

- 71 -

### 17.    4Q and FY13 Press Release, Earnings Call, Annual Report, and Financial Statements

169.    On March 4, 2014, SQM issued a press release titled "SQM Reports Earnings For The Fourth Quarter Of 2013."  On March 5, 2014, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

170.    On March 6, 2014, SQM hosted a conference call to discuss the Company's 4Q13 financial results with investors and analysts.  Contesse and Illanes participated in the call.  Analysts representing five major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

171.    On April 28, 2014, SQM filed with the SEC a Form 20-F Annual Report for the FY ended December 31, 2013 ("FY13 Annual Report").  The FY13 Annual Report was issued by SQM and authorized or approved by SQM, and executed on SQM's behalf by Contesse and Ramos pursuant to §§302 and 906 of SOX.

172.    <u>Legal Compliance Misrepresentations and Omissions</u>: The FY13 Annual Report falsely stated that SQM was in compliance with all applicable laws:

There are currently no material legal or administrative proceedings pending against us except as discussed in Note 16.1 to our Consolidated Financial Statements and below under "–Safety, health and environmental regulations in Chile,"[28] and we believe that *we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business*.

173.   <u>Internal Controls Misrepresentations and Omissions</u>: The FY13 Annual Report falsely represented that SQM maintained effective internal controls over financial and non-financial reporting:

### ITEM 15. CONTROLS AND PROCEDURES

*(a)*      *Disclosure Control and Procedures*

SQM management, with the participation of the Company's Executive management, including the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report.   Based upon that evaluation, *management with the participation of the Chief Executive Officer and Chief Financial Officer, have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported*.

*The procedures associated with our internal controls are designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported*. . . .

There were no significant changes in our internal controls over financial reporting that occurred during the period covered by this Annual Report that have materially affected, or are likely to materially affect our internal control over financial reporting.

*(b)*      *Management's Annual Report on Internal Control Over Financial Reporting*

*SQM Management is responsible for establishing and maintaining adequate internal control over financial reporting.   The Company's internal*

---

[28]   None of the material legal or administrative proceedings discussed in these sections concerns the illegal use of false invoices to funnel money to politicians, or the other allegations that give rise to this action.

*control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles*.

\*        \*        \*

Management assessed the effectiveness of its internal control over financial reporting for the year ended December 31, 2013. The assessment was based on criteria established in the framework "Internal Controls – Integrated Framework (1992)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the assessment, *SQM management has concluded that as of December 31, 2013, the Company's internal control over financial reporting was effective*.

174.  <u>Code of Conduct Misrepresentations and Omissions</u>: The FY13 Annual Report stated that SQM had adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F:

## ITEM 16B. CODE OF ETHICS

*We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees. Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act*.

No waivers have been granted therefrom to the officers mentioned above.

175.  Item 16B of Form 20-F, incorporated by reference into SQM's code of ethics representation, requires, in relevant part:

(b)  For purposes of this Item 16B, the term "code of ethics" means written standards that are reasonably designed to deter wrongdoing and to promote:

(1)  Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2)  Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

(3)  Compliance with applicable governmental laws, rules and regulations;

(4)  The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and

(5)     Accountability for adherence to the code.

176.     <u>Financial Misrepresentations and Omissions</u>: The March 4, 2014 press release, FY13 Annual Report, and 4Q13 Financial Statements each falsely reported ***4Q13 net income of $69 million and FY2013 net income of $467.1 million, and 4Q13 income tax of $21.5 million and FY2013 income tax of $138.5 million***.

177.     <u>IFRS Compliance Misrepresentations and Omissions</u>: The FY13 Annual Report and FY13 Financial Statements falsely reported that the 4Q13 Financial Statements were prepared on the basis of IFRS:

**2.2     Financial statements**

The consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, ***have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)***.

***These annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended***.

\*          \*          \*

***The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation. Certain reclassifications have been made for comparative purposes, refer to Note 14.6***.

\*          \*          \*

**2.6 Significant accounting judgments, estimates and assumptions**

***Management of Sociedad Química y Minera de Chile S.A. and its subsidiaries is responsible for the information contained in these consolidated financial statements, which expressly indicate that all the principles and criteria included in IFRSs as issued by the International Accounting Standard Board (IASB) have been applied in full***.

- 75 -

### 18.   1Q14 Press Release, Earnings Call, and Financial Statements

178.   On May 20, 2014, SQM issued a press release titled "SQM Reports Earnings For The First Quarter 2014."  On May 21, 2014, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued or authorized and approved by SQM.

179.   On May 22, 2014, SQM hosted a conference call to discuss the Company's 1Q14 financial results with investors and analysts.  Solminihac, Ramos, and Illanes participated in the call.  Analysts representing two major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

180.   On June 9, 2014, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the year ended March 31, 2014 ("1Q14 Financial Statements").  The 1Q14 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

181.   <u>Financial Misrepresentations and Omissions</u>: The May 20, 2014 press release and 1Q14 Financial Statements each falsely reported *1Q14 net income of $81 million and 1Q14 income tax of $28.9 million*.

182.   <u>IFRS Compliance Misrepresentations and Omissions</u>:   The 1Q14 Financial Statements falsely reported that the 1Q14 Financial Statements were prepared on the basis of IFRS:

**2.2     Financial statements**

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, ***have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)***.

***These annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended***.

\*          \*          \*

***The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation. Certain reclassifications have been made for comparative purposes***.

\*          \*          \*

**2.6 Significant accounting judgments, estimates and assumptions**

***Management of Sociedad Química y Minera de Chile S.A. and its subsidiaries is responsible for the information contained in these consolidated financial statements, which expressly indicate that all the principles and criteria included in IFRSs as issued by the International Accounting Standard Board (IASB) have been applied in full***.

