UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN VILLELLA, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>CHEMICAL AND MINING COMPANY OF CHILE, INC., et al.,<br><br>               Defendants. | No. 1:15-cv-02106-ER<br><br>The Honorable Edgardo Ramos<br><br>**ECF Case**<br><br>**Oral Argument Requested** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHEMICAL AND MINING COMPANY OF CHILE, INC.'S MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

MILBANK, TWEED, HADLEY & MCCLOY LLP
Scott A. Edelman (sedelman@milbank.com)
Grant R. Mainland (gmainland@milbank.com)
28 Liberty Street
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant Chemical and Mining Company of Chile, Inc.*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES…………………………………………………...………........ii

PRELIMINARY STATEMENT ............................................................................................ 1

SUMMARY OF ALLEGATIONS ........................................................................................ 4

     A.     The parties........................................................................................................ 4

     B.     Disclosures regarding Contesse's $13 million in payments to Chilean
           political figures ................................................................................................ 5

     C.     Disclosures regarding the Corfo arbitration.................................................... 6

     D.     The alleged false and misleading disclosures .................................................. 7

ARGUMENT ......................................................................................................................... 8

I.     THE CONSOLIDATED COMPLAINT SHOULD BE DISMISSED UNDER THE
      DOCTRINE OF *FORUM NON CONVENIENS*.................................................... 8

     A.     Plaintiff's choice of forum is entitled to little, if any, deference. ........................ 8

     B.     Chile is an adequate alternative forum.................................................................. 9

     C.     The balance of private and public interest factors strongly favors dismissal. ...... 10

           1.     The private factors strongly favor dismissal. ............................................. 11

           2.     The public factors strongly favor dismissal. ............................................. 12

II.    THE CONSOLIDATED COMPLAINT SHOULD BE DISMISSED FOR FAILURE
      TO STATE A CLAIM. ............................................................................................ 14

     A.     Plaintiff fails to plead a material misstatement or omission. ............................... 15

           1.     Compliance with applicable law and effectiveness of internal controls... 15

           2.     Adoption of a code of ethics .................................................................... 18

           3.     Financial reporting and accounting........................................................... 19

           4.     Arbitration with Corfo ............................................................................. 20

     B.     Plaintiff fails to plead a strong inference of scienter with respect to any of the
           alleged misstatements. ........................................................................................ 22

           1.     Plaintiff does not allege a motive to defraud. ........................................... 23

           2.     Plaintiff does not allege strong circumstantial evidence of conscious
                misbehavior or recklessness.................................................................... 23

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegon N.V. Sec. Litig.*,
   2004 WL 1415973 (S.D.N.Y. 2004) ...................................................................25

*In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*,
   574 F. Supp. 2d 272 (E.D.N.Y. 2008) ............................................................9, 10

*Alfadda v. Fenn*,
   159 F.3d 41 (2d Cir. 1998) ..........................................................................12, 13

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
   994 F.2d 996 (2d Cir. 1993) ...............................................................11, 12, 13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ..........................................................................4, 14

*Base Metal Trading SA v. Russian Aluminum*,
   253 F. Supp. 2d 681 (S.D.N.Y. 2003) ............................................................9, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................14

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ..................................................................15, 18

*In re BP p.l.c. Sec. Litig.*,
   27 F. Supp. 3d 755 (S.D. Tex. 2014) ...........................................................13, 14

*Butcher v. Gerber Prods. Co.*,
   1998 WL 437150 (S.D.N.Y. Aug. 3, 1998) .......................................................9

*Carey v. Bayerische Hypo-und Vereinsbank AG*,
   370 F.3d 234 (2d Cir. 2004) ...........................................................................11

*CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*,
   1998 WL 512951 (S.D.N.Y. Aug. 18, 1998) ....................................................14

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ............................................................................24

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..............................................................20

*City of Brockton Ret. Sys. v. Avon Prods.*,
   2014 WL 4832321 (S.D.N.Y. Sept. 28, 2014) .................................................18

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..................................................................................15, 18

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009).............................................................................20

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  2015 WL 5311196 (S.D.N.Y. Sept. 11, 2015)..............................................................16, 20

*DiRienzo v. Philip Servs. Corp.*,
  294 F.3d 21 (2d Cir. 2002)..................................................................................................14

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).................................................................................16

*ECA & Local 134 IBEW Joint Pension Tr. v. JPMorgan Chase & Co.*,
  553 F.3d 187 (2d Cir. 2009)..................................................................................19, 22, 23

*Europe & Overseas Commodity Traders v. Banque Paribas London*,
  940 F. Supp. 528 (S.D.N.Y. 1996) .....................................................................................13

*In re European Aeronautic Def. & Space Co. Sec. Litig.*,
  703 F. Supp. 2d 348 (S.D.N.Y. 2010)................................................................................10

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)..................................................................................15, 19, 23

*In re Gilat Satellite Networks*,
  2005 WL 2277476 (E.D.N.Y. 2005)....................................................................................25

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010)................................................................................21

*In re GlaxoSmithkline PLC*,
  2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) .....................................................................21

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947)................................................................................................................8

*Gusinsky v. Barclays PLC*,
  944 F. Supp. 2d 279 (S.D.N.Y. May 13, 2013) ............................................................15, 18

*Howe v. Goldcorp Invs., Ltd.*,
  946 F.2d 944 (1st Cir. 1991)..............................................................................................12, 13

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
  Scot. Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015)...............................................................................................19

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
    34 F. Supp. 3d 298 (S.D.N.Y. 2014)...................................................................24

*La Russo v. St. George's Univ. Sch. of Med.*,
    936 F. Supp. 2d 288 (S.D.N.Y. 2013).............................................................9, 11

*Lindner Fund, Inc. v. Polly Peck Int'l PLC*,
    811 F. Supp. 133 (S.D.N.Y. 1992) .....................................................................11

*Lipow v. Net1 UEPS Techs., Inc.*,
    2015 WL 5459730 (S.D.N.Y. Sept. 16, 2015).....................................................22

*Medis Inv. Grp. v. Medis Techs., Ltd.*,
    586 F. Supp. 2d 136 (S.D.N.Y. 2008).................................................................24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................20, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................3, 16, 17, 18

*Otor, S.A. v. Crédit Lyonnais, S.A.*,
    2006 WL 2613775 (S.D.N.Y. Sept. 11, 2006).....................................................13

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    2015 WL 9462115 (S.D.N.Y. Dec. 23, 2015) .....................................................24

*In re PetroChina Co. Ltd. Sec. Litig.*,
    2015 WL 4619797 (S.D.N.Y. Aug. 3, 2015)............................................15, 16, 18

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)......................................................................................8, 10

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.*
    *Holdings Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012)..................................................................20

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)......................................................................8, 9, 10

*In re Royal Grp. Techs. Sec. Litig.*,
    2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005)..................................................13, 14

*In re Sanofi Sec. Litig.*,
    2016 WL 93866 (S.D.N.Y. Jan. 6, 2016) .............................................................18

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................................23

*Scottish Air Int'l, Inc. v. British Caledonian Grp.*,
  81 F.3d 1224 (2d Cir. 1996)..................................................................8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008).........................................................................14

*Sussman v. Bank of Israel*,
  801 F. Supp. 1068 (S.D.N.Y. 1992)...............................................9, 13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................22, 23

*Tongue v. Sanofi*,
  2016 WL 851797 (2d Cir. Mar. 4, 2016)........................................16, 17

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)................................18, 20

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
  2013 WL 2154381 (S.D.N.Y. Mar. 29, 2013) ....................................24

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. July 21, 2006) .......................................24

*Yung v. Lee*,
  2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002) ...................................13

**Statutes**

15 U.S.C. § 78j(b) ....................................................................... *passim*

15 U.S.C. § 78u-4 ..............................................................1, 4, 21, 25

15 U.S.C. § 78u-5(c) ..........................................................................21

**Other Authorities**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (Aug. 12, 1999) ............................19

Defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Corrected Consolidated Complaint for Violation of the Securities Laws (ECF No. 40, the "Consolidated Complaint") under the doctrine of *forum non conveniens* or, alternatively, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").

