UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEGAN VILLELLA, Individually and on Behalf
of All Others Similarly Situated,

Plaintiff,

– against –

CHEMICAL & MINING CO. OF CHILE INC.,
PATRICIO CONTESSE, PATRICIO DE
SOLMINIHAC, and RICARDO RAMOS,

Defendants.

**OPINION AND ORDER**

15 Civ. 2106 (ER)

Ramos, D.J.:

This action is brought as a putative class action against Chemical and Mining Company

of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or "Defendant") and

individual SQM executives[1] alleging violations of Section 10(b) of the Securities Exchange Act

and Rule 10b-5, promulgated thereunder.  Before the Court is Defendant's motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of *forum non conveniens*, or

alternatively, for failure to state a claim.

For the reasons set forth below, Defendant's motion is DENIED in part and GRANTED

in part.

---

[1] On November 13, 2015, the parties stipulated to the dismissal without prejudice of the individual SQM executives.
(Doc. 38)

## I.  BACKGROUND[2]

### A.  The Parties

SQM is a producer and worldwide distributor of specialty fertilizers and industrial chemicals, based in Chile.  Corrected Consolidated Complaint for Violation of the Securities Laws ("Consolidated Complaint") ¶ 18.  SQM's Series B American Depository Shares ("shares") have been listed on the New York Stock Exchange ("NYSE") since 1993, under the ticker symbol "SQM."  *Id.*  This class action is brought on behalf of all persons who purchased SQM's shares traded on the NYSE between June 30, 2010 and June 18, 2015 (the "Class Period").  *Id.* at ¶ 1.  Lead Plaintiff, the Council of the Borough of South Tyneside, acting in its capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff"), is located in South Shields, Tyne and Wear, England.  *Id.* at ¶ 17.  Plaintiff alleges that it purchased a total of 376,521 shares and suffered damages in excess of $4.4 million during the Class Period as a result of Defendant's securities violations.  *Id.*

### B.  Factual Background

On February 24, 2015, the Attorney General of Chile ("AG") announced an investigation of a bribery and tax-evasion scandal involving the financial firm Banco Penta, which embroiled numerous politicians across the country's political spectrum.  *Id.* at ¶¶ 2, 5.  The scheme involved the creation of fake expense receipts used to lower Banco Penta's taxable income, all for the purpose of funding illegal payments to political candidates.  *Id.*  Two days later, on February 26, 2015, SQM issued a press release divulging that an extraordinary Board meeting

---

[2] The following facts are drawn from allegations contained in the Corrected Consolidated Complaint ("Consolidated Complaint") (Doc. 40), which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also takes judicial notice of the Deferred Prosecution Agreement entered into between SQM and the Department of Justice and SQM's settlement with the SEC on January 13, 2017.  *See Sullivan v. Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of deferred prosecution with Department of Justice).

had been held at the request of SQM's Chairman to "analyze" this escalating political scandal. *Id.* at ¶ 25.  The Board resolved at the meeting to establish a special committee ("Ad-Hoc Committee") comprised of three SQM Board members and the New York office of the law firm Shearman & Sterling, to conduct an investigation.  *Id.* at ¶¶ 9 n.1, 25.  Around the same time, the press started to report that SQM was being investigated by the AG for misconduct similar to Banco Penta's— using fake invoices and phony services to illegally fund politicians.  *Id.* at ¶ 23.

On March 11, 2015, SQM disclosed that its Board would meet the next day to evaluate a request from the Public Prosecutor that SQM deliver accounting records and other information in connection with the investigation into the political contributions scandal.  *Id.* at ¶¶ 26-27.  After the Board meeting on March 12, 2015, SQM issued a press release stating that the Board resolved (i) to request an independent report with respect to a March 6, 2015 letter from the AG requesting certain information from SQM, (ii) to schedule another extraordinary Board meeting on March 16, to analyze the independent report and decide whether to comply with the AG's request, (iii) to ratify its willingness to cooperate with the Public Prosecutor's investigation and request for information, and (iv) to inform the AG of the Board's plan in response to his March 6, 2015 letter.  *Id.* at ¶ 27.  Four days later, on March 16, SQM issued a subsequent press release announcing that the Board had unanimously voted to terminate its Chief Executive Officer ("CEO") Patricio Contesse, who had attempted to block the Board's decision to turn the information over to the IRS.  *Id.* at ¶ 32.  The Board subsequently voted to designate Patricio Solminihac Tampier ("Solminihac") as the new CEO of SQM.  *Id.*

On March 18 – just two days after the press release –  SQM announced that three SQM Board members from the Canadian stakeholder Potash Corporation of Saskatchewan, Inc. ("Potash Directors") – SQM's largest noncontrolling shareholder – had resigned from the Board.

