UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

MEGAN VILLELLA, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

     vs.                                 15-cv-2106-ER

CHEMICAL AND MINING COMPANY OF
CHILE, INC., et al.,

                Defendants.

------------------------------------------------------------ x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR THE ISSUANCE OF A LETTER OF REQUEST

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

Scott A. Edelman (sedelman@milbank.com)
Grant R. Mainland (gmainland@milbank.com)
Alison Bonelli (abonelli@milbank.com)
28 Liberty Street
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant Chemical
and Mining Company of Chile, Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 3

ARGUMENT .................................................................................................................................. 5

I. SQM'S REQUESTS ARE RELEVANT TO WHETHER PLAINTIFF IN FACT RELIED ON THE ALLEGED MISSTATEMENTS ......................................................... 6

II. SQM'S REQUESTS ARE NARROWLY TAILORED AND PROPORTIONAL TO THE NEEDS OF THE CASE ................................................................................... 11

CONCLUSION ............................................................................................................................. 12

Defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM"), respectfully submits this memorandum of law in support of its motion for the issuance of a letter of request, pursuant to Rule 28(b) of the Federal Rules of Civil Procedure and Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"). The proposed letter of request, attached to the accompanying Declaration of Grant R. Mainland, dated March 12, 2018 (the "Mainland Declaration") as **Exhibit A**,[1] requests that the appropriate authority in the United Kingdom direct non-party witness Sarasin and Partners, LLP ("Sarasin"), Plaintiff's former investment adviser, to produce documents and testimony upon oral examination.

## PRELIMINARY STATEMENT

By this motion, SQM seeks the Court's assistance in pursuing documents and testimony that are directly relevant both to class certification and the merits of Plaintiff's Section 10(b) claim. The information in question concerns the knowledge and decision-making of Plaintiff's investment adviser, Sarasin, which was the sole entity involved in the purchase of SQM securities on Plaintiff's behalf. Plaintiff does not contest that reliance is an element of securities fraud or that the "fraud on the market" presumption is rebuttable by a showing that the plaintiff did not in fact rely on the alleged misstatements—*i.e.*, that it would have invested even if it had known the allegedly concealed truth. Nor does Plaintiff contest that class certification can be denied on typicality grounds where a lead plaintiff is subject to an arguable defense of non-reliance.

The sole issue in dispute is whether the knowledge and decision-making of Plaintiff's investment adviser—rather than Plaintiff itself—is relevant to the claims or defenses. This is not a difficult question. Courts in securities cases routinely look to investment advisers' decisions in

---

[1] Unless otherwise specified, "Ex. __" refers to the Mainland Declaration.

1

assessing reliance issues.  Were it otherwise, institutional plaintiffs could effectively immunize themselves against the defense of non-reliance solely by outsourcing their investment decisions to advisers.  And in the course of ample letter writing and a pre-motion conference, Plaintiff has not yet identified a *single case* in which a court held that the knowledge of a plaintiff's investment adviser was irrelevant to reliance or otherwise an inappropriate topic in discovery.

SQM's requests are also proportional to the needs of the case.  SQM expects that Sarasin's decisions to purchase SQM securities were made by a discrete set of professionals (likely three or so individuals); the search terms that would be employed are specific to SQM and unlikely to generate a meaningful number of false positives; and the subject matter of the requested documents and testimony is likewise targeted.  Importantly, SQM's requests are far from the proverbial fishing expedition, as initial indications in the very limited discovery produced to date strongly suggest that Sarasin would have invested in SQM securities even if it had known of the allegedly concealed truth.  Moreover, although Plaintiff has not yet stated the amount of damages it seeks, based on plaintiffs' typical approach in Section 10(b) cases, SQM suspects Plaintiff will claim damages totaling hundreds of millions of dollars.  SQM believes that Plaintiff suffered *no damages*, but given the quantum of damages Plaintiff is likely to assert, it can hardly be deemed "disproportionate" for SQM to seek information directly bearing on Plaintiff's reliance (or lack thereof) from the only entity that would have it.

Accordingly, SQM respectfully requests that the Court issue the letter of request attached hereto as Exhibit A.[2]

---

[2] As indicated at the pre-motion conference, because the information sought is relevant to class certification, SQM believes that an extension of the March 30 deadline currently governing its opposition to Plaintiff's motion for class certification is necessary, in order to afford sufficient time for SQM to complete discovery.  The parties have conferred and agreed to extend that deadline to April 30, with SQM continuing to reserve the right to seek a further extension in the likely event that relevant discovery remains incomplete at that time.  SQM anticipates that the parties will submit an amended scheduling stipulation reflecting these terms in short order.

