UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MEGAN VILLELLA, individually, and on
behalf of all others similarly situated,

                         Plaintiff,

             -against-

CHEMICAL & MINING CO. OF CHILE INC.,

                        Defendant.

**<u>OPINION & ORDER</u>**

15 Civ. 2106 (ER)

---

Ramos, D.J.:

       This putative class action is brought on behalf of all individuals who purchased American Depository Shares in Defendant Chemical and Mining Company of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or "Defendant").  Lead Plaintiff, the Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Tyne and Wear" or "Plaintiff"), Doc. 31, alleges that SQM violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. Corrected Consolidated Complaint ("Consolidated Complaint") Doc. 40.

       Before the Court is Defendant's motion for the issuance of a letter of request, pursuant to Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), T.I.A.S. 7444, 23 U.S.T. 2555, *reprinted in* 28 U.S.C. § 1781.  Doc. 89.  For the reasons set forth below, Defendant's motion is GRANTED.

## I.    BACKGROUND

       The dispute in this case centers on the allegation that SQM's former Chief Executive Officer ("CEO") Patricio Contesse ("Contesse") illegally funneled money to Chilean politicians by authorizing SQM to pay phony invoices for services never actually rendered.  *See*

Consolidated Complaint ¶¶ 4–11.  The details of this case were previously set forth in this Court's March 2017 Opinion, granting in part and denying in part Defendant's motion to dismiss.  Doc. 67.  The Court assumes familiarity with the facts and procedural posture of this case and addresses here only those facts necessary to the disposition of the instant motion.  As relevant here, the Court denied Defendant's motion to dismiss with respect to Plaintiff's allegation that SQM made materially false and misleading statements concerning (i) its compliance with applicable laws, (ii) the effectiveness of its internal controls, and (iii) the accuracy of its financial statements regarding improper payments made by SQM's then-CEO, Contesse, to Chilean political figures.  *See generally* Consolidated Complaint; Doc. 67 at 40.

The parties commenced discovery in May 2017.  Doc. 71 at 1.  On May 25, 2017, SQM served its first request for production of documents.  Doc. 73.  As part of that request, SQM sought Plaintiff's communications, including communications with its investment manager, Sarasin and Partners LLP ("Sarasin"), a London-based asset manager, related to the purchase or sale of SQM securities.  Declaration of Grant R. Mainland ("Mainland Decl."), Doc. 91, Ex. B at 8–10; *id.* Ex. C at 5.  On August 9, 2017, Plaintiff produced the investment management agreement that governed its relationship with Sarasin and which specified that Sarasin had, subject to specified limitations, full discretion to make investment decisions on Plaintiff's behalf. *Id.* Ex. J; Plaintiff's Memorandum in Opposition ("Pl.'s Mem.") at 2.  Following communications between the parties, *see* Mainland Decl. Ex. D at 2, Plaintiff ultimately agreed to "search for and produce . . . responsive, non-privileged communications between Plaintiff and its investment managers . . . concerning Plaintiff's investment in SQM," *id.* Ex. E at 4.

On January 10, 2018, Plaintiff filed a motion for class certification, Doc. 75, and, on January 19, 2018, Plaintiff produced several communications between Plaintiff and Sarasin,

Mainland Decl. Ex. F at 1.  One such communication was an April 2015 email chain in which



. Mainland Decl., Ex. K at 8152.  In that email chain,

. *Id.* at

8153.  In response, Sarasin provided an

*Id.* at 8151.  Sarasin further

noted

," *id.* at 8149, and that

, *id.*  Though, one activist investor acknowledged that it was

*Id.* at 8151.  Defendant suggests that a

reasonable inference to be drawn from the email chain is that Sarasin was fully aware of the

governance issues on the SQM board and would have invested in SQM even had it known of

Contesse's fraudulent payments.  Defendant therefore asserts that Sarasin cannot be presumed to

have relied on the integrity of the market price of the securities in making its investment

decision.

