UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
MEGAN VILLELLA, Individually and on       :
Behalf of All Others Similarly Situated,        :
                                                                    :
                    Plaintiff,                         :
                                                                    :
         vs.                                               :  15-cv-2106-ER
                                                                    :
CHEMICAL AND MINING COMPANY   :  *Oral Argument Requested*
OF CHILE, INC., et al.,                             :
                                                                    :
                                                                    :
                    Defendants.                   :
------------------------------------------------------- x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHEMICAL AND MINING COMPANY OF CHILE, INC.'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, BJORN I. STEINHOLT

**MILBANK, TWEED, HADLEY & McCLOY LLP**

Scott A. Edelman (sedelman@milbank.com)
Grant R. Mainland (gmainland@milbank.com)
Alison M. Bonelli (abonelli@milbank.com)
28 Liberty Street
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant Chemical
and Mining Company of Chile, Inc.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................... ii
PRELIMINARY STATEMENT ............................................................................................... 1
LEGAL STANDARD ............................................................................................................... 3
ARGUMENT ............................................................................................................................. 5
I.    MR. STEINHOLT IS NOT QUALIFIED. ..................................................................... 5
II.    MR. STEINHOLT'S EVENT STUDY IS METHODOLOGICALLY UNSOUND AND UNRELIABLE. ........................................................................................................ 9
CONCLUSION ........................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Am. Honda Motor Co. v. Allen*,
   600 F.3d 813 (7th Cir. 2010) ..................................................................................................3

*Barrie v. Intervoice-Brite, Inc.*,
   2006 WL 2792199 (N.D. Tex. Sept. 26, 2006)........................................................................3

*Bell v. Ascendant Sols., Inc.*,
   2004 WL 1490009 (N.D. Tex. July 1, 2004),
   *aff'd,* 422 F.3d 307 (5th Cir. 2005)........................................................................................12

*Bell v. Ascendant Sols., Inc.*,
   422 F.3d 307 (5th Cir. 2005) ....................................................................................4, 5, 12, 13

*In re Blood Reagents Antitrust Litig.*,
   783 F.3d 183 (3d Cir. 2015).....................................................................................................3

*Brown v. China Integrated Energy, Inc.*,
   2014 WL 12576643 (C.D. Cal. Aug. 4, 2014).....................................................................8, 14

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) .............................................................................................9

*In re Carpenter Co.*,
   No. 14-0302, 2014 WL 12809636 (6th Cir. Sept. 29, 2014) ....................................................3

*Chill v. Calamos Advisors LLC*,
   2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ............................................................................3

*Cunha v. Hansen Nat. Corp.*,
   2013 WL 12124073 (C.D. Cal. June 20, 2013) .......................................................................2

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)........................................................................................................ *passim*

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) .............................................................................................5

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...............................................................................................................13

*George v. China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..........................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..................................................................................................................6

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
 2013 WL 5815472, at *15 (S.D.N.Y. Oct. 29, 2013) ...................................................... *passim*

*Krogman v. Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................................9

*Loussier v. Universal Music Grp., Inc.*,
 2005 WL 5644422 (S.D.N.Y. June 28, 2005) ............................................................................4

*Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Del., Inc.*,
 2009 WL 5173920 (S.D.N.Y. Dec. 30, 2009) ............................................................................4

*Nimely v. City of New York*,
 414 F.3d 381 (2d Cir. 2005).....................................................................................................4, 5

*In re Northfield Labs., Inc. Sec. Litig.*,
 267 F.R.D. 536 (N.D. Ill. 2010)......................................................................................11, 12, 14

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..................................................................11, 13

*In re PolyMedica Corp. Sec. Litig.*,
 453 F. Supp. 2d 260 (D. Mass. 2006) ...................................................................................3, 14

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*,
 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ...............................................................................3

*Ryan v. Flowserve Corp.*,
 245 F.R.D. 560 (N.D. Tex. 2007), *rev'd on other grounds by Alaska Elec.
 Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) ...............................3, 14, 15

*Sali v. Corona Reg'l Med. Ctr.*,
 2018 WL 6175617 (9th Cir. May 3, 2018) ................................................................................3