**19.     2Q14 Press Release, Earnings Call, and Financial Statements**

183.   On August 26, 2014, SQM issued a press release titled "SQM Reports Earnings For The First Half Of 2014."   On August 27, 2014, SQM filed with the SEC a Form 6-K Report attaching the press release.   The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.   As a result, the information communicated in the press release became widely available to investors and was

- 77 -

reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or approved by SQM.

184.     On August 28, 2014, SQM hosted a conference call to discuss the Company's 2Q14 financial results with investors and analysts.  Solminihac, Ramos, and Illanes participated in the call. Analysts representing six major brokerage houses also participated in and asked questions during the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

185.     On October 20, 2014, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Interim Consolidated Financial Statements for the period ended as of June 30, 2014 ("2Q14 Financial Statements").  The 2Q14 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

186.     <u>Financial Misrepresentations and Omissions</u>: The August 26, 2014 press release and 2Q14 Financial Statements each falsely reported ***2Q14 net income of $71.1 million and $152.1 million for 1H14, as well as 2Q14 income tax of $28.8 million and $57.7 million for the 1H14***.

187.     <u>IFRS Compliance Misrepresentations and Omissions</u>: The 2Q14 Financial Statements falsely reported that they were prepared on the basis of IFRS.  The consolidated financial statements reported that:

### 2.2     Financial statements

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, ***have been prepared in accordance with***

- 78 -

*International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB).*

*These annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended.*

\*       \*       \*

*The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation. Certain reclassifications have been made for comparative purposes.*

\*       \*       \*

**2.6 Significant accounting judgments, estimates and assumptions**

*Management of Sociedad Química y Minera de Chile S.A. and its subsidiaries is responsible for the information contained in these consolidated financial statements, which expressly indicate that all the principles and criteria included in IFRSs as issued by the International Accounting Standard Board (IASB) have been applied in full.*

### 20.    3Q14 Press Release, Earnings Call, and Financial Statements

188.    On November 18, 2014, SQM issued a press release titled "SQM Reports Earnings For The Third Quarter Of 2014."  On November 19, 2014, SQM filed with the SEC a Form 6-K Report attaching the press release.  The press release was disseminated by news organizations, financial analysts, investor websites, and other sources of information for investors.  As a result, the information communicated in the press release became widely available to investors and was reflected in the market price for SQM securities.  The press release quoted Contesse and was issued and authorized or issued by SQM.

189.    On November 20, 2014, SQM hosted a conference call to discuss the Company's 3Q14 financial results with investors and analysts.  Contesse and Illanes participated in the call. Analysts representing five major brokerage houses also participated in and asked questions during

- 79 -

the conference call.  Written transcripts of the call were published and disseminated by Thomson Reuters StreetEvents and other sources.  The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet.  As a result, the information communicated on the call became widely available to investors and was reflected in the market price for SQM securities.

190.    On January 20, 2015, SQM filed with the SEC a Form 6-K Report in which it reported the Company's Consolidated Financial Statements for the nine months ended September 30, 2014 ("3Q14 Financial Statements").  The 3Q14 Financial Statements were issued and authorized or approved by SQM, and executed on SQM's behalf by Ramos pursuant to the requirements of the Exchange Act.

191.    Financial Misrepresentations and Omissions: The November 18, 2014 press release and 3Q14 Financial Statements each falsely reported *3Q14 net income of $66.4 million and $218.4 million for the first nine months of 2014, as well as 3Q14 income tax of $29.3 million and $87.1 million for the first nine months of 2014*

192.    IFRS Compliance Misrepresentations and Omissions: The 3Q14 Financial Statements falsely reported that they were prepared on the basis of IFRS:

**2.2    Financial statements**

The consolidated interim financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, *have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and represent the full, explicit and unreserved application of the aforementioned international standards issued by the International Accounting Oversight Board (IASB)*. . . .

*           *           *

*These consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized revenue and expenses and cash flows, which have occurred during the periods then ended*.

- 80 -

<div align="center">*     *     *</div>

*The accounting policies used in the preparation of these consolidated annual and interim accounts comply with each IFRS in force at their date of presentation. Certain reclassifications have been made for comparative purposes*.

<div align="center">*     *     *</div>

**2.6 Significant accounting judgments, estimates and assumptions**

*Management of Sociedad Química y Minera de Chile S.A. and its subsidiaries is responsible for the information contained in these consolidated financial statements, which expressly indicate that all the principles and criteria included in IFRSs as issued by the International Accounting Standard Board (IASB) have been applied in full*.

### 21.    FY14 Annual Report

193.    On May 18, 2015, SQM filed its 2014 Annual Report.  In the 2014 Annual Report, SQM summarized its dispute with Corfo, expressing confidence in its position and warning about negative outcomes, but failing to warn that the Company's problematic corporate governance and illegal payment scheme threatened the lease with Corfo[29]:

> SQM Salar contested [Corfo's] claim, asserting that both parties have applied formulas for the calculation and payment of lease payments for more than 20 years without conflict, in accordance with the terms of the Lease Agreement and their mutual understanding of the agreements by the parties during the term of the Lease Agreement. SQM Salar also asserted that the alleged breaches would be technical breaches and that Corfo may terminate the Lease Agreement solely for a material breach. SQM Salar in consultation with external counsel believes that it is likely it will prevail in the arbitration proceeding. However, an adverse ruling awarding damages sought by Corfo or permitting early termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash flows and results of operations. We cannot assure you that Corfo will not use this arbitration proceeding to seek to renegotiate the terms of the Lease Agreement in a manner that is not favorable to SQM Salar. Although the parties are currently discussing potential resolutions, we cannot assure you such discussions will be successful or that Corfo will not take other actions in the future in relation to the Lease Agreement that are contrary to our interests.