## PRELIMINARY STATEMENT

SQM is a Chilean mining corporation.  Over a six-year period, SQM's former Chief Executive Officer, Patricio Contesse G. ("Contesse"), used SQM funds to make approximately $13 million in payments to numerous Chilean political figures.  All of the conduct at issue took place in Chile.  Not surprisingly, all of the critical documents and witnesses, including Contesse, are located in Chile.

Under any reasonable measure, the payments directed by Contesse were immaterial to SQM's financial results, averaging about $2.2 million per year for a company that averaged annual revenues of $2 billion and net income of over $440 million during the relevant period. Moreover, Plaintiff does not plead any facts demonstrating that Contesse or anyone else at SQM believed that the payments were illegal.

This action should be dismissed at the pleadings stage on numerous grounds.

***Forum non conveniens.***  This case has nothing to do with the United States and everything to do with Chile, and accordingly should be dismissed under the doctrine of *forum non conveniens*.  The pleadings establish:

- SQM is a Chilean corporation headquartered in Santiago and incorporated under the laws of Chile.

- The Company's common stock trades on the Santiago Stock Exchange.

- Plaintiff's claims are premised on an alleged scandal "implicat[ing] many of Chile's most powerful heads of business and state" in which dozens of Chilean political figures received payments through the issuance of third-party invoices, potentially in violation of Chilean tax law.

- The scandal is the subject of investigations and other proceedings by multiple arms of the Chilean government—the Ministerio Público de Chile (Chile's public prosecutor), the Servicio de Impuestos Internos (Chile's internal revenue service), and the Superintendencia de Valores y Seguros (Chile's securities regulator).

- All of the potential witnesses, including Contesse (who is not a defendant in this action), are located in Chile.

- All of the relevant documents, almost all of them in Spanish, are located in Chile.

- The statements challenged by Plaintiff as fraudulent were prepared in Chile and, where appropriate, audited by Chilean accountants using Chilean GAAP or International Financial Reporting Standards ("IFRS").

- One of the challenged statements concerns a dispute between SQM and the Chilean government over a lease to government-owned mining rights in Chile.

- No conduct is alleged to have occurred in New York or the United States.

- Plaintiff is a U.K. pension fund.

The *only* connection to New York or the United States is that SQM American Depositary Shares ("ADSs") trade on the New York Stock Exchange ("NYSE"). The case law makes clear, however, that the listing of shares on a U.S. exchange does not create an irrefutable right to a U.S. forum where, as here, the other factors point so strongly to a foreign jurisdiction. This case belongs in a Chilean court, not an American one. The Court should exercise its broad discretion to dismiss the case under the doctrine of *forum non conveniens*.

**Failure to state a claim.**  Should this Court decline to dismiss the Consolidated Complaint on *forum non conveniens* grounds, dismissal is warranted under Rules 9(b) and 12(b)(6) for failure to state a claim of securities fraud.

2

Plaintiff alleges that SQM falsely stated in its annual and quarterly SEC filings: (1) that the Company was "in compliance with all applicable laws" and that its internal controls were effective (*e.g.*, ¶¶ 82-83); (2) that it had adopted a code of ethics (*e.g.*, ¶ 84); and (3) that its financial statements were accurate and compliant with Chilean GAAP or IFRS (*e.g.*, ¶¶ 86-87). Plaintiff further alleges that SQM's Annual Report for the year ending December 31, 2014 (the "2014 Annual Report") was materially misleading because it failed to warn that the Chilean government's investigations into the payments to political figures could harm SQM's position in an arbitration over a mining lease with a government entity called Corporación de Fomento de la Producción de Chile ("Corfo").  (¶¶ 193, 200.)  Plaintiff alleges that this risk later materialized when Corfo pulled out of settlement talks with SQM.  (¶ 217.)

These allegations are fatally deficient in two respects:  (1) they fail to plead a material misstatement or omission; and (2) they fail to plead a strong inference of scienter.

***No material misstatement or omission.***  First, the statements concerning the Company's compliance with applicable law and effectiveness of internal controls were non-actionable statements of opinion under the standard set forth by the U.S. Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015); in addition, courts have found such generalized statements concerning legal compliance and internal controls immaterial as a matter of law.  Second, with respect to the statements concerning SQM's adoption of a code of ethics, Plaintiff has pleaded no facts showing that SQM did ***not*** adopt a code of ethics; rather, Plaintiff alleges that SQM failed to adhere to the one it had adopted—an allegation that, even assuming it to be true, does not plead a false statement.  Third, any inaccuracies in the financial statements were both quantitatively and qualitatively immaterial; Plaintiff has not identified in what respect any accounting standards were violated; and even if it had, mere allegations of inaccuracies in accounting are insufficient to state a securities fraud claim.  Finally, the statements concerning Corfo are non-actionable because the 2014 Annual Report fully disclosed the risks arising from both the arbitration with Corfo and the government investigations into the payments to Chilean political figures; the statements are

protected by the PSLRA's safe harbor for forward-looking statements; and no facts are pled showing that Corfo's rejection of settlement talks was related to the payments to political figures.

***No strong inference of scienter.***  Plaintiff also fails to plead a strong inference of scienter.  The Consolidated Complaint does not allege a motive to defraud, as there is no allegation that Contesse sold stock or otherwise sought to benefit personally from the supposed price inflation; rather, the only allegations relating to motive suggest that Contesse acted to further the business interests of the Company and its shareholders.  Nor does Plaintiff plead conscious misbehavior or recklessness.  Plaintiff merely alleges that Contesse directed payments to Chilean political figures, not that he believed these payments were illegal or otherwise improper.  Absent such facts, Plaintiff has no support for its claim that SQM or Contesse believed that SQM's statements concerning compliance with law or ethics, or the effectiveness of its internal controls, were false or misleading.  Likewise, Plaintiff offers no factual support for the contention that SQM misstated its financial results with the intent to defraud investors.  Indeed, to the extent SQM's financials were inaccurate, the inaccuracy caused SQM to appear financially ***weaker***—a fact that is plainly inconsistent with an intent to artificially inflate the price of SQM shares.  Accordingly, Plaintiff has not pleaded particularized facts showing an intent to deceive, manipulate, or defraud, as required by Section 10(b) and the PSLRA.