*Id.* at ¶¶ 210-11.  SQM disclosed in a press release that day that the Potash Directors had resigned because they could not ensure an adequate investigation of SQM and that their "emphatic requests" that SQM cooperate fully with the authorities had been rejected by a majority of the Board.  *Id.* at ¶ 36.  Plaintiff alleges that as a result of SQM's disclosures, as of March 17, 2015, SQM shares dropped more than 15% from its price on February 25, 2015.  *Id.* at ¶ 11.  SQM shares also fell an additional 15% after the Potash Directors' resignation.  *Id.*

In late March and early April 2015, both the Chilean tax regulatory agency (a/k/a Servicio de Impuestos Internos) ("SII") and the securities regulator (Superintendencia de Valores y Seguros) ("SVS") initiated criminal proceedings against SQM Board members and representatives.  The five individuals were criminally charged with, among other offenses, participation in tax fraud and "failure to provide the market with information that could be relevant for investment decisions" in violation of the Chilean corporations code.  *Id.* at ¶¶ 39, 45.  The charges were brought based on numerous declarations from the recipients of SQM's payments, who admitted that they submitted invoices to SQM without having provided services.  *Id.* at ¶¶ 47, 50, 56.  The investigation also led to an admission by SQM's Chief Financial Officer ("CFO") Ricardo Andres Ramos Rodriguez that SQM made 1,000 payments to companies without any consideration of whether they were based on services rendered.  *Id.* at ¶ 57.  In September, the SII updated its complaint against Contesse to include allegations that he authorized the submission of 91 additional false invoices for expenses totaling more than CLP 309 million.

On December 15, 2015, SQM filed a Form 6-K with the Securities Exchange Commission ("SEC") summarizing the findings of the Ad-Hoc Committee's investigation.  The Committee found that payments were made on invoices that lacked supporting documentation,

that SQM's books did not accurately reflect questioned transactions and that SQM lacked sufficient controls over expenses managed by Contesse. *Id.* at ¶ 75. The Committee also stated that it found no evidence demonstrating that the payments were made in order to induce a public official to act or refrain from acting. *Id.* at ¶ 76. Plaintiff nevertheless claims that the "illegal acts perpetrated by SQM's top executives acting on [SQM's] behalf, extended its sphere of influence throughout Chile's political system." *Id.* at ¶ 78.

### C. The Disclosures

Throughout the Class Period, SQM filed financial reports with the SEC and issued press releases detailing the company's financial performance, including its revenue, gross margins, and earnings per share. *Id.* at ¶ 80. In its Annual Reports filed during the Class Period, SQM also made the following representations:

- **Legal Compliance**

  There are currently no material legal or administrative proceedings pending against the Company with respect to any regulatory matter, except as discussed under 'Safety, Health and Environmental Regulations' below, and we believe that we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business.

- **Internal Controls and Procedures**

  Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported.

- **Code of Ethics**

  We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and

employees. Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act.

The Annual Reports also assured its shareholders that its financial statements were prepared in accordance with Chilean Generally Accepted Accounting Principles ("GAAP") and reported net and paid income tax pursuant to the U.S. GAAP. *See e.g.*, *id.* at ¶¶ 86-87.

In its 2014 Annual Report (filed on May 18, 2015), SQM reported a contract dispute with the Chilean government organization Corporacion de Fomento de la Produccion de Chile ("Corfo") which had issued SQM a lease to mine the valuable Salar de Atacama region – the source of 40% of SQM's revenue. *Id.* at ¶¶ 11, 193. SQM explained that any breaches of the lease were technical and that Corfo was allowed to terminate the agreement only for a material breach. The disclosure further stated that:

> SQM Salar[3] in consultation with external counsel believes that it is likely it will prevail in the arbitration proceeding. However, an adverse ruling awarding damages sought by Corfo or permitting early termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash flows and results of operations. We cannot assure you that Corfo will not use this arbitration proceeding to seek to renegotiate the terms of the Lease Agreement in a manner that is not favorable to SQM Salar. Although the parties are currently discussing potential resolutions, we cannot assure you such discussions will be successful or that Corfo will not take other actions in the future in relation to the Lease Agreement that are contrary to our interests.

*Id.* at ¶ 193.

Plaintiff alleges that SQM's disclosures were materially false and/or misleading, because they failed to disclose: (i) that money from SQM was illegally channeled to bribe Chilean politicians and political parties, (ii) that SQM had filed fictitious tax receipts in order to conceal these bribe payments, (iii) that SQM lacked adequate internal controls over its financial reporting, and (iv) that, as a result, SQM's financial statements were materially false and

---

[3] SQM Salar is a subsidiary of SQM. *See* Consolidated Complaint ¶ 50 n.15.

misleading and not prepared in accordance with applicable accounting principles.  *Id.* at ¶¶ 2-12.
Plaintiff further claims that SQM's negotiation with Corfo was "put at risk" at least in part by
SQM's inadequate corporate governance.  *Id.* at ¶ 11.

On January 13, 2017, SQM agreed to pay a $15 million criminal penalty and $15 million
civil penalty to resolve parallel criminal and civil cases brought by the U.S. Department of
Justice and SEC, respectively.  (Doc. 64, Ex. A-E)  In the deferred prosecution agreement
("DPA") with the Department of Justice, SQM admitted that it "knowingly and willfully failed to
maintain internal accounting controls," that Contesse authorized and directly paid funds to
Chilean politicians and candidates in violation of "Chilean tax law and/or campaign finance
limits, and caused payments of those funds to be falsely recorded in the SQM's books and
records."  (Doc. 64, Ex. B)  The SEC Order similarly stated that SQM made improper payments
to Chilean politicians and political candidates and that the "payments were not supported by
documentation that those vendors provided services to SQM.  Virtually all of the improper
payments" were directed and authorized by a senior SQM executive."  (Doc. 64, Ex. E)

### D.  Procedural Background

On March 19, 2015 and April 14, 2015, two separate class actions were filed – the
Villella action and the Molinaro action, respectively – seeking damages for violations of Sections
10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.
(Doc. 1); (No. 15 Civ. 2884, Doc. 1).  As required by the Private Securities Litigation Reform
Act ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(A), Villella's counsel published notice over *Globe
Newswire* on March 19, 2015, announcing that a securities class action had been filed against
SQM and the individual defendants, and advising SQM shareholders that they had until May 18,

2015 to file a motion for appointment as lead plaintiff.  *See* Decl. Jeremy A. Lieberman Supp. Villella Mot. for Consol., Appt. as Lead Pl. & Approval of Counsel (Doc. 14, Ex. A).