**BACKGROUND**

On March 19, 2015, Plaintiff the Council of Borough of South Tyneside, Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff" or "Tyne and Wear"), filed a complaint against SQM, alleging securities fraud under Section 10(b) of the Securities Exchange Act of 1934. (Dkt. No. 1.) Plaintiff later moved for, and was granted, lead plaintiff status under the Private Securities Litigation Reform Act. (Dkt. No. 31.) The Court also consolidated this action with another then-pending action. (*Id.*) On February 9, 2016, Plaintiff filed a consolidated complaint (the "Complaint"). (Dkt. No. 40.) The Complaint alleges that SQM made materially false and misleading statements concerning its compliance with law, the effectiveness of its internal controls, and the accuracy of its financial statements in connection with payments made by SQM's former Chief Executive Officer to Chilean political figures. (*Id.*)

Since May 2017, following the Court's order denying in part and granting in part SQM's motion to dismiss (Dkt. No. 67), the parties have been engaged in discovery. On May 25, 2017, SQM served its First Request for the Production of Documents, which included requests for Plaintiff's communications concerning its investments in SQM securities. (Ex. B, Defendant's First Request for the Production of Documents, dated May 25, 2017, at 8.) As part of the meet-and-confer process, SQM explained that this request would call for, at a minimum, Plaintiff's communications with any investment advisers involved in Plaintiff's purchase or sale of SQM securities. (Ex. C, Letter from Grant Mainland to John George, dated July 26, 2017, at 5.) Plaintiff initially contested the relevance of such communications (Ex. D, Letter from John George to Grant Mainland, dated August 25, 2017, at 2), but ultimately agreed to produce them (Ex. E, Letter from John George to Grant Mainland, dated Nov. 7, 2017, at 4).

3

On January 10, 2018, Plaintiff filed a motion for class certification. (Dkt. No. 75.) On January 19, 2018, Plaintiff made a production of documents containing communications between Plaintiff and its investment adviser, Sarasin. On January 29, 2018, and in part as a result of information contained in Plaintiff's January 19 production, SQM asked if Plaintiff intended to produce documents internal to its investment adviser, explaining that such documents would be relevant to class certification as well as the merits of Plaintiff's claims. (*See* Ex. F, Letter from Grant Mainland to John George, dated Jan. 29, 2018, at 2.) Plaintiff responded that it lacked the ability to cause Sarasin to produce documents, noting that it had no involvement in Sarasin's investment decisions on behalf of Tyne & Wear. (*See* Ex. G, Letter from John George to Grant Mainland, dated Jan. 31, 2018, at 1.) Plaintiff has indicated that it would consider making a document request of Sarasin "as a courtesy," but only one that is substantially narrower than the request made by SQM. Plaintiff has not indicated a willingness to request deposition testimony from Sarasin.

On February 12, 2018, SQM requested that Sarasin voluntarily comply with SQM's requests for documents and testimony. (*See* Ex. H, Letter from Grant Mainland to Christopher Bell, dated Feb. 12, 2018, at 1.) On February 16, 2018, Sarasin declined SQM's request. (*See* Ex. I, Email from Archie Khan to Grant Mainland, dated Feb. 16, 2018, at 1.)

On March 7, 2018, this Court held an informal conference concerning SQM's proposed motion to seek evidence from Sarasin pursuant to the Hague Convention. At the conclusion of the conference, the Court authorized SQM to file the instant motion.

Under the operative scheduling order governing class certification proceedings, SQM's opposition to Plaintiff's class certification motion is due on March 30, 2018. (Dkt. No. 82.)

**ARGUMENT**

The United States and United Kingdom are signatories to the Hague Convention and bound by its provisions as "Contracting States." The Hague Convention allows a court in one Contracting State to request another Contracting State to "obtain evidence, or to perform some other judicial act." Hague Convention, Ch. I, Art. 1 (23 U.S.T. 2555); *see also* 28 U.S.C. § 1781; S*ociete Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist.*, 482 U.S. 522, 533 (1987); *Pain v. United Techs. Corp.*, 637 F.2d 775, 788-90 (D.C. Cir. 1980).