      In view of this email chain, and Defendant's recognition that the production failed to

include documents related to the liquidation of Plaintiff's holdings, on January 29, 2018, SQM

asked Plaintiff to produce "all communications concerning Plaintiff's and/or Sarasin's decision to sell Plaintiff's holdings of SQM shares," and "confirm" that it would produce documents in Sarasin's physical possession because, SQM asserted, those documents were in fact under Plaintiff's control. *Id.* Ex. F at 1–2. In response, Plaintiff disagreed that Sarasin's documents were under its control and disputed how documents that were not shared with Plaintiff could be relevant to any claims or defenses in this action. *Id.* Ex. G at 2. Nonetheless, Plaintiff agreed as "a courtesy" to ask Sarasin to produce a reasonable subset of documents concerning "Sarasin's decision to purchase or sell SQM securities." *Id.* Ex. A at 4; Doc. 83 at 2. Defendant declined to take Plaintiff up on its offer and, following Sarasin's declination to voluntarily produce the requested information, Doc. 83, Ex. B, filed the instant motion instead.

In this motion, Defendants ask the Court to issue a letter of request, also known as "letters rogatory,"[1] for judicial assistance from the United Kingdom to direct Sarasin to provide discovery, pursuant to Chapter I of the Hague Convention and Federal Rule of Civil Procedure 28(b). *See* T.I.A.S. 7444, 23 U.S.T. 2555, *reprinted in* 28 U.S.C. § 1781. Specifically, Defendant seeks discovery from Sarasin and testimony from Henry Boucher, Sarasin's Deputy Chief Investment Officer, with whom Plaintiff directly corresponded, regarding Sarasin's investment strategy in SQM. Mainland Decl., Ex. A at 3–4. Defendant asserts that such discovery is relevant to the question of whether Plaintiff in fact relied on SQM's alleged misstatements in purchasing shares in SQM. Defendant's Memorandum in Support ("Def.'s Mem.") at 6.

---

[1] *See Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 775 n.5 (S.D.N.Y. 2012) ("The term 'letters rogatory' is synonymous with the term 'letter of request.'") (citing Black's Law Dictionary 778 (9th ed. abridged 2009)).

II.    **LEGAL STANDARD**

    **A.  Hague Convention**

Pursuant to the Hague Convention, United States courts may, in accordance with Federal law, "request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act."  Hague Convention Chapter I, Article 1; *id.* Article 42 (showing United States and United Kingdom are Contracting States) T.I.A.S. No. 7444, 23 U.S.T 2555 *reprinted in* 28 U.S.C. § 1781; *see* Fed. R. Civ. P. 28(b) (permitting federal courts to issue a letter of request to foreign countries); *see also United States v. Al Fawwaz*, No. S7 98 CRIM. 1023 (LAK), 2014 WL 627083, at *2 (S.D.N.Y. Feb. 18, 2014) ("District Courts have inherent authority to issue [a letter of request].") (citation and quotation marks omitted).  Obtaining evidence includes deposing non-party witnesses in a foreign country. *See Elliott Assocs. v. Republic of Peru*, No. 96 CIV. 7916 (RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997). ("Application for a letter of request to take testimony pursuant to the Hague Convention is an appropriate mechanism for obtaining discovery of a non-party witness in a foreign country.") (citing *Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. S.D. Iowa*, 482 U.S. 522, 541 (1987)).  "'[T]he decision of whether to issue [a letter of request] lies within a district court's sound discretion.'"  *Al Fawwaz*, 2014 WL 627083, at *2 (quoting *United States v. Jefferson*, 594 F. Supp. 2d 655, 675 (E.D. Va. 2009)) (citing *United States v. Mason*, No. 89–5675, 1990 WL 185894, at *2 (4th Cir. Nov. 29, 1990)).

In determining whether to issue a letter of request, "'courts apply the discovery principles contained in Federal Rule of Civil Procedure 26.'"  *Joseph v. Gnutti Carlo S.p.A.*, No. 15-CV-8910 (AJN), 2016 WL 4083433, at *1 (S.D.N.Y. July 25, 2016) (alteration omitted) (quoting *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012)); 8 Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2005.1 (3d ed. 2010) ("Fed. Prac. &

Proc. Civ.") ("A court should make use of the Convention procedures whenever it is determined on a case–by–case basis that their use will facilitate discovery.").  Such principles include "whether 'the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence,'" and consideration of "breadth, relevance, and the availability of the information sought from other sources."  *Lantheus Med. Imaging, Inc.*, 841 F. Supp. 2d at 776–77 (alteration omitted) (quoting *Netherby Ltd. v. Jones Apparel Grp., Inc.*, No. 04 CIV. 7028 (GEL), 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005)) (and citing *Elliott Assocs. v. Peru*, No. 96 Civ. 7916(RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997)).