*Scott v. Chipotle Mexican Grill, Inc.*,
 315 F.R.D. 33, 55 (S.D.N.Y. 2016) ............................................................................................3

*Sher v. Raytheon Co.*,
 419 F. App'x 887 (11th Cir. 2011) ............................................................................................3

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
 546 F.3d 196 (2d Cir. 2008).......................................................................................................4

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
 878 F.2d 791 (4th Cir. 1989) ......................................................................................................6

*Waggoner v. Barclays PLC*,
 875 F.3d 79 (2d Cir. 2017).........................................................................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...............................................................................................................3

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000).........................................................................................................4, 15

*Willis v. Big Lots, Inc.*,
    2017 WL 1074048 (S.D. Ohio Mar. 17, 2017).......................................................................9

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ..................................................................................................3

**Rules**

Fed. R. Evid. 702 ................................................................................................... *passim*

**Other Authorities**

Paul A. Ferillo et al., *The "Less Than" Efficient Capital Markets Hypothesis:
    Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases*,
    78 St. John's L. Rev. 81, 128 (2004) ...................................................................................11

Defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or the "Company"), respectfully submits this memorandum of law in support of its motion to exclude the testimony of Plaintiff's expert, Bjorn I. Steinholt, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT

Plaintiff's motion for class certification invokes the fraud-on-the-market ("FOTM") presumption of reliance to avoid individualized reliance issues that would preclude certification of the putative class. To be entitled to that presumption, Plaintiff must establish by a preponderance of the evidence that SQM's American Depositary Shares ("ADS") traded in an efficient market during the Class Period.[1] Plaintiff's sole "evidence" in this regard is the testimony of its expert, Bjorn I. Steinholt. Mr. Steinholt, however, is unqualified and his opinion is unreliable. His testimony should be excluded pursuant to Rule 702 and the Supreme Court's *Daubert* decision.

A computer scientist and engineer by academic background, Mr. Steinholt lacks genuine expertise in finance or economics. His sole claim to educational qualification as an expert in that area is that he took courses in finance and economics while studying for a Master of International Business degree from the University of San Diego (which he described as an MBA program with a foreign language component); and that he engaged in a "self-study program" to obtain a Chartered Financial Analyst designation. Mr. Steinholt has never taught courses, conducted research, or published articles in the area of finance or economics. Instead, his professional "expertise" derives from decades of work as a serial litigation consultant in securities class

---

[1] All capitalized terms not otherwise defined herein are as defined in SQM's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, filed contemporaneously herewith.

actions—first for a controversial firm that collapsed due to the indictment of its founder for perjuring himself in expert declarations; and then with a former colleague from that collapsed firm who has since been excluded for offering opinions not dissimilar from those offered here, and who apparently no longer works in the business as a result.  This experience does not qualify Mr. Steinholt to opine on market efficiency.  As Judge Forrest correctly recognized in *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, "simply being an expert at being an expert is not enough." 2013 WL 5815472, at *15 (S.D.N.Y. Oct. 29, 2013).  (*See infra* Point I.)

Qualifications aside, Mr. Steinholt's purported market efficiency analysis is methodologically unsound and unreliable, as explained in more detail in SQM's opposition to Plaintiff's class certification motion and the accompanying report of Dr. Walter N. Torous, a financial economist at MIT.  Specifically, Mr. Steinholt's purported "event study" (1) applies a weak and scientifically unsupportable standard of efficiency (and only narrowly clears that low bar); (2) excludes disclosures of non-financial information (the kind of information at issue in this case); (3) introduces bias by testing an alleged "corrective disclosure" on the last day of the Class Period (which was accompanied by a highly significant share price decline), while ignoring all other alleged corrective disclosures (which were not); and (4) overlooks the total absence of any direct evidence of efficiency during the first 26 months—or nearly half—of the Class Period, even according to his own, scientifically unsupportable model.  (*See infra* Point II.)