---

[29]    SQM also failed to disclose the risk that its illegal payment scheme would jeopardize its lease from Corfo to mine the Salar de Atacama in its 2013 Annual Report.

<div align="center">- 81 -</div>

B. **Reasons Why SQM's Material Statements and Omissions from 2010 to 2015 Were Knowingly or Recklessly False and Misleading**

194.    SQM knowingly or recklessly made the misrepresentations identified in §V.A.  The scheme was pervasive and long lasting.  Leading into and throughout the Class Period, SQM and its top executives were involved in paying millions of dollars in bribes disguised as payments for services rendered to the Company.  The executives who made or authorized the payments were not only empowered to speak on the Company's behalf, but their knowledge or recklessness is also imputed to the Company.

1. **SQM's Legal Compliance Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made**

195.    The legal compliance misrepresentations set forth in ¶¶82, 103, 125, 147, 172 to the effect that SQM was in compliance with all applicable laws were knowingly or recklessly false and misleading when made for reasons explained above in §IV and including that:

(a)    SQM failed to disclose that, in violation of numerous Chilean laws, it was involved in a years-long scheme dating from at least 2009 to 2014 to use the payment of falsified invoices to facilitate millions of dollars of illicit payments to scores of politicians and politically-connected individuals and entities.  §IV; Attachment A.  SQM also failed to disclose the potential risks its illegal course of action would have on its dispute with Corfo ¶217.

(b)    SQM has admitted that its compliance statements were false and that it was in fact not in compliance in all material respects with applicable statutory and administrative regulations between 2009 and 2014.  It has identified at least $13 million in payments that did not meet the requirements to qualify as tax expenses under Chilean law due to insufficient supporting documentation.  *See* §IV.E (admitting $11 million in unsupported payments between 2009 and 2014); §IV.I (identifying $2 million more in unsupported payments between 2009 and 2014); *see*

- 82 -

*also* §IV.R (Ad-Hoc Report identifying unsupported payments and transactions inaccurately reflected).  Former CEO Contesse himself – the person whom SQM, Solminihac, Ramos, and the Ad-Hoc Committee have now admitted used false invoices to illicitly divert funds to politicians (§§IV.E, I, O, R) – executed each Annual Report containing the internal controls misrepresentations on behalf of SQM.  ¶¶81, 102, 124, 146, 171.

(c)     The Public Prosecutor filed a request for entry, search, and seizure of SQM documents, which stated that the documents sought were related to potential violations of Chilean penal code Articles 248, 470 Nos. 1 and 8, and 471 No. 2; corporations act Articles 42 and 46; and tax code Article 97 No. 4.  §IV.B; *see also* ¶IV.D (SII alleged that SQM violated penal code Article 15, No. 1).  Moreover, the Public Prosecutor commenced a formal investigation into Contesse alleging that on behalf of SQM he made intentionally false or incomplete declarations or used fraudulent procedures designed to conceal or disguise the true amount of transactions or to circumvent taxes.  ¶48.

(d)     The SVS conducted an investigation that resulted in fines against SQM Board members for violating Corporations Act Articles 42 and 46 by failing to timely provide investors with information that could be relevant for investment decisions concerning the payment of false invoices between 2009 and 2014.  §IV.F.

(e)     The SII conducted an investigation which uncovered substantial evidence supporting criminal complaints and other pleadings alleging that SQM's executive officers Contesse, Solminihac, and Ramos made payments as the legal representatives of SQM on false invoices to politicians and political operatives associated with nearly every major Chilean political party and political figures including the former, current, and possibly future Presidents of Chile in violation of Chilean tax code Article 97 No. 4 (which has a fraudulent intent requirement) and the Chilean

- 83 -

Inheritance and Donations Law.  *See* §IV.G (illicit payments to individuals associated with the UDI and RN between 2009 and 2014); §IV.H (illicit payments to fund the campaign of President Bachelet, a member of the PS, between January 11, 2012 and October 8, 2013); §IV.J (illicit payments to fund the senatorial campaign of former mayor of Santiago, a member of the UDI, between February 2013 and May 2013); §IV.H (illicit payments to fund campaign of former President Frei, a member of the PDC, in 2009); §IV.M (illicit contributions to members of the PS party in 2012); §IV.O (illicit contributions between 2012 and 2014); §IV.P (illicit payments to support presidential candidacy of ME-O, then a member of the PS, now a member of the PRO, in 2009); §IV.Q (illicit payments to support RN- and PRI-associated politicians from 2012 through 2013 and 2011 through 2014, respectively).

(f)     The SII's criminal complaints and pleadings were based on declarations, testimony, and other documentary evidence from individuals, many high-ranking political party officials, who were involved in processing the false invoices or receiving the payments on such invoices for the purpose of illicitly funding political campaigns and activities.  *See, e.g.*, §IV.D (admission by recipients of payment on false invoices); ¶IV.G (same); §IV.H (admission by primary campaign fundraiser for President Bachelet that false invoices paid by SQM were used to fund her campaign); §IV.J (admissions by legal representatives of consultants to senatorial campaign for Santiago Mayor Zalaquett that false invoices paid by SQM were used to pay bills associated with his campaign); §IV.P (admissions by former socialist party treasurer that false invoices paid by SQM were used to fund presidential campaign of ME-O); §IV.Q (evidence that RN party VP received payment on false invoices and requested party politicians submit false invoices to SQM to fund their political activities); *id.* (evidence that PRI senator and treasurer contacted Contesse to secure funding for the party and instructed party politicians to submit false invoices to SQM).  The SII also

- 84 -

collected details regarding more than 400 false invoices paid by SQM between 2009 and 2014. Attachment A.  Furthermore, the Guarantee Court has ordered that Contesse be placed under house arrest due to the SII's allegations.  ¶IV.N.