## SUMMARY OF ALLEGATIONS[1]

### A.      The parties

SQM is "one of Chile's largest companies" (¶ 2),[2] specializing in the production of fertilizers and chemicals derived principally from caliche ore and salt brines mined in Northern Chile (¶¶ 18-19).  The Company is headquartered in Santiago and incorporated under the laws of

---

[1] Solely for purposes of this motion to dismiss, Defendant accepts as true, as it must, the well-pleaded allegations of the Consolidated Complaint.  Defendant does not concede the truth of any such allegations and reserves the right to contest the accuracy of any of the facts alleged in the Consolidated Complaint.  Defendant also cites certain SEC filings relied upon by Plaintiff in the Consolidated Complaint, as permitted by Second Circuit precedent.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] Unless otherwise specified, "¶ __" refers to paragraphs in the Consolidated Complaint.  "Ex. __" refers to exhibits to the Declaration of Grant R. Mainland, dated March 30, 2016, filed herewith.

Chile.  (Ex. A at 19.)  Over 96% of the Company's employees are located there.  (Ex. A at 97.)
SQM's stock trades on the Santiago Stock Exchange.  (¶ 18.)  SQM's ADSs are listed on the
NYSE, constituting 23.5% of the Company's equity as of April 30, 2015.  (Ex. A at 109.)

Lead Plaintiff, the Council of the Borough of South Tyneside, Acting in Its Capacity as
the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff"), is a pension fund
located in South Shields (¶ 17), a town on the northeast coast of England.  Plaintiff manages
assets valued at approximately 6.4 billion British pounds sterling.  (*Id.*)

### B.  Disclosures regarding Contesse's $13 million in payments to Chilean political figures

On February 26, 2015, the Company announced the formation of an Ad Hoc Committee
to investigate reports that SQM may have been involved in activity under investigation by
Chilean prosecutors at "one of Chile's largest financial firms, Penta."  (¶¶ 21, 26.)  The Chilean
government was then investigating whether Penta made payments to Chilean political figures
through invoices issued by third parties, allegedly in violation of Chilean tax laws.  (¶¶ 21, 23.)

On March 6, 2015, SQM received an information request from the head of the Ministerio
Público de Chile relating to alleged tax avoidance through the payment of such invoices.  (¶ 26.)
SQM's board of directors debated how best to respond to the public prosecutor's request.
(¶¶ 27-28.)  One director resigned from the Ad Hoc Committee during that debate.  (¶ 28.)

On March 16, 2015, SQM announced the termination of Contesse, its then-CEO.  (¶ 32.)
On March 18, 2015, SQM disclosed that three directors had resigned, each of whom had been
nominated by Potash Corporation of Saskatchewan, Inc. ("Potash"), a Canadian corporation and
SQM's largest noncontrolling shareholder.  (¶ 34.)  Potash stated that the directors resigned due
to disagreements over SQM's response to the Chilean government investigations.  (¶ 36.)  SQM
ADSs fell by about 15%.  (¶ 214.)  Investigations were later commenced by the Servicio de
Impuestos Internos, Chile's internal revenue service, and the Superintendencia de Valores y
Seguros, Chile's securities regulator.  (¶¶ 39, 45.)  Despite these new investigations, on April 24,
2015, three new Potash executives joined the SQM board of directors.  (¶ 52.)

On March 25, 2015, SQM announced that it had identified approximately $11 million in payments originating from the office of the former CEO between 2009 and 2014 that lacked sufficient supporting documentation or that may not have been necessary to generate corporate income, and that accordingly may not have qualified as valid tax expenses.  (¶ 42.)  On May 18, 2015, in the 2014 Annual Report, SQM stated that it had identified an additional $2 million in such payments.  (¶ 52.)  The 2014 Annual Report described the Chilean governmental proceedings against the Company and certain of its directors and officers, including the nature of the claims asserted against them and the risks to the Company arising therefrom.  (*Id.*)[3]  SQM further disclosed a material weakness in its internal controls relating to "payments made by the office of the former Chief Executive Officer," noting that management had concluded that its internal controls over financial reporting were not effective as of December 31, 2014.  (*Id.*)

### C.       Disclosures regarding the Corfo arbitration

The 2014 Annual Report also described the status of arbitration proceedings initiated by Corfo, a Chilean government entity, against an SQM entity called SQM Salar S.A. concerning a government lease to mining rights in Northern Chile.  (¶¶ 193, 200.)  SQM explained that "SQM Salar in consultation with external counsel believes that it is likely it will prevail in the arbitration proceeding," but also stated that the parties were discussing a potential resolution. (¶ 193.)  Even Plaintiff concedes that SQM further "warn[ed] about negative outcomes." (*Id.*)[4]

---

[3] Specifically, the 2014 Annual Report stated that the Company "could be subject to civil, criminal or regulatory proceedings in Chile and . . . outside of Chile, including for violation of the U.S. securities or anti-corruption laws"; that such proceedings "could divert our management's attention from day-to-day operations"; that litigation expenses and claims for indemnification, advancement or reimbursement could arise; that "[w]e may be required to pay material damages or penalties or have other remedies imposed upon us"; that "we could be required to restate financial information for prior reporting periods"; and that "[t]he occurrence of any of the foregoing could materially and adversely affect our business, financial condition, cash flows, results of operations and the prices of our securities."  (¶ 52).

[4] The Company stated:  "[A]n adverse ruling awarding damages sought by Corfo or permitting early termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash flows and results of operations.  We cannot assure you that Corfo will not use this arbitration to seek to renegotiate the terms of the Lease Agreement in a manner that is not favorable to SQM Salar.  Although the parties are currently discussing potential resolutions, we cannot assure you that such discussions will be successful or that Corfo will not take other actions in the future in relation to the Lease Agreement that are contrary to our interests."  (¶ 193.)

On June 18, 2015, reports indicated that Corfo had rejected settlement talks with SQM. (¶ 217.)  SQM ADSs fell by about 13%.  (¶ 218.)  A report by a stock analyst stated that Corfo's arguments for terminating the lease included "bad corporate governance, unfair related parties transactions, unfair transfer prices, lack of disclosure and environmental rules breakage." (¶ 217.)  Plaintiff alleges, without any factual basis, that the reference to "bad corporate governance" alluded to Contesse's payments to Chilean political figures.  (¶¶ 193, 200.)

**D.**   **The alleged false and misleading disclosures**

Plaintiff's claims are premised on statements in each of the Company's annual and quarterly SEC filings beginning with SQM's Annual Report for the year ending December 31, 2009 and ending with the 2014 Annual Report.  (¶¶ 80-193.)  Except for the statements in the 2014 Annual Report concerning the arbitration with Corfo, the challenged statements are largely identical across the six years' worth of filings and fall into five basic categories.  First, the Company stated that there were no material undisclosed legal or administrative proceedings pending against the Company, and that the Company "believe[d]" it was "in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business."  (*E.g.*, ¶ 82.)  Second, the Company stated that its management had concluded that the Company's internal controls over financial and non-financial information were "effective" as of the date of the filing.  (*E.g.*, ¶83.)  Third, the Company stated that it had "adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F."  (*E.g.*, ¶ 84.)  Fourth, the Company reported its financial results, including its net income and paid income tax.  (*E.g.*, ¶ 86.)  Finally, the Company stated that its financial statements were prepared in accordance with Chilean GAAP or IFRS (*e.g.*, ¶ 87), and that the Company's financial statements "reflect[ed] fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized income and expenses and cash flows" (*e.g.*, ¶ 92).