On May 18, 2015, six motions were filed seeking consolidation of the Villella and Molinaro Actions, with each movant seeking appointment as lead plaintiff and approval of the movant's selected counsel as lead counsel.  (Docs. 7-23)  On October 14, 2015, the Court issued an Opinion and Order consolidating the two actions, appointing Tyne and Wear as lead plaintiff, and approving Tyne and Wear's selected counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel.  (Doc. 31)  Plaintiff filed the Consolidated Complaint on February 9, 2016.  (Doc. 40)

The instant motion, which Defendant filed on March 30, 2016, seeks dismissal on two alternative grounds.  (Doc. 42)  First, Defendant argues that pursuant to the doctrine of *forum non conveniens*, the Consolidated Complaint should be dismissed because the claims can be addressed more adequately in Chile.  Alternatively, Defendant claims that the Consolidated Complaint should be dismissed for failure to state a claim under the securities laws.

## II.  Legal Standards

### A.  *Forum Non Conveniens*

The doctrine of *forum non conveniens* allows a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim."  *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (quoting *Carey v. Bayerische Hypo– und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)).  "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court."  *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).  The Second Circuit has "outlined a three-step process to guide the exercise of that discretion."  *Norex Petroleum Ltd. v. Access Indus., Inc*, 416 F.3d 146,

153 (2d. Cir. 2005) (citing *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc)).  First, "a court determines the degree of deference properly accorded the plaintiff's choice of forum."  *Id.*  Second, "it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  *Id.*  And third, "a court balances the private and public interests implicated in the choice of forum."  *Id.*

### B.  Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

Beyond the requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of*

*Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)).  Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  *See U.S. ex rel. Kester v. Novartis Pharm. Corp.,* 23 F. Supp. 3d 242, 251-52 (S.D.N.Y. 2014).   Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## III.  Discussion

### A.  *Forum Non Conveniens*

#### i.   **Degree of Deference to Plaintiff's Choice of Forum**

A defendant who invokes *forum non conveniens* generally bears "a heavy burden" in opposing plaintiff's chosen forum.  *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).  When reviewing a *forum non conveniens motion*, courts start with "a strong presumption" in favor of the plaintiff's forum choice.  *Norex*, 416 F.3d at 154 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).  In applying this presumption, however, "'the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale'

depending on the convenience reflected by the given choice." *Palacios*, 757 F. Supp. 2d at 352,

(quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001)).  The Second Circuit in

*Iragorri* explained the sliding-scale analysis:

> [T]he greater the plaintiff's or the lawsuit's bona fide connection to
> the United States and to the forum of choice and the more it appears
> that considerations of convenience favor the conduct of the lawsuit
> in the United States, the more difficult it will be for the defendant to
> gain dismissal for *forum non conveniens*. . . . On the other hand, the
> more it appears that the plaintiff's choice of a U.S. forum was
> motivated by forum-shopping reasons . . . the less deference the
> plaintiff's choice commands[.]

*Iragorri*, 274 F.3d at 71–72.  In short, courts give greater deference to a plaintiff's chosen forum

when that choice is motivated by convenience and give less deference when the plaintiff is

merely seeking a tactical advantage.  When applying this sliding-scale analysis, courts are guided

by *Iragorri*'s convenience and forum shopping factors.  *Norex*, 416 F.3d at 154–55.

*Iragorri*'s convenience factors are:  "(1) the convenience of the plaintiff's residence in relation to

the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the

defendant's amenability to suit in the forum district, (4) the availability of appropriate legal

assistance, and (5) other reasons relating to convenience or expense."  *Norex*, 416 F.3d at 155

(quoting *Iragorri*, 274 F.3d at 72).  Conversely, *Iragorri*'s forum shopping factors are:  "(1)

attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, (2)

the habitual generosity of juries in the United States or in the forum district, (3) the plaintiff's

popularity or the defendant's unpopularity in the region, or (4) the inconvenience and expense to

the defendant resulting from litigation in that forum."  *Norex*, 416 F.3d at 155 (quoting *Iragorri*,

274 F.3d at 72).

      Here, the Court finds that some deference should be given to Plaintiff's choice of forum.

First, Plaintiff is a pension fund located in South Shields, England.  Thus, Plaintiff's "overseas

residence vitiates any presumption that [it] would find the U.S. forum convenient." *Banculescu v. Compania Sud Americana De Vapores, SA*, No. 11 Civ. 2681 (ALC), 2012 WL 5909696, at *6 (S.D.N.Y. Nov. 26, 2012). Though Plaintiff highlights that the majority of the class are U.S. investors, because Plaintiff is bringing this action in its representative capacity, its chosen forum is entitled to less weight. *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83 (2d Cir. 2007) ("Though the fact that a plaintiff sues as a representative of a putative class does not mean that his choice of forum is deprived of all deference, plaintiffs in such cases generally 'have only a small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions.'") (quoting *DeYoung v. Beddome*, 707 F. Supp. 132, 138 (S.D.N.Y. 1989)); *see also Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 358 (E.D.N.Y. 2008) (noting that even though lead plaintiff resides in the chosen forum, "his choice of forum is given less weight than if he were an individual plaintiff"). Nevertheless, the Court notes Plaintiff's contention that the trip from England to New York is unquestionably shorter, and thus much more convenient, than the trip from England to Chile.