The determination to issue a letter of request is committed to the Court's discretion. *See, e.g.*, *United States v. Al Fawwaz*, 98 Cr. 1023, 2014 WL 627083, at *2 (S.D.N.Y. Feb. 18, 2014). In making that determination, courts apply the relevance and proportionality standards of Rule 26. *See Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.,* 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012) ("In considering the issuance of letters rogatory, U.S. courts apply the discovery principles contained in Rule 26."); *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd*., 11 Civ. 3108, 2012 WL 4784632, at *3 (S.D.N.Y. Oct. 4, 2012) ("[A] court should not authorize the service of letters rogatory if it would not approve of the discovery requests in a purely domestic context."). Under Rule 26, evidence must be produced if it is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b).

Under Rule 26, relevance is "an extremely broad concept," *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y. 2013), "encompass[ing] any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case," *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). "Proportionality focuses on the marginal utility of the discovery sought," *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386 at *14 (S.D.N.Y. 2016), requiring the court to determine whether the burdens imposed are "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). These standards are easily satisfied here.

5

As set forth in the proposed letter of request, SQM seeks two general categories of documentary evidence from Sarasin:

1. All documents and communications regarding Sarasin's decision to purchase or sell SQM securities during the Class Period;

2. Documents sufficient to show Sarasin's investment policies, procedures, and strategies with respect to publicly traded securities during the Class Period.

SQM also seeks the testimony of a knowledgeable witness on the same topics. The evidence sought is both relevant and proportional.

### I. SQM'S REQUESTS ARE RELEVANT TO WHETHER PLAINTIFF IN FACT RELIED ON THE ALLEGED MISSTATEMENTS

The requests are relevant to the crucial issue of reliance. To prevail on a Section 10(b) claim, a plaintiff must establish that it relied on the alleged misstatements. *Basic v. Levinson*, 485 U.S. 224, 243 (1988) ("[R]eliance is an element of a Rule 10b-5 cause of action."). Although it appears that Plaintiff intends to seek to meet that burden by means of the "fraud-on-the-market" presumption, it is well understood that that presumption is rebuttable. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*"). And as the Supreme Court held in *Halliburton II*, the fraud-on-the-market presumption is rebuttable ***at the class certification stage***. *Id.* at 2414. One way of rebutting the presumption of reliance is through direct evidence that an individual plaintiff did not in fact rely on the alleged misstatements. *See Basic*, 485 U.S. at 249 (presumption of reliance is rebuttable if defendant can show that plaintiffs did not rely on integrity of market); *Halliburton II*, 134 S. Ct. at 2408 (presumption of reliance can be rebutted by showing that plaintiff "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud"); *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 436 (S.D.N.Y. 2015) (defendant rebutted presumption of reliance as to individual plaintiff where evidence showed that plaintiff did not rely on alleged misstatements);

6

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 101-02 (S.D.N.Y. 2013) (defendant rebutted presumption of reliance by showing that plaintiffs did not rely on market price, but rather independently determined market value of securities at issue), *aff'd,* 838 F.3d 214 (2d Cir. 2016). All of the foregoing law is undisputed.

In analyzing whether a plaintiff relied or not, courts in securities cases routinely look to the knowledge and decision-making of the plaintiff's investment adviser where, as here, that adviser has been granted the discretion to invest on the plaintiff's behalf. The *Vivendi* cases present a prominent example. There, the court considered whether certain institutional plaintiffs had relied on the alleged misrepresentations by analyzing the investment approach of the investment adviser, Capital Guardian Trust Company, which had discretion to invest on behalf of the plaintiffs. *See In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 460 (S.D.N.Y. 2016) ("The claims at issue were submitted by ten institutional clients of Capital Guardian, for whom Capital Guardian made investment decisions."). In response to complaints about Capital Guardian's compliance with discovery requests, the court ordered Capital Guardian to produce documents and appear for a deposition. *Id.* Following a close analysis of Capital Guardian's investment strategy (as detailed for the court through documentary and testimonial evidence), the court held that Vivendi had rebutted the presumption of reliance with respect to the institutional plaintiffs' claims "because Capital Guardian was indifferent to the fraud." *Id.* at 466.