Although the "party seeking the application of the Hague Convention procedures . . . bears the burden of persuasion," *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 435 (E.D. N.Y. 2008), that burden is not a heavy one, *Joseph*, No., 2016 WL 4083433, at *1 (noting that "relevance, for purposes of discovery, is an extremely broad concept" (citation and quotation marks omitted); Fed. Prac. & Proc. Civ. § 2005.1 (citing *Tulip Computers Intern. B.V. v. Dell Computer Corp.*, 254 F. Supp. 2d 469 (D. Del. 2003)).

### 1.  Proving Reliance in a Securities Fraud Action

Reliance is an "'essential element'" of proving a Section 10(b) securities fraud case. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2418 (2014) ("*Halliburton II*") ("'Reliance by the plaintiff upon the defendant's deceptive acts is an essential element' of the [Section 10(b)] private cause of action.") (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008).  Although a securities fraud plaintiff may invoke the fraud-on-the-market presumption of reliance, "which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" *id.* at 2408 (quoting *Basic v. Levinson*, 485 U.S. 224, 246 (1988)), that

presumption may be rebutted, *id*.  "Any showing that severs the link between the alleged

misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade

at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at

248.

   In practical terms, then, the fraud-on-the-market presumption may be rebutted in one of

two ways.  A defendant may show "that the alleged misrepresentation did not . . . actually affect

the market price," in other words, that the fraud had no price impact.  *Halliburton II*, 134 S. Ct.

at 2408.  Alternatively, a defendant may provide direct evidence that "an individual plaintiff . . .

did not rely on the integrity of the market price in trading stock," *id.* at 2412, by showing that

"plaintiff would have bought or sold the stock even had he been aware that the stock's price was

tainted by fraud," *id*. at 2408; *see also id.* at 2424 (Thomas, J., concurring) (noting that *Basic*

"afforded defendants an opportunity to rebut the presumption by providing evidence that either

aspect of a plaintiff's fraud-on-the-market reliance—price impact, or reliance on the integrity of

the market price—is missing").  In either event, the defendant bears the burden of rebutting the

presumption of reliance.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 102 (2d Cir. 2017)

(noting that "defendants bear the burden of persuasion to rebut the *Basic* presumption of reliance

at the class certification stage").

## III.  DISCUSSION

### A. Defendant's Request for Issuance of a Letter of Request

   In seeking class certification, Plaintiff invokes the fraud-on-the-market presumption of

reliance.  Doc. 75 at 12 ("With respect to reliance, the predominance requirement is [met]

because plaintiffs are entitled to rely on the FOTM [fraud-on-the-market] presumption of

reliance.").  Plaintiff concedes that it made no decisions concerning the purchase or sale of

individual securities.  *See* Pl.'s Mem. at 3 (noting that Plaintiff "did not make decisions concerning the purchase or sale of individual securities").  Rather, those decisions were made by Plaintiff's investment advisor, Sarasin, who, as Plaintiff's "agent," had "full authority and  . . . complete discretion to buy, sell, [and] retain" investments on Plaintiff's behalf.  Mainland Decl., Ex. J, Management Agreement, at 009, 012; *see* Pl.'s Mem. at 3 (stating that "the purchases were made on Tyne & Wear's behalf by Sarasin . . . acting as Tyne & Wear's agent pursuant to an investment management agreement").

Because Sarasin exercised sole authority to purchase and sell securities, Defendant contends that reliance "can be determined only by reference to whether *Sarasin* . . . relied" on the allegedly false statements, and that it is entitled to discovery from Sarasin to challenge the merits of Plaintiff's reliance, and, more urgently, to contest at class certification Plaintiff's typicality to serve as class representative.  Def.'s Mem. at 8 (emphasis added).  In contrast, Plaintiff insists that Defendant may not rebut the fraud-on-the-market presumption of reliance based on an investment adviser's knowledge and that, in any event, such a rebuttal against a lead plaintiff is not proper at the class certification stage.  Pl.'s Mem. at 5–6.  The Court disagrees with Plaintiff on both counts.