These kinds of methodological flaws led the court in *Cunha v. Hansen Natural Corp.* to conclude that the plaintiff, relying on Mr. Steinholt's testimony, was not entitled to invoke the FOTM presumption.  2013 WL 12124073, at *8 n.12 (C.D. Cal. June 20, 2013) (Tentative Order Denying Class Certification), later confirmed by Jan. 17, 2014 Final Ruling on Mot. for Class Cert. (Dkt. No. 155).  Other submissions by Mr. Steinholt have similarly been criticized as "too

conclusory," *Barrie v. Intervoice-Brite, Inc.*, 2006 WL 2792199, at *8 (N.D. Tex. Sept. 26, 2006), or "flawed and underwhelming in several aspects," *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 573 (N.D. Tex. 2007), *rev'd on other grounds by Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009). And in *Deutsche Bank*, the court excluded an event study performed by Mr. Steinholt's former business partner due to similar methodological flaws. 2013 WL 5815472, at *15–16. Mr. Steinholt's analysis should be excluded here for the same reasons.

## LEGAL STANDARD

Where a plaintiff seeks to invoke the FOTM presumption of reliance, it must establish by a preponderance of the evidence that the securities in question traded in an efficient market. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 n.27 (2d Cir. 2017) ("[A]bsent an efficient market, the basis for the *Basic* presumption does not exist."); *see also In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 272 (D. Mass. 2006) (burden of establishing market efficiency "erects a significant hurdle which plaintiffs must jump before being permitted to take advantage of the fraud-on-the-market presumption"). Although the court's "gatekeeping" function may be more attenuated in bench proceedings, *see Chill v. Calamos Advisors LLC*, 2018 WL 4778912, at *6 (S.D.N.Y. Oct. 3, 2018) (Ramos, J.), "trial courts in this Circuit often 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 739580, at *4 (S.D.N.Y. Jan. 10, 2018) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).[2]

---

[2] The Supreme Court has suggested that the trial courts in this Circuit are correct in doing so. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (stating that "[w]e doubt" that "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings"). All federal courts of appeals that have considered the issue are in accord. *See Sali v. Corona Reg'l Med. Ctr.*, 2018 WL 6175617, at *7 (9th Cir. May 3, 2018); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015); *In re Carpenter Co.*, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010).

The proponent of expert testimony has the burden of proving that the testimony is admissible by establishing three criteria. *See Nimely v. City of New York*, 414 F.3d 381, 395–97 (2d Cir. 2005). First, the proponent must establish that the expert is **qualified** through "knowledge, skill, experience, training, or education." *Id.* at 395 (quoting Fed. R. Evid. 702); *see also Deutsche Bank*, 2013 WL 5815472, at *13 ("being an expert in plaintiffs' securities cases . . . is not sufficient to qualify as an expert"). Second, the proponent must prove that the testimony is **reliable**, which requires that the testimony be "based upon 'sufficient facts or data,'" that "the testimony is the 'product of reliable principles and methods,'" and that the expert "'has applied the principles and methods reliably to the facts of the case.'" *Nimely*, 414 F.3d at 395 (quoting Fed. R. Evid. 702); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) (reliability is an "exacting standard[]"). Third, the proponent must prove that the testimony is **relevant**, meaning that it will assist the trier of fact to understand the evidence. *See Nimely*, 414 F.3d at 397. Where, as here, the first two criteria have not been established, the relevance requirement by definition is not met. *See Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Del., Inc.*, 2009 WL 5173920, at *2 (S.D.N.Y. Dec. 30, 2009) ("To determine if scientific knowledge will assist the trier of fact, a court must assess an expert's methodology to determine if it is scientifically valid and can properly be applied to the facts in issue."); *Loussier v. Universal Music Grp., Inc.*, 2005 WL 5644422, at *4 (S.D.N.Y. June 28, 2005) (where unqualified, proposed expert is "unlikely to 'assist the trier of fact' in understanding the evidence or determining the facts at issue in the present case").