(g)     Based largely on SQM's amended tax returns, court documents, declarations and testimonies, numerous media sources have linked SQM's payment of false invoices to a longstanding and widespread illegal scheme to bribe politicians and political operatives.  *E.g.* §§IV.H, L-M, P.  One article quoted an e-mail request to Contesse soliciting illegal campaign donations and cited an SQM attorney as admitting he made the donations at Contesse's direction. §IV.M; *see also* §IV.O (declaration supporting inference that political party bosses contacted Contesse directly to request illicit campaign donations).

(h)     SQM CFO Ramos admitted that SQM paid invoices without any consideration of whether the invoices were based on services rendered.  §IV.K.  He also declared it unlikely that the recipients of SQM's payments on the invoices in question had provided any services to the company.  §IV.O.  Like Contesse, Ramos also signed the Annual Reports containing the legal compliance misrepresentations.  ¶¶81, 102, 124, 146, 171.  Current SQM CEO and former COO Solminihac also stated that no one he spoke to was aware of any services rendered regarding the invoices in question.  §IV.O.

(i)     The length of time during which SQM was paying false invoices to facilitate bribery, the sheer number of false invoices paid between 2009 and 2014, and the repetitive nature of the misrepresentations support a strong inference of scienter.  *See generally*, §IV; Attachment A.

2.     **SQM's Internal Controls Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made**

196.    The internal controls misrepresentations in ¶¶83, 104, 126, 148, 173 were knowingly or recklessly false and misleading when made for reasons explained in §IV and including that:

(a)     SQM failed to disclose, prior to May of 2015, that its internal controls were far from sufficient. In fact, SQM's former CEO was overseeing a years-long scheme dating from at least 2009 to use the payment of false invoices to facilitate illicit payments totaling millions of dollars to scores of politicians and politically-connected individuals and entities.  §IV; Attachment A.  SQM failed to disclose the potential risks on its dispute with Corfo due to SQM's inadequate internal controls.  ¶217.

(b)     SQM has now admitted, in the May 18, 2015 Form 20-F, that its internal controls were insufficient.  ¶53 ("We recently identified a material weakness in our internal controls over payments directed by the office of the former Chief Executive Officer."); *id.* ("the Company's internal control over financial reporting was not effective").  The Ad-Hoc Report confirmed SQM's admission, concluding that "SQM's internal controls were not sufficient to supervise the expenses made by the cost center managed by . . . SQM's former CEO" Contesse and that the Company simply "trusted [Contesse] to make a proper use of resources."  §IV.R.  SQM's illegal payments evaded internal controls during at least the years 2009 to 2014.  §IV; Attachment A.

(c)     Contesse was, while SQM's CEO, directly involved in communications that led to the payment of false invoices to facilitate illicit campaign funding, in violation of purportedly sufficient internal financial controls.  *E.g.*, ¶IV.H. (article stating that Contesse participated in meetings to arrange political contributions); §IV.M (illicit payments to PS candidates directly approved by Contesse); §IV.O (illicit payments were ordered and approved by Contesse, but no one

- 86 -

was aware of any services provided in exchange for payments); §IV.P (declaration from former senator that Contesse himself agreed to fund presidential candidate); *id.* (testimony that Contesse met personally with presidential candidate at SQM's offices); §IV.Q (senator contacted Contesse directly to seek money for PRI candidates).

(d)     Contesse himself – the person whom SQM, Solminihac, Ramos, and the Ad-Hoc Committee, among others, identified as responsible for the use of false invoices to illicitly fund politicians (§§IV.E, I, O, R) – executed on behalf of SQM each Annual Report containing the internal controls misrepresentations. ¶¶81, 102, 124, 146, 171. When asked to justify the payments, Contesse asserted his right to remain silent in order to avoid self-incrimination. §IV.E. The Public Prosecutor commenced a formal investigation into whether Contesse "made intentionally false or incomplete declarations or used fraudulent procedures designed to conceal or disguise the true amount of transactions or to circumvent taxes." §IV.I. A court has ordered that Contesse be confined to house arrest due to the SII's allegations. ¶IV.N.

(e)     A declaration from a former party treasurer tied SQM employees directly to communications regarding the payment of false invoices and stated that her boss, a Chilean senator, contacted SQM directly to seek money to fund a presidential candidate. §IV.Q. She believed the contact was with Contesse himself. *Id.* Contesse directly approved contributions to political candidates. §§IV.H, M, P.

(f)     SQM CFO Ramos has admitted that SQM paid invoices without any consideration of whether the invoices were based on services rendered. §IV.K. He also declared it unlikely that the recipients of SQM's payments on invoices in question had provided any services to the company. §IV.O. Like Contesse, Ramos also signed the Annual Reports containing the internal controls misrepresentations. ¶¶81, 102, 124, 146, 171. Current SQM CEO and former COO

- 87 -

Solminihac also stated that no one he spoke to was aware of any services rendered regarding the invoices in question.  §IV.O.

(g)     The stark insufficiency of SQM's internal controls, which enabled the Company's top executives to provide millions of dollars in illicit political campaign funding for at least six years, from 2009 and 2014, supports a strong inference of scienter.  §IV.