## <u>ARGUMENT</u>

**I.     THE CONSOLIDATED COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.**

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).  In deciding whether to dismiss an action on the ground of *forum non conveniens*, courts consider (1) the degree of deference properly accorded the plaintiff's choice of forum; (2) whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) the balance of private and public interest factors implicated in the choice of forum.  *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).  The decision to grant such a motion "lies wholly within the broad discretion of the district court."  *Scottish Air Int'l, Inc. v. British Caledonian Grp.*, 81 F.3d 1224, 1232 (2d Cir. 1996).  No single factor is dispositive.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249-50 (1981) ("If central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable.").

As set forth below, this action involves a Chilean company, Chilean events, Chilean witnesses, Chilean legal issues, and even Chilean GAAP.  Chile provides an adequate alternative forum and its interest in the underlying payments to Chilean political figures dramatically outweighs any conceivable interest the United States could have.  Accordingly, the case should be dismissed under the doctrine of *forum non conveniens*.

**A.     Plaintiff's choice of forum is entitled to little, if any, deference.**

The first step of the *forum non conveniens* analysis is to determine the degree of deference owed the plaintiff's choice of forum.  *See Pollux*, 329 F.3d at 70.  In a case where a plaintiff seeks to sue in its home forum, that choice of forum deserves some deference.  *Id.*  But here, Plaintiff is a pension fund located in South Shields, England.  (¶ 17.)  Thus, any deference to its choice of forum should be limited.  *See id.* at 71 (foreign plaintiff's decision to sue in the United States is "entitled to less deference because one may not easily presume that choice is

8

convenient"). This is especially so where, as here, the dispute involves events, witnesses, and evidence located entirely outside the United States. *See Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 693-94 (S.D.N.Y. 2003); *see also La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 305 n.13 (S.D.N.Y. 2013) (Ramos, J.) (finding dismissal warranted on *forum non conveniens* grounds in part because "all the relevant events giving rise to Plaintiff's claims occurred in Grenada").

That Plaintiff is pursuing class claims does not preclude dismissal. Courts give little weight to a plaintiff's choice of forum in class actions because the large number of potential plaintiffs will "'each possibly [be] able to make a showing that a particular forum is best suited for the adjudication of the class claim.'" *Butcher v. Gerber Prods. Co.*, 1998 WL 437150, at *10 (S.D.N.Y. Aug. 3, 1998) (quoting *Eichenholtz v. Brennan,* 677 F.Supp. 198, 202 (S.D.N.Y. 1988)). The class is likely to include persons from all over the globe, including Chile. Even if Plaintiff alleged that a majority of putative class members were Americans (it does not), "[w]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against *forum non conveniens* dismissal is diminished." *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) (citing *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (dismissing case on ground of *forum non conveniens* because it had "little to do with [plaintiff's chosen forum] or any other jurisdiction in the United States" despite a "significant number of American shareholder[]" plaintiffs)).

### B.     Chile is an adequate alternative forum.

The next step in the Court's *forum non conveniens* analysis is to determine "whether an adequate alternative forum exists." *Pollux*, 329 F.3d at 74. An alternative forum is adequate if two criteria are met: "the defendants are amenable to service of process there, and . . . it permits litigation of the subject matter in dispute." *Id.* at 75. To establish the inadequacy of an alternative forum, plaintiffs must demonstrate that they are "highly unlikely to obtain basic justice" in the proposed forum. *In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29,*

*2006*, 574 F. Supp. 2d 272, 283 (E.D.N.Y. 2008), *aff'd sub nom. Lleras v. Excelaire Servs. Inc.*, 354 F. App'x 585 (2d Cir. 2009) (internal quotation marks and citation omitted).  It is only in "rare circumstances" that the remedy offered in the alternative forum is so "clearly unsatisfactory" as to render the alternative forum inadequate.  *Piper Aircraft*, 454 U.S. at 255.

Chile is clearly an adequate alternative forum for this dispute.  As set forth in the affidavit of Mr. Pedro Pablo Vergara,[5] a Chilean commercial litigator and professor of law, SQM is subject to service of process in Chile.  (*See* Vergara Decl. ¶¶ 10-11.)[6]  Further, Chilean law permits litigation of the subject matter of the dispute:  Articles 53 and 55 of the Chilean Securities Law together provide for a private right of action for stockholders who claim they have suffered injury as a result of a company's false or misleading disclosures.  (*Id.* ¶¶ 12-14.)  It is true that Chile, like many fora, does not permit class actions, although Chilean law imposes no restrictions on the number of claimants who can join a securities lawsuit.  (*Id.* ¶ 15.)  In any event, as the Second Circuit has held, the fact that a foreign court "'do[es] not recognize class actions . . . is not so burdensome as to deprive the plaintiffs of an effective alternative forum.'" *In re European Aeronautic Defence & Space Co. Sec. Litig.*, 703 F. Supp. 2d 348, 360 (S.D.N.Y. 2010) (quoting *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002)).

###### C. The balance of private and public interest factors strongly favors dismissal.

The final step in the *forum non conveniens* analysis is to "balance factors of private and public interest . . . based on weighing the relative hardships involved."  *Pollux*, 329 F.3d at 70. "The private interest factors relevant here include:  (1) the relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses, and (3) all other practical problems that make trial

---

[5] "'[I]n the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties.'"  *Base Metal Trading*, 253 F. Supp. 2d at 699 n.13 (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 645 (2d Cir. 1956)).  Defendant submits herewith the declarations of Pedro Pablo Vergara V. ("Vergara Decl.") and Matias Astaburuaga S. ("Astaburuaga Decl."), General Counsel and Senior Vice President of SQM.

[6] A defendant's agreement to submit to the jurisdiction of the foreign forum can satisfy this requirement.  *In re Air Crash*, 574 F. Supp. 2d at 282-83 (citing *Pollux*, 329 F.3d at 64).  SQM stands ready to so stipulate.

of a case easy, expeditious and inexpensive." *Id.* at 75 (citing *Gulf Oil Corp.*, 330 U.S. at 508). The public interest favors include "court congestion; the interest of forums in having local disputes decided at home; and the interest in having issues of law decided by courts of the nation whose law is involved." *Carey v. Bayerische Hypo- und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004). The ultimate question is "whether the balance strongly favors dismissal." *Id.* Here, both the private and public interest factors overwhelmingly favor litigation of this case in Chile.

### 1.   The private factors strongly favor dismissal.

The record unequivocally reflects that the relevant documentary evidence and percipient witnesses are located in Chile. Because "all of [Defendant's] allegedly fraudulent activity occurred in [Chile], most relevant documents are located there." *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993). The third-party invoices were created in Chile (*e.g.*, ¶ 53), the challenged disclosures were prepared exclusively in Chile (Astaburuaga Decl. ¶¶ 5-6), and any potentially relevant electronic communications are housed there (*id.* ¶ 9). As for witnesses, by far the most relevant witness is Contesse, who Plaintiff alleges is under house arrest in Chile. (*E.g.*, ¶ 3.) All other individuals alleged to have engaged in the conduct underlying the purported securities fraud reside in Chile. (Astaburuaga Decl. ¶¶ 5-6.)