Second, the availability of witnesses or evidence in the forum district does not strongly weigh in favor of either party's choice of forum. Defendant correctly argues that most, if not all, of the relevant evidence and witnesses are outside of the U.S. – either in Chile or Canada. Memorandum of Law in Support ("Def. Memo") (Doc. 42) at 11. Specifically, Contesse and Ramos are in Chile; and the Potash Directors are in Canada. However, and importantly, SQM's Ad-Hoc Committee included U.S. lawyers and engaged U.S. forensic accountants to conduct an investigation and as a result, more than 3.5 million documents have been collected in the U.S. Memorandum of Law in Opposition ("Pl. Opp.") (Doc. 49) at 20. Moreover, though the "core

operative facts" – the illegal financing of electoral campaigns and politicians – occurred in Chile, the alleged misleading documents were filed with the SEC in the U.S. and relied upon by investors to purchase ADSs on the NYSE.  *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (finding that plaintiffs' choice of forum in a federal securities fraud case should be accorded deference where "defendants sought out business opportunities in this country by registering stock on American exchanges, filing statements with the SEC and conducting the bulk of its business in the United States).

Third, the consideration of "the defendant's amenability to the suit in the forum district" weighs in favor of according deference to Plaintiff.  There is no question that Defendant is subject to jurisdiction in New York because of its listing on the NYSE.  Similarly, for the fourth factor, the fact that Plaintiff brings solely federal securities claims further supports Plaintiff's choice of a U.S. forum.  *See DiRienzo*, 294 F.3d at 28 (finding that the U.S.'s "interest in having [U.S.] courts enforce [U.S.] securities laws" was a "valid reason for litigating in federal court").  Further, Plaintiff argues that the language barrier significantly influenced its decision to bring the action in the U.S.  Pl. Opp. at 17.

The Court also notes, however, that Plaintiff's choice of forum may have been, in part, motivated by tactical reasons.  As Plaintiff concedes, Chile does not allow for securities class actions, Pl. Opp. at 22, thus, Plaintiff's decision to pursue this action on behalf of a class seems to indicate that it was trying to take advantage of the U.S.'s class action device.  *See Gilstrap*, 443 F. Supp. 2d at 481 (affording plaintiffs' choice of forum less deference, in part, because "some indicia of forum-shopping" was present because plaintiffs admitted that "their decision to sue here rather than in England was, at least in part, motivated by the availability of contingent fees and class actions, procedural devices not available in England").

On balance, the Court finds that some deference should be given to Plaintiff's choice of forum.

### ii.    Adequate Alternative Forum

The Court's deference to Plaintiff's forum choice does "not necessarily preclude *forum non conveniens* dismissal." *Norex*, 416 F.3d at 157.  Rather, it "simply recalibrate[s] the balance for purposes of the remaining analysis." *Id*.  To be successful on a motion to dismiss on *forum non conveniens* grounds, "a movant must demonstrate the availability of an adequate alternative forum." *Id*. (citing *Pollux*, 329 F.3d at 75).  In order for an alternative forum to be adequate, it must satisfy two requirements.  First, all defendants must be amenable to service of process in the alternative forum.  *Norex*, 416 F.3d at 157; *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042 (RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) (for an alternative forum to be adequate, "a court must satisfy itself that the litigation may be conducted elsewhere against *all defendants*") (citing *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998)) (emphasis added).  And second, the alternative forum must permit litigation of the subject matter of the dispute.  *Norex*, 416 F.3d at 157.  However, "'the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies." *Id*. (quoting *PT United*, 138 F.3d at 74).

Plaintiff does not contest that Defendant, a Chilean company, is amenable to service of process in Chile.  Thus, at issue here is solely whether Chile permits litigation "of the subject matter of the dispute."  Defendant claims that Articles 53 and 55 of the Chilean Securities Law "together provide for a private right of action for stockholders who claim they have suffered injury as a result of a company's false or misleading disclosures."  Def. Memo at 10; Declaration of Pedro Pablo Vargas ("Vargas Decl.") (Doc. 45) at ¶ 13.  Article 53 provides, in pertinent part,

that "[n]o person shall carry out any transaction or induce or try to induce the purchase or sale of securities, overseen or not by this law, by means of any action, strategy, mechanism or artifice that is false or misleading."  Article 55 further provides for a private right of action for those who have suffered damages as a result of an entity's violation of Article 53.  *Id.*  Though Chile does not permit class actions, it does not impose restrictions on the number of claimants who can join a securities suit.  *Id.*

Plaintiff argues that Articles 53 and 55 do not, in fact, provide an adequate remedy for its losses because the laws only provide for a remedy for fraudulent inducement or fictitious transactions, which are not alleged here.  Pl. Opp. at 18.  Plaintiff further contends that Defendant has not identified (nor can it) any cases in which damages were awarded to shareholders pursuant to Article 53 for losses caused by misrepresentations or omissions made in SEC filings.  *Id.* at 19.  Plaintiff also notes an official order of the SVS stating that "considering that the inscription, offering, listing and trading of ADRs is developed abroad, it will be necessarily regulated by the foreign legislation, so its reach and compliance is beyond the scope of competence of this Institution."  Declaration of Andres Jana L. ("Jana Decl.") (Doc. 51) at ¶ 18.  Though Defendant attempts to qualify the SVS's order by stating that it only referred to unsponsored ADSs and described the SVS's inability to regulate the registration and filing requirements for unsponsored ADSs, Defendant does not include a copy of the SVS's order.