The *Vivendi* court's approach to Capital Guardian was not an outlier. In *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, the court denied class certification on the basis that individualized reliance issues predominated over common ones, in part by looking to the knowledge of an institutional plaintiff's investment adviser, which "had complete discretion

over [the plaintiff's] investments." 272 F.R.D. 160, 169 (S.D.N.Y. 2011).[3]  In *In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, in assessing a typicality challenge to class certification, the court stated that it was "proper to look to [the investment adviser's] knowledge and actions with regard to those purchases made on [the institutional plaintiff's] behalf where [the plaintiff] gave [the adviser] full discretion." 2010 WL 4272567, at *4 (S.D.N.Y. Oct. 12, 2010).  And in *In re Enron Corp. Sec. Litig.*, the court denied a plaintiff's application for lead plaintiff on the ground that an officer of its investment adviser sat on Enron's board, such that his knowledge could be imputed to the plaintiff itself, resulting in a potential typicality problem for the plaintiff. 206 F.R.D. 427, 456 (S.D. Tex. 2002) ("[T]he Court cannot ignore that the relationship between [the investment adviser] and Enron could make [the plaintiff] subject to unique defenses . . . .").

As in the above cases, Plaintiff has acknowledged that it did not have *any* involvement in the decisions to purchase or sell SQM securities.  (*See* Ex. G, Jan. 31, 2018 Letter, at 1 (noting that Lead Plaintiff does "not make decisions with respect to the purchase or sale of individual securities").)  Instead, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Accordingly, the question whether Plaintiff in fact relied on the alleged misstatements can be determined only by reference to whether Sarasin so relied in acting on Plaintiff's behalf.

---

[3] In its letter to the Court dated March 6, 2018 and at the pre-motion conference, Plaintiff attempted to distinguish *Residential Capital* by arguing that the facts that gave rise to the court's finding of lack of predominance are "wholly absent here." (Dkt. No. 88 at 2.)  But SQM does not cite *Residential Capital* on the issue of predominance—which is not yet before the Court—but rather for the far more limited proposition that the knowledge of a plaintiff's investment adviser is relevant to the question of reliance.  Nothing in *Residential Capital* itself nor in any decision subsequently addressing it calls into question that basic proposition.  Moreover, Plaintiff has no right to assert that the facts at issue in *Residential Capital* are "wholly absent here" when SQM has not been afforded a chance to explore the relevant facts.  By contrast, the defendant in *Residential Capital* had the opportunity to take discovery of an institutional plaintiff's investment adviser (WAMCO), and succeeded on the basis of that discovery in defeating class certification.

8

The limited discovery produced to date gives strong reason to doubt that Sarasin did in fact rely. As the evidence has shown, in April 2015, after the news of SQM's payments to Chilean political figures was revealed, ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

Sarasin's analysis strongly suggests that it would have invested in SQM securities even if it had known about the payments to Chilean political figures, which were quantitatively immaterial by any reasonable measure.

The evidence to date, however, is almost certainly only one small piece of the overall picture. Plaintiff has only produced its communications with Sarasin; it disclaims the ability to produce (or cause the production of) Sarasin's internal communications concerning its investments in SQM securities. But given Plaintiff's lack of involvement in decisions to buy or sell individual securities held in its portfolio, it stands to reason that there would be few communications regarding SQM between Plaintiff and Sarasin, as is borne out by the limited size of Plaintiff's document production.[4] Conversely, given Sarasin's discretion to purchase or sell securities on behalf of Plaintiff without the latter's prior consent or sign-off, it is virtually certain that there would be a meaningful number of documents internal to Sarasin regarding its investments in SQM securities. This is particularly so in light of Sarasin's detailed response to Plaintiff's inquiry in the April 2015 email, ███████████████████

███████████████████████████████████

---

[4] Plaintiff has produced a total of thirteen communications with Sarasin.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Indeed, as of March 2016, Sarasin held more than 2 million SQM ADSs—many multiples of the amount purchased on behalf of Tyne & Wear—and was the fourth largest holder of SQM ADSs.  (*See* Dkt No. 57-1, at 1.)  It is inconceivable that such a large position was accumulated without substantive discussion and analysis, and it is unlikely that such information would have been shared with Tyne & Wear given its limited informational rights.