### 1.  Investment Adviser's Knowledge

In support of their arguments on this point, both sides rely heavily on the *Vivendi* line of cases emanating from the Southern District of New York.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 426 (S.D.N.Y. 2015) ("*Vivendi I*"); *In re Vivendi Universal, S.A.*

*Sec. Litig.*, 183 F. Supp. 3d 458 (S.D.N.Y. 2016) ("*Vivendi* II").[2]  Defendant relies on *Vivendi* II for the proposition that an institutional investor's knowledge is relevant to the reliance inquiry where, as here, that adviser exercised discretion to invest on plaintiff's behalf.  *See* Def.'s Mem at 7.  In *Vivendi* II, as in the instant case, non-party investment advisor Capital Guardian Trust Company, acting on behalf of ten institutional clients, made the decision to invest in defendant Vivendi Universal S.A.'s ADRs.  *Id.* at 459–60.  Following a securities fraud trial that was decided in plaintiffs' favor, the court established "a post-trial claims administration process whereby class members could submit claims against Vivendi, and Vivendi could interpose individualized challenges, including on the basis of a claimant's lack of reliance."  *Id.* at 459 n.1. Following discovery from Capital Guardian on the issue of reliance and a deposition of the particular analyst who managed plaintiffs' investment strategy in Vivendi, the Court determined that Vivendi had "rebutted the *Basic* presumption because Capital Guardian was indifferent to the fraud."  *Id.* at 466.  *Vivendi II* therefore demonstrates that courts may look to a non-party investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs.[3]

The *Vivendi II* court is not alone in imputing an investment adviser's knowledge to institutional plaintiffs for purposes of determining whether that plaintiff relied on an alleged

[2] Numerous opinions in the *Vivendi* line of cases predate these two.  *See e.g.*, *In re Vivendi Universal, S.A.*, No. 02 CIV. 5571 (RJH), 2004 WL 2375830, at *1 (S.D.N.Y. Oct. 22, 2004); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 585 (S.D.N.Y. 2011).  This opinion's reference to "*Vivendi I*" and "*Vivendi II*" is meant only to distinguish these two cases from each other when discussed in this opinion.

[3] In response, Plaintiff does not challenge that *Vivendi II* supports this proposition.  Rather, it contends that because "the class in that matter had already been certified" Defendant should, as a legal matter, not be permitted to rebut the fraud-on-the-market presumption at the class certification stage.  *See* Pl.'s Mem. at 5–6.  That is a separate issue, which the Court addresses in turn.

misstatement or omission.  *See e.g., Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 119–27

(D.D.C. 2017) (evaluating reliance based challenge against lead plaintiffs based on their

investment managers' knowledge); *Jay Dees Inc. v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954,

2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) ("Reliance need not result from direct

communication from defendant to plaintiff.  There is no reason why a misrepresentation to the

plaintiff's agent does not suffice."); *cf. In re Beacon Assocs. Litig.*, 745 F.Supp.2d 386, 408

(S.D.N.Y. 2010) (denying motion to dismiss claims based on alleged misstatements where

plaintiff plead reliance by its agent upon representations made by defendant).[4]

      And as Defendant notes, if courts could not look to an investment adviser's knowledge,

plaintiffs could immunize themselves from reliance challenges by outsourcing their investment

decisions to their investment advisers, or other agents.  Def.'s Reply. at 3.  Where, as here, a

plaintiff wholly outsources their decision making to an investment adviser who acts as their

agent, that agent's decision-making calculus is relevant to the reliance inquiry.

---

[4] Defendants rightly point to other cases in which courts have looked to the knowledge of a plaintiff's
investment adviser in assessing reliance, predominance or typicality in the class certification context.  *See
e.g., New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 169 (S.D.N.Y.
2011) (denying class certification in part because putative class's knowledge of an alleged fraud varied
based on a certain plaintiff's investment adviser exercising "complete discretion over [the plaintiff's]
investments"), *aff'd sub nom. New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*, 477 F.
App'x 809 (2d Cir. 2012).  Although Plaintiff attempts to distinguish *Residential Capital, LLC* on the
ground that the court later certified the class notwithstanding its earlier concern that "predominance was
defeated by individualized knowledge," *New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 5093 HB, 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013), the fact that the court certified
the class is irrelevant to the inquiry of whether a court may look to the knowledge of a plaintiff's
investment adviser in assessing the propriety of class certification.  *See* Pl's. Mem. at 7.  Plaintiff's
reliance on *In re Veeco*, 235 F.R.D. 220, 238–39 (S.D.N.Y. 2006), *see* Pl's. Mem. at 3–4, is likewise
misplaced, as that case held only that an institutional plaintiff's use of an investment advisor does not, in
and of itself, create a typicality problem.