The Second Circuit has recognized that "[a]n event study [offered in support of market efficiency] may be rejected . . . if it is methodologically unsound or unreliable." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 208 n.15 (2d Cir. 2008) (citing *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005)). Indeed, courts in this Circuit and

4

others have excluded the testimony of expert witnesses concerning market efficiency on both qualification and reliability grounds. *See, e.g.*, *Deutsche Bank*, 2013 WL 5815472, at *15–16 (excluding plaintiff's expert at class certification stage on qualification and reliability grounds); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181–82 (S.D.N.Y. 2012) (excluding plaintiff's expert's testimony at class certification stage on reliability grounds); *Bell*, 422 F.3d at 316 (affirming district court's denial of class certification motion resulting from exclusion of plaintiff's expert under *Daubert*).

## ARGUMENT

### I.  MR. STEINHOLT IS NOT QUALIFIED.

To qualify as an expert on market efficiency, Mr. Steinholt must have expertise either by dint of his educational background and training, or as a result of his professional experience. *Nimely*, 414 F.3d at 395–96. Mr. Steinholt has neither.

Mr. Steinholt is not an economist. In 1987, he received an undergraduate degree in computer science and engineering and, contemporaneously, a graduate degree in engineering from a Norwegian university. (Steinholt Rpt. Ex. A at 2; Tr. 12:21-25; 13:1-11.)[3] He then pursued a Master of International Business degree from the University of San Diego, which he described as "the same as an MBA" except with "one additional interdisciplinary course" and a "second language requirement." (Tr. 11:23–12:1.) In the course of pursuing that degree in business generally, Mr. Steinholt claims to have taken unspecified courses in economics and finance. (*Id.* at 10:15-23.) And he also obtained a Chartered Financial Analyst designation, a "self-study program." (*Id.* at 13:12-18.) But he has never taught a finance or economics course, published articles in peer-reviewed finance or economics journals, or performed any independent research

---

[3] "Steinholt Rpt." refers to the Expert Report of Bjorn I. Steinholt, CFA (Dkt. No. 75-4). "Tr." refers to Mr. Steinholt's deposition transcript, enclosed as Exhibit 1 to the Declaration of Grant R. Mainland, dated December 12, 2018.

on market efficiency or other finance-related concepts. (*Id.* at 67:7–68:2; 68:24–69:2.) Indeed, Mr. Steinholt's sole publication (other than his dozens of reports submitted on behalf of securities plaintiffs) is a blurb in "Law360" criticizing a district court's "price impact" analysis after the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"). (Steinholt Rpt. Ex. A at 3.)

That leaves the Court to look for Mr. Steinholt's expertise in his professional background. But the only expertise the Court will find there is as a serial litigation consultant. Mr. Steinholt acknowledged at deposition that virtually his entire career, over more than 25 years, has been devoted to providing "expert" services, whether in a consulting or testifying capacity, to plaintiffs in securities cases. (Tr. 16:23–17:20; 37:23–38:10; 50:4-10; 50:20–51:17.) Thus, Mr. Steinholt's supposed expertise in finance and economics is almost entirely self-taught and self-developed as an adjunct to his development of a business providing economic support and testimony to plaintiffs' law firms pursuing securities class action work. He has provided those services in "many, many hundreds of cases" (Tr. 51:10), typically in cases brought by the law firm prosecuting this case, Robbins, Geller, Rudman & Dowd, which Mr. Steinholt admitted was his "most important client" (*id.* at 60:6–13). Whatever this experience is worth, it is not the kind of "expertise" that courts look for in judging the qualifications of an expert. To the contrary, courts are critical of experts whose true "expertise is being an expert in plaintiffs' securities cases," which is "not enough." *Deutsche Bank*, 2013 WL 5815472, at *13, 15; *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("Although it would be incorrect to conclude that [the expert's] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."). This is true even if courts have admitted the expert's testimony in the past, as "the

6

Supreme Court made it quite clear that a court should not simply accept a proffered expert—even if he has been accepted as such before . . . ." *Deutsche Bank*, 2013 WL 5815472, at *12.