### 3.     SQM's Code of Conduct Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made

197.     The code of conduct misrepresentations in ¶¶84-85, 105-106, 127-128, 149-150, 174-175 were false and misleading when made for reasons explained in §IV and including that:

(a)     SQM did not disclose that, while it had purportedly adopted a code of ethics adhering to the definition in Item 16B of SEC Form 20-F,  the Company's unlawful conduct departed dramatically from the requirements therein.  §IV.

(b)     Item 16B requires honest and ethical conduct.  ¶85, 106, 128, 150, 175.  SQM did not disclose that it was engaged in dishonest and unethical conduct throughout the Class Period – *i.e.*, using the payment of false invoices to fund political campaigns – and later admitted that it did not engage in honest and ethical conduct.  §IV.  As detailed in §V.B.1-2 above, the Company, Solminihac, Ramos, and the Ad-Hoc Committee each admitted that the Company had paid at least CLP 13 million for invoices unsupported by any services rendered.  As also detailed above, complaints, declarations, testimony and media investigations established that those invoices were, in fact, false, and were being used to facilitate illegal contributions to politicians and political campaigns.  §V.B.1-2.  Moreover, the Company acknowledged that the Public Prosecutor was conducting a formal investigation into whether the Company made intentionally false or incomplete

- 88 -

declarations or used fraudulent procedures designed to conceal or disguise the true amount of transactions or to circumvent taxes between 2009 and 2014.  §IV.I.

        (c)      Item 16B requires full, fair, accurate and timely disclosure in SEC filings. ¶85, 106, 128, 150, 175.  SQM concealed from investors its involvement in the scheme to divert funds and concealed its failure to make full, fair, accurate, and timely reports to the SEC. *See* §V.B.1-2 (identifying factual allegations in §IV).  The SVS filed a criminal complaint against and fined SQM Board members for failing to disclose such information between 2009 and 2014.  §IV.F. The Company has now identified at least $13 million in payments of invoices from 2009 through 2014, which were unsupported by any services rendered. §IV.I.  The Company amended its tax returns for those years, paying millions of dollars in taxes and interest.  *Id.*

        (d)      Item 16B required compliance with applicable laws, rules and regulations. ¶¶85, 106, 128, 150, 175.  SQM did not disclose that it was not in compliance with applicable laws as set forth above in §V.B.1.

        (e)      Item 16B also required prompt internal reporting of code violations and accountability for adherence to the code of ethics.  ¶¶85, 106, 128, 150, 175.  By the Company's own admission, SQM's former CEO willfully and repeatedly violated the code of ethics with impunity for a period of six years. *E.g.*, §IV.I.

      **4.**     **SQM's Financial Statements Were Knowingly or Recklessly False and Misleading When Made**

      198.    SQM's financial statements – specifically, the net income and income taxes reported (¶¶86, 91, 95, 99, 107, 111, 115, 119, 129, 133, 137, 141, 151, 157, 162, 167, 176, 181, 186, 191) – were false and misleading when made for reasons explained in §IV and including:

        (a)      SQM admitted that it made at least $13 million in payments that may not meet the requirements to be qualified as tax expenses under the Chilean tax code.  §IV.I.  As a result,

- 89 -

SQM amended its taxes for the years 2009 through 2014, paying additional taxes on net income that had not previously been reported.   *Id.*

(b)      The Ad-Hoc Report confirmed that SQM's "books did not accurately reflect transactions that have been questioned."  IV.R.

### 5.      SQM's Accounting Compliance Misrepresentations and Omissions Were Knowingly or Recklessly False and Misleading When Made

199.      The accounting compliance misrepresentations and omissions in ¶¶87, 92, 96, 100, 108, 112, 116, 120, 130, 134, 138, 142, 152, 158, 163, 168, 177, 182, 187, 192 were false and misleading when made for reasons explained in §IV and including:

(a)      SQM did not disclose that, between 2009 and 2014, its financial statements did not properly account for payments for invoices that were not supported by any services rendered. §IV.E, I, R.  Nor did SQM disclose that the payments of such invoices were used to illicitly fund politicians and political campaigns.  §IV.B, D, G-H, J-Q.  SQM's understatement of taxable income and resulting understatement of taxes for a six-year period violated, among others, FASB Conceptual Framework for Financial Reporting; Statement of Financial Accounting Standards ("SFAS") No. 109 and *Accounting for Income Taxes*; International Accounting Standards ("IAS") No. 1, *Presentation of Financial Statements*; and IAS No. 12, *Income Taxes*.

(b)      SQM admitted that it paid at least $13 million in invoices for which it could not find supporting documentation of services rendered, in violation of the foundation of the accounting principles underlying Chilean GAAP and IFRS and specific principles and rules therein. §IV.I; FASB Conceptual Framework for Financial Reporting; SFAS No. 109, *Accounting for Income Taxes*; IAS No. 1, *Presentation of Financial Statements*; and IAS No. 12, *Income Taxes*.

(c)     The Ad-Hoc Report concluded that, in fact, payments authorized by SQM's former CEO between 2009 and 2014 lacked sufficient supporting documentation. §IV.R. Thus, the accounting for such payments and ramifications thereof on other aspects of SQM's financial statements were in violation of, among others, FASB Conceptual Framework for Financial Reporting; SFAS No. 109, *Accounting for Income Taxes*; IAS No. 1, *Presentation of Financial Statements*; and IAS No. 12, *Income Taxes*.