Most important, virtually all of the relevant witnesses are third-party witnesses: Contesse himself is a former SQM employee (¶ 32) and thus is no longer under the control of the Company, and the myriad Chilean political candidates and operatives identified in the Consolidated Complaint are not alleged to have been employed by SQM. Accordingly, this Court would be powerless to compel the appearance of these witnesses; their testimony could be procured, if at all, only through a cumbersome letters rogatory process involving substantially different procedures, including lack of cross-examination by opposing counsel. (*See* Vergara Decl. ¶¶ 20-30.) This fact alone strongly supports dismissal. *See Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 811 F. Supp. 133, 136 (S.D.N.Y. 1992) (dismissing case on *forum non conveniens* grounds because "this Court would be powerless to command" the appearance of witnesses located abroad, including former employees of the defendant company); *see also La*

*Russo*, 936 F. Supp. 2d at 305 n.13 (Ramos, J.) (finding dismissal warranted on *forum non conveniens* grounds in part because "[t]his court lacks power to compel the attendance of non-party witnesses at a deposition or the production of documents in their possession").

If this case were to proceed, Contesse's testimony would be critical, as Plaintiff's core theory of liability is that Contesse believed his conduct to be illegal, and therefore defrauded SQM's ADS investors when he authorized statements by SQM that it was materially compliant with applicable law, ethics, and accounting standards and that its internal controls were effective. As explained by then-Chief Judge Breyer in affirming the dismissal of a 10b-5 case on the ground of *forum non conveniens*:  "Compulsory process would seem especially important where, as here, fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial."  *Howe*, 946 F.2d at 952 (citing *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978)); *see also Alfadda v. Fenn*, 159 F.3d 41, 48 (2d Cir. 1998) (in securities fraud cases, "[t]he ability to secure witness testimony takes on added importance . . . because . . . 'live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor.'" (quoting *Allstate*, 994 F.2d at 1001)).  Because Contesse's "testimony as to what [he] knew or intended regarding the contents of [SQM's disclosures] is central to the case against [SQM], [his] unavailability is a factor favoring dismissal on the ground of *forum non conveniens*."  *Allstate*, 994 F.2d at 1001.

### 2.    The public factors strongly favor dismissal.

As for the public interest factors, "the interest in having local disputes settled locally" carries unusual weight here.  *Alfadda*, 159 F.3d at 46.  This case involves "one of Chile's largest companies."  (¶ 2.)  At the "epicenter of this action" are "many of Chile's most powerful heads of business and state" (*id.*), a campaign "to control the government and gain influence across Chile's political spectrum" (*id.*), and "an institutional crisis in Chile" (¶ 48)—all of which amounts to "a bomb affecting the country's entire political class" (¶ 3).  Chile's Attorney General has allegedly assumed oversight of the governmental investigations into the matter for the first time in over a decade.  (¶ 5.)  Some of Plaintiff's alleged losses arise from a dispute

between SQM and the Chilean government regarding mining rights in Chile's sovereign territory.  (¶¶ 217-18.)  Chile has a *far* greater interest in this dispute than the United States.

Chile's public interest in this case is all the greater because it will require adjudication of novel issues of Chilean law.  Although the fulcrum of this case is the allegation that Contesse knew his conduct was illegal (*e.g.*, ¶ 53), it remains to be determined by Chilean courts whether Contesse's conduct *was* illegal, putting aside whether Contesse believed it to be.  (*See* Vergara Decl. ¶¶ 31-35.)  Clearly, a Chilean court is better suited to resolve this question of law than an American one.  *Cf. Sussman*, 801 F. Supp. at 1068 ("Israel's public interest" in routing of funds "for the purpose of evading Israeli law" is "far greater than that of the State of New York").

True, the United States has an interest in enforcing the federal securities laws.  But Plaintiff may not avoid *forum non conveniens* dismissal on that basis.  *See Allstate*, 994 F.2d at 1002 ("United States courts have an interest in enforcing United States securities laws, [but] this alone does not prohibit them from dismissing a securities action on the ground of forum non conveniens."); *Howe*, 946 F.2d at 945 (Breyer, C.J.) ("[F]ederal courts possess the power to invoke *forum non conveniens* doctrine in a private action claiming a violation of American anti-fraud securities statutes.").[7]  Nor does a defendant's listing of securities on a U.S. exchange provide a basis to avoid *forum non conveniens* dismissal.[8]  As the court noted in *In re BP*, "[t]o the extent that [Plaintiff] relies upon [Defendant's] decision to exploit the U.S. capital markets, suggesting that it imbues New York with a special interest in [Defendant's] corporate

---

[7] *Accord Alfadda*, 159 F.3d at 45 (rejecting argument "that *forum non conveniens* dismissal is never appropriate when a plaintiff alleges a federal securities . . . cause of action" (citing *Allstate*, 994 F.2d at 1002)); *Otor, S.A. v. Crédit Lyonnais, S.A.*, 2006 WL 2613775, at *5 (S.D.N.Y. Sept. 11, 2006) ("The fact that plaintiff[] ha[s] alleged claims based on the securities laws of this country is not compelling in [the *forum non conveniens*] analysis."); *Europe & Overseas Commodity Traders v. Banque Paribas London*, 940 F. Supp. 528, 537 (S.D.N.Y. 1996) (fact that "at the heart of plaintiff's action are claims under the federal securities laws . . . does not . . . make the United Kingdom a per se inadequate forum"), *aff'd on other grounds*, 147 F.3d 118 (2d Cir. 1998).

[8] *See In re BP p.l.c. Sec. Litig.*, 27 F. Supp. 3d 755, 764-65 (S.D. Tex. 2014) (dismissing case on *forum non conveniens* grounds even though defendant's ADSs traded on NYSE), *aff'd*, 602 F. App'x 199 (5th Cir. 2015); *In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, at *1 (S.D.N.Y. Nov. 21, 2005) (dismissing case on *forum non conveniens* grounds even though defendant's shares traded on NYSE); *Yung v. Lee*, 2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002), *aff'd*, 432 F.3d 142, 144 (2d Cir. 2005) (dismissing case on *forum non conveniens* grounds even though defendant's shares were "listed and traded on the securities markets of the United States").

governance, the same argument can be made about any locality with a stock exchange listing [Defendant's] securities."  27 F. Supp. 3d at 765.[9]

Finally, this Court need not devote its limited resources to claims by investors in a foreign corporation concerning conduct that occurred entirely on foreign soil by foreign citizens involving a foreign country's political and business elite.  *See CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, 1998 WL 512951, at *10 (S.D.N.Y. Aug. 18, 1998) ("[T]he Southern District of New York is a heavily congested district.").  "In light of the limited connection of this dispute to this district," *id.*, this Court should not face additional burdens resolving this dispute.

## II.   THE CONSOLIDATED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

To state a claim of securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead facts showing "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  However, "[s]ecurities fraud claims are subject to heightened pleading requirements"; these claims "must satisfy Rule 9(b), which requires that the circumstances constituting fraud . . . shall be stated with particularity."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (internal quotation marks and citations omitted).

The Consolidated Complaint fails to satisfy Plaintiff's pleading burden in two respects. First, it fails to plead a material misstatement or omission.  Second, it fails to plead a strong inference of scienter.  These deficiencies mandate dismissal.

---

[9] Notably, SQM's NYSE-listed ADSs constitute less than a quarter of its equity; the remainder trades on the Santiago Stock Exchange.  (Ex. A at 109.)  *Compare DiRienzo v. Philip Servs. Corp*., 294 F.3d 21, 31 (2d Cir. 2002) (denying *forum non conveniens* motion where "nearly **80 percent** of the [defendant's] shares sold during the class period were traded on exchanges in the United States"), *with In re Royal Grp.*, 2005 WL 3105341, at *3 (distinguishing *DiRienzo* because "here less than **12%** of Royal Group's shares traded on an American exchange").