The Court finds that Defendant has met its burden to establish that Chile is an adequate forum, but barely.  Though Defendant cites statutes that appear at first blush to apply to Plaintiff's claims, Defendant provides no examples of cases – and Plaintiff asserts that there are none – in which a plaintiff has actually brought suit pursuant to the cited statutes against a Chilean company for financial statements registered in foreign jurisdictions.

### iii.    Private and Public Interest Factors

After finding that Chile is an adequate alternative forum, this Court's inquiry turns to the balance of private and public interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action.  *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667 (NRB), 2006 WL 3247363, at \*7 (S.D.N.Y. Nov. 8, 2006).  That is, a defendant must demonstrate that "trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience," or that litigating in the chosen forum is inappropriate upon consideration of the public interests.  *Sinochem*, 549 U.S. at 429 (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–448 (1994)) (alterations omitted). Defendants bear the burden of establishing that "the balance of private and public interest factors tilts heavily in favor of the alternative forum."  *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 135 (2d Cir. 2005); *PT United.*, 138 F.3d at 74.

This Court first considers "the private interest factors– those which reflect the convenience with which the parties may litigate here."  *Kirch*, 2006 WL 3247363, at \*7.  The private interest factors include:  (1) the relative ease of access to sources of proof, (2) the cost of obtaining attendance of willing witnesses, (3) availability of compulsory process for attendance of unwilling witnesses, and (4) all other problems that make the trial of a case easy, expeditious, and inexpensive.  *Iragorri*, 274 F.3d at 73–74.

Here, as the Court already noted, most of the relevant documentary evidence and material witnesses are located in Chile.  The invoices and challenged disclosures were prepared in Chile, and Contesse, presumably the most relevant witness, is under house arrest in Chile.  Moreover, Contesse, the Chilean political candidates, the Potash directors, and other potential witnesses, are third-party witnesses, and therefore, this Court would not be able to compel their appearance.

16

However, as Plaintiff argues, witness testimony can be procured through letters rogatory, which Plaintiff's expert persuasively explains is not overwhelmingly tedious or oppressive. Jana Decl. ¶¶ 26-28. Further, a significant amount of evidence has already been gathered in the U.S and SQM's current employees, including Ramos, can be compelled by this Court.

Next, the Court turns to the public interest factors: "(1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community." *Iragorri*, 274 F.3d at 74.

Here, though Chile's interest in this case is significant, the U.S. also has a strong interest in upholding its federal securities laws. *See DiRienzo*, 294 F.3d at 28. Second, Defendant claims that the Court will have to interpret a novel issue of Chilean law because a Chilean court has not determined whether Contesse's actions constitute a criminal tax violation.[4] Def. Memo. at 13. However, Plaintiff alleges strictly federal securities violations – to which SQM has already admitted. Thus, at this stage, it is unclear to what extent the Court will need to apply or interpret Chilean law. Third, there is no question that jurors have an interest in ensuring that financial institutions that are traded on American stock exchanges do not mislead investors. Thus, the Court finds that the balance of private and public factors do not heavily tilt in favor of trial in Defendant's choice of forum.

Accordingly, because the Court finds that Plaintiff's choice of forum is entitled to some deference, and the private and public factors do not tilt heavily in favor of Defendant, Defendant's motion to dismiss on the basis of *forum non conveniens* is denied.

---

[4] Defendant's expert states that "[p]rominent Chilean lawyers with expertise in civil and criminal tax matters have stated that the conduct alleged against SQM is not criminal in nature, but rather presents a civil tax matter concerning the appropriate treatment of tax expense." Vergara Decl. ¶ 34.

**B.  Failure to State a Claim**

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341-42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Defendant argues that Plaintiff fails to adequately plead (1) an actionable misstatement or omission and (2) scienter.

**i.    Material Misstatement or Omission**

In order to survive a motion to dismiss, Plaintiff must establish that Defendant "made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original).  "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)*, aff'd*, 604 Fed. App'x 62 (2d Cir. 2015) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)) (emphasis in original).  The Second Circuit has

repeatedly indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate with specificity why . . . that is so." *Rombach*, 355 F.3d at 174.

Where the alleged violations of Section 10b and Rule 10b-5 are based on allegations that the defendant "omitted to state a material fact necessary to make the statement . . . not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). "[I]f an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

Plaintiff alleges that Defendant made material misstatements with respect to its (1) compliance with applicable law and effectiveness of internal controls; (2) code of ethics; and (3) financial reporting and accounting.  Plaintiff also claims that Defendant made a material omission in its statements regarding its lease negotiations with Corfo.  The Court will address each claim in turn.