Importantly, information concerning Sarasin's (and by extension Plaintiff's) reliance—or lack thereof—on the alleged misstatements is relevant not only to the merits of Plaintiff's claims, but also to the more urgent question of whether Plaintiff can meet the standards governing class certification under Rule 23.  Specifically, Rule 23(a)(3) requires a plaintiff seeking class certification to establish that it is "typical" of the absent class members.  As Judge Weinfeld explained in *Kline v. Wolf*, a plaintiff fails to satisfy Rule 23's typicality requirement if it would be subject to unique defenses which may become "the focus of the litigation" and "divert attention from the substance of the basic claim," including, notably, a defense of non-reliance.  88 F.R.D. 696, 700 (S.D.N.Y. 1981), *aff'd in part, vacated on other grounds*, 702 F.2d 400 (2d Cir. 1983).  Numerous courts in this Circuit have declined to certify a class on precisely that basis.  *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990) (affirming denial of class certification on typicality grounds where plaintiff was subject to defense of non-reliance); *Kamerman v. Ockap Corp.*, 112 F.R.D. 197, 198 (S.D.N.Y. 1986) (same); *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("[A] named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class.").[5]

---

[5] It is irrelevant at the class certification stage whether these unique defenses would ultimately succeed on the merits. *See Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *4 (D. Conn. Mar. 10, 2015) ("[C]ertification is routinely refused

10

## II.     SQM'S REQUESTS ARE NARROWLY TAILORED AND PROPORTIONAL TO THE NEEDS OF THE CASE

The requests likewise satisfy Rule 26's proportionality requirement. SQM seeks information concerning Sarasin's reasons for purchasing and selling SQM securities in order to determine whether it did so in reliance on the alleged misstatements. SQM's principal document request—seeking documents concerning Sarasin's purchase and sale of SQM securities during the Class Period—is targeted and easy to implement. Sarasin would need only to identify the discrete set of custodians involved in the purchase or sale of SQM securities and apply SQM-related search terms to their files—search terms which are sufficiently specific that they are unlikely to generate substantial numbers of "false positives." The other category of documents requested—Sarasin's investment policies and procedures—would be easily located by any professional investment adviser. Finally, the testimony sought by SQM is likewise tailored to the issue of Sarasin's decision-making process with respect to its investments in SQM securities. In light of the importance of the evidence sought—which has direct bearing on both the merits of Plaintiff's Section 10(b) claims and on whether the class can be certified consistent with Rule 23's typicality requirement—the evidence is clearly "proportional to the needs of the case." *Vaigasi* 2016 WL 616386 at *14.[6]

---

when the court is 'confronted with a sufficiently clear showing of the defense's applicability to the present plaintiff.'" (quoting *In re Omnicom Grp. Inc. Sec. Litig.*, 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007)), *aff'd*, 658 F. App'x 5 (2d Cir. 2016). The defendant must only show that the claim is "meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008).

[6] As SQM explained at the pre-motion conference, Plaintiff lacks standing to object to SQM's motion on the grounds of overbreadth or disproportionality—the only grounds Plaintiff has asserted thus far. *See, e.g.*, *Samad Bros. v. Bokara Rug Co. Inc.*, 2010 WL 5094344 at *4 (S.D.N.Y. Nov. 30, 2010) ("The plaintiff cannot . . . challenge the subpoena served on non-party witness Kapoor based on Kapoor's interest in being free from undue burden."). Even if it had standing, such an objection would be highly disingenuous in light of the third-party subpoenas that Plaintiff itself has served on five different banks propounding 11-12 different requests per bank covering a nearly 10-year period, including, *inter alia*, for "all documents prepared, collected, considered or reviewed by you concerning SQM" and "all documents concerning SQM from the files of the analysts who followed SQM for you." (Ex. L, Plaintiff's Second Amended Notice of Request for Production to Non-Parties, dated Oct. 27, 2017, at 11-12.)

**CONCLUSION**

For the foregoing reasons, SQM respectfully requests (1) that the Court approve and sign the proposed letter of request attached to the Mainland Declaration as Exhibit A; (2) that the Clerk of this Court authenticate the Court's signature under the seal of this Court; and (3) that the letter of request thereafter be returned to SQM's counsel of record.[7]

Dated: March 12, 2018
New York, New York

**MILBANK, TWEED, HADLEY & MCCLOY LLP**

By: /s/ Grant R. Mainland
Scott A. Edelman
Grant R. Mainland
Alison Bonelli
28 Liberty Street
New York, New York 10005
Tel:  (212) 530-5000

***Attorneys for Defendant Chemical and Mining Company of Chile, Inc.***

---

[7] Upon receipt of the Letter of Request from the Clerk of Court, SQM will promptly cause the Letter of Request to be transmitted to the Competent Authority in conformity with Article 1 of the Hague Convention and pursuant to the laws of the United Kingdom.  Defendant stands ready to reimburse the Court and/or the judicial authorities of the United Kingdom for any expenses incurred in connection with the execution of this Letter of Request.