2.  **Rebutting Lead Plaintiff's Reliance on the Integrity of the Market Price at Class Certification**

Next, Plaintiff contends that Defendant should not, as a legal matter, be permitted to rebut the fraud-on-the-market presumption at the class certification stage.  Pl.'s Mem. at 5–6. *Halliburton II* is instructive here.

In *Halliburton II*, the defendant sought to overturn the *Basic* fraud-on-the-market presumption or, alternatively, to "rebut the presumption at the class certification stage, by showing a lack of price impact."  134 S. Ct. at 2405.  Although the Court declined to overrule the *Basic* presumption, it nonetheless held that, "to maintain the consistency of the presumption with the class certification requirements of Federal Rule of Civil Procedure 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock."  *Id.* at 2417. The Court also noted that "*Basic* . . . afford[s] defendants an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock."  *Id.* at 2412.  To be sure, by acknowledging that such challenges "ha[ve] the effect of 'leaving individualized questions of reliance in the case,'" *id.* (quoting *id.* at 2424 (Thomas, J. concurrence), which do not "render class certification inappropriate under Rule 23(b)(3)," *id.*, the majority opinion resolved that such challenges could not be used to destroy *predominance* at class certification.  The majority, however, was silent on whether such challenges could be brought against *putative class representatives* to test their *typicality* at class certification.

Justice Thomas's concurrence, however, where he laments the "virtual[] impossib[ility]" of "rebuttal based on an individual plaintiff's lack of reliance," appears to fill that void.  *Id.* at 2424.  Justice Thomas explained that "[a]t the class-certification stage, [rebuttal based on an

11

individual plaintiff's lack of reliance] is only directed at the class representatives, which means that counsel only needs to find one class member who can withstand the challenge," thereby permitting class certification to move forward.  *Id.* at 2424 (citing Grundfest, *Damages and Reliance Under Section 10(b) of the Exchange Act*, 69 Bus. Lawyer 307, 362 (2014)).  "After class certification," however, "courts have refused to allow defendants to challenge any plaintiff's reliance on the integrity of the market price prior to a determination on classwide liability."  *Id.  Halliburton II* therefore suggests that while a defendant's opportunity to rebut an individual plaintiff's reliance at the class certification stage is narrow, defendants are not precluded from challenging a putative class representative's reliance on typicality grounds. Although such challenges may require the class to identify a new class representative, it will not destroy the class by causing "individual questions to predominate."  *Id.* at 2412 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").

Indeed, both prior to and following the Supreme Court's decision in *Halliburton II*, courts have permitted defendants to challenge the fraud-on-the-market presumption at the class certification stage by demonstrating, on an individual basis, that the lead plaintiff did not rely on the integrity of a stock's market price in trading in that security.  *See Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 108, 118–28 (D.D.C. 2017) (evaluating for purposes of class certification, whether co-lead plaintiffs' reliance, as evidenced by discovery from their investment adviser, was sufficiently typical of the class); *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786 ADM/TNL, 2016 WL 4098741, at *3–4 (D. Minn. July 28, 2016) (evaluating at class certification stage whether certain named plaintiffs met typicality requirement in view of individualized reliance challenge based on post-disclosure purchases); *In re Safeguard*

12

*Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (finding "compelling reason to rebut the

reliance presumption" with respect to the lead plaintiffs and holding as a result that lead

plaintiffs' claims were neither typical nor adequate); *see also In re Pfizer Inc. Sec. Litig.*, 282

F.R.D. 38, 44 (S.D.N.Y. 2012) (defendants "argue that [the class representative] fails to satisfy

the typicality requirement because it is subject to unique defenses"); *Rocco v. Nam Tai

Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (recognizing that "a named plaintiff who

is subject to an arguable defense of non-reliance on the market has been held subject to a unique

defense, and therefore, atypical of the class"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267,

281 (S.D.N.Y. 2003) ("The SSB Defendants contend that the claims of all of the named plaintiffs

are atypical and subject to unique defenses because they did not rely, and cannot be presumed to

have relied, on the market price for WorldCom securities."); *Saddle Rock Partners v. Hiatt*, No.