Even if the Court were to consider the possibility that Mr. Steinholt developed expertise in finance and economics in the course of his work as a professional expert, the particulars of Mr. Steinholt's background raise serious doubts on that score. Immediately after receiving his Master of International Business, Mr. Steinholt's first job was with a firm called Princeton Venture Research ("Princeton Venture"). (Steinholt Rpt. Ex. A at 2; Tr. 14:15-18.) Princeton Venture eventually became notorious when its founder, John Torkelsen, pleaded guilty to perjuring himself in declarations submitted to federal courts in securities class actions brought by a predecessor firm of Robbins Geller. (Waiver of Indictment at Ex. A. ¶ 5, United States v. Torkelsen, Cr. No. 08-121 (E.D. Pa. May 12, 2008) (Dkt. No. 10); *see also* Tr. 20:17-22.) Mr. Torkelsen stated in those declarations that he was independent and that his compensation did not depend on the outcome of the case, when in fact he had agreed with the plaintiffs' lawyers to be paid on a contingency basis. (*Id.* at ¶¶ 4–5) In his deposition, Mr. Steinholt disclaimed knowledge of the fraud (Tr. 21:6-10), but he acknowledged that he personally drafted expert reports that Mr. Torkelsen signed and submitted (Tr. 19:23–20:1). Moreover, Mr. Torkelsen knew Mr. Steinholt well enough that he asked him to remain at Princeton Venture even after its litigation consulting arm was shuttered, apparently due to troubles in getting paid and associated contingency fees that eventually sent Mr. Torkelsen to federal prison. (Tr. 29:10-21.)[4]

---

[4] Mr. Steinholt sought to further distance himself from Mr. Torkelsen by asserting that the conduct in question "occurred one year after I left." (Tr. 20:22.) But nothing in Mr. Torkelsen's plea agreement with federal prosecutors suggests that the perjury was limited to a single declaration, or that conduct of that sort did not occur during the eight years in which Mr. Steinholt worked at Mr. Torkelsen's firm. On the contrary, the Statement of Facts in Mr. Torkelsen's plea agreement makes clear that the conduct was wide-ranging and began at least as early as September 1995—more than two years before Mr. Steinholt left Princeton Venture. (*See* Waiver of Indictment at Ex. A. ¶¶ 5, 5(c), 5(d), United States v. Torkelsen, No. 2:08-cr-00121-JS (E.D. Pa. May 12, 2008) (Dkt. No. 10) (referring to multiple false declarations, including ones filed in September 1995 and December 1996).)

Mr. Steinholt's roots at Princeton Venture were strong; shortly after leaving, Mr. Steinholt "decided to hang out my own shingles" with a former Princeton Venture colleague, Michael Marek. (Tr. 33:5-8.) The new firm was named Financial Markets Analysis, LLC, and Messrs. Steinholt and Marek were business partners there for approximately fourteen years, again engaged almost exclusively in "expert" services for plaintiffs in securities class actions. (Tr. 37:23–38:3.) Near the end of that time period, however, Mr. Marek's standing as an expert hit a rough patch. In late 2013, Judge Forrest excluded Mr. Marek's testimony on market efficiency in connection with a class certification motion, finding him to be unqualified and his testimony—very similar to the testimony offered here—to be unreliable. *Deutsche Bank*, 2013 WL 5815472, at *12–15. Judge Forrest found the fact that Mr. Marek "ha[d]—after [Torkelsen] was indicted—now gone into business as an 'expert' himself, does not an expert with reliable qualifications make." *Id.* at *14. Less than a year later, Mr. Marek's testimony on market efficiency was again deemed unreliable. *See Brown v. China Integrated Energy, Inc.*, 2014 WL 12576643, at *8 (C.D. Cal. Aug. 4, 2014) (rejecting Mr. Marek's methodology as "inconsistent with commonly accepted practice, and therefore unsound"). Mr. Marek does not appear to have testified in any cases since that time. Very shortly after these developments, Mr. Steinholt left the firm he founded with Mr. Marek to serve primarily as a litigation consultant at another firm. (Steinholt Rpt. Ex. A at 1.)[5]

In sum, Mr. Steinholt lacks the educational training to qualify as an expert on financial and economic topics, and his professional experience qualifies him at most as an expert in the business of securities litigation. Cause for skepticism is only amplified by the fact that the two most significant professional moves in Mr. Steinholt's career occurred against a backdrop of dubious