>        **6.      SQM's Statements Regarding Corfo's Efforts to Terminate the Salar de Atacama Lease Were Knowingly or Recklessly False and Misleading When Made**

200.    The Salar de Atacama lease misrepresentations and omissions in ¶193 were false and misleading because SQM did not disclose that the Company's illegal payments to politicians and inadequate corporate governance and internal controls could lead to Corfo rejecting the arbitration settlement and moving to terminate the Salar de Atacama lease, a risk that materialized less than one month later.  ¶217.  On June 18, 2015, analysts following SQM reported that Corfo rejected settlement talks with SQM and decided to seek early termination of the lease based on SQM's poor corporate governance.  *Id.*

## VI.     THE TRUTH IS REVEALED CAUSING LOSS/ECONOMIC DAMAGES TO INVESTORS

201.    As set forth above, throughout the Class Period SQM materially misrepresented or omitted to state facts necessary to not misrepresent: its compliance with applicable laws and regulations; the sufficiency of its internal controls; its establishment of and adherence to a code of ethics consistent with SEC requirements; and its financial statements, including revenues, taxes owed and compliance with the governing accounting principles.  These material misrepresentations and omissions caused SQM's ADSs to trade at an artificially inflated level.

202.    In fact, contemporaneous with these misrepresentations, SQM, through top executives empowered to act and acting on its behalf, was illegally channeling money to Chilean politicians and political parties by paying millions of dollars' worth of fictitious invoices. After the fact, SQM admitted that the unsupported payments of false invoices had not complied with governing tax laws, that the Company had lacked adequate internal controls over its top officers and, as a result, the Company's financial statements were materially false and misleading and not prepared in accordance with applicable accounting principles.

203.    When the truth about SQM's long-running illegal payments scheme, tax evasion, misstated financials and lack of adequate internal controls began to be revealed, the price of SQM's ADSs fell precipitously.  As a result, Lead Plaintiff and other Class members suffered economic losses.

204.    On Sunday, January 11, 2015, SII requested clarification from SQM on the payment of CLP 7.5 million in fees to Wagner, the former Undersecretary of Mining implicated in Pentagate. Upon the disclosure of this new material information, SQM ADSs declined $0.40 per share to close at $23.53 per share on January 12, 2015, a one-day decline of nearly 2%.

205.    On February 26, 2015, in response to news articles regarding SQM's link to the Penta investigation, the Company issued a press release stating that, at the request of the Chairman of the Board, an extraordinary Board meeting had been held "to analyze the matters that have been divulged by the press in recent weeks and are the subject of ongoing public cases."  In the meeting, the Board resolved to establish a special committee comprised of Board members von Appen, Eyzaguirre and Guzmán.  Upon the disclosure of this new material information, SQM ADSs declined $0.33 per share to close at $25.84 per share on February 26, 2015.

- 92 -

206.    On March 11, 2015, SQM announced that it had received a request from Chile's Public Prosecutor to produce the Company's account records and related information in connection with the Public Prosecutor's investigation into improper political campaign contributions and that the Board would meet the next day to discuss the request.  On March 12, 2015, SQM issued a press release disclosing that the Board would provide some information responsive to the Public Prosecutor's request, and would consider providing additional information.  Upon the disclosure of this new material information, SQM ADSs declined $1.46 per share from the closing price on March 10, 2015 to close at $22.42 per share on March 13, 2015, a decline of nearly 6% on high trading volume.

207.    On March 17, 2015, in a Form 6-K filed with the SEC, SQM announced that the Board had agreed on March 16, 2015 to terminate CEO Contesse, effective immediately, and name Solminihac as the new CEO.  Upon the disclosure of this new material information, SQM ADSs declined $0.41 per share to close at $22.10 per share on March 17, 2015, a one-day decline of nearly 2% on high trading volume.

208.    On March 17, 2015, HSBC issued an analyst report stating that it expected the uncertainty from the ongoing investigations, despite their early stage, to put downward pressure on SQM's stock price:

> Fundamentally, we see weaker iodine and lithium dynamics as offset by stability in the potash and SPN segments, ***but we expect the uncertainty surrounding the investigation to continue to weigh on the stock***.

209.    As a result of the above partial disclosures, the price of SQM ADSs declined – from a closing price of $26.17 per share on February 25, 2015 to close at $22.10 per share on March 17, 2015, a decline of over 15%.

- 93 -

210.    On March 18, 2015, SQM issued a press release indicating that the three representatives on its Board from Potash – SQM Vice Chairman Brownlee, who also serves as CFO of Potash, and directors Eyzaguirre and Montero – had resigned the night before.

211.    On March 18, 2015, before Potash explained why the directors resigned, Santander issued an analyst report voicing concern over the immediate resignation of the three SQM directors:

**FROM BAD TO WORSE**

> **Net/Net**: We maintain our Underperform rating on SQM stock based on the tough market conditions in iodine. *Additionally, the resignation of all the board members elected by the largest noncontrolling shareholder, without having official information on the reasons for that measure, is a major concern for us in the context of the ongoing investigations*.
>
> •    Potash Corp.'s board members resigned: On March 17, the three board members elected with votes of Potash Corp. (owns 32% of SQM) resigned from their positions. *There is no official explanation on this, but we believe it might be related to discrepancies on the board (reported by the press) on the level of the company's cooperation regarding ongoing investigations of potential irregular funding of political campaigns*.

212.    That same day, Potash issued a separate press release stating that the Potash directors resigned from the SQM Board because they could not ensure an adequate investigation of SQM. The release explained that the directors' "emphatic requests that SQM fully and voluntarily cooperate with competent authorities" had been "rejected by a majority of the [SQM] board."