## A.      Plaintiff fails to plead a material misstatement or omission.

To satisfy the materiality requirement of Rule 10b-5, the plaintiff must "alleg[e] a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  In addition, "'[t]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *Id.* at 162 (quoting *Basic Inc. v. Levinson* 485 U.S. 224, 231 (1988).  To be considered material, an alleged misstatement must be "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  None of the actual statements challenged by Plaintiff was false or misleading, much less materially so.

### 1.      Compliance with applicable law and effectiveness of internal controls

Plaintiff alleges that the Company "falsely represented that SQM was in compliance with all applicable laws."  (*E.g.*, ¶ 82.)[10]  Here is what SQM actually said:

> There are currently no material legal or administrative proceedings pending against the company with respect to any regulatory matter, except as discussed . . . below, and **we believe** that we are in compliance **in all material respects** with all applicable statutory and administrative regulations with respect to our business.

(¶ 82 (emphasis added).)  Contrary to Plaintiff's characterization, SQM did not represent that it "was in compliance with all applicable laws."  (*Id.*)  Rather, it only represented that there were no undisclosed material legal proceedings pending against the Company (a statement that Plaintiff does not challenge), and that the Company's management "believe[d]" that SQM was in

---

[10] "'[T]he Second Circuit has rejected as insufficiently 'particular' precisely the style of pleading Plaintiff[] use[s] in this case—a 'complaint consist[ing] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding] paragraphs were each materially false and misleading when made for the reasons set forth in ¶ [90] . . . .'"  *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 288-89 (S.D.N.Y. May 13, 2013) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012)), *rev'd on other grounds sub nom. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 2015 WL 4619797, at *8 (S.D.N.Y. Aug. 3, 2015) (Ramos, J.) (same).

material compliance with applicable law.  Plaintiff also alleges that SQM "falsely represented that SQM maintained effective internal controls over financial and non-financial reporting." (¶ 83.)  Not so:  SQM only stated that it had "evaluated" and "assessed" its controls over financial and non-financial reporting, and had "concluded" that the controls were effective.

Each of these statements was a quintessential statement of opinion.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323-24 (2015) (statement of belief in legal compliance a statement of opinion); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245-46 (S.D.N.Y. 2012) (statement of belief in effectiveness of internal controls a statement of opinion).  As the Supreme Court recently held in *Omnicare*,[11] only where a plaintiff can plead facts showing that the speaker ***subjectively disbelieved*** a statement of opinion will the statement be shown to be false.  *Id.* at 1327.  The mere fact that a statement of opinion may later turn out to be erroneous does not show that the opinion was not honestly held.  *Id.*; *see also Sanofi*, 2016 WL 851797, at *6 (FDA's rejection of drug following issuer's statements of optimism regarding FDA approval did not suggest that Defendants "'did not genuinely believe what they were saying at the time they said it'") (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531-33 (S.D.N.Y. 2015)); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2015 WL 5311196, at *15 (S.D.N.Y. Sept. 11, 2015) (denying Section 10(b) claim under *Omnicare* in part because plaintiff did not adequately plead that MetLife did not believe its representations that certain claim reserves were sufficient).  Here, as set forth in Section II.B below, the Consolidated Complaint lacks any allegations showing that Contesse believed that the payments to Chilean political figures violated Chilean law or evaded the Company's internal controls. Plaintiff therefore fails to allege that the Company's statements of belief in its material compliance with law or the effectiveness of its internal controls were false.[12]

---

[11] Though *Omnicare* involved claims arising under Section 11 of the Securities Act of 1933, the Second Circuit has now applied it to Section 10(b) cases.  *See Tongue v. Sanofi*, 2016 WL 851797 (2d Cir. Mar. 4, 2016).

[12] With respect to internal controls in particular, SQM's independent outside auditor attested to the effectiveness of SQM's internal controls over financial reporting in each of the SEC filings in question.  (Exs. B-F.)  Plaintiff does not allege that SQM concealed any weaknesses in its controls from its auditors.  *In re PetroChina*, 2015 WL 4619797, at *11 (Ramos, J.) (noting that internal controls were audited by an independent outside auditor and

Nor has Plaintiff alleged that either statement was misleading due to a material omission. *See Omnicare*, 135 S. C. at 1332 (statement of belief or opinion may be rendered misleading by omission of material facts going to the basis of the opinion).  With the exception of the statements concerning the dispute with Corfo (*see infra* Section II.A.4), Plaintiff does not pursue an omissions theory here.  Even if it did, the Court in *Omnicare* made clear that opinion liability would arise from an alleged omission only where the plaintiff can

> identify ***particular (and material) facts*** going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Omnicare*, 135 S. Ct. at 1332 (emphasis added).  The Court characterized such a pleading as "no small task for an investor."  *Id.*  Plaintiff comes nowhere near satisfying this burden, as no facts are pled going to the basis for SQM's opinion, much less that the Company was advised that the payments were illegal or that the internal controls were materially deficient.

The Second Circuit's recent decision in *Sanofi* demonstrates the difficulty of satisfying this task.  There, the plaintiffs alleged specific undisclosed facts that cut against Sanofi's statements of optimism concerning FDA approval of the company's multiple sclerosis drug— *i.e.*, that the FDA had expressed concern about Sanofi's use of single-blind studies in testing the drug's efficacy.  *See Sanofi*, 2016 WL 851797, at *1-2.  Still, the Second Circuit held that Sanofi's failure to disclose the FDA's concerns was not materially misleading because Sanofi's investors understood that Sanofi received a variety of feedback from the FDA, not all of it positive, and because no facts were alleged showing that Sanofi's confidence in the drug's efficacy was unsupported by a meaningful inquiry.  *See id*. at *9, 11.  Here, Plaintiff alleges no facts at all concerning any legal analysis of the payments to political figures or contradicting the Company's statements that its management had evaluated its internal controls and concluded that

---

plaintiffs did not claim that "PetroChina failed to . . . disclose any weaknesses to its auditors" or "neglected to inform PetroChina's auditors of any relevant fraud").

they were effective.  *See In re PetroChina*, 2015 WL 4619797, at *11 (Ramos, J.) ("The SAC does not claim that PetroChina failed to evaluate its internal controls . . . .").

Moreover, even if Plaintiff had adequately pleaded that Contesse did not believe that SQM was in compliance with the law or that its internal controls were effective, Plaintiff would still have to allege that SQM's generalized statements concerning legal compliance and internal controls were material.  *See Omnicare*, 135 S. Ct. at 1326 (misrepresentation of speaker's opinion would be actionable "assuming the misrepresentation were material").  But the Second Circuit has squarely held that such generalized statements are immaterial as a matter of law.  *See City of Pontiac*, 752 F.3d at 183 ("Plaintiffs' claim that . . . statements [concerning compliance] were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."); *Gusinsky*, 944 F. Supp. 2d at 289-90 (generalized statements concerning legal compliance "f[e]ll squarely within the Second Circuit's definition of non-actionable puffery" and generalized statements concerning effectiveness of internal controls "f[e]ll short" because connection to defendant's LIBOR practices was "too attenuated").[13]

### 2.      Adoption of a code of ethics

Plaintiff alleges that the Company "falsely represented that SQM had adopted a code of ethics adhering to the definition set forth in Item 16B of Form 20-F."  (*E.g.*, ¶ 84.)  But as this Court recently acknowledged in rejecting an identical argument, there is an elementary difference between ***adopting*** a code of ethics and guaranteeing compliance with one.  *See In re PetroChina*, 2015 WL 4619797, at *12 (Ramos, J.) ("Although the Company's codes of ethics prohibit bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them."); *City of Brockton Ret. Sys. v. Avon Prods.*, 2014 WL 4832321, at