First, Plaintiff claims that Defendant's representations that it was in compliance with all applicable laws and that it had effective internal controls were false when made.  Consolidated Complaint ¶¶ 195-96.  In response, Defendant does not contest the statements' objective falsity but rather argues that the statements were statements of opinion and that Plaintiff has not sufficiently alleged that Defendant believed they were false when made.  Def. Memo at 15-16. To bring a fraud claim based on an alleged misstatement in an *opinion*, a plaintiff must plausibly assert that "defendants did not [subjectively] believe the statements . . . at the time they made them."  *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (emphasis added); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1321 (2015) (holding that a statement of opinion qualifies as an

untrue statement of fact. "if the opinion expressed was not sincerely held").  "A reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1329).  Here, the Annual Reports for the fiscal years 2009-2013 stated that SQM "believe[d]" that it was in compliance with applicable laws and that based upon an evaluation the CEO and CFO concluded that SQM's internal controls were adequate. Consolidated Complaint ¶¶ 82, 103, 125, 147, 172.  These statements are indeed statements of opinion.  However, the Court finds that Plaintiff has sufficiently alleged that Defendant knew or should have known that the statements were false when made.

Plaintiff claims that top SQM executives, including Contesse, the former CEO, and Ramos, the CFO, should have known of and in many cases authorized the payments of false invoices throughout the relevant time period.  As an initial matter, Plaintiff claims – and the investigations in Chile allegedly uncovered – that more than $11 million in payments without sufficient supporting documentation originated from Contesse's office.  *See* Consolidated Complaint ¶ 42.  The SII investigation also revealed that Contesse had authorized at least 90 false invoices from 2012-2014.  *Id.* at ¶ 63.  Plaintiff also alleges that Contesse received an email in August 2012 regarding contributions to a number of political candidates and asking about submitting invoices to SQM and that Contesse directed SQM attorney Enrique Olivares to contribute to those campaigns.  Additionally, as part of the SII investigation, Ramos admitted that SQM made 1,000 payments to political campaigns "without any consideration of whether they were based on any services rendered."  *Id.* at ¶ 57.  Solminihac, SQM's current CEO, further declared that the payments were "ordered and approved by Contesse."  *Id.* at ¶ 64.  These

allegations are sufficient to show that Defendant did not believe its statements regarding

compliance with all relevant regulations and that its disclosure controls were effective in

ensuring that "financial and non-financial information [was] properly recorded . . . and reported."

      The Court also finds that SQM's statements regarding its legal compliance and the

efficiency of its internal controls are not mere puffery.  Def. Memo at 17-18.  "It is well-

established that general statements about reputation, integrity, and compliance with ethical

norms are inactionable puffery, meaning that they are too general to cause a reasonable investor

to rely upon them*." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d

173, 183 (2d Cir. 2014).  "Puffery is frequently comprised of statements that are explicitly

aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *In re: EZCorp, Inc. Sec.

Litigations*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016).  Here, SQM's statements do not

communicate an aspiration or a desire to comply with all relevant laws or implement efficient

controls.  The statements in the Annual Reports relay positive assurances that SQM believed it

was in compliance with all applicable laws and regulations and that based on an evaluation, the

CEO and CFO concluded that SQM's controls were effective.  *See  Pirnik v. Fiat Chrysler

Automobiles, N.V.*, No. 15 Civ. 7199 (JMF), 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016)

(finding "easily" that plaintiff plausibly alleged that defendant's statements that it was

substantially in compliance with relevant global requirements were actionable); *In re BioScrip,

Inc. Sec. Litig*., 95 F. Supp. 3d 711, 726-27 (S.D.N.Y. 2015) (holding that the statement that "the

Company believes it is in substantial compliance with all laws, rules and regulations that affects

its business and operations," was an actionable statement of opinion); *see also Omnicare*, 135 S.

Ct. at 1326 ("And so too the statement about legal compliance ('I believe our marketing practices

are lawful') would falsely describe her own state of mind if she thought her company was breaking the law.").

Second, Plaintiff claims that Defendant's statements regarding its code of ethics were misleading in that it failed to report or acknowledge that its CEO and CFO were engaging in illegal activity.  Consolidated Complaint ¶ 197.  In this regard, the Court finds Plaintiff's argument unavailing.  Courts have found that a defendant's mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance with the code, is not misleading.  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) ("[A] code of ethics," he noted, "is inherently aspirational; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory.") (quoting *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett– Packard Co.*, 52 F. Supp. 3d 961, 964–66 (N.D. Cal. 2014)).  Plaintiff does not allege that SQM assured its investors that its employees were in fact complying with the adopted code.  *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016) (dismissing claim regarding defendant's compliance with its code of ethics because "[a]lthough the Company's codes of ethics prohibit[ed] bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them").  Accordingly, Plaintiff's misrepresentation claim with respect to Defendant's code of ethics is dismissed.

Third, Plaintiff claims that Defendant's statements regarding its financial reporting and accounting statements were false or misleading because they were not prepared in accordance with U.S. or Chilean GAAP.  Consolidated Complaint ¶¶ 86-87.  Defendant argues that Plaintiff's claim fails because Plaintiff did not adequately identify the financial standards that

22

were violated. Def. Memo at 20. However, the Consolidated Complaint specifically alleges that SQM's purportedly illicit conduct violated "FASB Conceptual Framework for Financial Reporting; Statement of Financial Accounting Standards ("SFAS") No. 109 and *Accounting for Income Taxes*; International Accounting Standards ("IAS") No. 1, *Presentation of Financial Statements*; and IAS No. 12, *Income Taxes*" by, among other things, failing to disclose the amount of taxes payable and tax liabilities. Consolidated Complaint ¶ 199.