96 CIV. 9474, 2000 WL 1182793, at *5 (S.D.N.Y. Aug. 21, 2000) ("[E]ven a successful defense

rebutting reliance [as to the class representative] would still leave intact the basic issues of

defendants' liability for the alleged fraud.  Since these are common to all class members and

central to plaintiff's claim, certification is warranted.").

Against this extensive authority, Plaintiff offers up two cases:  *Vivendi I* and *Willis v. Big

Lots, Inc.*, 242 F. Supp. 3d 634, 647 (S.D. Ohio 2017), *leave to appeal granted sub nom. In re

Big Lots, Inc.*, No. 17-0303, 2017 WL 4404634 (6th Cir. Aug. 23, 2017).  Plaintiff relies on

*Vivendi I* for the proposition that, because that case permitted defendants to raise individualized

reliance challenges following a trial on liability, defendants may not invoke individualized

reliance challenges against a lead plaintiff at class certification.  Pl.'s Mem. at 5 ("the class in

[*Vivendi*] had already been certified and had prevailed at trial").  *Vivendi I* does not support this

proposition for several reasons.  As an initial matter, that case is inapposite precisely because it

did not address a reliance-based typicality challenge against a lead plaintiff at the class certification stage. *See Vivendi I*, 123 F. Supp. 3d at 425. Moreover, the *Vivendi I* court's analysis of *Halliburton II* does not foreclose the kind of individualized, lead-plaintiff challenge advanced here. Like *Halliburton II*, the *Vivendi I* court was concerned that individualized challenges to class members would "disrupt a finding of predominance at the class certification stage," but considered it permissible to "'pick off the occasional class member'" by challenging whether they relied on the integrity of the market price. *Vivendi I*, 123 F. Supp. 3d at 438. *Vivendi I* is therefore silent as to whether defendants may assert reliance-based, typicality challenges against putative class representatives at class certification. Nor did the earlier *Vivendi* opinions directly address that issue. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 585 (S.D.N.Y. 2011), (noting that "Vivendi did not challenge . . . individual reliance" prior to trial but was permitted to do so following a trial on the merits), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Plaintiff's reliance on *Big Lots, Inc.*, fares no better. There, defendants argued that lead plaintiff did not rely on the integrity of Big Lot's stock price because its investment adviser purchased the stock by determining its "intrinsic value," rather than relying on the market price of the stock. *Big Lots, Inc.*, 242 F. Supp. 3d at 646. The court likened that argument to the claim that value investors do not, as a general matter, rely on the integrity of a stock's market price. Relying on *Halliburton II*'s rejection of such a blanket rule, the Court noted that value investors do "'not believe that the market price accurately reflects public information *at the time he transacts*,'" but that it is sufficient for purposes of the *Basic* presumption if the value investor "'trade[s] stock based on the belief that the market price will incorporate pubic information within a reasonable period.'" *Id.* at 647 (quoting *Halliburton II*, 134 S. Ct. at 2411 (emphasis in

original)).  That reasoning is readily distinguishable from the present case.  Here, Defendant does not assert that Sarasin was a value investor who relied only on its own calculations of SQM's value.  Rather, Defendant makes a far more specific claim:  that the limited discovery available "strongly suggests that [Sarasin] would have invested in SQM securities even if it had known about the payments to Chilean political figures."  Def.'s Mem. at 9.  Such allegation is sufficient to sustain a reliance challenge.  *See Halliburton II*, 134 S. Ct. at 2408 (to rebut the fraud-on-the-market presumption based on a plaintiff's failure to rely on the integrity of a securities market price a defendant must show that  "plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud").  Accordingly, the Court concludes that neither the reasoning nor holding of *Vivendi I* or *Big Lots, Inc.* forecloses Defendant's present challenge.

The fact that Defendant may, as a legal matter, raise such a challenge, however, does not mean that the facts of this case will be sufficient for Defendant to prevail on that challenge.