---

[5] Mr. Steinholt acknowledged that to be disqualified or deemed unreliable in two separate cases in the course of a year would be "a significant event for someone who earns their living testifying in securities class actions." (Tr. 47:3-9.) Nonetheless, Mr. Steinholt denied that his departure from Financial Markets Analysis had anything to do with the reputational effects of Mr. Marek's difficulties, maintaining that the timing was purely coincidental. (Tr. 46:1–47:1.)

ethics and equally dubious scientific reliability. The Court can and should exclude Mr. Steinholt's testimony under Rule 702 on this basis alone.[6]

## II. MR. STEINHOLT'S EVENT STUDY IS METHODOLOGICALLY UNSOUND AND UNRELIABLE.

Even if Mr. Steinholt were qualified, his analysis is methodologically unsound and unreliable, and therefore inadmissible under Rule 702. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

The Steinholt Report mechanically ticks through certain factors used by courts to gauge market efficiency in class certification proceedings—namely, the "*Cammer* factors" set forth by the court in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and the "*Krogman* factors" enumerated by the court in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). (Steinholt Rpt. ¶¶ 17–18.) Mr. Steinholt takes the position that the "indirect" *Cammer* factors are sufficient, by themselves, to establish market efficiency in a reliance context, such that a conclusion of market efficiency can be reached without any direct evidence of a causal relationship between news and the share price. (*Id.* ¶ 17.) Notwithstanding this view (and his conclusion that SQM's ADS satisfy the indirect factors), Mr. Steinholt then conducts a statistical analysis designed to test the "direct" *Cammer* factor—known as "*Cammer* 5"—which looks to whether the disclosure of material news in fact affected the share price in question. (*Id.* ¶ 18.) Mr. Steinholt does this through a regression analysis or "event study" that has two components: (1) a financial release date study that measures the rate at which SQM's ADS price evidenced statistically significant reactions to earnings disclosures; and (2) a "test" of an alleged corrective disclosure on March

---

[6] A significant portion of the Steinholt Report is devoted to case law on market efficiency. (Steinholt Rpt. ¶¶ 13–18.) Mr. Steinholt is not a lawyer and does not profess any qualifications or expertise in the law. To the extent he purports to offer opinions on the law, such opinions would not assist the Court and should be excluded. *See Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017) (refusing to consider Mr. Steinholt's "understanding or explanation of case law" and "legal opinions").

9

18, 2015, the last day of the Class Period and the single greatest movement in the ADS price out of all 1,187 trading days. (*Id.* ¶¶ 40–45.)

As a threshold matter, Mr. Steinholt's assertion that the indirect *Cammer* factors are sufficient, by themselves, to draw a conclusion of market efficiency is unsupported by the economics literature. Even the single article cited by Mr. Steinholt for this questionable proposition does not support it. (Steinholt Rpt. ¶ 17 n.14.) And numerous peer-reviewed studies have demonstrated market inefficiency even with respect to stocks that satisfy the indirect *Cammer* factors. (Torous Rpt. ¶¶ 18–24.)[7] When asked about these studies, Mr. Steinholt was only vaguely familiar with them and misstated their conclusions as relating to differences in investors' valuation views, not informational efficiency. (Tr. 138:5–144:23.) This interpretation is wrong and reflects a basic misunderstanding of the literature. (Torous Rpt. ¶ 24.)

But it is with respect to Mr. Steinholt's event study that the errors and methodological infirmities rapidly accumulate. The problems with Mr. Steinholt's event study are thoroughly explored in SQM's opposition brief and the Torous Report, and SQM does not wish to belabor them. Nonetheless, for purposes of determining whether Mr. Steinholt's study can satisfy the reliability standard of Rule 702, the Court should consider the following.

First, Mr. Steinholt's study of financial release dates applies a weak standard of market efficiency that finds no support in economic or statistical principles. Mr. Steinholt purportedly chose those dates for their information-intensive nature, but then looked only to the degree they exceeded the kinds of share price reactions that would occur by chance. (*Id.* ¶¶ 29–30.) Because the rate of statistically significant returns on those dates—five out of 19—was unlikely to occur

---

[7] "Torous Rpt." refers to the Rebuttal Expert Report of Walter N. Torous, Ph.D., dated December 12, 2018, enclosed as Exhibit 31 to the Mainland Declaration.