213.    On March 18, 2015, Miller Tabak & Co., LLC issued an analyst report reacting to Contesse's firing and the directors' mass exodus by removing its rating on SQM and stripping the Company of its good corporate-governance premium:

> •    **Remove Rating Until Corporate Governance Crisis Is Resolved**: Although we haven't been aggressively promoting shares in recent months, due to moderation in global potash prices and lingering iodine price pressures, we had maintained our Buy rating based on historical valuation comparisons. *However, in light of the corporate governance setback, we remove our fundamental rating until this situation is resolved.*

- 94 -

- **Historical Premium For Lithium Assets-Corporate Leadership In Chile Is No Longer Tenable**. Since we believe the country still values its relative reputation in the region for political stability and providing a fair playing ground for business, we see nationalization of SQM and extremely punitive financial fines as a remote possibility. *However, a prolonged conflict with the current government will likely put future lithium concessions at a greater risk, as well as leave lingering doubts about SQM's commitment to global corporate governance standards. As such, the historical valuation premium that SQM had enjoyed is no longer tenable at this point.* As a result, we reset our intrinsic fair value for ADR shares to $20 from $30, which is derived by applying a 14x price-to-earnings multiple to our FY:16E

214.    As a result of these disclosures, the price of SQM ADSs fell an additional $3.45 per share, or more than 15%, from $22.10 per share at the close of trading on March 17, 2015 to close at $18.65 per share on March 18, 2015 on a volume of 11.39 million shares, more than 20-times the average daily volume during the Class Period.  The price of SQM ADSs continued to fall as a result of the disclosures on March 19, 2015, opening at $18.06 per share and closing at $17.87 per share, approximately 4% lower than the previous day's close, on continued high volume of more than three-times the average daily volume during the Class Period.

215.    On March 25, 2015, SQM revealed in a press release and Form 6-K that it had identified $11 million in payments made between 2009 and 2014, inclusive, that may not meet the requirements to be qualified as tax expenses under the Chilean tax code.  Upon the disclosure of this new material information, SQM ADSs collapsed $0.55 per share from the closing price on March 24, 2015 to close at $19.23 per share on March 25, 2015, a decline of approximately 3% on high trading volume.  SQM ADSs continued to decline on March 26, 2015, closing $0.56 lower, and on March 27, 2015, closing $0.78 lower, ultimately declining approximately 9% as a result of this new material information.

216.    On April 2, 2015, an analyst at J.P. Morgan attributed the precipitous decline in the price of SQM's ADSs to the Company's recent disclosures:

- 95 -

**What Happened with SQM Recently?**

SQM's turmoil last week led the company to lose a big chunk of its market value (-17% compared to two weeks ago vs. +5% for Chilean MSCI index). News started with former CEO Patricio Contesse being ousted by the board of directors, and less than 24 hours later, three board members (representing Potash Corporation) resigned ….

Additionally, the company was questioned on tax evasion by the Chilean authorities – according to the CEO during the company's March 25th conference call, the company's internal investigation identified roughly US$11 million in invoice mismatching.

217.    On June 18, 2015, Chilean and American news outlets reported that Corfo had decided to reject conciliation proceedings in its arbitration with SQM over SQM's leases in the Salar de Atacama and changed its position from renegotiation of the lease contract (set to expire in 2030) to early termination.[30]   According to analysts following SQM, whereas before the dispute had focused primarily on SQM's failure to meet the payment terms of the lease, Corfo's rejection of the settlement talks and decision to seek early termination were now based on SQM's inadequate corporate governance.   On June 18, 2015, BTG Pactual reported Corfo's rejection, stating

---

[30]   Chile, not SQM, owns the Salar de Atacama land on which the Company mines lithium.  SQM is allowed to mine lithium on the Salar de Atacama pursuant to a contract with Corfo in exchange for annual concession payments.  SQM's lease with Corfo expires in 2030, but on November 15, 2013, Corfo claimed SQM had underpaid concessions and demanded further payment from SQM.  In May 2014, Corfo initiated arbitration proceedings against SQM seeking, among other relief, approximately $9 million and early termination of the lease.  Analysts following SQM reported the parties were largely expected to settle, however, on June 18, 2015, Chilean and American media, as well as analysts, reported that Corfo had suddenly rejected settlement with SQM and sought to revoke the mining lease due in part to corporate governance concerns arising from the investigation of SQM.  Eduardo Thomson and Matt Craze, *SQM Tumbles on Reports Chile Threatens to Revoke Land Concession*, Bloomberg Business (June 18, 2015); http://www.bloomberg.com/news/articles/2015-06-18/chile-s-corfo-to-seek-repeal-of-sqm-leases-mercurio-reports (last visited Jan. 14, 2016, 5:42 p.m.); *see also* Teresa Matich, *SQM Stock Still Down on News Chile Wants to Revoke Mining Leases*, Lithium Investing News (June 21, 2015), http://investingnews.com/daily/resource-investing/energy-investing/lithium-investing/sqm-santiago-chile-atacama-corfo/ (last visited Jan. 14, 2016, 5:53 p.m.).

"**Complaint rational?:** Formerly, under-investment; now, **corporate governance**."  The same day, Morgan Stanley stated:

> On top of previous claim that SQM was underpaying leases, now [Corfo] is arguing ethical reasons why SQM should not run those assets, ***including bad corporate governance***, unfair related parties transactions, unfair transfer prices, lack of disclosure and environmental rules breakage.[31]

218.    On this news, SQM ADSs declined in value by over 13% from a closing price of $18.89 per share on June 17, 2015 to close at $16.39 per share on June 18, 2015, on a trading volume of more than five-times the daily average during the Class Period.

219.    The following chart demonstrates the precipitating decline in SQM's ADSs resulting from these end-of-Class Period disclosures:

---

[31]    On January 9, 2015, press reports revealed that prosecutors had met with Corfo executives regarding the investigation into tax fraud perpetrated by SQM.  On January 13, 2016, Eduardo Bitran, the Executive Vice President of Corfo, stated that it wants to prove that it has grounds for early termination of the Salar de Atacama lease with SQM and that termination would be the right thing to do.