---

[13] *See also Bahash*, 506 F. App'x at 37 ("[t]he 'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue"); *In re Sanofi Sec. Litig.*, 2016 WL 93866, at *9 (S.D.N.Y. Jan. 6, 2016) ("statements about Sanofi's maintenance of an 'effective compliance organization' . . . are too general to cause a reasonable investor to rely on them"); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (statements "concerning UBS's compliance with legal . . . standards . . . constitute[d] non-actionable puffery"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

*16 (S.D.N.Y. Sept. 28, 2014) (general statements about compliance with ethical and legal standards "offer no assurance that Avon's compliance efforts will be successful"). Here, Plaintiff has pleaded no facts showing that SQM did not adopt a code of ethics; at most, Plaintiff alleges that SQM failed to adhere to the one it had adopted. Even if that were true (Defendant denies it), Plaintiff does not allege a false statement of material fact.

### 3. Financial reporting and accounting

Plaintiff alleges that SQM misreported its financial results and therefore falsely represented that its financial statements were compliant with Chilean GAAP or IFRS. (*E.g.*, ¶¶ 86, 87, 108.) This claim fails on multiple levels.

Any inaccuracies in the financial statements were quantitatively immaterial. The $13 million in payments over a six-year period (¶ 195(b)) understated net income by $2.2 million per year—about 0.5% of SQM's average annual net income during that period.[14] The $7 million in back taxes attributable to the same period (¶ 52) reflect an understatement of tax liability of $1.2 million per year—about 0.8% of SQM's average annual paid income tax.[15] These immaterial figures do not give rise to a securities fraud claim under Section 10(b). *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (Aug. 12, 1999) ("SAB No. 99") (providing for 5% materiality threshold); *ECA & Local 134 IBEW Joint Pension Trust v. JPMorgan Chase & Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009) (finding allegedly improper accounting treatment did not "even come close to [the 5%] threshold" in SAB No. 99).

Nor is there an argument that the alleged understatements of net income and tax liability were qualitatively material, as the alleged political contributions made SQM appear financially ***weaker***, not ***stronger***. *See IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015) (to be qualitatively material, disclosure must mask issuer's misconduct or negative results); *Ganino*, 228 F.3d at 166 (financial misstatement was material in part because it concealed negative financial

---

[14] SQM's average annual net income was $437,300,000. (*See* ¶¶ 86, 107, 129, 151, 176; Ex. A at F-169.)

[15] SQM's average annual paid income tax was $146,416,667. (*See* ¶¶ 86, 107, 129, 151, 176; Ex. A at F-169.)

performance).[16]  As the court stated in *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Financial Holdings Ltd.*, 886 F. Supp. 2d 328, 336 (S.D.N.Y. 2012) (emphasis in original):

> To allow Plaintiff to argue that a correction that **increases** profits actually harms shareholders would be to force companies into virtual strict liability for any misstatement.  Essentially, Plaintiff is trying to establish a scenario where companies are liable for any accounting misstatement even if shareholders got a bargain for a stock that was ultimately more valuable than they initially thought.

As for accounting standards, Plaintiff has not identified a rule of Chilean GAAP or IFRS that was violated.  *See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, 655 F. Supp. 2d 262, 270 (S.D.N.Y. 2009) (dismissing Section 10(b) claim in part for failure to plead with particularity how GAAP or IFRS standards were violated); *MetLife*, 2015 WL 5311196, at *8 n.107 (dismissing Section 10(b) claim in part for failure to identify "specific principle(s) of accounting that MetLife allegedly violated").  Even if it had, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).[17]

### 4.    Arbitration with Corfo

Finally, Plaintiff alleges that SQM's 2014 Annual Report misled investors by "expressing confidence in its position" in the dispute with Corfo over its lease to the mining rights in the Salar de Atacama, while failing to warn them that "the Company's illegal payments to politicians and inadequate corporate governance and internal controls" could jeopardize the lease.  (¶¶ 193,

---

[16] Even assuming *arguendo* that the payments to political figures were unlawful, there is no allegation that SQM's financial statements concealed the payments.  Had the financials been presented as Plaintiff claims they should have been—with higher net income and income tax—it would have been no clearer to a reader of the financial statements that a supposedly unlawful transaction had occurred than was the case on the financial statements as presented.

[17] *See also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (Section 10(b) claim premised on alleged violations of IFRS fails when not "coupled with evidence of corresponding fraudulent intent"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) ("[T]he GAAP violation claim is fundamentally one challenging Citigroup's management of its financial reporting function and does not allege the sort of fraudulent or deceptive conduct that is actionable under section 10(b)."), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).  Further, "the fact that [SQM's] outside independent auditor . . . did not require a restatement of [SQM]'s financials significantly undercuts Plaintiffs' allegations of recklessness as to compliance with IFRS."  *In re UBS*, 2012 WL 4471265, at *18.

200.)  Plaintiff claims that this supposedly concealed risk later materialized when "analysts

following SQM reported that Corfo rejected settlement talks with SQM and decided to seek early

termination of the lease based on SQM's poor corporate governance."  (¶ 200.)

As an initial matter, no information has emerged that is contrary to SQM's disclosure, as

there has been no determination by any tribunal with respect to the dispute.  That settlement talks

were "rejected" was hardly an unforeseen development.  Surely, the existence of settlement talks

reveals to investors the possibility that there will not be a settlement.  Here, SQM expressly

warned investors of that possibility.[18]

Further, the statements in question are subject to the PSLRA's "safe harbor," which

protects forward-looking statements if they are accompanied by meaningful cautionary language.

*See* 15 U.S.C. § 78u-5(c); *Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010).  The

disclosures concerning the dispute with Corfo are plainly forward-looking.  (*See* ¶ 193 ("SQM

Salar in consultation with external counsel believes that it is likely it will prevail in the

arbitration proceeding.")); *see also In re GlaxoSmithkline PLC*, 2006 WL 2871968, at *10

(S.D.N.Y. Oct. 6, 2006) (defendant's "optimism that [it] would prevail in the litigation is a

classic example of a forward-looking statement and is clearly protected as such.").  And the

statements were accompanied by meaningful cautionary language.  (*See* ¶ 193 (alleging that the

2014 Annual Report "warn[ed] about negative outcomes" in the Corfo dispute).)

In any event, Plaintiff identifies no statement by Corfo suggesting that its rejection of

settlement discussions was driven by the government investigations into SQM's payments to

political figures, and the analyst report purporting to convey Corfo's litigation position merely

states that its reasons included "bad corporate governance, unfair related parties transactions,

unfair transfer prices, lack of disclosure and environmental rules breakage."  (¶ 217.)  Not only is

---

[18] Specifically, the Company stated:  "[A]n adverse ruling awarding damages sought by Corfo or permitting early
termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash
flows and results of operations.  We cannot assure you that Corfo will not use this arbitration to seek to renegotiate
the terms of the Lease Agreement in a manner that is not favorable to SQM Salar.  Although the parties are currently
discussing potential resolutions, we cannot assure you that such discussions will be successful or that Corfo will not
take other actions in the future in relation to the Lease Agreement that are contrary to our interests."  (¶ 193.)

the reference to "bad corporate governance" one of a host of reasons supposedly underlying Corfo's position, it comes nowhere near showing that Corfo's rejection of settlement talks was related to SQM's payments to political figures.  That claim is pure speculation.  *See Lipow v. Net1 UEPS Techs., Inc.*, 2015 WL 5459730, at *20 (S.D.N.Y. Sept. 16, 2015) (Ramos, J.) ("[D]efendants cannot be held liable for failing to disclose what would have been pure speculation.") (internal quotation marks and citation omitted).  Indeed, the generic reference to "corporate governance" more likely was intended to refer to the resignation of the Potash directors, not SQM's payments to Chilean political figures.  (*See supra* at 5; ¶ 34.)