Defendant further argues that any inaccuracies in its statements were not material. Def. Memo at 19. "The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 27 (S.D.N.Y. 2016) (quoting *ECA*, 553 F.3d at 197). The Second Circuit has cautioned that because materiality is a mixed question of law and fact, in the context of a Rule 12(b)(6) motion, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

When assessing materiality, courts must fully analyze "all relevant considerations." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). The SEC's Staff Accounting Bulletin ("SAB") No. 99, provides that "a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality." *United States Sec. & Exch. Comm'n v. DiMaria*, No. 15 Civ. 7035 (GHW), 2016 WL 4926200, at *6 (S.D.N.Y. Sept. 15, 2016) (citing 64 Fed. Reg. 45150, 45151 (Aug. 19, 1999)). In addition to quantitative factors, courts are required to consider any relevant qualitative factors. Sufficient qualitative

factors "can turn a quantitatively immaterial statement into a material statement." *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. The Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015).  SAB No. 99 provides a non-exhaustive list of the relevant qualitative factors a court should consider, including whether the misstatement "affects the registrant's compliance with regulatory requirements" or "involves concealment of an unlawful transaction," and the "volatility of the price of a registrant's securities in response" to the disclosures.  *See* SAB 99, 64 Fed. Reg. at 45152.

Defendant claims that the financial inaccuracies were quantitatively immaterial because the allegedly $13 million in payments made over the six-year period only understated SQM's net income by $2.2 million per year, or about 0.5% of SQM's average annual income during that period.  Def. Memo at 19.  Defendant further asserts that SQM's $7 million in back taxes attributable to the same period, resulted in an understatement of tax liability of only $1.2 million per year, or about 0.8% of SQM's average annual paid income tax.  *Id.*  These losses are significantly below the 5% threshold.  However, even assuming that these calculations are accurate, the Court finds that the qualitative factors are sufficient to allege materiality at this stage.

Here, Plaintiff alleges that Contesse improperly funneled money to politicians by authorizing SQM to pay false invoices.  SQM's disclosures of these actions resulted in a decrease of over 15% in the price of ADSs, from $26.17 per share on February 25, 2015 to $22.10 on March 17.  Consolidated Complaint ¶¶ 204-09.  By March 19, 2015, the price for ADSs had fallen to $17.87 per share.  *Id.*  The disclosures also impacted SQM's reputation. Plaintiff alleges that companies like Santander and Miller Tabak & Co., LLC issued analyst reports in which SQM was given an "underperform" rating or stripped of its "Buy" rating due to

the investigations and the resulting issues with corporate governance.  *Id.* at ¶¶ 211-13.  Plaintiff

further alleges SQM's actions violated Chilean tax law and subjected SQM to regulatory

penalties.  *Id.* at ¶ 44.  The SVS – Chile's securities regulator – found that SQM failed to provide

investors "with information that could be relevant for investment decisions" in violation of

securities laws and fined SQM's directors.  *Id.* at ¶ 8.  Additionally, SQM agreed to pay a $15

million penalty to settle the SEC's charges and a $15.5 million penalty as part of the DPA with

the DOJ regarding its improper payments to Chilean polticians.  Taking these allegations as true

– and acknowledging that materiality is generally not an appropriate basis for dismissal at this

stage – the Court finds that Plaintiff has sufficiently alleged materiality.

Lastly, Plaintiff alleges that Defendant misled its investors by "expressing confidence in

its position" in the Corfo arbitration, despite knowing that its illegal payments to politicians

could potentially jeopardize the lease.  Consolidated Complaint at ¶¶ 193, 200.  Plaintiff claims

that the concealed risk materialized when Corfo rejected the settlement due to "poor corporate

governance."  *Id.*  Challenging Plaintiff's claim, Defendant argues that its statements were

"forward-looking" and that they were accompanied by meaningful cautionary language and are

thus not actionable.  Def. Memo at 20-21.

The PSLRA safe harbor provision provides that no liability attaches to certain forward-

looking statements that are identified as such and "accompanied by meaningful cautionary

language identifying important factors that could cause actual results to differ materially from

those in the forward looking statements."  *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp.

2d 364, 400 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78u–5(c)).  The bespeaks caution doctrine,

similarly "refers to the use of cautionary language aimed at warning investors of potential risks

that may occur in the future" and provides that where "*no reasonable investor* could have been

misled about the nature of the risk when he invested," a claim for securities fraud fails. *Id.*
(emphasis in original). "To avail themselves of safe harbor protection under the meaningful
cautionary language prong, defendants must demonstrate that their cautionary language was not
boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see also In re*
*Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 400 (explaining that under the bespeaks
caution doctrine, "effective, cautionary language needs to warn of, or directly relate to, the risk
that brought about the plaintiff's loss").

   Here, Defendant represented that it would "likely . . . prevail in the arbitration
proceeding" with Corfo.  It also warned investors that "an adverse ruling awarding damages
sought by Corfo or permitting early termination of the Lease Agreement would have a material
adverse effect on our business, financial condition, cash flows and results of operations."
Plaintiff alleges that before SQM's disclosures, the arbitration primarily focused on SQM's
failure to meet its payment obligations.  Plaintiff cites to an analyst's report which claims that
Corfo ultimately rejected settlement discussions and opted for early termination of the lease (set
to expire in 2030) due to ethical reasons, including "corporate governance, unfair related parties
transactions, unfair transfer prices, lack of disclosure and environmental rules breakage."
Consolidated Complaint ¶ 217.