Rule 23's typicality requirement is "not demanding."  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (quoting *Tsereteli v. Residential Asset Securitization Trust 2006–A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012).  It "does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *Id.* (quoting *Pennsylvania Ave. Funds v. Inyx Inc.*, 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011)).   Nor does typicality "require that damages be identical among class members."  *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (citing *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 337 (E.D.N.Y. 2013) ("[I]ndividualized proof of damages alone will not defeat class certification.") (quotation marks

omitted)).  Although typicality may be defeated "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (citation and quotation marks omitted), "'the unique defense rule . . . is not rigidly applied in this Circuit,'" *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012) (quoting *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008)).  A unique defense will only render a putative class representative's claims atypical when the defense "threaten[s] to become the focus of the litigation."  *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

Accordingly, there are only limited circumstances in which courts are willing to find a lead plaintiff's lack of reliance on the integrity of a security's market price sufficient to defeat typicality at the class certification stage.  Those circumstances tend to involve cases where "a putative class representative relied on information unavailable to the public in choosing to purchase a security."  7 Newberg on Class Actions § 22:72 (5th ed.) (citing *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 262–63 (D. Mass. 2005) (noting that "when the putative class representative has relied upon information that is not generally available to the public, and hence to the unnamed class representatives," a lack of reliance can defeat typicality) (quotation marks omitted)); *see also* 5 Moore's Federal Practice - Civil § 23.24[8][b] ("[T]ypicality may be defeated . . . if class representative is a sophisticated investor who had access to information or relied on expertise that other class members did not possess."); Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1764 (3d ed.) ("The [typicality] requirement . . . has not been met in securities class actions in which unique defenses—most commonly, reliance—would be applicable to the representative party's claims.") (footnotes omitted).

Here, as noted above, Defendant relies on an email chain that it assert raises questions about whether Sarasin would have invested in SQM securities even if Sarasin had known about SQM's illegal payments to Chilean politicians.  Def.'s Mem. at 9.  Specifically, Defendants draw the Court's attention to Sarasin's statements—offered in response to Plaintiff's request for an analysis of the fraud at SQM—that Sarasin had ██████████████████████████████████ ██████████████████████████ Mainland Decl., Ex. K, April 23, 2015 Email chain between Plaintiff and Henry Boucher, at 8151, that there was agreement among certain large institutional shareholders that SQM ██████████████████████████████████████ ████, and that Sarasin was nonetheless considering whether █████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████, *id.*  Plaintiff contends that because ████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████.  Pl.'s Mem. at 9.  However, ████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████.  Mainland Decl., Ex. K, April 23, 2015 Email chain between Plaintiff and Henry Boucher, at 8150, 8151.  The email also states, in general terms ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████  *Id.* at 8151.  These statements are ambiguous and on their own would be insufficient for Defendant to demonstrate that Plaintiff is atypical.  They are,

however, sufficient to demonstrate "that the information sought may be relevant to the subject matter of [this] action." *See MacCartney v. O'Dell*, No. 14-CV-3925 (NSR), 2017 WL 766906, at *3 (S.D.N.Y. Feb. 27, 2017); *id.* ("It is well-established within this Circuit that [Rule 26] will be satisfied if there is 'any possibility' that the information sought may be relevant to the subject matter of the action.") (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (noting that relevance under Rule 26(b)(1) is broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").

Because there is no dispute that the discovery Defendant seeks is relevant to Sarasin's reliance on the integrity of SQM's market price, and because significant sums of money are at stake in this matter, the Court finds that the request is relevant and proportional to the needs of the case.[5] *See N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, No. CV 12-1633, 2018 WL 1515711, at *11 (E.D.N.Y. Mar. 28, 2018) ("Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate.") (citation omitted).

---

[5] The Court separately notes that any individualized challenges to a putative class member's reliance will only be considered after a determination on liability. *See Vivendi II*, 183 F. Supp. 3d 458; *Vivendi I*, 123 F. Supp. 3d 424 (bifurcating liability phase from individualized reliance rebuttal); *Swack*, 230 F.R.D. 250, 263 (same); 7 Newberg on Class Actions § 22:72 (5th ed.) (noting that courts may "sever" the liability and damages phases of a trial to address individualized claims of non-reliance).

IV.     **CONCLUSION**

Accordingly, the Court GRANTS Defendant's motion for the issuance of a letter of request.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 89.

SO ORDERED.

Dated:     June 12, 2018
           New York, New York

Edgardo Ramos, U.S.D.J.