10

by chance, Mr. Steinholt concluded that SQM's ADS rapidly incorporated all publicly information on all 1,187 days of the Class Period.  (*Id.* ¶ 50.)

No reasonable economist with real academic credentials would design a market efficiency test this way; rather, an economist testing for direct evidence of market efficiency based on information-intensive disclosures such as the financial release dates would be looking for evidence that statistically significant returns occurred at far greater rates than would happen randomly.  *See George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("[S]howing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency."); *cf. Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *2 (N.D. Ohio Aug. 14, 2018) ("[M]erely demonstrating a single or small number of cases where there is an apparent cause and effect relationship is not enough, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures.") (citing Paul A. Ferillo et al., *The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases*, 78 St. John's L. Rev. 81, 128 (2004)).  And the design of Mr. Steinholt's test powerfully stacks the deck in favor of a finding of efficiency, as it will almost always be the case that share price reactions on financial release dates will occur at a greater rate than would occur randomly.  *See In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (excluding event study as unreliable because expert "made decisions about that study that tend to skew it toward a conclusion that the market was efficient").

Moreover, Mr. Steinholt misunderstands the problem of multiple comparisons (which increases the risk of false positives), erroneously asserting that his financial release dates test does not involve multiple comparisons because he did not repeat the test more than once.  (Tr.

294:24–295:7; 296:1-4.) A trained economist would know that this is wrong—his cumulative binomial probability equation by its very nature involves multiple comparisons. (Torous Rpt. ¶ 53.) And it is wrong in a material way; when the problem is corrected, the results of Mr. Steinholt's study are in a range that does not support a finding of efficiency even according to his own exceedingly low and scientifically unsupportable standard. (*Id.* ¶ 55)

Second, Mr. Steinholt's financial release dates study does not test for the share price reaction to disclosures of non-financial information. That is a critical flaw given that the allegations in this case involve alleged misrepresentations about non-financial information and do not implicate materially incorrect disclosures about financial information. The economics literature, including studies relied upon by Mr. Steinholt, recognizes that efficiency varies across informational items, such that disclosures easily reducible to the present value of future cash flows—such as earnings releases—are incorporated far more readily than qualitative information. (*Id.* ¶ 44; *see also* Tr. 247:15–248:7.) And here, too, the effect of the exclusion is biased in favor of efficiency. When SQM's non-financial Form 6-Ks are tested using Mr. Steinholt's own method, the rate of statistical significance—already quite modest with respect to the financial release dates—plummets, with a mere two out of 31 test dates associated with a statistically significant reaction in the ADS price. (Torous Rpt. ¶ 48.) It is precisely this kind of skewed statistical design that has caused other courts to exclude expert testimony on *Daubert* grounds at the class certification stage. *See In re Northfield Labs.*, 267 F.R.D. at 548; *see also Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004) (event study unreliable because it "include[d] dates that appear[ed] to be consciously chosen in order [to] artificially . . . support his hypothesis of efficiency"), *aff'd,* 422 F.3d 307 (5th Cir. 2005).

12

Third, Mr. Steinholt's "test" of the last day of the Class Period is antithetical to the widely accepted literature on event studies, and indeed to the scientific method itself, as courts have recognized. *See Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at *2 ("Economists . . . agree that using the last day of a class period is not a scientifically valid way to test for market efficiency . . . ."); *Bell*, 422 F.3d at 316 ("[T]his single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period . . . ."). As Dr. Torous explains, the first step in a properly designed event study is to select events of interest, irrespective of the share price reaction on those dates. (Torous Rpt. ¶ 58.) Mr. Steinholt's test does exactly the opposite, starting with the single most significant decline in the ADS price of the entire Class Period—a decline he was aware of from the outset of his engagement (Tr. 301:19–302:22)—and then working backwards to see if there was news that could explain the decline. *See Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at *7 (expert's use of last day of class period "was entirely improper because you are supposed to hypothesize and then see your results. You are not supposed to know your results in advance.").