- 97 -



## VII.   THE INAPPLICABILITY OF STATUTORY SAFE HARBOR TO SQM'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS

220.   The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") statutory Safe Harbor for forward-looking statements because: (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward looking, SQM cannot meet the requirements for invoking the protection, *i.e.*, identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language.  The statements were misleading in light of omissions of material present or historical facts and cannot be considered forward looking.

221.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary language." 15 U.S.C. §78u-5(c)(1)(A)(i).

222.    An oral forward-looking statement must be accompanied by a cautionary statement that it is forward looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such factor; and (b) the referenced written documents must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

223.    The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with GAAP.  15 U.S.C. §78u-5(b)(2)(A).  Statements of historical fact, current condition or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

224.    For example, among the false statements at issue herein, the following false statements alleged herein are actionable because they are statements of current or historical fact:

- ***Repeated representations that SQM was in compliance in all material respects with all applicable statutory and administrative regulations with respect to its business***. ¶¶82, 103, 125, 147, 172.

- ***Repeated representations that SQM management had concluded that the Company's internal control over financial reporting was effective***. ¶¶83, 104, 126, 148, 173.

- ***Repeated representations that SQM had adopted a code of ethics that adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act***. ¶¶84-85, 105-106, 127-128, 149-150, 174-175.

- ***Repeated false statements concerning SQM's financial results and compliance with accounting principles***. ¶¶86-87, 91-92, 95-96, 99-100, 107-108, 111-112, 115-116, 119-120, 129-130, 133-134, 137-138, 141-142, 151-152, 157-158, 162-163, 167-168, 176-177, 181-182, 186-187, 191-192.

- 99 -

225.    Nor were the historic or present-tense statements made by SQM assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by the Company expressly related to or stated to be dependent on those historic or present-tense statements when made.

226.    Even if the false statements set forth in ¶V.A. are considered forward-looking statements, they do not fall within the protections of the Safe Harbor because they had no reasonable basis.  SQM is liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of SQM, who knew that those statements were false or misleading when made.

## VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

227.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendant made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's ADSs traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

- 100 -

(e)     Lead Plaintiff and other members of the Class purchased SQM ADSs between the time defendant misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

228.    At all relevant times, the market for SQM ADSs was an efficient market for the following reasons, among others:

(a)     SQM ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, SQM filed periodic public reports with the SEC; and

(c)     Defendant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## IX.    CLASS ACTION ALLEGATIONS

229.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class is defendant and its families, the officers and directors of the Company, at all relevant times, members of its immediate families and its legal representatives, heirs, successors or assigns and any entity in which defendant has or had a controlling interest.

230.    The members of the Class are so numerous that joinder of all members is impracticable.  SQM ADSs are actively traded on the NYSE and there are over 120 million SQM ADSs outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be

- 101 -

identified from records maintained by SQM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

231.     Common questions of law and fact predominate and include: (i) whether SQM violated the Exchange Act; (ii) whether SQM omitted and/or misrepresented material facts; (iii) whether SQM knew or recklessly disregarded that their statements were false; and (iv) whether SQM's statements and/or omissions artificially inflated the price of SQM ADSs and the extent and appropriate measure of damages.

232.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by SQM's wrongful conduct in violation of federal law that is complained of herein.

233.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

234.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

1100957_1

## FIRST CAUSE OF ACTION

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against SQM

235.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

236.   During the Class Period, SQM disseminated or approved the false statements specified above, which it knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

237.   SQM violated §10(b) of the Exchange Act and Rule 10b-5 in that it:

     (a)   Employed devices, schemes and artifices to defraud;

     (b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     (c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of SQM ADSs during the Class Period.

238.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SQM ADSs.  Lead Plaintiff and the Class would not have purchased SQM ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by SQM's misleading statements.

239.   As a direct and proximate result of SQM's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of SQM ADSs during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding damages and interest;

C.     Awarding Lead Plaintiff reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  January 15, 2016            ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    AELISH M. BAIG
                                    MATTHEW S. MELAMED
                                    JOHN H. GEORGE


                                            s/ Aelish M. Baig
                                    _____
                                         AELISH M. BAIG

                                    Post Montgomery Center
                                    One Montgomery Street, Suite 1800
                                    San Francisco, CA  94104
                                    Telephone:  415/288-4545
                                    415/288-4534 (fax)
                                    aelishb@rgrdlaw.com
                                    mmelamed@rgrdlaw.com
                                    jgeorge@rgrdlaw.com

- 104 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
stirabassi@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN W. BEAR
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nbear@rgrdlaw.com

Lead Counsel for Plaintiff

1100957_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 15, 2016.

<div style="margin-left: 50%;">

s/ Aelish M. Baig
AELISH M. BAIG

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:aelishb@rgrdlaw.com

</div>

1100957_1

## Mailing Information for a Case 1:15-cv-02106-ER

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Brian E Cochran**
  bcochran@rgrdlaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **Scott Alexander Edelman**
  sedelman@milbank.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Grant Richard Mainland**
  gmainland@milbank.com,calipio@milbank.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,iveneck@rgrdlaw.com,e_file_ny@rgrdlaw.com,aelishb@rgrdlaw.com,smorris@rgrdlaw.com,mmelamed@rgrdlaw.com,e_file_sd@rgrdlaw.

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,errol.hall@blbglaw.com,ross@blbglaw.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,tomm@hbsslaw.com,chi_filings@hbsslaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Richard Gielata
,