### B. Plaintiff fails to plead a strong inference of scienter with respect to any of the alleged misstatements.

To survive dismissal, a plaintiff's Section 10(b) claim must state ***particularized facts*** giving rise to a "strong inference" that "the defendant acted with . . . an intent to 'deceive, manipulate, or defraud.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  "When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  The only person whose intent could even arguably be imputed to SQM is Contesse, the Company's former CEO.[19]

To establish that Contesse acted with an intent to deceive, manipulate, or defraud, Plaintiff must plead facts creating an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  A plaintiff may establish scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  The Consolidated Complaint does not satisfy either of these requirements.

---

[19] Although the Consolidated Complaint includes various allegations concerning SQM's current CEO and CFO, no facts are pled that even purport to show that these individuals knew or had reason to know about the alleged payments to Chilean political figures at the time the payments or the challenged statements were made.

### 1.   Plaintiff does not allege a motive to defraud.

To establish a motive to defraud, Plaintiff must plead facts showing that Contesse "benefitted in some concrete and personal way from the purported fraud," *Novak*, 216 F.3d at 311, such as by selling stock to profit from the alleged inflation of the price of the stock.  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) ("The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit.").  The Consolidated Complaint alleges no such personal transactions[20] or other self-interested conduct.  Indeed, the only allegations relating to motive suggest that Contesse acted to further SQM's business interests, *i.e.*, so that "SQM [could] benefit financially from improper payments" (¶ 77) or enjoy a lower tax burden (*e.g.*, ¶ 195(c)).[21]  But even if either theory were supported by actual facts (they are not), this would at most show that Contesse sought to benefit ***the Company***, not ***himself***.

### 2.   Plaintiff does not allege strong circumstantial evidence of conscious misbehavior or recklessness.

Having failed to allege motive, "the strength of the circumstantial allegations [of scienter] must be correspondingly greater."  *ECA*, 553 F.3d at 199.  Plaintiff cannot meet this burden.

As noted in the Consolidated Complaint, Contesse understood himself to have an annual "discretionary budget" of $6 million.  (¶ 52.)  Thus, the allegation that Contesse, when asked, was unable to "justify the payments" or provide "sufficient documentation" of the transactions underlying them (¶ 43) at most shows that Contesse could not provide sufficient detail about how he used his "discretionary budget," not that he believed he was making illegal payments.  A more plausible inference is that Contesse simply made payments over which he believed he had discretion, ***not*** that he engaged in fraud.  *See Tellabs*, 551 U.S. at 314 (inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").

---

[20] In any event, as noted above (*see supra*  at 4, 19-20), if Contesse's desire were to fraudulently inflate the stock price, it stands to reason that he would have sought ways to ***increase*** the Company's net income, rather than to ***decrease*** it by spending SQM revenues on political contributions, as the Consolidated Complaint alleges.

[21] These allegations are entirely conclusory and thus need not be credited even for purposes of this motion to dismiss.  *See Ganino*, 228 F.3d at 169 ("[S]peculation and conclusory allegations will not suffice.").  In any event, as noted above (*see supra* at 4 n.1), Defendant reserves the right to contest the accuracy of these facts.

Plaintiff further alleges that Contesse was present at meetings with political fundraisers where payments to political figures were discussed.  (¶ 51.)  Contesse's mere presence at such meetings, however, does not show that he knew such payments were illegal, nor do the allegations of Chilean prosecutors in cases that have yet to result in findings of culpability.  *See Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154381, at *1 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations . . . provides no evidence of scienter."); *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (allegations of government investigations, while not "categorically irrelevant" to scienter inquiry, "are not tremendously probative," especially where "[i]t is not clear whether, or how much, each investigation hinged on the Defendants' states of mind . . . and none has yet been resolved").  Plaintiff's allegation that the Company's CFO had determined, after the fact, that "there was no review or audit of the payments" nor efforts "to ensure that the invoices reflected services performed" (¶ 57), is likewise unavailing, as this allegation sounds in negligence, not fraud.  *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 2015 WL 9462115, at *14 (S.D.N.Y. Dec. 23, 2015) (Ramos, J.) ("Recklessness in the scienter context . . . cannot be merely enhanced negligence." (internal quotation marks and citation omitted)); *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008) ("To properly allege recklessness, the plaintiff must plead 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)).

Plaintiff has also failed to allege scienter with respect to the Company's financial statements and the statements concerning accounting standards, as there is no allegation that these statements were intended to artificially inflate the stock price.  *See In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. July 21, 2006) ("[T]o establish scienter, defendants' awareness of incidences of improper accounting in violation of GAAP must also be accompanied by allegations showing defendants' intent to defraud the public regarding the content of the company's financial records."); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 266 (2d Cir. 1996) ("The mere fact that GE's financial reporting was inaccurate does not establish scienter.").

As noted above (*see supra* at 4 & 23 n.20), the alleged financial and accounting inaccuracies had the effect of **depressing** SQM's financial results, and thus could not have **inflated** the stock price.

Finally, with respect to the Corfo statements, "the defendant's state of mind is irrelevant" because the statements are forward-looking and accompanied by meaningful cautionary language. *In re Gilat Satellite Networks*, 2005 WL 2277476, at *15 (E.D.N.Y. 2005). But even if not accompanied by cautionary language, the PSLRA protects forward-looking statements "unless the Plaintiffs plead that the statements were made with actual knowledge by [the speaker] that the statement was false or misleading." *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12 (S.D.N.Y. 2004). There is no such pleading here, as no facts are alleged suggesting that SQM knew that Corfo would reject settlement talks, much less that it would do so on account of government investigations. Moreover, prior to Corfo's rejection of settlement talks, SQM had already disclosed the payments to political figures and the risks relating to its negotiations with Corfo. Plaintiff offers no facts to support the counterintuitive notion that despite SQM's disclosure of those facts, SQM was still looking to deceive investors. Thus, the Consolidated Complaint fails to plead scienter with respect to any of SQM's disclosures.

## CONCLUSION

Defendant SQM respectfully requests that this Court dismiss the Consolidated Complaint with prejudice under the doctrine of *forum non conveniens* or, alternatively, pursuant to Rules 9(b) and 12(b)(6) for failure to state a claim under Section 10(b) and the PSLRA.

Dated:  New York, New York
       March 30, 2016                MILBANK, TWEED, HADLEY & MCCLOY LLP

                                 By:  /s/ Scott A. Edelman
                                 Scott A. Edelman
                                 Grant R. Mainland
                                 28 Liberty Street
                                 New York, New York 10005
                                 Tel:  (212) 530-5000

                                 *Attorneys for Defendant Chemical and Mining Company of Chile, Inc.*