   The Court finds that Plaintiff has failed to adequately allege that SQM's statement
regarding the Corfo arbitration is actionable.  Defendant's expression of confidence in the
arbitration is a forward looking statement.  The statement is also accompanied by cautionary
language which warned its investors of the risk that settlement discussions would not be
successful and that an adverse ruling might result in early termination of the lease.  This
language warned investors of the risk that ultimately transpired – early termination of the lease.

Though Plaintiff argues that SQM failed to disclose the risk that its illicit conduct could negatively affect the arbitration, it does not allege that SQM's conduct was in fact the basis for Corfo's rejection of the arbitration and the termination of the lease.

### ii.    Scienter

Section 10(b) and Rule 10b-5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004).  To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind."   *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (internal quotation marks omitted).   As Supreme Court precedent dictates, a "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314 (emphasis added).  This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Id.*

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198; *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  The relevant inquiry for the Court "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *In*

*re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291-92 (S.D.N.Y. June 23, 2014)

(citing *Tellabs*, 551 U.S. at 322-23) (emphasis original); *see also ECA*, 553 F.3d at 198; *Medis*

*Inv. Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine

whether a complaint has adequately pleaded scienter, a court should examine all of the facts

alleged collectively or 'holistically' (without parsing individual allegations), and take into

account any inference concerning scienter—supporting or opposing—which can be drawn from

the complaint."), *aff'd,* 328 Fed. App'x 754 (2d Cir. 2009) (summary order).  "According to the

Supreme Court, the critical inquiry is: '[w]hen the allegations are accepted as true and taken

collectively, would a reasonable person deem the inference of scienter at least as strong as any

opposing inference?'  If so, then scienter has been adequately pleaded.  If not, the case may be

dismissed."  *Medis Inv. Grp.*, 586 F. Supp. 2d at 141 (citing *Tellabs*, 551 U.S. at 326).

   "When the defendant is a corporate entity . . . the pleaded facts must create a strong

inference that someone whose intent could be imputed to the corporation acted with the requisite

scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190,

195 (2d Cir. 2008).  The "most straightforward way to raise such an inference for a corporate

defendant" in most cases is "to plead it for an individual defendant," however, there may be

some instances where a plaintiff may allege scienter as to a corporate defendant without also

alleging scienter as to an individual defendant.  *Id*.; *Vining v. Oppenheimer Holdings Inc*., No. 08

Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) ("[A] plaintiff can raise

an inference of corporate scienter by establishing scienter on behalf of an employee who acted

within the scope of his employment.") (internal citation omitted).  "A strong inference of

corporate scienter may also be appropriate 'where a corporate statement is so important and

dramatic that it would have been approved by corporate officials sufficiently knowledgeable

about the company to know that the announcement was false.'"  *In re Gentiva Secs. Litig.*, 932 F.

Supp. 2d 352, 384 (S.D.N.Y. 2013) (citing *Vining*, 2010 WL 3825722, at *13).

Defendant argues that Plaintiff has neither alleged a motive nor alleged sufficient facts to

constitute circumstantial evidence of conscious misbehavior or recklessness.  Def. Memo at 21.

While the Court agrees that Plaintiff has not alleged motive, the Court finds that taking the facts

as a whole, Plaintiff has adequately alleged facts creating an inference of scienter.  With respect

to Defendant's statements regarding its legal compliance and effectiveness of internal controls,

the Court applies the same reasoning as it did for its finding of subjective falsity.  Because the

Court finds that Plaintiff has sufficiently alleged that Defendant knew or should have known that

the statements were false or misleading when made, the Court also finds that Plaintiff has

sufficiently pled scienter with respect to those statements.  *See Podany v. Robertson Stephens,

Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004) ("[I]n false statement of opinion cases . . . the falsity

and scienter requirements are essentially identical").  Moreover, Defendant in the DPA and SEC

order admitted that it knowingly and willfully made misrepresentations in its SEC filings.

Accordingly, Defendant's motion to dismiss Plaintiff's claims that Defendant made

material misstatements regarding its compliance with applicable law, effectiveness of internal

controls, and financial reporting and accounting in its SEC filings is denied.  The Court grants

Defendant's motion to dismiss Plaintiff's claim as to SQM's statements regarding its code of

ethics and its lease negotiations with Corfo.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss on grounds of *forum non conveniens* is DENIED.  Defendant's motion to dismiss for failure to state a claim is DENIED in part and GRANTED in part.  Specifically, Defendant's motion to dismiss Plaintiff's claims that SQM made material misstatements in its SEC filings regarding its (1) compliance with applicable law, (2) effectiveness of internal controls, and (3) financial reporting and accounting is DENIED.  Defendant's motion to dismiss Plaintiff's claims that SQM made material misrepresentations with respect to its statements regarding its code of ethics and its lease negotiations with Corfo is GRANTED.  The parties are directed to appear for an initial pre-trial conference on **Thursday, April 13, 2017 at 10:00 AM**.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 42, 59.

It is SO ORDERED.

Dated:    March 28, 2017
          New York, New York

                                        Edgardo Ramos, U.S.D.J.

30