Mr. Steinholt's explanation for selecting this date for testing—"I always look at the last day of the class period"—was devoid of economic substance. (Tr. 326:9-14.) His comment that it was "too bad" that he could not explain it (*id.* at 326:16–327:2) did not suggest a sincere desire to assist the trier of fact in understanding the evidence, as opposed to delivering a foreordained conclusion for his "most important client." *See Gen. Elec. Co v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not admit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). And here, yet again, Mr. Steinholt's design stacks the deck in favor of a finding of efficiency by choosing the one alleged "corrective disclosure" associated with a statistically significant return, while ignoring—without any hint of substantive justification—

13

the many others that are not. *See Brown*, 2014 WL 12576643, at *7 ("Marek never could satisfactorily explain why he decided to include in his study the December 3, 2010 rebuttal press release but not the December 1, 2010 article."); *In re PolyMedica*, 453 F. Supp. at 269–70 (plaintiff's expert "selected the few news days that would prove [his] point" and thus it was not a "scientific study").

Fourth, Mr. Steinholt ignores that, even according to his own study, there is not a scintilla of direct evidence that the ADS price reacted to news during the first 26 months—or nearly half—of the Class Period. (Steinholt Rpt. Ex. E at 1–13; *see also* Torous Rpt. ¶ 52.) No reasonable economist would conclude that the market was efficient for 26 months without any direct evidence that the share price reacted to news during that period. *See In re Northfield Labs.*, 267 F.R.D. at 549 ("Although there is some evidence to suggest that Northfield might have traded in an efficient market during the final years of the class period . . . , the same evidence makes clear that Northfield did not trade in an efficient market during the first years of the class period . . . ."). This is especially so where, as here, the sample size of the tested dates for the entirety of the Class Period is already exceedingly small—a total of 20 out of 1,187 trading days, or 1.7%. *See Deutsche Bank*, 2013 WL 5815472, at *21 (expert's "analysis of market efficiency was based on an inadequate foundation of 12 trading days out of 515"); *In re PolyMedica*, 453 F. Supp. 2d at 270 (expert's "mere listing of five days [out of 160 trading days] on which news was released and which exhibited large price fluctuations proves nothing"). Mr. Steinholt has already been criticized for brushing away evidence inconsistent with his desired conclusion. *See Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 573 (N.D. Tex. 2007) ("The flawed thread interwoven throughout Steinholt's opinions is his results-oriented approach to the public data often

discounting inconvenient but relevant facts."), *rev'd on other grounds by Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009).[8]  And that is precisely what he does here.

Ultimately, the flaws in Mr. Steinholt's event study go beyond mere differences of expert opinion; they are premised on unreliable principles and methods that find no support in the financial or economic disciplines, in violation of Rule 702.  "The Supreme Court has made it clear that the Court should not ignore such flaws—but rather should place such flaws against the requirements of the standards set forth in *Daubert*." *Deutsche Bank*, 2013 WL 5815472, at *16.  Mr. Steinholt's opinions and testimony do not meet the "exacting standards of reliability" to which they are subject, *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), and should accordingly be excluded.

## CONCLUSION

For the foregoing reasons, SQM respectfully requests that the Court grant SQM's motion to exclude the testimony of Mr. Steinholt pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Dated: December 12, 2018  
   New York, New York

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**

/s/ Scott A. Edelman  
Scott A. Edelman  
Grant R. Mainland  
Alison M. Bonelli  
28 Liberty Street  
New York, New York 10005  
Tel:  (212) 530-5000

***Attorneys for Defendant Chemical and Mining Company of Chile, Inc.***

---

[8] Mr. Steinholt suggested at deposition that the Fifth Circuit's reversal of the district court opinion in *Flowserve* vindicated Mr. Steinholt's testimony in that case.  (Tr. 53:13–57:10.)  Not so.  The Fifth Circuit simply corrected an error the district court had committed with respect to the legal standard governing loss causation, 572 F.3d at 229–230, but took no issue with the district court's criticism of Mr. Steinholt's "results-oriented approach."