# Exhibit 1

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------x

4    MEGAN VILLELLA, Individually

     and on Behalf of all Others

5    Similarly Situated,

6              Plaintiffs,

7    vs.                       Case No.

                               15-cv-02106-ER-GWG

8

     CHEMICAL AND MINING COMPANY

9    OF CHILE, INC., et al.,

10             Defendants.

11   ------------------------------x

12

13      VIDEOTAPED DEPOSITION OF BJORN STEINHOLT

14

15

16

17

18   DATE:        Friday, November 9, 2018

19   TIME:        9:05 a.m.

20   LOCATION:    Robbins Geller Rudman & Dowd

                  One Montgomery Street

21                San Francisco, California

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 149397

Page 2

```
1
2
3
4                      November 9, 2018
5                         9:05 a.m.
6
7
8
9        Deposition of Bjorn Steinholt, held
10    at Robbins Geller Rudman & Dowd, One
11    Montgomery Street, San Francisco,
12    California, before Lynne Ledanois, Certified
13    Shorthand Reporter No. 6811.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           A P P E A R A N C E S:
2
3     FOR CHEMICAL AND MINING COMPANY OF CHILE, INC:
4        MILBANK, TWEED, HADLEY & McCLOY
5     By: GRANT MAINLAND, Esq.
6           ALISON BONELLI, Esq.
7        28 Liberty Street
8        New York, New York 10005
9
10
11
12
13    FOR THE PLAINTIFFS:
14        ROBBINS GELLER RUDMAN & DOWD LLP
15     By:  ARMEN ZOHRABIAN, Esq.
16           MATTHEW MELAMED, Esq.
17           AELISH BAIG, Esq.
18        One Montgomery Street
19        San Francisco, California 94104
20
21
22
23
24    Also Present: Tony Hensley, Videographer
25           Michael Holland, Analysis Group
```

Page 4

```
1        I N D E X  O F  E X A M I N A T I O N
2     Examination by:                  Page
3        MR. MAINLAND                    7
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        I N D E X  O F  E X H I B I T S
```

Page 5

```
1     Deposition      Description       Page
2     Exhibit 1   Expert Report of Bjorn I.
3                 Steinholt, CFA, 1/10/18;        9
4     Exhibit 2   Document headed, The Fraud-on-
5                 the-Market Theory and the
6                 Indicators of Common Stocks'
7                 Efficiency, Brad Barber, Paul
8                 Griffin and Baruch Lev,
9                 TW0008399-426;          135
10    Exhibit 3   Document headed, Market
11                Efficiency, Crashes, and
12                Securities Litigation,
13                Bradford Cornell and James
14                Rutten,
15                TW0008494-522;          150
16    Exhibit 4   Document headed, Report of
17                Foreign Private Issuer
18                Pursuant to Rule 13-a16, or
19                15d-16 Under the Securities
20                Exchange Act of 1934 For 6-K;  220
21
22
23
24
25
```

Page 6

1    San Francisco, California
2    Friday, November 9, 2018
3    9:05 a.m.
4
5        VIDEOGRAPHER:  This is the start of
6    media labeled Number 1 of the video recorded
7    deposition of Bjorn Steinholt in the matter
8    of Megan Villella, et al., versus Chemical
9    and Mining Company of Chile Incorporated,
10   et al., in the United States District Court
11   for the Southern District of New York, case
12   number 1:15-cv-02106-ER.
13       This deposition is being held at
14   One Montgomery Street in San Francisco,
15   California on November 9th, 2018 at
16   approximately 9:05 a.m.
17       My name is Anthony Hensley.  I'm the
18   legal video specialist from TSG Reporting
19   Incorporated, headquartered at 747 Third
20   Avenue, New York, New York.  The court
21   reporter is Lynne Ledanois in association
22   with TSG Reporting.
23       Counsel, will you please introduce
24   yourselves.
25       MR. ZOHRABIAN:  Armen Zohrabian for

Page 7

1    plaintiffs and the witness.
2        MR. MELAMED:  Matt Melamed, plaintiffs
3    and the witness.
4        MS. BAIG: Aelish Baig representing
5    plaintiffs and the witness.
6        MR. MAINLAND:  Grant Mainland of
7    Millbank, Tweed, Hadley & McCloy on behalf
8    of the defendant SQM.  And I'm joined by
9    Allison Bonelli, also of Millbank, and Mike
10   Holland of Analysis Group.
11       VIDEOGRAPHER:  Would the court
12   reporter please swear in the witness.
13       BJORN STEINHOLT,
14   having been first duly sworn, testified as
15       follows:
16       VIDEOGRAPHER:  Counsel, you may now
17   proceed.
18       EXAMINATION
19   BY MR. MAINLAND:
20   Q    Good morning.
21   A    Good morning.
22   Q    You've been deposed many times before;
23   correct?
24   A    Correct, yes.
25   Q    Approximately how many times?

Page 8

1    A    All the times are listed on my C.V.
2    Actually, there may be two additional ones that
3    had not been completed at the time I submitted
4    my report.  But I think there are two additional
5    ones plus the ones on my -- that's listed on my
6    C.V.
7    Q    So approximately dozens of times; is
8    that fair to say?
9    A    Thirty-five, 40 times.
10   Q    That's your estimate?
11   A    Correct, yes.
12   Q    Is it fair to say you're very familiar
13   with the process of being deposed?
14   A    I get deposed probably two times,
15   three times a year, so --
16   Q    And you've been doing that for many
17   years; correct?
18   A    Yes.  I think I started around 2003.
19   For 15 years, yes.
20   Q    So I'm going to skip -- if it's okay
21   with you, I'm going to skip the preliminaries
22   and jump right in to the substance of my
23   questioning.  Is that okay?
24   A    That's fine.
25   Q    So before we went on the record, I

Page 9

1    placed before you a document that's been marked
2    Steinholt Exhibit 1.
3        (Exhibit 1 was marked.)
4    BY MR. MAINLAND:
5    Q    Is this the report that you prepared
6    the submitted in this case?
7    A    Yes, this looks to be the report that
8    I submitted on January 10th, 2018 in this case.
9    Q    And just to be clear for the record,
10   the only thing that we've changed to this
11   document is we've inserted some letter tabs so
12   that it is clear to you when I'm directing you
13   to a particular exhibit to your report.  So it's
14   easy for you to reach that part of the report.
15   Otherwise, I can assure you that the report
16   remains untouched.
17   A    I appreciate that.
18   Q    Now, when I speak of directing you to
19   exhibits, why don't I direct you to Exhibit A of
20   your report.  This is your C.V.; correct?
21   A    That's correct, yes.
22   Q    Is it an accurate reflection of your
23   professional and educational background?
24   A    Yes, it is.
25   Q    You do not have a degree in finance,

Page 10

1    do you?
2        A    In finance?  I mean, I went to
3    graduate business school where my focus was
4    finance.
5        Q    Do you have a degree in finance?
6        A    If you're asking me whether or not
7    there is -- I mean, finance was one of the
8    emphasis of my graduate degree.
9        Q    We'll get to your graduate degree.
10   Your graduate degree is a master's of
11   international business; correct?
12       A    That's correct.  My focus was finance
13   and I was particularly focusing in on investment
14   research.
15       Q    Do you have a degree in economics?
16       A    Again, I went to graduate school and
17   that's where I was trained in finance, in
18   investment research, in evaluation, in
19   statistics, econometrics.  That's my training.
20   You know, the business degree does not
21   specifically say finance, but certainly it was
22   included in that economics was also included in
23   that.
24            I also have training through the CFA
25   program.  I have -- which is a three-year

Page 11

1    program that also focuses on investment
2    research, valuation, equity analysis, securities
3    analysis, econometrics, statistics and so on.
4        Q    You said a lot of things there that
5    were not responsive to what I asked.  You
6    understand, do you not, that there are degrees
7    out there that are called a Ph.D. in economics;
8    correct?  Is there such a thing?
9        A    I do not have a Ph.D., so I do not --
10       Q    You don't have a Ph.D. of any sort;
11   right?
12       A    That's correct, yes.
13       Q    You don't have a master's degree --
14   let's just say terminologically speaking, is
15   there such a thing as a master's degree in
16   economics?
17       A    I would imagine so.  I can just tell
18   you what I have.  And what I have a degree in is
19   listed on my C.V.  How you characterize it is up
20   to you.
21       Q    What is a master of international
22   business?
23       A    It is the same as an MBA, but we had
24   to take one additional interdisciplinary course
25   and we would have to have a second language

Page 12

1    requirement.  And so we -- it's the same as a
2    master of business administration.
3        Q    It's a one-year program at the
4    University of San Diego, is it not?
5        A    That's not correct.
6        Q    When you received your master of
7    international business, when did you start and
8    when did you end?
9        A    It was a two-year program.
10       Q    When did you start and when did it
11   end?
12       A    I started in 1997, it ended in 1999.
13   It's a two-year program.
14       Q    So it started in September of 1997 and
15   ended in which year of 1999?
16       A    In the fall of 1997, that's when I
17   started and it ended two years later in '99.
18       Q    You're saying 1997 and '99?
19       A    '89, I'm sorry.  It's a two-year
20   program.
21       Q    And your undergrad degree, your
22   undergraduate degree is a bachelor of science in
23   computer science and engineering; is that
24   correct?
25       A    That's correct, yes.

Page 13

1        Q    And that following that, you pursued
2    another degree at the University of Trondheim in
3    Norway?
4        A    It was taken at the same time.  It was
5    a parallel thing.  So when I -- I was on a
6    scholarship and the agreement was that I also
7    would take additional courses in order to
8    satisfy the Norwegian degree of Sivillingenior.
9        Q    That program was also in engineering;
10   correct?
11       A    Correct, yes.
12       Q    And you also have a chartered
13   financial analyst designation; is that right?
14       A    That's correct, yes.
15       Q    That's a self-study program; correct?
16       A    Yes.  It's a self-study program, then
17   you have three tests that you have to take and
18   pass.
19       Q    Okay.  So there are no classes or
20   teachers, you just read and take a test; is that
21   right?
22       A    You have the option of doing that.  I
23   actually did take classes.
24       Q    How many classes did you take?
25       A    It would be one week kind of -- for

Page 14

1   each test you would go and you would have a
2   one-week kind of time period where you took a
3   lot of different classes.  But it was also based
4   on your professional experience and also based
5   on self-study.
6         So prior to actually showing up for
7   that one-week set of courses, you should pretty
8   much be familiar with the course material.
9       Q    I assume you have no other academic
10  degrees other than what's listed on your C.V.?
11      A    That's correct, yes.
12      Q    Is it fair toe say you have no other
13  professional certifications other than your CFA?
14      A    That's correct.
15      Q    Your first job following your master
16  of international business degree appears to be
17  at Princeton Venture Research; is that right?
18      A    That's correct, yes.
19      Q    And your C.V. says that your work at
20  Princeton Venture included shareholder disputes?
21      A    Correct, yes.
22      Q    What do you mean by shareholder
23  disputes?
24      A    There was a lot of securities
25  litigation 10b-5 actions, Section 11 actions.

Page 15

1   So they are all full of the different types of
2   disputes, that was the majority of them.
3       Q    Was that the majority of what you did
4   during your time at Princeton Venture?
5       A    Depending on time period.  The
6   beginning the focus was more on finding
7   investment opportunities.  The defense industry
8   was coming -- kind of tapering off in San Diego
9   and there were opportunities to utilize the
10  skilled workforce in upstart companies.  So that
11  was kind of the focus.
12        The individual who hired me was Bill
13  McKiernan the first couple of years and I
14  reported to him.  He went down to be president
15  of McAfee, which then went public and then he
16  started CyberSource that was sold a few years
17  back for $2 billion.
18        So that was kind of the focus early
19  on.  When he left, it shifted more towards
20  securities litigation.  So there was also a lot
21  of -- I would say a majority of my time would be
22  securities litigation after he left.
23      Q    Mr. McKiernan left in 1992; isn't that
24  right?
25      A    I believe so.  I don't have the

Page 16

1   specific date in my mind.  But yes, around that
2   time.
3       Q    You have no reason to doubt that?
4   That sounds about right?
5       A    It sounds about right, yes.
6       Q    So you overlapped with him for
7   approximately two years?
8       A    Yes, the first couple of years, yes.
9       Q    And then when he left, you
10  transitioned into doing securities litigation
11  full-time?
12      A    It was mostly securities litigation.
13  I was also responsible -- I was also the
14  individual in the San Diego office responsible
15  for looking for new investment opportunities
16  that required me to go to, for instance, Comdex
17  to look at various company presentations there.
18        So I did a little bit of that, but the
19  majority of my time was spent on litigation
20  engagement and of those litigation engagements,
21  certainly 10b-5 actions and Section 11 actions
22  was the predominant, the largest portion.
23      Q    Over the eight-year period that you
24  were there, approximately what proportion of
25  your work was devoted to securities class

Page 17

1   actions or litigation consulting?
2       A    It would be a majority.  I don't know
3   if I was there for the full eight years, but it
4   would be a majority.
5       Q    Okay.  Can you be more precise than a
6   majority?  Was it 75 percent of your time,
7   90 percent of your time?
8       A    It's a long time ago and I certainly
9   did my share of securities litigation work.
10      Q    Is it fair to say that all of the
11  securities litigation work you did was on the
12  plaintiff's side?
13      A    There was some -- you're talking about
14  Princeton Venture Research?
15      Q    Yes.
16      A    Yes.  I think we had some cases on the
17  defense side.  But the vast majority, I would
18  say more than 90, probably more than 95 percent
19  of the ones that I was involved with would be on
20  the plaintiff side.
21      Q    Do you recall a specific case where
22  you did litigation consulting on the defendant's
23  side from that time period?
24      A    My memory of those cases are very,
25  very vague.  I cannot really -- I can't remember

Page 18

1   specific cases from way back then.
2       Q    So the answer is no?
3       A    No, I cannot remember.  There may be a
4   handful of cases out of hundreds of cases I
5   worked on, I cannot remember.
6       Q    You cannot recall any by name?
7       A    No.
8       Q    Who is John Torkelsen?
9       A    John Torkelsen was the president of
10  Princeton Venture Research.  And the president
11  of Princeton Venture Research was a large
12  company, more than 50 individuals.  And the
13  headquarter was in Princeton.
14          And then they opened up an office in
15  San Diego with Bill McKiernan and that's the one
16  that I joined.
17      Q    Did you work with Mr. Torkelsen during
18  your eight years at Princeton Venture?
19      A    Out of the hundreds of cases I worked
20  on, I worked with him probably a handful of
21  time.
22      Q    What do you mean by a handful of
23  times?
24      A    Well --
25      Q    Thirty-five times, ten times?

Page 19

1       A    I mean, probably five times that I can
2   think of.
3       Q    But there may have been others that
4   you cannot recall?
5       A    No.  I mean, Torkelsen was working in
6   the Princeton office.  The only reason for me to
7   work with him would be if there was a case
8   that -- where he was testifying and you needed
9   somebody to support him and his testimony at a
10  deposition or at trial.
11          So it would be very rare to actually
12  work with him directly.  His time was very
13  limited.
14      Q    So when you worked with him, on the
15  handful of cases where you did work with him,
16  what role did you play on those cases?
17      A    I would be in a support role; in other
18  words, I would perform analyses that would go
19  into his expert reports and then would be -- and
20  he would then review it and, you know, if he
21  accepted the analysis and so on, he would sign
22  on to it and be the testifying expert.
23      Q    Did you draft any declaration or
24  expert reports that he ultimately submitted to
25  the court?

Page 20

1       A    Yes.
2       Q    Okay.  And --
3       A    I was part of the drafting process.
4       Q    When you say you were part of the
5   drafting process, it was you and others?
6           MR. ZOHRABIAN:  Objection to form.
7           THE WITNESS:  When I was there, there
8   would be -- typically there would be a
9   supervisor, typically it would be Mark
10  Kangas.
11          And so I would provide -- or I would
12  write up a report, I would provide it to
13  Mr. Kangas and when he thought it was final,
14  he would take it to Torkelsen and get it
15  signed.
16  BY MR. MAINLAND:
17      Q    So Mr. Torkelsen was eventually
18  indicted and sentenced to a term in federal
19  prison; is that right?
20      A    My understanding is that in 2008, he
21  was -- he pled guilty to one count of perjury
22  that occurred one year after I left, yes.
23      Q    And when you say perjury, among the
24  crimes that he pled guilty to were purging
25  himself to the court in connection with expert

Page 21

1   declarations; isn't that right?
2       A    I have not -- my understanding is he
3   pled guilty to perjury with respect to a
4   declaration that was written one year after I
5   left.
6       Q    You have no idea what the nature of
7   the perjury was?
8       A    I assume it had to do with billing,
9   but that's my recollection.  But it happened one
10  year after I left, so I don't know.
11      Q    Are you unaware that he admitted that
12  he perjured himself by representing to courts
13  that he was independent when, in fact, he was
14  receiving contingency fees from plaintiffs'
15  firms?
16      A    My understanding is that he pled
17  guilty to one count of perjury that happened one
18  year after I left.
19      Q    So what I --
20      A    I don't know if that is different than
21  what you're saying or not.  That's my
22  recollection.  This is 20 years ago.
23      Q    What I said is much more specific than
24  what you said.  Is it news to you that he
25  perjured himself in that precise manner?

Page 22

1  A   I don't have as detailed
2  recollection -- a detailed recollection of it.
3  My recollection is what I told you.  I would not
4  say it's news or not news to me, but I mean this
5  is -- he pled guilty ten years ago to something
6  that happened one year after I left.  That's my
7  recollection.
8       That's the best recollection I have as
9  I sit here right now.
10  Q   So are you saying you've forgotten the
11  precise way in which he perjured himself or that
12  you never knew?
13  A   I have not read -- I don't think I
14  even know that I have read anything specifically
15  in terms of what he has pled guilty to or not.
16  I mean, it's not something that -- I have not
17  spoken to the individual for 20 years.  It's not
18  something that I would be particularly involved
19  in.
20       So I don't -- I mean, I know the
21  general fact that he pleaded guilty to perjury,
22  but other than that, it's not something that
23  involved me.  I was in the San Diego office.  I
24  was not called as a witness in any of the
25  investigation.

Page 23

1       So I mean, I don't really have any
2  specific knowledge.
3  Q   You worked at Princeton Venture for
4  approximately eight years; right?
5  A   A little bit less.
6  Q   That's what your C.V. seems to say, it
7  says 1990 to 1998.  That's approximately eight
8  years; right?
9  A   I worked from September of 1990
10  through January of 1998.
11  Q   And during that time, did you know an
12  individual named Michael Marek; correct?
13  A   Correct.
14  Q   He also worked at Princeton Venture;
15  right?
16  A   Yes, he did.
17  Q   Eventually, not long after you left
18  Princeton Venture, the two of you formed a firm
19  together; correct?
20  A   The two of us together with Candace
21  Preston, yes.
22  Q   When the news emerged in the 2000s
23  that Mr. Torkelsen was being indicted and that
24  he was pleading guilty to committing perjury
25  relating to how he was compensated in connection

Page 24

1  with expert declarations submitted during his
2  time at Princeton venture, that was not
3  something that you discussed with Mr. Marek?
4       MR. ZOHRABIAN:  Objection to form.
5       THE WITNESS:  Discussed with
6  Mr. Marek?
7  BY MR. MAINLAND:
8  Q   That wasn't of interest to you and
9  Mr. Marek?
10       Mr. Marek spent more than ten years at
11  Princeton Venture, you spent eight years there
12  and Mr. Torkelsen was the head of the firm.
13  This was discussed extensively in litigation
14  circles.  Was this not of interest to you?
15  A   I didn't say it was not of interest to
16  me.
17  Q   Well, your testimony seems to be that
18  you don't remember the way in which he perjured
19  himself.  Can that be --
20  A   Listen, I have explained to you what I
21  remember and I think I'm correct and if I
22  misremember, so be it.  Let the record show that
23  I misremembered.  But I think that that's what
24  happened.
25  Q   You think what's what happened?  I'm

Page 25

1  sorry.
2  A   I just explained to you what I
3  remembered with respect to that particular
4  incident.  And I mean, you can be argumentative
5  with me, I just -- I came here to talk about
6  SQM, you're asking me about something that
7  happened ten years ago that relate to somebody
8  that was the president of the firm that I worked
9  for more than 20 years ago.
10       And, you know, as I sit here right
11  now, I have explained to you what my memory of
12  that is.
13  Q   Did you have any understanding during
14  your time at Princeton Venture of what fee
15  arrangements had been worked out between
16  Mr. Torkelsen and any of the plaintiffs' firms
17  that he was working with?
18  A   No.
19  Q   Did you have an understanding while
20  you were at Princeton Venture as to how that
21  firm was compensated for its expert work?
22  A   On an hourly basis.  We were -- every
23  so often, I think it was every two weeks, every
24  four week, whatever, we would take our time
25  sheets and we would send them to the accounting

Page 26

1  department in Princeton. And then when -- the
2  accounting department would then use that and
3  send out the invoices.
4     Q    Are you saying that Princeton Venture
5  was, in fact, compensated on an hourly basis or
6  that your understanding at the time was that it
7  was compensated on an hourly basis?
8     A    Well, that's my understanding at the
9  time, yes.
10    Q    And -- but you don't recall anything
11 after leaving Princeton Venture that educated
12 you otherwise?
13    A    Oh, my understanding is that there was
14 an investigation into the billing practices and
15 whether or not he was getting billed on a timely
16 basis. In other words, whether or not he waited
17 until the end. I don't know if he pleaded
18 guilty to that or not.
19    Q    Why did you leave Princeton Venture in
20 1998?
21    A    I left Princeton Venture Research in
22 1998 because I wanted to join Business Valuation
23 Services, another valuation firm.
24    Q    Why did you want to join another firm?
25    A    Because I did not want to work for

Page 27

1  Princeton Venture Research anymore and I thought
2  I had better opportunities at Business Valuation
3  Services.
4     Q    Why didn't you want to work at
5  Princeton Venture anymore?
6     A    One of the things that were happening
7  in the fall of 1997 -- actually, I think it was
8  December of 1997, was that the a lot of the
9  individuals at the San Diego office was
10 terminated as Mr. Torkelsen explained that he
11 had made a decision to focus more on venture
12 capital.
13       I was not terminated because I
14 actually did -- I was the individual in San
15 Diego that actually did do some work relating to
16 venture capital. And it was something that I
17 did not particularly appreciate.
18       So I told everybody that I would find
19 another job and I did so and left Princeton
20 Venture Research right after Christmas.
21    Q    Is it fair to say that in or around
22 1998, Princeton Venture's litigation consulting
23 business was essentially shut down?
24    A    I don't exactly know what the
25 rationale was, but I do think that -- I'm not

Page 28

1  going to speculate too much. I think there were
2  some disagreements between law firm and
3  Mr. Torkelsen. I don't have any firsthand
4  knowledge about it.
5       But it did not make much sense to me
6  and when it did not make sense to me, I thought
7  it was time to leave.
8     Q    When you refer to disagreements, do
9  you mean disagreements related to compensation?
10    A    No, disagreement in terms of what I
11 saw in terms of what workload and what I heard
12 from Mr. Torkelsen in terms of workload. There
13 was a discrepancy there.
14       There seemed to be disagreement in
15 terms of the amount of work that needed to be
16 done and the amount of work that Mr. Torkelsen
17 said was there to be done.
18       And of course, it ultimately resulted
19 in the termination of a lot of individuals at my
20 San Diego office. And I did not particularly
21 appreciate that.
22    Q    And I'm having difficulty following.
23 What is the nature of the disagreements that led
24 to people being terminated?
25    A    The argument was that there was -- the

Page 29

1  argument from Mr. Torkelsen was that there was
2  not sufficient litigation work. And what I
3  heard from the attorneys was that there was
4  sufficient litigation work.
5     Q    And that argument was between
6  Mr. Torkelsen and the attorneys?
7     A    No. What I'm saying is that there is
8  a discrepancy from what I heard from the
9  attorneys and what I heard from Mr. Torkelsen.
10    Q    And Mr. Torkelsen was saying there's
11 not enough work to justify retaining employees
12 who are engaged in that particular practice?
13    A    Correct.
14    Q    And you were among that group?
15    A    No. I was -- he wanted to keep me
16 because of my work on other projects,
17 nonlitigation projects.
18    Q    Okay.
19    A    So I was then the individual -- one of
20 the individuals that would have remained with
21 the company.
22       But individuals who were more
23 litigation oriented were let go and in any
24 event, I decided it would be better for me to
25 work for another firm and I worked -- decided to

Page 30

1   join Business Valuation Services.
2       Q    Setting aside discussions about the
3   volume of work that was available, did you have
4   any discussions with Mr. Torkelsen in or around
5   1998 about the firm not being paid by the
6   plaintiffs' lawyers?
7       A    No.
8       Q    Did you have any discussions with
9   anyone else at Princeton Venture about the firm
10  not being paid by the plaintiffs' lawyers?
11      A    No.
12      Q    Was that -- were you in any way
13  involved during that time period in Princeton
14  Venture receiving or billing or receiving fees
15  from the plaintiffs' lawyers?
16      A    I never saw a check.  It was all done
17  in the Princeton office.
18      Q    Did you prepare any bills?
19      A    No, that was all done by the
20  accounting department in Princeton.  The only
21  thing that we would do would be write up the
22  work that was performed in a particular -- in a
23  particular engagement.
24      Q    Why would you write off work?
25      A    Write up.

Page 31

1       Q    Oh, write up work.
2       A    Like time sheets or a synopsis of the
3   work that was done.
4       Q    Now, after Princeton Venture closed,
5   you've already referenced you went to a firm
6   called Business Valuation Services; is that
7   right?
8       A    That's correct, yes.
9       Q    And in Mr. Torkelsen's -- I guess in
10  the Department of Justice press release
11  announcing Mr. Torkelsen's indictment, it refers
12  to him as the head of both Princeton Valuation
13  Services but also a company called Equity
14  Valuation Advisors.  Have you heard of the
15  latter?
16      A    My recollection is that he started --
17  and this is just -- I may be wrong on this, but
18  my recollection is that he started another
19  valuation firm with a different name and that
20  sounds like the name he used, yes.
21      Q    It's a very similar name to Business
22  Valuation Services, so I'm just asking a simple
23  factual question.  Are those the same companies?
24      A    No, Business Valuation Services was
25  actually part of CBIZ, which is a

Page 32

1   publicly-traded company and had nothing to do
2   with Mr. Torkelsen.  I have not worked with him
3   or I don't recall speaking with him at all since
4   I left Princeton Venture Research.
5       Q    And so he had no involvement at all
6   with Business Valuation Services?
7       A    That's correct, yes.
8       Q    You haven't spoken to him once since
9   you left Princeton?
10      A    I don't recall a single time I've
11  spoken with him.  It could have been maybe a
12  phone call or something like that in the year or
13  two after, but I don't -- I think it's been
14  probably 20 years since I've spoken with him.
15      Q    You mention in your C.V. that you also
16  provided litigation support in shareholder
17  disputes at Business Valuation Services; is that
18  right?
19      A    That's correct, yes.
20      Q    And is that more of the same that
21  we've already discussed, providing litigation
22  consulting in connection with plaintiffs'
23  securities class actions?
24      A    Yes.
25      Q    How much of your time at Business

Page 33

1   Valuation Services was devoted to that?
2       A    In the beginning, very little to none.
3   And then as it shifted towards the end of my
4   two-year tenure there, it became a majority of
5   my time, which is one of the reasons that I
6   decided to hang out my own shingles, to get with
7   Mike and Candace to focus in on securities
8   litigation full-time.
9       Q    And so in or around 2000, you founded
10  Financial Markets Analysis with Mr. Marek and
11  Ms. Preston?
12      A    That's correct.
13      Q    Is that right?
14      A    Yes.
15      Q    And both Mr. Marek and Ms. Preston
16  were at Princeton Venture with you; correct?
17      A    That's correct.  They worked in the
18  Princeton office, so we did not interact on a
19  daily or weekly basis necessarily.  But we
20  obviously over the years knew each other.
21      Q    Did you know Mr. Marek well?
22      A    Know him well?  I would -- we would --
23  we did not work together on more than maybe one
24  or two projects.  But we certainly would call
25  each other if one had a question about something

Page 34

1   or -- and of course, I assume you mean during
2   the Princeton Venture Research time period. And
3   of course, we also had gatherings with all of
4   the analysts, so you may have ten, 15 analysts
5   coming together and we would share ideas and
6   things of that nature.
7       Q   Mr. Marek left Princeton Venture
8   around the same time that you did; isn't that
9   right?
10      A   Correct.
11      Q   Do you know why he left Princeton
12  Venture?
13      A   You would have to ask him. I don't
14  know the details of his situation.
15      Q   Do you know anything about that?
16      A   Oh, I know that he went out to work on
17  his own, but I don't know in terms of the
18  relationship between him and Princeton Venture
19  Research, I don't know.
20      Q   Was he let go because of the decline
21  in the amount of litigation consulting work?
22      A   I don't know. It happened around that
23  particular time. I know what happened to the
24  individuals in the San Diego office, I'm not
25  that familiar in terms of everything that

Page 35

1   happened in the Princeton office.
2       Q   But you founded a firm with him about
3   two years after you left Princeton; correct?
4       A   Correct. With him and Candace
5   Preston, yes.
6       Q   You never discussed the circumstances
7   of his leaving Princeton Venture?
8       A   No, of course I knew he left. I knew
9   he left and he was working in -- doing analysis
10  in the area of securities litigation. So --
11  and, you know, I kept contact with him.
12      Q   But all you knew was that he left.
13  You didn't know why he left?
14      A   I don't know exactly what the details
15  of why he left, no.
16      Q   Do you have any idea? You said you
17  don't know exactly the details, I'm just asking
18  as a general matter, do you have any idea why
19  Mr. Marek left Princeton?
20      A   All I know is that it happened at the
21  same time that we were downsize -- Princeton
22  Venture Research was downsizing a lot of
23  litigation side of the business and people
24  were -- some people were let go because of the
25  reduced work in the litigation business.

Page 36

1       Other people like me decided to resign
2   and move on to other firms.
3       Q   It sounds like your testimony is that
4   you don't know?
5       A   Yes, I don't know the specifics, no.
6       Q   You never discussed that with him?
7       MR. ZOHRABIAN: Asked and answered.
8       THE WITNESS: I don't recall what I
9   discussed, but as I sit here, I mean, you're
10  talking about something that happened
11  20 years ago. I don't have a clear
12  recollection of what I discussed with him
13  and what I did not discuss with him. I
14  mean, this is 20 years ago.
15  BY MR. MAINLAND:
16      Q   How did you come to found a firm with
17  Mr. Marek the Ms. Preston?
18      A   As I testified earlier, I wanted to
19  focus in on what I viewed to be an opportunity
20  in consulting in the securities litigation
21  space.
22      So I wanted to form a firm and I
23  wanted to have somebody to work with me. I did
24  not want to just be a single individual. And I
25  was reaching out to individuals and seeing if

Page 37

1   anyone would be interested in forming a firm.
2       Q   So you proposed it to Mr. Marek?
3       A   I don't remember who proposed that, if
4   it was him or whether or not it was I who
5   proposed it. But I know that I was actively
6   looking for a way to start litigation consulting
7   firm.
8       Q   And he was a natural fit because you
9   knew he had done that kind of work at Princeton
10  Venture?
11      A   He was a natural fit because he had
12  done work at Princeton Venture Research, so he
13  knew the issues, he was very specialized in that
14  particular field.
15      But more than that, it was also
16  Candace Preston, who at the time was the
17  managing director of valuation at Bank of New
18  York and so I had a lot of discussions with her.
19      Both she and Mr. Marek lived in
20  Princeton, so it was a natural fit for when I
21  joined up with her that Mike would also be part
22  of it.
23      Q   And was the exclusive focus of the
24  firm securities litigation consulting?
25      A   It was not the exclusive focus of the

Page 38

1  firm. But it was certainly the key focus in
2  order -- I mean, the majority of the work was
3  related to securities litigation.
4      Q    You were there for approximately
5  14 years; right?
6      A    That's correct, yes.
7      Q    Was the vast majority of your work
8  during that time period in securities litigation
9  consulting?
10     A    Yes.
11     Q    Did you do anything else?
12     A    Yes. We did valuation from 2005
13 through 2008. I opened an office in Shanghai to
14 do business valuation over there, took up a lot
15 of my time.
16     Q    What do you mean by business
17 valuation?
18     A    Valuing businesses.
19     Q    But in what context? In an M&A
20 context, in some other context?
21     A    It could be M&A context, it could be
22 for reporting purposes.
23     Q    Do you recall a specific M&A
24 engagement you were involved in where you were
25 evaluating business?

Page 39

1      A    No. The work that we did -- I'm
2  trying to think back -- it was ended up being a
3  lot for reporting purposes. But with respect to
4  M&A work, there is purchase allocation work that
5  goes along with that. So -- but I kind of
6  typically view that as more for reporting
7  purposes as opposed to M&A work in terms of
8  fairness opinions.
9          So I make that kind of distinction.
10     Q    Does your -- withdrawn.
11         You're opining in this case on market
12 efficiency; correct?
13     A    That's correct, yes.
14     Q    And is your professional foundation
15 for providing an opinion on market efficiency
16 premised exclusively on your securities
17 litigation experience?
18         MR. ZOHRABIAN: Objection to form.
19         THE WITNESS: No, I mean, market
20     efficiency is foundational for a lot of the
21     work that is done both in investment
22     research and with respect to valuation.
23 BY MR. MAINLAND:
24     Q    How is market efficiency relevant to
25 valuing a business?

Page 40

1      A    When you do valuation -- for instance,
2  let's take Financial Accounting Standard 157 --
3  you have to determine whether or not you use the
4  market price to value certain assets. If
5  there's a publicly-traded market price, you use
6  that if it is an actively-traded market. And
7  that is premised on the notion that the market
8  is sufficient, that market price then becomes
9  the fair value of that asset.
10         So it does -- it is fundamental in
11 certain aspect of valuations as well.
12     Q    So it's a premise to valuation, but I
13 guess what I'm asking is: Did you actually
14 conduct analyses of whether a given market was
15 efficient -- and a market for shares I have in
16 mind -- in connection with any business
17 valuation that you did?
18         MR. ZOHRABIAN: Object to form.
19         THE WITNESS: The analysis that's done
20     in terms of FAS 157 is to determine that the
21     market is actively traded and that it's not
22     a distress situation.
23         So -- which is kind of -- it's a
24     little bit different than what is done in
25     litigation where we have these Cammer

Page 41

1  factors. In evaluation you don't go through
2  Cammer factors. If the security is actively
3  traded, the market is presumed to be
4  efficient and you use the market price.
5  BY MR. MAINLAND:
6      Q    So your analysis of Cammer factors,
7  you've learned to do in the course of being a
8  securities litigation consultation; right?
9      A    That's correct. The Cammer factors
10 are specific to class certification and
11 securities litigation.
12     Q    Now, during your time at Financial
13 Markets Analysis, was Mr. Marek engaged in
14 similar securities litigation work?
15     A    Yes, he was.
16     Q    And are you aware that in late 2013,
17 Mr. Marek was -- his testimony on market
18 efficiency was excluded as unreliable and he was
19 deemed unqualified?
20     A    I believe that there was a case, I
21 think you're referring to Deutsche Bank.
22     Q    Correct. Do you recall that?
23     A    I recall that, yes.
24     Q    Are you aware that in 2014, less than
25 a year later, Mr. Marek -- Mr. Marek's testimony

Page 42

1  on market efficiency was again excluded by a
2  different federal court in California?
3      A    I don't recall one way or the other.
4  I know that he had one opinion where the court
5  deemed him to be qualified as an expert.  I
6  think there was another -- there was another
7  case where they ended up using a different
8  expert for whatever reason.
9          But I think that that kind of -- it
10 stemmed from the -- probably stemmed from the
11 Deutsche Bank issue.  But I'm not an expert on
12 the cases that Mr. Marek has been engaged in.
13 I'm sure that he's been engaged in hundreds of
14 cases.  I'm not an expert on it.  I'm not the
15 right person to ask those questions.
16     Q    I'm not asking if you are an expert in
17 it, but he was a close business partner of
18 yours; right?
19     A    He was my business partner, yes.
20     Q    You worked with him essentially from
21 the early '90s through 2014; right?
22     A    Correct, yes.
23     Q    And you did not notice that he was
24 disqualified in two different cases within the
25 periods of a year in 2013 and '14?

Page 43

1          MR. ZOHRABIAN:  Objection to form.
2          THE WITNESS:  As I said, that's not
3  what my testimony is.
4  BY MR. MAINLAND:
5      Q    Well, so far you identified -- you
6  agreed that he was disqualified in Deutsche
7  Bank; correct?
8      A    That's my recollection, yes.
9      Q    And yet what I heard you to be saying
10 is that you don't recall that he was
11 disqualified in a different case less than a
12 year later?
13     A    That's not my testimony.
14     Q    Then what is your testimony?
15     A    I have some recollection of a case
16 that -- listen, you're giving not giving me case
17 names.
18     Q    I'm happy to give you the case name,
19 Brown v. China Integrated Energy Inc.
20     A    My recollection, whether or not it's
21 correct or not, they ended up using a different
22 expert.  And I think there were a couple of
23 cases, one where he was deemed to be qualified
24 as an expert and there was one where he was --
25 someone else ended up testifying as an expert.

Page 44

1          I -- quite frankly, I don't know the
2  details of those particular cases.
3      Q    Someone else ending up testifying as
4  an expert and someone being disqualified are two
5  different things; isn't that right?
6      A    Being disqualified?
7      Q    The court excluding his testimony is
8  unreliable, that's different than just the mere
9  fact that someone else ended up testifying,
10 isn't it?
11         MR. ZOHRABIAN:  Objection to form.
12         THE WITNESS:  Yes, and again, I don't
13 have any details in terms of -- I don't have
14 any specific recollection with respect to
15 the specifics that happened with respect to
16 his testimony.
17 BY MR. MAINLAND:
18     Q    You remember Deutsche Bank, but you
19 don't remember anything else about him being
20 disqualified by a court during that time period?
21 It's a very specific question.
22         MR. ZOHRABIAN:  Objection to form.
23         THE WITNESS:  Listen, I'm not going to
24 go down this rabbit hole.  Listen, I've
25 explained to you what I remember as I sit

Page 45

1  here today and that's it.
2  BY MR. MAINLAND:
3      Q    I'll take that as testimony that you
4  don't recall about the second one.
5          MR. ZOHRABIAN:  Objection to form.
6  BY MR. MAINLAND:
7      Q    It looks like, based on your C.V.,
8  that you left Financial Markets Analysis in
9  2014; is that right?
10     A    That's correct, yes.
11     Q    Did you leave because of the negative
12 publicity surrounding Mr. Marek's
13 disqualification?
14     A    No, I left because Candace Preston was
15 starting to retire and I wanted to find another
16 consulting firm to join.
17     Q    So I'm going to -- because the
18 testimony was a little unclear on whether you
19 remember the Brown v. China Integrated case
20 where Mr. Marek was disqualified, I'm just going
21 to represent to you that he was disqualified in
22 that case.  You don't have to accept it as true,
23 I'm just saying I'm going to represent that to
24 you.
25     A    Okay.

Page 46

1    Q    Are you saying that it is purely
2  coincidental that you left Financial Markets
3  Analysis right around the time that Mr. Marek
4  was disqualified in two separate cases in less
5  than a year?
6         MR. ZOHRABIAN:  Objection to form.
7         THE WITNESS:  I would have left around
8  that time regardless of what happened in any
9  of Mr. Marek's cases.
10 BY MR. MAINLAND:
11   Q    So it is purely coincidental?
12        MR. ZOHRABIAN:  Same objection.
13        THE WITNESS:  The timing has nothing
14 to do with it, no.  I mean, the reasons for
15 me leaving was completely different.  It had
16 everything to do with me wanting to join
17 Caliber Advisors.  Caliber Advisors and I
18 had been talking about -- or being in
19 contact for a long period of time and we had
20 talked about -- for a long period of time
21 about joining forces.
22        2014 was the time when it seemed right
23 for both parties to join forces and
24 particularly for me, given that Candace
25 Preston was indicating that she was going to

Page 47

1  start retiring.
2  BY MR. MAINLAND:
3    Q    Isn't it a significant event for
4  someone who earns their living testifying in
5  securities class actions to be disqualified two
6  times in less than a year?
7         MR. ZOHRABIAN:  Objection to form.
8         THE WITNESS:  Yes, I think that's a
9  significant event.
10 BY MR. MAINLAND:
11   Q    If that happened to you, that would be
12 significant for you, wouldn't it?
13   A    Yes, it's never happened.
14   Q    And you did not have any concern about
15 the fact that it happened to Mr. Marek?
16   A    I don't know if the terminology that
17 you're using is correct in terms of him being
18 disqualified or not.  But it is -- you know, it
19 is what it is.  It's what happened.
20   Q    Well, your professional reputation was
21 to some degree tied to his, was it not?
22        MR. ZOHRABIAN:  Object to form.
23        THE WITNESS:  Why?
24 BY MR. MAINLAND:
25   Q    Because you were partners of a firm?

Page 48

1    A    Well, so do you think that if one of
2  your partners at one of your firm is found to
3  not live up to whatever the standards are, legal
4  standards, that necessarily implicates you?
5    Q    I'm going to be asking you the
6  questions today.  You can ask me questions, but
7  I'm not going to answer them.  I assume it's a
8  rhetorical question.
9         This was a firm with you, Mr. Marek
10 and Ms. Preston, that's it; right?
11   A    That's correct.
12   Q    So he was a close business associate
13 of yours?
14   A    He was my -- a business partner of
15 mine, yes.
16   Q    He was excluded from two different
17 cases in less than a year.  You weren't worried
18 about that having any impact on your
19 professional reputation?
20        MR. ZOHRABIAN:  Objection, asked and
21 answered.
22        THE WITNESS:  For me personally, no,
23 absolutely not.  And the reason is that I
24 have worked in this area for a long time and
25 I don't think there's any of the attorneys

Page 49

1  that looked on that and viewed that as
2  negatively -- as resulting in viewing me
3  negatively because of what happened to
4  Mr. Marek.
5         You may think so, but none of the --
6  none of my clients, no one expressed any
7  concerns about my work because of what
8  happened to Mr. Marek.  That is something I
9  hear for the first time by you.
10 BY MR. MAINLAND:
11   Q    Do you know if Mr. Marek still
12 testifies in securities cases?
13   A    I don't know.
14   Q    Do you have any reason to believe he's
15 ever testified again since those cases in 2013
16 and 2014?
17   A    I think he did testify after Deutsche
18 Bank in one case, but, you know, you're spending
19 most of your time asking me about someone else.
20 So -- and I'm not intimately familiar with
21 everything that Mr. Marek has done and has
22 not -- or has not done.
23   Q    Is Financial Markets Analysis still in
24 business?
25   A    I believe it is, but I don't know.

Page 50

```
1        Q    And you're now at Caliber Advisors as
2   you mentioned; correct?
3        A    Correct, yes.
4        Q    What is Caliber Advisors?
5        A    Caliber Advisors is primarily an
6   evaluation firm.  And so we do a lot of
7   valuation for reporting purposes.  We also do
8   litigation.  My focus has been on litigation.  I
9   spent most of my time on litigation, on
10  specifically securities litigation.
11       Q    How many people are employed there?
12       A    We have about a dozen individuals.
13       Q    And you said you've been working -- I
14  don't want to put words in your mouth.  Did you
15  say you were working primarily on securities
16  litigation?
17       A    Correct, yes.
18       Q    That's accurate?
19       A    Yes.
20       Q    During your entire career, how many
21  times have you provided litigation consulting
22  services in securities class actions?  And let
23  me be clear in the question.  That would be
24  inclusive of when you're in a consulting role
25  and a testifying role.
```

Page 51

```
1        A    So we're talking about effectively a
2   quarter of a century.
3        Q    That's fine.
4        A    Yes.
5        Q    Is it 100 cases?
6        A    Oh, much more.
7        Q    Much more?
8        A    Hundreds of cases.
9        Q    Hundreds of cases?
10       A    Yes, many, many hundreds of cases.
11       Q    What proportion of that were you
12  serving as a testifying expert?
13       A    It would be a small fraction of that.
14  Every time I've testified, by the way, is on my
15  C.V. and I think there's 35, 40 cases here.  And
16  then there are other cases where I would have
17  submitted a report but I would not be deposed.
18       Q    I'm glad you mentioned that because
19  we've identified a substantial number of cases
20  in addition to what is listed in your C.V. where
21  you were -- where you submitted an expert
22  report.
23       A    Right.
24       Q    Why are those cases not included in
25  your C.V.?
```

Page 52

```
1        A    The C.V. is -- only includes cases
2   where I've testified at deposition, trials or
3   arbitration.
4        Q    Why did you draw that line?
5        A    I did not draw that line.
6            MR. ZOHRABIAN:  I'm going to caution
7        you to the extent it involves communication
8        with attorneys, not to disclose that.
9   BY MR. MAINLAND:
10       Q    Were your attorneys involved in
11  preparing your C.V.?
12       A    No.
13       Q    So I'll repeat the question.  Why did
14  you draw the line between cases in which you
15  testified at deposition and cases in which you
16  did not but you nevertheless submitted an expert
17  report?
18       A    My understanding is that there is a
19  rule where you have to provide that information
20  for, I believe it is, four years.  I included
21  four my whole career.  But my understanding is
22  that that is a rule.
23       Q    Your understanding is that the
24  requirements of disclosing that is limited to
25  cases in which you've orally testified?
```

Page 53

```
1            MR. ZOHRABIAN:  I'm just going to
2        instruct you to the extent your answer
3        depends on communications you have had with
4        an attorney, not to disclose any attorney
5        communications with you.
6            THE WITNESS:  Yes, I mean, this is
7        something I've put together and my
8        understanding is that there is some sort of
9        a rule in terms of what is required to be
10       disclosed and I follow those rules as I
11       understood them to be.
12  BY MR. MAINLAND:
13       Q    Do you recall the Ryan v. Flowserve
14  case?
15       A    Yes.
16       Q    And that was a case in Texas; right?
17       A    Correct, yes.
18       Q    You testified in that case; right?
19  That's listed on your C.V.?
20       A    That's correct, yes.
21       Q    And there the court criticized your
22  opinion and denied class certification; right?
23           MR. ZOHRABIAN:  Objection to form.
24           THE WITNESS:  The District Court
25       criticized my loss causation standard.  That
```

Page 54

1             was then appealed and reversed.
2 BY MR. MAINLAND:
3      Q     So the loss causation standard you
4 used in that case at the District Court level
5 was a true financial condition theory; right?
6      A     That is a word that was introduced by
7 defendants to characterize what I had plainly
8 written. What I had written in my view is
9 indistinguishable from what the Fifth Circuit,
10 the appellate court wrote in terms of what the
11 loss causation standard is.
12         So what I did after that was to
13 instead of trying to put something in my own
14 words, I now just quote the Flowserve, the
15 appellate court opinion, so that attorneys
16 cannot try to characterize it as defendants did
17 in Flowserve.
18      Q     So you mentioned that the Fifth
19 Circuit reversed the decision of the District
20 Court; right?
21      A     Correct, yes.
22      Q     Did you review that reversal of the
23 District Court's opinion as an endorsement of
24 the theory that you had advanced at the District
25 Court level?

Page 55

1      A     I viewed -- I was concerned about the
2 loss causation standard. And there's language
3 in that opinion that in my view -- and people
4 may disagree, in my view was exactly what I was
5 trying to communicate with my loss causation
6 standard that was criticized by the District
7 Court.
8         And in order -- and going forward, I'm
9 using that. So I think that the appellate court
10 and I were in agreement in terms of the loss
11 causation standard and we were in disagreement
12 with the District Court.
13      Q     Are you qualified to interpret that
14 opinion?
15         MR. ZOHRABIAN: Objection to form.
16 BY MR. MAINLAND:
17      Q     You're not a lawyer; right?
18      A     I'm not the lawyer. What I try to do
19 is to put everything out there in terms of what
20 I do. So when I put -- so when I do something,
21 an analysis of loss causation, for instance, I
22 provide the court with my standard so that the
23 court can look at it and they can say, yes, that
24 is consistent with the law or that is
25 inconsistent with the law.

Page 56

1          That's what I do.
2      Q     So did you -- sorry, go ahead.
3      A     So when I find -- when I'm trying to
4 communicate something and I see what I'm trying
5 to communicate be distorted, that's on me.
6         I haven't been able to write it
7 correctly. So when I see an appellate court
8 communicate it exactly what I was trying to
9 communicate, then I take that language and I use
10 that instead because that is what I was trying
11 to say -- the loss causation standard in
12 Flowserve is what I was trying -- what my
13 understanding of the loss causation standard in
14 Flowserve is what I was trying to communicate
15 all along.
16      Q     So your understanding is that the
17 Fifth Circuit's opinion in that case endorsed
18 exactly what you were trying to communicate; is
19 that fair?
20      A     It was --
21         MR. ZOHRABIAN: Sorry, excuse me.
22 Objection to form.
23         THE WITNESS: The language in that
24 opinion relating to the disclosure, what
25 should be disclosed, there may be other

Page 57

1 issues relating to loss causation, but in
2 terms of the information that needed to be
3 disclosed, I believe the term -- what they
4 wrote was it's the relevant truth obscured
5 by the misrepresentations.
6        That is what I was trying to
7 communicate. That little portion there that
8 directly related to what I was trying to
9 communicate I believe is exactly the same
10 that I was trying to communicate, yes.
11 BY MR. MAINLAND:
12      Q     And you premised that on your own
13 reading of the opinion or what you were advised
14 that by counsel?
15        MR. ZOHRABIAN: I don't want you to
16 get into any communications you had with
17 counsel.
18        MR. MAINLAND: I'm not asking for any
19 communication. I'm just asking yes or no,
20 were you advised that by counsel.
21        MR. ZOHRABIAN: And that is going to
22 assume that --
23        MR. MAINLAND: It's just the subject
24 matter of the discussion. Okay. I'll
25 rephrase it.

Page 58

1   Q   I'm not asking if any advice was given
2 to you.  Did you discuss the Fifth Circuit's
3 opinion with your counsel?
4   A   I'm sure I've discussed the opinion
5 with all sorts of different attorneys.  However,
6 in terms of me picking out that language and
7 using it my subsequent report, that is something
8 that I have done.
9   Q   Have you ever been excluded on Daubert
10 grounds?
11   A   No.
12   Q   Are there any other cases in which
13 your opinion was criticized?
14   A   Not that I can think of.
15   Q   How much of your income derives from
16 litigation consulting?
17   A   I would say I probably spend
18 80 percent of my time on litigation consulting
19 and that would result in probably about
20 80 percent of my income being related to
21 litigation consulting.
22   Q   And at Caliber, how are you
23 compensated?
24   A   Based on my projects.  So I am a
25 managing director, so it's almost -- so it's

Page 59

1 based on the money that I bring out less
2 whatever the expenses are and whatever is left
3 over is mine.
4   Q   So if you're retained in a new matter,
5 are you receiving all of the revenue that comes
6 from that matter less the expenses that you just
7 referenced?
8   A   Right.  I mean, yes.  There will be
9 expenses and so the profits would be my profits,
10 yes.
11   Q   What are the expenses?
12   A   Oh, there's office expenses, there are
13 expenses of individuals who work on the cases,
14 so there's a lot of -- there is a lot of
15 expenses relating to that.  But whatever is left
16 over, that goes to me.
17   Q   And what is the remaining 20 percent
18 of your income?
19   A   The 20 percent of my income would be
20 where I engage in other type of projects
21 relating to being a securities analyst.
22     So that would not relate to securities
23 litigation.
24   Q   And those you get paid on a
25 project-by-project basis?

Page 60

1   A   A lot of that will be -- it's not
2 consulting necessarily.  So it will be based on
3 effectively how profitable the project is that I
4 am working on, particularly if I take an equity
5 stake in the company or something like that.
6   Q   Is it fair to say that the Robbins
7 Geller firm is an important client to you?
8   A   Yes.
9   Q   They've retained you dozens of times?
10   A   That's correct.
11   Q   Are they your most important client?
12     MR. ZOHRABIAN:  Objection to form.
13     THE WITNESS:  Yes.
14     MR. ZOHRABIAN:  Grant, we've been
15 going for a little over an hour, so whenever
16 is a natural break for you.
17     MR. MAINLAND:  Yes, very close.  Let's
18 push through to a natural stopping point, if
19 that's okay.
20     THE WITNESS:  Sure.
21 BY MR. MAINLAND:
22   Q   Have you ever concluded in --
23 you've -- withdrawn.
24     You've testified numerous times in
25 securities cases; correct?

Page 61

1   A   That's correct, yes.
2   Q   Have you ever concluded in one of
3 those cases that a market for the shares in
4 question was inefficient?
5   A   You are talking about the cases I've
6 testified in?
7   Q   Testified or consulted in, any
8 securities case where you've been retained to
9 provide litigation consulting.
10   A   Yes.
11   Q   You've concluded that the market was
12 inefficient?
13   A   Yes.
14   Q   What kind of securities were at issue
15 in those cases?
16   A   Equity securities, publicly-traded
17 securities.
18   Q   So have you filed an expert report in
19 which your opinion was that the securities that
20 were the subject of the lawsuit were treated
21 inefficiently?
22   A   Not an expert report that has been
23 filed with the courts, no.
24   Q   Is that because in the cases where you
25 determined that the market was inefficient, you

Page 62

1    declined to submit a report?
2        A.  No.
3        Q.  So can you flush out for me the
4    situation in which you were engaged to opine on
5    market efficiency and concluded that the market
6    was inefficient?
7        A.  It has not gotten to that -- well, if
8    I do so when I'm hired by plaintiffs, they are
9    not going to have me submit a report to the
10   court saying that the market is inefficient.
11       Q.  Has that happened -- go ahead.
12       A.  So we can produce a side because those
13   are kind of irrelevant.
14           I have had -- when working for
15   defendants, if that is an issue, I have not had
16   a case that has gone to the point of class
17   certification where the -- I would need to write
18   a report.
19       Q.  I guess what is I'm asking is simpler.
20   Have you ever been engaged by a plaintiff's law
21   firm that said we would like to -- we would like
22   you to opine on market efficiency and you did
23   some analysis and answered to them, I can't in
24   good faith say that this market is efficient, it
25   just isn't?

Page 63

1        MR. ZOHRABIAN:  Objection to form.
2        THE WITNESS:  I don't endorse that
3    characterization, but I have been looking at
4    cases and looked at cases that in my opinion
5    have not been efficient and I've
6    communicated that to attorneys, but, you
7    know --
8    BY MR. MAINLAND:
9        Q.  That's why I was asking.  You did --
10       A.  Your characterization was a little bit
11   more embellished in terms of --
12       Q.  I can reread the question.  I don't
13   know if it's very embellished.
14       A.  It has been more informal than
15   anything else.  It hasn't been like a formal
16   request, write a report and then I've come back
17   and said, well, you know, I've written the
18   report and now it's -- and I think it's
19   inefficient.
20           It has been more in terms of perhaps
21   preliminary stages where I've been asked, you
22   know, well, do you think this is efficient or is
23   it not efficient and so on.
24           And I have pointed out areas where it
25   may fail to meet the Cammer factors.

Page 64

1        Q.  How many times have you pointed out
2    those areas?
3        MR. ZOHRABIAN:  I'm just going to
4    caution you, Bjorn, I don't want you to get
5    into the specifics of any case.  At a high
6    level of generality, this is okay but to the
7    extent you're going to delve into the
8    specifics, I'm going to instruct you not to
9    answer.
10       THE WITNESS:  It probably happened
11   probably half a dozen times.
12   BY MR. MAINLAND:
13       Q.  Do you accept the possibility that
14   shares traded on a national stock exchange may
15   trade in an inefficient market?
16       MR. ZOHRABIAN:  Object to form.
17       THE WITNESS:  It is possible.  In my
18   opinion I think that you can -- I think you
19   always should allow for that possibility.
20   BY MR. MAINLAND:
21       Q.  But you've never found it to be the
22   case in a written report or in any testimony
23   that you've given in a securities case; right?
24       A.  No.  I think that most of the -- most
25   of the cases where I have provided an opinion

Page 65

1    the Cammer factors have been satisfied and
2    that's far and beyond, in my view, what is
3    needed to demonstrate that the market is
4    efficient in a reliance context.
5        Q.  Was it your expectation going into
6    this lawsuit that SQM's American depository
7    shares traded efficiently because they are
8    listed on the New York Stock Exchange?
9        A.  Not because it was -- necessarily
10   because it was listed on the New York Stock
11   Exchange, but because it was substantial volume,
12   because there was substantial analyst following
13   and because there was substantial institutional
14   holding.
15       Q.  We can talk about -- I wasn't really
16   asking about the Cammer factors.  Trust me,
17   we'll get to the Cammer factors.
18           I just mean literally the -- you must
19   have known fairly early on that the shares at
20   issues in this lawsuit are listed in the NYSE,
21   right, before you did any Cammer analysis?
22       A.  Correct.  And it was a big company, it
23   was listed on the New York Stock Exchange and
24   that would be a good indication that most likely
25   this is a stock that traded in an efficient

1  market.
2      Q    But you're aware that the fact of
3  listing on a national stock exchange is not
4  dispositive of that question; right?
5          MR. ZOHRABIAN: Object to form.
6          THE WITNESS: No, I would want to
7  review the Cammer factors first.
8  BY MR. MAINLAND:
9      Q    Just to be clear, the answer was no,
10 but I think you were agreeing with me? You
11 agree -- let me ask the question more simply.
12         As a matter of legal principle, is the
13 fact that shares are listed on the New York
14 Stock Exchange dispositive of the market
15 efficiency question?
16         MR. ZOHRABIAN: Objection to form.
17         THE WITNESS: I'm sorry, legal
18 principle?
19 BY MR. MAINLAND:
20     Q    Yes.  You're not opining on that?
21     A    I'm -- no, I don't think that -- I
22 think that trading on the New York Stock
23 Exchange is one indication that one may want to
24 consider.  It's more likely than not that it's
25 traded in an efficient market if it's traded on

1  the New York Stock Exchange.  But it would not
2  be sufficient for me at least to opine that the
3  market was efficient.
4      Q    I'm almost at a stopping point.  So
5  unless you just really need to stop, I'm very
6  close.
7          In terms of your publications, you
8  listed one publication in your C.V. from Law360
9  from a few years ago that was relating to
10 Halliburton decision.  Is that the entirety of
11 your published writing?
12     A    That's correct, yes.  I didn't write
13 the heading, but I did write the article.
14     Q    That's the only article that you've
15 published?
16     A    Correct.
17     Q    You've not taught any university
18 courses, have you?
19     A    That's correct.  I'm not an academic.
20     Q    Have you taught any other kind of
21 courses, professional courses or the like?
22     A    There has been occasional CLE type
23 courses.  But other than that, no.
24     Q    You've been on a CLE panel?
25     A    No, I've taught -- law firms have

1  asked me to come in to do presentations on the
2  area of damages in securities cases.
3      Q    Is it fair to say that your knowledge
4  of finance and economics is essentially
5  self-taught?
6          MR. ZOHRABIAN: Objection to the form.
7          THE WITNESS: No, it's not
8  self-taught.  It's based on my educational
9  background.  It is based on my CFA
10 designation.  It is based on my continuous
11 participation in continuing education in
12 CFA, continuing education program.  And it
13 is together with my interaction with a lot
14 of other individuals in this space.
15         So it's not self-taught at all, no.
16 BY MR. MAINLAND:
17     Q    Educationally, in terms of a formal
18 degree, your master's in international business
19 is the degree that educated you in finance and
20 economics?
21         MR. ZOHRABIAN: Objection to form.
22         THE WITNESS: Of course.  I mean, my
23 emphasis at University of San Diego was
24 finance.  I was a research assistant to the
25 investment professor at University of San

1  Diego.  I did investment research under his
2  guidance for a year and a half.
3          You know, I participated in the CFA
4  program and have done that for, you know,
5  20 years.  So the notion that it is
6  self-taught is -- does not ring true.
7          I mean, in May, I was in Hong Kong at
8  the big CFA conference together with
9  another -- another 2,000 of my colleagues,
10 we were listening to Nobel laureates like
11 Daniel Kahneman talking about finance.
12         I mean, this is something that is not
13 self-taught.  It is -- this is my world, you
14 know.
15     Q    How much time did you spend preparing
16 your report?
17     A    I spent -- I think it was 98 and a
18 half hours, if I recall correctly.
19     Q    That's very precise.
20     A    Yes.
21     Q    Were you supported by a team?
22     A    I had two individuals that assisted
23 me.
24     Q    And is the 98 and a half hours
25 referring to hours that you personally worked on

1    it?
2        A    Me personally.
3        Q    And then you had two other individuals
4    who assisted?
5        A    Correct.
6        Q    And how much time did they put into
7    it?
8        A    The first individual was Paul Hanouna
9    and he put in, I believe, 24 hours.  And then we
10   had a junior staff member who put in probably
11   less than ten hours.
12       Q    I noticed a number of prior reports
13   that were essentially identical in wording to
14   the report that you have here.  And I just
15   wondering -- they are identical in wording but
16   also in methodological approach, or at least
17   they appeared that way to me.
18           When you drafted your report, did you
19   just take a prior report and use that as a
20   template and update it to the specifics of the
21   new case that you're working on?
22       A    Yes.  What I try to do is to be
23   consistent; in other words, I don't want to, you
24   know, use a new methodology for each case
25   because then you get accused of cherrypicking

1    methodologies.
2        So what -- the methodologies that I
3    have used in this particular case is
4    methodologies that I have used before in cases
5    where courts have certified the class.
6        So I try to be as consistent with
7    prior reports as I can understanding that there
8    will always be some variability with different
9    cases.  The facts are always a little bit
10   different.
11       MR. MAINLAND:  Let's take a break.
12       VIDEOGRAPHER:  This marks the end of
13   media 1, Volume 1 in the deposition of Bjorn
14   Steinholt.  The time is 10:19, and we're off
15   the record.
16       (Recess taken.)
17       VIDEOGRAPHER:  This marks the
18   beginning of media 2, Volume 1 in the
19   deposition of Bjorn Steinholt.  The time is
20   10:36, and we're back on the record.
21   BY MR. MAINLAND:
22       Q    Sir, what is an efficient market?
23       A    An efficient market is one that
24   processes information efficiently.
25       Q    You state in Paragraph 10 of your

1    report -- why don't you take a look at that,
2    give us a slightly more precise answer or
3    definition as it were.
4        It says:  An efficient market is one
5    that efficiently processes new and material
6    information.  In an efficient market, new and
7    material information is quickly incorporated
8    into the stock price as different investors buy
9    and sell based on their respective evaluations
10   of the new information disclosed.
11       Do you see that?
12       A    Yes.
13       Q    Is that what you mean by an efficient
14   market as we discuss it today?
15       A    Yes.  I mean, this is a part of a
16   whole section about market efficiency that I
17   have, yes.
18       Q    Economists posit different forms of
19   market efficiency; correct?
20       A    Typically when you say different forms
21   of market efficiency, you typically refer to the
22   information that is incorporated into the stock
23   price.  In other words, the weak form, the
24   semi-strong form and the strong form, that all
25   relates to whether or not you look at historical

1    stock price movements, whether or not you look
2    at all information, corporate -- all
3    publicly-available information or all
4    information in the universe.
5        So that's typical -- I don't know if
6    that's what you're referring to, but that
7    relates to the information.  It's not
8    necessarily a different definition of the
9    process of incorporating that information.
10       Q    Do you agree with Professor Fama that
11   weak form efficiency tests how well do past
12   returns affect future returns?
13       A    Yes, that's what the weak form relates
14   to.
15       Q    And do you agree with Professor Fama
16   that the relevant information for weak form
17   efficiency is just historical prices?
18       A    Yes, it looks at historical prices to
19   try to predict the future and to see whether or
20   not that is doable or not.
21       Q    And in a weak form efficient market,
22   it's not doable; correct?
23       A    If it's efficient, you cannot set up
24   arbitrage strategies to earn excess returns.
25   You know, there are hedge funds that, of course,

Page 74

1   focus on making money on that.
2       So somebody may make money on it, but
3   on average, you're not going to make money on
4   consistently.
5       Q   Do you agree with Professor Fama that
6   semi-strong form efficiency tests how quickly do
7   security prices reflect public information
8   announcements?
9       A   Yes, I mean, he came up with the
10  definition, so --
11      Q   But you agree with -- that that's what
12  semi-strong form means, that it quickly
13  incorporates all publicly-available information?
14      A   Yes.  He came up -- he's the one who
15  termed -- came up with the term "market
16  efficiency."  He's the one who talked about
17  these different pieces of information.  So, yes,
18  he gets to define it, he's the one who defines
19  it.
20      Q   Semi-strong form efficiency tests for
21  whether share prices reflect all
22  publicly-available information, correct, not
23  just some publicly-available information?
24          MR. ZOHRABIAN:  Objection to form.
25          THE WITNESS:  It relates to all

Page 75

1   publicly-available information, yes.
2   BY MR. MAINLAND:
3       Q   And that would include historical
4   prices; correct?
5       A   Yes, all publicly-available
6   information will include everything, it will
7   include historical prices and it will include
8   new information that's being disclosed by the
9   company, yes.
10      Q   So weak form efficiency is a
11  prerequisite to semi-strong form efficiency;
12  correct?
13      A   Yes, you can say that.
14      Q   And then strong form efficiency tests
15  whether all information, not just all
16  publicly-available information, is incorporated
17  in the share price; right?
18      A   That's correct, that's how it is
19  defined, yes.
20      Q   As a practical matter, is that
21  possible?
22          MR. ZOHRABIAN:  Objection to form.
23          THE WITNESS:  As a practical matter is
24  that possible?  If insiders started to buy
25  an selling, then the insider -- that

Page 76

1   information that's known by the insiders may
2   become reflected in the stock price.
3       But typically we do not believe that
4   the markets meet that definition.
5   BY MR. MAINLAND:
6       Q   Would you agree that strong form
7   efficiency is essentially a theoretical
8   benchmark, not a practical reality?
9          MR. ZOHRABIAN:  Objection to form.
10         THE WITNESS:  They are all theoretical
11  in that sense.  I mean, you don't -- I mean,
12  the notion that stock prices reflect all
13  publicly-available information, nobody
14  literally believes that to be true.  It's an
15  extreme hypothesis.  And when I say that, I
16  am actually directly quoting Eugene Fama.
17      So the definitions that he has come up
18  with in terms of a perfectly efficient
19  market, nobody believes them to be literally
20  true.  With respect to the strong form,
21  however, unlike the weak and the semi-strong
22  form, we don't believe -- that doesn't even
23  approximate the truth.
24      The weak form and the semi-strong
25  form, the reality approximates the extreme

Page 77

1   null hypothesis.
2   BY MR. MAINLAND:
3       Q   Your report doesn't distinguish
4   between these three theoretical constructs.
5   When you refer to market efficiency in your
6   report and today, what form of efficiency do you
7   have in mind?
8       A   Well, I'll look at all
9   publicly-available information.  Even though in
10  the context of reliance, what is important is
11  whether or not the misrepresentations are
12  reflected in the stock price.
13      Q   We'll return to that in a bit.  But to
14  simplify, are you using the semi-strong form
15  efficiency when you refer to market efficiency
16  in this report and in your testimony today?
17      A   In terms of information that I am
18  focusing on, I'm focusing on all information, so
19  that would be most consistent with the
20  semi-strong form.
21      Q   You mean all publicly-available
22  information?
23      A   Correct.  I'm looking at
24  publicly-available information, I'm not looking
25  at nonpublic information.

1   Q    And the ultimate question you're
2   trying to answer is whether the shares rapidly
3   incorporated all publicly-available information;
4   correct?
5   A    Well --
6        MR. ZOHRABIAN:  Objection to form.
7        THE WITNESS:  Well, what I'm trying to
8   determine based on the factors provided by
9   the court is whether or not they meet those
10  factors.  So whether or not market
11  efficiency in a reliance context has been
12  established.
13  BY MR. MAINLAND:
14  Q    You're looking to whether the market
15  prices during the class period quickly change to
16  reflect new and material information concerning
17  SQM as such information became available?
18  A    That's correct, yes.
19  Q    What constitutes new information?
20  A    New information is information that
21  has not been disclosed before.
22  Q    And that could be because it did not
23  exist or because it was not publicly known or
24  both?
25  A    Regardless -- regardless of the

1   reason, as long as it wasn't known before or
2   known publicly before and it had not been
3   disclosed before, it's new information.
4   Q    What does material information mean?
5   A    There are different definitions of
6   materiality.  Of course, there is a legal
7   definition relating to what reasonable investors
8   would have wanted to consider prior to making an
9   investment decision.
10       Typically something that's material is
11  some -- for a securities analyst is something
12  that impacts the future cash flow and thereby
13  impacts the value of the company.
14  Q    And is that -- which meaning of
15  materiality do you have in mind when you use the
16  word "material" in your report?
17  A    I think they are trying to say the
18  same thing and -- but I'm looking at something
19  that impacts -- would impact the future cash
20  flows and impact the stock price.
21       But I think it's the same, that is,
22  what a reasonable investor would want to know
23  prior to making an investment decision.  I don't
24  think there's necessarily a conflict, it's just
25  two different ways of looking at it.

1   Q    That's because what the reasonable
2   investor would want to know is whether the
3   present value of future cash flows has been
4   impacted by the information?
5        MR. ZOHRABIAN:  Objection to form.
6        THE WITNESS:  It is because a
7   reasonable investor is concerned with the
8   value.  And the value is the present value
9   of the future cash flows and the riskiness
10  of these cash flows.
11  BY MR. MAINLAND:
12  Q    Your report refers to efficient
13  markets as quickly incorporating
14  publicly-available information.  What do you
15  mean by quickly?
16  A    Quickly relates -- by the way, the
17  time it takes depends on the complexity of the
18  information.  So complex information may take
19  longer time to be incorporated than something
20  that's less complex.
21       That said, what we are looking at is
22  whether or not there is an opportunity to make
23  excess return, for regular investors to make
24  excess returns.
25       So if it's so quick that class

1   members, regular class members would not be able
2   to trade on the information and make profit from
3   that prior to it being reflected in the stock
4   price, then it's slow and if not, it's quick.
5   Q    Isn't it true that open and developed
6   markets quickly incorporate and reflect new
7   information as it becomes available?
8        MR. ZOHRABIAN:  Objection to form.
9        THE WITNESS:  Generally that's true,
10  absolutely.
11  BY MR. MAINLAND:
12  Q    And as it becomes available, that
13  sounds to me like more or less instantaneously.
14  Is that generally what you mean by quickly?
15       MR. ZOHRABIAN:  Objection to form.
16       THE WITNESS:  No, not necessarily.  I
17  mean, it's not instantaneous.  You can go
18  through a process -- particularly if the
19  information is unclear, you can have
20  something -- you may have one group of
21  investors who are looking at it one way and
22  trade quickly and then you have another
23  group of investors that may take a little
24  bit longer time.  They want to double check
25  and things of that nature.

Page 82

1    And so ultimately, it can take a
2  longer period of time particularly if the
3  information is unclear and particularly if
4  there are conflicting information so that
5  investors do not have a clear understanding
6  of the economic implications of the
7  information.
8  BY MR. MAINLAND:
9    Q   So it's not as it becomes available?
10    MR. ZOHRABIAN:  Objection to form.
11    THE WITNESS:  As it becomes available
12  but not necessarily instantaneous because
13  you have to analyze the information.
14  BY MR. MAINLAND:
15    Q   Well, at any given time, multiple
16  investors have different views of the
17  information that's in the market; correct?
18    A   Yes, absolutely.
19    Q   And so the fact that different people
20  are going to spend more time or less time
21  analyzing something does not -- I mean, one
22  person could take two weeks to analyze the
23  implication of something.  That does not mean
24  that information did not enter the stock price
25  for two weeks, does it?

Page 83

1    A   No.  What I'm saying is for it to be
2  fully reflective, you would have to -- there is
3  a price discovery mechanism where you have
4  shares being traded by different types of
5  investors.  And ultimately it will find its
6  equillibrum and that can take some time.
7    Q   What do you mean by some time?
8    A   We're talking about short periods of
9  time.  In fact, my analysis looks at it on a
10  daily basis, so -- but I don't look at less than
11  a day.  I'm just looking at it on a one-day
12  basis.
13    Q   But one trading day is your benchmark;
14  is that fair to say?
15    MR. ZOHRABIAN:  Objection, form.
16    THE WITNESS:  That's what I'm using.
17  Sometimes when information becomes
18  disclosed, there are subsequent related
19  disclosures, so -- that clarify the first
20  disclosure.
21    So it could take a longer period of
22  time, more than a day, for everything to be
23  fully incorporated into the stock price.
24    But that does not necessarily mean
25  that, you know, the market is efficient.

Page 84

1    It's just that you have small little
2  disclosures on the way that kind of
3  clarifies the first disclosure.  It's not
4  necessarily people sitting and twiddling
5  their thumb for an entire day before they
6  start trading on it.  It's not just not as
7  clear-cut in some instances.
8  BY MR. MAINLAND:
9    Q   The clarifying disclosure that you're
10  referencing, that doesn't mean that the prior
11  information was not in the stock price, does it?
12    A   Well, the prior information may be
13  unclear.  And so it may take longer period of
14  time to get a full understanding of what the
15  economic implications is of the initial
16  disclosure.
17    So if you have clear disclosures,
18  typically it will happen really quickly.  If
19  there's ambiguity with respect to what the
20  disclosure means, then it can take longer time.
21    Q   Semi-strong efficiency does not mean
22  that the share price rapidly incorporates all
23  clear publicly information, does it?
24    MR. ZOHRABIAN:  Objection to form.
25

Page 85

1  BY MR. MAINLAND:
2    Q   You're not limiting it to that
3  particular kind of information, are you?
4    MR. ZOHRABIAN:  Same objection.
5    THE WITNESS:  Of course not.
6  BY MR. MAINLAND:
7    Q   A lot of information is unclear;
8  right?
9    A   Yes, that's what I'm explaining to
10  you.
11    Q   Okay.  So I just want to --
12    A   I'm explaining exactly the concept
13  that you're asking about.
14    Q   Well, I'm trying to understand because
15  you seem to be saying if information is unclear,
16  it may take more than a day for that information
17  to be reflected in the share price.  Why is the
18  lack of clarity relevant as to whether it's
19  impounded in the stock price?
20    A   Because the clarity can come
21  subsequent to the initial disclosure.
22    Q   But does that mean that prior
23  information was not in the stock price?
24    A   No.  I mean, the unclarity will be --
25  but in terms of if you have a disclosure and

1    it's not clear, what I was saying was that the
2    subsequent disclosures, you may want to look at
3    it from the point when the first disclosure is
4    made until the clarity has been made.
5         You may want to combine multiple days
6    in order to determine whether or not -- what
7    impact on the stock price was.
8         Q    That's not what you did here, is it?
9         A    Oh, no.  I'm just -- we're talking
10   about general concepts here.  I was looking at
11   one day, and that was it.
12        Q    You were looking at days, just to get
13   the terminology straight, where information was
14   disclosed after the market closed on a given day
15   and then you looked at what happened to the
16   share price the next trading day; is that
17   correct?
18        MR. ZOHRABIAN:  Objection to form.
19        THE WITNESS:  First of all, I looked
20   at every day.  And if I was looking at a
21   particular event that happened after the
22   market was disclosed, then I would look at
23   the next trading day.
24   BY MR. MAINLAND:
25        Q    Well, so for the -- we'll get to the

1    financial release date tests in a little bit.
2    But is it fair to say that for those 19
3    financial release dates, I think you used the
4    term effective trading -- "effective trading
5    date," is that right, or effective date?
6         A    I don't know what the terminology
7    would be.  But if it is disclosed after the
8    close of trading, then you would look at the
9    following trading day.
10        Q    And that's what you did with the
11   financial release dates here; right?
12        A    That's correct.
13        Q    Would it be -- withdrawn.
14        If information is not incorporated in
15   the share price more or less instantaneously,
16   isn't it the case that there would be arbitrage
17   opportunities for riskless gains?
18        MR. ZOHRABIAN:  Objection to form.
19        THE WITNESS:  If you have information
20   that's not quickly incorporated into the
21   stock price, then there's an opportunity for
22   investors to get in there and arbitrage that
23   information.
24   BY MR. MAINLAND:
25        Q    You've changed the word -- I had said

1    instantaneously and you changed it to quickly.
2    That's what I'm trying to understand.
3         If quickly does not mean
4    instantaneously, then aren't there arbitrage
5    opportunities for riskless gains?
6         A    Yes, there always are, in this stock
7    and in any stock.  The notion that an efficient
8    market means that new publicly-available
9    information is instantaneously reflected in the
10   stock price, it's the very extreme new
11   hypothesis that Eugene Fama says is not
12   literally true.
13        And this is what has led to what we
14   call the Grossman-Stiglitz paradox and that is
15   that the informationally efficient market is an
16   impossibility.  They wrote a paper in -- I think
17   it was 1980.
18        So people understand that the market
19   is not perfectly efficient.  People understand
20   that stock prices do not instantaneously reflect
21   new information.  People understand that it
22   takes time.  People understand that, yes, of
23   course there are arbitrage opportunities.
24        If there were not arbitrage
25   opportunities, nobody would try to arbitrage

1    anything because nobody could make money of it.
2    Of course there's money to be made.
3    The thing is whether or not for regular
4    investors, if they can engage in this and
5    consistently outperform the market.
6         What I'm pointing out in this
7    Section 3 here is that all of the research done
8    on this is that even actively managed funds are
9    unable, for the most part, to outperform the
10   market.
11        So the market for actively traded
12   stocks here in the United States on the New York
13   Stock Exchange and the NASDAQ is extremely
14   efficient.
15        Q    What are American depository shares?
16        A    They are depository receipts that are
17   foreign shares that are deposited to a
18   depository bank.  And they then -- the bank then
19   issues shares so they can be traded in this case
20   on the New York Stock Exchange.
21        Q    For ease of reference, I'll refer to
22   them as ADS today.  Is that okay?
23        A    That's fine.
24        Q    And the claims in this case are
25   premised entirely on SQM's ADS; right?

Page 90

1    A    That's correct, yes.
2    Q    And your opinion as to market
3  efficiency in this case relates exclusively to
4  SQM's ADS; right?
5    A    That's correct, yes.
6    Q    Are you aware that SQM has common
7  stock listed on the Santiago Stock Exchange?
8    A    Yes, I am.
9    Q    You haven't studied the efficiency of
10  that market; correct?
11    MR. ZOHRABIAN:  Objection, form.
12    THE WITNESS:  In this report I focus
13  on the ADS's traded on the New York Stock
14  Exchange.  I do make some reference to
15  analysts coverage in Chile.  Obviously when
16  you have analyst coverage, there are some
17  consumers of that and that's institutional
18  investors.
19    And I also have an analysis of the
20  trading of SQM ordinary shares in Chile and
21  on the New York Stock Exchange to
22  demonstrate that they track each other very,
23  very closely.
24  BY MR. MAINLAND:
25    Q    I'll get to that in a minute.  But

Page 91

1  have you formed a general opinion as to the
2  efficiency of the common stock on the Santiago
3  Stock Exchange?
4    MR. ZOHRABIAN:  Objection to form.
5    THE WITNESS:  I believe the price is
6  efficient in the Chilean market, but it's
7  not an opinion that I have -- I would have
8  wanted to do a little bit more analysis and
9  support it more if that was one of the
10  opinions that I put in my report.  It's not
11  part of my opinion in this case.
12  BY MR. MAINLAND:
13    Q    Is it relevant to the analysis of the
14  ADS?
15    MR. ZOHRABIAN:  Objection to form.
16    THE WITNESS:  I think the fact that it
17  has analyst coverage, as I mentioned in the
18  report, and for the reasons that I just
19  stated, obviously analysts have -- there are
20  consumers of that research and the fact that
21  they track very, very closely is, in fact,
22  relevant to determining market efficiency of
23  the ADS's traded on the New York Stock
24  Exchange.  And I believe it supports it.
25

Page 92

1  BY MR. MAINLAND:
2    Q    If the market for SQM's common stock
3  listed on the Santiago Stock Exchange is not
4  efficient, would the market for SQM's ADS on the
5  New York Stock Exchange be efficient?
6    MR. ZOHRABIAN:  Objection to form.
7    THE WITNESS:  Again, I would have to
8  look into that in greater detail, because
9  you would have to try to figure out what do
10  they track.  So that's something you would
11  need to look at it in greater detail.
12  BY MR. MAINLAND:
13    Q    I'm going to direct you to
14  Paragraph 30 of your report.  Are you there?
15    A    Yes.
16    Q    So in Paragraph 30, you state in the
17  really the final sentence on that page it says:
18  Consequently, it is possible to observe whether
19  or not the two securities that the U.S. ADS's
20  and the Chilean ordinary shares traded in tandem
21  consistent with arbitrage orders being present
22  and eliminating discrepancies between the
23  respective market prices.
24    And then you -- in the next sentence
25  you say:  During the class period, I determined

Page 93

1  that the correlation between the price changes
2  in the U.S. ADS's and the Chilean ordinary
3  shares, after adjusting for the exchange rate
4  between the U.S. dollar and Chilean peso, was
5  approximately 92 percent.
6    Does correlation mean that the two
7  securities traded in tandem?
8    MR. ZOHRABIAN:  Objection to form.
9    THE WITNESS:  That's what -- yes, if
10  you have a correlation of 100, it would be
11  perfectly in tandem.
12  BY MR. MAINLAND:
13    Q    Can you describe the correlation
14  calculation that you ran?
15    A    You want the formula?
16    Q    However you see fit to describe it.
17  Is that what --
18    A    So if you have 100 -- if it's positive
19  100 percent, that means that whenever it went up
20  by a dollar, the other security also went up by
21  a dollar.  If it's negative 100 percent, then
22  it's the other way, right.  So it's between one,
23  minus one and one.
24    So what you calculate is how much they
25  moved together.

Page 94

1      Q    So 100 -- a value of 100 percent means
2  that the two prices are perfectly correlated;
3  correct?
4      A    Correct.
5      Q    So they truly move in tandem?
6          MR. ZOHRABIAN:  Objection to form.
7          THE WITNESS:  Right.  But you have --
8  I thought I had it in here.  I mean, there
9  is a reason why --
10          MR. ZOHRABIAN:  If you need to, read
11  the full paragraph -- sorry.  If you want to
12  look at the full paragraph to answer the
13  question, you can feel free to do so.
14          THE WITNESS:  Yes.  If -- these would
15  not ever be -- this would not ever be
16  100 percent and the reason is because there
17  are timing differences between the Chilean
18  market and the U.S. market.  You have
19  different holidays in the two different
20  markets and so there's a lot of reasons why
21  it never would be 100 percent.  The question
22  is whether or not it's close to 100 percent.
23          In this case it's 92 percent and what
24  I did, because I think it's more -- it kind
25  of explains the point better, is to actually

Page 95

1  draw the graph and when you draw the graph,
2  you can see that one is on top of the other.
3          MR. ZOHRABIAN:  I'll just note for the
4  record that the graph that was originally
5  provided was in color and this does not look
6  to be in color.
7  BY MR. MAINLAND:
8      Q    You mentioned time zone differences.
9  What is the time zone difference between New
10  York and Santiago?
11      A    As I sit here right now, I don't
12  recall exactly, but I think that they have
13  different daylight savings time and so I think
14  it's one or two hours.
15          But that's one thing that one would
16  look at.
17      Q    Did you look at it when preparing your
18  report?
19      A    Yes, I looked at that when I was
20  preparing my report.  It's just not something
21  that I have -- I mean, this deposition is one
22  year after I prepared my report and I don't have
23  that fresh in my mind.
24      Q    You did look at it?
25      A    Yes.

Page 96

1      Q    What are the holiday differences?
2      A    Well, they have different holidays.
3  Labor Day is on May 1st, you know, things of
4  that nature, you know, so you would not have
5  those holidays that we have in the United
6  States, they would not necessarily be there in
7  Chile.  So those would be differences.
8      Q    Did you look at that in preparing your
9  report?
10      A    I looked at it, yes.
11      Q    You determined what the specific
12  holiday differences are?
13      A    I know the holidays -- or I have the
14  United States holidays, I know that they are
15  different in Chile and that was the extent of
16  what I did.
17      Q    So you didn't figure out literally on
18  how many days was the stock market closed in
19  Chile but open in New York?
20      A    No, I did not do that.  Obviously
21  there are some overlap, you know, Christmas and
22  so on.
23          But no, I did not do that.
24      Q    What is the cost of arbitrage?
25      A    In order to do arbitrage, you had to

Page 97

1  monitor the security.  The first thing that you
2  do, you had to do -- you had to set up the
3  analysis so you know when there is an arbitrage
4  opportunity.  So you had to monitor the
5  security, so there's costs associated with that.
6          There's cost associated with trading,
7  trading the security.  And so you have to cover
8  the cost of the trading and the cost of the
9  monitoring in order to be economically
10  incentivized to actually do the arbitrage.
11      Q    Time zone differences, holiday
12  differences, cost of arbitrage, are these things
13  calculable in terms of their impact on the share
14  price?
15          Why don't I withdraw that and restate
16  it because I want to be a little more precise.
17          Are the time zone differences, the
18  holiday differences and the cost of arbitrage
19  calculable in terms of their impact on
20  correlation between the Chilean shares and ADS?
21          MR. ZOHRABIAN:  Objection, form.
22          THE WITNESS:  You could do further
23  analysis and additional analysis, yes.
24  BY MR. MAINLAND:
25      Q    You say in your report that the

Page 98

```
 1    92 percent correlation is very close; is that
 2   right?
 3       A    I say that it's very close, but it is
 4   I think better to look at the picture and that
 5   probably illustrates better in terms of what the
 6   closeness actually is.
 7       Q    What is the benchmark for what
 8   constitutes very close?
 9       A    Well, I think that the picture tells
10   the story.  On my version here, I have one
11   single line effectively, and that is because --
12   well, what I literally had to do was to make --
13   I think it was the red line, I made it a little
14   bit wider so you could see that the blue line
15   was in between the red line.
16        We're talking about very, very small
17   little differences.  So I characterize that as
18   close.
19        MR. MAINLAND:  I will state for the
20   record, responding to Armen's point as to
21   the color, I think that when it is in color,
22   and I agree it's not in this particular
23   exhibit, I think the spread between the two
24   is actually a little clearer than it is in
25   this particular graph that's in black and
```

Page 99

```
 1   white.
 2   BY MR. MAINLAND:
 3       Q    In any event, set aside the graph.
 4   92 percent, is that what you expected?
 5       A    I expected it to be very, very high.
 6   I did not -- and I expected it not to be 100.
 7   So I expected it to be in the 90s, yes.
 8       Q    How low would the percentage need to
 9   go for you to be concerned as to whether there
10   actually are arbitragers?
11       A    Well, in this case, we are dealing --
12   it's 92 percent of the difference.  So let's say
13   that the stock price goes up 50 cents, so
14   92 percent then is -- so one goes up 50 cents,
15   the other one goes up 46 cents.  So there is a
16   4 cent spread there that some arbitrage may be
17   able to take advantage of, right.
18        But when you factor in the fact that,
19   you know, the holidays -- by the way, the
20   exchange rates, it's not on the closing day of
21   the stock exchange either, so that's another
22   timing issue.
23        So when you factor in all of these
24   things, the 4 cents is the most you can make on
25   the trade and that's very, very small.  The
```

Page 100

```
 1   spreads in the olden days for trading common
 2   stocks on the NASDAQ, for instance, was
 3   25 cents -- 25 cents.
 4        So to trade something and, you know,
 5   you can only pick up 4 cents, it doesn't seem to
 6   be a lot.  But again, just to clarify, I'm not
 7   saying that nobody can make money doing
 8   arbitrage.  In fact, looking at the graph, I
 9   think it's very clear, because they are so
10   close, that some people are doing arbitrage
11   here.
12        And it is probably as close as one
13   would expect in order for it just to be
14   profitable for them.  That's what you would
15   expect.
16       Q    The one thing I did not hear in your
17   answer is whether there is a specific percentage
18   that would be a benchmark relevant to whether
19   arbitragers are present sufficient to satisfy
20   Cammer 3, I believe it is?
21       A    No, there wouldn't be a specific
22   benchmark.  I think -- I mean, that is not what
23   I have quantified here.  I can talk about it in
24   generalities and I think that this is -- I think
25   the graph speaks for itself.
```

Page 101

```
 1       Q    Your opinion is that the market for
 2   SQM's ADS traded in an efficient market on
 3   alternating days between the class period of
 4   time; right?
 5        MR. ZOHRABIAN:  Objection to form.
 6        THE WITNESS:  That's my conclusion,
 7   yes.  Obviously I have not -- I don't have a
 8   section here discussing however many days
 9   there are, more than a thousand trading
10   days.  And although I have performed a
11   statistical analysis of each day, I have
12   not -- and I have looked at media and
13   analysts reports, there is a lot of it
14   during this period of time.
15        My general conclusion is that
16   throughout the entire class period, which
17   would include every day, the stock market
18   was efficient.
19   BY MR. MAINLAND:
20       Q    And the class period is from June 30,
21   2010 through March 18th, 2015; right?
22       A    Yes.
23       Q    And that's about 56 months; correct?
24       A    Correct, yes.
25       Q    That's almost five years; correct?
```

1    A    That is almost five years, yes.
2    Q    And do you know how many trading days
3  there were in the class period?
4    A    Well, there's 250 trading days roughly
5  in a year, so in five years it would be 1250,
6  but it's a little bit less than that, so it's
7  probably slightly below 1200.
8    Q    And that's -- I'll represent I counted
9  them, so the number is 1,187, so very close to
10  what you just said.
11        Have you ever analyzed market
12  efficiency over a class period of that duration?
13    A    Yes.
14    Q    And about how many times?
15    A    I don't know.  Probably a dozen times.
16  The one that comes to mind is HealthSouth.  I
17  provide an opinion at class cert in HealthSouth
18  and the class was certified.
19    Q    Would it surprise you to learn that
20  we've only been able to discover two cases where
21  the class period was longer than in this case?
22    A    No, that wouldn't surprise me.  Is
23  HealthSouth one of them?
24    Q    That's a good question.
25        HealthSouth was 70 months and there

1  was one other case that was 58 months.
2    A    Okay.
3        MR. ZOHRABIAN:  I'm sorry, did you say
4  HealthSouth or household?
5        MR. MAINLAND:  HealthSouth.
6    Q    Which is what you were saying too
7  Mr. Steinholt; right?
8    A    Yes, I was the expert in that one.
9    Q    Look, we've looked the vast majority
10  of the cases you worked on involved class period
11  of 25 months or less.  I'm just representing
12  this to you.
13    A    Right.
14    Q    The average class period was about
15  14 months.
16    A    Right.
17    Q    Median class period was about nine
18  months and so those are much shorter time
19  periods.  How, if at all, does the length of the
20  class period affect your analysis?
21    A    It would affect -- it could affect it
22  if there is some systemic break in the market.
23  Sometimes what happens is that, you know, a
24  stock may get delisted and then the question
25  becomes, well, does that impact market

1  efficiency.
2        It can also -- you may have a stock
3  and all of a sudden the stock declines and it
4  ends up being a penny stock and all of the
5  institutional investors and the analysts stop
6  covering the stock, so they kind of disappear.
7  And so it no longer meets the Cammer factors.
8        So there's different things that can
9  happen during -- or are more likely to happen
10  during a longer period of time.
11    Q    Any number of those things could
12  happen in a shorter class period; right?  You're
13  saying they are more likely simply by virtue
14  there are more days in a longer class period?
15    A    Correct.
16    Q    In your analysis of the direct
17  evidence of market efficiency -- so now I'm
18  referring to your event study -- you evaluated
19  19 earnings days and one day, March 18th, 2015,
20  for a total of 20 days; right?
21    A    I did two different analyses.  One was
22  on the -- all of the earnings releases during
23  the class period and that is the 19 days that
24  you referred to.
25        And I always look at the last day of

1  the class period and -- to see whether or not
2  there is evidence that the stock market reacted
3  quickly to the disclosure of the alleged truth.
4    Q    Nineteen plus one is 20; right?
5    A    Yes.
6    Q    I know I'm asking you a simple
7  question.  I'm sure you know that.
8    A    I'm just saying it's two different
9  analyses.  I thought you kind of lumped it
10  into -- you may have thought it was one
11  analysis.
12    Q    I'm literally just counting up dates
13  here.  So 20 days out of 1,187 is less than
14  2 percent of the days, the trading days during
15  the class period?
16    A    Yes.
17    Q    You thought that was sufficient to
18  evaluate whether the market was efficient for
19  the SQM ADS during the entirety of the class
20  period; right?
21    A    Actually, that's not the analysis I've
22  submitted mere.  I have an analysis where I
23  looked at a lot of different factors.  So this
24  is just one factor that I looked at.
25        And so my conclusion is based on all

1   of the things that I have here.  If you take one
2   piece of it and you ask me, well, if you only
3   have that piece of information, can you -- would
4   you opine that the market was efficient, that
5   may not be true because, you know, I would want
6   to look at these other pieces as well.
7       Q     Let me rephrase the question.  You
8   thought 20 days out of one hundred -- withdrawn.
9       You thought 20 days out of 1,187 was
10  sufficient to evaluate whether there's direct
11  evidence that SQM's ADS rapidly incorporated all
12  publicly-available information during the
13  entirety of the class period; is that fair?
14          MR. ZOHRABIAN:  Objection to form.
15          THE WITNESS:  No.
16  BY MR. MAINLAND:
17      Q     Why not?
18      A     The Cammer Factor 5, which is what
19  you're referring to, started out by looking at
20  market information.  So I have an analysis where
21  I render regression during the class period to
22  determine whether or not market information was
23  quickly incorporated into the stock price.  And
24  it's on -- let me provide you with a paragraph,
25  it's in Paragraph 38.

1           And I concluded that the market
2   information was quickly incorporated into the
3   stock price.  I then looked at industry
4   information.  I had a peer group and I looked at
5   that information.  I regressed it against the
6   SQM and I determined that industry information
7   was quickly incorporated into the stock price.
8       I then -- then I come to the analysis
9   that you're talking about.  I looked at earnings
10  releases and the reason I looked at earnings
11  releases is that Cammer Factor 5 specifically
12  talks about cause and effect relationship
13  between financial releases and a response in the
14  stock price.
15          And it says that it would be helpful
16  to know if there's evidence that the financial
17  releases actually did impact the stock price.
18          So that's why I looked at the 19
19  earnings releases.  And as I mentioned earlier,
20  I also looked at the last day of the class
21  period because I always look at the last day of
22  the class period.  In this case it's a corporate
23  event, it's the resignation of board members
24  because of certain concerns that they have.
25          So that's what I did in order to be

1   comfortable that Cammer Factor 5 was satisfied
2   in this case.
3       Q     You had 20 event dates; right?
4           MR. ZOHRABIAN:  Objection to form.
5           THE WITNESS:  I had -- I did more than
6   that.
7   BY MR. MAINLAND:
8       Q     That's not what I'm asking.  I'm
9   asking:  How many event dates did you have?
10      A     I looked at --
11      Q     You already described all the other
12  stuff you did.  That's fine, I'm not disputing
13  that, though I have some questions about that.
14  But I'm literally just asking how many events
15  dates did you have?
16          MR. ZOHRABIAN:  Objection to form.
17          THE WITNESS:  I had all of the 19
18  financial releases and I had the last day of
19  the class period, which adds up to 20.
20  BY MR. MAINLAND:
21      Q     So you had 20 event dates, the answer
22  is yes; right?
23          It's a very simple question and I
24  don't know why you're fighting me on this.  19
25  plus one is 20, 20 event dates.  The answer is

1   yes, is it not?
2           MR. ZOHRABIAN:  Grant, I'm going to
3   ask you to be polite to the witness.
4   BY MR. MAINLAND:
5       Q     No?
6       A     You started out by saying that all I
7   did in Cammer Factor 5 was to look at 20 event
8   dates.  I explained that that was not all I did.
9   I have already explained what I did.
10          You come back to me and pretend that
11  your original question was simply whether or not
12  I only looked at 19 release dates and the
13  corrected disclosure at the very end, which is
14  somewhat deceptive to me at least, because
15  that's not why I went through a full description
16  of all of this.
17          Nineteen plus one is 20, I mean, I
18  don't understand what the issue there is.
19      Q     I'm just asking is 20 event dates --
20  you had comfort that using 20 event dates for
21  your event study was sufficient in a five-year
22  class period; right?
23      A     I was --
24      Q     You would not have done the event
25  study premised on 20 event dates if you didn't

## Page 110

1  think that was enough; isn't that fair?
2      MR. ZOHRABIAN:  Objection to form.
3      THE WITNESS:  I looked at -- I was
4  comfortable that it met what -- the
5  definition of financial releases that the
6  Cammer factor set forward.
7      In other words --
8  BY MR. MAINLAND:
9      Q   Not my question.
10     A   -- I follow the Cammer factor.  This
11 is reading the Cammer factor, following the
12 Cammer factor.  When I do my analysis of the
13 financial releases, I pick the financial
14 releases there are, and there are 19, I can't
15 make up more financial releases.
16     Q   I'm not asking you to.  I'm asking a
17 very simple question.  You felt comfortable that
18 20 event dates in a five-year class period was
19 sufficient; correct?
20     MR. ZOHRABIAN:  Objection to form.
21     THE WITNESS:  I felt comfortable that
22 analyzing financial releases as Cammer
23 Factor 5 calls for --
24 BY MR. MAINLAND:
25     Q   Does it call for -- sorry, finish.

## Page 111

1  I'm sorry, finish your answer.
2      A   I was comfortable by looking at the
3  financial release dates.  It turns out to be 19
4  of them, yes.
5      Q   So the answer is yes, you were
6  comfortable that a total of 20 event dates was
7  sufficient during this class period --
8      MR DEFENSE:  Objection.
9  BY MR. MAINLAND:
10     Q   -- to conduct a reliable event study?
11     MR. ZOHRABIAN:  Same objection.
12 BY MR. MAINLAND:
13     Q   Is that a controversial question?  I
14 don't know why --
15     A   Because you're twisting it around.
16     Q   It's a very simple question.  Let me
17 just reread -- would you --
18     A   I'm going to sit back and tell you ask
19 me a question that I can answer without being
20 interrupted.
21     Q   I don't think I've interrupted you
22 very much.  The one time I did, I stopped and
23 asked you to finish the question.  So that's not
24 an issue.  But why don't we go back and see what
25 the question was.

## Page 112

1      The answer is yes, you were
2  comfortable that a total of 20 event dates was
3  sufficient during this class period to conduct a
4  reliable event study; is that right?
5      MR. ZOHRABIAN:  I'm going to make the
6  same objection.
7      THE WITNESS:  An event study -- first
8  of all, what an event study is is a study of
9  an event, right.  The event that I analyzed
10 related to the last day of the class period.
11 So I performed an event study for that
12 purpose.  And that's one day.
13     In addition what I did was I analyzed
14 cause and effect relating to the financial
15 releases and that's 19 days.  There's not --
16 I wouldn't necessarily call that an event
17 study, it was just to see whether or not the
18 magnitude -- whether or not there was a
19 statistically significant price return
20 following the financial releases.
21     And then using that binomial
22 distribution to determine the probability of
23 that occurring randomly.  That's what I did
24 there.  Those are two different analysis.
25

## Page 113

1  BY MR. MAINLAND:
2      Q   Okay.
3      A   In addition to that, I quantified, for
4  each day during the class period, the statistic
5  that enabled me to look through the large volume
6  of analysts' reports and media to see whether or
7  not there was any evidence of market
8  inefficiencies that would concern me.
9      In addition to that, I also looked at
10 whether market information was quickly reflected
11 in the stock price and whether or not industry
12 information was reflected in the stock price.
13     Based on all of that, I concluded that
14 Cammer Factor 5 was satisfied.  In terms of
15 market being efficient, I looked at all of the
16 evidence, including Cammer Factor 1, 2, 3 and 4
17 and the Krogman factors.
18     Q   Thank you for summarizing the entirety
19 of your report.  I still didn't get an answer,
20 but I'll move on.  And I would appreciate
21 answers to my questions.  I didn't get one on
22 whether you felt like -- what I heard you to say
23 there is, no, it actually wasn't 20 dates, it
24 was 19 dates.  19 dates sufficient to conduct a

1  reliable event study during this class period?
2      A   For what purpose?
3      Q   For purposes of determining whether
4  there is direct evidence of the SQM ADS price
5  quickly incorporating unexpected new material
6  information?
7      A   And as I explained to you, that's not
8  all I did.
9      Q   So the answer is no?
10     A   It's not no.
11     Q   You needed to do something more?
12         MR. ZOHRABIAN:  Objection to form.
13         THE WITNESS:  Whether or not I needed
14  to do it or not is irrelevant.  I did
15  something more and this was additional
16  evidence and the analysis of the financial
17  releases was one of many things that I did.
18  I have not analyzed whether or not that
19  would be sufficient by itself.
20         If I had problems in the other areas,
21  maybe I would have investigated more.  I
22  didn't.  I had several different indicators
23  that demonstrated that Cammer Factor 5 was
24  satisfied and based on all of that, I
25  concluded that it was satisfied.

1  BY MR. MAINLAND:
2      Q   Why did you look at the market index
3  IPSA?
4      A   Well, I looked at the dollar changes
5  and the market index.  And that is the -- what I
6  considered to be kind of like the equivalent of
7  the S&P 500 in the United States.  So IPSA is a
8  very large -- or it's an index of the larger
9  companies in Chile.
10     Q   Is it fair to say you looked at the
11  index to see whether SQM's ADS price was rapidly
12  incorporating market information?
13     A   Well, that's one thing I used it for.
14  But more importantly, the reason that I used it
15  was to see whether or not there was information,
16  market information in Chile and changes in the
17  exchange rate that could explain portion of
18  SQM's stock price.
19         When I combined the market index and
20  the peer group index, I think the R-squared was
21  above 50 percent, so I can explain a large
22  portion of SQM's stock price.
23     Q   In Paragraph 38 when you refer to
24  IPSA, you say that you found that there was a
25  statistically significant relationship between

1  the market index IPSA and SQM indicating that
2  new and material information, market
3  information, was quickly incorporated into the
4  company's stock price.
5      Why was it relevant to look to whether
6  SQM's ADS was incorporating market information?
7      A   In terms of market efficiency in
8  term -- relates to whether or not information is
9  being incorporated into the stock price.
10     Q   Company specific information, no?
11     A   Market efficiency is not limited to
12  company specific information.
13     Q   Isn't Cammer 5 limited to company
14  specific information?
15     A   No -- well, now we're getting involved
16  in -- Cammer Factor 5 actually relates to
17  company specific information in terms of
18  earnings releases and financial releases.
19         And market efficiency in the context
20  of reliance relates to misrepresentations.
21     Q   Why --
22     A   But it's the same thing with what you
23  were asking me earlier in terms of serial
24  correlation, why would you care about serial
25  correlation or anything else?

1          The reason is that as the Supreme
2  Court pointed out, if you can -- this is my
3  interpretation and you can take it for what it's
4  worth.  But according to the Supreme Court, if
5  you can demonstrate that the market is generally
6  inefficient in incorporating information, then
7  you can presume that misrepresentations are
8  also -- is incorporated into the stock price.
9          So here I'm looking at market
10  information and demonstrating that that
11  information was quickly incorporated into the
12  stock price.
13         This means that there are investors
14  that care about market information and they must
15  have traded on it because if it was a stock
16  where people did not monitor what was happening
17  in the market or the industry, there would be no
18  one buying and selling the stock and no way for
19  that information to become reflected in the
20  stock price.
21     Q   Why do you control for market and
22  industry factors in doing your regression?
23     A   To isolate the company specific
24  factor.
25     Q   Because the company specific factor is

1  what does or does not demonstrate that the ADS
2  is actually incorporating unexpected news,
3  right?
4          MR. ZOHRABIAN:  Objection to form.
5          THE WITNESS:  That relates to company
6  specific information.  If you're going to
7  look at whether or not market information is
8  incorporated, you would obviously not
9  exclude market information.
10         If you're looking at whether or not
11  the company -- company's stock price is
12  incorporating company specific information,
13  what you would you want to do is to exclude
14  market and industry factors.
15  BY MR. MAINLAND:
16     Q    What if the company had issued five
17  financial releases during the class period of
18  1,187 days, would you have conducted an event
19  study premised on those five financial releases?
20         MR. ZOHRABIAN:  Objection to form.
21         THE WITNESS:  If you -- I would have
22  to think about that because financial
23  releases may or may not -- it may be that
24  the analysis would be inconclusive.  I would
25  have to look at and analyze whether or not

1  there was anything -- any informational
2  value from an analysis like that.
3  BY MR. MAINLAND:
4      Q    Well, that's going to the outputs of
5  the study.  I'm talking about the formation and
6  the structure of the study.
7          Would you have been comfortable
8  running an event study where it was premised
9  exclusively on five financial release dates
10  during a five-year class period?
11         MR. ZOHRABIAN:  Objection to form.
12  BY MR. MAINLAND:
13     Q    Would you have viewed that as a well
14  constructed event study?
15         MR. ZOHRABIAN:  Same objection.
16         THE WITNESS:  Well, it's not -- the
17  event studies, there would be five event
18  studies, right.  So the binomial analysis is
19  not -- I guess you can call it an event
20  study if you want.
21         But the question is whether or not the
22  results would be inconclusive or not.
23  And --
24  BY MR. MAINLAND:
25     Q    That's the results, I was asking about

1  the -- I mean, you don't decide whether a given
2  test is appropriately designed based on the
3  results, do you?
4      A    No, but based on the result, you can
5  look at it and determine whether or not the
6  results are inconclusive or conclusive.  So when
7  you run an event analysis, for instance, what
8  happens is that you look at the result and you
9  have to say does it meet whatever benchmarks or
10  not or is there any informational value with the
11  analysis.
12         There is not a problem with doing the
13  analysis per se.  All I'm saying is that, you
14  know, you may end up with an incomplete or
15  results that are not conclusive.  So it does not
16  help you one way or the other.  It's not
17  helpful.
18     Q    Take off your statistician hat.  At
19  the end of the day, you're trying to figure out
20  whether SQM's ADS reacted to new material
21  information; right?
22     A    That's correct, yes.
23     Q    Isn't that just sort of the essence of
24  the test that you're conducting?
25     A    Correct.

1      Q    I'm going to have to make the
2  hypothetical a little more extreme than the one
3  I just did where I referred to five dates
4  because I still wasn't really feeling like I was
5  getting an answer.  So let's just say there was
6  one financial release during 1,187 days.  Would
7  testing that one day tell you anything?
8          MR. ZOHRABIAN:  Objection to form.
9          THE WITNESS:  It would tell you
10  everything with respect to that day.
11  BY MR. MAINLAND:
12     Q    With respect to that day?
13     A    Yes.
14     Q    Okay.  It would tell you everything
15  with respect to that day?
16     A    Yes.
17     Q    That's your testimony.  What would it
18  tell you about the general efficiency of the
19  shares during a 1,187-day class period?
20         MR. ZOHRABIAN:  Same objection.
21         THE WITNESS:  The -- it would tell
22  you -- what you would want to do is to
23  determine, like I did on the last day of the
24  class period, you would see whether or not
25  there was -- you would do a little bit of a

Page 122

1   different test.  What you would do is to
2   determine whether or not the information
3   disclosed was new and material information.
4        Then you would make a determination
5   whether or not this information would likely
6   cause a statistically significant increase
7   or decrease in the stock price.  Then you
8   would perform a test and then you would look
9   at the results of your event study and see
10  whether or not the price reaction was what
11  one would expect in an efficient market.
12  BY MR. MAINLAND:
13       Q    Isn't it your testimony that you would
14  be comfortable conducting an event study
15  premised on a single date during a five-year
16  class period?
17       A    For what purpose?
18       MR. ZOHRABIAN:  Objection.
19  BY MR. MAINLAND:
20       Q    The same question we're asking over
21  and over again here.  Are the shares -- is there
22  direct evidence of market efficiency here?
23       MR. ZOHRABIAN:  Objection to form.
24       THE WITNESS:  If you have one event
25  and you can look at the last event of the

Page 123

1   class period, that is evidence that the
2   stock price quickly reacted to new material
3   and information.  So yes, that would be
4   evidence of market efficiency.
5   BY MR. MAINLAND:
6        Q    So --
7        A    Regardless of how long the class
8   period of time.
9        Q    Let's say there have been no financial
10  releases during this period.  Would you feel
11  comfortable drawing a conclusion or offering an
12  opinion regarding the general efficiency of
13  SQM's ADS premised entirely on the last day of
14  the class period?
15       MR. ZOHRABIAN:  Objection to form.
16       THE WITNESS:  No, because, again, I
17  look at Cammer Factor 1, I looked at Cammer
18  Factor 2, 3, 4 --
19  BY MR. MAINLAND:
20       Q    I'm talking about direct evidence.
21       MR. ZOHRABIAN:  Same objection.
22       THE WITNESS:  I look at everything.  I
23  can exclude Cammer Factor 5.  If only I had
24  Cammer Factor 1, 2 and 3 and knew nothing
25  about Cammer Factor 5, if it meets Cammer

Page 124

1   Factor 1, 2 and 3, as it does in this case,
2   with respect to volume, with respect to
3   analyst coverage and with respect to analyst
4   ownership, in my opinion, the stock would
5   trade in an efficient market in a reliance
6   context.
7   BY MR. MAINLAND:
8        Q    But that wasn't what I'm asking.  I
9   mean, I'm happy to ask you a lot of questions
10  and I will in a little bit.  We can take a break
11  soon if you would like to.  But I intend to ask
12  you about your apparent opinion you stated in
13  your report that the indirect factors are
14  sufficient on their own.
15       But I'm just saying, if you're going
16  to do an event study, you don't want to do an
17  obviously unreliable event study; right?
18       MR. ZOHRABIAN:  Objection to form.
19       THE WITNESS:  No, that's why I'm
20  saying that you make --
21       MR. MAINLAND:  Do you want to take
22  that?
23       MR. ZOHRABIAN:  Can we go off the
24  record for a second?  Is that okay?
25       MR. MAINLAND:  Yes.

Page 125

1        (Discussion off the record.)
2   BY MR. MAINLAND:
3        Q    So I'm literally just talking about if
4   you're going to do an event study, you would
5   want to have some confidence that it's
6   constructed in a way that's going to be
7   meaningful.  Simple as that.  Do you dispute
8   that?
9        A    No, and then you look at the results
10  and --
11       Q    I did not finish my question.  I was
12  trying to lay the predicate for the question.
13       You obviously don't want to design a
14  crazy event study; right?
15       MR. ZOHRABIAN:  Objection to form.
16       THE WITNESS:  I agree with that
17  because --
18  BY MR. MAINLAND:
19       Q    Wouldn't an event study with one event
20  during a five-year class period be a crazy event
21  study?
22       MR. ZOHRABIAN:  Objection to form.
23  BY MR. MAINLAND:
24       Q    To put it colloquially.  Would you
25  ever stake your professional reputation on

1   saying, I've tested a single news days in 1,187
2   trading days and because I see what the share
3   price is doing on that one news day, I've
4   decided the shares traded efficiently for all
5   the other 1,186 days?
6           MS. ZOHRABIAN:  Same objection.
7           THE WITNESS:  I don't want to offend
8       your intelligence here, but that's not what
9       my opinion is based on.
10  BY MR. MAINLAND:
11      Q    That's not what I asked.  We can
12  reread the question.  It's a pretty
13  straightforward question.
14      A    The...
15      Q    Would you like me to restate it?
16      A    No, but I would like you to be quiet
17  when I start answering the question to explain
18  it to you.
19          Different piece of evidence mean
20  different things, okay?  You're going to one
21  event study and you're asking me does that mean
22  that the market for a five-year period is
23  efficient.  I've already explained to you if you
24  look at an event study for one event, which is
25  typically what you do, you look at one event and

1   you analyze it.
2           That will tell you something with
3   respect to that event and whether or not the
4   market process information efficiently with
5   respect to that event.
6           So that was one piece of information.
7   And then in terms of the other part, in terms of
8   concluding that the market for a five-year
9   period is efficient, what you would want to do
10  is to look at all of the evidence and then make
11  a determination on that.
12      Q    So there is no minimal sample size
13  that you're looking for in terms of constructing
14  your event study?
15          MR. ZOHRABIAN:  Objection to form.
16          THE WITNESS:  An event study by
17      definition is the analysis of an event.
18      There is one event, right.
19  BY MR. MAINLAND:
20      Q    Maybe where --
21      A    So if you pick an event and you want
22  to analyze that event and determine whether or
23  not the market reacted or processed the
24  information that was disclosed in that day
25  efficiently, that's what you do.  You analyze

1   it.  If it processed the information
2   efficiently, well, that is in favor of market
3   efficiency.
4           If it didn't, if it was inconclusive
5   or it completely ignored it, you draw a
6   different conclusion.
7       Q    Maybe we're getting bogged down in
8   terminology, so let's put the phrase "event
9   study" aside.
10          You conducted a test here where you
11  looked at 19 financial release dates, you
12  determined that on five of those 19 financial
13  release dates, there had been a statistically
14  significant return.  And you concluded that that
15  was strong evidence that the shares generally
16  traded in an efficient market.  Isn't that fair?
17          MR. ZOHRABIAN:  Objection to form.
18          MR. MAINLAND:  I'll read the words to
19      you.
20          THE WITNESS:  No.
21  BY MR. MAINLAND:
22      Q    I don't know what more I can say here.
23      A    I said it supported trading and
24  efficient market but the test --
25      Q    No, you said the statistical evidence

1   is strong that new -- I'll direct the witness to
2   the bottom of Paragraph 40.  This is after you
3   identified that five of the 19 releases were
4   associated with statistically significant
5   returns.  And the bottom line sentence in that
6   paragraph is:  Consequently, the statistical
7   evidence is strong that new and material company
8   specific information was quickly incorporated
9   into SQM's ADS price.
10          All I'm asking is if there hadn't been
11  19 dates but there had been three dates, four
12  dates, two dates, doesn't really matter, is
13  there some minimal amount that you think is
14  necessary when you're dealing with a class
15  period of this size?
16      A    Well, with respect, when you have a
17  class period of this size, you would end up with
18  19 financial releases.
19      Q    I'm asking you to entertainment my
20  hypothetical.
21          MR. ZOHRABIAN:  Sorry, I'm just going
22      to ask -- I know you guys have been kind of
23      talking quickly over each other, but to the
24      extent that you can refrain and let him
25      finish his answer and also if you can just

1   let him ask his question, that would be
2   better I think for the court reporter.
3        THE WITNESS:  The number of financial
4   releases included is incorporated into the
5   statistical calculation.  Right.
6        So when you do the calculation, that
7   will be incorporated -- so you may have a
8   different result if you have a smaller
9   sample.  And it may end up being
10  inconclusive.  It may end up, as in this
11  case, demonstrating that a chance of this
12  occurring randomly is less than 1 percent.
13       So that is evidence that company
14  specific information was quickly
15  incorporated into SQM's ADS price.
16  BY MR. MAINLAND:
17       Q    What you're referring to there is the
18  cumulative binomial probability test; right?
19       A    Correct, yes.
20       Q    I'll repeat essentially the same
21  question.  If you had four dates and two of them
22  are statistically significant, and let's just
23  assume -- I haven't run the binomial
24  probability, but let's assume that gets you into
25  the range that you concluded was strong evidence

1   of efficiency in this case.
2        Would that be strong evidence of
3   market efficiency?
4        A    Well --
5        MR. ZOHRABIAN:  Sorry, objection to
6   form.
7        THE WITNESS:  That probably would
8   meet -- if you were able to get two
9   statistically significant price movements
10  out of four, that probably would end up
11  showing that -- just mathematically that
12  probably would result in evidence that it
13  was unlikely -- you would reject a null
14  hypothesis, which basically means that you
15  would accept the proposition that new and
16  material company specific information on
17  those days were quickly incorporated into
18  the stock price.
19       But you would have a smaller sample
20  and --
21  BY MR. MAINLAND:
22       Q    That's all I'm asking.
23       A    Yes, you would have a smaller sample.
24  I have had cases where you have small samples
25  like that where I have expanded it outside of

1   the class period just to -- you know, instead of
2   just having four, having eight, for instance,
3   just to get a little bit more.
4        MR. MAINLAND:  Why don't we take a
5   break?
6        MR. ZOHRABIAN:  Okay.  I know we're
7   going to have lunch soon, so what is your
8   sense of --
9        (Discussion off the record.)
10       VIDEOGRAPHER:  This marks the end of
11  media 2, Volume 1 in the deposition of Bjorn
12  Steinholt.  The time is 11:47, and we're off
13  the record.
14       (Recess taken.)
15       VIDEOGRAPHER:  This marks the
16  beginning of media 3, Volume 1 in the
17  deposition of Bjorn Steinholt.  The time is
18  1:04, and we are back on the record.
19  BY MR. MAINLAND:
20       Q    Mr. Steinholt, before the break we
21  were at various times referring to the Cammer
22  factors.  You recall that; right?
23       A    That's correct, yes.
24       Q    And you believe the Cammer factors are
25  very useful in analyzing market efficiency;

1   right?
2        A    I believe so from -- in the context of
3   reliance that is, yes.
4        Q    In the context of reliance as opposed
5   to what other context?
6        A    Well, there is a lot of academic
7   research relating to market efficiency where
8   you're looking at market anomalies and you would
9   use different methodologies for that purpose.
10       Q    I see.  I'll return to that in a bit.
11  But I wanted to ask you, there is a paper
12  that -- well, before I get to that, are you
13  aware of any systematic body of peer reviewed
14  evidence or peer reviewed literature finding
15  that the Cammer factors distinguish between
16  efficient and inefficient stocks?
17       MR. ZOHRABIAN:  Object to form.
18       THE WITNESS:  I referenced one paper
19  here that talks about the Cammer factors.  I
20  think what the Cammer factors does is to --
21  where it's helpful is to identify stocks
22  that are traded in open and developed
23  markets and the academic research have shown
24  time and time again that stocks that trade
25  in open and developed markets trade

1     efficiently in the sense that it is
2     extremely difficult for investors to
3     continuously make abnormal returns, in other
4     words, beat the market.
5  BY MR. MAINLAND:
6     Q    There is an article you cite in I
7  guess Footnote 21 of your report by Brad Barber,
8  Paul Griffin and Baruch Lev.  It's entitled
9  The Fraud-on-the-Market Theory and the
10 Indicators of Common Stocks' Efficiency.
11    A    Yes.
12    Q    You're familiar with that article?
13    A    It's an article that I have read and I
14 have cited here.  I have not read it in a few
15 years, but I know of the article, yes.
16    Q    So you did not reread it in connection
17 with preparing this report?
18    A    No.  This is an article that has been
19 around for more than I think 20 years.
20    Q    And they state at Page 290 of the
21 report -- of their article, I'm sorry, they
22 state:  We know of no systematic body of
23 evidence showing that these or any other
24 criteria -- and they are referring to the Cammer
25 criteria -- distinguish between efficient and

1  inefficient stocks.
2     A    Right.
3     Q    Are you familiar with a systematic
4  body of evidence on that topic?
5        MR. ZOHRABIAN:  I'm just going to
6  object that we'll just take your
7  representation that you accurately read it
8  but we don't see the --
9        MR. MAINLAND:  Why don't we show him
10 the exhibit.  That was Exhibit 5 I think.  I
11 was going to get to it later, so I wasn't
12 withholding it for any reason, but it's fine
13 to mention it.
14       I'm handing the court reporter what
15 will be marked as Steinholt Exhibit 2.
16       (Exhibit 2 was marked.)
17 BY MR. MAINLAND:
18    Q    What I was reading from was on
19 Page 290 of that article at the very top.  In
20 the sentence -- I'm sorry, in the paragraph
21 immediately preceding the top of Page 290,
22 there's discussion of the Cammer factors.  You
23 can see that on 289 in the Cammer v. Bloom case.
24       Then on Page 290 they say:  The
25 various market efficiency criteria applied to it

1  by courts are ad hoc.  We know of no systematic
2  body of evidence showing that these or any other
3  criteria distinguish between efficient and
4  inefficient stocks.
5        I guess the question is:  Are you
6  aware of any systematic body of evidence since
7  they published this that does distinguish
8  between efficient the inefficient stocks?
9        MR. ZOHRABIAN:  I'm just going to
10 object to form.
11       THE WITNESS:  I don't think there has
12 been a lot analysis one way or another.  I
13 think that the reasons why -- I speculate
14 that the reasons why court used them is
15 because they are focused in on evidence that
16 demonstrates that the stocks trade in an
17 open and developed market and believes that
18 it's helpful also to see that, in fact, the
19 stock price do react quickly to new and
20 material information.
21       As I mentioned earlier, I think that
22 in evaluation, for instance, we typically
23 don't go through Cammer factors, we just
24 assume that actively traded stock, that the
25 prices in such markets are efficient and

1  reflect information in it.
2        I think also in academic research, I
3  don't think that even though market
4  efficiency is a premise when you run the
5  event study, academics don't run any
6  specific tests of market efficiency to
7  determine whether or not the market for the
8  stocks that are used in the event study is
9  efficient.
10       Efficiency is presumed with respect to
11 the open and developed markets that were
12 actively traded stocks trade.  So it's kind
13 of like a presumption in academia and in
14 evaluation and -- but in the law, you know,
15 we have these factors which seem reasonable.
16       I think the one that comes the closest
17 probably is the Cammer -- I'm sorry, the
18 Cornell and Rutten article that I cited in
19 here in order to explain why the Cammer
20 factors would be relevant.
21 BY MR. MAINLAND:
22    Q    Okay.  And I'll be asking about the
23 Cornell and Rutten article in a little bit.
24 Before we get to that it, are you aware of
25 any -- of studies that have been conducted

1  finding market inefficiency even in open and
2  developed markets?
3      A    I'm sorry, could you repeat the
4  question?
5      Q    Are you aware that studies have been
6  conducted finding instances of market
7  inefficiency even in situation where the shares
8  trade in open and developed markets?
9          MR. ZOHRABIAN:  I'm just going to
10  object to form.
11         THE WITNESS:  There are anomalies in
12  the market.  So there are a large body of
13  event studies that identify such anomalies.
14  The problem is whether or not you can
15  consistently outperform the market and all
16  of the studies that look at investment
17  returns by actively managed funds
18  demonstrates that that is very, very
19  difficult.
20         It's not that it can't be done, it's
21  just that it is extremely difficult and that
22  most actively managed funds do not meet the
23  market.
24         In fact, when I was in Hong Kong in
25  May of this year, and that's the latest

1  analysis I'm aware of, they also had some
2  data on actively traded funds and the fact
3  that actively traded funds do not beat the
4  market.
5          So given that, you can't -- and that's
6  the basis for saying that, you know, when
7  you have open and developed markets, it is
8  difficult, extremely difficult for ordinary
9  investors to beat the market.
10  BY MR. MAINLAND:
11      Q    Are you familiar with the economists
12  Owen Lamont and Richard Thaler?
13      A    Certainly Richard Thaler.  He won the
14  Nobel Prize recently, yes.
15      Q    Are you aware with their articles
16  regarding the Royal Dutch Shell and Palm-3Com
17  situations?
18      A    Yes, I do.  Yes.
19      Q    Isn't it true that with respect to
20  Royal Dutch Shell, they identified significant
21  inefficiencies in the pricing of two sets of
22  shares notwithstanding the fact that they traded
23  in highly illiquid and open markets?
24      A    They formed two different sets -- my
25  recollection is you were asking me about

1  something that I am obviously not -- I haven't
2  really read or prepared for.  But this is my
3  recollection.  They were talking about a
4  situation where there were no arbitrage
5  opportunities between two different sets of
6  investors who had to do two different valuation
7  views on the respective securities.  Those
8  things happen.
9          I also know that Richard Thaler
10  himself puts the money in index funds because --
11  precisely because he doesn't think that his
12  retirement funds -- he believes that that is the
13  best place to put his retirement fund because
14  it's so difficult to meet the market.
15         MR. ZOHRABIAN:  I'm just going to
16  object to the prior question.  I did not get
17  an opportunity to interject it, it's just an
18  objection to form.
19  BY MR. MAINLAND:
20      Q    With respect to the Palm spinoff from
21  3Com, they discovered the same thing, that there
22  were substantial pricing inefficiencies even
23  though the relevant shares satisfied the Cammer
24  factors?
25         MR. ZOHRABIAN:  Objection to form.

1          THE WITNESS:  Correct.  This relates
2  to whether or not the investors value the
3  information.  And that is a different -- and
4  that's basically where the academic research
5  is, you know, they try and -- it's not that
6  information is not reflected in the stock
7  price, it is whether or not investors
8  correctly interpret and analyze the
9  information.  So that resulting price ends
10  up being correct.  That's a different issue.
11  BY MR. MAINLAND:
12      Q    Are you distinguishing between
13  fundamental efficiency and informational
14  efficiency?
15         MR. ZOHRABIAN:  Objection to form.
16         THE WITNESS:  I'm distinguishing
17  between whether or not -- well, there will
18  always be disagreement whether or not
19  investors are correct in their valuation of
20  information.
21         And that's what this particular
22  research relates to.  And that may be true.
23  Maybe -- and that may be true in any stock
24  that investors are simply not correct.
25         What I'm saying and I think I --

Page 142

1  explained in my report -- let me just find
2  it.  So in Footnote 2, you know, it does not
3  solve the issue of whether or not which
4  investor is correct.  All I'm looking at is
5  whether or not the respective investors'
6  view of the stocks' true value drives their
7  purchases and sales, which in turn becomes
8  the basis for the consensus price set by the
9  overall market.
10        The market may be wrong.  But what I'm
11  saying is that the information is being
12  interpreted by the market and their
13  interpretation, whether or not it's correct
14  or incorrect, becomes reflected in the stock
15  price.
16  BY MR. MAINLAND:
17     Q    And so your understanding -- your view
18  is that the Lamont/Thaler scholarship is dealing
19  not with informational inefficiencies?
20     A    No, well --
21        MR. ZOHRABIAN:  Object to the form of
22  the question.
23        THE WITNESS:  It deals with -- well,
24  you're asking me about an article that I
25  have not read or --

Page 143

1  BY MR. MAINLAND:
2     Q    If you don't know, that's fine.
3     A    So I'm not going to comment on that.
4        But based on my recollection, it deals
5  with what I just said and it relates to whether
6  or not there were arbitrage opportunities
7  between two different set of investors who may
8  have different views in terms of the value of
9  the securities.
10        And based on my recollection, that
11  fits into the issue of whether or not investors
12  are correct in their valuation.
13     Q    But if there --
14     A    Which is a different issue.
15     Q    I understand.  That's what I intended
16  when I referred to a distinction between what is
17  sometimes referred to as fundamental efficiency
18  versus informational efficiency.  Are you
19  familiar with those terms?
20     A    Yes.  And it's -- I'm not sure exactly
21  if I would phrase it that way.  But --
22     Q    And -- but you just mentioned
23  arbitrage opportunities in connection with two
24  sets of shares.
25     A    Yes.

Page 144

1     Q    With respect to the Lamont/Thaler
2  scholarship, isn't the presence of arbitrage
3  opportunities precisely an informational issue?
4     A    That is -- well, arbitrage --
5        MR. ZOHRABIAN:  I object to the form.
6        THE WITNESS:  With respect to Cammer,
7  they viewed arbitrage a little bit different
8  in the sense that they were talking about
9  sophisticated investors who acted quickly on
10  new information.
11        So that if you have two markets like
12  we have in this case, you know, the prices
13  of the two would be -- well, arbitrage in
14  the classic sense, if you have two markets
15  and you have different prices, then
16  arbitrage will kind of force these two
17  prices to be the same.
18        My recollection is that there was a
19  lack of arbitrage opportunities, so you had
20  two different prices back then.  So then,
21  again, I'm stretching my recollection of
22  that particular issue.
23        But I do recall reading about it.
24  BY MR. MAINLAND:
25     Q    Are the standards used by courts in

Page 145

1  assessing market efficiency supported by
2  economic principles?
3        MR. ZOHRABIAN:  Object to form.
4        THE WITNESS:  Yes.
5  BY MR. MAINLAND:
6     Q    Have you ever given any analysis or
7  applied any analysis as to whether the Cammer
8  factors are, in fact, supported by economic
9  principles?
10        MR. ZOHRABIAN:  Same objection.
11        THE WITNESS:  Yes.  I mean, it is
12  supported by academic research, as I said
13  before, that demonstrates that in open and
14  developed markets, actively traded stocks
15  trade efficiently in the sense that it is
16  extraordinarily difficult for anybody but
17  the most sophisticated investors to earn
18  abnormal returns; in other words, beat the
19  market.
20  BY MR. MAINLAND:
21     Q    What do you mean by open and developed
22  markets?
23     A    An open and developed -- an open
24  market is one where if you have a brokerage
25  account, you can buy and sell the shares.

Page 146

1 Developed market means effectively actively
2 traded securities.
3     Q     What is an actively traded security?
4     A     It's one that has sufficient volume to
5 absorb trading when you want to trade it.
6     Q     The first four Cammer factors are
7 frequently referred to as indirect factors;
8 right?
9     A     That's correct, yes.
10     Q     I believe you refer to them that way;
11 is that right?
12     A     Correct.  I just adopt the common
13 language that's being used, yes.
14     Q     What does indirect mean when referring
15 to the first four Cammer factors?
16     A     It means effectively that you're
17 looking at the economic conditions that
18 facilitates market efficiency.
19     Q     And the indirect factors do not
20 measure what the share price in question
21 actually does; right?
22         MR. ZOHRABIAN:  Object to form.
23         THE WITNESS:  No, it's not an analysis
24 of the share price.  It looks at volume, but
25 not the price.

Page 147

1 BY MR. MAINLAND:
2     Q     In other words, it looks at the
3 context in which the shares are trading; is that
4 fair?
5     A     It looks at the market.
6     Q     Okay.
7     A     It looks at the market where the
8 shares traded.
9     Q     But it's not looking at what the
10 shares actually did on a given day; correct?
11     A     It's only the volume, not the price.
12     Q     Right.  What I should have said more
13 clearly is it's not looking at what the share
14 price did on a given day, correct, the four
15 indirect factors?
16     A     Exactly, it does not look at the
17 price, it looks at the overall market and market
18 structure.
19     Q     In Paragraph 17 of your report, you
20 state -- in the second to last sentence there,
21 you state:  From an economic point of view, the
22 indirect factors are by themselves commonly
23 viewed to be sufficient to establish market
24 efficiency in a reliance context.
25     A     Correct, yes.

Page 148

1     Q     Commonly viewed by whom?
2     A     Commonly viewed by the same economists
3 who accepts the notion that actively traded
4 markets are efficient when they run events that
5 is commonly -- common by valuation experts that
6 accepts the market price under FAS 157 as
7 reflecting the value given the available
8 information.
9         So commonly it's the common view of
10 anyone who's familiar with the research that
11 demonstrates that stocks traded in such markets,
12 you know, are efficient in that it is extremely
13 difficult, if not impossible, to beat the
14 market.
15     Q     The only support you cite for it in
16 your report is this Bradford Cornell and James
17 Rutten article; isn't that right?
18     A     No, I think you missed a lot there.  I
19 think that --
20     Q     Am I missing -- there's one citation
21 there.
22     A     There's one citation for this
23 particular sentence, but in terms of the concept
24 that shares that trade on the open and developed
25 markets are efficient, you know, I have a lot of

Page 149

1 footnotes here that talks about that particular
2 issue.
3     Q     And so when you say indirect
4 factors -- when you say -- sorry, withdrawn.
5         When you say open and developed, do
6 you limit that to the four indirect Cammer
7 factors?
8     A     No, I mean, open and -- I'm talking
9 about a U.S. market, U.S. stock market, open and
10 developed shares traded on U.S. stock exchanges
11 such as the New York Stock Exchange and NASDAQ.
12     Q     Okay.  So the sentence says:  From an
13 economic point of view, the indirect factors are
14 by themselves commonly viewed to be sufficient
15 to establish market efficiency in a reliance
16 context.
17     A     Yes.
18     Q     Then there is a footnote at the end of
19 that.
20     A     Yes.
21     Q     Can we at least agree that there's
22 only one article cited in that footnote,
23 Footnote 14?
24     A     Yes.
25     Q     You would agree with that.  Okay.  Is

1   there other authority that you considered
2   putting into that footnote but omitted?
3       A.   No.  I mean, I've discussed the
4   concept and why the indirect Cammer factors are
5   important.  I had a full section before this
6   discussing that.
7           And also I believe that this article
8   itself has certain footnotes to that effect.
9       Q    Okay.  Let's look at the article.  Can
10  we get the Cornell written article, please?
11      MR. MAINLAND: We will mark this
12  article as Steinholt Exhibit 3.
13          (Exhibit 3 was marked.)
14  BY MR. MAINLAND:
15      Q    I've placed in front of you Steinholt
16  Exhibit 3.  It's the article that you cite by
17  Bradford Cornell and James Rutten in Footnote 14
18  of your report.  It's entitled Market Efficiency
19  Crashes and Securities Litigation.
20          You're familiar with this article;
21  correct?
22      A    Yes, I am.
23      Q    Did you read it in connection with
24  reading this report?
25      A    No, I did not, but I'm familiar with

1   it.
2       Q    Have you read it before?
3       A    Yes.
4       Q    In the parenthetical in Footnote 14
5   you quote some direct text from the article and
6   that's on Page 457 of the article.
7           And the particular language you cite
8   is as follows:  There's almost no dispute,
9   however, that for securities traded in open and
10  developed markets as measured by the Cammer and
11  Krogman material, it is reasonable for all but
12  the most sophisticated investors to rely on
13  market prices.  There is, thus, little dispute
14  that with respect to such securities, reliance
15  on the integrity of the market prices (and thus,
16  on the defendant's statements) is appropriately
17  presumed.
18          Do you see that?
19      A    Yes.
20      Q    Now, it says open and developed
21  markets as measured by the Cammer and Krogman
22  criteria.  Cornell and Rutten do not purport to
23  carve out Cammer 5 from that sentence, do they?
24      MR. ZOHRABIAN: Objection to form.
25      THE WITNESS:  I think when you're

1       looking at the totality of the article, I
2       think that is exactly what they do.
3           When they are talking about the
4       indirect Cammer factors in the section
5       before, I think that that is the way that I
6       read it and that is the way that makes
7       sense.
8   BY MR. MAINLAND:
9       Q    Well, why don't I direct you to
10  Page 451 of the article.
11      A    Okay.
12      MR. ZOHRABIAN:  Bjorn, I'm going to
13  let you know that if you need to look beyond
14  the specific places that he's pointing you
15  to understand the full context of the
16  article -- I realize that you read it
17  before, but if you need to do that, feel
18  free to take the time to do so.
19  BY MR. MAINLAND:
20      Q    I'm going to point you to a specific
21  portion of that page on Page 451 in, I guess,
22  the third paragraph on that page, the first
23  under:  Assessing market efficiency for reliance
24  purposes.
25          The very last sentence in that

1   paragraph says:  The Cammer court eschewed such
2   a bright line rule and held that the critical
3   inquiry was not where the securities were traded
4   but whether the market for the particular
5   security was, quote, open and developed, end
6   quote, parentheses, and therefore, in the
7   court's view, inferentially efficient, end
8   parentheses, as demonstrated by five criteria.
9       A    Right.
10      Q    There are five Cammer criteria;
11  correct?
12      A    That's correct, yes.
13      Q    And so here it's referring to open and
14  developed as demonstrated by five criteria.
15          Why do you think the fifth Cammer
16  factor is being carved out of the sentence on
17  Page 457?
18      MR. ZOHRABIAN:  Object to form.
19      THE WITNESS:  The discussion centers
20  around the indirect factors and that is why
21  I -- I have to read it again and it's going
22  to take me some time, but that's fine.
23  BY MR. MAINLAND:
24      Q    Your testimony is that this general
25  discussion in or around Page 457 is centered on

## Page 154

1  the indirect factors?
2      A    Yes.  For instance, on Page 455,
3  second paragraph, it says:  Inasmuch as the
4  Cammer and Krogman factors for the most part do
5  not directly speak to efficiency, but instead
6  speak to whether a market is, quote, open and
7  developed -- which is -- which relates to the
8  first four factors -- they are best understood
9  as constituting an indirect test by which courts
10  infer efficiency for reliance purposes.
11      The Cammer and Krogman courts
12  apparently assume that if the stock is actively
13  traded by a large number of reasonably informed
14  investors -- i.e., if the market is open and
15  developed -- then a threshold level of
16  efficiency can be inferred for reliance
17  purposes.
18      So this discussion centers around the
19  indirect tasks under Cammer and they also add
20  Krogman.
21      And then it goes on to say that:  This
22  assumption makes economic sense given that the
23  market could never be fully efficient but that
24  all securities markets are efficient enough to
25  incorporate a defendant's public statements to

## Page 155

1  some degree.  The fundamental question in the
2  reliance context is whether the market is
3  efficient enough that investors can be presumed
4  to have relied on the integrity of the market
5  price and thus to have relied on defendant's
6  public statements.
7      Q    So is it your testimony that open and
8  developed as used by Cornell and Rutten refers
9  only to the indirect factors?
10      A    Yes.  I mean, that is typically what
11  you mean by open and developed.
12      Q    Even though they say open and
13  developed as demonstrated by five criteria?
14      A    Well, if you understand --
15      Q    Why didn't they say it's developed by
16  four criteria?
17      A    I mean, ask them.  I'm not here to
18  testify what is in their head, I'm just
19  explaining to you the way that I read it and I
20  think it's very clear to anybody who has an
21  understanding of what an open and developed
22  market is, it relates to the market structure
23  whether or not it's open and developed, whether
24  or not people can trade on it and whether or not
25  it's actively traded, which all relate to the

## Page 156

1  indirect factors.  Cammer Factor 5 is a separate
2  and distinct from that.
3      Q    Is there any peer reviewed literature
4  concluding that from an economic point of view,
5  the indirect factors are by themselves
6  sufficient to establish market efficiency?
7      A    As I've explained before, the relevant
8  research is that securities -- when actively
9  managed funds are trying to earn excess return
10  by buying and selling stocks in open and
11  developed markets or actively traded markets,
12  they by and large fail to do so.
13      So that is the relevant research in my
14  view.
15      Q    Okay.  But I'm not hearing any
16  particular articles in there.
17      A    I've cited to probably a handful of
18  articles that explains this concept that
19  publicly-traded securities and on the New York
20  Stock Exchange and NASDAQ can be -- is presumed
21  to be efficient in that they incorporate new
22  information so that it is extraordinarily
23  difficult for anybody but the most sophisticated
24  investors to earn excess return, in other words,
25  beat the market.

## Page 157

1      Q    You don't cite any of those articles
2  in Footnote 14, do you?
3      A    I cited in my report Footnote 14
4  specifically related to the Cammer factors, but
5  the concept of the fact that securities
6  traded -- actively traded securities on the New
7  York Stock Exchange and NASDAQ, that they are
8  generally presumed by pretty much anyone,
9  economists, valuation experts and so on, to be
10  efficient.
11      I've cited quite a few articles to
12  that effect.
13      Q    Do you think the courts are mistaken
14  in considering Cammer 5?
15      A    No.
16      MR. ZOHRABIAN:  Object to form.
17      THE WITNESS:  As the -- the Cammer
18  court was very, very specific.  It said that
19  Cammer Factor 5 was helpful.  It also -- but
20  it also added that, quote:  As previously
21  noted, one of the most convincing ways to
22  demonstrate efficiency would be to
23  illustrate over time a cause and effect
24  relationship between company disclosures and
25  resulting movements in stock price.

1    However, as mentioned, as such -- as
2    mentioned, such a showing would be difficult
3    because it would require exploration of
4    materiality and causation issues.
5    Plaintiffs will not be required to delve
6    into such issues at this early stage, end
7    quote.
8         That's Footnote 6 of my report.
9         So I think that Cammer -- the Cammer
10   court understood that Cammer Factor 5 would
11   be helpful.  They understand the importance
12   of it, but they also -- I don't think that
13   they intended it -- I may be wrong, I'm not
14   the legal expert, but I don't think that
15   they intended it to be necessary.
16   BY MR. MAINLAND:
17        Q    They also -- the Cammer court also
18   referred to Cammer Factor 4 as helpful, didn't it?
19        A    Where?
20        Q    In Cammer v. Bloom, the court in
21   Cammer said Cammer Factor 4 would be helpful?
22        A    Yes.  I mean, that was one of the
23   factors that they looked at, yes.
24        Q    We'll return to that in a bit.
25        In Paragraph 17 you say that:  The

1    indirect factors are by themselves commonly
2    viewed to be sufficient to establish market
3    efficiency in a reliance context.
4         I asked you a little earlier about
5    what you meant by that and I think you referred
6    to market anomalies.
7         Maybe I'm mixing it up.  But I asked
8    you before when you used the words "in a
9    reliance context" as opposed to what other kind
10   of context do you have in mind?  What are you
11   trying to emphasize by using those words?
12        MR. ZOHRABIAN:  Object to form.
13        THE WITNESS:  Correct.  So it is --
14   let me just -- in Paragraph -- this is just
15   my reading of the Supreme Court and
16   Halliburton and in Paragraph 14, I quoted
17   that Supreme Court decision.  Quote:  The
18   Basic court acknowledged a debate amongst
19   academics and declined to enter the fray
20   declaring that, quote, we need not determine
21   by adjudication what economists and social
22   scientists have debated through the use of
23   sophisticated statistical analysis and
24   application of economic theory, end quote.
25   To recognize the presumption of reliance,

1    the court explained, was not, quote,
2    conclusively to adopt any particular theory
3    of how quickly and completely publicly
4    available information is reflected in the
5    market price, unquote.
6         The court instead based the
7    presumption on the fairly modest premise
8    that the, quote, market professionals
9    generally consider most publicly announced
10   material statements about companies, thereby
11   affecting stock market prices, end quote.
12        So in other words, there is a
13   difference between what -- the academic
14   research relating to anomalies and the
15   analysis in Cammer which only focuses --
16   well, which focuses on indirect factors to
17   make sure that the market factors are there
18   so that reliance can be properly presumed a
19   fraud-on-the-market case.
20   BY MR. MAINLAND:
21        Q    Is it your view that the court in
22   Cammer and the Supreme Court in Halliburton too
23   essentially adopted a more permissive standard
24   of efficiency in a reliance context than
25   economists consider when they are engaged in

1    academic debates?
2         MR. ZOHRABIAN:  Objection to form.
3         THE WITNESS:  In fact, I think what
4    they are focusing in on is reliance and
5    whether or not the miss -- whether or not
6    one can presume that material
7    misrepresentations became reflected in the
8    stock price.  I think that's the primary
9    focus.
10        I don't think that it is whether or
11   not the market is perfectly efficient.  As
12   Eugene Foma has explained, a perfectly
13   efficient market is a -- is an unrealistic
14   null -- extreme null hypothesis that nobody
15   literally believes is true.
16        As I explained earlier this morning,
17   as Grossman and Stiglitz demonstrated in
18   their 1980 paper, an informationally
19   efficient market is an impossibility
20   because, of course, there are inefficiencies
21   in a market.  That's what drives the
22   competition.  That's why people analyze
23   stocks and that's why some people make
24   money.
25        But I don't think it was intended -- I

Page 162

1    don't think the courts really are that
2    focused in on whether or not the markets are
3    correct.  I think it is more of an issue of
4    reliance, is it reasonable to rely on the
5    stock price as having incorporated the
6    alleged misrepresentations in the stock
7    price.
8  BY MR. MAINLAND:
9       Q    And I'm familiar with the
10   Grossman-Stiglitz paradox you're referring to.
11   What I'm having a hard time understanding is
12   when you use the words "in a reliance context,"
13   what other contexts might there be in which an
14   analysis of market efficiency might be
15   important?
16          MR. ZOHRABIAN:  Objection, asked and
17   answered.
18          THE WITNESS:  Well, you can have all
19   sorts of different analyses of market
20   efficiencies, and academic research have
21   performed some or a lot of them where they
22   believe that investors effectively are
23   incorrect.
24          The issue there is not whether or not
25   information becomes reflected in the stock

Page 163

1    price, it is whether or not the
2    information -- it is whether or not the
3    information is correctly evaluated by
4    investors, which is a very subjective issue.
5          I quoted one article in Paragraph 12
6    from one academic article and they say,
7    quote:  Financial economists have shown
8    repeatedly that stock prices react quickly
9    to the release of important new information.
10   Though they may differ in their
11   interpretation of this evidence, they do
12   exist -- they do agree it exists.
13          Even prominent financial economists
14   with divergent interpretation of the
15   evidence of market efficiency share similar
16   views on how stock prices react to new
17   information, end quote.
18  BY MR. MAINLAND:
19      Q    What about in the damages context?
20          MR. ZOHRABIAN:  Object to form.
21          THE WITNESS:  That's an interesting
22   issue because the Cornell/Rutten article
23   actually leans towards using fundamental
24   analysis for the purposes of the damage
25   analysis.

Page 164

1  BY MR. MAINLAND:
2       Q    More than leans towards, doesn't it
3    affirmatively propose that?
4       A    Yes, exactly.  That's what I meant.
5       Q    Okay.
6       A    So one of the things it advocates is
7    that instead of relying on the market being
8    efficient and someone, why not do the final
9    analysis and do it that way, so --
10      Q    Do you agree with that aspect of the
11   article?
12      A    No, I don't agree with that aspect of
13   it.  I think that using the event studies is
14   preferable when possible.  It may not always be
15   possible.  There has been instances where I have
16   used fundamental analysis myself and so I don't
17   think that -- I don't think it's wrong to use
18   fundamental analysis.
19          All I'm saying is that in my
20   experience, it is preferable to rely on the
21   event study first and then, you know, if you
22   need to, for instance, parse a price decline or
23   do some adjustments, then use fundamental
24   analysis for that purpose.
25      Q    So, I mean, you do cite the

Page 165

1    Cornell/Rutten article approvingly in your
2    report; correct?
3       A    I do cite it approvingly in respect to
4    the portions I agree with.
5       Q    So you agree with the portions that
6    say the Cammer factors generally are an
7    appropriate gauge of market efficiency in the
8    reliance context; is that right?
9       A    Correct, yes.
10      Q    But you disagree with the portion of
11   their opinion that says that applying efficient
12   market theory in the damages context permits
13   plaintiffs to use ex post selection bias to take
14   unfair advantage of market crashes and recover
15   sums greatly in excess of actual damages?
16          MR. ZOHRABIAN:  Objection to form.
17          THE WITNESS:  Yes.  I disagree with
18   that.  I think that the event study is the
19   best methodology, although there could -- as
20   I said before, it's not that I disagree with
21   his view that it can be done on a
22   fundamental basis as well.  In my
23   experience, the concerns that he addresses,
24   I don't think that those concerns outweighs
25   the benefit of using the event study.

1          But it could be on a case-by-case
2      basis, maybe there are some cases where he's
3      correct, maybe there are some cases where
4      I'm correct.  But in general, I think that
5      in my practice, or in my experience, using
6      the event study for the purposes of
7      quantifying damages has been the best
8      methodology.
9  BY MR. MAINLAND:
10     Q    What is the substantive basis for your
11     disagreement with Cornell/Rutten on this damages
12     issue other than the fact that it aligns with
13     the interests of plaintiffs?
14         MS. ZOHRABIAN:  Objection to form.
15         THE WITNESS:  I'm not sure it aligns
16     with the interest of plaintiffs.  I think
17     that it's more unbiased.  In other words,
18     you can -- the event study that plaintiffs
19     have and the event study that defendants
20     have is a fairly unbiased analysis of the
21     impact of the information on the stock
22     price.
23         To the extent you want to adjust that
24     price decline by some fundamental analysis,
25     I don't necessarily have a problem with that

1      if it is appropriate.
2          But the thing with the event study is
3      that you're not going to -- you're going to
4      have something that's unbiased in the sense
5      that it doesn't benefit one side or the
6      other.
7  BY MR. MAINLAND:
8      Q    You don't think it's in the interest
9  of plaintiffs -- let me withdraw that.
10         Maybe I misunderstood the question.  I
11     was asking what is the basis of your
12     disagreement on damages other than that
13     disagreement happens to align with the interests
14     of plaintiffs?
15         MR. ZOHRABIAN:  Same objection.
16         THE WITNESS:  I don't agree with the
17     notion that the disagreement happened to
18     align with the interests of plaintiffs.
19  BY MR. MAINLAND:
20     Q    Let me just --
21     A    If I can explain.  The event study
22  or -- to the extent that investors incorrectly
23  incorporates the information -- in other words,
24  that the impact is not the fundamental impact --
25  it can be greater or it can be lesser than the

1  actual or the fundamental impact.  You don't
2  know that it's going to be greater, you don't
3  know it's going to be less.
4          So I just -- it doesn't bias the
5  analysis in favor of one or the other.
6      Q    What doesn't bias the analysis?  I
7  don't know what the bias is you're referring to.
8      A    You're saying -- you say the event
9  study is preferential to plaintiffs; in other
10 words, that it has a bias.  I'm talking about
11 the bias that I understood you to argue there
12 is.  What I'm saying is that if you do it on a
13 fundamental basis and if you have an event study
14 and you have a fundamental analysis, if
15 investors are correct, it should be exactly the
16 same, okay.
17         If investors are incorrect, well, they
18 may be incorrect in that the fundamental
19 analysis comes up with less damages or more
20 damages.  It can go in either direction.
21     Q    So they discuss market crashes and
22 their argument is that using efficient markets
23 or what you've been referring to as an event
24 study template systematically overcompensates
25 plaintiffs in those contexts?

1          MR. ZOHRABIAN:  Objection, form.
2  BY MR. MAINLAND:
3      Q    Isn't that their argument?
4      A    That may be true in a market crash
5  case if, in fact, the market overreacts and
6  legally you're not entitled to that recovery.
7  Part of this is a legal question.
8          You know, if -- let's say that the
9  market overreact, you lost the money.  Why did
10 you lose the money and is that money
11 recoverable?
12         Part of that is a legal issue, so that
13 has to be also determined.
14     Q    So -- but in a nutshell, you agree
15 with the portion of Cornell written on reliance
16 but disagree with their argument on damages; is
17 that a fair summary?
18         MS. ZOHRABIAN:  Object to form.
19         THE WITNESS:  I think it's a
20 simplified summary, but it's not complete.
21 I think that there is, as I said before,
22 certainly times where I agree with him that
23 doing fundamental analysis is necessary and
24 I have done fundamental analysis in my cases
25 myself.

1   So I'm not disagreeing with the
2   validity of using fundamental analysis.  But
3   my preference is to do event study for the
4   reasons that I stated.
5   BY MR. MAINLAND:
6     Q    You go on in your report to say that
7   the fifth -- that Cammer 5 demonstrates cause
8   and effect.  What does that mean?
9     A    It means -- well, cause and effect, it
10  means new material information comes out and it
11  impacted the stock price.
12    Q    So the fifth factor looks to the
13  actual reaction of the share price to new and
14  material information; right?
15      MR. ZOHRABIAN:  Object to form.
16      THE WITNESS:  Yes, that's -- yes, it
17  looks at the share price reaction to new
18  material information, yes.
19  BY MR. MAINLAND:
20    Q    And the fifth factor is often referred
21  to as the direct factor; correct?
22    A    Yes, I have referred to it as a direct
23  factor and that is a common thing.  I think that
24  maybe Cornell said that analyst reports also was
25  a direct factor, but that is not commonly how

1   the term "direct factor" is used.
2     Q    Right.  Okay.  So I'm just speaking
3   more generally, occasionally that Cammer 5 is
4   referred to as the direct factor; right?  Is
5   that right?
6     A    Yes.
7     Q    And occasionally it's referred to as
8   the empirical factor; is that right?
9     A    I don't know.
10    Q    You have not heard it referred to as
11  the empirical factor?
12    A    No, I don't think -- maybe I have,
13  maybe I have not.  Typically they talk about
14  it -- or typically the term direct factor is
15  used.
16    Q    You would agree, sir, that the
17  ultimate test of market efficiency is a stock's
18  actual price reaction to unexpected new material
19  information, would you not?
20      MR. ZOHRABIAN:  Object to form.
21      THE WITNESS:  In a sense that is --
22  yes, it's the direct test.  So on a
23  particular day, you can actually demonstrate
24  that on that day, new information came out
25  and if the stock price reacted to that,

1   then -- well, then I think you have
2   irrefutable evidence that the stock price
3   reacted to new material information.
4   BY MR. MAINLAND:
5     Q    When you say irrefutable evidence,
6   you're saying assuming the evidence is, in fact,
7   irrefutable?
8     A    No, I'm saying that if you have --
9   yes, I mean --
10    Q    A lot of things can be refuted, I
11  mean -- okay.  I don't mean to argue with you,
12  I'm trying to understand the word "irrefutable."
13    A    If you have new information and you
14  have evidence that the stock price reacted to
15  that information, well, then, you know --
16    Q    If it reacted, it reacted?
17    A    Exactly.
18    Q    Okay.  You would agree that the
19  empirical factor is in many ways the most
20  important of the Cammer factors?
21      MR. ZOHRABIAN:  Object to form.
22      THE WITNESS:  I think -- no.  I think
23  it is good to look at it.  I don't
24  necessarily think it is the most important
25  factor.  I think it is the one where you can

1   bring the most subjectivity into the
2   analysis.
3       I think defendants may like it because
4   you can obfuscate the issue more with Cammer
5   Factor 5 because you can use subjectivity
6   and add that into an argument that
7   effectively second guess investors' actions
8   and reactions to new information.
9       So you can basically say, well, you
10  know, you have this investor that says
11  something negative, why doesn't the stock
12  price decline.  Well, it's only one investor
13  or it's just one analyst report.  The market
14  may interpret things differently than this
15  particular investor or this particular
16  analyst.
17      So it's much easier I think to bring
18  subjectivity into the analysis.  As such, I
19  don't think that other than -- you know, the
20  type of analysis that I perform, I don't
21  think that it necessarily -- it's a good
22  thing to look at, but I don't think that it
23  is the most important one.
24  BY MR. MAINLAND:
25    Q    And that's because you think

1    defendants like to obfuscate, that's the reason
2    for --
3          MR. ZOHRABIAN:  Object to --
4    BY MR. MAINLAND:
5          Q    -- your view?
6          A    I think that there is an opportunity
7    to introduce subjectivity into the analysis.
8          Q    Why would defendants be any more
9    motivated to obfuscate than the plaintiffs?
10          MS. ZOHRABIAN:  Same objection.
11          THE WITNESS:  I think that with
12    respect to the issue of market efficiency,
13    that's pretty much -- you pretty much have
14    unanimous view in terms of how actively
15    traded stocks trade in the U.S. stock
16    market.
17          I think on this particular issue, not
18    necessarily other issues, but in terms of
19    market efficiency, plaintiffs have the best
20    arguments, quite frankly.
21          So it's very difficult in my view to
22    rebut the presumption of market efficiency
23    unless it is unique circumstance.
24    BY MR. MAINLAND:
25          Q    If a plaintiffs wants to certify the

1    class, why are they any less motivated?  In
2    fact, aren't they more motivated to obfuscate?
3          MR. ZOHRABIAN:  Objection to form.
4          THE WITNESS:  I don't think I
5    testified in terms of motivation.  I said
6    that --
7    BY MR. MAINLAND:
8          Q    You said defendants like to obfuscate
9    and that's why we should not trust Cammer 5.
10          MR. ZOHRABIAN:  Objection.
11          THE WITNESS:  No --
12    BY MR. MAINLAND:
13          Q    Let me ask a question.  Do you
14    disagree with the Cammer court's holding and its
15    statement that the Cammer Factor 5 is the
16    essence of market efficiency?  Do you disagree
17    with that statement?
18          A    No.
19          Q    So you agree that it's the essence of
20    market efficiency?
21          MR. ZOHRABIAN:  Objection to form.
22          THE WITNESS:  Correct.
23    BY MR. MAINLAND:
24          Q    And yet defendants like it because
25    they like to obfuscate and that it shouldn't be

1    trusted for that reason.  Is that your
2    testimony?
3          MR. ZOHRABIAN:  Objection,
4    mischaracterizes testimony.
5          THE WITNESS:  It's not my testimony.
6    If you want me to provide my testimony, you
7    can be quiet and listen to what I've said.
8    BY MR. MAINLAND:
9          Q    I've listened to what you said for the
10    last two minutes and that seems to be the gist
11    of it.
12          MR. ZOHRABIAN:  Objection to form.
13    BY MR. MAINLAND:
14          Q    Do you disagree with the Cammer
15    court's statement that the empirical factor, the
16    direct factor, Cammer 5, is the foundation for
17    the fraud-on-the-market theory?
18          MR. ZOHRABIAN:  Same objection.
19          THE WITNESS:  I believe that cause and
20    effect is the key.  It is whether or not
21    price reacted to defendant's
22    misrepresentations.
23    BY MR. MAINLAND:
24          Q    And you would agree the other four
25    factors, the indirect factors, are indicators of

1    market efficiency but it's the direct factor
2    that focuses on whether the market is actually
3    efficient; is that fair?
4          MS. ZOHRABIAN:  Object to form.
5          THE WITNESS:  That is fair.  My point
6    is that you can more objectively assess the
7    indirect factors than the fifth Cammer
8    factor because the fifth Cammer factor you
9    can always bring all sorts of different
10    subjectivity into it such as what is the
11    definition of market efficiency, you know,
12    if you have an arbitrage opportunity, does
13    that automatically means that defendant's
14    misrepresentations are not incorporated into
15    the stock price.
16          You can always second guess analysts
17    or you can second guess the market.  So
18    there's a host of subjectivity that gets --
19    that can be introduced.
20          What I try to do is to do tests for
21    Cammer Factor 5 that are objective and it
22    demonstrates cause and effect but still are
23    objective without bringing in that level of
24    subjectivity.
25

Page 178

1    BY MR. MAINLAND:
2        Q    Now, in Paragraph 18 you refer to
3    Cammer Factor 5 as, quote/unquote, helpful.  Is
4    that your way of saying that it's ultimately
5    unnecessary?
6            MR. ZOHRABIAN:  Objection to form.
7            THE WITNESS:  Actually, the term
8    helpful comes from Cammer court.
9    BY MR. MAINLAND:
10       Q    Okay.  Is that the reason you used
11   that word?
12       A    Yes, it's the term used by the Cammer
13   court, yes.
14       Q    Just like the word -- the exact same
15   word used with respect to Cammer 4, are you
16   aware of that?
17           MR. ZOHRABIAN:  Objection to form.
18           THE WITNESS:  Cammer Factor 4 --
19   BY MR. MAINLAND:
20       Q    I'll just represent to you the Cammer
21   court also referred to Cammer Factor 4, not just
22   Cammer Factor 5, as, quote/unquote, helpful?
23       A    Yes.
24       Q    You didn't use that word with respect
25   to Cammer Factor 4, I don't believe?

Page 179

1        A    I have no problem using it with
2    respect to anything.  I mean, that's fine.
3        Q    Is it your view that the court can
4    simply disregard Cammer Factor 5?
5            MR. ZOHRABIAN:  Objection to form.
6    BY MR. MAINLAND:
7        Q    Doesn't it need direct evidence?
8        A    If you could ask one question at a
9    time.
10       Q    I wasn't done with my question.  You
11   were the one who was answering it before I was
12   done.  Look, let's commit to this.  Let me
13   finish my questions.  I'll let you finish your
14   answers as long as they don't go on for ten
15   minutes.  Go ahead.
16           MR. ZOHRABIAN:  I'll say no answer has
17   gone on for ten minutes.
18           THE WITNESS:  Let me just repeat the
19   question.
20   BY MR. MAINLAND:
21       Q    Is it your testimony that a court in
22   assessing market efficiency can disregard Cammer
23   Factor 5?
24       A    Absolutely not.  I think that if there
25   is evidence, relevant evidence relating to

Page 180

1    Cammer Factor 5, I think that that should
2    absolutely be considered by the court.
3        Q    And you cite in your report -- you
4    cite a lot of cases in your report, a lot of
5    case law.  But you cite in particular a recent
6    decision called Waggoner v. Barclays in
7    Footnote 15.
8            Are you offering an opinion on the
9    law?
10       A    No.
11       Q    So why did you discuss what Cammer
12   requires, what the Barclays decision says?  Why
13   is that relevant to your analysis if you are a
14   securities analyst?
15           MR. ZOHRABIAN:  Objection to form.
16           THE WITNESS:  When you do the
17   analysis -- and it doesn't matter.  It can
18   be if you do an evaluation or any type of
19   analysis, what you're trained to do, at
20   least in evaluation, is that -- what you
21   want to do is to communicate clearly what
22   you're trying to do.
23           So I'm not telling anybody what the
24   law is.  But I am communicating what my
25   understanding is of the law and provide a

Page 181

1    context to what I'm doing so that, you know,
2    I am not opining that the market for SQM is
3    perfectly efficient.  What I'm doing is I'm
4    using certain factors that has been provided
5    by a particular court in order to see
6    whether or not it meets -- whether or not
7    these factors are being met.
8            And I'm using the language that Cammer
9    used in terms of Cammer Factor 5 and I have
10   this Second Circuit opinion, given that this
11   is a Second Circuit case, relating to their
12   view in terms of what the importance of
13   Cammer Factor 5 is.
14   BY MR. MAINLAND:
15       Q    On this sentence that I have returned
16   to a number of times, it says:  From an economic
17   point of view, the indirect factors are by
18   themselves commonly viewed to be sufficient to
19   establish market efficiency in a reliance
20   context.
21           I went back through some of your past
22   reports.  And about four or five years ago, I'm
23   not being perfectly precise here, that sentence
24   appeared.
25           You used to have a very equivalent

Page 182

1  paragraph for many years that didn't have that
2  sentence. What was it that changed in the
3  economic thinking that caused you to add that
4  sentence in that now appears in virtually every
5  report you've done since?
6        MR. ZOHRABIAN: Objection to form.
7        THE WITNESS: I have no clue. What I
8  try to do is keep the reports very, very
9  similar. As time goes on, there is things I
10 change for whatever reason but then those
11 changes then stick with the subsequent --
12 may stick with a subsequent report.
13       I have no -- I don't know what the
14 language was before, I don't -- I have no
15 clue what caused the change other than I
16 most likely sat by the computer and I
17 thought, well, this is a good sentence and I
18 typed it in.
19 BY MR. MAINLAND:
20    Q    Did your lawyer suggest the sentence?
21    A    It definitely was not the lawyers.
22       MR. ZOHRABIAN: Objection to form.
23 I'll caution you not to get into any
24 communications you had with attorneys.
25       MR. MAINLAND: We've been going for

Page 183

1  about an hour and 15 minutes. Why don't we
2  take another break.
3        VIDEOGRAPHER: This marks the end of
4  media 3, Volume 1 in the deposition Bjorn
5  Steinholt. The time is 2:07, and we're off
6  the record.
7        (Recess taken.)
8        VIDEOGRAPHER: This marks the
9  beginning of media 4, Volume 1 in the
10 deposition of Bjorn Steinholt. The time is
11 2:30, and we're on the record.
12 BY MR. MAINLAND:
13    Q    Mr. Steinholt, in all of the reports
14 you've done on market efficiency, it's been your
15 practice to include an event study or other
16 empirical analysis of market efficiency;
17 correct?
18    A    Yes, I'm pretty sure that's true.
19    Q    Have you ever submitted a report on
20 market efficiency in which you did not include
21 an event study?
22    A    I can't imagine I have, no.
23    Q    Have you ever -- withdrawn.
24       Your opinion in your report regarding
25 damages, that opinion is that an event -- let me

Page 184

1  rephrase. Sorry.
2        Your opinion is that an event study
3  can be used to estimate damages; is that fair?
4    A    The event study framework can be used
5  to estimate damages which would include an event
6  study and, if necessary, some modifications
7  using fundamental valuation tools.
8    Q    What kind of modifications would those
9  be?
10   A    In some cases, sometimes there is two
11 pieces of information that's being disclosed and
12 one piece relate to the fraud and one piece does
13 not relate to the fraud.
14       So what you want to do is that you
15 want to take a look at the company specific
16 price movement, but you want to only use the
17 fraud related component of the company specific
18 price movement in the damage analysis.
19   Q    So you're referring to isolating
20 confounding factors, for instance?
21   A    Correct, yes.
22   Q    But in your report, in Section 5, the
23 final section of your report that is entitled
24 Using the Event Study Framework to Calculate
25 Classwide Damages, that section of the report

Page 185

1  doesn't refer to any fundamental analysis, does
2  it?
3    A    I state that in some circumstances
4  generally event study methodology described in
5  the article that I included in Footnote 56 is
6  refined using fundamental valuation tools based
7  on the premise that the present value of an
8  investment is a reflection of its future cash
9  flows, including the riskiness of these cash
10 flows.
11       So if necessary, that is obviously
12 what you would have to do.
13   Q    If an event study is not sufficient to
14 prove efficiency in the reliance context, can it
15 be used to reliably estimate damages?
16       MR. ZOHRABIAN: Objection to form.
17       THE WITNESS: I'm not sure I follow.
18 Are you saying that there's nothing wrong
19 with the event study?
20 BY MR. MAINLAND:
21   Q    Sure. If for whatever reason -- I
22 know you believe in your event study, so we're
23 not going to -- I'm not asking you to accept
24 that there's any particular flaw in your event
25 study.

1    I'm just saying if an event study were
2  determined to be unreliable for purposes of
3  showing market inefficiency, would it be
4  workable as a means of estimating damages?
5         MR. ZOHRABIAN:  Objection to form.
6         THE WITNESS:  I would like to study
7  that particular scenario and I would like to
8  know why it would be unreliable.  I would
9  like to know -- I just would want to know
10  why and whether or not it's something
11  fundamentally wrong with the event study
12  methodology, which -- I would like to know
13  what that is or whether or not it relates to
14  the application of the event study that made
15  it unreliable.
16  BY MR. MAINLAND:
17    Q    Going back to the sentence we've
18  talked about where you said the indirect factors
19  are sufficient by themselves to establish market
20  efficiency, your opinion is that the indirect
21  factors are, in fact, satisfied in this case;
22  right?
23         MR. ZOHRABIAN:  Objection to form.
24  BY MR. MAINLAND:
25    Q    That's a yes or no question.

1    A    My opinion is that the indirect
2  factors in this case is satisfied -- the first
3  part of your question is not exactly my
4  position.  My position is certainly that if the
5  only evidence that you have is that indirect
6  factors are satisfied, then I would conclude
7  that the market is efficient because that would
8  be consistent with economic research.
9         But if you in addition have an
10  analysis, a Cammer Factor 5 type analysis that
11  refutes that, that demonstrates that the market
12  is inefficient, then I probably -- then I would
13  weigh that higher than the indirect factors.
14         All I'm saying is that if that's the
15  only evidence that you have, I would conclude
16  that the market is efficient.
17    Q    And taking that as the premise, that
18  you only have the four factors, presenting that
19  to the judge, not even going into the fifth
20  factor, but the four factors are overwhelmingly
21  satisfied, that's your opinion that you convey
22  to the judge, aren't you effectively saying that
23  he does not need an event study in order to
24  conclude, to agree with you that the market is,
25  in fact, efficient; right?

1         MR. ZOHRABIAN:  Object to form.
2         THE WITNESS:  That's a determination
3  that the judge has to make.
4  BY MR. MAINLAND:
5    Q    But you're offering an opinion to the
6  judge.
7    A    Yes, and he --
8    Q    You would want him to agree with your
9  opinion; right?
10    A    I just want to answer the question.
11  I'm not here to tell the judge what
12  the judge should consider or not consider.  I'm
13  providing an opinion and I'm explaining the
14  basis for my opinion.
15         In this case I have analyzed five
16  Cammer factors and three Krogman factors and I
17  have determined that the -- based on all of
18  those, I have determined that the market is
19  efficient.
20    Q    I've read your report, I know what you
21  say in it.
22    A    Jeez.
23    Q    It's not responsive to my question.
24    A    I'm explaining to you --
25    Q    I don't think you are.  You're not

1  answering the question.
2    A    I mean --
3    Q    I'm asking you to answer the question.
4  Can I rephrase the question?
5    A    I'm explaining to you -- I mean, if
6  you're going to tell me what my opinions are and
7  I believe that to be inaccurate, okay, I have
8  the right to correct you, okay.
9    Q    You clearly were not listening because
10  I didn't say anything about what your opinion
11  is.  Let's back up and try to go back to the
12  hypothetical I originally set.
13         The hypothetical is you have not done
14  the direct factor at all, just haven't looked at
15  it because you thought the first four indirect
16  factors overwhelmingly establish market
17  efficiency.  And you convey that information to
18  the judge in your report.  Let's assume that's a
19  report that you conveyed to the judge.  There is
20  no event study.
21         Could you then satisfy the judge that
22  there is a workable damages model?
23         MR. ZOHRABIAN:  Objection to form.
24         THE WITNESS:  I'm sorry.  Damages
25  model?

1   BY MR. MAINLAND:
2       Q    Is that confusing?  Yes, because we
3   were talking about an event study showing
4   damages.  Point 5 of your report discusses an
5   event study establishing or estimating damages.
6   You need an event study to estimate damages, do
7   you not?
8           MR. ZOHRABIAN:  Object to form.
9   BY MR. MAINLAND:
10      Q    Your testimony is that they are used
11  all the time?
12      A    Your testimony is that that's done all
13  the time, is that a question?
14      Q    I asked the question:  Your testimony
15  is that they are used all the time; is that not
16  right?
17          It's in the report.  We can read it.
18      A    You added "is that not right" in order
19  to make me answer the question.  I was just
20  waiting --
21      Q    I thought in context it was clear, but
22  now it's abundantly clear.
23      A    In order to do an -- if you're going
24  to use an event study to quantify damages, you
25  obviously would have to perform an event study.

1   It typically will not be the event study that
2   you perform for the purposes of market
3   efficiency.
4           Because what you're trying to do when
5   you're quantifying damages is to isolate the
6   fraud related events.  Consequently, there are
7   things that you would do to the event study in
8   order to try to isolate the fraud related events
9   that you would not do for the purposes of market
10  efficiency.
11          So the -- it's not necessary -- the
12  event study for the purposes of market
13  efficiency may or may not be the event study
14  that you used to quantify damages.
15      Q    A little bit earlier -- I'm just
16  thinking through your answer.  A little bit
17  earlier you said that you would -- if, let's
18  say, the judge determined that the event study
19  used to demonstrate direct evidence of market
20  efficiency was unreliable and you said something
21  to the effect of:  I would need to know in what
22  sense it was unreliable.
23          Let's just say the judge were to look
24  at your event study and the tests that you ran
25  based on the event study and say:  I don't view

1   that as sufficient evidence to demonstrate
2   direct evidence of market efficiency.
3           Could you then turn around and use an
4   event study to propose a workable damages model?
5           MR. ZOHRABIAN:  Object to form.
6           THE WITNESS:  If I understand your
7   hypothetical, there's nothing wrong with the
8   event study itself.  It is just the
9   quantification of using the binomial
10  distribution to demonstrate cause and effect
11  there.  Then it seems to me that there is
12  nothing wrong with the event study, so --
13  but I don't necessarily think that you would
14  use the event study that I have submitted
15  for market efficiency purposes to quantify
16  damages in any event.
17          So it's kind of irrelevant in terms of
18  my argument that you can use -- my argument
19  related to the methodology unless the
20  argument is an event study for purposes of
21  quantifying damages cannot be constructed.
22  BY MR. MAINLAND:
23      Q    Is it logical to say, I believe the
24  event study is insufficient to show direct
25  evidence of market efficiency but I believe that

1   an event study can nonetheless estimate damages?
2           MR. ZOHRABIAN:  Objection to form.
3           THE WITNESS:  Presumably the two event
4   studies are different in any event for the
5   reasons I've explained.
6           So the -- an event study can very well
7   be inconclusive related to market efficiency
8   but still be valid with respect to
9   quantifying damages.
10  BY MR. MAINLAND:
11      Q    Now, turning to the financial
12  releases, we spoke in detail earlier about the
13  financial release date study.  Was that the
14  right way to think of it or should I refer to it
15  as a financial release date test or what is your
16  preferred way of referring to it?
17      A    You can refer to it however you want.
18      Q    You understand what I'm referring to?
19      A    Yes.
20      Q    Okay.  So you considered 19 financial
21  release dates.  Those were all the dates during
22  the class period on which SQM released earnings
23  information; is that right?
24      A    Yes.
25      Q    And then second and separately, you

1   looked at the performance of the ADS price on
2   March 18th, 2015, the last day of the class
3   period, after certain news came out regarding
4   the resignation of certain directors; is that
5   right?
6       A    That's correct.
7       Q    I think you said earlier you don't
8   view the latter as a similar study or that it's
9   not an event study.  Can you explain that a
10  little bit?
11      MR. ZOHRABIAN:  Object to form.
12      THE WITNESS:  No, the last analysis I
13  did of March 18 is an event study.  An event
14  is the information that was disclosed on
15  March 18th, so it is a study of that
16  specifically.  If I said anything different
17  earlier, I misspoke.
18  BY MR. MAINLAND:
19      Q    The event on March 18th is
20  fundamentally different from the financial
21  release dates; correct?
22      MR. ZOHRABIAN:  Objection to form.
23      THE WITNESS:  Fundamentally -- oh, the
24  analysis is different in the sense that I am
25  using binomial distribution in order to look

1   at the earnings releases in aggregate.  The
2   last event, I'm just looking at one event.
3   BY MR. MAINLAND:
4       Q    But I'm talking a little bit -- I hear
5   you on that, but my question was a little bit
6   different, which is that the event itself on
7   March 18th was a disclosure of the resignation
8   of SQM's Potash directors; isn't that right?
9       MR. ZOHRABIAN:  Objection to form.
10      THE WITNESS:  Yes, it was not an
11  earnings release.  The nature of the
12  information was different than the earnings
13  releases, yes.
14  BY MR. MAINLAND:
15      Q    So no financial or earnings related
16  information was disclosed on March 18th, 2015;
17  right?
18      MR. ZOHRABIAN:  Objection to form.
19      THE WITNESS:  That's correct, it was
20  not an earnings release.
21  BY MR. MAINLAND:
22      Q    Before getting to March 18th, I'm
23  going to focus on the financial release date
24  test in the first instance.
25      How did you determine to use those 19

1   financial release dates as the events for that
2   portion of the study?
3       A    I determined -- I decided to use the
4   financial releases because Cammer Factor 5
5   specifically states that a cause and effect
6   analysis of financial releases would be helpful.
7       Q    Okay.  But -- well, let me see where
8   you seem to be reading from your report.  Are
9   you reading from --
10      A    It's on Page 18.
11      Q    Paragraph 36?
12      A    Correct.
13      Q    And in Paragraph 40 you state that
14  financial releases -- the second sentence of
15  Paragraph 40 you state:  Financial releases
16  generally provide new information to investors.
17      And then you go on.  But just focusing
18  on that portion of the sentence -- actually, I'm
19  sorry, if you do go on, the end of the sentence
20  you say:  As noted in Cammer above.
21      Are you referring to the quote in
22  Paragraph 36 when you say:  As noted in Cammer
23  above?
24      A    Yes.
25      Q    And is it true that the Cammer court

1   said that financial releases generally provide
2   new information to investors?
3       A    No, it's true that Cammer court
4   identified financial releases as disclosures
5   that would provide new material information
6   would show cause and effect.
7       Q    It refers to unexpected corporate
8   events or financial releases; right?
9       A    Correct.  It also has corporate events
10  as well, yes.
11      Q    Right.  So -- but isn't the word
12  "unexpected" modifying both?
13      MR. ZOHRABIAN:  Object to form.
14  BY MR. MAINLAND:
15      Q    That's how I read it.  Do you read it
16  differently?
17      A    Yes.  I mean, I have no problem if you
18  want to read it that way.  That's -- I don't
19  have a problem with that.
20      Q    So isn't new or unexpected information
21  the touchstone of analyzing direct evidence of
22  market efficiency?
23      A    Well --
24      MR. ZOHRABIAN:  Object to form.
25      THE WITNESS:  Information can be new,

1       but the results can be exactly what the
2   market expected.
3   BY MR. MAINLAND:
4       Q    Right.
5       A    So I don't think that the fact that --
6   I mean, the market knew they were going to
7   release their financials, so the release of the
8   last quarter's financials was not unexpected nor
9   necessarily the earnings or revenues numbers,
10  you know.  So it may have just met the
11  expectations, in which case you would not expect
12  there to be a price reaction.
13      Q    So your view is that financial
14  releases are, as a general matter, more likely
15  to convey new material information than on other
16  days; is that fair?
17      A    That's fair, yes.
18      Q    They're more likely to but not
19  necessarily that they will?
20      A    That's correct, yes.
21      Q    When you looked or used the 19
22  financial releases, did you look at the content
23  of the releases?
24      A    Not for the purposes of performing
25  this test.  I did obviously look at it, you

1   know, as just -- afterwards just to say that, in
2   fact, there were information that could explain
3   the price movement on the days where there was
4   significant price movements.  But I mean, that
5   was a year ago, I don't really recall too much
6   of it other than I did look at it.
7       Q    You did that after running the
8   regression?
9       A    Correct.  So this is not -- so this is
10  an analysis that was performed without
11  consideration to the direction.  In other words,
12  I did not determine beforehand what the
13  direction would be.  It was just a totally
14  objective analysis; in other words, there was
15  not a subjective analysis by me to say, well,
16  you know, I think that would cause the stock
17  price to go up or I think the stock price should
18  go down.
19          It was just a purely objective
20  analysis to see whether or not the stock
21  price -- there were more statistically
22  significant stock price movements on earnings
23  release days as opposed to other days.
24      Q    And when you say in Paragraph 40 that
25  you believed the financial releases had a

1   greater likelihood of altering the total mix of
2   information, greater as compared to what?
3       A    Greater as opposed to days without
4   earnings releases.  That does not mean that days
5   without earnings releases could not also have
6   new and material information, but on average,
7   you would expect that earnings release dates,
8   there would be greater likelihood just because
9   you know you're going to have new information,
10  you're going to have new information in both the
11  last quarter about revenues, about earnings and
12  so on.
13          So there is a greater likelihood that
14  some of that is going to be unexpected either in
15  the negative direction or a positive direction
16  than a regular day.
17      Q    Did you look to see whether there were
18  other days during the class period where news
19  was released that might have an equal or greater
20  chance of altering the total mix of information?
21      A    In terms of coming up with the type of
22  disclosures, I don't have a type of disclosures
23  that would likely be more result in more
24  positive or negative price reaction that I can
25  think of as I sit here.

1           There's certainly -- this is a long
2   time ago that I actually reviewed the analyst
3   reports and so on.
4           But there were events that I saw that
5   certainly were material and also, you know, had
6   corresponding price movements.
7           You know, but that would be like an
8   individual event, it would not be like a group
9   of events -- I'm hoping to like 19, like I have
10  four earnings releases, so I picked earnings
11  releases.
12      Q    I wasn't asking about a group events.
13  I'm just wondering:  Did you look at whether
14  there was significant news on any of the other
15  days other than these 19 days?
16      A    Yes, back then I did.  I had my event
17  study and I had my analyst reports and so on.
18  But I did not put any of that in the report.  It
19  was more an exercise to see whether or not there
20  was something unusual that I should be aware of.
21      Q    When you said you had your event
22  study, why would that be a means of analyzing
23  whether there's news?
24      A    So the event study has a column here.
25  When I talk about the event study, let me

1    explain what I'm talking about.  I have an
2    exhibit to my report and it is Exhibit E, and I
3    have a column and it's a column with a heading
4    T-statistic.
5          And that is an assessment of the
6    statistical significance and so when I would go
7    through analysts reports and media reports and
8    if I looked at something that I thought, well,
9    you know, this seemed to be an important event,
10   I could then double check my event analysis or
11   Exhibit E and see what the statistic would be on
12   that particular day.
13   Q     And is it your testimony under oath
14   that you looked at the analyst reports or the
15   news reports before you looked at the
16   T-statistic?
17         MR. ZOHRABIAN:  Object to form.
18         THE WITNESS:  Yes, that's typically
19   what I would do.  I would go through on the
20   Bloomberg and I would have, you know, the
21   analyst reports and I would go through and
22   see whether or not there is anything that
23   seemed unusual or unexpected.
24         I then would check that with the
25   T-statistic in the report to see whether or

1    not there, in fact, was a -- you know, a
2    price movement either statistically
3    significant or close to statistically
4    significant at either the 10, the 5 or the
5    1 percent level.
6          But that's not an analysis that I put
7    in my report.  So I'm not suggesting that
8    that's not the base -- that's just the
9    basis -- that's just for my own comfort that
10   I did that.
11         It's not -- I mean, the basis for my
12   opinion is the analysis that I did do that's
13   in here in this report.
14   BY MR. MAINLAND:
15   Q     Did you always review them in that
16   order, analysts reports first and T-statistics
17   second?
18         MR. ZOHRABIAN:  Object to form.
19         THE WITNESS:  Analyst reports first,
20   T-statistics second and -- you know, just to
21   see whether or not there was -- you know, if
22   the price reaction was roughly what I would
23   have expected.
24   BY MR. MAINLAND:
25   Q     Was there ever a time where you looked

1    at the T-statistic and said, wow, that's a
2    significant T-statistic, I'm going to go look
3    and see if there was news?
4          MR. ZOHRABIAN:  Object to form.
5          THE WITNESS:  I don't know, but it
6    wouldn't be uncommon to look, if there's
7    like a big large statistic, to see whether
8    or not, okay, what happened on that, but --
9    on that day.
10         But usually when you go through it,
11   you pretty much cover most of it.
12         But again, it's a year ago so it's
13   not like it is fresh in my head exactly.
14   BY MR. MAINLAND:
15   Q     You said it would not be uncommon, but
16   would it be methodologically sound to look at
17   the T-statistic first and then look at the news
18   and draw inferences as to market efficiency
19   based on that?
20         MR. ZOHRABIAN:  Object to form.
21         THE WITNESS:  Well, I did not -- my
22   conclusion regarding market efficiency is
23   based on what is in my report.  It's not --
24   BY MR. MAINLAND:
25   Q     That wasn't the question.  Would it be

1    methodologically sound to do it in that order?
2          MR. ZOHRABIAN:  Object to form.
3          THE WITNESS:  It depends.  If you're
4    doing the test of market efficiency where
5    you want on a priori basis to determine the
6    direction and then you want to test that, if
7    that is the methodology that you use, then
8    you would not look at the T-statistic first.
9          What you would do is you would look at
10   the event first, then make the determination
11   in terms of the direction and then test
12   whether or not that the price reaction is
13   consistent with what you expected.
14   BY MR. MAINLAND:
15   Q     I think what you said there is that it
16   wouldn't be methodologically sound to first look
17   at the T-statistic and then look at the news and
18   draw inferences as to market efficiencies based
19   on that comparison, but tell me if I'm wrong.
20         MR. ZOHRABIAN:  Object to form.
21         THE WITNESS:  If that's the
22   methodology, if that is what you're trying
23   to do, then what you would want to do is for
24   the a priori -- in other words, before
25   looking at the T-statistic, what you would

1  want to do is to look at the event, then
2  determine the direction of the event and
3  then look at whether or not it is consistent
4  with what you believed before.
5      Of course, there's -- this is part of
6  what I said a little bit before, and that is
7  that doing that type of analysis also
8  introduces a lot of subjectivity because it
9  means that your a priori analysis is
10  consistent with that of investors and as
11  I've discussed in my report, investors may
12  regard the new information disclosed quite
13  differently.
14      So -- and there may be information
15  that is not captured in your media searches
16  on Bloomberg and I think I have LexisNexis.
17      So there is a lot of issues with that
18  type of an analysis, but it is something
19  that I did just for my own -- as I said
20  before, just for my own comfort.
21  BY MR. MAINLAND:
22      Q    What do you mean your own comfort?
23      A    My own comfort that the market for SQM
24  was efficient and they there were now obvious
25  days when there was new information that I

1  believed should cause a statistically
2  significant price movement and there was no
3  statistically significant price movement.
4      Q    But I thought you said earlier when
5  you looked at news that whatever you saw there,
6  it wasn't forming the basis for your opinion in
7  this report?
8          MR. ZOHRABIAN:  Object to form.
9          THE WITNESS:  No, not the opinion in
10  the report, but that is something that I did
11  for additional comfort.
12  BY MR. MAINLAND:
13      Q    It gave you comfort, so in that sense
14  it is part of the basis for your opinion, isn't
15  it?
16          MR. ZOHRABIAN:  Object to form.
17          THE WITNESS:  No.  I mean, I think
18  what I have provided here is the basis for
19  my opinion, the fact that I was looking to
20  see whether or not there was something that
21  would challenge that.  I mean, it's
22  something that I did, but it's not a -- it's
23  not something that I think a court should --
24  it was for my benefit.  It was not for the
25  court's benefit.

1      I don't think that the court should
2  provide or give any benefit to it because
3  it's something that -- it's something that I
4  did and it's not part of my report.
5  BY MR. MAINLAND:
6      Q    But it must have added some value to
7  you in your analysis, otherwise you would not
8  have bothered doing it; right?
9      A    Well, it has -- it provides comfort,
10  as I said.
11      Q    In what sense did it provide you
12  comfort?  You were looking for significant news
13  events and then you wanted to see how did the
14  stock react in a way one would expect given it
15  was a significant news events and to the extent
16  it did, that gave you comfort you were on the
17  right track?
18      A    It gave me comfort, yes.
19      Q    How many of those dates did you
20  identify?
21      A    That is what I did when I went through
22  the analyst reports and when I went through the
23  media.
24      Q    How many of those dates did you
25  identify?

1      A    Dates?  I mean, that's like asking how
2  many reports did you look at.  If I was looking
3  at the --
4      Q    No, it's a little different than that.
5  I'm asking how many additional dates gave you
6  comfort?
7          MR DEFENSE:  Object to form.
8  BY MR. MAINLAND:
9      Q    Dates, calendar dates?
10      A    I mean, I don't know.  I was reviewing
11  different media reports and analyst reports and
12  there seemed to be a lot of different dates.
13      Q    Your Exhibit B to your report just
14  refers generically to LexisNexis media reports
15  from February 2010 to June 2015 and Bloomberg
16  media reports from 2010 through 2015.
17          MR. ZOHRABIAN:  Objection to
18  characterization of the report.
19          MR. MAINLAND:  I'm just reading the
20  words.  Those are literally the words.  I'll
21  collectively agree on that if we need to.
22  It's not very --
23          MR. ZOHRABIAN:  I'm not trying to be
24  argumentative with you, but it does provide
25  the search terms for the LexisNexis in the

1  time period through which the search term
2  was applied.
3       MR. MAINLAND:  I'll read it in full.
4  Exhibit B, media reports, LexisNexis media
5  reports from February 2010 to June 2015,
6  parentheses, search term Sociedad Quimica,
7  end parenthesis.  And then the second bullet
8  says Bloomberg media reports from 2010
9  through 2015, parenthesis, SQM USCN, end
10 paren.
11      MR. ZOHRABIAN:  Sorry, I'll just note
12 for the record that there's -- in addition
13 to the media reports, the SEC filings as
14 well as the analyst reports that are listed.
15      MR. MAINLAND:  Armen, the expert
16 report is in the record.  I don't think
17 anyone is disputing as to what is in
18 Exhibit B.
19      MR. ZOHRABIAN:  Okay.
20      MR. MAINLAND:  Is there a problem with
21 me reading from a portion of a report
22 without reading every single word that's on
23 the page?  Do you think that's misleading?
24      MR. ZOHRABIAN:  What sounded
25 misleading to me was just talking about

1  media reports as if those were the only
2  times where particular events are going to
3  come up.
4       MR. MAINLAND:  That was not remotely
5  what it was I was suggesting.  I was just
6  setting up the question.  Let's just reset
7  here.
8       Q    Under the media report subsection of
9  Exhibit B which is entitled information relied
10 upon, you generally refer to LexisNexis media
11 reports and Bloomberg reports.  Isn't that as a
12 general matter accurate?
13      A    Yes.
14      Q    You don't identify any particular
15 articles; right?
16      A    No.
17      Q    How many articles did you read?
18      A    I think that I produced all of the
19 articles that I had in front of me.  And I know
20 that on Bloomberg there may be -- there were
21 additional articles, but I kind of -- when I
22 printed it out, I just -- you know, there were a
23 lot of them that may not have been as important
24 to me, so I just printed out not everything but
25 the ones that I thought were important.

1       So I don't know exactly how many
2  articles, but there were quite a few articles on
3  this company.
4       Q    So in Paragraph 26 of your report you
5  refer to 2500 media reports and a search on
6  LexisNexis that uncovered more than 400
7  articles.
8       A    That's correct.
9       Q    You didn't read 2,900 media reports,
10 did you?
11      A    2,500 --
12      Q    No, I'm sorry, 2,900, 2500 plus 400?
13      A    Sorry.
14      Q    To be clear --
15      A    I misunderstood.
16      Q    2500 media reports on Bloomberg, 400
17 on LexisNexis, the total is 2900.  Did you read
18 2900 reports?
19      A    No.  I actually -- on Bloomberg is
20 pretty straightforward because I actually
21 literally printed out the ones that -- you
22 actually have a copy of each one that I
23 actually, you know, spent time reading.  On the
24 other ones, I would just skim really, I mean,
25 spend a second on it or, you know, but the ones

1  that I actually quickly read, I printed out and
2  I'm pretty sure -- or I provided to counsel
3  here, so I assume that you guys received it in
4  discovery.
5       Q    So the ones that you produced in
6  connection with your report are the ones that
7  you actually read?
8       MR. ZOHRABIAN:  Objection,
9  mischaracterizes testimony.
10      THE WITNESS:  I look -- even though I
11 looked at all of them, those are the ones
12 that I would characterize as read as opposed
13 to skimmed through.
14 BY MR. MAINLAND:
15      Q    I mean, you did say:  I actually
16 literally printed out the ones that you actually
17 have a copy of each one that actually, you know,
18 spent time reading.
19      Sorry, I interpreted that as saying
20 that the ones you read are the ones you printed
21 out and the ones you printed out are the ones
22 you produced to us.  Is that accurate?
23      A    Yes.  It's accurate that, you know, if
24 I would read something and find it important, I
25 would print it out and it would be produced to

1    you, yes.
2        Q    How did you decide what was worth
3    printing out?
4        A    It is a subjective exercise.  If I
5    thought it was important enough to print out,
6    then I printed it out.
7        Q    Okay.  Is there any -- can you put any
8    more flesh on that?  What would -- what is an
9    example of something that you recall as seeming
10   important to you that would cause it to be worth
11   printing out?
12       A    If I thought that it was something
13   that I as an investor would be interested in, I
14   printed it out.
15       Q    Can you give me an example?
16       A    I just -- not really.  I mean, it's --
17   if I thought it was important at the time, I
18   printed it out.  And if I thought it was
19   either -- like many of the Bloomberg reports are
20   somewhat repetitive and so on, I would not.
21       Q    And you can't give me an example just
22   because you don't remember?
23       A    I don't remember, no.
24       Q    There is not a single event out of the
25   19 financial releases that sticks in your head

1    as that one was -- clearly I had to print out
2    that article?
3        A    Well, obviously the March 18th event.
4        Q    Why is that obvious?
5        A    Because it's discussed in my report.
6        Q    Okay.  So I thought you meant
7    obviously that would be material to investors, I
8    should print that out as opposed to you
9    obviously read it in, it's in your report.  You
10   meant the latter; right?
11       A    Yes.
12       Q    When you tested -- so when you looked
13   at 19 financial release dates, what was your
14   expectation as to how many of them -- actually,
15   let me withdraw that question and ask a more
16   basic one.
17            When you looked at the 19 financial
18   release dates, did you have an expectation as to
19   how many of them would be associated with a
20   statistically significant return?
21       A    No.  So -- no, it's just a test, the
22   null hypothesis as being that financial release
23   dates are just the same as any other day.  And
24   then you look at how many days are statistically
25   significant and you see whether or not -- you

1    look at what is the probability of that simply
2    occurring randomly.
3            And if you get a small P value, in
4    this case the P value, the probability of it
5    simply being random, was less than 1 percent.
6    That is evidence that there was price reactions
7    to the earnings release information.
8        Q    Did you think it would be more than
9    would occur by chance?
10       A    Did I think that it would be more than
11   would occur by chance?  I mean, that's what I
12   tested for, that's why I ran the test to find
13   out.
14       Q    What did you expect?
15       A    Well, the hypothesis was that there
16   would be no difference.  That's the hypothesis.
17       Q    That's the null hypothesis?
18       A    Yes.  So if, in fact, there is
19   reaction to earnings releases, then you would
20   expect there to be more statistically
21   significant days on earnings release days.  And
22   then the question is, well, in terms of how many
23   more and that's why you run -- you use the
24   binomial distribution to determine what is the
25   probability of getting five out of 19.  It's

1    less than 1 percent.
2        Q    So just speaking simply, as between --
3    you thought it would be more than one out of 19;
4    is that fair?
5            MR. ZOHRABIAN:  Objection.
6    BY MR. MAINLAND:
7        Q    You had no expectation?  How could you
8    not?  Here's the reason I ask:  You said in your
9    report that they generally convey new
10   information to investors and that they,
11   therefore, have a greater likelihood of altering
12   the total mix of information.
13           With that as your premise, can it
14   really be that you have had no expectation that
15   they would more than once be associated with
16   statistically significant returns?
17           MR. ZOHRABIAN:  Objection to form.
18           THE WITNESS:  No, because even if, in
19   fact, the market is efficient, there may
20   simply not be material information disclosed
21   on the earnings release.
22   BY MR. MAINLAND:
23       Q    Any of the 19 times?
24       A    You don't know.
25       Q    Of course you don't know, you're not

1    going to know until you run the test.  I'm
2    saying what did you expect?
3        A    I did not expect anything.  I just did
4    the test.
5        Q    So would you agree that share prices
6    move in statistically significant ways even in
7    the absence of news?
8        A    That -- yes, I mean that's what the P
9    value is for, you know, what is the probability
10   of that actually happening.  So if you have a P
11   value of 5 percent, then you would find a
12   statistically significant price movement
13   5 percent of the time even if there is no new
14   information.
15       Q    Why don't we flip back to your --
16   Exhibit E to your report.  This is the event
17   study.  I'll direct you to Page 21 of Exhibit E
18   to your report.
19            Are you there?
20       A    Yes.
21       Q    So I was going to ask you about
22   January 15th, 2014.  And what you see on that
23   date is that the predicted return was
24   1.66 percent, the abnormal return was
25   5.77 percent and the T-statistic was 4.01.

1        So just looking at the share price
2    itself, the return was approximately 7.5 percent
3    that one day; is that accurate?
4        A    Yes.
5        Q    And you would agree that's a
6    significant increase on one day, wouldn't you?
7        A    Yes.
8        Q    And the T-statistic is well in excess
9    of 1.96; right?
10       A    Correct, yes.
11       Q    And that's generally the T-statistic
12   measuring statistical significance at the
13   5 percent level, 1.96?
14       A    Yes.  I mean, if you use the 1.96, the
15   5 percent level, then it's -- then what is this,
16   4.01 is much higher.
17       Q    And this was one of the most
18   statistically significant movements in the share
19   price during the entire class period; right?
20            Look, if you don't know, I understand
21   there is a lot of numbers in here.  I'll just
22   represent to you that we looked, it's the 13th
23   most statistically significant return in the
24   class period.
25       A    Right.

1        Q    Does that surprise you?
2        A    It does not surprise me or not
3    surprise me.
4        Q    I'm just -- literally I'm only asking
5    you, you have no reason to doubt what I just
6    said; right?
7        A    Right.
8        Q    Okay.  Do you know whether there was
9    news on that day?
10       A    Do I know?
11       Q    Yes.
12       A    As I sit here right now, no, I don't.
13            MR. MAINLAND:  I'm going to mark the
14   next exhibit as -- I believe it should be
15   Steinholt Exhibit 4.
16            (Exhibit 4 was marked.)
17   BY MR. MAINLAND:
18       Q    Now, this is a Form 6-K filed by
19   Chemical and Mining Company of Chile Inc.
20   That's SQM; right?
21       A    Yes.
22       Q    If you look, it's a very short
23   paragraph.  On Page 2 of that 6-K, January 16th,
24   2014, it says that SQM reports that it received
25   a letter from the Santiago Stock Exchange, and

1    then it says the name of that in Spanish, on
2    January 15th, 2014 notifying SQM that on
3    Wednesday, January 15th, 2014 the Series B
4    shares issued by SQM registered transactions at
5    the price of Chilean pesos 14,919 each, marking
6    a 7.35 percent rise with respect to the price of
7    yesterday, Tuesday, January 14, which was
8    Chilean pesos 13,897 per share.  The Santiago
9    Stock Exchange requested that SQM inform the
10   market as soon as possible of any special
11   circumstances or relevant facts or events that
12   could explain said significant variation.  SQM
13   responded on such same January 15th, 2014 that
14   it was not aware of any concrete circumstances,
15   facts or events that could explain the referred
16   price variation.
17            Have you seen this 6-K before?
18       A    I don't recall.  I would have -- I
19   would have all of the ICC documents or documents
20   that would be in my files.  I don't recall any
21   specific 6-K.
22       Q    Did you read all of the 6-Ks?
23       A    I would have skim through the 6-Ks.
24   There may be some that I would have focused on
25   more than others, but --

1    Q    And so one of the statistical -- most
2  statistically significant share price reactions
3  during the class period occurred entirely in the
4  absence of news; right?
5         MR. ZOHRABIAN:  Object to form.
6         THE WITNESS:  I have -- I would have
7  to analyze that.  I don't know one way or
8  another as I sit here.
9  BY MR. MAINLAND:
10   Q    Isn't that what the company is saying
11 here?
12   A    I think the company is --
13        MR. ZOHRABIAN:  Same objection.
14        THE WITNESS:  I think the company says
15 that it's not aware of any news.
16 BY MR. MAINLAND:
17   Q    So the company was asked by its
18 securities regulator whether it was aware of any
19 news?
20   A    That's my understanding.
21   Q    That's what it says in the 6-K; right?
22   A    Right.
23   Q    And it stated -- SQM stated in an SEC
24 filing that it had told the Santiago Stock
25 Exchange that it was not aware of any events or

1  news that would have caused that share price
2  reaction.  Is that a fair characterization of
3  the 6-K?
4         MR. ZOHRABIAN:  Object to form.
5         THE WITNESS:  Based on what you're
6  giving me, that's my understanding.
7  BY MR. MAINLAND:
8    Q    Can it be there was other news that
9  the company wasn't aware of that caused a
10 statistically significant increase in the share
11 price of this magnitude?
12        MR. ZOHRABIAN:  Same objection.
13        THE WITNESS:  I don't know as I sit
14 here.
15 BY MR. MAINLAND:
16   Q    Does it make sense to you?  Other
17 investors learn something really significant
18 that cause them to buy up the shares and SQM had
19 no idea what it was?
20        MR. ZOHRABIAN:  Same objection.
21        THE WITNESS:  I don't know who bought
22 the shares.  I mean, I --
23 BY MR. MAINLAND:
24   Q    That wasn't my question.
25        Does it make sense that's

1  something that could have even happened?
2    A    Well, when you're asking --
3         MR. ZOHRABIAN:  Same objection.
4         THE WITNESS:  -- whether or not
5  something makes sense, you know, somebody
6  bought shares and paid whatever the stock
7  price was, $28, and there was a short
8  increase here.  You know, for all I know, it
9  was a short squeeze but that would be pure
10 speculation.
11        You know, you don't know why somebody
12 has to buy shares.  Sometimes it happens,
13 but it's not something I have -- I can
14 explain to you here as I sit on a
15 deposition.
16 BY MR. MAINLAND:
17   Q    In all of the cases that you've worked
18 on analyzing market efficiency, have you ever
19 come across a situation where the companies or
20 the issuers' securities regulator asked you to
21 explain a significant movement in the share
22 price?
23   A    I'm trying to think.  I mean, this
24 is -- this was the regulators in Chile.  I don't
25 know if I have or not.  I mean, I cannot --

1  maybe I have in some of my cases, maybe I have
2  not.
3    Q    You can't recall?
4    A    I can't recall one way or the other.
5    Q    Does it seem unusual to you?
6    A    Well, obviously it's a large price
7  increase.  So in that sense, it is unusual, but
8  unusual things happen all the time.  But I don't
9  know why it went up there.
10        Who is buying the shares, sometimes --
11 you know, sometimes there are rumors that
12 someone is going to buy shares in a company and
13 there is a runup on -- in the stock price even
14 though the company is not aware of it.
15        But it would be pure speculation of me
16 obviously to sit here at the deposition to start
17 speculating in terms of why the share price
18 increased without having analyzed it and just
19 based on a 6-K that you're providing me.
20   Q    Would you expect that in an efficient
21 market that one of the largest abnormal returns
22 during a five-year class period would be on a
23 day when there was no evident news?
24        MR. ZOHRABIAN:  Object to form.
25        THE WITNESS:  It actually happens

1    quite a bit in securities litigation.  What
2    we -- sometimes we don't find out exactly
3    what happened with respect to certain days
4    until after discovery.  So I've had cases
5    where you don't know exactly what happened
6    on specific days until after you go through
7    internal documents and so on and you find
8    out later in the litigation exactly what was
9    going on.
10   BY MR. MAINLAND:
11       Q    Speaking of a 6-K, what is a Form 6-K?
12       A    It is material events that foreign
13   companies are filing with the SEC.
14       Q    It's a form by which foreign private
15   issuers such as SQM disclose material
16   information; is that right?
17           MR. ZOHRABIAN:  Sorry, I think you
18   were still answering the question.  I'm not
19   sure if you were but --
20           MR. MAINLAND:  It didn't seem like he
21   was.
22           MR. ZOHRABIAN:  He was definitely
23   saying something.
24           THE WITNESS:  So yes.  I mean, the
25   primary forms with respect to SQM is the

1    20-F that's filed on an annual basis and the
2    Form 6-Ks.
3    BY MR. MAINLAND:
4        Q    And generally 6-Ks disclose
5    information material to -- with respect to the
6    issuer; right?
7        A    Right.  It's something that could be
8    material.  It's not -- if the company thinks
9    that this might be material, this is something
10   that should be disclosed to investors, they can
11   use a 6-K to do so.
12           It's similar to an 8-K in a sense
13   and -- for U.S. companies, but that doesn't mean
14   that information is viewed as material --
15   materially different from a public mix of
16   information by investors.
17       Q    Would you agree that 6-Ks have a
18   greater likelihood of altering the total mix of
19   information?
20           MR. ZOHRABIAN:  Object to form.
21           THE WITNESS:  I would not think so,
22   quite frankly, because there are -- it may
23   have a greater likelihood, but I think that
24   differences between the two samples -- in
25   other words, the days that did not have 10-K

1    and days with 6-Ks, I don't think that that
2    difference would be that large because my
3    experience has been that -- and this is the
4    same for 8-Ks for U.S. companies, that
5    typically they do not result in
6    statistically significant price increases or
7    price decreases.
8            So there may be some increase, but I
9    don't think it necessarily is material.
10   BY MR. MAINLAND:
11       Q    Does the fact that there is no
12   statistically significant reaction on the days
13   that 6-Ks or 8-Ks are released, assuming that's,
14   in fact, correct, show that they are not
15   generally conveying new material information?
16           MR. ZOHRABIAN:  Object to form.
17           THE WITNESS:  I don't think I
18   understood the question.  If you could --
19   BY MR. MAINLAND:
20       Q    I think you said:  My experience has
21   been, and this is the same for 8-Ks for U.S.
22   companies, that typically they do not result in
23   statistically significant price increases or
24   price decreases.
25           Is that the metric for determining

1    whether a given disclosure contained new
2    material information?
3            MR. ZOHRABIAN:  Objection to form.
4            THE WITNESS:  Earnings releases very
5    often result in statistically significant
6    price increases or price decreases.  So in
7    my mind, it makes sense to use earnings
8    releases with respect to these Form 6-Ks.
9    If they traditionally do not materially
10   alter the public mix of information, then it
11   is a less valuable analysis because it most
12   likely will end up being inconclusive.
13   BY MR. MAINLAND:
14       Q    Are you aware that during the class
15   period, SQM issued a far larger set of 6-Ks than
16   the 19 financial releases?
17       A    Yes.  And that is one of the reasons.
18       Q    Reasons for what?
19       A    Because that's one of the reasons
20   there are a lot of them and to be statistically
21   significant, you know, you have to -- the price
22   movement has to be at the 5 percent level or
23   10 percent or 1 percent, whatever level you use,
24   I use the 5 percent level.  So if you have a lot
25   of -- if you have a lot of days with 6-Ks, it's

Page 230

```
 1    difficult for them all to be statistically
 2    significant; in other words, to be in the top
 3    5 percent of price returns.
 4        Q    So you did not want to use them
 5    because you were aware they are not going to
 6    result in statistical significance?
 7        MR. ZOHRABIAN:  Objection to form,
 8    mischaracterizes testimony.
 9        THE WITNESS:  No.  Like I said before,
10    I did not use them because I believed that
11    they -- the analysis most likely would be
12    inconclusive and if it was an inconclusive
13    analysis, it would not be helpful to the
14    court.
15    BY MR. MAINLAND:
16        Q    It would not be helpful to you either,
17    right, or to the plaintiff?
18        MR. ZOHRABIAN:  Objection, form.
19        THE WITNESS:  It wouldn't be helpful
20    to defendants either.  I mean, if you have
21    evidence and it's inconclusive, I don't
22    understand -- I mean, what is the value of
23    it to anybody, to either side or the court?
24    BY MR. MAINLAND:
25        Q    It sounds like what you chose to look
```

Page 231

```
 1    at was driven by what you thought the results
 2    would be?
 3        MR. ZOHRABIAN:  Object to the
 4    characterization.
 5        THE WITNESS:  Not what the results
 6    would be, it would be whether or not you
 7    would get the results that was meaningful.
 8    BY MR. MAINLAND:
 9        Q    Meaningful meaning either
10    demonstrating market efficiency or refuting
11    market efficiency, one of those two things,
12    that's what would be meaningful?
13        A    Well, by the way, it's a test that I
14    do regularly in my reports and if it -- it's
15    kind of -- if you have somebody committing a
16    murder and they were wearing gloves, would you
17    go in there and look for fingerprints, would you
18    go in there looking for DNA in order to see
19    whether or not the perpetrator could be
20    identified?
21        You know, so if you look for
22    fingerprints and no fingerprints comes up, it's
23    inconclusive, it's not particularly helpful.
24        If you look for DNA, then you may have
25    an analysis that -- you may have evidence of the
```

Page 232

```
 1    culprit, either the -- either there is a match
 2    or there is not.
 3        Q    I understand what it means for
 4    evidence to be inconclusive.  That's not really
 5    what I'm asking.  I'm asking:  Without even
 6    looking at the other nonfinancial release 6-Ks,
 7    you determined ex ante that the result would be
 8    inconclusive?
 9        A    No.
10        MR. ZOHRABIAN:  Objection to form.
11    BY MR. MAINLAND:
12        Q    Is that right?
13        A    No, it is not.  The -- the issue is
14    not whether or not did I have concluded it
15    because I haven't run the analysis.  I don't
16    know whether or not it's one way or the other.
17        Q    But you said --
18        A    I'm -- what I'm telling you is that I
19    don't think it is a particularly meaningful
20    test.
21        If it is, defendant's expert can run
22    it and I can explain to the court why I don't
23    think that it's fair and meaningful.
24        Q    I mean in terms of your process, you
25    just think it's an abstract matter, it's not
```

Page 233

```
 1    meaningful?
 2        A    I think that when you have -- as an
 3    abstract matter, it is -- I don't think it is
 4    particularly meaningful because generally, in
 5    order to meet the 5 percent threshold, the
 6    information disclosed has to be very materially
 7    different from a public mix of information.
 8        And most of the 6-Ks would not include
 9    such information, including this thing -- this
10    6-K here.  Let's see, whatever date that was
11    filed on.
12        Maybe it had some informational value,
13    maybe there was a different way -- maybe it's a
14    different test one can run on some of these
15    things.
16        But it's kind of like when you do
17    medical research, what you want to do is to try
18    to keep the people getting the placebo away from
19    the people who are not getting the placebo and
20    there's too much overlap with the 6-Ks.
21        Q    Okay.  I don't really understand what
22    that means, but it's okay, we can move on.
23        Isn't it the case that financial
24    releases are generally anticipated?
25        MR. ZOHRABIAN:  Objection to the form.
```

Page 234

1    THE WITNESS:  The timing of financial
2  releases are anticipated, yes.
3  BY MR. MAINLAND:
4    Q    The substance is unclear?
5    A    Well --
6    MR. ZOHRABIAN:  Same objection.
7  BY MR. MAINLAND:
8    Q    I'm asking what you meant by your
9  timing of qualification.
10    A    Well, people know --
11    Q    People know when -- go ahead.
12    A    People generally know when a company
13  will release their financials.  There is a
14  process typically in place.  You have --
15  generally you have the press release and then
16  you have the conference call and so on.  So
17  people are -- expect new information to be
18  available.
19    Now, what that information is, of
20  course, is not knowable.  It's not knowable
21  whether or not they meet or beat expectations.
22  Any projections or guidance that they will
23  provide, that is not known.
24    Q    And other 6-Ks, at least some of them,
25  are filed in a more ad hoc manner; isn't that

Page 235

1  right?
2    A    It can be filed at any time, yes.
3    Q    And completely out of the blue;
4  correct?
5    A    The timing would be whenever the
6  company decide to file it.
7    Q    So isn't at least some subset of the
8  other 6-Ks if anything more likely to convey new
9  unexpected information, material information
10  because by definition it's unanticipated?
11    MR. ZOHRABIAN:  Objection to form.
12    THE WITNESS:  That -- the timing does
13  not relate to the information disclosed.
14  BY MR. MAINLAND:
15    Q    But it relates to the expected nature
16  of the information disclosed; right?
17    A    The timing of it does not relate to
18  the information disclosed.  And it is the
19  information disclosed that investors will react
20  to, not the fact that a 6-K is being filed.
21    Q    All of the alleged corrective
22  disclosures in this case were made via 6-K;
23  right?
24    MR. ZOHRABIAN:  Object to form.
25    THE WITNESS:  You're talking about in

Page 236

1  the -- I think February, March?
2  BY MR. MAINLAND:
3    Q    In the complaint, which of course is
4  disputed, but the complaint goes through a
5  series of dates in the February and March 2015
6  time frame that the plaintiff alleges were
7  corrective of prior disclosures.  That's fair;
8  right?
9    A    I believe that that is -- yes, I just
10  want to make sure that I understood what you
11  were talking about.
12    Q    Sure.  That information came out in
13  the form of a 6-K; right?
14    A    The information --
15    MR. ZOHRABIAN:  Objection to form.
16    THE WITNESS:  -- was filed with the --
17  the information was filed in a 6-K.  I don't
18  know if that's the -- as I sit here right
19  now, I don't know if that is the first time
20  it was disclosed to the market or not.
21  BY MR. MAINLAND:
22    Q    You state in your report that you
23  reviewed SQM's filings on Form 6-K.  Just to be
24  clear, did you read every single 6-K?
25    A    I'm trying to think.  There were a lot

Page 237

1  of them.  I mean, I may not have read all of
2  them.
3    But I certainly read ones that were
4  referenced in the complaint or on those dates,
5  yes.
6    Q    Why did you review any 6-Ks other than
7  the financial release dates?
8    A    I want to get a sense of the
9  information that was disclosed about the company
10  during the class period of time.
11    Q    Why?
12    A    Because I thought that was something I
13  want to know.
14    Q    Why?
15    A    Because I was analyzing market
16  efficiency and I wanted to see that information
17  about the company was disclosed to investors
18  because the investors was not aware of what was
19  going on with the company.
20    That would be something that I would,
21  you know, note.  And this is an ADS type of a
22  company.  So not all foreign companies are
23  supporting their stock in the same way that SQM
24  was.  I think SQM was a level 3 type ADR.  So
25  they had a lot of filings and they provided a

1    lot of information about the company.

2       Q   Did you consider using any 6-K other

3    than the 19 financial releases as part of your

4    test?

5       A   No.  I think that the benefit of using

6    the financial releases, which is what I do in

7    I've decided to do in all of my cases, is that

8    it is an unbiased example of information.  I did

9    not want to cherrypick and as I said earlier, I

10    did not want to use all of them because there

11    are so many 6-Ks and 8-Ks in my experience that

12    do not convey any material information that it

13    dilutes the difference between the news and no

14    news base.

15       Q   Why isn't just limiting yourself to

16    financial releases cherrypicking?

17       MR. ZOHRABIAN:  Object to form.

18       THE WITNESS:  Because the financial

19    releases are specifically identified in

20    Cammer Factor 5.  And you do it on a

21    consistent bases from -- so you can look at

22    my report, you can look at the reports I

23    have submitted after SQM and you can look at

24    them before.  I'm not cherrypicking it for

25    this particular case, it is what I typically

1    do.  I look at earnings releases.

2    BY MR. MAINLAND:

3       Q   Is the Cammer court's statement

4    regarding financial releases prescriptive of

5    what you should do?

6       A   No, but the Cammer court was unbiased

7    in the sense that it didn't pick these things in

8    order to favor one or the other.  Regardless,

9    when you look at financial releases, I think

10    that's the most unbiased sample that you can

11    come up with.

12       If I'm wrong, someone can pick another

13    group of events that I should have looked at and

14    we can see what the result of that is.

15       MR. MAINLAND:  How long have we been

16    on the record?

17       VIDEOGRAPHER:  One hour, nine minutes.

18       MR. MAINLAND:  Why don't we take a

19    break.

20       VIDEOGRAPHER:  This marks the end of

21    media 4, Volume 1 in the deposition of Bjorn

22    Steinholt.  The time is 3:40, and we're off

23    the record.

24       (Recess taken.)

25       VIDEOGRAPHER:  This marks the

1    beginning of media 5, Volume 1 of the

2    deposition of Bjorn Steinholt.  The time is

3    4:03, and we're on the record.

4    BY MR. MAINLAND:

5       Q   Mr. Steinholt, do you agree that the

6    price of a stock reflects the market's

7    measurement of the present value of its future

8    cash flows?

9       MR. ZOHRABIAN:  Objection to form.

10       THE WITNESS:  Yes.

11    BY MR. MAINLAND:

12       Q   So -- okay.  So given that you agree

13    with that, are financial disclosures more

14    readily impounded into the stock price than

15    nonfinancial disclosures?

16       MR. ZOHRABIAN:  Same objection.

17       THE WITNESS:  I'm not sure.  I suppose

18    that would depend on the information

19    disclosed.

20    BY MR. MAINLAND:

21       Q   Isn't it easier to calculate the

22    impact on the present value of future cash flows

23    when the information disclosed is financial in

24    nature as opposed to something more qualitative?

25       MR. ZOHRABIAN:  Objection to form.

1       THE WITNESS:  Yes, the more

2    information you have, the clearer it is, the

3    more quantitative it is, that's --

4    everything else being equal, that would be

5    more -- it would be easier to quantify than

6    just qualitative statements.

7    BY MR. MAINLAND:

8       Q   All things equal, wouldn't the test --

9    excuse me.  All things equal, wouldn't the test

10    that you ran be more robust if you had

11    considered the share price reaction to different

12    kinds of information?

13       MR. ZOHRABIAN:  Object to form.

14       THE WITNESS:  More robust?  I'm not

15    sure one way or the other.  I have not

16    thought about it.

17    BY MR. MAINLAND:

18       Q   You agree, do you not, that efficiency

19    might vary across information items?

20       MR. ZOHRABIAN:  Same objection.

21       THE WITNESS:  You know, I suppose so.

22    I'm not sure.

23    BY MR. MAINLAND:

24       Q   Well, let's go to what I believe was

25    Steinholt Exhibit 2.  I'm not sure, it's the

1  Barber, Griffin, Lev article.
2      Is that Steinholt Exhibit 2?
3  A   Yes, it is.
4  Q   You're familiar with this article.  We
5  already discussed it earlier today; right?
6  A   It is one I have read.  I have not
7  recently read it, but I certainly can take the
8  time to read it if you need me to.
9  Q   No, I don't need you to read it.  I'll
10  just ask you some questions about it -- do you
11  want to sit here and read it?
12  A   It depends on what the questions are.
13  Q   I won't ask my question then.
14      If you go to Page 290.  Under the
15  section candidate efficiency drivers, basically
16  the bottom sentence on that Page 290 it says:
17  Even for a given security and time period,
18  efficiency might vary across different
19  information items.
20      For example, while the market can be
21  efficient with respect to a widely used and
22  regularly reported item such as earnings, it can
23  be inefficient, parentheses, react slowly to the
24  release of information, closed parentheses, with
25  respect to an infrequent, difficult to interpret

1  item such as the announcement of a new business
2  alliance.
3      Do you see that?
4  A   Yes.
5  Q   Do you agree with that statement?
6  A   If I understand it correctly, I think
7  that was the point I was trying to make this
8  morning when I was talking about some
9  information is more complex than other
10  information.
11      So consequently, it may -- the
12  reaction may be more slow with respect to some
13  information than other information.
14  Q   By slow you mean inefficient; right?
15  A   They talk about it inefficient, and
16  react slowly to the release of information.
17  With respect to reacting slowly, that does not
18  necessarily mean inefficient.
19  Q   So you disagree with them on that?
20  A   I don't know if that is exactly -- I'm
21  just answering your question.  I don't -- I'm
22  not sure that this addresses exactly what you're
23  talking about.
24      Let me double check if I included one
25  article here that actually addresses this issue

1  in my report.  Just a second.
2      I may not have included in this
3  report, but the fact that it reacts more slowly
4  it may only mean that it takes more time to
5  analyze, it does not necessarily mean that you
6  have an opportunity to generate excess profits
7  on it.
8      It may simply be that instead of
9  knowing the economic implications right away, it
10  takes some time.
11  Q   That's what you were saying earlier
12  today.  I continue to have a hard time with that
13  concept.  It takes some time for investors to
14  decide how to interpret a particular item?
15  A   That's correct.  Sometimes it takes
16  analysis in order to interpret information
17  that's being disclosed by a company.  And
18  sometimes what the investors will do is to call
19  around to get additional information to get a
20  fuller understanding of the issue at hand.
21      Things just take longer time.  And
22  with respect to earnings releases, if you just
23  beat earnings by, you know, a couple of pennies,
24  that is something that analysts are prepared to
25  analyze very quickly.  But if you have new

1  information, that is a little bit more complex,
2  that need additional analysis, then it's going
3  to take more time.
4      That does not necessarily mean that
5  the market is inefficient.
6  Q   So the market for certain types of
7  information may react somewhat slowly to that
8  information, and nonetheless, be an efficient
9  market?
10  A   That's correct.
11  Q   So you disagree with Barber and
12  Griffin and Lev on that point?
13  A   Well, I don't think that they -- I
14  think that they are making a different point.  I
15  think that they believe that it could be -- it's
16  not simply that it's reacting more slowly but
17  it's reacting so slowly that, in fact, there are
18  arbitrage opportunities for -- that otherwise
19  would not exist for investors.
20  Q   Turn to Page 294, if you would.
21      They say -- under the section the
22  efficiency criterion, the authors write:  In an
23  efficient market, all publicly released
24  information should be quickly and fully
25  reflected in the price of a security.

Page 246

1      You agree with that statement; right?
2      A   I'm sorry, what page are you on?
3      Q   294, please.
4      A   I'm sorry.
5      Q   You agree with the first sentence
6  under the efficiency criterion?
7      A   That is a definition of efficient
8  market that is commonly used, yes.
9      Q   Then further down, I guess three
10  paragraphs down, the paragraph starting with,
11  "We chose corporate earnings," it says:
12  Earnings information -- this is the second
13  sentence:  Earnings information, therefore, sets
14  a lower bound of market efficiency.
15      Would you agree with that statement?
16      MR. ZOHRABIAN:  Object to form.
17      THE WITNESS:  I'm not sure.  I would
18  have to look at the basis for it.
19  BY MR. MAINLAND:
20      Q   They go on to say:  It is conceivable
21  that a given stock is traded efficiently with
22  respect to earnings, i.e., price reacts quickly
23  and unbiasedly to the release of earnings, but
24  inefficiently with respect to other information
25  items which are more difficult for investors to

Page 247

1  interpret, i.e., a new business alliance, a new
2  strategic plan.
3      Do you agree or disagree with that
4  statement?
5      A   It's -- obviously, it's possible that
6  it's more efficient -- or that it's more
7  efficient relating to earnings releases if, in
8  fact, as it seems like these -- these authors
9  are doing is defining efficiency by the time it
10  takes to react to information than to other
11  information.
12      So -- and again, I have not read the
13  basis for it, but I don't have -- as I sit here
14  right now, I don't have a problem with it.
15      Q   Do you accept the possibility that a
16  market might be efficient with respect to
17  earnings information but not with respect to
18  other kinds of information?
19      MS. ZOHRABIAN:  Object to form.
20      THE WITNESS:  It may be less efficient
21  with respect to other information.  I'm not
22  exactly -- if by inefficient, you mean it
23  would ignore other information or
24  inefficient you mean that it just takes
25  longer time to fully incorporate, then use

Page 248

1  also makes it different.
2      I think it's certainly reasonable to
3  expect that it would take longer time to
4  incorporate more complex information than
5  easily interpreted earnings releases.  Not
6  all earnings releases are easily
7  interpreted, but some are.
8  BY MR. MAINLAND:
9      Q   You don't view that as an efficiency
10  issue; is that your testimony?
11      A   It could be an efficiency issue.  It
12  may or may not be.  It's just that we are --
13  whenever we deal with what's possible, there is
14  a lot of things that are possible in the world.
15      Q   Are the misstatements at issue in this
16  lawsuit financial in nature?
17      A   The statements that are at issue --
18      MR. ZOHRABIAN:  Objection, form.
19      THE WITNESS:  -- are
20  misrepresentations, and the corrective
21  disclosure --
22  BY MR. MAINLAND:
23      Q   Why don't I just withdraw the question
24  and restate the questions.
25      Are the alleged misstatements at issue

Page 249

1  in this lawsuit financial in nature?
2      MR. ZOHRABIAN:  Object to form.
3      THE WITNESS:  My understanding is that
4  it's part financial in nature with respect
5  to not complying with GAAP and -- but it
6  also relates to other issues such as not
7  complying with the law and not having an
8  effective -- not having effective internal
9  controls.
10  BY MR. MAINLAND:
11      Q   Does a statement regarding the
12  company's compliance with law convey any
13  earnings information?
14      MR. ZOHRABIAN:  Objection to form.
15      THE WITNESS:  Whether or not it
16  conveys any earnings information?  I assume
17  you mean historical earnings because that's
18  typically the focus of earnings releases.
19  It does not say anything necessarily about
20  prior earnings.
21  BY MR. MAINLAND:
22      Q   Does -- well, necessarily or at all?
23      A   Well --
24      MR. ZOHRABIAN:  Same objection.
25      THE WITNESS:  It depends on what the

Page 250

1    statement is.
2    BY MR. MAINLAND:
3        Q    It's in the complaint.  I'm not being
4    hypothetical, I'm asking about the misstatements
5    in the case.  You've reviewed the complaints;
6    correct?
7        A    Yes, I have reviewed the complaint.
8        Q    The complaints is extremely detailed,
9    it goes through each one, there are dozens of
10   them that the plaintiff alleges were material
11   misstatements made by SQM; isn't that right?
12           MR. ZOHRABIAN:  Objection to form.
13           THE WITNESS:  That's correct.
14   BY MR. MAINLAND:
15       Q    You can just read them.  Do they
16   contain earnings information?
17           MR. ZOHRABIAN:  Object to form.
18           THE WITNESS:  Okay.  The earnings --
19   BY MR. MAINLAND:
20       Q    Is that a hard question?  It's yes or
21   no, isn't it?
22       A    Whether or not a statement relates to
23   historical earnings --
24       Q    That's not what I said.
25       A    Well...

Page 251

1        Q    Do they contain earnings information?
2        A    With respect to the question that I
3    answered quite awhile back, these are not
4    earnings releases.  It doesn't relate to
5    historical earnings.
6            Now, you asked me repeatedly -- you
7    can ask the same question in a different form
8    and I would add and expand on that and explain
9    that a portion of the alleged misconduct does
10   relate to the historical earnings.
11       Q    Were any numbers included in any of
12   the statements, the alleged misstatements in the
13   complaint?
14           MR. ZOHRABIAN:  Object to form.
15           THE WITNESS:  I do not believe so, no.
16   BY MR. MAINLAND:
17       Q    Did the company restate its financials
18   with respect to the payments at issue in this
19   lawsuit?
20       A    I do not recall that it did.
21       Q    Did you test whether the market for
22   SQM shares was efficient with respect to the
23   kinds of information that are contained in the
24   alleged misstatements in the complaint?
25           MR. ZOHRABIAN:  Object to form.

Page 252

1            THE WITNESS:  The only event that
2    specifically relates to the allegation in
3    this case would be the corrective disclosure
4    that I tested at the very end with the
5    resignation of the board members.
6    BY MR. MAINLAND:
7        Q    Are you saying you have an opinion as
8    to whether that -- let me back up.  I'll
9    withdraw that question.
10           So I just want to be clear, just
11   distinguish what I'm asking about.  I'm asking
12   about the alleged misstatements in the
13   complaint, not the corrective disclosures but
14   the alleged misstatements on the front end that
15   the plaintiff has alleged caused inflation in
16   the stock price.
17       A    You're talking about statements that
18   omitted certain information related to the
19   fraudulent alleged fraudulent conduct?
20       Q    According to plaintiff, yes.
21       A    I think that in -- I mean, I have
22   tested the statistical significance of -- every
23   day to the extent some of these
24   misrepresentations were made on earnings release
25   dates, I have tested the statistical

Page 253

1    significance on those days.
2            But my understanding based on my
3    reading of the complaint is that this is more of
4    what one would call an omissions case in the
5    sense that statements were false and misleading
6    as they would not be expected to cause an
7    increase in the stock price.  It would be more
8    to conceal the truth.  So a test of those
9    particular statements would not be particularly
10   relevant.  It would be the disclosure of the
11   alleged truth.
12       Q    But you're trying to -- you're
13   offering an opinion that is designed to support
14   the idea that it's reasonable to presume that
15   the market relied upon the integrity of the
16   market price; isn't that right?
17       A    Yes, that's correct.
18       Q    And that it's reasonable to presume
19   that the market relied on the integrity of the
20   market price precisely with respect to the kind
21   of information that allegedly inflated the stock
22   price; isn't that right?
23           MR. ZOHRABIAN:  Object to form.
24           THE WITNESS:  Well, when you make
25   statements designed to conceal some conduct,

Page 254

1    typically what would happen is that it's the
2    disclosure of -- or a disclosure relating to
3    that conduct that would be the focus on the
4    analysis.
5         But I want to make one thing clear and
6    that is that I do not -- I have not
7    performed a price impact analysis; in other
8    words, an analysis directly relating to the
9    alleged fraud here.
10        I have performed a general market
11   efficiency analysis and my understanding is
12   that if the market is generally efficient in
13   incorporating publicly-available information
14   into the securities market price, it is
15   reasonable to presume that a particular
16   public material misrepresentation will be
17   reflected in the securities price.
18        Furthermore, it is reasonable to
19   presume that most investors, knowing that
20   they have little hope of outperforming the
21   market in the long run based solely on their
22   analysis of publicly available information,
23   will rely on the securities market price as
24   an unbiased assessment of the securities
25   value in light of all publicly-available

Page 255

1    information.
2         And that is me quoting Amgen in
3    Paragraph 13.  So that was --
4    BY MR. MAINLAND:
5         Q    You're reading from your report
6    there -- when you say Paragraph 13, you mean
7    Paragraph 13 of your report?
8         A    I was reading from my quote of the
9    U.S. Supreme Court decision in Amgen on Page 13
10   and what I'm trying to do is to be helpful to
11   the court by looking at market efficiency and
12   following the guidance that is set forth by
13   Cammer by looking at the financial releases and
14   also looking at market efficiency as the Supreme
15   Court has discussed in their decisions.
16        Q    So --
17             MR. ZOHRABIAN:  I'll just note that it
18   was on Page 6 in Paragraph 13, not Page 13.
19             MR. MAINLAND:  Thank you.  Of
20   Mr. Steinholt's expert report; right?
21             MR. ZOHRABIAN:  Mr. Steinholt's expert
22   report.
23   BY MR. MAINLAND:
24        Q    I appreciate the clarification that
25   you haven't conducted a price impact analysis

Page 256

1    here.  It's also fair to say it's sort of a
2    similar way of saying the same thing, I guess,
3    that you haven't done a loss causation analysis
4    here; correct?
5         A    That's correct.
6             MR. ZOHRABIAN:  Object to form.
7    BY MR. MAINLAND:
8         Q    You haven't actually conducted a
9    damages analysis, right, in the sense of
10   quantifying what you believe any damages to have
11   been suffered to be?
12        A    That's correct.
13        Q    Okay.  And I understand that, but
14   that's not really what I was asking.  What I was
15   asking -- I understand you're not taking a
16   position, at least at this stage of the
17   proceeding, whether any of the alleged
18   misstatements actually caused damages to
19   investors in the class; is that fair to say?  At
20   this stage, that's not something you were asked
21   to opine on and you haven't done that analysis;
22   correct?
23        A    That's correct.
24        Q    What you're really analyzing here is a
25   general analysis of the market efficiency of

Page 257

1    SQM's ADS; is that fair?
2         A    I think that's fair to say, yes.
3         Q    So what I'm wondering on the market
4    efficiency point, not about price impact, not
5    about loss causation, not about damages, but
6    just merely on the question of whether SQM's ADS
7    rapidly incorporated all publicly-available
8    information, is did you test the kinds of
9    information that are alleged to have inflated
10   the stock price there?
11             MR. ZOHRABIAN:  Object to form.
12             THE WITNESS:  No.  I have trouble
13   conceptualizing what that would be.  But
14   anyway, I have only performed what is
15   included in my report.
16   BY MR. MAINLAND:
17        Q    Would you agree that information on
18   the topics of compliance with law or
19   effectiveness of internal controls may be more
20   difficult for investors to interpret than
21   information concerning earnings per share
22   revenues or EBITDA?
23             MR. ZOHRABIAN:  Object to form.
24             THE WITNESS:  It's a little bit more
25   complex because we are dealing with severity

1    and the degree.  So the consequences of not
2    complying with the law and having effective
3    internal control can be quite severe.  It
4    may not be severe, it can be quite severe.
5        It can involve -- you know, if you're
6    paying somebody bribes, I mean, that's money
7    that's not going to the company.  That's one
8    component of it.  You also have possible
9    fines from regulators.  That's one component
10   of it.  You have internal investigation that
11   can be costly.
12       I was the expert in Walmart that
13   recently settled and Walmart spent more than
14   half a billion dollars on their internal
15   investigation relating to the bribes
16   primarily relating to Mexico.  So it can be
17   very, very costly.
18       And so there is a lot of different
19   things such as reputational, you know,
20   damage to reputation and things of that
21   nature.
22       So I think you're right.  There are a
23   lot of different components.  It can be
24   quite severe and it may not be that severe.
25   It can be difficult for analysts to

1    determine how severe such an investigation
2    or such a problem is.
3    BY MR. MAINLAND:
4        Q    It was that last point that I was
5    asking about.  More difficult to interpret then
6    just straight financials; is that fair?
7            MR DEFENSE:  Object to form.
8            THE WITNESS:  Yes.  You can have a
9    wide variety of different outcomes and
10   investors are put in a position to do their
11   best and -- with respect to determining the
12   severity of the problem.
13   BY MR. MAINLAND:
14       Q    Are you aware that in the 20-F that
15   was filed by SQM in 2015, that they disclosed
16   that their auditor had identified a material
17   weakness in the company's internal controls?
18       A    I believe so, but it's not something
19   that's fresh in my mind, no.
20       Q    Is that the kind of information you
21   think would be material to investors?
22           MR. ZOHRABIAN:  Objection to form.
23           THE WITNESS:  While I think that given
24   the bribery scheme, I think that could
25   certainly be important information for

1    investors.
2    BY MR. MAINLAND:
3        Q    A couple of things there.  First of
4    all, you said given the bribery scheme.  I
5    assume you haven't done any personal look into
6    whether there was, in fact, bribery here, that's
7    what is alleged in the complaint and you're
8    assuming the truth of that; right?
9        A    Yes, and I appreciate that.  I have
10   not conducted any analysis to determine that, in
11   fact, there was a bribery scheme or illegal
12   conduct.  I just know generally that there was
13   talk about an investigation in at least February
14   and March and, of course, you had the board
15   members resigning in mid March.
16       Q    The question was really as a general
17   matter, do you think a disclosure that the
18   auditor has identified a material weakness in
19   the company's internal controls would be
20   material to investors?
21           MR. ZOHRABIAN:  Object to form.
22           THE WITNESS:  Yes, it's material and
23   then in the sense that it's something that
24   reasonable investors would want to know.
25   And then the issue is, well, how severe is

1    it because it could lead to, as I -- my
2    prior answer a little while ago, there can
3    be some very, very severe consequences and
4    then again, it may not be severe.  So the
5    issue is severity.
6    BY MR. MAINLAND:
7        Q    Are you surprised that -- I will just
8    represent to you that according to your event
9    study in Exhibit E of your report, on the date
10   that the company disclosed this material
11   weakness in internal controls, the ADS price did
12   not move in a statistically significant manner.
13           MR. ZOHRABIAN:  Object to form.
14           THE WITNESS:  It will move in whatever
15   manner it moves depending on all of the --
16   the market's assessment of all of the
17   information contained in the 20-F.
18       So what you would want to do is to
19   analyze all of the component and then you
20   would try to figure out the totality of the
21   information that's disclosed.  And so you
22   wouldn't know one way or the other whether
23   or not just by the information that you have
24   provided me here right now.
25

Page 262

BY MR. MAINLAND:

Q   So that's another way of saying there might have been a lot of information in that 20-F, maybe some of it canceled it out or something?  I'm just trying to understand what you said.

A   Well, that would be part of it.  Then the question is whether or not the information is new and then the question is how is that information interpreted by analysts and investors; in other words, what do the analysts and investors view the future cash flow implication of that information.

And in an efficient market, and I have concluded the market is efficient, the price reaction answers that question.

Q   So given that you believe that the market was efficient during this time period, given that the stock price didn't move in reaction to this news, your conclusion or your inference from that is that the information wasn't material to investors?

MR. ZOHRABIAN:  Objection to form.

THE WITNESS:  When you have an efficient market and if you have a price

Page 263

movement that is, you know, there's zero -- let's say the return is zero, the stock price doesn't change at all, it probably changed a little bit in one direction or another.  I'm just saying let's just say that there is no change in the stock price.  What that would mean is that the totality of the information disclosed on that particular day as interpreted by investors would be immaterial.

BY MR. MAINLAND:

Q   The Cammer court itself recognized the importance of allegation related information; right?  That is, that the share price reaction to the particular type of information alleged to have been misrepresented; is that fair?

MR. ZOHRABIAN:  Objection form.

THE WITNESS:  I don't know what you're referencing.  If you give me the opinion and where that comes from.

BY MR. MAINLAND:

Q   I don't have the opinion with me.  But I can at least tell you that the court -- here's a direct quote:  The central question under the fraud-on-the-market theory is whether the stock

Page 264

price at the time plaintiff affected a trade reflected the, quote, misinformation alleged to have been disseminated.

Do you agree that that's the central question under the fraud-on-the-market theory?

A   That's my understanding of the law.  I don't have -- yes, that's my understanding of the law.  That's a legal issue.

Q   That's a legal issue, not an economic one?

A   What is relevant to the fraud-on-the-market theory is a legal issue.

Q   Do you know who Julio Ponce is?

A   You have to refresh my memory.

Q   Mr. Ponce was the chairman of the board at SQM at a certain time.

A   Right.

Q   Does that ring a bell?

A   I do -- it does ring a bell and I think -- yes.

Q   Are you aware that Mr. Ponce was charged with market manipulation by the SVS, which is essentially Chile's equivalent of the SEC, in September of 2013?

A   I remember something to that effect,

Page 265

but to be quite honest with you, I wouldn't have -- as I sit here right now, it's such a long time since I actually read through all of that information, it's not something that's fresh in my mind.

Q   Does that strike you as the kind of information that would tend to have an impact on SQM's ADS price?

MR. ZOHRABIAN:  Object to form.

THE WITNESS:  I would need to analyze it.

BY MR. MAINLAND:

Q   Did you look at whether it did?

A   I don't think I did.  But as I sit here right now, I don't recall.

Q   Have you heard of something called a Caso Cascadas scandal?

A   Again, this is something that I may have reviewed a year ago, but as I sit here right now, it's not fresh in my mind.

Q   When you tested the 19 potential release dates, five of them are associated with a statistically significant return; right?

A   At the 5 percent level, yes.

Q   Correct, at the 5 percent level.  Feel

Page 266

1  free to look at your report if you need to.  Why
2  don't we do that together just so we're on the
3  same page.  Let's go back to Exhibit E.  When I
4  say Exhibit, E I mean to your report.
5      And is it fair to say on the dates of
6  the financial -- the effective dates of the
7  financial releases, you put a sort of
8  rectangular box around those particular dates in
9  Exhibit E?
10     A    That's correct, yes.
11     Q    Okay.  And when you say the P value --
12  there's either a no or a yes in the right column
13  for P value.  When it says no, that means the
14  return was not statistically significant at the
15  5 percent level.  And when it says yes, it means
16  it was; correct?
17     A    That's correct.
18     Q    Okay.  And so the class period begins
19  on June 30, 2010, if I'm not mistaken.  I know
20  there's some dates in here that predate that,
21  but -- and if I'm reading it correctly, the
22  first financial release date on which you
23  observed a statistically significant return was
24  on August 31st, 2011.  Does that seem right?
25     A    That's correct, yes.

Page 267

1      Q    And the period of time from June 30,
2  2010, the first day of the class period, through
3  August 31st, 2011 is approximately 14 months; is
4  that fair?
5      A    That's correct, yes.
6      Q    Is it also fair to say that you
7  uncovered no direct evidence of market
8  efficiency during that 14-month period?
9          MR. ZOHRABIAN:  Objection to form.
10         THE WITNESS:  If you were only to look
11  at that period and you used my methodology,
12  then there would be no direct evidence of
13  market efficiency.
14  BY MR. MAINLAND:
15     Q    Would you agree that efficiency is
16  something that can vary with time?
17     A    This goes back to what we discussed
18  earlier.  There are situations where companies
19  may experience a significant share decline, so
20  that institutional investors get out of the
21  stock and analysts stop covering the firm.
22         And it is entirely possible for a
23  company going through such a transition to go
24  from an efficiently traded stock to an
25  inefficiently traded stock.

Page 268

1      Q    And with respect to the 14-month
2  period from June 30, 2010 to August 31st, 2011
3  that I asked about, I think your answer to my
4  question on that was that if you were only to
5  look at that period and you used my methodology
6  at that period, then there would be no direct
7  evidence of market efficiency.
8          And so assume the hypothetical that
9  that is the class period.  And if you use the
10  same methodology, as you said, you wouldn't be
11  discovering direct evidence of market
12  efficiency.  Is there some other methodology
13  that you would use in that context and then do a
14  subsequent test?
15         MR. ZOHRABIAN:  Object to test.
16         THE WITNESS:  As I explained to you, I
17  think it was a little bit earlier, what I
18  would want to do if there is a limited
19  number of earnings releases would be to
20  expand the number.  I mean, theoretically
21  you can say that any earnings release that's
22  not statistically significant means that for
23  that period, you have not demonstrated
24  market efficiency.
25         So you can always find periods but --

Page 269

1  within the total analysis that does not have
2  statistically significant days.
3          But if you get too narrow and have too
4  few observations, which is what we talked
5  about during the morning session, then the
6  analysis becomes less meaningful.  So you
7  would want to expand it.
8  BY MR. MAINLAND:
9      Q    But 14 months is still a meaningful
10  class period, is it not?
11         MR. ZOHRABIAN:  Object to form.
12         MR. MAINLAND:  That's a fair
13  objection.  It's a vague question.  Why
14  don't I be a little more specific about what
15  I mean by that.
16     Q    I think when we were talking earlier
17  about general lengths of class period in cases
18  that you've worked on, our finding was that both
19  average and median members of the class periods
20  were, if anything, a little bit less than the
21  14-month period that I have been referring to in
22  my -- in the preceding questions.
23         Is it really the case if that was the
24  class period and you found no direct evidence of
25  market efficiency based on the methodology you

1  used, that you would then just expand the dates
2  to see if you could find any on the other end?
3         MR. ZOHRABIAN:  Same objection.
4         THE WITNESS:  It wouldn't be based on
5  not finding statistical significance.  But
6  what I have done in the past, and I think I
7  testified to that, is that I have expanded
8  it to include a two-year period because I
9  would want to have a larger sample.
10         Now, if you have no statistically
11  significant price movements during that
12  particular class period and then you only
13  expanded in order to pull in statistically
14  significant price declines, I wouldn't do
15  that.  It would require further
16  investigation in my view in terms of market
17  efficiency.
18  BY MR. MAINLAND:
19      Q    I think we might be conflating a
20  couple of things.  One thing is the amount of
21  time in the class period and the other is the
22  number of events that are appropriate candidates
23  for testing during that class period.
24      A    Right.
25      Q    I'm not asking about whether -- you

1  know, if there was an issue where you don't have
2  enough appropriate candidates for testing,
3  whether you might then go beyond the corners of
4  the class period to find better candidates or
5  other candidates.  I'm asking if there are a
6  perfectly good number of candidates, but the
7  result is that not a single one of them is
8  statistically significance and it's a 14-month
9  time period, what would you do then?
10      A    That's the point where I would have to
11  do further investigation.
12      Q    And what would the nature of the
13  investigation be?
14      A    I don't know.
15      Q    Do you have any idea?
16      A    I have encountered that in cases or
17  particularly in one case where I opined that the
18  market was inefficient.  And that I discussed
19  earlier.  But I look at my analysis and my
20  conclusion as being based on all of the
21  information and you certainly would want to
22  investigate any evidence that might not support
23  a market efficiency further if such evidence
24  existed.
25      Q    Let's look at Paragraph 40 of your

1  report, if you would.
2         Sorry, before we get there -- I mean,
3  keep it there because I'm about to ask you some
4  questions on that.  Before we do that, let's
5  just round off what I was just asking about.
6         On what basis can you conclude that
7  the market for SQM's ADS was -- sorry, let me
8  withdraw that.
9         On what basis can you conclude that
10  there's direct evidence of market efficiency
11  during the first 14 months of the class period
12  for SQM's ADS?
13      A    Well, the direct evidence comes from
14  the analysis that I have performed, including
15  analysis with respect to the fact that market
16  information was quickly incorporated into the
17  stock price and industry information was quickly
18  incorporated into the stock price.  With respect
19  to earnings releases, that particular piece of
20  it doesn't -- there are no earnings releases
21  that cause a statistically significant price
22  movement at the 5 percent level.
23         So if that was all of the -- if that
24  was the only thing that you had, what you would
25  want to do is to further investigate it.

1      Q    And meaning go to the 10 percent
2  level?
3      A    No.  I mean, the level does not
4  really -- you can do it at a 10 percent level,
5  5 percent level or 1 percent level.  The
6  binomial distribution will account for that, so
7  you can't cheat away by lowering the level.
8         But what you can do is to investigate
9  the earnings releases and try to figure out,
10  well, why is it that the stock price or that
11  investors did not react to this information.
12         Maybe there is other information out
13  there that is more appropriate or maybe the
14  market is -- as I said earlier, I concluded in
15  some other case, maybe the market is simply
16  inefficient.
17      Q    Did you do any of those things with
18  respect to the first 14 months of the class
19  period?
20      A    No, I did not.
21      Q    Now, turning to Paragraph 40, you
22  state -- my apologies, let me just find where we
23  are.
24         Okay.  So in the third sentence in
25  Paragraph 40 you state:  There is almost one

1    chance out of 19 that a random price movement is
2    statistically significant at the 5 percent level
3    absent a cause and effect relationship.
4         That's not the entire sentence, but
5    that's a portion of that sentence; right?
6         A    Yes.
7         Q    Can you just explain to me what you
8    mean by that?
9         A    It means that if you have a random
10   sample, 5 percent of the time you will have a
11   statistically significant price movement.
12   5 percent out of 20 is one, 19 is slightly less
13   than 20.  Consequently, it's almost one when you
14   have 20 observations.
15        Q    So with a random sample, you're going
16   to expect that one out of nine is going to be
17   statistically significant?
18        A    Roughly, yes.
19        Q    On the basis of that incidence, you're
20   not going to have any ability to determine if
21   it's reacting to any specific situation or not;
22   right?  That could be just market noise?
23        A    Well, this thing here -- this analysis
24   here is not an analysis of the information
25   disclosed.  It is only the knowledge that there

1    is new information because there is an earnings
2    release.  So this is purely statistical
3    analysis.
4         Q    So the benchmark is -- when you say
5    one would expect one return out of 19 financial
6    announcements to be statistically significant at
7    the 5 percent level, that's the benchmark.  And
8    then you look to see whether there were more
9    than that; is that fair?
10             MR. ZOHRABIAN:  Object to form.
11             THE WITNESS:  No, it's actually a much
12        more complicated analysis than that.
13   BY MR. MAINLAND:
14        Q    It's more complicated.  Why don't you
15   explain it then?
16        A    So we have a binomial distribution
17   and --
18        Q    Right, I'm going to get to that.
19        A    Okay.
20        Q    That's -- I'm going to ask you about
21   that in detail.  I'm asking more about the
22   predicate to it.
23             So I understand the binomial
24   distribution, that you have an equation, that
25   you have five out of 19 and you're basically

1    asking what are the odds that I am going to draw
2    the same card five times.  I get that and I will
3    get into that in a minute.  I'm actually just
4    trying to understand the one out of 19.
5         You need to see something more than
6    that to have statistical significance; is that
7    fair?
8              MR. ZOHRABIAN:  Object to form.
9              THE WITNESS:  Well, the question is
10        how much more in order for it to be
11        statistically or in order for it to have a P
12        value of 5 percent or less.
13   BY MR. MAINLAND:
14        Q    I see.  So let's just go through each
15   step.  This is obviously an important paragraph
16   in terms of how your methodology is constructed.
17        So you then say:  I determined that
18   five out of SQM's 19 financial releases were
19   followed by statistically significant share
20   price movements at the 5 percent level.
21             That we've already established today.
22             Then you say:  The cumulative
23   probability of five or more days out of 19 being
24   statistically significant at the 5 percent level
25   simply by chance is significantly less than

1    1 percent.
2         So that's -- and that's where you drop
3    the footnote to the cumulative probability.
4    That's the binomial distribution that you're
5    using there; right?
6         A    That's correct.
7         Q    Okay.  So basically there is an
8    equation and there are 19 sort of target dates
9    and five of them end up being statistically
10   significance and at -- you know, at the
11   5 percent level and you run the equation and the
12   cumulative probability is spit out.
13        In this case what was spit out is
14   something less than 1 percent; is that basically
15   right?
16        A    That's correct.
17        Q    I just want to make sure I understand
18   it.  Then you say:  Consequently -- and this is
19   sort of the conclusion sentence there -- the
20   statistical evidence is strong that new and
21   material company specific information was
22   quickly incorporated into SQM's ADS price.
23        So what is the benchmark for what
24   level of -- let me rephrase.
25        You say that the chance of it being

1   statistically significant at the 5 percent level
2   simply by chance is significantly less than
3   1 percent, that that would happen five out of 19
4   times.
5          And then you conclude that that's
6   strong evidence of new and material company
7   specific information being quickly incorporated.
8          What is the level that you're looking
9   for there to conclude that it's strong evidence?
10          MR. ZOHRABIAN:  Objection to form.
11          THE WITNESS:  Less than 1 percent.
12   BY MR. MAINLAND:
13      Q   Well, I understand you observed less
14   than 1 percent and you concluded that's strong.
15      A   Right.
16      Q   You know, I've looked at your binomial
17   distribution equation.  If you tinker with the
18   numbers a little bit -- let me just represent
19   this to you.  I can confidently represent to you
20   that this is how the numbers play out, that the
21   cumulative probability of four or more days, not
22   five days, but four days out of 19 being
23   statistically significant at the 5 percent level
24   by chance is 1.3 percent, which makes sense
25   going in that direction.

1          Would you conclude then that the
2   statistical evidence is strong that new and
3   material information is quickly incorporated
4   into SQM's ADS price?
5      A   No, then it would be at the 5 percent
6   level, not the 1 -- if you have something above
7   1 percent, then it goes to the 5 percent level.
8      Q   Well, what does that mean?  So then
9   what would you conclude, what would this
10   consequently sentence say if those --
11      A   That there's confidence, because there's
12   one chance out of 20 that -- or one chance out
13   of 1.5 percent that you're wrong.  So the P
14   value is basically the error rate, the
15   probability that you're wrong; right.
16          So if you have a P value of 1.5, which
17   I think you represented to me, so --
18      Q   It was 1.3, but yes.
19      A   1.3, that means that you could be
20   wrong because it could have happened randomly.
21   It happens randomly 1.3 percent of the time.
22          So then I would not have used the term
23   "strong," but you still have evidence and the
24   evidence is more than the 5 percent level that
25   is frequently used, yes.

1      Q   Okay.  And so you basically take the
2   word strong out, but you would say there's
3   evidence?
4      A   Usually -- yes.  If it's less than
5   1 percent, typically what I do is to say it's
6   highly statistically significance or strong
7   evidence.  It's just -- it's typically the way
8   that I write my reports.
9      Q   Let's just keep -- to keep going with
10   the -- and I looked at this with the binomial
11   distribution, the cumulative -- I can represent
12   to you that the cumulative probability of three
13   days out of 19 being statistically significant
14   at the 5 percent level is 6.6 percent.  Would
15   you then conclude that there's evidence or --
16   you certainly wouldn't conclude there's strong
17   evidence; right?
18      A   That's correct.
19      Q   Would you conclude that there's
20   evidence?
21      A   Typically at the 10 percent level,
22   typically the terminology that I use -- and I
23   think this is actually the terminology that was
24   used in the textbook that was -- that I
25   referenced, is that at the 10 percent level,

1   there is some evidence.
2      Q   So in that instance, there would be
3   some evidence at the 10 percent level?
4      A   At the 10 percent level, yes.
5      Q   The 10 percent level is less -- has
6   less confidence, so to speak, than the 5 percent
7   level?
8      A   Correct, yes.
9      Q   And then just the exact same tinkering
10   of the numbers, if it's just two out of 19, the
11   cumulative probability of two out of 19 being
12   statistically significant by chance is
13   24.5 percent based on the binomial distribution,
14   so what would you conclude in that circumstance?
15      A   In that case, when -- you wouldn't --
16   you couldn't reject the null hypothesis, which
17   means that it could, in fact, be -- the
18   difference between the two could be -- there may
19   be no difference between the two using the type
20   of benchmark that I typically use.
21      Q   So if that were the results -- I mean,
22   when you say you could not reject the null
23   hypothesis, that's a statistician's way of
24   saying you would not have evidence of new and
25   material company specific information being

Page 282

```
1    quickly incorporated into the ADS price; right?
2        A    Yes, that's correct, yes.
3        Q    Now, the 19 financial release dates
4    are a subgroup that you intentionally selected
5    because they are -- let me rephrase.
6            The 19 financial release dates are a
7    subgroup you intentionally selected to increase
8    the rate of information flow; is that fair?
9            MR. ZOHRABIAN:  Object to form.
10           THE WITNESS:  To increase the --
11   BY MR. MAINLAND:
12       Q    Maybe that's the wrong way to phrase
13   it.  I can see you're skeptical.  I'm not
14   setting a trap for you, I'm not accusing you.
15           I'm literally saying:  You chose those
16   dates because they tend to have greater
17   information flow than the average date just
18   picked out of a hat?
19           MR. ZOHRABIAN:  Same objection.
20           THE WITNESS:  I picked them because
21       there's greater probability on those days
22       for there to be new material information
23       that would result in a statistically
24       significant price movement.
25   BY MR. MAINLAND:
```

Page 283

```
1        Q    Right.  I think that's a different way
2    of saying what I said.  So I think we're agreed
3    on that.
4            Wouldn't you expect the share price to
5    move at a much greater rate than would occur
6    randomly?
7            MR. ZOHRABIAN:  Object to form.
8            THE WITNESS:  I don't understand the
9    question.
10   BY MR. MAINLAND:
11       Q    You don't understand the question?
12       A    No.  The share price move at a greater
13   rate, what does that mean?
14       Q    Of the 19 dates, wouldn't you expect
15   there to be more of them than would occur
16   randomly?
17       A    It would depend on the information
18   disclosed.
19       Q    But you think there is a greater
20   likelihood that there will be materially --
21   material information disclosed?
22       A    Yes.  I may have misunderstood your
23   question.  That's precisely the point.  In an
24   efficient market, when new material information
25   is disclosed, you would expect there to be more
```

Page 284

```
1    statistically significant days than on other
2    days.
3            It may not be so even in an efficient
4    market, but generally that is what the
5    expectations -- expectation would be.
6        Q    And you're not saying that if the
7    market sometimes reacts to material news, that
8    that would mean that the market is
9    informationally efficient, would you?
10           MR. ZOHRABIAN:  Object to form.
11           THE WITNESS:  That if it sometimes --
12       so on Thursday it's efficient but on Friday
13       it is not?
14   BY MR. MAINLAND:
15       Q    Yeah, or let's say all 19 days had
16   highly material news and only half of them moved
17   in a significant way, you're not saying that's
18   informationally efficient because -- I'm just
19   looking for some evidence that sometimes it
20   reacts to news.  That's not the standard; right?
21           MR. ZOHRABIAN:  Object to form.
22           THE WITNESS:  It reacts to news more
23       than one would expect if there is no news.
24       That is what I'm looking for.
25           And by the way, with respect to the
```

Page 285

```
1    earnings releases, it's not just the fact
2    that when you look at the price movement in
3    those earnings releases.  You also have
4    analyst commentary on earnings release days,
5    you can look at the volume of many of these
6    days.  It seems to me quite obvious that the
7    information disclosed on earnings release
8    dates, it was widely distributed, it was
9    analyzed by analysts and investors traded on
10   it.
11           So it's not the only evidence that I
12   have looked at with respect to earnings
13   release dates.  You're just focusing in on
14   one component on it and that demonstrates
15   that it was a greater likelihood the
16   evidence would show that on earnings release
17   dates, that the stock price reacted to
18   company specific information.
19   BY MR. MAINLAND:
20       Q    And the results you found were five
21   out of 19 financial release dates were
22   statistically significant; right?
23           MR. ZOHRABIAN:  Object to form.
24           THE WITNESS:  Correct, yes.
25   BY MR. MAINLAND:
```

1    Q    And that's about a quarter of the
2  dates tested; right?
3    A    Yes.
4    Q    Thereabouts?  It's not five out of 20,
5  five out of 19, but it's close enough; right?
6    A    Yes.
7    Q    Okay.  So in your experience, because
8  I know you've done this exact kind of test in
9  numerous prior cases.  That's right, isn't it?
10    A    That's correct, yes.
11    Q    And in your experience, how common is
12  it for only one-quarter of the financial release
13  dates that you tested to show statistically
14  significant returns?
15        MR. ZOHRABIAN:  Objection to form.
16        THE WITNESS:  That's a good question.
17  I mean, it depends a little bit on the
18  company and how meaningful the earnings are
19  for the company.
20        You have -- when you have a company
21  that is basically having a commodity product
22  where a lot of the value on the company is
23  dependent on commodity prices and other
24  factors, the earnings revealed on earnings
25  days may not be as unexpected as for other

1  companies where investors may be more in the
2  dark with respect to what is ultimately
3  disclosed on earnings release days.  So it
4  can depend a little bit on the company.
5        I have looked at some companies where
6  the majority of the earnings releases have
7  been accompanied by statistically
8  significant results.
9        So some company earnings releases are
10  extraordinarily important and frequently
11  result in statistically significant price
12  movements.  For other companies, it's not
13  necessarily that frequent.
14  BY MR. MAINLAND:
15    Q    I went back to look and it seems like
16  the lowest rate that you found in any of the
17  cases where you've done an equivalent study was
18  where half of the financial release dates were
19  statistically significance and the average was
20  more in the 70 percent range.  One of them was
21  as high as 87.5 percent.
22        Given that sort of background, did it
23  give you pause or did it surprise you based on
24  that prior experience to find that five out of
25  19 were statistically significant?

1        MR. ZOHRABIAN:  Objection to form.
2        THE WITNESS:  As you pointed out
3  earlier, there is a large period in the
4  early part of the class period where
5  earnings seemed to be fairly consistent with
6  what investors expected.  So yes, I mean, it
7  is lower than one would normally see
8  primarily because of -- or at least in part
9  because of that, which is the same issue
10  that we've discussed in terms of the -- I
11  think you said the first 14 months, there is
12  no statistically significant price movements
13  during that period of time.
14  BY MR. MAINLAND:
15    Q    Can I direct you to Footnote 44?
16  That's I guess associated with -- let me see
17  where it is.  That's also in Paragraph 40 of
18  your report.
19        What you write there is:  It should be
20  noted that just because the company announced
21  earnings does not mean that one would
22  necessarily expect there to be a statistically
23  significant price increase or decrease because
24  the totality of the information disclosed could
25  be interpreted by the market as being neutral.

1        Is that your explanation for why all
2  14 out of the 19 dates the share price did not
3  move in a statistically significant way?
4    A    No, it's not something I have -- I
5  haven't provided any analysis to that effect in
6  my report.  I'm just offering this up as
7  explaining the fact that it's very seldom that
8  you find that 100 percent of the earnings
9  releases are statistically significant.  Usually
10  it's a number less than that.
11    Q    Did you go back to look at the 14 and
12  develop a determination as to neutrality or
13  non-neutrality?
14        MR. ZOHRABIAN:  Objection to form.
15        THE WITNESS:  No, I have not -- I
16  don't have any analysis relating to that.
17  If I did so, I would discuss it in my
18  report.
19  BY MR. MAINLAND:
20    Q    If you went back to look at the
21  neutrality question, let's say you look at an
22  individual financial release with an eye to is
23  the information neutral to investors, doesn't
24  that implicate the same subjectivity problem
25  that you've identified earlier today and in your

Page 290

```
1    report?
2            MR. ZOHRABIAN:  Objection to form.
3            THE WITNESS:  I'm sorry, can you
4    repeat the question?
5    BY MR. MAINLAND:
6        Q    Sure.  The question is:  If you went
7    back to look at the neutrality question, let's
8    say you look at an individual financial release
9    with an eye to whether the information is
10   neutral from the point of view of investors,
11   doesn't that implicate the same subjectivity
12   issue that you've identified earlier today?
13           MR. ZOHRABIAN:  Objection to form.
14           THE WITNESS:  Well, one of the reasons
15   that I did not do it is that I just
16   presented, you know, an objective analysis.
17   It is what it is.  You know, you can -- so
18   there is no subjectivity into it.  Just the
19   earnings releases, are they more likely to
20   produce statistically significant results or
21   not.
22           With respect to going back and doing a
23   subjective analysis or doing an analysis of
24   the neutrality, it is -- it would include
25   some subjectivity but that -- I don't
```

Page 291

```
1    necessarily -- if that's the only option you
2    have, I don't necessarily think that
3    subjectivity is something that you cannot --
4    that cannot be included in an analysis.
5            I don't necessarily have a problem if
6    people would go back and look and
7    subjectively analyze these particular
8    earnings releases.
9            But the question of subjectivity, you
10   know, the results may be scrutinized a
11   little bit more than a purely objective
12   analysis.
13   BY MR. MAINLAND:
14       Q    Are you familiar with the problem of
15   multiple comparisons?
16       A    Yes.
17       Q    You seem to have -- I can tell through
18   your body language that you seem to have a
19   particular view of that.  Am I misreading it?
20       A    No, I mentioned this multiple
21   comparison issue in the article that I wrote,
22   the Law360 article.
23       Q    Right.
24       A    So I have -- my issue is simply with
25   respect to when it's misapplied and when it's
```

Page 292

```
1    not misapplied.
2        Q    Right.  That was the Law360 article
3    where you were essentially criticizing the use
4    of the Holm-Bonferroni method in connection --
5    so that was the Law360 article where you
6    criticized the use of Holm-Bonferroni in the
7    context of a price impact analysis; is that
8    fair?
9        A    Yes, I think that it was in the
10   context of a price impact analysis.  I think
11   that's correct, yes.
12       Q    Why don't I back up, though?
13           What is the problem of multiple
14   comparisons?
15       A    Well, there is not a problem -- well,
16   if you are going to do multiple comparisons, you
17   cannot just compare something one time and if
18   you don't get the result you like, throw it out,
19   do it again, throw it up and continue to compare
20   something multiple times until you find a result
21   that you like.
22           So that is the problem with doing so
23   and sometimes I view it as data mining in terms
24   of trying to find a pattern in data even though
25   none really exists, but just by pure chance or
```

Page 293

```
1    randomly you find something that looks like a
2    pattern and then you present it as if it is the
3    only thing you looked at.
4        Q    Let me just restate so you can tell me
5    if you disagree with how I understand it or not.
6            When economists -- when financial
7    economists refer to -- or statisticians refer to
8    the problem of multiple comparisons, isn't the
9    basic idea that the more comparisons that are
10   conducted, the higher the probability of a false
11   positive?
12           MR. ZOHRABIAN:  Object to form.
13           THE WITNESS:  Yes.  You're going to
14   have a false positive.  It can go both
15   directions, of course.  But yes, you can
16   have a higher probability of getting a
17   positive result and so in those cases, I
18   have used not the Bonferroni adjustment but
19   the Sidak adjustment, but it's a similar
20   type of adjustment in order to adjust your
21   statistical results.
22   BY MR. MAINLAND:
23       Q    And false positives are also referred
24   to as type 1 errors; is that right?
25       A    Correct, yes.
```

1    Q    And, well, I think you already -- you
2  almost predicted my question.  What I was going
3  to ask is:  Are there ways to correct for
4  multiple comparisons?
5          And I think you -- Holm-Bonferroni is
6  something I mentioned.  Isn't that one method
7  that statisticians use to correct for the
8  problem of multiple comparisons?
9    A    Yes, it's one way of doing it.  And I
10  just mentioned that I typically use a different
11  method, but it's just numbers, it's just
12  statistics.
13    Q    I did not hear what you said.  What is
14  the other method?
15    A    I said the Sidak.
16    Q    How do you spell that?
17    A    S-I-D-A-K.
18    Q    How does the Sidak adjustment differ
19  from Bonferroni?
20    A    To be quite honest with you, as I sit
21  here right now, I don't know, but it's the
22  two -- it's two very common ways of adjusting
23  for multiple comparisons.
24    Q    Did you apply either of those
25  adjustments to the comparisons that you

1  conducted here?
2    A    No.
3    Q    Did you feel -- was there any reason
4  you did not?
5    A    I only conducted one analysis.
6    Q    Meaning the binomial distribution?
7    A    Correct.
8    Q    And you did not think there was any
9  rationale in looking to whether you should
10  correct for the potential of false positive?
11    A    Correction for false positive, I mean,
12  no.  The probabilities are whatever the
13  probabilities are.  This is just pure math.
14  It's -- the equivalent of the binomial
15  distribution is similar to the calculations you
16  do in terms of what is the probability of
17  flipping a coin and getting heads four times in
18  a row.
19          So it's two, four, eight, 16, so it's
20  one out of 16.  Right?  If you do it ten times,
21  it's one out of 1024.  And that doesn't change
22  because it's just one analysis and it provides
23  one answer.
24          I don't have any repeated testing
25  involved in that analysis.

1    Q    Okay.  So your view is that the test
2  you conducted here just does not implicate the
3  problem of multiple comparisons?
4    A    Correct.
5          MR. MAINLAND:  Why don't we take a
6  break?
7          VIDEOGRAPHER:  This marks the end of
8  media 5, Volume 1 in the deposition of Bjorn
9  Steinholt.  The time is 5:16, and we are off
10  the record.
11          (Recess taken.)
12          VIDEOGRAPHER:  This marks the
13  beginning of media 6, Volume 1 in the
14  deposition of Bjorn Steinholt.  The time is
15  5:35, and we are on the record.
16  BY MR. MAINLAND:
17    Q    Sir, what is a Z test?
18    A    Well, it's similar to a T test, but
19  for my purposes, I don't make a distinction
20  between it.  I could have used a T test or Z
21  test, but one has to do with population, one has
22  to do with a sample.
23    Q    You used a T test in this case?
24    A    Well, the T test and Z test, if the
25  sample is large enough, it effectively ends up

1  being the same thing.  I could have called it a
2  Z test.  I used the same.
3    Q    You're seeing Z test as in zebra;
4  right?
5    A    Correct.
6    Q    I just want to make sure.
7          So I've seen a lot of cases in
8  securities litigation where a Z test is
9  conducted to compare news days to nonnews days.
10  Are you familiar with that kind of approach?
11    A    Correct.  That's the narrow approach
12  to doing things, yes.
13    Q    You don't do it that way?
14    A    No.  They wrote this article, I don't
15  remember if it was in St. Paul Law Review or
16  some article where they proposed this test.
17  There are, of course, various problems with it
18  and I discussed these problems in various
19  reports and there was some subsequent paper that
20  David Tabak wrote where he kind of summarized
21  some of the concerns that I had relating to that
22  particular test.  And that is to objectively
23  determine what is a news day and what is no news
24  days.
25          In order to get something that is

1  statistically significant, it is not sufficient
2  to simply impact the price but it has to impact
3  the price quite a bit in order to meet the
4  55 percent benchmark.
5      So when you have a large sample of
6  so-called news days, a lot of those news days
7  will not meet that threshold and consequently,
8  you will dilute the differences between the two.
9      It's kind of like what I was talking
10  about earlier.  You have one group who has the
11  placebo and you have one that's given the drug.
12  And now you're kind of mixing the two a lot and
13  then it becomes very different -- difficult to
14  get any result that's not inconclusive.
15      Q    So I think you said a lot of those
16  news days will not meet that threshold and
17  consequently will dilute the differences between
18  the two.
19      They will not meet the threshold of
20  materiality?
21      A    It may be material in the sense that
22  it impacted the stock price.  But just because
23  you have an event day with new information that
24  impacts the stock price, that does not mean that
25  you meet the threshold of being statistically

1  significant.  And that's because it's not just
2  to have false positive, you can also have what's
3  called false negatives.  In other words, you may
4  not be able to detect the impact even though
5  there is an impact and that's the type 2 error.
6      And that is one of the issues with the
7  single form -- the single firm event study.  It
8  has low power, so you end up with what's
9  effectively inconclusive results a lot of the
10  time.
11      So that's my main criticism of that
12  particular analysis.
13      Q    Have you ever conducted a Z test?
14      A    I have conducted Z tests just to see
15  exactly what the opposing expert has done.  So I
16  have duplicated what has been done by an
17  opposing expert just to understand exactly how
18  the statistics work.
19      Q    But plaintiff's on -- sorry,
20  withdrawn.
21      Experts on the plaintiff's side
22  conduct Z tests to analyze market efficiency all
23  the time, don't they?
24      MR. ZOHRABIAN:  Objection to form.
25      THE WITNESS:  When you say Z test,

1  that's a different term in my book.  You
2  know, I mean, that is not the known use news
3  day test in my vocabulary.  Maybe somebody
4  uses it, but I think they use typically the
5  first letter of each of the authors named
6  when they describe this particular model.
7  BY MR. MAINLAND:
8      Q    The FTD test?
9      A    Correct.  So that is the name that's
10  familiar to me.  I probably answered your
11  question earlier with respect to Z test, which
12  is similar to a T test in statistics.  So I
13  misunderstood your earlier question.  I did not
14  know that you were actually talking about the
15  FTD test.
16      Q    What I'm really asking about, setting
17  aside FDT, set aside Z test, it doesn't matter
18  what it's called.  There are a lot of experts
19  who will look at, will identify, quote/unquote,
20  news days and identify nonnews days and look to
21  see whether there is a greater incidence of
22  statistically significant returns on the news
23  days as compared to the nonnews days; right?
24      A    There are experts on both sides, so I
25  performed the test.  But the particular problem

1  in this particular case is that we are dealing
2  with SQM.  SQM is a massive company, it's a
3  large company.  Arguably every day is a news
4  day.  In other words, every day has new
5  information because it's just simply such a
6  large company.
7      So how do you determine which day is a
8  news day and which day is a no news days?  And
9  this goes back to my example about the placebo
10  and the drug.  In order to -- for the test to be
11  effective, you have to differentiate between the
12  two.  And that is the problem that I see.  So it
13  may be able to determine whether or not a market
14  is efficient.
15      My experience has been that very, very
16  frequently it does not, it ends up being
17  inconclusive, because the samples end up being
18  diluted.
19      Q    Let's turn to March 18, 2015.  That
20  was the last day of the class period; right?
21      A    That is correct, yes.
22      Q    And among the information you
23  considered in preparing your report was the
24  complaint filed in this case; right?
25      A    That's correct, yes.

1    Q    Were you provided the complaint at the
2 outset of your engagement in this case?
3    A    I had it from the very beginning, yes.
4    Q    Was that among the first materials you
5 reviewed?
6    A    It's such a long time ago, to be quite
7 honest with you, I don't really remember the
8 process.  But at some point early on, I would
9 have reviewed the complaint.
10    Q    Is the complaint typically something
11 that you would look at at the outset of a new
12 litigation consulting engagement?
13    A    Yes, it is.
14    Q    And you were aware at the outset that
15 the complaint alleges that SQM's share price
16 dropped by a significant amount on March 18th,
17 2015; right?
18    A    Did you say March 15th?
19    Q    I said March 18th, 2015.
20    A    I apologize.
21    Q    That's fine.
22    A    Yes.
23    Q    What information was disclosed on that
24 day?
25    A    I have it in my report.  Effectively

1 three individuals on the board of SQM resigned
2 and it was communicated or understood by the
3 market that they resigned because they were
4 concerned about the company not cooperating
5 sufficiently in an investigation relating to the
6 company.
7    Q    And the complaint alleges that that
8 news was a, quote/unquote, corrective
9 disclosure; right?
10    A    That's correct, yes.
11    Q    And a corrective disclosure is a
12 disclosure that reveals prior information or
13 prior disclosures to have been false or
14 misleading; right?
15        MR. ZOHRABIAN:  Object to form.
16        THE WITNESS:  No -- well, the way I
17    define a corrective disclosure is a
18    disclosure that corrects the inflation by
19    disclosing the relevant truth or the alleged
20    truth conceal by the misrepresentations.
21 BY MR. MAINLAND:
22    Q    Fine.  Did you consider whether it was
23 appropriate to use as an event date a date that
24 you already knew was associated with a
25 statistically significant return?

1        MR. ZOHRABIAN:  Objection to form.
2        THE WITNESS:  Well, first of all, I
3    obviously suspected that it would be
4    statistically significant given that the
5    price decline was so large.
6 BY MR. MAINLAND:
7    Q    Right.
8    A    But it is obviously relevant to look
9 at a particular event and actually test and see
10 if that is true even though the answer is fairly
11 obvious.
12    Q    And why is it relevant?  Relevant to
13 what I guess is what I'm asking?  What is it
14 relevant to?
15    A    It is relevant to see whether or not
16 investors reacted to the news disclosed on that
17 day just because the answer is so obvious that
18 you can just look at stock price and see the
19 15 percent decline, you still want to go through
20 the process of actually conducting the event
21 analysis and quantify the abnormal return and
22 determine that it was, in fact, statistically
23 significant.
24    Q    So would it have been a reliable event
25 study if you had just looked through the 1,187

1 trading days, found the most five most
2 statistically significant returns and then
3 backed up from there to see whether there was
4 news on those days?
5        MR. ZOHRABIAN:  Object to form.
6        THE WITNESS:  Would that be reliable
7    for what purpose?
8 BY MR. MAINLAND:
9    Q    Demonstrating market efficiency,
10 direct evidence of market efficiency during the
11 class period.
12    A    I don't think that -- that's not the
13 process that I would have done, but --
14    Q    Because that would not be reliable in
15 terms of analyzing market efficiency; right?
16    A    Well, it's not typically the process
17 you would go through.  But that said, it does
18 not mean that it does not have -- even if you do
19 it in a manner that does not strictly follow the
20 process you should be following, it does not
21 mean that it does not have informational value
22 to look at -- you know, to look at whether or
23 not there is two things happening at the same
24 time; in other words, disclosure of material new
25 information and statistically significant price

1  decline.
2       It's just not -- what you're
3  describing to me is just not the process that
4  one would typically follow.
5       Q    Because the -- well, you wouldn't
6  typically follow it because wouldn't really tell
7  you anything, would it?
8       MR. ZOHRABIAN:  Objection to form.
9       THE WITNESS:  That's where you're
10 wrong.  You know, you can -- even though the
11 process is incorrect, it does not mean that
12 it's not informative to look at days and
13 look and see whether or not there is
14 material new information disclosed on those
15 days.
16      It's just not the process that you
17 typically would do if you wanted to analyze
18 or if you wanted to look at the event first
19 and then test it using the event study.
20 BY MR. MAINLAND:
21      Q    Cammer 5 looks for direct evidence of
22 a cause and effect relationship between material
23 news and the share price; right?
24      A    That's correct, yes.
25      Q    So if you start with looking at the

1  returns themselves and then go back to see was
2  there news on days where there was statistically
3  significant returns, does that tell you anything
4  about actual causation?
5       MR. ZOHRABIAN:  Object to form.
6       THE WITNESS:  It can -- it may or may
7  not.  I mean, you're talking about a
8  different process, doing something different
9  than what I've done.
10      The --
11 BY MR. MAINLAND:
12      Q    I'm not saying that's what you did,
13 I'm just asking -- I'm not taking a position one
14 way or the other as to what you did.  I'm just
15 asking:  If you had done it that way, would that
16 demonstrate causation?
17      A    I would have to --
18      MR. ZOHRABIAN:  Object to form.
19      THE WITNESS:  You can analyze -- you
20 can analyze the stock price movements
21 different ways.  And it is -- you know, you
22 can -- it doesn't mean that it wouldn't have
23 informational value.  If you picked the five
24 largest statistically significant price
25 decline and see whether or not there is any

1  material information on those days and if
2  there were, you said, well, this is some
3  evidence for market efficiency.
4       It's not as if it wouldn't have zero
5  informational value.  You can criticize it
6  by saying, well, you know, I would prefer
7  that you identify the days first like I did
8  with the earnings releases and then do the
9  analysis.
10      But it's -- it doesn't all of a sudden
11 lose all meaning.  It depends on what the
12 data is.  It is what it is.
13 BY MR. MAINLAND:
14      Q    It would have -- you're saying it
15 would potentially have informational value as to
16 causation?
17      MR. ZOHRABIAN:  Object to form.
18      THE WITNESS:  If you have new material
19 information on any day that is followed by a
20 statistically significant price decline, if
21 you can determine that the information
22 disclosed on that particular day was new and
23 material, and the stock price reacted just
24 as one would expect, then that has some
25 value.

1       Now, typically what -- if you're going
2  to do it by identifying the events a priori,
3  I mean, yes, that's -- that would be a
4  more -- a better way from a scientific point
5  of view because a priori, you would have to
6  do the analysis prior to knowing what the
7  outcome is.
8       But, you know, ultimately, it still
9  has some value to find new material
10 information that's corresponding with
11 significant price reactions.
12 BY MR. MAINLAND:
13      Q    The word "corresponding" is exactly
14 what I'm getting at.  Isn't there a difference
15 between correlation and causation?
16      A    Absolutely.  But correlation is all
17 you can demonstrate with an event analysis.  So
18 you infer causation from correlation.
19      Q    But if you literally just choose the
20 five most statistically significant dates and
21 then look to see if there is news and you
22 discover that there was news, is that telling
23 you anything other than that there is a
24 correlation between the two?
25      MR. ZOHRABIAN:  Object to form.

1     THE WITNESS:  Well, yes.  Because what
2  is the likelihood that on all of those five
3  days, there happened to be new material
4  information that is directly consistent, for
5  instance.  I can tell you what the
6  probability is, as a matter of fact.  You
7  would have five, so it would be two, four,
8  eight, 16, 32 -- it would be one out of 32
9  chance that you would get all of them to be
10  consistent with the direction.
11     And that probability -- so even though
12  you did not -- that's what my point is, even
13  though you did not do the process in the way
14  that one may want to do, if you want to do
15  an a priori analysis beforehand, it doesn't
16  mean that it doesn't have any informational
17  value because it's very unlikely if a market
18  is inefficient that you picked out the --
19  the largest five price movements and right
20  there it just happened to be, you know,
21  material new information to explain it that
22  is directionally consistent with how the
23  stock price moved.
24  BY MR. MAINLAND:
25     Q    So it would be a scientifically

1  reliable study if you chose the five most
2  statistically significant dates during the class
3  period and then looked at whether there was news
4  on those days and if there was, to conclude that
5  the market was generally efficient?
6     MR. ZOHRABIAN:  Object to form.
7     THE WITNESS:  It could be because you
8  can do a statistical analysis and determine
9  the probability of finding this type of
10  correlation randomly, you can compare the
11  two.
12  BY MR. MAINLAND:
13     Q    We talked about how March 18th is the
14  last day of the class period.  It was also the
15  most statistically significant change in the
16  stock price during the class period; isn't that
17  right?
18     A    I have not looked, but it would not
19  surprise me.
20     Q    I can represent to you that it was
21  based on what I'm seeing in your event study.
22     In fact, it was the most statistically
23  significant return by a substantial margin.  Is
24  that -- does that come as a surprise to you?
25     MR. ZOHRABIAN:  Objection to form.

1     THE WITNESS:  No, and I think that
2  that is evidence of market efficiency.
3  BY MR. MAINLAND:
4     Q    Why is that evidence of market
5  efficiency, the single most statistically
6  significant return in the entire class period?
7     A    You have negative news coming out and
8  you have large statistically significant price
9  decline.
10     Q    It was -- more than a third of the
11  board resigned on that day; correct?
12     A    Correct.
13     Q    Totally unexpectedly?
14     A    Three individuals resigned, yes.
15     Q    Three out of eight directors.  So this
16  was significant news for the company; right?
17     A    I would think so, yes -- the reasons
18  why they resigned was very significant, yes.
19     Q    So it was a big news day?
20     MR. ZOHRABIAN:  Objection to form.
21     THE WITNESS:  Yes.
22  BY MR. MAINLAND:
23     Q    And would you agree that even a
24  grossly inefficient market will incorporate to
25  some degree news that -- news about extremely

1  significant events?
2     MR. ZOHRABIAN:  Objection to form.
3     THE WITNESS:  A grossly inefficient
4  market?
5  BY MR. MAINLAND:
6     Q    Yes.
7     A    Well, if it doesn't react -- if it's
8  inefficient, then do not react to new
9  information, then why would it incorporate this
10  information?
11     Q    Maybe I should just restate the
12  question.
13     Would you agree that a grossly
14  inefficient market will nonetheless incorporate
15  to some degree news about extremely significant
16  events?
17     MR. ZOHRABIAN:  Objection to form.
18     THE WITNESS:  I don't know what you
19  mean by grossly inefficient.
20  BY MR. MAINLAND:
21     Q    Highly inefficient, very inefficient?
22     A    You know --
23     MR. ZOHRABIAN:  Same objection.
24     THE WITNESS:  If -- so the market has
25  some efficiency.  So I mean, it processes --

Page 314

1  in this case, it processed information
2  really, really quickly.  And in an
3  inefficient market who would the analyst be
4  to analyze it, who are the investors there
5  to trade on the information?  How is the
6  information distributed?
7      You have to have the structure in
8  order for that information to become
9  reflected in the stock price.  So this is
10  evidence of efficiency.
11  BY MR. MAINLAND:
12      Q   Why don't we look briefly at the
13  Cornell/Rutten article.  I'm not remembering
14  exactly what exhibit that was.
15      A   Three.
16      Q   Exhibit 3, thank you.  And this is
17  just to give a little more context to what I'm
18  really asking you.  Sorry.
19      If you turn to Page 457 of that
20  article, Footnote 55.  In the middle there it
21  says:  Although no market will be entirely
22  inefficient in the sense that market price will
23  always be impervious to news about company
24  fundamentals, the market nevertheless may be
25  impervious to some types of news.  For example,

Page 315

1  even though a grossly inefficient market will
2  incorporate to some degree news about extremely
3  significant events, e.g., a sharp unexpected
4  decline in earnings, it may be impervious to
5  more minor news that is still material, e.g.,
6  the hiring of a new CFO.  In such a market,
7  whether a defendant's statement will be
8  incorporated into price to some degree will
9  depend on the type and significance of the
10  statement.
11      And so this was incredibly significant
12  news, this meaning the resignations on
13  March 18th, it was big news.  And it was the
14  single most statistically significant return
15  during the entire class period.
16      Why would that be an appropriate
17  indicator of whether the share price was
18  generally efficient during a five-year class
19  period for all kinds of publicly-available
20  information?
21      MR. ZOHRABIAN:  Object to form.
22      THE WITNESS:  Well, in the context of
23  reliance, typically we want to determine
24  that the stock price is generally efficient
25  to infer that it was efficient related to

Page 316

1  fraud related events.
2      In this case we have the fraud related
3  events and you want to infer from the fraud
4  related event and the price decline relating
5  to the fraud related event that the market
6  was generally efficient.  Who cares whether
7  or not -- if that is the argument, then you
8  have already demonstrated what that -- with
9  respect to the fraud related event, the
10  correct disclosure, the market was
11  efficient.
12  BY MR. MAINLAND:
13      Q   There are a bunch of things in there.
14  First of all, are you -- you're not doing a loss
15  causation analysis here; right?
16      A   I have not provided a loss causation
17  analysis.
18      Q   Do you have a view as to whether this
19  was, in fact, a fraud related event?
20      A   It is an alleged fraud related.
21      Q   So you are not taking an opinion or
22  you haven't done an analysis of whether you
23  agree with the allegation.  You're just assuming
24  the allegation to be true for the purposes of
25  your analysis?

Page 317

1      A   I'm assuming that it is an alleged
2  fraud related event and I assume that is an
3  event of great importance in this particular
4  case because it is an alleged corrective
5  disclosure.
6      Q   Okay.  But assuming, not opining?
7      A   Exactly.  I'm assuming that, yes.
8      Q   Now, I just want to be -- I just want
9  to understand.  You said who cares whether or
10  not -- I think what you were saying is who cares
11  whether or not it shows whether the market was
12  generally efficient.  Isn't that precisely what
13  you're trying to do?
14      MR. ZOHRABIAN:  Object to form.
15      THE WITNESS:  If you can demonstrate
16  directly that the alleged fraud related
17  events caused the stock price or impacted
18  the stock price, in that -- under that
19  scenario, then who cares about other types
20  of information.  I don't know, is there a
21  legal reason to care about it.
22      If the issue is reliance and the
23  reliance relates to whether or not the stock
24  price was impacted by the alleged fraud
25  related events, regardless of whether or not

Page 318

1  these events were true or not, why is that
2  relevant?
3      That's actually the very point that
4  was made in this one article that I included
5  here.  It is in Footnote -- let me --
6  Footnote 6 by Macey, Miller, Mitchell and
7  Netter, and that is that, you know, if you
8  can directly demonstrate -- assuming that
9  defendants can -- I'm not pretending to
10  prove that their allegations are correct or
11  not, but if you can demonstrate that the
12  price reacted to either a misrepresentation
13  or the disclosure of the relevant truth,
14  then it seems to me that you have
15  demonstrated that the market -- that would
16  be important to a judge to consider in terms
17  of determining whether or not the
18  misrepresentations impacted the stock price.
19  BY MR. MAINLAND:
20      Q    It sounds like you're conflating loss
21  causation and damages analysis with market
22  efficiency analysis.
23      A    No, it's not the loss causation
24  analysis because you assume that this is a
25  corrective disclosure.  And you assume that if

Page 319

1  there was a misrepresentation, that the alleged
2  misrepresentation, that plaintiff's allegations
3  are true.
4      Q    But my question is a little simpler.
5  If you were trying to demonstrate the general
6  efficiency of SQM's ADS during the five-year
7  class period, why would you choose the single
8  biggest statistically significant return during
9  that class period in one of the biggest,
10  arguably, news events for the company during the
11  class period?
12      MR. ZOHRABIAN:  Objection to form.
13      THE WITNESS:  First of all, as I
14  previously testified, I did not choose the
15  single largest price decline.  In fact,
16  until you told me, I didn't -- as I was
17  sitting here, I did not know it was.  I
18  chose it because it was the last day of the
19  class period.
20      No, my conclusion is not simply based
21  on that particular event, as I've
22  continuously testified throughout this
23  deposition.  I looked at all of the
24  evidence.  I believe that that is relevant
25  evidence.  I think that it is -- if you

Page 320

1  didn't have a price decline on the last day
2  of the class period, I think that
3  defendants -- and I think they would be
4  right to bring that up to the court to point
5  out the fact that the last day of the class
6  period did not have a corresponding
7  statistically significant price decline.  So
8  that's why I typically look at it.
9      But my opinion is in no way simply
10  based on that one event analysis.  It is one
11  I did.  You can -- you know, the judge is
12  free to put whatever weight the judge wants
13  on that analysis, but I base my opinion on
14  all of the evidence in my report.
15  BY MR. MAINLAND:
16      Q    But the last day of the class period,
17  who chooses what the last day of the class
18  period is?
19      MR. ZOHRABIAN:  Object to form.
20      THE WITNESS:  Presumably it is the
21  investor who claims that he or she has been
22  defrauded.
23  BY MR. MAINLAND:
24      Q    And the plaintiffs sue because there
25  has been a big drop on the last day of the class

Page 321

1  period?
2      MR. ZOHRABIAN:  Objection.
3  BY MR. MAINLAND:
4      Q    They determine what the class period
5  is, they are the ones who are requesting that a
6  court certify a class.
7      MS. ZOHRABIAN:  Objection to form.
8  BY MR. MAINLAND:
9      Q    So of course the last day of the class
10  period is going to be a big drop.
11      MR. ZOHRABIAN:  Object --
12  BY MR. MAINLAND:
13      Q    Why would you look at that over and
14  over again?
15      A    Well, that's just an incorrect
16  statement.  I've looked at hundred of cases and
17  it does not necessarily follow that the last day
18  of the class period has a statistically
19  significant decline.  That is just incorrect.
20      Q    What is the special significance of
21  the last day of the class period as opposed to
22  any other big day?
23      MR. ZOHRABIAN:  Object to the form of
24  the question.
25      THE WITNESS:  The last day of the

25

25

## Page 322

```
 1    class period is a day that plaintiffs
 2    allege, correctly or wrongly, that new
 3    material, active information has been
 4    disclosed.
 5         So if plaintiffs are correct in their
 6    allegations, then there should be a
 7    statistically significant negative return on
 8    that day.
 9         That does not always happen in
10    securities class actions.  There are actions
11    where the last day of the class period is
12    not statistically significant.  In this case
13    it is.
14    BY MR. MAINLAND:
15    Q    Okay.  And there are five other days
16    in the complaint where the plaintiff alleges
17    that there were corrective disclosures; isn't
18    that right?
19    A    I think that there are gradual
20    disclosures during the --
21         MR. ZOHRABIAN:  Sorry, object to form.
22         THE WITNESS:  -- end of February and
23    during March.
24    BY MR. MAINLAND:
25    Q    Right.  And one example is on
```

## Page 323

```
 1    February 27th, SQM announced it had formed an ad
 2    hoc committee to look into the payments that are
 3    at issue in this case; isn't that right?
 4    A    Yes, that's correct.
 5    Q    And that it would be conducting an
 6    internal investigation into those
 7    payments?right?
 8         MR. ZOHRABIAN:  Object to form.
 9         THE WITNESS:  Correct.
10    BY MR. MAINLAND:
11    Q    Do you have an opinion as to whether
12    that information was new and would be viewed as
13    material?
14    A    I haven't analyzed that.
15    Q    Why didn't you analyze that?
16    A    It was not -- in my opinion, it was
17    not -- it seemed more like a loss causation
18    analysis to me than a market efficiency
19    analysis.
20    Q    Wasn't there news on that day?
21    A    Yes, there are new information on that
22    day as well as a lot of other days during the
23    almost 1200-day class period.  I didn't analyze
24    every day just because there was new
25    information.
```

## Page 324

```
 1    Q    And -- but there was news on the last
 2    day of the class period too?
 3    A    There was news on the last day of the
 4    class period, yes.
 5    Q    And it's alleged to be a corrective
 6    disclosure?
 7    A    That's correct, yes.
 8    Q    You looked at that date?
 9    A    Correct.
10    Q    And I'm just wondering why didn't you
11    look at February 27th, which seems to be the
12    same?
13         MR. ZOHRABIAN:  Object to form.
14         THE WITNESS:  The last day of the
15    class period is the ending point of the
16    class period.
17    BY MR. MAINLAND:
18    Q    Agreed.
19    A    So that if, in fact, that -- and this
20    is for class certification purposes.  The class
21    period -- whether or not plaintiff is correct
22    with respect to these other price declines does
23    not impact the class period at all because you
24    have a class period ending at the last day of
25    the class period.
```

## Page 325

```
 1         Consequently, I want to look at the
 2    last day of the class period.
 3    Q    So -- but we're talking about general
 4    market efficiency here; right?
 5    A    We're talking about market efficiency
 6    in a reliance context for the purposes of class
 7    certifications, yes.
 8    Q    So there are five -- February 27th,
 9    there is alleged to be a corrective
10    disclosure -- or put differently, it doesn't
11    matter that it's a corrective disclosure, just
12    significant news; right?
13         MR. ZOHRABIAN:  Object to form.
14    BY MR. MAINLAND:
15    Q    Let me just finish the question and
16    then I'll just ask it.
17         March 11th is a similar date where the
18    company -- and it's alleged -- you had read the
19    complaint and there's all this stuff about how
20    SQM announced that it received a request from
21    the public prosecutor.  March 13th, more
22    information about Chilean government
23    investigations.  March 16th, the CEO of the
24    company is terminated in the context of this
25    unfolding news about payments to political
```

## Page 326

```
1    figures.
2           You didn't look at any of those dates
3    to determine whether they were evidence of
4    market efficiency; correct?
5           MR. ZOHRABIAN:  Object to form.
6           THE WITNESS:  Yes, that's correct.  I
7    mean --
8    BY MR. MAINLAND:
9       Q    I just don't understand why.  Why
10   would you look at March 18th and not those five
11   other days?
12          MR. ZOHRABIAN:  Object to form.
13          THE WITNESS:  I always look at the
14   last day of the class period.
15   BY MR. MAINLAND:
16      Q    Right, and I'm not understanding why.
17   And I'm sure it's my problem.  I just haven't
18   heard yet why you view that as a particularly
19   significant date for determining whether the
20   shares traded in an efficient market during the
21   entire class period?
22      A    Listen, it's getting late, I have
23   given you the answer.  And if that is
24   insufficient, that's too bad.
25      Q    It will remain one of the mysteries
```

## Page 327

```
1    when I walk out of this deposition.
2       A    Too bad.
3           MR. ZOHRABIAN:  It's been asked and
4    answered.
5    BY MR. MAINLAND:
6       Q    Do you recall the Lending Club case,
7    it's a fairly recent case?
8       A    Yes, I do.
9       Q    That involved a situation where the
10   CEO was terminated as well; right?
11      A    Yes, I believe so.
12      Q    And I believe you considered that news
13   in connection with that report in analyzing
14   market efficiency?
15      A    I think that was the last day of the
16   class period.
17      Q    That's why you looked at it?
18      A    Well, it was a big news -- it was a
19   big day with respect to the information that was
20   disclosed on that day.
21          So it is -- so I would have looked at
22   it.  There was a lot of commentary talking about
23   the importance of that particular event.  So
24   it's something that -- even though I don't have
25   everything fresh in my mind, it is something
```

## Page 328

```
1    that I am not surprised it that I looked at.
2       Q    It was a big day for SQM when it was
3    announced that their CEO had been terminated;
4    right?
5           MR. ZOHRABIAN:  Objection to the form.
6           THE WITNESS:  I can look at the number
7    of analyst reports that were issued
8    following March 18th compared to all of
9    these disclosures.  And I think that kind of
10   provides some indication how important
11   investors looked at various types of
12   disclosures.
13          I think that that disclosure at the
14   very end was a lot more significant that was
15   more likely to -- where one would clearly
16   expect a particular stock price reaction
17   than these other disclosures.
18   BY MR. MAINLAND:
19      Q    Why?
20      A    Well, because I'm of the same opinion
21   as a lot of analysts that it was kind of
22   difficult to figure out earlier on in terms of
23   exactly what the severity and the magnitude was
24   of the information that was disclosed.
25          So it would be more of an issue where
```

## Page 329

```
1    you would analyze it in the context of damages
2    and loss causation where you first established
3    that the market is efficient and then you look
4    at the price movements to determine how -- to
5    try to figure out how investors interpreted that
6    information.
7       Q    But the CEO being hired, I mean you
8    just said in Lending Club, it was a big deal,
9    the CEO was fired.  The CEO was fired here too?
10          MR. ZOHRABIAN:  Objection.
11          THE WITNESS:  And there was a big
12   price decline here.
13   BY MR. MAINLAND:
14      Q    No, actually, it was a statistically
15   insignificant price reduction.
16          MR. ZOHRABIAN:  Objection to form.
17          THE WITNESS:  What is the date?
18   BY MR. MAINLAND:
19      Q    Let's look.  Let's go to your
20   Exhibit E.
21      A    Page 29.
22      Q    So it was announced on March 17th.
23      A    So you have I think --
24      Q    The T-statistic there is 1.19; right?
25      A    Correct.
```

1    Q    And is that a statistically
2  significant return?
3    A    By itself, no.
4    Q    Okay.
5    A    So you're talking about the much more
6  complex analysis that I haven't performed which
7  relates to analyzing the -- because you have
8  multiple days where different things are being
9  disclosed.
10       And what you have to do is to
11 determine whether or not, when you look at it in
12 combination, is it statistically significance or
13 not.  I have not performed that analysis, but
14 that is the analysis I would perform if I wanted
15 to know whether or not on the last -- let's say
16 one, two, three, four -- five days when it was
17 determined by the company that they were going
18 to look into this particular issue and during
19 that period of time what I would want to know
20 specifically when the information was disclosed
21 during that time period.
22       I would combine it and I would look at
23 the cumulative of normal return over those five
24 days and I would divide it by the standard
25 deviation, multiply it by the square root of the

1  number of days, square root of five, and I would
2  determine is that statistically significant or
3  not.  I have not done that in this context, but
4  that's what I would do if I did it.
5    Q    Has the plaintiff indicated whether
6  they intend to retain you to opine on issues of
7  loss causation or damages?
8         MR. ZOHRABIAN:  Objection to form.
9         THE WITNESS:  No.
10        MR. ZOHRABIAN:  I instruct the witness
11 not to answer questions about conversations
12 that we have had.
13 BY MR. MAINLAND:
14    Q    Do you expect to play that role in
15 this case?
16    A    I have no expectations, but I can tell
17 you one thing, I have had cases such as Novotel
18 where you have had days that are not
19 statistically significant but based on further
20 analysis, I have been able to demonstrate that
21 there, in fact, was surprise impact.
22    Q    A leakage model, is that what it's
23 called?
24    A    In certain instances you can use a
25 leakage model.  In Novotel what I did was an

1  intraday analysis.  That was a case where there
2  was a Daubert motion filed, it was rejected and
3  there's also an academic article that discusses
4  the way that I handled it and advocated using
5  intraday trading in order to do a more detailed
6  analysis.
7        This type of more detailed analysis is
8  an analysis that I have not performed.
9    Q    And in the context of this class
10 certification motion, you don't intend to
11 perform that analysis; right?
12    A    No, I do not.
13    Q    And the opinions that you will be
14 offering in support of class certification are
15 limited to those that are in your report and
16 those that you've expressed today; is that
17 correct?
18    A    Correct.
19        MR. ZOHRABIAN:  I object to the form
20 of the question.
21 BY MR. MAINLAND:
22    Q    Is there anything other than what is
23 in your report or what may have said today that
24 you intend to opine on?
25        MR. ZOHRABIAN:  Object to form.

1        THE WITNESS:  Other than to respond to
2  a potential rebuttal report.
3  BY MR. MAINLAND:
4    Q    Sure.
5    A    No, this is all.
6    Q    And with respect to -- there's just
7  one footnote I want to ask you about in your
8  report.  It's Footnote 46 in Paragraph 41.
9        So here you say:  It is my
10 understanding that this disclosure -- and this
11 is referring to March 18th.  It says:  It is my
12 understanding that this disclosure is alleged to
13 be disclosure dates of the relevant truth
14 concealed by the alleged misrepresentations in
15 this case.  Regardless, my analysis simply
16 involves determining whether the disclosure
17 impacted the ADS price consistent with the
18 information disclosed.
19       So I just want to be sure I understand
20 what you're saying there.  I think it's what
21 you've already said today is basically what
22 you're looking at there is whether there's
23 evidence that the share price reacted to news,
24 not that the decline on that day was caused by
25 the revelation of any alleged fraud; is that

Page 334

1 fair?
2     A    Absolutely.  I have not performed a
3 loss causation analysis and so it's just simply
4 the news regardless of whether or not that
5 specific news can be tied to the alleged fraud
6 or not.
7         MR. MAINLAND:  Why don't we take a
8 quick break and we'll see if we have
9 anything minor as follow-up and we'll come
10 back on the record.
11         THE WITNESS:  Okay.
12         VIDEOGRAPHER:  This marks the end of
13 media 6, Volume 1 in the deposition of Bjorn
14 Steinholt.  The time is 6:21 and we're off
15 the record.
16         (Recess taken.)
17         VIDEOGRAPHER:  This marks the
18 beginning of media 7, Volume 1 in the
19 deposition of Bjorn Steinholt.  The time is
20 6:23, and we are on the record.
21         MR. MAINLAND:  Thank you,
22 Mr. Steinholt, I have no further questions.
23         THE WITNESS:  Thank you.
24         MR. ZOHRABIAN:  I have no questions
25 either.

Page 335

1         VIDEOGRAPHER:  This marks the end of
2 media 7, Volume 1 and conclude today's
3 deposition of Bjorn Steinholt.  The time is
4 6:24, and we are off record.
5         (Proceedings concluded at 6:24 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 336

1         I, LYNNE M. LEDANOIS, a Certified
2 Shorthand Reporter of the State of
3 California, do hereby certify:
4         That the foregoing proceedings were
5 taken before me at the time and place herein set
6 forth; that a record of the proceedings was made
7 by me using machine shorthand which was
8 thereafter transcribed under my direction; that
9 the foregoing transcript is a true record of the
10 testimony given.
11         Further, that if the foregoing
12 pertains to the original transcript of a
13 deposition in a Federal Case, before completion
14 of the proceedings, review of the transcript [ ]
15 was [X] was not requested.
16         I further certify I am neither
17 financially interested in the action nor a
18 relative or employee of any attorney or party
19 to this action.
20         IN WITNESS WHEREOF, I have this date
21 subscribed my name.
22 Dated: November 9th, 2018
23
24
                    _____
25                    LYNNE MARIE LEDANOIS
                    CSR No. 6811

Page 337

1                   ERRATA SHEET
2 Case Name:
3 Deposition Date:
4 Deponent:
5 Pg. No. Now Reads   Should Read  Reason
6 ___ ___ _____   _____  _____
7 ___ ___ _____   _____  _____
8 ___ ___ _____   _____  _____
9 ___ ___ _____   _____  _____
10 ___ ___ _____   _____  _____
11 ___ ___ _____   _____  _____
12 ___ ___ _____   _____  _____
13 ___ ___ _____   _____  _____
14 ___ ___ _____   _____  _____
15 ___ ___ _____   _____  _____
16 ___ ___ _____   _____  _____
17 ___ ___ _____   _____  _____
18 ___ ___ _____   _____  _____
19 ___ ___ _____   _____  _____
20 ___ ___ _____   _____  _____
21               _____
              Signature of Deponent
22 SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 2018.
24               _____
25 (Notary Public)  MY COMMISSION EXPIRES:_____

**A**

**$2 (1)**
15:17
**$28 (1)**
224:7
**a.m (4)**
1:19 2:5 6:3,16
**ability (1)**
274:20
**able (8)**
56:6 81:1 99:17
   102:20 131:8 299:4
   301:13 331:20
**abnormal (5)**
134:3 145:18 218:24
   225:21 304:21
**absence (2)**
218:7 222:4
**absent (1)**
274:3
**absolutely (7)**
48:23 81:10 82:18
   179:24 180:2
   309:16 334:2
**absorb (1)**
146:5
**abstract (2)**
232:25 233:3
**abundantly (1)**
190:22
**academia (1)**
137:13
**academic (12)**
14:9 67:19 133:6,23
   137:2 141:4 145:12
   160:13 161:1
   162:20 163:6 332:3
**academics (2)**
137:5 159:19
**accept (5)**
45:22 64:13 131:15
   185:23 247:15
**accepted (1)**
19:21
**accepts (2)**
148:3,6
**accompanied (1)**
287:7
**account (2)**
145:25 273:6
**accounting (4)**
25:25 26:2 30:20 40:2
**accurate (6)**
9:22 50:18 211:12
   213:22,23 219:3
**accurately (1)**

135:7
**accused (1)**
70:25
**accusing (1)**
282:14
**acknowledged (1)**
159:18
**Act (1)**
5:20
**acted (1)**
144:9
**action (2)**
336:17,19
**actions (11)**
14:25,25 16:21,21
   17:1 32:23 47:5
   50:22 173:7 322:10
   322:10
**active (1)**
322:3
**actively (21)**
37:5 40:21 41:2 89:8
   89:11 136:24
   137:12 138:17,22
   139:2,3 145:14
   146:1,3 148:3
   154:12 155:25
   156:8,11 157:6
   174:14
**actively-traded (1)**
40:6
**actual (5)**
165:15 168:1 170:13
   171:18 307:4
**ad (3)**
136:1 234:25 323:1
**add (4)**
154:19 173:6 182:3
   251:8
**added (3)**
157:20 190:18 208:6
**addition (6)**
51:20 112:13 113:3,9
   187:9 210:12
**additional (11)**
8:2,4 11:24 13:7
   97:23 114:15
   207:11 209:5
   211:21 244:19
   245:2
**addresses (3)**
165:23 243:22,25
**adds (1)**
108:19
**adjudication (1)**
159:21

**adjust (2)**
166:23 293:20
**adjusting (2)**
93:3 294:22
**adjustment (4)**
293:18,19,20 294:18
**adjustments (2)**
164:23 294:25
**administration (1)**
12:2
**admitted (1)**
21:11
**adopt (2)**
146:12 160:2
**adopted (1)**
160:23
**ADR (1)**
237:24
**ADS (30)**
89:22,25 90:4 91:14
   92:4 97:20 101:2
   105:19 106:11
   114:4 115:11 116:6
   118:1 120:20
   123:13 129:9
   130:15 194:1
   237:21 257:1,6
   261:11 265:8 272:7
   272:12 277:22
   279:4 282:1 319:6
   333:17
**ADS's (4)**
90:13 91:23 92:19
   93:2
**advanced (1)**
54:24
**advantage (2)**
99:17 165:14
**advice (1)**
58:1
**advised (2)**
57:13,20
**Advisors (6)**
31:14 46:17,17 50:1,4
   50:5
**advocated (1)**
332:4
**advocates (1)**
164:6
**Aelish (2)**
3:17 7:4
**affect (4)**
73:12 103:20,21,21
**affirmatively (1)**
164:3
**aggregate (1)**

195:1
**ago (15)**
17:8 21:22 22:5 25:7
   25:9 36:11,14 67:9
   181:22 199:5 201:2
   204:12 261:2
   265:19 302:6
**agree (42)**
66:11 73:10,15 74:5
   74:11 76:6 98:22
   125:16 149:21,25
   163:12 164:10,12
   165:4,5 167:16
   169:14,22 171:16
   172:18 175:19
   176:24 187:24
   188:8 209:21 218:5
   219:5 227:17 240:5
   240:12 241:18
   243:5 246:1,5,15
   247:3 257:17 264:4
   267:15 312:23
   313:13 316:23
**agreed (3)**
43:6 283:2 324:18
**agreeing (1)**
66:10
**agreement (2)**
13:6 55:10
**ahead (4)**
56:2 62:11 179:15
   234:11
**al (3)**
1:9 6:8,10
**align (2)**
167:13,18
**aligns (2)**
166:12,15
**ALISON (1)**
3:6
**allegation (4)**
252:2 263:13 316:23
   316:24
**allegations (3)**
318:10 319:2 322:6
**allege (1)**
322:2
**alleged (32)**
105:3 162:6 235:21
   248:25 251:9,12,24
   252:12,14,15,19
   253:11 254:9
   256:17 257:9 260:7
   263:15 264:2
   303:19 316:20
   317:1,4,16,24 319:1

324:5 325:9,18
   333:12,14,25 334:5
**allegedly (1)**
253:21
**alleges (5)**
236:6 250:10 302:15
   303:7 322:16
**alliance (2)**
243:2 247:1
**Allison (1)**
7:9
**allocation (1)**
39:4
**allow (1)**
64:19
**alter (1)**
229:10
**altering (4)**
200:1,20 217:11
   227:18
**alternating (1)**
101:3
**ambiguity (1)**
84:19
**American (2)**
65:6 89:15
**Amgen (2)**
255:2,9
**amount (6)**
28:15,16 34:21
   129:13 270:20
   302:16
**analyses (5)**
19:18 40:14 104:21
   105:9 162:19
**analysis (158)**
3:25 7:10 11:2,3
   19:21 33:10 35:9
   40:19 41:6,13 45:8
   46:3 49:23 55:21
   62:23 65:21 83:9
   90:19 91:8,13 97:3
   97:23,23 101:11
   103:20 104:16
   105:11,21,22
   106:20 107:8
   110:12 112:24
   114:16 118:24
   119:2,18 120:7,11
   120:13 127:17
   136:12 139:1 145:6
   145:7 146:23
   159:23 160:15
   162:14 163:24,25
   164:9,16,18,24
   166:20,24 168:5,6

168:14,19 169:23
169:24 170:2 173:2
173:18,20 174:7
180:13,17,19
183:16 184:18
185:1 187:10,10
194:12,24 196:6
199:10,14,15,20
202:10 203:6,12
206:7,9,18 208:7
229:11 230:11,13
231:25 232:15
244:16 245:2 254:4
254:7,8,11,22
255:25 256:3,9,21
256:25 260:10
269:1,6 271:19
272:14,15 274:23
274:24 275:3,12
289:5,16 290:16,23
290:23 291:4,12
292:7,10 295:5,22
295:25 299:12
304:21 308:9 309:6
309:17 310:15
311:8 316:15,17,22
316:25 318:21,22
318:24 320:10,13
323:18,19 330:6,13
330:14 331:20
332:1,6,7,8,11
333:15 334:3
**analyst (23)**
13:13 59:21 65:12
79:11 90:16 91:17
124:3,3 170:24
173:13,16 180:14
201:2,17 202:14,21
203:19 208:22
209:11 210:14
285:4 314:3 328:7
**analysts (17)**
34:4,4 90:15 91:19
101:13 104:5 113:6
177:16 202:7
203:16 244:24
258:25 262:10,11
267:21 285:9
328:21
**analyze (22)**
82:13,22 118:25
127:1,22,25 141:8
161:22 222:7 244:5
244:25 261:19
265:10 291:7
299:22 306:17

307:19,20 314:4
323:15,23 329:1
**analyzed (8)**
102:11 112:9,13
114:18 188:15
225:18 285:9
323:14
**analyzing (11)**
82:21 110:22 132:25
197:21 201:22
224:18 237:15
256:24 305:15
327:13 330:7
**announced (6)**
160:9 288:20 323:1
325:20 328:3
329:22
**announcement (1)**
243:1
**announcements (2)**
74:8 275:6
**announcing (1)**
31:11
**annual (1)**
227:1
**anomalies (5)**
133:8 138:11,13
159:6 160:14
**answer (31)**
18:2 48:7 53:2 64:9
66:9 72:2 78:2
94:12 100:17
108:21,25 111:1,5
111:19 112:1
113:19 114:9 121:5
129:25 179:16
188:10 189:3
190:19 191:16
261:2 268:3 295:23
304:10,17 326:23
331:11
**answered (7)**
36:7 48:21 62:23
162:17 251:3
300:10 327:4
**answering (5)**
126:17 179:11 189:1
226:18 243:21
**answers (3)**
113:21 179:14 262:16
**ante (1)**
232:7
**Anthony (1)**
6:17
**anticipated (2)**
233:24 234:2

**anybody (5)**
145:16 155:20 156:23
180:23 230:23
**anymore (2)**
27:1,5
**anyway (1)**
257:14
**apologies (1)**
273:22
**apologize (1)**
302:20
**apparent (1)**
124:12
**apparently (1)**
154:12
**appealed (1)**
54:1
**appeared (2)**
70:17 181:24
**appears (2)**
14:16 182:4
**appellate (4)**
54:10,15 55:9 56:7
**application (2)**
159:24 186:14
**applied (3)**
135:25 145:7 210:2
**apply (1)**
294:24
**applying (1)**
165:11
**appreciate (6)**
9:17 27:17 28:21
113:20 255:24
260:9
**approach (3)**
70:16 297:10,11
**appropriate (7)**
165:7 167:1 270:22
271:2 273:13
303:23 315:16
**appropriately (2)**
120:2 151:16
**approvingly (2)**
165:1,3
**approximate (1)**
76:23
**approximately (11)**
6:16 7:25 8:7 16:7,24
23:4,7 38:4 93:5
219:2 267:3
**approximates (1)**
76:25
**arbitrage (28)**
73:24 87:16,22 88:4
88:23,24,25 92:21

96:24,25 97:3,10,12
97:18 99:16 100:8
100:10 140:4 143:6
143:23 144:2,4,7,13
144:16,19 177:12
245:18
**arbitragers (2)**
99:10 100:19
**arbitration (1)**
52:3
**area (3)**
35:10 48:24 68:2
**areas (3)**
63:24 64:2 114:20
**arguably (2)**
301:3 319:10
**argue (2)**
168:11 172:11
**argument (11)**
28:25 29:1,5 168:22
169:3,16 173:6
192:18,18,20 316:7
**argumentative (2)**
25:4 209:24
**arguments (1)**
174:20
**Armen (3)**
3:15 6:25 210:15
**Armen's (1)**
98:20
**arrangements (1)**
25:15
**article (45)**
67:13,14 134:6,12,13
134:15,18,21
135:19 137:18,23
142:24 148:17
149:22 150:7,9,10
150:12,16,20 151:5
151:6 152:1,10,16
163:5,6,22 164:11
165:1 185:5 215:2
242:1,4 243:25
291:21,22 292:2,5
297:14,16 314:13
314:20 318:4 332:3
**articles (12)**
139:15 156:16,18
157:1,11 211:15,17
211:19,21 212:2,2,7
**aside (5)**
30:2 99:3 128:9
300:17,17
**asked (17)**
11:5 36:7 48:20 63:21
68:1 111:23 126:11

159:4,7 162:16
190:14 222:17
224:20 251:6
256:20 268:3 327:3
**asking (60)**
10:6 25:6 31:22 35:17
40:13 42:16 48:5
49:19 57:18,19 58:1
62:19 63:9 65:16
85:13 105:16 108:8,9
108:14 109:19
110:16,16 116:23
119:25 122:20
124:8 126:21
129:10,19 131:22
137:22 139:25
142:24 167:11
185:23 189:3
201:12 209:1,5
220:4 224:2 232:5,5
234:8 250:4 252:11
252:11 256:14,15
259:5 270:25 271:5
272:5 275:21 276:1
300:16 304:13
307:13,15 314:18
**aspect (3)**
40:11 164:10,12
**assess (1)**
177:6
**assessing (3)**
145:1 152:23 179:22
**assessment (3)**
202:5 254:24 261:16
**asset (1)**
40:9
**assets (1)**
40:4
**assistant (1)**
68:24
**assisted (2)**
69:22 70:4
**associate (1)**
48:12
**associated (8)**
97:5,6 129:4 215:19
217:15 265:22
288:16 303:24
**association (1)**
6:21
**assume (17)**
14:9 21:8 34:1 48:7
57:22 130:23,24
136:24 154:12
189:18 213:3
249:16 260:5 268:8

317:2 318:24,25
**assuming (8)**
172:6 228:13 260:8
316:23 317:1,6,7
318:8
**assumption (1)**
154:22
**assure (1)**
9:15
**attorney (3)**
53:4,4 336:18
**attorneys (10)**
29:3,6,9 48:25 52:8
52:10 54:15 58:5
63:6 182:24
**auditor (2)**
259:16 260:18
**August (3)**
266:24 267:3 268:2
**authority (1)**
150:1
**authors (3)**
245:22 247:8 300:5
**automatically (1)**
177:13
**available (10)**
30:3 78:17 81:7,12
82:9,11 148:7 160:4
234:18 254:22
**Avenue (1)**
6:20
**average (6)**
74:3 103:14 200:6
269:19 282:17
287:19
**aware (24)**
41:16,24 66:2 90:6
133:13 136:6
137:24 138:5 139:1
139:15 178:16
201:20 221:14
222:15,18,25 223:9
225:14 229:14
230:5 237:18
259:14 264:21
302:14
**awhile (1)**
251:3

_____

**B**

**B (6)**
4:25 209:13 210:4,18
211:9 221:3
**bachelor (1)**
12:22
**back (30)**

15:17 18:1 39:2 63:16
71:20 109:10
111:18,24 132:18
144:20 181:21
186:17 189:11,11
201:16 218:15
251:3 252:8 266:3
267:17 287:15
289:11,20 290:7,22
291:6 292:12 301:9
307:1 334:10
**backed (1)**
305:3
**background (3)**
9:23 68:9 287:22
**bad (2)**
326:24 327:2
**Baig (3)**
3:17 7:4,4
**bank (8)**
37:17 41:21 42:11
43:7 44:18 49:18
89:18,18
**Barber (4)**
5:7 134:7 242:1
245:11
**Barclays (2)**
180:6,12
**Baruch (2)**
5:8 134:8
**base (3)**
203:8 238:14 320:13
**based (39)**
14:3,4 45:7 58:24
59:1 60:2 68:8,9,10
72:9 78:8 105:25
113:13 114:24
120:2,4 126:9 143:4
143:10 160:6 185:6
188:17 191:25
204:19,23 205:18
223:5 225:19 253:2
254:21 269:25
270:4 271:20
281:13 287:23
311:21 319:20
320:10 331:19
**bases (1)**
238:21
**basic (3)**
159:18 215:16 293:9
**basically (11)**
131:14 141:4 173:9
242:15 275:25
277:7,14 279:14
280:1 286:21

333:21
**basis (28)**
25:22 26:5,7,16 33:19
59:25 83:10,12
139:6 142:8 165:22
166:2,10 167:11
168:13 188:14
203:9,11 205:5
207:6,14,18 227:1
246:18 247:13
272:6,9 274:19
**beat (8)**
134:4 139:3,9 145:18
148:13 156:25
234:21 244:23
**beginning (9)**
15:6 33:2 71:18
132:16 183:9 240:1
296:13 302:3
334:18
**begins (1)**
266:18
**behalf (2)**
1:4 7:7
**believe (35)**
15:25 41:20 49:14,25
52:20 57:3,9 70:9
76:3,22 91:5,24
100:20 132:24
133:2 146:10 150:7
162:22 176:19
178:25 185:22
189:7 192:23,25
220:14 236:9
241:24 245:15
251:15 256:10
259:18 262:17
319:24 327:11,12
**believed (4)**
199:25 206:4 207:1
230:10
**believes (5)**
76:14,19 136:17
140:12 161:15
**bell (2)**
264:18,19
**benchmark (10)**
76:8 83:13 98:7
100:18,22 275:4,7
277:23 281:20
298:4
**benchmarks (1)**
120:9
**benefit (6)**
165:25 167:5 207:24
207:25 208:2 238:5

**best (7)**
22:8 140:13 154:8
165:19 166:7
174:19 259:11
**better (8)**
27:2 29:24 94:25 98:4
98:5 130:2 271:4
309:4
**beyond (3)**
65:2 152:13 271:3
**bias (6)**
165:13 168:4,6,7,10
168:11
**big (13)**
65:22 69:8 204:7
312:19 315:13
320:25 321:10,22
327:18,19 328:2
329:8,11
**biggest (2)**
319:8,9
**Bill (2)**
15:12 18:15
**billed (1)**
26:15
**billing (3)**
21:8 26:14 30:14
**billion (2)**
15:17 258:14
**bills (1)**
30:18
**binomial (16)**
112:21 119:18 130:18
130:23 192:9
194:25 216:24
273:6 275:16,23
277:4 278:16
280:10 281:13
295:6,14
**bit (35)**
16:18 23:5 40:24
63:10 71:9 77:13
81:24 87:1 91:8
98:14 102:6 121:25
124:10 132:3
133:10 137:23
144:7 158:24
191:15,16 194:10
195:4,5 206:6 226:1
245:1 257:24 263:4
268:17 269:20
278:18 286:17
287:4 291:11 298:3
**Bjorn (20)**
1:13 2:9 5:2 6:7 7:13
64:4 71:13,19

132:11,17 152:12
183:4,10 239:21
240:2 296:8,14
334:13,19 335:3
**black (1)**
98:25
**Bloom (2)**
135:23 158:20
**Bloomberg (9)**
202:20 206:16 209:15
210:8 211:11,20
212:16,19 214:19
**blue (2)**
98:14 235:3
**board (6)**
107:23 252:5 260:12
264:16 303:1
312:11
**body (7)**
133:13 134:22 135:4
136:2,6 138:12
291:18
**bogged (1)**
128:7
**Bonelli (2)**
3:6 7:9
**Bonferroni (2)**
293:18 294:19
**book (1)**
300:1
**bothered (1)**
208:8
**bottom (3)**
129:2,5 242:16
**bought (2)**
223:21 224:6
**bound (1)**
246:14
**box (1)**
266:8
**Brad (2)**
5:7 134:7
**Bradford (3)**
5:13 148:16 150:17
**break (10)**
60:16 71:11 103:22
124:10 132:5,20
183:2 239:19 296:6
334:8
**bribery (4)**
259:24 260:4,6,11
**bribes (2)**
258:6,15
**briefly (1)**
314:12
**bright (1)**

153:2
**bring (5)**
59:1 173:1,17 177:9
320:4
**bringing (1)**
177:23
**brokerage (1)**
145:24
**Brown (2)**
43:19 45:19
**bullet (1)**
210:7
**bunch (1)**
316:13
**business (32)**
10:3,11,20 11:22 12:2
12:7 14:16 26:22
27:2,23 30:1 31:6
31:21,24 32:6,17,25
35:23,25 38:14,16
38:25 39:25 40:16
42:17,19 48:12,14
49:24 68:18 243:1
247:1
**businesses (1)**
38:18
**buy (6)**
72:8 75:24 145:25
223:18 224:12
225:12
**buying (3)**
117:18 156:10 225:10

---

**C**

**C (1)**
3:1
**C.V (16)**
8:1,6 9:20 11:19
14:10,19 23:6 32:15
45:7 51:15,20,25
52:1,11 53:19 67:8
**calculable (2)**
97:13,19
**calculate (3)**
93:24 184:24 240:21
**calculation (3)**
93:14 130:5,6
**calculations (1)**
295:15
**calendar (1)**
209:9
**Caliber (6)**
46:17,17 50:1,4,5
58:22
**California (7)**
1:21 2:12 3:19 6:1,15

42:2 336:3
**call (9)**
32:12 33:24 88:14
110:25 112:16
119:19 234:16
244:18 253:4
**called (10)**
11:7 22:24 31:6,13
180:6 265:16 297:1
299:3 300:18
331:23
**calls (1)**
110:23
**Cammer (117)**
40:25 41:2,6,9 63:25
65:1,16,17,21 66:7
100:20 104:7
106:18 107:11
108:1 109:7 110:6
110:10,11,12,22
113:14,16 114:23
116:13,16 123:17
123:17,23,24,25,25
132:21,24 133:15
133:19,20 134:24
135:22,23 136:23
137:17,19 140:23
144:6 145:7 146:6
146:15 149:6 150:4
151:10,21,23 152:4
153:1,10,15 154:4
154:11,19 156:1
157:4,14,17,19
158:9,9,10,17,18,20
158:21,21 160:15
160:22 165:6 170:7
171:3 172:20 173:4
175:9,14,15 176:14
176:16 177:7,8,21
178:3,8,12,15,18,20
178:21,22,25 179:4
179:22 180:1,11
181:8,9,13 187:10
188:16 196:4,20,22
196:25 197:3
238:20 239:3,6
255:13 263:12
306:21
**canceled (1)**
262:4
**Candace (6)**
23:20 33:7 35:4 37:16
45:14 46:24
**candidate (1)**
242:15
**candidates (5)**

270:22 271:2,4,5,6
**capital (2)**
27:12,16
**captured (1)**
206:15
**card (1)**
276:2
**care (3)**
116:24 117:14 317:21
**career (2)**
50:20 52:21
**cares (4)**
316:6 317:9,10,19
**carve (1)**
151:23
**carved (1)**
153:16
**Cascadas (1)**
265:17
**case (81)**
1:7 6:11 9:6,8 17:21
19:7 39:11 41:20
42:7 43:11,15,16,18
45:19,22 49:18
53:14,16,18 54:4
56:17 61:8 62:16
64:5,22,23 70:21,24
71:3 87:16 89:19,24
90:3 91:11 94:23
99:11 102:21 103:1
107:22 108:2 124:1
130:11 131:1
135:23 144:12
160:19 169:5 180:5
181:11 186:21
187:2 188:15
198:11 216:4
233:23 235:22
238:25 250:5 252:3
253:4 269:23
271:17 273:15
277:13 281:15
296:23 301:1,24
302:2 314:1 316:2
317:4 322:12 323:3
327:6,7 331:15
332:1 333:15
336:13 337:2
**case-by-case (1)**
166:1
**cases (63)**
17:16,24 18:1,4,4,19
19:15,16 42:12,14
42:24 43:23 44:2
46:4,9 48:17 49:12
49:15 51:5,8,9,10

51:15,16,19,24 52:1
52:14,15,25 58:12
59:13 60:25 61:3,5
61:15,24 63:4,4
64:25 68:2 71:4,9
102:20 103:10
131:24 166:2,3
169:24 180:4
184:10 224:17
225:1 226:4 238:7
269:17 271:16
286:9 287:17
293:17 297:7
321:16 331:17
**cash (10)**
79:12,19 80:3,9,10
185:8,9 240:8,22
262:12
**Caso (1)**
265:17
**causation (26)**
53:25 54:3,11 55:2,5
55:11,21 56:11,13
57:1 158:4 256:3
257:5 307:4,16
308:16 309:15,18
316:15,16 318:21
318:23 323:17
329:2 331:7 334:3
**cause (19)**
107:12 112:14 122:6
157:23 170:7,9
176:19 177:22
192:10 196:5 197:6
199:16 207:1
214:10 223:18
253:6 272:21 274:3
306:22
**caused (8)**
182:3,15 223:1,9
252:15 256:18
317:17 333:24
**caution (3)**
52:6 64:4 182:23
**CBIZ (1)**
31:25
**cent (1)**
99:16
**centered (1)**
153:25
**centers (2)**
153:19 154:18
**central (2)**
263:24 264:4
**cents (7)**
99:13,14,15,24 100:3

100:3,5
**century (1)**
51:2
**CEO (6)**
325:23 327:10 328:3
329:7,9,9
**cert (1)**
102:17
**certain (12)**
40:4,11 107:24 150:8
181:4 194:3,4 226:3
245:6 252:18
264:16 331:24
**certainly (16)**
10:21 16:21 17:8
33:24 38:1 139:13
169:22 187:4 201:1
201:5 237:3 242:7
248:2 259:25
271:21 280:16
**certification (6)**
41:10 53:22 62:17
324:20 332:10,14
**certifications (2)**
14:13 325:7
**certified (4)**
2:12 71:5 102:18
336:1
**certify (4)**
174:25 321:6 336:3
336:16
**CFA (7)**
5:3 10:24 14:13 68:9
68:12 69:3,8
**CFO (1)**
315:6
**chairman (1)**
264:15
**challenge (1)**
207:21
**chance (14)**
130:11 200:20 216:9
216:11 274:1
276:25 277:25
278:2,24 279:12,12
281:12 292:25
310:9
**change (7)**
78:15 182:10,15
263:3,6 295:21
311:15
**changed (5)**
9:10 87:25 88:1 182:2
263:4
**changes (4)**
93:1 115:4,16 182:11

characterization (5)
63:3,10 209:18 223:2
231:4
characterize (5)
11:19 54:7,16 98:17
213:12
charged (1)
264:22
chartered (1)
13:12
cheat (1)
273:7
check (5)
30:16 81:24 202:10
202:24 243:24
Chemical (4)
1:8 3:3 6:8 220:19
cherrypick (1)
238:9
cherrypicking (3)
70:25 238:16,24
Chile (12)
1:9 3:3 6:9 90:15,20
96:7,15,19 115:9,16
220:19 224:24
Chile's (1)
264:23
Chilean (9)
91:6 92:20 93:2,4
94:17 97:20 221:5,8
325:22
China (2)
43:19 45:19
choose (3)
309:19 319:7,14
chooses (1)
320:17
chose (5)
230:25 246:11 282:15
311:1 319:18
Christmas (2)
27:20 96:21
circles (1)
24:14
Circuit (4)
54:9,19 181:10,11
Circuit's (2)
56:17 58:2
circumstance (2)
174:23 281:14
circumstances (4)
35:6 185:3 221:11,14
citation (2)
148:20,22
cite (10)
134:6 148:15 150:16

151:7 157:1 164:25
165:3 180:3,4,5
cited (6)
134:14 137:18 149:22
156:17 157:3,11
claims (2)
89:24 320:21
clarification (1)
255:24
clarifies (1)
84:3
clarify (2)
83:19 100:6
clarifying (1)
84:9
clarity (3)
85:18,20 86:4
class (121)
16:25 32:23 41:10
47:5 50:22 53:22
62:16 71:5 78:15
80:25 81:1 92:25
101:3,16,20 102:3
102:12,17,18,21
103:10,14,17,20
104:12,14,23 105:1
105:15,19 106:13
106:21 107:20,22
108:19 109:22
110:18 111:7 112:3
112:10 113:4 114:1
118:17 119:10
121:19,24 122:16
123:1,7,14 125:20
129:14,17 132:1
175:1 193:22 194:2
200:18 219:19,24
222:3 225:22
229:14 237:10
256:19 266:18
267:2 268:9 269:10
269:17,19,24
270:12,21,23 271:4
272:11 273:18
288:4 301:20
305:11 311:2,14,16
312:6 315:15,18
319:7,9,11,19 320:2
320:5,16,17,25
321:4,6,9,18,21
322:1,10,11 323:23
324:2,4,15,16,20,20
324:23,24,25 325:2
325:6 326:14,21
327:16 332:9,14
classes (4)

13:19,23,24 14:3
classic (1)
144:14
Classwide (1)
184:25
CLE (2)
67:22,24
clear (17)
9:9,12 36:11 50:23
66:9 82:5 84:17,23
86:1 100:9 155:20
190:21,22 212:14
236:24 252:10
254:5
clear-cut (1)
84:7
clearer (2)
98:24 241:2
clearly (5)
147:13 180:21 189:9
215:1 328:15
client (2)
60:7,11
clients (1)
49:6
close (15)
42:17 48:12 60:17
67:6 87:8 94:22
98:1,3,8,18 100:10
100:12 102:9 203:3
286:5
closed (4)
31:4 86:14 96:18
242:24
closely (2)
90:23 91:21
closeness (1)
98:6
closest (1)
137:16
closing (1)
99:20
Club (2)
327:6 329:8
clue (2)
182:7,15
coin (1)
295:17
coincidental (2)
46:2,11
colleagues (1)
69:9
collectively (1)
209:21
colloquially (1)
125:24

color (4)
95:5,6 98:21,21
column (4)
201:24 202:3,3
266:12
combination (1)
330:12
combine (2)
86:5 330:22
combined (1)
115:19
Comdex (1)
16:16
come (12)
36:16 63:16 68:1
76:17 85:20 107:8
109:10 211:3
224:19 239:11
311:24 334:9
comes (9)
59:5 102:16 137:16
168:19 170:10
178:8 231:22
263:20 272:13
comfort (12)
109:20 203:9 206:20
206:22,23 207:11
207:13 208:9,12,16
208:18 209:6
comfortable (10)
108:1 110:4,17,21
111:2,6 112:2 119:7
122:14 123:11
coming (4)
15:8 34:5 200:21
312:7
comment (1)
143:3
commentary (2)
285:4 327:22
COMMISSION (1)
337:25
commit (1)
179:12
committee (1)
323:2
committing (2)
23:24 231:15
commodity (2)
286:21,23
common (12)
5:6 90:6 91:2 92:2
100:1 134:10
146:12 148:5,9
170:23 286:11
294:22

commonly (10)
147:22 148:1,2,5,9
149:14 159:1
170:25 181:18
246:8
communicate (11)
55:5 56:4,5,8,9,14,18
57:7,9,10 180:21
communicated (2)
63:6 303:2
communicating (1)
180:24
communication (1)
52:7 57:19
communications (4)
53:3,5 57:16 182:24
companies (14)
15:10 31:23 115:9
160:10 224:19
226:13 227:13
228:4,22 237:22
267:18 287:1,5,12
company (72)
1:8 3:3 6:9 16:17
18:12 29:21 31:13
32:1 60:5 65:22
75:9 79:13 116:10
116:12,13,17
117:23,25 118:5,11
118:12,16 129:7
130:13 131:16
157:24 184:15,17
212:3 220:19
222:10,12,14,17
223:9 225:12,14
227:8 234:12 235:6
237:9,17,19,22
238:1 244:17
251:17 258:7
261:10 267:23
277:21 278:6
281:25 285:18
286:18,19,20,22
287:4,9 288:20
301:2,3,6 303:4,6
312:16 314:23
319:10 325:18,24
330:17
company's (5)
116:4 118:11 249:12
259:17 260:19
compare (4)
292:17,19 297:9
311:10
compared (3)
200:2 300:23 328:8

comparison (2)
205:19 291:21
comparisons (10)
291:15 292:14,16
293:8,9 294:4,8,23
294:25 296:3
compensated (5)
23:25 25:21 26:5,7
58:23
compensation (1)
28:9
competition (1)
161:22
complaint (18)
236:3,4 237:4 250:3,7
251:13,24 252:13
253:3 260:7 301:24
302:1,9,10,15 303:7
322:16 325:19
complaints (2)
250:5,8
complete (1)
169:20
completed (1)
8:3
completely (4)
46:15 128:5 160:3
235:3
completion (1)
336:13
complex (7)
80:18,20 243:9 245:1
248:4 257:25 330:6
complexity (1)
80:17
compliance (2)
249:12 257:18
complicated (2)
275:12,14
complying (3)
249:5,7 258:2
component (5)
184:17 258:8,9
261:19 285:14
components (1)
258:23
computer (2)
12:23 182:16
conceal (3)
253:8,25 303:20
concealed (1)
333:14
conceivable (1)
246:20
concept (6)
85:12 148:23 150:4

156:18 157:5
244:13
concepts (1)
86:10
conceptualizing (1)
257:13
concern (2)
47:14 113:8
concerned (4)
55:1 80:7 99:9 303:4
concerning (2)
78:16 257:21
concerns (5)
49:7 107:24 165:23
165:24 297:21
conclude (15)
187:6,15,24 272:6,9
278:5,9 279:1,9
280:15,16,19
281:14 311:4 335:2
concluded (14)
60:22 61:2,11 62:5
107:1 113:13
114:25 128:14
130:25 232:14
262:15 273:14
278:14 335:5
concluding (2)
127:8 156:4
conclusion (10)
101:6,15 105:25
123:11 128:6
204:22 262:20
271:20 277:19
319:20
conclusive (2)
120:6,15
conclusively (1)
160:2
concrete (1)
221:14
condition (1)
54:5
conditions (1)
146:17
conduct (9)
40:14 111:10 112:3
113:25 252:19
253:25 254:3
260:12 299:22
conducted (14)
118:18 128:10 137:25
138:6 255:25 256:8
260:10 293:10
295:1,5 296:2 297:9
299:13,14

154:9
conducting (4)
120:24 122:14 304:20
323:5
conference (2)
69:8 234:16
confidence (2)
125:5 281:6
confidently (1)
278:19
conflating (2)
270:19 318:20
conflict (1)
79:24
conflicting (1)
82:4
confounding (1)
184:20
confusing (1)
190:2
connection (10)
20:25 23:25 32:22
40:16 134:16
143:23 150:23
213:6 292:4 327:13
consensus (1)
142:8
consequences (2)
258:1 261:3
consequently (10)
92:18 129:6 191:6
243:11 274:13
277:18 279:10
298:7,17 325:1
consider (9)
66:24 79:8 160:9,25
188:12,12 238:2
303:22 318:16
consideration (1)
199:11
considered (7)
115:6 150:1 180:2
193:20 241:11
301:23 327:12
considering (1)
157:14
consistent (15)
55:24 70:23 71:6
77:19 92:21 187:8
205:13 206:3,10
238:21 288:5 310:4
310:10,22 333:17
consistently (3)
74:4 89:5 138:15
constitutes (2)
78:19 98:8
constituting (1)

constructed (4)
119:14 125:6 192:21
276:16
constructing (1)
127:13
constructs (1)
77:4
consultation (1)
41:8
consulted (1)
61:7
consulting (18)
17:1,22 27:22 32:22
34:21 36:20 37:6,24
38:9 45:16 50:21,24
58:16,18,21 60:2
61:9 302:12
consumers (2)
90:17 91:20
contact (2)
35:11 46:19
contain (2)
250:16 251:1
contained (3)
229:1 251:23 261:17
content (1)
198:22
context (39)
38:19,20,20,21 65:4
77:10 78:11 116:19
124:6 133:2,4,5
147:3,24 149:16
152:15 155:2 159:3
159:9,10 160:24
162:12 163:19
165:8,12 181:1,20
185:14 190:21
268:13 292:7,10
314:17 315:22
325:6,24 329:1
331:3 332:9
contexts (2)
162:13 168:25
contingency (1)
21:14
continue (2)
244:12 292:19
continuing (2)
68:11,12
continuous (1)
68:10
continuously (2)
134:3 319:22
control (2)
117:21 258:3

controls (5)
249:9 257:19 259:17
260:19 261:11
controversial (1)
111:13
conversations (1)
331:11
convey (7)
187:21 189:17 198:15
217:9 235:8 238:12
249:12
conveyed (1)
189:19
conveying (1)
228:15
conveys (1)
249:16
convincing (1)
157:21
cooperating (1)
303:4
copy (2)
212:22 213:17
Cornell (10)
5:13 137:18,23
148:16 150:10,17
151:22 155:8
169:15 170:24
Cornell/Rutten (4)
163:22 165:1 166:11
314:13
corners (1)
271:3
corporate (5)
73:2 107:22 197:7,9
246:11
correct (176)
7:23,24 8:11,17 9:20
9:21 10:11,12 11:8
11:12 12:5,24,25
13:10,11,14,15
14:11,14,18,21
23:12,13,19 24:21
29:13 31:8 32:7,19
33:12,16,17 34:10
35:3,4 38:6 39:12
39:13 41:9,22 42:22
43:7,21 45:10 47:17
48:11 50:2,3,17
53:17,20 54:21
60:10,25 61:1 65:22
67:12,16,19 70:5
72:19 73:22 74:22
75:4,12,18 77:23
78:4,18 82:17 86:17
87:12 90:1,5,10

94:3,4 101:23,24,25
104:15 110:19
120:22,25 130:19
132:23 141:1,10,19
141:24 142:4,13
143:12 146:9,12
147:10,14,25
150:21 153:11,12
159:13 162:3 165:2
165:9 166:3,4
168:15 170:21
175:22 183:17
184:21 189:8 194:6
194:21 195:19
196:12 197:9
198:20 199:9 212:8
219:10 228:14
235:4 244:15
245:10 250:6,13
253:17 256:4,5,12
256:22,23 265:25
266:10,16,17,25
267:5 277:6,16
280:18 281:8 282:2
285:24 286:10
292:11 293:25
294:3,7 295:7,10
296:4 297:5,11
300:9 301:21,25
303:10 306:24
312:11,12 316:10
318:10 322:5 323:4
323:9 324:7,9,21
326:4,6 329:25
332:17,18

**corrected (1)**
109:13
**Correction (1)**
295:11
**corrective (14)**
235:21 236:7 248:20
252:3,13 303:8,11
303:17 317:4
318:25 322:17
324:5 325:9,11
**correctly (7)**
56:7 69:18 141:8
163:3 243:6 266:21
322:2
**corrects (1)**
303:18
**correlated (1)**
94:2
**correlation (13)**
93:1,6,10,13 97:20
98:1 116:24,25

309:15,16,18,24
311:10
**corresponding (4)**
201:6 309:10,13
320:6
**cost (6)**
96:24 97:6,8,8,12,18
**costly (2)**
258:11,17
**costs (1)**
97:5
**counsel (7)**
6:23 7:16 57:14,17,20
58:3 213:2
**count (2)**
20:21 21:17
**counted (1)**
102:8
**counting (1)**
105:12
**couple (6)**
15:13 16:8 43:22
244:23 260:3
270:20
**course (22)**
11:24 14:8 28:18 34:1
34:3 35:8 41:7
68:22 73:25 79:6
85:5 88:23 89:2
161:20 206:5
217:25 234:20
236:3 260:14
293:15 297:17
321:9
**courses (6)**
13:7 14:7 67:18,21,21
67:23
**court (64)**
1:1 6:10,20 7:11
19:25 20:25 42:2,4
44:7,20 53:21,24
54:4,10,15,20,25
55:7,9,12,22,23
56:7 62:10 78:9
117:2,4 130:2
135:14 136:14
153:1 157:18
158:10,17,20
159:15,17,18 160:1
160:6,21,22 178:8
178:13,21 179:3,21
180:2 181:5 196:25
197:3 207:23 208:1
230:14,23 232:22
239:6 255:9,11,15
263:12,23 320:4

321:6
**court's (6)**
54:23 153:7 175:14
176:15 207:25
239:3
**courts (9)**
21:12 61:23 71:5
136:1 144:25 154:9
154:11 157:13
162:1
**cover (2)**
97:7 204:11
**coverage (4)**
90:15,16 91:17 124:3
**covering (2)**
104:6 267:21
**crash (1)**
169:4
**crashes (4)**
5:11 150:19 165:14
168:21
**crazy (2)**
125:14,20
**crimes (1)**
20:24
**criteria (10)**
134:24,25 135:25
136:3 151:22 153:8
153:10,14 155:13
155:16
**criterion (2)**
245:22 246:6
**critical (1)**
153:2
**criticism (1)**
299:11
**criticize (1)**
308:5
**criticized (5)**
53:21,25 55:6 58:13
292:6
**criticizing (1)**
292:3
**CSR (2)**
1:24 336:25
**culprit (1)**
232:1
**cumulative (9)**
130:18 276:22 277:3
277:12 278:21
280:11,12 281:11
330:23
**CyberSource (1)**
15:16

_____
**D**

**D (2)**
4:1,25
**daily (2)**
33:19 83:10
**damage (3)**
163:24 184:18 258:20
**damages (36)**
68:2 163:19 165:12
165:15 166:7,11
167:12 168:19,20
169:16 183:25
184:3,5,25 185:15
186:4 189:22,24
190:4,5,6,24 191:5
191:14 192:4,16,21
193:1,9 256:9,10,18
257:5 318:21 329:1
331:7
**Daniel (1)**
69:11
**dark (1)**
287:2
**data (4)**
139:2 292:23,24
308:12
**date (22)**
1:18 16:1 87:1,5,5
122:15 193:13,15
195:23 218:23
233:10 261:9
266:22 282:17
303:23,23 324:8
325:17 326:19
329:17 336:20
337:3
**Dated (1)**
336:22
**dates (71)**
87:3,11 105:12 108:3
108:9,15,21,25
109:8,12,19,20,25
110:18 111:3,6
112:2 113:23,24,25
119:9 121:3 128:11
128:13 129:11,11
129:12,12 130:21
193:21,21 194:21
196:1 200:7 208:19
208:24 209:1,5,9,9
209:12 215:13,18
215:23 236:5 237:4
237:7 252:25
265:22 266:5,6,8,20
270:1 277:8 282:3,6
282:16 283:14
285:8,13,17,21

286:2,13 287:18
289:2 309:20 311:2
326:2 333:13
**Daubert (2)**
58:9 332:2
**David (1)**
297:20
**day (94)**
83:11,13,22 84:5
85:16 86:11,14,16
86:20,23 87:9 96:3
99:20 101:11,17
104:19,25 107:20
107:21 108:18
112:10,12 113:4
120:19 121:7,10,12
121:15,23 123:13
126:3 127:24
147:10,14 171:23
171:24 194:2
200:16 202:12
204:9 215:23 219:3
219:6 220:9 225:23
252:23 263:9 267:2
297:23 298:23
300:3 301:3,4,4,7,8
301:8,20 302:24
304:17 308:19,22
311:14 312:11,19
319:18 320:1,5,16
320:17,25 321:9,17
321:21,22,25 322:1
322:8,11 323:20,22
323:24 324:2,3,14
324:24 325:2
326:14 327:15,19
327:20 328:2
333:24 337:23
**daylight (1)**
95:13
**days (87)**
86:5,12 96:18 100:1
101:3,8,10 102:2,4
104:14,19,20,23
105:13,14,14 106:8
106:9 112:15
118:18 121:6 126:1
126:2,5 131:17
198:16 199:3,23,23
200:3,4,18 201:15
201:15 206:25
215:24 216:21,21
226:3,6 227:25
228:1,12 229:25
253:1 269:2 276:23
278:21,22,22

280:13 282:21
284:1,2,15 285:4,6
286:25 287:3 297:9
297:9,24 298:6,6,16
300:20,20,23,23
301:8 305:1,4
306:12,15 307:2
308:1,7 310:3 311:4
322:15 323:22
326:11 330:8,16,24
331:1,18
**deal (2)**
248:13 329:8
**dealing (5)**
99:11 129:14 142:18
257:25 301:1
**deals (2)**
142:23 143:4
**debate (1)**
159:18
**debated (1)**
159:22
**debates (1)**
161:1
**December (1)**
27:8
**deceptive (1)**
109:14
**decide (4)**
120:1 214:2 235:6
244:14
**decided (7)**
29:24,25 33:6 36:1
126:4 196:3 238:7
**decision (9)**
27:11 54:19 67:10
79:9,23 159:17
180:6,12 255:9
**decisions (1)**
255:15
**declaration (2)**
19:23 21:4
**declarations (2)**
21:1 24:1
**declaring (1)**
159:20
**decline (19)**
34:20 164:22 166:24
173:12 267:19
304:5,19 306:1
307:25 308:20
312:9 315:4 316:4
319:15 320:1,7
321:19 329:12
333:24
**declined (2)**

62:1 159:19
**declines (3)**
104:3 270:14 324:22
**decrease (2)**
122:7 288:23
**decreases (3)**
228:7,24 229:6
**deemed (3)**
41:19 42:5 43:23
**defendant (1)**
7:8
**defendant's (8)**
17:22 151:16 154:25
155:5 176:21
177:13 232:21
315:7
**defendants (13)**
1:10 54:7,16 62:15
166:19 173:3 174:1
174:8 175:8,24
230:20 318:9 320:3
**defense (5)**
15:7 17:17 111:8
209:7 259:7
**define (2)**
74:18 303:17
**defined (1)**
75:19
**defines (1)**
74:18
**defining (1)**
247:9
**definitely (2)**
182:21 226:22
**definition (10)**
72:3 73:8 74:10 76:4
79:7 110:5 127:17
177:11 235:10
246:7
**definitions (2)**
76:17 79:5
**defrauded (1)**
320:22
**degree (24)**
9:25 10:5,8,9,10,15
10:20 11:13,15,18
12:21,22 13:2,8
14:16 47:21 68:18
68:19 155:1 258:1
312:25 313:15
315:2,8
**degrees (2)**
11:6 14:10
**delisted (1)**
103:24
**delve (2)**

64:7 158:5
**demonstrate (16)**
65:3 90:22 117:5
118:1 157:22
171:23 191:19
192:1,10 307:16
309:17 317:15
318:8,11 319:5
331:20
**demonstrated (8)**
114:23 153:8,14
155:13 161:17
268:23 316:8
318:15
**demonstrates (8)**
136:16 138:18 145:13
148:11 170:7
177:22 187:11
285:14
**demonstrating (4)**
117:10 130:11 231:10
305:9
**denied (1)**
53:22
**department (4)**
26:1,2 30:20 31:10
**depend (4)**
240:18 283:17 287:4
315:9
**dependent (1)**
286:23
**depending (2)**
15:5 261:15
**depends (7)**
53:3 80:17 205:3
242:12 249:25
286:17 308:11
**Deponent (2)**
337:4,21
**deposed (4)**
7:22 8:13,14 51:17
**deposited (1)**
89:17
**deposition (28)**
1:13 2:9 5:1 6:7,13
19:10 52:2,15 71:13
71:19 95:21 132:11
132:17 183:4,10
224:15 225:16
239:21 240:2 296:8
296:14 319:23
327:1 334:13,19
335:3 336:13 337:3
**depository (4)**
65:6 89:15,16,18
**derives (1)**

58:15
**describe (3)**
93:13,16 300:6
**described (2)**
108:11 185:4
**describing (1)**
306:3
**description (2)**
5:1 109:15
**design (1)**
125:13
**designation (2)**
13:13 68:10
**designed (3)**
120:2 253:13,25
**detail (4)**
92:8,11 193:12
275:21
**detailed (5)**
22:1,2 250:8 332:5,7
**details (5)**
34:14 35:14,17 44:2
44:13
**detect (1)**
299:4
**determination (5)**
122:4 127:11 188:2
205:10 289:12
**determine (32)**
40:3,20 78:8 86:6
106:22 112:22
120:5 121:23 122:2
127:22 137:7
159:20 195:25
199:12 205:5 206:2
216:24 259:1
260:10 274:20
297:23 301:7,13
304:22 308:21
311:8 315:23 321:4
326:3 329:4 330:11
331:2
**determined (14)**
61:25 92:25 96:11
107:6 128:12
169:13 186:2
188:17,18 191:18
196:3 232:7 276:17
330:17
**determining (7)**
91:22 114:3 228:25
259:11 318:17
326:19 333:16
**Deutsche (5)**
41:21 42:11 43:6
44:18 49:17

**develop (1)**
289:12
**developed (28)**
81:5 133:22,25
136:17 137:11
138:2,8 139:7
145:14,21,23 146:1
148:24 149:5,10
151:10,20 153:5,14
154:7,15 155:8,11
155:13,15,21,23
156:11
**deviation (1)**
330:25
**devoted (2)**
16:25 33:1
**Diego (11)**
12:4 15:8 16:14 18:15
22:23 27:9,15 28:20
34:24 68:23 69:1
**differ (2)**
163:10 294:18
**difference (9)**
95:9 99:12 160:13
216:16 228:2
238:13 281:18,19
309:14
**differences (13)**
94:17 95:8 96:1,7,12
97:11,12,17,18
98:17 227:24 298:8
298:17
**different (86)**
14:3 15:1 21:20 31:19
40:24 42:2,7,24
43:11,21 44:5,8
46:15 48:16 58:5
71:8,10 72:8,18,20
73:8 74:17 79:5,25
82:16,19 83:4 94:19
94:19 95:13 96:2,15
104:8,21 105:8,23
112:24 114:22
122:1 126:19,20
128:6 130:8 133:9
139:24 140:5,6
141:3,10 143:7,8,14
144:7,15,20 162:19
177:9 193:4 194:16
194:20,24 195:6,12
209:4,11,12 227:15
233:7,13,14 241:11
242:18 245:14
248:1 251:7 258:18
258:23 259:9 283:1
294:10 298:13

300:1 307:8,8,21
330:8
**differentiate (1)**
301:11
**differently (4)**
173:14 197:16 206:13
325:10
**difficult (19)**
134:2 138:19,21
139:8,8 140:14
145:16 148:13
156:23 158:2
174:21 230:1
242:25 246:25
257:20 258:25
259:5 298:13
328:22
**difficulty (1)**
28:22
**dilute (2)**
298:8,17
**diluted (1)**
301:18
**dilutes (1)**
238:13
**direct (37)**
9:19 92:13 104:16
106:10 114:4
122:22 123:20
129:1 151:5 152:9
170:21,22,25 171:1
171:4,14,22 176:16
177:1 179:7 189:14
191:19 192:2,24
197:21 218:17
263:24 267:7,12
268:6,11 269:24
272:10,13 288:15
305:10 306:21
**directing (2)**
9:12,18
**direction (12)**
168:20 199:11,13
200:15,15 205:6,11
206:2 263:4 278:25
310:10 336:8
**directionally (1)**
310:22
**directions (1)**
293:15
**directly (8)**
19:12 57:8 76:16
154:5 254:8 310:4
317:16 318:8
**director (2)**
37:17 58:25

**directors (3)**
194:4 195:8 312:15
**disagree (12)**
55:4 165:10,17,20
169:16 175:14,16
176:14 243:19
245:11 247:3 293:5
**disagreeing (1)**
170:1
**disagreement (8)**
28:10,14 55:11
141:18 166:11
167:12,13,17
**disagreements (4)**
28:2,8,9,23
**disappear (1)**
104:6
**disclose (4)**
52:8 53:4 226:15
227:4
**disclosed (51)**
53:10 56:25 57:3
72:10 75:8 78:21
79:3 83:18 86:14,22
87:7 122:3 127:24
184:11 194:14
195:16 206:12
217:20 227:10
233:6 235:13,16,18
235:19 236:20
237:9,17 240:19,23
244:17 259:15
261:10,21 263:8
274:25 283:18,21
283:25 285:7 287:3
288:24 302:23
304:16 306:14
308:22 322:4
327:20 328:24
330:9,20 333:18
**disclosing (2)**
52:24 303:19
**disclosure (37)**
56:24 83:20 84:3,9,16
84:20 85:21,25 86:3
105:3 109:13 195:7
229:1 248:21 252:3
253:10 254:2,2
260:17 303:9,11,12
303:17,18 305:24
316:10 317:5
318:13,25 324:6
325:10,11 328:13
333:10,12,13,16
**disclosures (19)**
83:19 84:2,17 86:2

157:24 197:4
200:22,22 235:22
236:7 240:13,15
252:13 303:13
322:17,20 328:9,12
328:17
**discover (2)**
102:20 309:22
**discovered (1)**
140:21
**discovering (1)**
268:11
**discovery (3)**
83:3 213:4 226:4
**discrepancies (1)**
92:22
**discrepancy (2)**
28:13 29:8
**discuss (6)**
36:13 58:2 72:14
168:21 180:11
289:17
**discussed (18)**
24:3,5,13 32:21 35:6
36:6,9,12 58:4
150:3 206:11 215:5
242:5 255:15
267:17 271:18
288:10 297:18
**discusses (2)**
190:4 332:3
**discussing (2)**
101:8 150:6
**discussion (7)**
57:24 125:1 132:9
135:22 153:19,25
154:18
**discussions (4)**
30:2,4,8 37:18
**dispositive (2)**
66:4,14
**dispute (3)**
125:7 151:8,13
**disputed (1)**
236:4
**disputes (4)**
14:20,23 15:2 32:17
**disputing (2)**
108:12 210:17
**disqualification (1)**
45:13
**disqualified (11)**
42:24 43:6,11 44:4,6
44:20 45:20,21 46:4
47:5,18
**disregard (2)**

179:4,22
**disseminated (1)**
264:3
**distinct (1)**
156:2
**distinction (3)**
39:9 143:16 296:19
**distinguish (6)**
77:3 133:15 134:25
136:3,7 252:11
**distinguishing (2)**
141:12,16
**distorted (1)**
56:5
**distress (1)**
40:22
**distributed (2)**
285:8 314:6
**distribution (13)**
112:22 192:10 194:25
216:24 273:6
275:16,24 277:4
278:17 280:11
281:13 295:6,15
**District (11)**
1:1,2 6:10,11 53:24
54:4,19,23,24 55:6
55:12
**divergent (1)**
163:14
**divide (1)**
330:24
**DNA (2)**
231:18,24
**doable (2)**
73:20,22
**document (5)**
5:4,10,16 9:1,11
**documents (3)**
221:19,19 226:7
**doing (23)**
8:16 13:22 16:10 35:9
100:7,10 117:22
120:12 126:3
169:23 181:1,3
205:4 206:7 208:8
247:9 290:22,23
292:22 294:9
297:12 307:8
316:14
**dollar (4)**
93:4,20,21 115:4
**dollars (1)**
258:14
**double (3)**
81:24 202:10 243:24

**doubt (2)**
16:3 220:5
**Dowd (3)**
1:20 2:10 3:14
**downsize (1)**
35:21
**downsizing (1)**
35:22
**dozen (3)**
50:12 64:11 102:15
**dozens (3)**
8:7 60:9 250:9
**draft (1)**
19:23
**drafted (1)**
70:18
**drafting (2)**
20:3,5
**draw (9)**
52:4,5,14 95:1,1
128:5 204:18
205:18 276:1
**drawing (1)**
123:11
**driven (1)**
231:1
**drivers (1)**
242:15
**drives (2)**
142:6 161:21
**drop (3)**
277:2 320:25 321:10
**dropped (1)**
302:16
**drug (2)**
298:11 301:10
**duly (1)**
7:14
**duplicated (1)**
299:16
**duration (1)**
102:12
**Dutch (2)**
139:16,20

_____
E
_____

**E (15)**
3:1,1 4:1,1,25,25
202:2,11 218:16,17
261:9 266:3,4,9
329:20
**e.g (2)**
315:3,5
**earlier (27)**
36:18 107:19 116:23
136:21 159:4

161:16 191:15,17
193:12 194:7,17
207:4 238:9 242:5
244:11 267:18
268:17 269:16
271:19 273:14
288:3 289:25
290:12 298:10
300:11,13 328:22
**early (6)**
15:18 42:21 65:19
158:6 288:4 302:8
**earn (4)**
73:24 145:17 156:9
156:24
**earnings (78)**
104:19,22 107:9,10
107:19 116:18
193:22 195:1,11,12
195:15,20 198:9
199:22 200:4,5,7,11
201:10,10 216:7,19
216:21 217:21
229:4,7 239:1
242:22 244:22,23
246:11,12,13,22,23
247:7,17 248:5,6
249:13,16,17,18,20
250:16,18,23 251:1
251:4,5,10 252:24
257:21 268:19,21
272:19,20 273:9
275:1 285:1,3,4,7
285:12,16 286:18
286:24,24 287:3,6,9
288:5,21 289:8
290:19 291:8 308:8
315:4
**earns (1)**
47:4
**ease (1)**
89:21
**easier (3)**
173:17 240:21 241:5
**easily (2)**
248:5,6
**easy (1)**
9:14
**EBITDA (1)**
257:22
**econometrics (2)**
10:19 11:3
**economic (15)**
82:6 84:15 145:2,8
146:17 147:21
149:13 154:22

156:4 159:24
181:16 182:3 187:8
244:9 264:9
**economically (1)**
97:9
**economics (6)**
10:15,22 11:7,16 68:4
68:20
**economists (10)**
72:18 139:11 148:2
157:9 159:21
160:25 163:7,13
293:6,7
**educated (2)**
26:11 68:19
**education (2)**
68:11,12
**educational (2)**
9:23 68:8
**Educationally (1)**
68:17
**effect (17)**
107:12 112:14 150:8
157:12,23 170:8,9
176:20 177:22
191:21 192:10
196:5 197:6 264:25
274:3 289:5 306:22
**effective (8)**
87:4,4,5 249:8,8
258:2 266:6 301:11
**effectively (11)**
51:1 60:3 98:11 146:1
146:16 162:22
173:7 187:22
296:25 299:9
302:25
**effectiveness (1)**
257:19
**efficiencies (2)**
162:20 205:18
**efficiency (145)**
5:7,11 39:12,15,20,24
41:18 42:1 62:5,22
66:15 72:16,19,21
73:11,17 74:6,16,20
75:10,11,14 76:7
77:5,6,15,15 78:11
84:21 90:3,9 91:2
91:22 102:12 104:1
104:17 116:7,11,19
121:18 122:22
123:4,12 128:3
131:1,3 132:25
133:7 134:10
135:25 137:4,6,10

141:13,14 143:17
143:18 145:1
146:18 147:24
149:15 150:18
152:23 154:5,10,16
156:6 157:22 159:3
160:24 162:14
163:15 165:7
171:17 174:12,19
174:22 175:16,20
177:1,11 179:22
181:19 183:14,16
183:20 185:14
186:20 189:17
191:3,10,13,20
192:2,15,25 193:7
197:22 204:18,22
205:4 224:18
231:10,11 237:16
241:18 242:15,18
245:22 246:6,14
247:9 248:9,11
254:11 255:11,14
256:25 257:4 267:8
267:13,15 268:7,12
268:24 269:25
270:17 271:23
272:10 299:22
305:9,10,15 308:3
312:2,5 313:25
314:10 318:22
319:6 323:18 325:4
325:5 326:4 327:14
**efficient (97)**
40:15 41:4 62:24 63:5
63:22,23 65:4,25
66:25 67:3 71:22,23
72:4,6,13 73:21,23
76:18 80:12 83:25
88:7,15,19 89:14
91:6 92:4,5 101:2
101:18 105:18
106:4 113:15
122:11 124:5
126:23 127:9
128:16,24 133:16
134:25 136:3,8,25
137:9 148:4,12,25
153:7 154:23,24
155:3 156:21
157:10 161:11,13
161:19 164:8
165:11 168:22
177:3 181:3 187:7
187:16,25 188:19
206:24 217:19

225:20 242:21
245:8,23 246:7
247:6,7,16,20
251:22 254:12
262:14,15,18,25
283:24 284:3,9,12
284:18 301:14
311:5 315:18,24,25
316:6,11 317:12
326:20 329:3
**efficiently (11)**
65:7 71:24 72:5 126:4
127:4,25 128:2
134:1 145:15
246:21 267:24
**eight (9)**
17:3 18:18 23:4,7
24:11 132:2 295:19
310:8 312:15
**eight-year (1)**
16:23
**either (16)**
99:21 168:20 200:14
203:2,4 214:19
230:16,20,23 231:9
232:1,1 266:12
294:24 318:12
334:25
**eliminating (1)**
92:22
**embellished (2)**
63:11,13
**emerged (1)**
23:22
**emphasis (2)**
10:8 68:23
**emphasize (1)**
159:11
**empirical (5)**
171:8,11 172:19
176:15 183:16
**employed (1)**
50:11
**employee (1)**
336:18
**employees (1)**
29:11
**enabled (1)**
113:5
**encountered (1)**
271:16
**ended (8)**
12:12,15,17 39:2 42:7
43:21,25 44:9
**endorse (1)**
63:2

**endorsed (1)**
56:17
**endorsement (1)**
54:23
**ends (4)**
104:4 141:9 296:25
301:16
**Energy (1)**
43:19
**engage (2)**
59:20 89:4
**engaged (7)**
29:12 41:13 42:12,13
62:4,20 160:25
**engagement (5)**
16:20 30:23 38:24
302:2,12
**engagements (1)**
16:20
**engineering (2)**
12:23 13:9
**enter (2)**
82:24 159:19
**entertainment (1)**
129:19
**entire (8)**
50:20 84:5 101:16
219:19 274:4 312:6
315:15 326:21
**entirely (5)**
89:25 123:13 222:3
267:22 314:21
**entirety (4)**
67:10 105:19 106:13
113:18
**entitled (5)**
134:8 150:18 169:6
184:23 211:9
**equal (4)**
200:19 241:4,8,9
**equation (4)**
275:24 277:8,11
278:17
**equillibrum (1)**
83:6
**equity (4)**
11:2 31:13 60:4 61:16
**equivalent (5)**
115:6 181:25 264:23
287:17 295:14
**ERRATA (1)**
337:1
**error (2)**
279:14 299:5
**errors (1)**
293:24

eschewed (1)
153:1
Esq (5)
3:5,6,15,16,17
essence (3)
120:23 175:16,19
essentially (9)
27:23 42:20 68:4
70:13 76:7 130:20
160:23 264:23
292:3
establish (7)
147:23 149:15 156:6
159:2 181:19
186:19 189:16
established (3)
78:12 276:21 329:2
establishing (1)
190:5
estimate (6)
8:10 184:3,5 185:15
190:6 193:1
estimating (2)
186:4 190:5
et (3)
1:9 6:8,10
Eugene (3)
76:16 88:11 161:12
evaluate (2)
105:18 106:10
evaluated (2)
104:18 163:3
evaluating (1)
38:25
evaluation (7)
10:18 41:1 50:6
136:22 137:14
180:18,20
evaluations (1)
72:9
event (157)
29:24 47:3,9 86:21
99:3 104:18 107:23
108:3,9,21,25 109:7
109:19,20,21,24,25
110:18 111:6,10
112:2,4,7,8,9,9,11
112:16 114:1
118:18 119:8,14,17
119:17,19 120:7
122:9,14,24,25
124:16,17 125:4,14
125:19,19,20
126:21,24,24,25
127:3,5,14,16,17,18
127:21,22 128:8

137:5,8 138:13
164:13,21 165:18
165:25 166:6,18,19
167:2,21 168:8,13
168:23 170:3
183:15,21,25 184:2
184:4,5,24 185:4,13
185:19,22,24 186:1
186:11,14 187:23
189:20 190:3,5,6,24
190:25 191:1,7,12
191:13,18,24,25
192:4,8,12,14,16,20
192:24 193:1,3,4,6
194:9,13,13,19
195:2,2,6 201:8,16
201:21,24,25 202:9
202:10 205:10
206:1,2 214:24
215:3 218:16 252:1
261:8 298:23 299:7
303:23 304:9,20,24
306:18,19 309:17
311:21 316:4,5,9,19
317:2,3 319:21
320:10 327:23
events (29)
108:14 148:4 191:6,8
196:1 197:8,9 201:4
201:9,12 208:13,15
211:2 221:11,15
222:25 226:12
239:13 270:22
309:2 313:1,16
315:3 316:1,3
317:17,25 318:1
319:10
eventually (2)
20:17 23:17
everybody (1)
27:18
evidence (85)
104:17 105:2 106:11
107:16 113:7,16
114:4,16 122:22
123:1,4,20 126:19
127:10 128:15,25
129:7 130:13,25
131:2,12 133:14
134:23 135:4 136:2
136:6,15 163:11,15
172:2,5,6,14 179:7
179:25,25 187:5,15
191:19 192:1,2,25
197:21 216:6
230:21 231:25

232:4 267:7,12
268:7,11 269:24
271:22,23 272:10
272:13 277:20
278:6,9 279:2,11,23
279:24 280:3,7,15
280:17,20 281:1,3
281:24 284:19
285:11,16 305:10
306:21 308:3 312:2
312:4 314:10
319:24,25 320:14
326:3 333:23
evident (1)
225:23
ex (2)
165:13 232:7
exact (3)
178:14 281:9 286:8
exactly (31)
27:24 35:14,17 55:4
56:8,18 57:9 85:12
95:12 143:20
147:16 152:2 164:4
168:15 172:17
187:3 198:1 204:13
212:1 226:2,5,8
243:20,22 247:22
299:15,17 309:13
314:14 317:7
328:23
Examination (2)
4:2 7:18
example (8)
214:9,15,21 238:8
242:20 301:9
314:25 322:25
excess (8)
73:24 80:23,24 156:9
156:24 165:15
219:8 244:6
exchange (28)
5:20 64:14 65:8,11,23
66:3,14,23 67:1
89:13,20 90:7,14,21
91:3,24 92:3,5 93:3
99:20,21 115:17
149:11 156:20
157:7 220:25 221:9
222:25
exchanges (1)
149:10
exclude (3)
118:9,13 123:23
excluded (4)
41:18 42:1 48:16 58:9

excluding (1)
44:7
exclusive (2)
37:23,25
exclusively (3)
39:16 90:3 119:9
excuse (2)
56:21 241:9
exercise (2)
201:19 214:4
exhibit (37)
5:2,4,10,16 9:2,3,13
9:19 98:23 135:10
135:10,15,16
150:12,13,16 202:2
202:2,11 209:13
210:4,18 211:9
218:16,17 220:14
220:15,16 241:25
242:2 261:9 266:3,4
266:9 314:14,16
329:20
exhibits (1)
9:19
exist (3)
78:23 163:12 245:19
existed (1)
271:24
exists (2)
163:12 292:25
expand (4)
251:8 268:20 269:7
270:1
expanded (3)
131:25 270:7,13
expect (23)
100:13,15 122:11
198:11 200:7
208:14 216:14,20
218:2,3 225:20
234:17 248:3
274:16 275:5 283:4
283:14,25 284:23
288:22 308:24
328:16 331:14
expectation (6)
65:5 215:14,18 217:7
217:14 284:5
expectations (4)
198:11 234:21 284:5
331:16
expected (10)
99:4,5,6,7 198:2
203:23 205:13
235:15 253:6 288:6
expenses (7)

59:2,6,9,11,12,13,15
experience (13)
14:4 39:17 164:20
165:23 166:5 228:3
228:20 238:11
267:19 286:7,11
287:24 301:15
expert (30)
5:2 19:19,22,24 20:25
24:1 25:21 42:5,8
42:11,14,16 43:22
43:24,25 44:4 51:12
51:21 52:16 61:18
61:22 103:8 158:14
210:15 232:21
255:20,21 258:12
299:15,17
experts (5)
148:5 157:9 299:21
300:18,24
EXPIRES (1)
337:25
explain (17)
115:17,21 126:17
137:19 167:21
194:9 199:2 202:1
221:12,15 224:14
224:21 232:22
251:8 274:7 275:15
310:21
explained (16)
24:20 25:2,11 27:10
44:25 109:8,9 114:7
126:23 142:1 156:7
160:1 161:12,16
193:5 268:16
explaining (7)
85:9,12 155:19
188:13,24 189:5
289:7
explains (2)
94:25 156:18
explanation (1)
289:1
exploration (1)
158:3
expressed (2)
49:6 332:16
extensively (1)
24:13
extent (9)
52:7 53:2 64:7 96:15
129:24 166:23
167:22 208:15
252:23
extraordinarily (3)

145:16 156:22
287:10
**extreme (5)**
76:15,25 88:10 121:2
161:14
**extremely (9)**
89:13 134:2 138:21
139:8 148:12 250:8
312:25 313:15
315:2
**eye (2)**
289:22 290:9

---

**F**

**F (2)**
4:1,25
**facilitates (1)**
146:18
**fact (53)**
21:13 22:21 26:5 44:9
47:15 66:2,13 82:19
83:9 91:16,20,21
99:18 100:8 136:18
138:24 139:2,22
145:8 157:5 161:3
166:12 169:5 172:6
175:2 186:21
187:25 198:5 199:2
203:1 207:19
216:18 217:19
228:11,14 235:20
244:3 245:17 247:8
260:6,11 272:15
281:17 285:1 289:7
304:22 310:6
311:22 316:19
319:15 320:5
324:19 331:21
**factor (64)**
99:18,23 105:24
106:18 107:11
108:1 109:7 110:6
110:10,11,12,23
113:14,16 114:23
116:16 117:24,25
123:17,18,23,24,25
124:1 153:16 156:1
157:19 158:10,21
170:12,20,21,23,25
171:1,4,8,11,14
172:19,25 173:5
175:15 176:15,16
177:1,8,8,21 178:3
178:18,21,22,25
179:4,23 180:1
181:9,13 187:10,20

189:14 196:4
238:20
**factors (71)**
41:1,2,6,9 63:25 65:1
65:16,17 66:7 78:8
78:10 104:7 105:23
113:17 117:22
118:14 124:13
132:22,24 133:15
133:19,20 135:22
136:23 137:15,20
140:24 145:8 146:6
146:7,15,19 147:15
147:22 149:4,7,13
150:4 152:4 153:20
154:1,4,8 155:9
156:1,5 157:4
158:23 159:1
160:16,17 165:6
172:20 176:25,25
177:7 181:4,7,17
184:20 186:18,21
187:2,6,13,18,20
188:16,16 189:16
286:24
**facts (3)**
71:9 221:11,15
**factual (1)**
31:23
**fail (2)**
63:25 156:12
**fair (41)**
8:8,12 14:12 17:10
27:21 40:9 56:19
60:6 68:3 83:14
87:2 106:13 110:1
115:10 128:16
147:4 169:17 177:3
177:5 184:3 198:16
198:17 217:4 223:2
232:23 236:7 256:1
256:19 257:1,2
259:6 263:16 266:5
267:4,6 269:12
275:9 276:7 282:8
292:8 334:1
**fairly (6)**
65:19 160:7 166:20
288:5 304:10 327:7
**fairness (1)**
39:8
**faith (1)**
62:24
**fall (2)**
12:16 27:7
**false (9)**

253:5 293:10,14,23
295:10,11 299:2,3
303:13
**Fama (5)**
73:10,15 74:5 76:16
88:11
**familiar (16)**
8:12 14:8 34:25 49:20
134:12 135:3
139:11 143:19
148:10 150:20,25
162:9 242:4 291:14
297:10 300:10
**far (3)**
43:5 65:2 229:15
**FAS (2)**
40:20 148:6
**favor (3)**
128:2 168:5 239:8
**FDT (1)**
300:17
**February (9)**
209:15 210:5 236:1,5
260:13 322:22
323:1 324:11 325:8
**federal (3)**
20:18 42:2 336:13
**fee (1)**
25:14
**feel (5)**
94:13 123:10 152:17
265:25 295:3
**feeling (1)**
121:4
**fees (2)**
21:14 30:14
**felt (3)**
110:17,21 113:22
**field (1)**
37:14
**fifth (11)**
54:9,18 56:17 58:2
153:15 170:7,12,20
177:7,8 187:19
**fighting (1)**
108:24
**figure (7)**
92:9 96:17 120:19
261:20 273:9
328:22 329:5
**figures (1)**
326:1
**file (1)**
235:6
**filed (13)**
61:18,23 220:18

227:1 233:11
234:25 235:2,20
236:16,17 259:15
301:24 332:2
**files (1)**
221:20
**filing (2)**
222:24 226:13
**filings (3)**
210:13 236:23 237:25
**final (4)**
20:13 92:17 164:8
184:23
**finance (12)**
9:25 10:2,4,5,7,12,17
10:21 68:4,19,24
69:11
**financial (87)**
13:13 33:10 40:2
41:12 45:8 46:2
49:23 54:5 87:1,3
87:11 107:13,16
108:18 110:5,13,13
110:15,22 111:3
112:14,20 114:16
116:18 118:17,19
118:22 119:9 121:6
123:9 128:11,12
129:18 130:3 163:7
163:13 193:11,13
193:15,20 194:20
195:15,23 196:1,4,6
196:14,15 197:1,4,8
198:13,22 199:25
214:25 215:13,17
215:22 229:16
233:23 234:1 237:7
238:3,6,16,18 239:4
239:9 240:13,23
248:16 249:1,4
255:13 266:6,7,22
275:5 276:18 282:3
282:6 285:21
286:12 287:18
289:22 290:8 293:6
**financially (1)**
336:17
**financials (5)**
198:7,8 234:13
251:17 259:6
**find (20)**
27:18 45:15 56:3 83:5
142:1 213:24
216:12 218:11
226:2,7 268:25
270:2 271:4 273:22

287:24 289:8
292:20,24 293:1
309:9
**finding (7)**
15:6 133:14 138:1,6
269:18 270:5 311:9
**fine (10)**
8:24 51:3 89:23
108:12 135:12
143:2 153:22 179:2
302:21 303:22
**fines (1)**
258:9
**fingerprints (3)**
231:17,22,22
**finish (8)**
110:25 111:1,23
125:11 129:25
179:13,13 325:15
**fired (2)**
329:9,9
**firm (28)**
23:18 24:12 25:8,21
26:23,24 28:2 29:25
30:5,9 31:5,19 35:2
36:16,22 37:1,7,24
38:1 45:16 47:25
48:2,9 50:6 60:7
62:21 267:21 299:7
**firms (4)**
21:15 25:16 36:2
67:25
**first (43)**
7:14 14:15 15:13 16:8
49:9 66:7 70:8
83:19 84:3 86:3,19
97:1 112:7 146:6,15
152:22 154:8
164:21 187:2
189:15 195:24
203:16,19 204:17
205:8,10,16 236:19
246:5 260:3 266:22
267:2 272:11
273:18 288:11
300:5 302:4 304:2
306:18 308:7
316:14 319:13
329:2
**firsthand (1)**
28:3
**fit (4)**
37:8,11,20 93:16
**fits (1)**
143:11
**five (43)**

118:16,19 119:9,17
121:3 128:12 129:3
153:8,10,14 155:13
181:22 188:15
216:25 265:22
275:25 276:2,18,23
277:9 278:3,22
285:20 286:4,5
287:24 305:1
307:23 309:20
310:2,7,19 311:1
322:15 325:8
326:10 330:16,23
331:1
**five-year (10)**
109:21 110:18 119:10
122:15 125:20
126:22 127:8
225:22 315:18
319:6
**flaw (1)**
185:24
**flesh (1)**
214:8
**flip (1)**
218:15
**flipping (1)**
295:17
**flow (4)**
79:12 262:12 282:8
282:17
**flows (8)**
79:20 80:3,9,10 185:9
185:10 240:8,22
**Flowserve (5)**
53:13 54:14,17 56:12
56:14
**flush (1)**
62:3
**focus (18)**
10:3,12 15:6,11,18
27:11 33:7 36:19
37:23,25 38:1 50:8
74:1 90:12 161:9
195:23 249:18
254:3
**focused (3)**
136:15 162:2 221:24
**focuses (4)**
11:1 160:15,16 177:2
**focusing (6)**
10:13 77:18,18 161:4
196:17 285:13
**follow (7)**
53:10 110:10 185:17
305:19 306:4,6

321:17
**follow-up (1)**
334:9
**followed (2)**
276:19 308:19
**following (10)**
13:1 14:15 28:22
65:12 87:9 110:11
112:20 255:12
305:20 328:8
**follows (2)**
7:15 151:8
**Foma (1)**
161:12
**footnote (20)**
134:7 142:2 149:18
149:22,23 150:2,17
151:4 157:2,3 158:8
180:7 185:5 277:3
288:15 314:20
318:5,6 333:7,8
**footnotes (2)**
149:1 150:8
**force (1)**
144:16
**forces (2)**
46:21,23
**foregoing (3)**
336:4,9,11
**foreign (5)**
5:17 89:17 226:12,14
237:22
**forgotten (1)**
22:10
**form (231)**
20:6 24:4 36:22 39:18
40:18 43:1 44:11,22
45:5 46:6 47:7,22
53:23 55:15 56:22
60:12 63:1 64:16
66:5,16 68:6,21
72:23,24,24 73:11
73:13,16,21 74:6,12
74:20,24 75:10,11
75:14,22 76:6,9,20
76:22,24,25 77:6,14
77:20 78:6 80:5
81:8,15 82:10 83:15
84:24 86:18 87:18
90:11 91:4,15 92:6
93:8 94:6 97:21
101:5 106:14 108:4
108:16 110:2,20
114:12 118:4,20
119:11 121:8
122:23 123:15

124:18 125:15,22
127:15 128:17
131:6 133:17
136:10 138:10
140:18,25 141:15
142:21 144:5 145:3
146:22 151:24
153:18 157:16
159:12 161:2
163:20 165:16
166:14 169:1,18
170:15 171:20
172:21 175:3,21
176:12 177:4 178:6
178:17 179:5
180:15 182:6,22
185:16 186:5,23
188:1 189:23 190:8
192:5 193:2 194:11
194:22 195:9,18
197:13,24 202:17
203:18 204:4,20
205:2,20 207:8,16
209:7 217:17
220:18 222:5 223:4
225:24 226:11,14
227:2,20 228:16
229:3,8 230:7,18
232:10 233:25
235:11,24 236:13
236:15,23 238:17
240:9,25 241:13
246:16 247:19
248:18 249:2,14
250:12,17 251:7,14
251:25 253:23
256:6 257:11,23
259:7,22 260:21
261:13 262:23
263:17 265:9 267:9
269:11 275:10
276:8 278:10 282:9
283:7 284:10,21
285:23 286:15
288:1 289:14 290:2
290:13 293:12
299:7,24 303:15
304:1 305:5 306:8
307:5,18 308:17
309:25 311:6,25
312:20 313:2,17
315:21 317:14
319:12 320:19
321:7,23 322:21
323:8 324:13
325:13 326:5,12

328:5 329:16 331:8
332:19,25
**formal (2)**
63:15 68:17
**formation (1)**
119:5
**formed (4)**
23:18 91:1 139:24
323:1
**forming (2)**
37:1 207:6
**forms (3)**
72:18,20 226:25
**formula (1)**
93:15
**forth (2)**
255:12 336:6
**forward (2)**
55:8 110:6
**found (8)**
36:16 48:2 64:21
115:24 269:24
285:20 287:16
305:1
**foundation (2)**
39:14 176:16
**foundational (1)**
39:20
**founded (2)**
33:9 35:2
**four (5)**
25:24 52:20,21
129:11 130:21
131:10 132:2 146:6
146:15 147:14
149:6 154:8 155:16
176:24 181:22
187:18,20 189:15
201:10 278:21,22
295:17,19 310:7
330:16
**fraction (1)**
51:13
**frame (1)**
236:6
**framework (2)**
184:4,24
**Francisco (5)**
1:21 2:11 3:19 6:1,14
**frankly (3)**
44:1 174:20 227:22
**fraud (18)**
184:12,13,17 191:6,8
254:9 316:1,2,3,5,9
316:19,20 317:2,16
317:24 333:25

334:5
**Fraud-on (1)**
5:4
**fraud-on-the-mark...**
134:9 160:19 176:17
263:25 264:5,12
**fraudulent (2)**
252:19,19
**fray (1)**
159:19
**free (4)**
94:13 152:18 266:1
320:12
**frequent (1)**
287:13
**frequently (4)**
146:7 279:25 287:10
301:16
**fresh (6)**
95:23 204:13 259:19
265:5,20 327:25
**Friday (3)**
1:18 6:2 284:12
**front (2)**
150:15 211:19 252:14
**FTD (2)**
300:8,15
**full (9)**
15:1 17:3 84:14 94:11
94:12 109:15 150:5
152:15 210:3
**full-time (2)**
16:11 33:8
**fuller (1)**
244:20
**fully (5)**
83:2,23 154:23
245:24 247:25
**fund (1)**
140:13
**fundamental (21)**
40:10 141:13 143:17
155:1 163:23
164:16,18,23
165:22 166:24
167:24 168:1,13,14
168:18 169:23,24
170:2 184:7 185:1,6
**fundamentally (3)**
186:11 194:20,23
**fundamentals (1)**
314:24
**funds (9)**
73:25 89:8 138:17,22
139:2,3 140:10,12
156:9

**further (10)**
97:22 246:9 270:15
271:11,23 272:25
331:19 334:22
336:11,16
**Furthermore (1)**
254:18
**future (10)**
73:12,19 79:12,19
80:3,9 185:8 240:7
240:22 262:12

_____
**G**

**GAAP (1)**
249:5
**gains (2)**
87:17 88:5
**gatherings (1)**
34:3
**gauge (1)**
165:7
**Geller (4)**
1:20 2:10 3:14 60:7
**general (17)**
22:21 35:18 86:10
91:1 101:15 121:18
123:12 153:24
166:4 198:14
211:12 254:10
256:25 260:16
269:17 319:5 325:3
**generalities (1)**
100:24
**generality (1)**
64:6
**generally (28)**
81:9,14 117:5 128:15
157:8 160:9 165:6
171:3 185:4 196:16
197:1 211:10 217:9
219:11 227:4
228:15 233:4,24
234:12,15 254:12
260:12 284:4 311:5
315:18,24 316:6
317:12
**generate (1)**
244:6
**generically (1)**
209:14
**getting (12)**
26:15 116:15 121:5
128:7 195:22
216:25 233:18,19
293:16 295:17
309:14 326:22

**gist (1)**
176:10
**give (8)**
43:18 72:2 208:2
214:15,21 263:19
287:23 314:17
**given (28)**
40:14 46:24 58:1
64:23 82:15 86:14
120:1 139:5 145:6
147:10,14 148:7
154:22 181:10
208:14 229:1
240:12 242:17
246:21 259:23
260:4 262:17,19
287:22 298:11
304:4 326:23
336:10
**giving (3)**
43:16,16 223:6
**glad (1)**
51:18
**gloves (1)**
231:16
**go (48)**
14:1 16:16 19:18
29:23 34:20 35:24
41:1 44:24 56:2
62:11 81:17 99:9
111:24 124:23
136:23 168:20
170:6 179:14,15
189:11 196:17,19
199:17,18 202:6,19
202:21 204:2,10
226:6 231:17,18
234:11 241:24
242:14 246:20
266:3 267:23 271:3
273:1 276:14
289:11 291:6
293:14 304:19
305:17 307:1
329:19
**goes (12)**
39:5 59:16 99:13,14
99:15 154:21 182:9
236:4 250:9 267:17
279:7 301:9
**going (86)**
8:20,21 28:1 44:23
45:17,20,23 46:25
48:5,7 52:6 53:1
55:8 57:21 60:15
62:9 64:3,7,8 65:5

74:3 82:20 92:13
109:2 111:18 112:5
118:6 119:4 121:1
124:15 125:4,6
126:20 129:21
132:7 135:5,11
136:9 138:9 140:15
143:3 152:12,20
153:21 167:3,3
168:2,3 182:25
185:23 186:17
187:19 189:6
190:23 195:23
198:6 200:9,10,14
204:2 211:2 218:1
218:21 220:13
225:12 226:9 230:5
237:19 245:2 258:7
267:23 274:15,16
274:20 275:18,20
276:1 278:25 280:9
290:22 292:16
293:13 294:2 309:1
321:10 330:17
**good (10)**
7:20,21 62:24 65:24
102:24 172:23
173:21 182:17
271:6 286:16
**gotten (1)**
62:7
**government (1)**
325:22
**gradual (1)**
322:19
**graduate (5)**
10:3,8,9,10,16
**Grant (4)**
3:5 7:6 60:14 109:2
**graph (7)**
95:1,1,4 98:25 99:3
100:8,25
**great (1)**
317:3
**greater (20)**
92:8,11 167:25 168:2
200:1,2,3,8,13,19
217:11 227:18,23
282:16,21 283:5,12
283:19 285:15
300:21
**greatly (1)**
165:15
**Griffin (4)**
5:8 134:8 242:1
245:12

**grossly (5)**
312:24 313:3,13,19
315:1
**Grossman (1)**
161:17
**Grossman-Stiglitz (2)**
88:14 162:10
**grounds (1)**
58:10
**group (11)**
3:25 7:10 29:14 81:20
81:23 107:4 115:20
201:8,12 239:13
298:10
**guess (14)**
31:9 40:13 62:19
119:19 134:7 136:5
152:21 173:7
177:16,17 246:9
256:2 288:16
304:13
**guidance (3)**
69:2 234:22 255:12
**guilty (9)**
20:21,24 21:3,17 22:5
22:15,21 23:24
26:18
**guys (2)**
129:22 213:3

_____
**H**

**H (1)**
4:25
**Hadley (2)**
3:4 7:7
**half (7)**
64:11 69:2,18,24
258:14 284:16
287:18
**Halliburton (3)**
67:10 159:16 160:22
**hand (1)**
244:20
**handful (5)**
18:4,20,22 19:15
156:17
**handing (1)**
135:14
**handled (1)**
332:4
**hang (1)**
33:6
**Hanouna (1)**
70:8
**happen (9)**
84:18 104:9,9,12

140:8 225:8 254:1
278:3 322:9
**happened (31)**
21:9,17 22:6 24:24,25
25:7 34:22,23 35:1
35:20 36:10 44:15
46:8 47:11,13,15,19
49:3,8 62:11 64:10
86:15,21 167:17
204:8 224:1 226:3,5
279:20 310:3,20
**happening (4)**
27:6 117:16 218:10
305:23
**happens (6)**
103:23 120:8 167:13
224:12 225:25
279:21
**happy (2)**
43:18 124:9
**hard (3)**
162:11 244:12 250:20
**hat (2)**
120:18 282:18
**head (5)**
24:12 31:12 155:18
204:13 214:25
**headed (3)**
5:4,10,16
**heading (2)**
67:13 202:3
**headquarter (1)**
18:13
**headquartered (1)**
6:19
**heads (1)**
295:17
**HealthSouth (6)**
102:16,17,23,25
103:4,5
**hear (4)**
49:9 100:16 195:4
294:13
**heard (10)**
28:11 29:3,8,9 31:14
43:9 113:22 171:10
265:16 326:18
**hearing (1)**
156:15
**hedge (1)**
73:25
**held (3)**
2:9 6:13 153:2
**help (1)**
120:16
**helpful (17)**

107:15 120:17
133:21 136:18
157:19 158:11,18
158:21 178:3,8,22
196:6 230:13,16,19
231:23 255:10
**Hensley (2)**
3:24 6:17
**high (3)**
64:5 99:5 287:21
**higher (4)**
187:13 219:16 293:10
293:16
**highly (4)**
139:23 280:6 284:16
313:21
**hired (3)**
15:12 62:8 329:7
**hiring (1)**
315:6
**historical (9)**
72:25 73:17,18 75:3,7
249:17 250:23
251:5,10
**hoc (3)**
136:1 234:25 323:2
**holding (2)**
65:14 175:14
**hole (1)**
44:24
**holiday (4)**
96:1,12 97:11,18
**holidays (6)**
94:19 96:2,5,13,14
99:19
**Holland (2)**
3:25 7:10
**Holm-Bonferroni (3)**
292:4,6 294:5
**honest (3)**
265:1 294:20 302:7
**Hong (2)**
69:7 138:24
**hope (1)**
254:20
**hoping (1)**
201:9
**host (1)**
177:18
**hour (3)**
60:15 183:1 239:17
**hourly (3)**
25:22 26:5,7
**hours (6)**
69:18,24,25 70:9,11
95:14

**household (1)**
103:4
**hundred (2)**
106:8 321:16
**hundreds (6)**
18:4,19 42:13 51:8,9
51:10
**hypothesis (11)**
76:15 77:1 88:11
131:14 161:14
215:22 216:15,16
216:17 281:16,23
**hypothetical (7)**
121:2 129:20 189:12
189:13 192:7 250:4
268:8

_____
**I**

**i.e (3)**
154:14 246:22 247:1
**ICC (1)**
221:19
**idea (7)**
21:6 35:16,18 223:19
253:14 271:15
293:9
**ideas (1)**
34:5
**identical (2)**
70:13,15
**identified (11)**
43:5 51:19 129:3
139:20 197:4
231:20 238:19
259:16 260:18
289:25 290:12
**identify (8)**
133:21 138:13 208:20
208:25 211:14
300:19,20 308:7
**identifying (1)**
309:2
**ignore (1)**
247:23
**ignored (1)**
128:5
**illegal (1)**
260:11
**illiquid (1)**
139:23
**illustrate (1)**
157:23
**illustrates (1)**
98:5
**imagine (2)**
11:17 183:22

**immaterial (1)**
263:10
**immediately (1)**
135:21
**impact (25)**
48:18 79:19,20 86:7
97:13,19 103:25
107:17 166:21
167:24,24 168:1
240:22 254:7
255:25 257:4 265:7
292:7,10 298:2,2
299:4,5 324:23
331:21
**impacted (7)**
80:4 170:11 298:22
317:17,24 318:18
333:17
**impacts (4)**
79:12,13,19 298:24
**impervious (3)**
314:23,25 315:4
**implicate (3)**
289:24 290:11 296:2
**implicates (1)**
48:4
**implication (2)**
82:23 262:13
**implications (3)**
82:6 84:15 244:9
**importance (5)**
158:11 181:12 263:13
317:3 327:23
**important (21)**
60:7,11 77:10 150:5
162:15 163:9
172:20,24 173:23
202:9 211:23,25
213:24 214:5,10,17
259:25 276:15
287:10 318:16
328:10
**importantly (1)**
115:14
**impossibility (2)**
88:16 161:19
**impossible (1)**
148:13
**impounded (2)**
85:19 240:14
**inaccurate (1)**
189:7
**Inasmuch (1)**
154:3
**incentivized (1)**
97:10

**incidence (2)**
274:19 300:21
**incident (1)**
25:4
**include (11)**
75:3,6,7,7 101:17
183:15,20 184:5
233:8 270:8 290:24
**included (13)**
10:22,22 14:20 51:24
52:20 130:4 185:5
243:24 244:2
251:11 257:15
291:4 318:4
**includes (1)**
52:1
**including (4)**
113:16 185:9 233:9
272:14
**inclusive (1)**
50:24
**income (4)**
58:15,20 59:18,19
**incomplete (1)**
120:14
**inconclusive (16)**
118:24 119:22 120:6
128:4 130:10 193:7
229:12 230:12,12
230:21 231:23
232:4,8 298:14
299:9 301:17
**inconsistent (1)**
55:25
**incorporate (9)**
81:6 154:25 156:21
247:25 248:4
312:24 313:9,14
315:2
**incorporated (34)**
6:9,19 72:7,22 75:16
78:3 80:19 83:23
87:14,20 106:11,23
107:2,7 116:3,9
117:8,11 118:8
129:8 130:4,7,15
131:17 162:5
177:14 257:7
272:16,18 277:22
278:7 279:3 282:1
315:8
**incorporates (3)**
74:13 84:22 167:23
**incorporating (9)**
73:9 80:13 114:5
115:12 116:6 117:6

118:2,12 254:13
**incorrect (7)**
142:14 162:23 168:17
168:18 306:11
321:15,19
**incorrectly (1)**
167:22
**increase (10)**
122:6 219:6 223:10
224:8 225:7 228:8
253:7 282:7,10
288:23
**increased (1)**
225:18
**increases (3)**
228:6,23 229:6
**incredibly (1)**
315:11
**independent (1)**
21:13
**index (8)**
115:2,5,8,11,19,20
116:1 140:10
**indicated (1)**
331:5
**indicating (2)**
46:25 116:1
**indication (3)**
65:24 66:23 328:10
**indicator (1)**
315:17
**indicators (4)**
5:6 114:22 134:10
176:25
**indicted (2)**
20:18 23:23
**indictment (1)**
31:11
**indirect (29)**
124:13 146:7,14,19
147:15,22 149:3,6
149:13 150:4 152:4
153:20 154:1,9,19
155:9 156:1,5 159:1
160:16 176:25
177:7 181:17
186:18,20 187:1,5
187:13 189:15
**indistinguishable (1)**
54:9
**individual (11)**
15:12 16:14 22:17
23:12 27:14 29:19
36:24 70:8 201:8
289:22 290:8
**Individually (1)**

1:4
**individuals (14)**
18:12 27:9 28:19
29:20,22 34:24
36:25 50:12 59:13
68:14 69:22 70:3
303:1 312:14
**industry (8)**
15:7 107:3,6 113:11
117:17,22 118:14
272:17
**inefficiencies (5)**
113:8 139:21 140:22
142:19 161:20
**inefficiency (3)**
138:1,7 186:3
**inefficient (33)**
61:4,12,25 62:6,10
63:19 64:15 117:6
133:16 135:1 136:4
136:8 187:12
242:23 243:14,15
243:18 245:5
247:22,24 271:18
273:16 310:18
312:24 313:3,8,14
313:19,21,21 314:3
314:22 315:1
**inefficiently (3)**
61:21 246:24 267:25
**infer (4)**
154:10 309:18 315:25
316:3
**inference (1)**
262:21
**inferences (2)**
204:18 205:18
**inferentially (1)**
153:7
**inferred (1)**
154:16
**inflated (2)**
253:21 257:9
**inflation (2)**
252:15 303:18
**inform (1)**
221:9
**informal (1)**
63:14
**information (301)**
52:19 57:2 71:24 72:6
72:7,10,22 73:2,3,4
73:7,9,16 74:7,13
74:17,22,23 75:1,6
75:8,15,16 76:1,13
77:9,17,18,22,24,25

78:3,16,17,19,20,20
79:3,4 80:4,14,18
80:18 81:2,7,19
82:3,4,7,13,17,24
83:17 84:11,12,23
85:3,7,15,16,23
86:13 87:14,19,22
88:9,21 106:3,12,20
106:22 107:2,4,5,6
113:10,12 114:6
115:12,15,16 116:2
116:3,6,8,10,12,14
116:17 117:6,10,11
117:14,19 118:6,7,9
118:12 120:21
122:2,3,5 123:3
127:4,6,24 128:1
129:8 130:14
131:16 136:20
137:1 141:3,6,9,20
142:11 144:10
148:8 156:22 160:4
162:25 163:2,3,9,17
166:21 167:23
170:10,14,18
171:19,24 172:3,13
172:15 173:8
184:11 189:17
193:23 194:14
195:12,16 196:16
197:2,5,20,25
198:15 199:2 200:2
200:6,9,10,20
206:12,14,25 211:9
216:7 217:10,12,20
218:14 226:16
227:5,14,16,19
228:15 229:2,10
233:6,7,9 234:17,19
235:9,9,13,16,18,19
236:12,14,17 237:9
237:16 238:1,8,12
240:18,23 241:2,12
241:19 242:19,24
243:9,10,13,13,16
244:16,19 245:1,7,8
245:24 246:12,13
246:24 247:10,11
247:17,18,21,23
248:4 249:13,16
250:16 251:1,23
252:18 253:21
254:13,22 255:1
257:8,9,17,21
259:20,25 261:17
261:21,23 262:3,8

262:10,13,21 263:8
263:13,15 265:4,7
271:21 272:16,17
273:11,12 274:24
275:1 277:21 278:7
279:3 281:25 282:8
282:17,22 283:17
283:21,24 285:7,18
288:24 289:23
290:9 298:23 301:5
301:22 302:23
303:12 305:25
306:14 308:1,19,21
309:10 310:4,21
313:9,10 314:1,5,6
314:8 315:20
317:20 322:3
323:12,21,25
325:22 327:19
328:24 329:6
330:20 333:18
**informational (12)**
119:1 120:10 141:13
142:19 143:18
144:3 233:12
305:21 307:23
308:5,15 310:16
**informationally (4)**
88:15 161:18 284:9
284:18
**informative (1)**
306:12
**informed (1)**
154:13
**infrequent (1)**
242:25
**initial (2)**
84:15 85:21
**inquiry (1)**
153:3
**inserted (1)**
9:11
**insider (1)**
75:25
**insiders (2)**
75:24 76:1
**insignificant (1)**
329:15
**instance (13)**
16:16 40:1 55:21
100:2 120:7 132:2
136:22 154:2
164:22 184:20
195:24 281:2 310:5
**instances (4)**
84:7 138:6 164:15

331:24
**instantaneous (2)**
81:17 82:12
**instantaneously (6)**
81:13 87:15 88:1,4,9
88:20
**institutional (4)**
65:13 90:17 104:5
267:20
**instruct (3)**
53:2 64:8 331:10
**insufficient (2)**
192:24 326:24
**Integrated (2)**
43:19 45:19
**integrity (4)**
151:15 155:4 253:15
253:19
**intelligence (1)**
126:8
**intend (4)**
124:11 331:6 332:10
332:24
**intended (4)**
143:15 158:13,15
161:25
**intentionally (2)**
282:4,7
**interact (1)**
33:18
**interaction (1)**
68:13
**interdisciplinary (1)**
11:24
**interest (5)**
24:8,14,15 166:16
167:8
**interested (3)**
37:1 214:13 336:17
**interesting (1)**
163:21
**interests (3)**
166:13 167:13,18
**interject (1)**
140:17
**internal (10)**
226:7 249:8 257:19
258:3,10,14 259:17
260:19 261:11
323:6
**international (5)**
10:11 11:21 12:7
14:16 68:18
**interpret (9)**
55:13 141:8 173:14
242:25 244:14,16

247:1 257:20 259:5
**interpretation (4)**
117:3 142:13 163:11
163:14
**interpreted (8)**
142:12 213:19 248:5
248:7 262:10 263:9
288:25 329:5
**interrupted (2)**
111:20,21
**intimately (1)**
49:20
**intraday (2)**
332:1,5
**introduce (2)**
6:23 174:7
**introduced (2)**
54:6 177:19
**introduces (1)**
206:8
**investigate (3)**
271:22 272:25 273:8
**investigated (1)**
114:21
**investigation (11)**
22:25 26:14 258:10
258:15 259:1
260:13 270:16
271:11,13 303:5
323:6
**investigations (1)**
325:23
**investment (12)**
10:13,18 11:1 15:7
16:15 39:21 68:25
69:1 79:9,23 138:16
185:8
**investor (9)**
79:22 80:2,7 142:4
173:10,12,15
214:13 320:21
**investors (74)**
72:8 79:7 80:23 81:21
81:23 82:5,16 83:5
87:22 89:4 90:18
104:5 117:13 134:2
139:9 140:6 141:2,7
141:19,24 142:5
143:7,11 144:9
145:17 151:12
154:14 155:3
156:24 162:22
163:4 167:22
168:15,17 173:7
196:16 197:2
206:10,11 215:7

217:10 223:17 227:10,16 235:19 237:17,18 244:13 244:18 245:19 246:25 254:19 256:19 257:20 259:10,21 260:1,20 260:24 262:11,12 262:22 263:9 267:20 273:11 285:9 287:1 288:6 289:23 290:10 304:16 314:4 328:11 329:5
**invoices (1)** 26:3
**involve (1)** 258:5
**involved (10)** 17:19 22:18,23 30:13 38:24 52:10 103:10 116:15 295:25 327:9
**involvement (1)** 32:5
**involves (2)** 52:7 333:16
**IPSA (4)** 115:3,7,24 116:1
**irrefutable (4)** 172:2,5,7,12
**irrelevant (3)** 62:13 114:14 192:17
**isolate (3)** 117:23 191:5,8
**isolating (1)** 184:19
**issue (45)** 42:11 61:14 62:15 99:22 109:18 111:24 141:10 142:3 143:11,14 144:3,22 149:2 162:3,24 163:4,22 166:12 169:12 173:4 174:12,17 232:13 243:25 244:20 248:10,11 248:15,17,25 251:18 260:25 261:5 264:8,9,12 271:1 288:9 290:12 291:21,24 317:22 323:3 328:25 330:18
**issued (4)** 118:16 221:4 229:15 328:7
**issuer (2)** 5:17 227:6
**issuers (2)** 224:20 226:15
**issues (11)** 37:13 57:1 65:20 89:19 158:4,6 174:18 206:17 249:6 299:6 331:6
**item (3)** 242:22 243:1 244:14
**items (3)** 241:19 242:19 246:25

**J**

**James (3)** 5:13 148:16 150:17
**January (8)** 9:8 23:10 218:22 220:23 221:2,3,7,13
**Jeez (1)** 188:22
**job (3)** 1:25 14:15 27:19
**John (2)** 18:8,9
**join (6)** 26:22,24 30:1 45:16 46:16,23
**joined (3)** 7:8 18:16 37:21
**joining (1)** 46:21
**judge (14)** 187:19,22 188:3,6,11 188:12 189:18,19 189:21 191:18,23 318:16 320:11,12
**Julio (1)** 264:13
**jump (1)** 8:22
**June (6)** 101:20 209:15 210:5 266:19 267:1 268:2
**junior (1)** 70:10
**Justice (1)** 31:10
**justify (1)** 29:11

**K**

**Kahneman (1)** 69:11
**Kangas (2)** 20:10,13
**keep (6)** 29:15 182:8 233:18 272:3 280:9,9
**kept (1)** 35:11
**key (2)** 38:1 176:20
**kind (38)** 13:25 14:2 15:8,11,18 37:9 39:5,9 40:23 42:9 61:14 62:13 67:20 84:2 85:3 94:24 104:6 105:9 115:6 129:22 137:12 144:16 159:9 184:8 192:17 211:21 231:15 233:16 253:20 259:20 265:6 286:8 297:10,20 298:9,12 328:9,21
**kinds (5)** 241:12 247:18 251:23 257:8 315:19
**knew (10)** 22:12 33:20 35:8,8,12 37:9,13 123:24 198:6 303:24
**know (191)** 10:20 17:2 19:20 21:10,20 22:14,20 23:11 25:10 26:17 27:24 33:21,22 34:11,14,15,16,17 34:19,22,23 35:11 35:13,14,17,20 36:4 36:5 37:5 42:4 44:1 47:16,18 49:11,13 49:18,25 63:7,13,17 63:22 69:3,4,14 70:24 73:5,25 79:22 80:2 83:25 87:6 96:3,4,13,14,21 97:3 99:19 100:4 102:2,15 103:23 105:6,7 106:5 107:16 108:24 111:14 120:14 128:22 129:22 132:1,6 134:15,22 136:1 137:14 139:6 140:9 141:5 142:2 143:2 144:12 148:12,25 152:13 164:21 168:2,3,7 169:8 171:9 172:15 173:10,19 177:11 181:1 182:13 185:22 186:8,9,9,12 188:20 191:21 198:10 199:1,16 200:9 201:5,7 202:9 202:20 203:1,20,21 204:5 209:10 211:19,22 212:1,23 212:25 213:17,23 217:24,25 218:1,9 219:20 220:8,10 222:7 223:13,21 224:5,8,8,11,11,25 225:9,11 226:5 229:21 231:21 232:16 234:10,11 234:12 236:18,19 237:13,21 241:21 243:20 244:23 258:5,19 260:12,24 261:22 263:1,18 264:13 266:19 271:1,14 277:10 278:16 286:8 290:16,17 291:10 294:21 300:2,14 305:22 306:10 307:21 308:6 309:8 310:20 313:18,22 317:20 318:7 319:17 320:11 330:15,19
**knowable (2)** 234:20,20
**knowing (3)** 244:9 254:19 309:6
**knowledge (4)** 23:2 28:4 68:3 274:25
**known (7)** 65:19 76:1 78:23 79:1 79:2 234:23 300:2
**Kong (2)** 69:7 138:24
**Krogman (7)** 113:17 151:11,21 154:4,11,20 188:16

**L**

**labeled (1)** 6:6
**Labor (1)** 96:3
**lack (2)** 85:18 144:19
**Lamont (1)** 139:12
**Lamont/Thaler (2)** 142:18 144:1
**language (10)** 11:25 55:2 56:9,23 58:6 146:13 151:7 181:8 182:14 291:18
**large (17)** 18:11 113:5 115:8,21 138:12 154:13 156:12 204:7 225:6 228:2 288:3 296:25 298:5 301:3,6 304:5 312:8
**larger (3)** 115:8 229:15 270:9
**largest (5)** 16:22 225:21 307:24 310:19 319:15
**late (2)** 41:16 326:22
**latest (1)** 138:25
**laureates (1)** 69:10
**law (17)** 28:2 55:24,25 62:20 67:25 137:14 180:5 180:9,24,25 249:7 249:12 257:18 258:2 264:6,8 297:15
**Law360 (4)** 67:8 291:22 292:2,5
**lawsuit (6)** 61:20 65:6,20 248:16 249:1 251:19
**lawyer (3)** 55:17,18 182:20
**lawyers (4)** 30:6,10,15 182:21
**lay (1)** 125:12
**lead (1)** 261:1
**leakage (2)** 331:22,25
**leans (2)** 163:23 164:2
**learn (2)** 102:19 223:17
**learned (1)**

41:7
**leave (3)**
26:19 28:7 45:11
**leaving (3)**
26:11 35:7 46:15
**led (2)**
28:23 88:13
**Ledanois (5)**
1:24 2:12 6:21 336:1
336:24
**left (29)**
15:19,22,23 16:9
20:22 21:5,10,18
22:6 23:17 26:21
27:19 32:4,9 34:7
34:11 35:3,8,9,12
35:13,15,19 45:8,14
46:2,7 59:2,15
**legal (12)**
6:18 48:3 66:12,17
79:6 158:14 169:7
169:12 264:8,9,12
317:21
**legally (1)**
169:6
**Lending (2)**
327:6 329:8
**length (1)**
103:19
**lengths (1)**
269:17
**lesser (1)**
167:25
**let's (34)**
11:14 40:2 60:17
71:11 99:12 121:5
123:9 128:8 130:22
130:24 150:9 169:8
179:12 189:11,18
191:17,23 211:6
233:10 241:24
263:2,5 266:3
271:25 272:4
276:14 280:9
284:15 289:21
290:7 301:19
329:19,19 330:15
**letter (3)**
9:11 220:25 300:5
**Lev (4)**
5:8 134:8 242:1
245:12
**level (41)**
54:4,25 64:6 154:15
177:23 203:5
219:13,15 229:22

229:23,24 237:24
265:24,25 266:15
272:22 273:2,3,4,5
273:5,7 274:2 275:7
276:20,24 277:11
277:24 278:1,8,23
279:6,7,24 280:14
280:21,25 281:3,4,5
281:7
**LexisNexis (7)**
206:16 209:14,25
210:4 211:10 212:6
212:17
**Liberty (1)**
3:7
**light (1)**
254:25
**likelihood (9)**
200:1,8,13 217:11
227:18,23 283:20
285:15 310:2
**limit (1)**
149:6
**limited (6)**
19:13 52:24 116:11
116:13 268:18
332:15
**limiting (2)**
85:2 238:15
**line (9)**
52:4,5,14 98:11,13,14
98:15 129:5 153:2
**listed (15)**
8:1,5 11:19 14:10
51:20 53:19 65:8,10
65:20,23 66:13 67:8
90:7 92:3 210:14
**listen (6)**
24:20 43:16 44:23,24
176:7 326:22
**listened (1)**
176:9
**listening (2)**
69:10 189:9
**listing (1)**
66:3
**literally (16)**
65:18 76:14,19 88:12
96:17 98:12 105:12
108:14 125:3
161:15 209:20
212:21 213:16
220:4 282:15
309:19
**literature (2)**
133:14 156:3

**litigation (50)**
5:12 14:25 15:20,22
16:10,12,19,20 17:1
17:9,11,22 24:13
27:22 29:2,4,23
32:16,21 33:8 34:21
35:10,23,25 36:20
37:6,24 38:3,8
39:17 40:25 41:8,11
41:14 50:8,8,9,10
50:16,21 58:16,18
58:21 59:23 61:9
150:19 226:1,8
297:8 302:12
**little (47)**
16:18 23:5 33:2 40:24
45:18 57:7 60:15
63:10 71:9 81:23
84:1 87:1 91:8
97:16 98:13,17,24
102:6 121:2,25
124:10 132:3
137:23 144:7
151:13 159:4
191:15,16 194:10
195:4,5 206:6 209:4
245:1 254:20
257:24 261:2 263:4
268:17 269:14,20
278:18 286:17
287:4 291:11
314:17 319:4
**live (1)**
48:3
**lived (1)**
37:19
**living (1)**
47:4
**LLP (1)**
3:14
**LOCATION (1)**
1:20
**logical (1)**
192:23
**long (13)**
17:8 23:17 46:19,20
48:24 79:1 123:7
179:14 201:1
239:15 254:21
265:3 302:6
**longer (13)**
80:19 81:24 82:2
83:21 84:13,20
102:21 104:7,10,14
244:21 247:25
248:3

**look (123)**
16:17 55:23 72:1,25
73:1 77:8 83:10
86:2,22 87:8 92:8
92:11 94:12 95:5,16
95:17,24 96:8 98:4
103:9 104:25 106:6
107:21 109:7 113:5
115:2 116:5 118:7
118:25 120:5,8
122:8,25 123:17,22
125:9 126:24,25
127:10 138:16
147:16 150:9
152:13 172:23
173:22 179:12
184:15 191:23
194:25 198:22,25
199:6 200:17
201:13 204:2,6,16
204:17 205:8,9,16
205:17 206:1,3
209:2 213:10
215:24 216:1
219:20 220:22
230:25 231:17,21
231:24 238:21,22
238:23 239:1,9
246:18 260:5
265:13 266:1
267:10 268:5
271:19,25 275:8
285:2,5 287:15
289:11,20,21 290:7
290:8 291:6 300:19
300:20 302:11
304:8,18 305:22,22
306:12,13,18
309:21 314:12
320:8 321:13 323:2
324:11 325:1 326:2
326:10,13 328:6
329:3,19 330:11,18
330:22
**looked (54)**
49:1 63:4 86:15,19
95:19 96:10 101:12
103:9 105:23,24
107:3,4,9,10,18,20
108:10 109:12
110:3 113:9,15
115:4,10 123:17
128:11 158:23
189:14 194:1
198:21 202:8,14,15
203:25 207:5

213:11 215:12,17
219:22 239:13
278:16 280:10
285:12 287:5 293:3
304:25 311:3,18
319:23 321:16
324:8 327:17,21
328:1,11
**looking (43)**
16:15 37:6 63:3 77:23
77:24 78:14 79:18
79:25 80:21 81:21
83:11 86:10,12,20
100:8 106:19 111:2
117:9 118:10
127:13 133:8 142:4
146:17 147:9,13
152:1 195:2 205:25
207:19 208:12
209:2 219:1 231:18
232:6 255:11,13,14
278:8 284:19,24
295:9 306:25
333:22
**looks (13)**
9:7 45:7 73:18 83:9
146:24 147:2,5,7,17
170:12,17 293:1
306:21
**lose (2)**
169:10 308:11
**loss (20)**
53:25 54:3,11 55:2,5
55:10,21 56:11,13
57:1 256:3 257:5
316:14,16 318:20
318:23 323:17
329:2 331:7 334:3
**lost (1)**
169:9
**lot (56)**
11:4 14:3,24 15:20
27:8 28:19 35:22
37:18 38:14 39:3,20
50:6 59:14,14 60:1
68:13 85:7 94:20
100:6 101:13
105:23 124:9 133:6
136:12 148:18,25
162:21 172:10
180:4,4 206:8,17
209:12 211:23
219:21 229:20,24
229:25 236:25
237:25 238:1
248:14 258:18,23

262:3 286:22 297:7
298:6,12,15 299:9
300:18 323:22
327:22 328:14,21
**low (2)**
99:8 299:8
**lower (2)**
246:14 288:7
**lowering (1)**
273:7
**lowest (1)**
287:16
**lumped (1)**
105:9
**lunch (1)**
132:7
**Lynne (5)**
1:24 2:12 6:21 336:1
336:24

**M**

**M (2)**
4:1 336:1
**M&A (5)**
38:19,21,23 39:4,7
**Macey (1)**
318:6
**machine (1)**
336:7
**magnitude (3)**
112:18 223:11 328:23
**main (1)**
299:11
**Mainland (287)**
3:5 4:3 7:6,6,19 9:4
20:16 24:7 36:15
39:23 41:5 43:4
44:17 45:2,6 46:10
47:2,10,24 49:10
52:9 53:12 54:2
55:16 57:11,18,23
60:17,21 63:8 64:12
64:20 66:8,19 68:16
71:11,21 75:2 76:5
77:2 78:13 80:11
81:11 82:8,14 84:8
85:1,6 86:24 87:24
90:24 91:12 92:1,12
93:12 95:7 97:24
98:19 99:2 101:19
103:5 106:16 108:7
108:20 109:4 110:8
110:24 111:9,12
113:1 115:1 118:15
119:3,12,24 121:11
122:12,19 123:5,19

124:7,21,25 125:2
125:18,23 126:10
127:19 128:18,21
130:16 131:21
132:4,19 134:5
135:9,17 137:21
139:10 140:19
141:11 142:16
143:1 144:24 145:5
145:20 147:1
150:11,14 152:8,19
153:23 158:16
160:20 162:8
163:18 164:1 166:9
167:7,19 169:2
170:5,19 172:4
173:24 174:4,24
175:7,12,23 176:8
176:13,23 178:1,9
178:19 179:6,20
181:14 182:19,25
183:12 185:20
186:16,24 188:4
190:1,9 192:22
193:10 194:18
195:3,14,21 197:14
198:3 203:14,24
204:14,24 205:14
206:21 207:12
208:5 209:8,19
210:3,15,20 211:4
213:14 217:6,22
220:13,17 222:9,16
223:7,15,23 224:16
226:10,20 227:3
228:10,19 229:13
230:15,24 231:8
232:11 234:3,7
235:14 236:2,21
239:2,15,18 240:4
240:11,20 241:7,17
241:23 246:19
248:8,22 249:10,21
250:2,14,19 251:16
252:6 255:4,19,23
256:7 257:16 259:3
259:13 260:2 261:6
262:1 263:11,21
265:12 267:14
269:8,12 270:18
275:13 276:13
278:12 282:11,25
283:10 284:14
285:19,25 287:14
288:14 289:19
290:5 291:13

293:22 296:5,16
300:7 303:21 304:6
305:8 306:20
307:11 308:13
309:12 310:24
311:12 312:3,22
313:5,20 314:11
316:12 318:19
320:15,23 321:3,8
321:12 322:14,24
323:10 324:17
325:14 326:8,15
327:5 328:18
329:13,18 331:13
332:21 333:3 334:7
334:21
**majority (13)**
15:2,3,21 16:19 17:2
17:4,6,17 33:4 38:2
38:7 103:9 287:6
**making (4)**
74:1 79:8,23 245:14
**managed (4)**
89:8 138:17,22 156:9
**managing (2)**
37:17 58:25
**manipulation (1)**
264:22
**manner (5)**
21:25 234:25 261:12
261:15 305:19
**March (28)**
101:21 104:19 194:2
194:13,15,19 195:7
195:16,22 215:3
236:1,5 260:14,15
301:19 302:16,18
302:19 311:13
315:13 322:23
325:17,21,23
326:10 328:8
329:22 333:11
**Marek (25)**
23:12 24:3,6,9,10
33:10,15,21 34:7
35:19 36:17 37:2,19
41:13,17,25 42:12
45:20 46:3 47:15
48:9 49:4,8,11,21
**Marek's (3)**
41:25 45:12 46:9
**margin (1)**
311:23
**MARIE (1)**
336:24
**mark (3)**

20:9 150:11 220:13
**marked (6)**
9:1,3 135:15,16
150:13 220:16
**market (313)**
5:10 39:11,15,19,24
40:4,5,6,7,8,14,15
40:21 41:3,4,17
42:1 61:3,11,25
62:5,5,10,22,24
64:15 65:3 66:1,14
66:25 67:3 71:22,23
72:4,6,14,16,19,21
73:21 74:15 76:19
77:5,15 78:10,14
82:17 83:25 86:14
86:22 88:8,15,18
89:5,10,11 90:2,10
91:6,22 92:2,4,23
94:18,18 96:18
101:1,2,17 102:11
103:22,25 104:17
105:2,18 106:4,20
106:22 107:1 113:7
113:10,15 115:2,5
115:12,16,19 116:1
116:2,6,7,11,19
117:5,9,14,17,21
118:7,9,14 122:11
122:22 123:4 124:5
126:22 127:4,8,23
128:2,16,24 131:3
132:25 133:7,8
134:4 135:25
136:17 137:3,6,7
138:1,6,12,15,23
139:4,9 140:14
142:9,10,12 145:1
145:19,24 146:1,18
147:5,7,17,17,23
148:6,14 149:9,9,15
150:18 151:13,15
152:23 153:4 154:6
154:14,23 155:2,4
155:22,22 156:6,25
159:2,6 160:5,8,11
160:17 161:11,13
161:19,21 162:14
162:19 163:15
164:7 165:7,12,14
168:21 169:4,5,9
171:17 173:13
174:12,16,19,22
175:16,20 177:1,2
177:11,17 179:22
181:2,19 183:14,16

183:20 186:3,19
187:7,11,16,24
188:18 189:16
191:2,9,12,19 192:2
192:15,25 193:7
197:22 198:2,6
204:18,22 205:4,18
206:23 217:19
221:10 224:18
225:21 231:10,11
236:20 237:15
242:20 245:5,6,9,23
246:8,14 247:16
251:21 253:15,16
253:19,20 254:10
254:12,14,21,23
255:11,14 256:25
257:3 262:14,15,18
262:25 264:22
267:7,13 268:7,11
268:24 269:25
270:16 271:18,23
272:7,10,15 273:14
273:15 274:22
283:24 284:4,7,8
288:25 299:22
301:13 303:3 305:9
305:10,15 308:3
310:17 311:5 312:2
312:4,24 313:4,14
313:24 314:3,21,22
314:24 315:1,6
316:5,10 317:11
318:15,21 323:18
325:4,5 326:4,20
327:14 329:3
**market's (2)**
240:6 261:16
**markets (31)**
33:10 41:13 45:8 46:2
49:23 76:4 80:13
81:6 94:20 133:23
133:25 136:25
137:11 138:2,8
139:7,23 144:11,14
145:14,22 148:4,11
148:25 151:10,21
154:24 156:11,11
162:2 168:22
**marking (1)**
221:5
**marks (13)**
71:12,17 132:10,15
183:3,8 239:20,25
296:7,12 334:12,17
335:1

**massive (1)**
301:2
**master (4)**
11:21 12:2,6 14:15
**master's (4)**
10:10 11:13,15 68:18
**match (1)**
232:1
**material (71)**
14:8 72:5,7 78:16
79:4,10,16 114:5
116:2 120:20 122:3
123:2 129:7 131:16
136:20 151:11
160:10 161:6
170:10,14,18
171:18 172:3 197:5
198:15 200:6 201:5
215:7 217:20
226:12,15 227:5,8,9
227:14 228:9,15
229:2 235:9 238:12
250:10 254:16
259:16,21 260:18
260:20,22 261:10
262:22 277:21
278:6 279:3 281:25
282:22 283:21,24
284:7,16 298:21
305:24 306:14,22
308:1,18,23 309:9
310:3,21 315:5
322:3 323:13
**materiality (4)**
79:6,15 158:4 298:20
**materially (4)**
227:15 229:9 233:6
283:20
**materials (1)**
302:4
**math (1)**
295:13
**mathematically (1)**
131:11
**Matt (1)**
7:2
**matter (18)**
6:7 35:18 57:24 59:4
59:6 66:12 75:20,23
129:12 180:17
198:14 211:12
232:25 233:3
260:17 300:17
310:6 325:11
**MATTHEW (1)**
3:16

**MBA (1)**
11:23
**McAfee (1)**
15:15
**McCLOY (2)**
3:4 7:7
**McKiernan (3)**
15:13,23 18:15
**mean (134)**
10:2,7 14:22 18:22
19:1,5 22:4,16,20
23:1 25:4 28:9 34:1
36:9,14 38:2,16
39:19 46:14 53:6
59:8 65:18 68:22
69:7,12 72:13,15
74:9 76:11,11 77:21
79:4 80:15 81:14,17
82:21,23 83:7,24
84:10,21 85:22,24
88:3 93:6 94:8
95:21 100:22
109:17 120:1 124:9
126:19,21 145:11
145:21 146:14
149:8 150:3 155:10
155:11,17 158:22
164:25 170:8 172:9
172:11,11 179:2
189:2,5 197:17
198:6 199:4 200:4
203:11 206:22
207:17,21 209:1,10
212:24 213:15
214:16 216:11
218:8 219:14
223:22 224:23,25
226:24 227:13
230:20,22 232:24
237:1 243:14,18
244:4,5 245:4
247:22,24 249:17
252:21 255:6 258:6
263:7 266:4 268:20
269:15 272:2 273:3
274:8 279:8 281:21
283:13 284:8
286:17 288:6,21
295:11 298:24
300:2 305:18,21
306:11 307:7,22
309:3 310:16
313:19,25 326:7
329:7
**meaning (6)**
79:14 231:9 273:1

295:6 308:11
315:12
**meaningful (11)**
125:7 231:7,9,12
232:19,23 233:1,4
269:6,9 286:18
**means (23)**
74:12 84:20 88:8
93:19 94:1 117:13
131:14 146:1,16
170:9,10 177:13
186:4 201:22 206:9
232:3 233:22
266:13,15 268:22
274:9 279:19
281:17
**meant (5)**
159:5 164:4 215:6,10
234:8
**measure (1)**
146:20
**measured (2)**
151:10,21
**measurement (1)**
240:7
**measuring (1)**
219:12
**mechanism (1)**
83:3
**media (32)**
6:6 71:13,18 101:12
113:6 132:11,16
183:4,9 202:7
206:15 208:23
209:11,14,16 210:4
210:4,8,13 211:1,8
211:10 212:5,9,16
239:21 240:1 296:8
296:13 334:13,18
335:2
**median (2)**
103:17 269:19
**medical (1)**
233:17
**meet (14)**
63:25 76:4 78:9 120:9
131:8 138:22
140:14 233:5
234:21 298:3,7,16
298:19,25
**meets (3)**
104:7 123:25 181:6
**Megan (2)**
1:4 6:8
**Melamed (3)**
3:16 7:2,2

**member (1)**
70:10
**members (6)**
81:1,1 107:23 252:5
260:15 269:19
**memory (3)**
17:24 25:11 264:14
**mention (2)**
32:15 135:13
**mentioned (13)**
50:2 51:18 54:18
91:17 95:8 107:19
136:21 143:22
158:1,2 291:20
294:6,10
**mere (2)**
44:8 105:22
**merely (1)**
257:6
**met (3)**
110:4 181:7 198:10
**method (4)**
292:4 294:6,11,14
**methodological (1)**
70:16
**methodologically (3)**
204:16 205:1,16
**methodologies (4)**
71:1,2,4 133:9
**methodology (14)**
70:24 165:19 166:8
185:4 186:12
192:19 205:7,22
267:11 268:5,10,12
269:25 276:16
**metric (1)**
228:25
**Mexico (1)**
258:16
**Michael (2)**
3:25 23:12
**mid (1)**
260:15
**middle (1)**
314:20
**Mike (3)**
7:9 33:7 37:21
**MILBANK (1)**
3:4
**Millbank (2)**
7:7,9
**Miller (1)**
318:6
**mind (12)**
16:1 40:16 77:7 79:15
95:23 102:16

159:10 229:7
259:19 265:5,20
327:25
**mine (2)**
48:15 59:3
**minimal (2)**
127:12 129:13
**mining (5)**
1:8 3:3 6:9 220:19
292:23
**minor (2)**
315:5 334:9
**minus (1)**
93:23
**minute (2)**
90:25 276:3
**minutes (5)**
176:10 179:15,17
183:1 239:17
**misapplied (2)**
291:25 292:1
**mischaracterizes (3)**
176:4 213:9 230:8
**misconduct (1)**
251:9
**misinformation (1)**
264:2
**misleading (4)**
210:23,25 253:5
303:14
**misreading (1)**
291:19
**misremember (1)**
24:22
**misremembered (1)**
24:23
**misrepresentation (4)**
254:16 318:12 319:1
319:2
**misrepresentations ...**
57:5 77:11 116:20
117:7 161:7 162:6
176:22 177:14
248:20 252:24
303:20 318:18
333:14
**misrepresented (1)**
263:16
**missed (1)**
148:18
**missing (1)**
148:20
**misspoke (1)**
194:17
**misstatements (9)**
248:15,25 250:4,11

251:12,24 252:12
252:14 256:18
**mistaken (2)**
157:13 266:19
**misunderstood (4)**
167:10 212:15 283:22
300:13
**Mitchell (1)**
318:6
**mix (7)**
200:1,20 217:12
227:15,18 229:10
233:7
**mixing (2)**
159:7 298:12
**model (6)**
189:22,25 192:4
300:6 331:22,25
**modest (1)**
160:7
**modifications (2)**
184:6,8
**modifying (1)**
197:12
**money (13)**
59:1 74:1,2,3 89:1,2
100:7 140:10
161:24 169:9,10,10
258:6
**monitor (3)**
97:1,4 117:16
**monitoring (1)**
97:9
**Montgomery (4)**
1:20 2:11 3:18 6:14
**months (10)**
101:23 102:25 103:1
103:11,15,18 267:3
269:9 272:11
273:18 288:11
**morning (5)**
7:20,21 161:16 243:8
269:5
**motion (2)**
332:2,10
**motivated (3)**
174:9 175:1,2
**motivation (1)**
175:5
**mouth (1)**
50:14
**move (11)**
36:2 94:5 113:20
218:6 233:22
261:12,14 262:19
283:5,12 289:3

**moved (3)**
93:25 284:16 310:23
**movement (15)**
184:16,18 199:3
203:2 207:2,3
218:12 224:21
229:22 263:1
272:22 274:1,11
282:24 285:2
**movements (14)**
73:1 131:9 157:25
199:4,22 201:6
219:18 270:11
276:20 287:12
288:12 307:20
310:19 329:4
**moves (1)**
261:15
**multiple (13)**
82:15 86:5 291:15,20
292:13,16,20 293:8
294:4,8,23 296:3
330:8
**multiply (1)**
330:25
**murder (1)**
231:16
**mysteries (1)**
326:25

_____
**N**

**N (5)**
3:1 4:1,1,1,25
**name (10)**
6:17 18:6 31:19,20,21
43:18 221:1 300:9
336:21 337:2
**named (2)**
23:12 300:5
**names (1)**
43:17
**narrow (2)**
269:3 297:11
**NASDAQ (5)**
89:13 100:2 149:11
156:20 157:7
**national (2)**
64:14 66:3
**natural (5)**
37:8,11,20 60:16,18
**nature (13)**
21:6 28:23 34:6 81:25
96:4 195:11 235:15
240:24 248:16
249:1,4 258:21
271:12

**necessarily (31)**
33:19 48:4 60:2 65:9
73:8 79:24 81:16
82:12 83:24 84:4
96:6 112:16 166:25
172:24 173:21
174:18 192:13
198:9,19 228:9
243:18 244:5 245:4
249:19,22 287:13
288:22 291:1,2,5
321:17
**necessary (6)**
129:14 158:15 169:23
184:6 185:11
191:11
**need (20)**
62:17 67:5 92:11
94:10 99:8 152:13
152:17 159:20
164:22 179:7
187:23 190:6
191:21 209:21
242:8,9 245:2
265:10 266:1 276:5
**needed (6)**
19:8 28:15 57:2 65:3
114:11,13
**negative (7)**
45:11 93:21 173:11
200:15,24 312:7
322:7
**negatively (2)**
49:2,3
**negatives (1)**
299:3
**neither (1)**
336:16
**Netter (1)**
318:7
**neutral (3)**
288:25 289:23 290:10
**neutrality (4)**
289:12,21 290:7,24
**never (8)**
22:12 30:16 35:6 36:6
47:13 64:21 94:21
154:23
**nevertheless (2)**
52:16 314:24
**new (106)**
1:2 3:8,8 6:11,20,20
16:15 37:17 59:4
65:8,10,23 66:13,22
67:1 70:21,24 72:5
72:6,10 75:8 78:16

78:19,20 79:3 81:6
88:8,10,21 89:12,20
90:13,21 91:23 92:5
95:9 96:19 114:5
116:2 120:20 122:3
123:2 129:1,7
131:15 136:19
144:10 149:11
156:19,21 157:6
163:9,16 170:10,13
170:17 171:18,24
172:3,13 173:8
196:16 197:2,5,20
197:25 198:15
200:6,9,10 206:12
206:25 217:9
218:13 228:15
229:1 234:17 235:8
243:1 244:25 247:1
247:1 262:9 275:1
277:20 278:6 279:2
281:24 282:22
283:24 298:23
301:4 302:11
305:24 306:14
308:18,22 309:9
310:3,21 313:8
315:6 322:2 323:12
323:21,24
**news (77)**
21:24 22:4,4 23:22
118:2 126:1,3 194:3
200:18 201:14,23
202:15 204:3,17
205:17 207:5
208:12,15 218:7
220:9 222:4,15,19
223:1,8 225:23
238:13,14 262:20
284:7,16,20,22,23
297:9,23,23 298:6,6
298:16 300:2,20,22
301:3,8,8 303:8
304:16 305:4
306:23 307:2
309:21,22 311:3
312:7,16,19,25,25
313:15 314:23,25
315:2,5,12,13
319:10 323:20
324:1,3 325:12,25
327:12,18 333:23
334:4,5
**nine (3)**
103:17 239:17 274:16
**Nineteen (2)**

105:4 109:17
**Nobel (2)**
69:10 139:14
**noise (1)**
274:22
**non-neutrality (1)**
289:13
**nonfinancial (2)**
232:6 240:15
**nonlitigation (1)**
29:17
**nonnews (3)**
297:9 300:20,23
**nonpublic (1)**
77:25
**normal (1)**
330:23
**normally (1)**
288:7
**Norway (1)**
13:3
**Norwegian (1)**
13:8
**Notary (1)**
337:25
**note (4)**
95:3 210:11 237:21
255:17
**noted (4)**
157:21 196:20,22
288:20
**notice (1)**
42:23
**noticed (1)**
70:12
**notifying (1)**
221:2
**notion (6)**
40:7 69:5 76:12 88:7
148:3 167:17
**notwithstanding (1)**
139:22
**November (5)**
1:18 2:4 6:2,15
336:22
**Novotel (2)**
331:17,25
**null (8)**
77:1 131:13 161:14
161:14 215:22
216:17 281:16,22
**number (16)**
6:6,12 51:19 70:12
102:9 104:11 130:3
154:13 181:16
268:19,20 270:22

271:6 289:10 328:6
331:1
**numbers (7)**
198:9 219:21 251:11
278:18,20 281:10
294:11
**numerous (2)**
60:24 286:9
**nutshell (1)**
169:14
**NYSE (1)**
65:20

---

**O**

**O (3)**
4:1,1,25
**oath (1)**
202:13
**obfuscate (6)**
173:4 174:1,9 175:2,8
175:25
**object (91)**
40:18 47:22 64:16
66:5 133:17 135:6
136:10 138:10
140:16 142:21
144:5 145:3 146:22
153:18 157:16
159:12 163:20
169:18 170:15
171:20 172:21
174:3 177:4 188:1
190:8 192:5 194:11
197:13,24 202:17
203:18 204:4,20
205:2,20 207:8,16
209:7 222:5 223:4
225:24 227:20
228:16 231:3
235:24 238:17
241:13 246:16
247:19 249:2
250:17 251:14,25
253:23 256:6
257:11,23 259:7
260:21 261:13
265:9 268:15
269:11 275:10
276:8 282:9 283:7
284:10,21 285:23
293:12 303:15
305:5 307:5,18
308:17 309:25
311:6 315:21
317:14 320:19
321:11,23 322:21

323:8 324:13
325:13 326:5,12
332:19,25
**objection (150)**
20:6 24:4 39:18 43:1
44:11,22 45:5 46:6
46:12 47:7 48:20
53:23 55:15 56:22
60:12 63:1 66:16
68:6,21 74:24 75:22
76:9 78:6 80:5 81:8
81:15 82:10 83:15
84:24 85:4 86:18
87:18 90:11 91:4,15
92:6 93:8 94:6
97:21 101:5 106:14
108:4,16 110:2,20
111:8,11 112:6
114:12 118:4,20
119:11,15 121:8,20
122:18,23 123:15
123:21 124:18
125:15,22 126:6
127:15 128:17
131:5 140:18,25
141:15 145:10
151:24 161:2
162:16 165:16
166:14 167:15
169:1 174:10 175:3
175:10,21 176:3,12
176:18 178:6,17
179:5 180:15 182:6
182:22 185:16
186:5,23 189:23
193:2 194:22 195:9
195:18 209:17
213:8 217:5,17
222:13 223:12,20
224:3 229:3 230:7
230:18 232:10
233:25 234:6
235:11 236:15
240:9,16,25 241:20
248:18 249:14,24
250:12 259:22
262:23 263:17
267:9 269:13 270:3
278:10 282:19
286:15 288:1
289:14 290:2,13
299:24 304:1 306:8
311:25 312:20
313:2,17,23 319:12
321:2,7 328:5
329:10,16 331:8

**objective (6)**
177:21,23 199:14,19
290:16 291:11
**objectively (2)**
177:6 297:22
**obscured (1)**
57:4
**observations (2)**
269:4 274:14
**observe (1)**
92:18
**observed (2)**
266:23 278:13
**obvious (5)**
206:24 215:4 285:6
304:11,17
**obviously (21)**
33:20 90:15 91:19
96:20 101:7 118:8
124:17 125:13
140:1 185:11
190:25 198:25
215:3,7,9 225:6,16
247:5 276:15 304:3
304:8
**occasional (1)**
67:22
**occasionally (2)**
171:3,7
**occur (4)**
216:9,11 283:5,15
**occurred (2)**
20:22 222:3
**occurring (3)**
112:23 130:12 216:2
**odds (1)**
276:1
**offend (1)**
126:7
**offering (6)**
123:11 180:8 188:5
253:13 289:6
332:14
**office (12)**
16:14 18:14 19:6
22:23 27:9 28:20
30:17 33:18 34:24
35:1 38:13 59:12
**oh (7)**
26:13 31:1 34:16 51:6
59:12 86:9 194:23
**okay (57)**
8:20,23 13:19 17:5
20:2 29:18 45:25
57:24 60:19 64:6
85:11 89:22 103:2

113:2 121:14
124:24 126:20
132:6 137:22 147:6
149:12,25 150:9
152:11 156:15
164:5 168:16 171:2
172:11,18 178:10
189:7,8 193:20
196:7 204:8 210:19
214:7 215:6 220:8
233:21,22 240:12
250:18 256:13
266:11,18 273:24
275:19 277:7 280:1
286:7 296:1 317:6
322:15 330:4
334:11
**olden (1)**
100:1
**omissions (1)**
253:4
**omitted (2)**
150:2 252:18
**once (2)**
32:8 217:15
**one-day (1)**
83:11
**one-quarter (1)**
286:12
**one-week (2)**
14:2,7
**one-year (1)**
12:3
**ones (18)**
8:2,5,5 17:19 211:25
212:21,24,25 213:5
213:6,11,16,20,20
213:21,21 237:3
321:5
**open (30)**
81:5 96:19 133:22,25
136:17 137:11
138:1,8 139:7,23
145:13,21,23,23
148:24 149:5,8,9
151:9,20 153:5,13
154:6,14 155:7,11
155:12,21,23
156:10
**opened (2)**
18:14 38:13
**opine (7)**
62:4,22 67:2 106:4
256:21 331:6
332:24
**opined (1)**

271:17
**opining (4)**
39:11 66:20 181:2
317:6
**opinion (56)**
39:15 42:4 53:22
54:15,23 55:3,14
56:17,24 57:13 58:3
58:4,13 61:19 63:4
64:18,25 90:2 91:1
91:7,11 101:1
102:17 123:12
124:4,12 126:9
165:11 180:8
181:10 183:24,25
184:2 186:20 187:1
187:21 188:5,9,13
188:14 189:10
203:12 207:6,9,14
207:19 252:7
253:13 263:19,22
316:21 320:9,13
323:11,16 328:20
**opinions (4)**
39:8 91:10 189:6
332:13
**opportunities (14)**
15:7,9 16:15 27:2
87:17 88:5,23,25
140:5 143:6,23
144:3,19 245:18
**opportunity (8)**
36:19 80:22 87:21
97:4 140:17 174:6
177:12 244:6
**opposed (9)**
39:7 133:4 159:9
199:23 200:3
213:12 215:8
240:24 321:21
**opposing (2)**
299:15,17
**option (2)**
13:22 291:1
**orally (1)**
52:25
**order (30)**
13:7 38:2 55:8 86:6
96:25 97:9 100:13
107:25 137:19
181:5 187:23
190:18,23 191:8
194:25 203:16
205:1 231:18 233:5
239:8 244:16
270:13 276:10,11

293:20 297:25
298:3 301:10 314:8
332:5
**orders (1)**
92:21
**ordinary (4)**
90:20 92:20 93:2
139:8
**oriented (1)**
29:23
**original (2)**
109:11 336:12
**originally (2)**
95:4 189:12
**outcome (1)**
309:7
**outcomes (1)**
259:9
**outperform (3)**
89:5,9 138:15
**outperforming (1)**
254:20
**outputs (1)**
119:4
**outset (3)**
302:2,11,14
**outside (1)**
131:25
**outweighs (1)**
165:24
**overall (2)**
142:9 147:17
**overcompensates (1)**
168:24
**overlap (2)**
96:21 233:20
**overlapped (1)**
16:6
**overreact (1)**
169:9
**overreacts (1)**
169:5
**overwhelmingly (2)**
187:20 189:16
**Owen (1)**
139:12
**ownership (1)**
124:4

**P**

**P (11)**
3:1,1 216:3,4 218:8
218:10 266:11,13
276:11 279:13,16
**p.m (1)**
335:5

**page (29)**
4:2 5:1 92:17 134:20
135:19,21,24 151:6
152:10,21,21,22
153:17,25 154:2
196:10 210:23
218:17 220:23
242:14,16 245:20
246:2 255:9,18,18
266:3 314:19
329:21
**paid (4)**
30:5,10 59:24 224:6
**Palm (1)**
140:20
**Palm-3Com (1)**
139:16
**panel (1)**
67:24
**paper (5)**
88:16 133:11,18
161:18 297:19
**paradox (2)**
88:14 162:10
**paragraph (39)**
71:25 92:14,16 94:11
94:12 106:24,25
115:23 129:2,6
135:20 147:19
152:22 153:1 154:3
158:25 159:14,16
163:5 178:2 182:1
196:11,13,15,22
199:24 212:4
220:23 246:10
255:3,6,7,18 271:25
273:21,25 276:15
288:17 333:8
**paragraphs (1)**
246:10
**parallel (1)**
13:5
**paren (1)**
210:10
**parentheses (5)**
153:6,8 210:6 242:23
242:24
**parenthesis (2)**
210:7,9
**parenthetical (1)**
151:4
**parse (1)**
164:22
**part (21)**
9:14 20:3,4 31:25
37:21 72:15 89:9

91:11 127:7 154:4
169:7,12 187:3
206:5 207:14 208:4
238:3 249:4 262:7
288:4,8
**participated (1)**
69:3
**participation (1)**
68:11
**particular (55)**
9:13 25:3 29:12 30:22
30:23 34:23 37:14
44:2 71:3 85:3
86:21 98:22,25
141:21 144:22
148:23 149:1 151:7
153:4 156:16 160:2
171:23 173:15,15
174:17 180:5 181:5
185:24 186:7
202:12 211:2,14
238:25 244:14
253:9 254:15 263:8
263:15 266:8
270:12 272:19
291:7,19 297:22
299:12 300:6,25
301:1 304:9 308:22
317:3 319:21
327:23 328:16
330:18
**particularly (15)**
10:13 22:18 27:17
28:20 46:24 60:4
81:18 82:2,3 231:23
232:19 233:4 253:9
271:17 326:18
**parties (1)**
46:23
**partner (3)**
42:17,19 48:14
**partners (2)**
47:25 48:2
**party (1)**
336:18
**pass (1)**
13:18
**pattern (2)**
292:24 293:2
**Paul (4)**
5:7 70:8 134:8 297:15
**pause (1)**
287:23
**paying (1)**
258:6
**payments (3)**

251:18 323:2 325:25
**payments?right (1)**
323:7
**peer (5)**
107:4 115:20 133:13
133:14 156:3
**pennies (1)**
244:23
**penny (1)**
104:4
**people (24)**
28:24 35:23,24 36:1
50:11 55:3 82:19
84:4 88:18,19,21,22
100:10 117:16
155:24 161:22,23
233:18,19 234:10
234:11,12,17 291:6
**percent (84)**
17:6,7,18 58:18,20
59:17,19 93:5,19,21
94:1,16,21,22,23
98:1 99:4,12,14
105:14 115:21
130:12 203:5 216:5
217:1 218:11,13,24
218:25 219:2,13,15
221:6 229:22,23,23
229:24 230:3 233:5
265:24,25 266:15
272:22 273:1,4,5,5
274:2,10,12 275:7
276:12,20,24 277:1
277:11,14 278:1,3
278:11,14,23,24
279:5,7,7,13,21,24
280:5,14,14,21,25
281:3,4,5,6,13
287:20,21 289:8
298:4 304:19
**percentage (2)**
99:8 100:17
**perfectly (9)**
76:18 88:19 93:11
94:2 161:11,12
181:3,23 271:6
**perform (7)**
19:18 122:8 173:20
190:25 191:2
330:14 332:11
**performance (1)**
194:1
**performed (14)**
30:22 101:10 112:11
162:21 199:10
254:7,10 257:14

272:14 300:25
330:6,13 332:8
334:2
**performing (1)**
198:24
**period (135)**
14:2 15:5 16:23 17:23
30:13 34:2 38:8
44:20 46:19,20
78:15 82:2 83:21
84:13 92:25 101:3
101:14,16,20 102:3
102:12,21 103:10
103:14,17,20
104:10,12,14,23
105:1,15,20 106:13
106:21 107:21,22
108:19 109:22
110:18 111:7 112:3
112:10 113:4 114:1
118:17 119:10
121:19,24 122:16
123:1,8,10,14
125:20 126:22
127:9 129:15,17
132:1 193:22 194:3
200:18 210:1
219:19,24 222:3
225:22 229:15
237:10 242:17
262:18 266:18
267:1,2,8,11 268:2
268:5,6,9,23 269:10
269:17,21,24 270:8
270:12,21,23 271:4
271:9 272:11
273:19 288:3,4,13
301:20 305:11
311:3,14,16 312:6
315:15,19 319:7,9
319:11,19 320:2,6
320:16,18 321:1,4
321:10,18,21 322:1
322:11 323:23
324:2,4,15,16,21,23
324:24,25 325:2
326:14,21 327:16
330:19,21
**periods (5)**
42:25 83:8 103:19
268:25 269:19
**perjured (4)**
21:12,25 22:11 24:18
**perjury (7)**
20:21,23 21:3,7,17
22:21 23:24

**permissive (1)**
160:23
**permits (1)**
165:12
**perpetrator (1)**
231:19
**person (2)**
42:15 82:22
**personal (1)**
260:5
**personally (3)**
48:22 69:25 70:2
**pertains (1)**
336:12
**peso (1)**
93:4
**pesos (2)**
221:5,8
**Pg (1)**
337:5
**Ph.D (3)**
11:7,9,10
**phone (1)**
32:12
**phrase (3)**
128:8 143:21 282:12
**pick (5)**
100:5 110:13 127:21
239:7,12
**picked (5)**
201:10 282:18,20
307:23 310:18
**picking (1)**
58:6
**picture (2)**
98:4,9
**piece (7)**
106:2,3 126:19 127:6
184:12,12 272:19
**pieces (3)**
74:17 106:6 184:11
**place (3)**
140:13 234:14 336:5
**placebo (4)**
233:18,19 298:11
301:9
**placed (2)**
9:1 150:15
**places (1)**
152:14
**plainly (1)**
54:7
**plaintiff (10)**
17:20 230:17 236:6
250:10 252:15,20
264:1 322:16

324:21 331:5
**plaintiff's (5)**
17:12 62:20 299:19
299:21 319:2
**plaintiffs (28)**
1:6 3:13 7:1,2,5 21:14
25:16 30:6,10,15
32:22 62:8 158:5
165:13 166:13,16
166:18 167:9,14,18
168:9,25 174:9,19
174:25 320:24
322:1,5
**plan (1)**
247:2
**play (3)**
19:16 278:20 331:14
**pleaded (2)**
22:21 26:17
**pleading (1)**
23:24
**please (4)**
6:23 7:12 150:10
246:3
**pled (6)**
20:21,24 21:3,16 22:5
22:15
**plus (5)**
8:5 105:4 108:25
109:17 212:12
**point (27)**
60:18 62:16 67:4 86:3
94:25 98:20 147:21
149:13 152:20
156:4 177:5 181:17
190:4 243:7 245:12
245:14 257:4 259:4
271:10 283:23
290:10 302:8 309:4
310:12 318:3 320:4
324:15
**pointed (4)**
63:24 64:1 117:2
288:2
**pointing (2)**
89:6 152:14
**polite (1)**
109:3
**political (1)**
325:25
**Ponce (3)**
264:13,15,21
**population (1)**
296:21
**portion (12)**
16:22 57:7 115:17,22

152:21 165:10
169:15 196:2,18
210:21 251:9 274:5
**portions (2)**
165:4,5
**posit (1)**
72:18
**position (5)**
187:4,4 256:16
259:10 307:13
**positive (9)**
93:18 200:15,24
293:11,14,17
295:10,11 299:2
**positives (1)**
293:23
**possibility (3)**
64:13,19 247:15
**possible (12)**
64:17 75:21,24 92:18
164:14,15 221:10
247:5 248:13,14
258:8 267:22
**post (1)**
165:13
**Potash (1)**
195:8
**potential (3)**
265:21 295:10 333:2
**potentially (1)**
308:15
**power (1)**
299:8
**practical (3)**
75:20,23 76:8
**practice (3)**
29:12 166:5 183:15
**practices (1)**
26:14
**preceding (2)**
135:21 269:22
**precise (7)**
17:5 21:25 22:11
69:19 72:2 97:16
181:23
**precisely (5)**
140:11 144:3 253:20
283:23 317:12
**predate (1)**
266:20
**predicate (2)**
125:12 275:22
**predict (1)**
73:19
**predicted (2)**
218:23 294:2

**predominant (1)**
16:22
**prefer (1)**
308:6
**preferable (2)**
164:14,20
**preference (1)**
170:3
**preferential (1)**
168:9
**preferred (1)**
193:16
**preliminaries (1)**
8:21
**preliminary (1)**
63:21
**premise (6)**
40:12 137:4 160:7
185:7 187:17
217:13
**premised (9)**
39:16 40:7 57:12
89:25 109:25
118:19 119:8
122:15 123:13
**prepare (1)**
30:18
**prepared (4)**
9:5 95:22 140:2
244:24
**preparing (7)**
52:11 69:15 95:17,20
96:8 134:17 301:23
**prerequisite (1)**
75:11
**prescriptive (1)**
239:4
**presence (1)**
144:2
**present (9)**
3:24 80:3,8 92:21
100:19 185:7 240:7
240:22 293:2
**presentations (2)**
16:17 68:1
**presented (1)**
290:16
**presenting (1)**
187:18
**president (4)**
15:14 18:9,10 25:8
**press (2)**
31:10 234:15
**Preston (9)**
23:21 33:11,15 35:5
36:17 37:16 45:14

46:25 48:10
**Presumably (2)**
193:3 320:20
**presume (6)**
117:7 161:6 253:14
253:16 254:15,19
**presumed (7)**
41:3 137:10 151:17
155:3 156:20 157:8
160:18
**presumption (4)**
137:13 159:25 160:7
174:22
**pretend (1)**
109:10
**pretending (1)**
318:9
**pretty (9)**
14:7 126:12 157:8
174:13,13 183:18
204:11 212:20
213:2
**previously (1)**
157:20 319:14
**price (215)**
40:4,5,8 41:4 72:8,23
73:1 75:17 76:2
77:12 79:20 81:4
82:24 83:3,23 84:11
84:22 85:17,19,23
86:7,16 87:15,21
88:10 91:5 93:1
97:14 99:13 106:23
107:3,7,14,17
112:19 113:11,12
114:4 115:11,18,22
116:4,9 117:8,12,20
118:11 122:7,10
123:2 126:3 129:9
130:15 131:9,18
136:19 141:7,9
142:8,15 146:20,24
146:25 147:11,14
147:17 148:6 155:5
157:25 160:5 161:8
162:5,7 163:1
164:22 166:22,24
170:11,13,17
171:18,25 172:2,14
173:12 176:21
177:15 184:16,18
194:1 198:12 199:3
199:4,17,17,21,22
200:24 201:6 203:2
203:22 205:12
207:2,3 216:6

218:12 219:1,19
221:5,6,16 222:2
223:1,11 224:7,22
225:6,13,17 228:6,7
228:23,24 229:6,6
229:21 230:3 240:6
240:14 241:11
245:25 246:22
252:16 253:7,16,20
253:22 254:7,14,17
254:23 255:25
257:4,10 261:11
262:15,19,25 263:3
263:6,14 264:1
265:8 270:11,14
272:17,18,21
273:10 274:1,11
276:20 277:22
279:4 282:1,24
283:4,12 285:2,17
287:11 288:12,23
289:2 292:7,10
298:2,3,22,24
302:15 304:5,18
305:25 306:23
307:20,24 308:20
308:23 309:11
310:19,23 311:16
312:8 314:9,22
315:8,17,24 316:4
317:17,18,24
318:12,18 319:15
320:1,7 324:22
328:16 329:4,12,15
333:17,23
**prices (23)**
73:17,18 74:7,21 75:4
75:7 76:12 78:15
88:20 92:23 94:2
136:25 144:12,15
144:17,20 151:13
151:15 160:11
163:8,16 218:5
286:23
**pricing (2)**
139:21 140:22
**primarily (4)**
50:5,15 258:16 288:8
**primary (2)**
161:8 226:25
**Princeton (47)**
14:17,20 15:4 17:14
18:10,11,13,18 19:6
23:3,14,18 24:2,11
25:14,20 26:1,4,11
26:19,21 27:1,5,19

27:22 30:9,13,17,20
31:4,12 32:4,9
33:16,18 34:2,7,11
34:18 35:1,3,7,19
35:21 37:9,12,20
**principle (2)**
66:12,18
**principles (2)**
145:2,9
**print (4)**
213:25 214:5 215:1,8
**printed (10)**
211:22,24 212:21
213:1,16,20,21
214:6,14,18
**printing (2)**
214:3,11
**prior (19)**
14:6 70:12,19 71:7
79:8,23 81:3 84:10
84:12 85:22 140:16
236:7 249:20 261:2
286:9 287:24
303:12,13 309:6
**priori (6)**
205:5,24 206:9 309:2
309:5 310:15
**prison (1)**
20:19
**private (2)**
5:17 226:14
**Prize (1)**
139:14
**probabilities (2)**
295:12,13
**probability (21)**
112:22 130:18,24
216:1,4,25 218:9
276:23 277:3,12
278:21 279:15
280:12 281:11
282:21 293:10,16
295:16 310:6,11
311:9
**probably (23)**
8:14 17:18 18:20 19:1
32:14 42:10 58:17
58:19 64:10,11
70:10 98:5 100:12
102:7,15 131:7,10
131:12 137:17
156:17 187:12
263:3 300:10
**problem (22)**
120:12 138:14 166:25
179:1 197:17,19

210:20 247:14
259:2,12 289:24
291:5,14 292:13,15
292:22 293:8 294:8
296:3 300:25
301:12 326:17
**problems (3)**
114:20 297:17,18
**proceed (1)**
7:17
**proceeding (1)**
256:17
**proceedings (4)**
335:5 336:4,6,14
**process (18)**
8:13 20:3,5 73:9
81:18 127:4 232:24
234:14 302:8
304:20 305:13,16
305:20 306:3,11,16
307:8 310:13
**processed (3)**
127:23 128:1 314:1
**processes (3)**
71:24 72:5 313:25
**produce (2)**
62:12 290:20
**produced (4)**
211:18 213:5,22,25
**product (1)**
286:21
**professional (8)**
9:23 14:4,13 39:14
47:20 48:19 67:21
125:25
**professionals (1)**
160:8
**professor (4)**
68:25 73:10,15 74:5
**profit (1)**
81:2
**profitable (2)**
60:3 100:14
**profits (3)**
59:9,9 244:6
**program (11)**
10:25 11:1 12:3,9,13
12:20 13:9,15,16
68:12 69:4
**project (1)**
60:3
**project-by-project (...**
59:25
**projections (1)**
234:22
**projects (5)**

29:16,17 33:24 58:24
59:20
**prominent (1)**
163:13
**properly (1)**
160:18
**proportion (2)**
16:24 51:11
**propose (2)**
164:3 192:4
**proposed (5)**
37:2,3,5 297:16
**proposition (1)**
131:15
**prosecutor (1)**
325:21
**prove (2)**
185:14 318:10
**provide (16)**
20:11,12 52:19 55:22
61:9 102:17 106:24
176:6 180:25
196:16 197:1,5
208:2,11 209:24
234:23
**provided (13)**
32:16 50:21 64:25
78:8 95:5 181:4
207:18 213:2
237:25 261:24
289:5 302:1 316:16
**provides (3)**
208:9 295:22 328:10
**providing (4)**
32:21 39:15 188:13
225:19
**public (10)**
15:15 74:7 154:25
155:6 227:15
229:10 233:7
254:16 325:21
337:25
**publication (1)**
67:8
**publications (1)**
67:7
**publicity (1)**
45:12
**publicly (7)**
78:23 79:2 84:23
160:3,9 245:23
254:22
**publicly-available (...**
73:3 74:13,22,23 75:1
75:5,16 76:13 77:9
77:21,24 78:3 80:14

88:8 106:12 254:13
254:25 257:7
315:19
**publicly-traded (4)**
32:1 40:5 61:16
156:19
**published (3)**
67:11,15 136:7
**pull (1)**
270:13
**purchase (1)**
39:4
**purchases (1)**
142:7
**pure (4)**
224:9 225:15 292:25
295:13
**purely (5)**
46:1,11 199:19 275:2
291:11
**purging (1)**
20:24
**purport (1)**
151:22
**purpose (6)**
112:12 114:2 122:17
133:9 164:24 305:7
**purposes (21)**
38:22 39:3,7 50:7
114:3 152:24
154:10,17 163:24
166:6 186:2 191:2,9
191:12 192:15,20
198:24 296:19
316:24 324:20
325:6
**Pursuant (1)**
5:18
**pursued (1)**
13:1
**push (1)**
60:18
**put (19)**
50:14 53:7 54:13
55:19,20 70:6,9,10
91:10 125:24 128:8
140:13 201:18
203:6 214:7 259:10
266:7 320:12
325:10
**puts (1)**
140:10
**putting (1)**
150:2

_____
**Q**

**qualification (1)**
234:9
**qualified (3)**
42:5 43:23 55:13
**qualitative (2)**
240:24 241:6
**quantification (1)**
192:9
**quantified (2)**
100:23 113:3
**quantify (5)**
190:24 191:14 192:15
241:5 304:21
**quantifying (5)**
166:7 191:5 192:21
193:9 256:10
**quantitative (1)**
241:3
**quarter (3)**
51:2 200:11 286:1
**quarter's (1)**
198:8
**question (100)**
31:23 33:25 44:21
48:8 50:23 52:13
61:4 63:12 66:4,11
66:15 78:1 94:13,21
102:24 103:24
105:7 106:7 108:23
109:11 110:9,17
111:13,16,19,23,25
119:21 122:20
125:11,12 126:12
126:13,17 130:1,21
136:5 138:4 140:16
142:22 146:20
155:1 167:10 169:7
175:13 179:8,10,19
186:25 187:3
188:10,23 189:1,3,4
190:13,14,19 195:5
204:25 211:6
215:15 216:22
223:24 226:18
228:18 242:13
243:21 248:23
250:20 251:2,7
252:9 257:6 260:16
262:8,9,16 263:24
264:5 268:4 269:13
276:9 283:9,11,23
286:16 289:21
290:4,6,7 291:9
294:2 300:11,13
313:12 319:4
321:24 325:15

332:20
**questioning (1)**
8:23
**questions (15)**
42:15 48:6,6 108:13
113:21 124:9
179:13 242:10,12
248:24 269:22
272:4 331:11
334:22,24
**quick (3)**
80:25 81:4 334:8
**quickly (42)**
72:7 74:6,12 78:15
80:13,15,16 81:6,14
81:22 84:18 87:20
88:1,3 105:3 106:23
107:2,7 113:10
114:5 116:3 117:11
123:2 129:8,23
130:14 131:17
136:19 144:9 160:3
163:8 213:1 244:25
245:24 246:22
272:16,17 277:22
278:7 279:3 282:1
314:2
**quiet (2)**
126:16 176:7
**Quimica (1)**
210:6
**quite (16)**
44:1 157:11 174:20
206:12 212:2 226:1
227:22 251:3 258:3
258:4,24 265:1
285:6 294:20 298:3
302:6
**quote (19)**
54:14 151:5 153:5,6
154:6 157:20 158:7
159:17,20,24 160:1
160:8,11 163:7,17
196:21 255:8
263:24 264:2
**quote/unquote (4)**
178:3,22 300:19
303:8
**quoted (2)**
159:16 163:5
**quoting (2)**
76:16 255:2

**R**

**R (1)**
3:1

**R-squared (1)**
115:20
**rabbit (1)**
44:24
**ran (4)**
93:14 191:24 216:12
241:10
**random (4)**
216:5 274:1,9,15
**randomly (9)**
112:23 130:12 216:2
279:20,21 283:6,16
293:1 311:10
**range (2)**
130:25 287:20
**rapidly (5)**
78:2 84:22 106:11
115:11 257:7
**rare (1)**
19:11
**rate (7)**
93:3 115:17 279:14
282:8 283:5,13
287:16
**rates (1)**
99:20
**rationale (2)**
27:25 295:9
**reach (1)**
9:14
**reaching (1)**
36:25
**react (12)**
136:19 163:8,16
208:14 235:19
242:23 243:16
245:7 247:10
273:11 313:7,8
**reacted (15)**
105:2 120:20 123:2
127:23 171:25
172:3,14,16,16
176:21 285:17
304:16 308:23
318:12 333:23
**reacting (4)**
243:17 245:16,17
274:21
**reaction (17)**
122:10 170:13,17
171:18 198:12
200:24 203:22
205:12 216:19
223:2 228:12
241:11 243:12
262:16,20 263:14

328:16
**reactions (4)**
173:8 216:6 222:2
309:11
**reacts (5)**
244:3 246:22 284:7
284:20,22
**read (45)**
13:20 22:13,14 94:10
128:18 134:13,14
135:7 140:2 142:25
150:23 151:2 152:6
152:16 153:21
155:19 188:20
190:17 197:15,15
197:18 210:3
211:17 212:9,17
213:1,7,12,20,24
215:9 221:22
236:24 237:1,3
242:6,7,8,9,11
247:12 250:15
265:3 325:18 337:5
**readily (1)**
240:14
**reading (17)**
57:13 110:11 135:18
144:23 150:24
159:15 196:8,9
209:19 210:21,22
212:23 213:18
253:3 255:5,8
266:21
**Reads (1)**
337:5
**reality (2)**
76:8,25
**realize (1)**
152:16
**really (29)**
17:25 23:1 65:15 67:5
84:18 92:17 121:4
129:12 140:2 162:1
199:5 212:24
214:16 217:14
223:17 232:4
233:21 256:14,24
260:16 269:23
273:4 292:25
300:16 302:7 306:6
314:2,2,18
**reason (22)**
16:3 19:6 42:8 48:23
49:14 79:1 94:9,16
107:10 115:14
117:1 135:12 174:1

176:1 178:10
182:10 185:21
217:8 220:5 295:3
317:21 337:5
**reasonable (13)**
79:7,22 80:1,7 137:15
151:11 162:4 248:2
253:14,18 254:15
254:18 260:24
**reasonably (1)**
154:13
**reasons (13)**
33:5 46:14 91:18
94:20 136:13,14
170:4 193:5 229:17
229:18,19 290:14
312:17
**rebut (1)**
174:22
**rebuttal (1)**
333:2
**recall (27)**
17:21 18:6 19:4 26:10
32:3,10 36:8 38:23
41:22,23 42:3 43:10
45:4 53:13 69:18
95:12 132:22
144:23 199:5 214:9
221:18,20 225:3,4
251:20 265:15
327:6
**receipts (1)**
89:16
**received (4)**
12:6 213:3 220:24
325:20
**receiving (4)**
21:14 30:14,14 59:5
**Recess (6)**
71:16 132:14 183:7
239:24 296:11
334:16
**recognize (1)**
159:25
**recognized (1)**
263:12
**recollection (20)**
21:9,22 22:2,2,3,7,8
31:16,18 36:12 43:8
43:15,20 44:14
139:25 140:3 143:4
143:10 144:18,21
**record (27)**
8:25 9:9 24:22 71:15
71:20 95:4 98:20
124:24 125:1 132:9

132:13,18 183:6,11
210:12,16 239:16
239:23 240:3
296:10,15 334:10
334:15,20 335:4
336:6,9
**recorded (1)**
6:6
**recover (1)**
165:14
**recoverable (1)**
169:11
**recovery (1)**
169:6
**rectangular (1)**
266:8
**red (2)**
98:13,15
**reduced (1)**
35:25
**reduction (1)**
329:15
**refer (15)**
28:8 72:21 77:5,15
89:21 115:23
146:10 178:2 185:1
193:14,17 211:10
212:5 293:7,7
**reference (2)**
89:21 90:14
**referenced (5)**
31:5 59:7 133:18
237:4 280:25
**referencing (2)**
84:10 263:19
**referred (15)**
104:24 121:3 143:16
143:17 146:7
158:18 159:5
170:20,22 171:4,7
171:10 178:21
221:15 293:23
**referring (19)**
41:21 69:25 73:6
104:18 106:19
130:17 132:21
134:24 146:14
153:13 162:10
168:7,23 184:19
193:16,18 196:21
269:21 333:11
**refers (5)**
31:11 80:12 155:8
197:7 209:14
**refined (1)**
185:6

**reflect (7)**
74:7,21 76:12 78:16
81:6 88:20 137:1
**reflected (17)**
76:2 77:12 81:3 85:17
88:9 113:10,12
117:19 141:6
142:14 160:4 161:7
162:25 245:25
254:17 264:2 314:9
**reflecting (1)**
148:7
**reflection (2)**
9:22 185:8
**reflective (1)**
83:2
**reflects (1)**
240:6
**refrain (1)**
129:24
**refresh (1)**
264:14
**refuted (1)**
172:10
**refutes (1)**
187:11
**refuting (1)**
231:10
**regard (1)**
206:12
**regarding (7)**
123:12 139:16 183:24
194:3 204:22 239:4
249:11
**regardless (8)**
46:8 78:25,25 123:7
239:8 317:25
333:15 334:4
**registered (1)**
221:4
**regressed (1)**
107:5
**regression (3)**
106:21 117:22 199:8
**regular (4)**
80:23 81:1 89:3
200:16
**regularly (2)**
231:14 242:22
**regulator (2)**
222:18 224:20
**regulators (2)**
224:24 258:9
**reject (3)**
131:13 281:16,22
**rejected (1)**

332:2
**relate (9)**
25:7 59:22 155:25
184:12,13 235:13
235:17 251:4,10
**related (26)**
28:9 38:3 57:8 58:20
83:18 112:10 157:4
184:17 191:6,8
192:19 193:7
195:15 252:18
263:13 315:25
316:1,2,4,5,9,19,20
317:2,16,25
**relates (22)**
72:25 73:7,13 74:25
80:16 90:3 116:8,16
116:20 118:5 141:1
141:22 143:5 154:7
155:22 186:13
235:15 249:6
250:22 252:2
317:23 330:7
**relating (22)**
23:25 27:15 56:24
57:1 59:15,21 67:9
79:7 112:14 133:7
160:14 179:25
181:11 247:7 254:2
254:8 258:15,16
289:16 297:21
303:5 316:4
**relationship (6)**
34:18 107:12 115:25
157:24 274:3
306:22
**relative (1)**
336:18
**release (53)**
31:10 87:1,3,11
109:12 111:3 119:9
121:6 128:11,13
163:9 193:13,15,21
194:21 195:11,20
195:23 196:1 198:7
198:7 199:23 200:7
215:13,18,22 216:7
216:21 217:21
232:6 234:13,15
237:7 242:24
243:16 246:23
252:24 265:22
266:22 268:21
275:2 282:3,6 285:4
285:7,13,16,21
286:12 287:3,18

289:22 290:8
**released (4)**
193:22 200:19 228:13
245:23
**releases (77)**
104:22 107:10,11,13
107:17,19 108:18
110:5,13,14,15,22
112:15,20 114:17
116:18,18 118:17
118:19,23 123:10
129:3,18 130:4
193:12 195:1,13
196:4,6,14,15 197:1
197:4,8 198:14,22
198:23 199:25
200:4,5 201:10,11
214:25 216:19
229:4,8,16 233:24
234:2 238:3,6,16,19
239:1,4,9 244:22
247:7 248:5,6
249:18 251:4
255:13 266:7
268:19 272:19,20
273:9 276:18 285:1
285:3 287:6,9 289:9
290:19 291:8 308:8
**relevant (27)**
39:24 57:4 73:16
85:18 91:13,22
100:18 116:5
137:20 140:23
156:7,13 179:25
180:13 221:11
253:10 264:11
303:19 304:8,12,12
304:14,15 318:2,13
319:24 333:13
**reliable (7)**
111:10 112:4 114:1
304:24 305:6,14
311:1
**reliably (1)**
185:15
**reliance (30)**
65:4 77:10 78:11
116:20 124:5 133:3
133:4 147:24
149:15 151:14
152:23 154:10,16
155:2 159:3,9,25
160:18,24 161:4
162:4,12 165:8
169:15 181:19
185:14 315:23

317:22,23 325:6
**relied (5)**
155:4,5 211:9 253:15
253:19
**rely (4)**
151:12 162:4 164:20
254:23
**relying (1)**
164:7
**remain (1)**
326:25
**remained (1)**
29:20
**remaining (1)**
59:17
**remains (1)**
9:16
**remember (15)**
17:25 18:3,5 24:18,21
37:3 44:18,19,25
45:19 214:22,23
264:25 297:15
302:7
**remembered (1)**
25:3
**remembering (1)**
314:13
**remotely (1)**
211:4
**render (1)**
106:21
**repeat (5)**
52:13 130:20 138:3
179:18 290:4
**repeated (1)**
295:24
**repeatedly (2)**
163:8 251:6
**repetitive (1)**
214:20
**rephrase (6)**
57:25 106:7 184:1
189:4 277:24 282:5
**report (118)**
5:2,16 8:4 9:5,7,13,14
9:15,20 20:12 51:17
51:22 52:17 58:7
61:18,22 62:1,9,18
63:16,18 64:22
69:16 70:14,18,19
72:1 77:3,6,16
79:16 80:12 90:12
91:10,18 92:14
95:18,20,22 96:9
97:25 113:19
124:13 134:7,17,21

142:1 147:19
148:16 150:18,24
157:3 158:8 165:2
170:6 173:13 180:3
180:4 182:5,12
183:19,24 184:22
184:23,25 188:20
189:18,19 190:4,17
196:8 201:18 202:2
202:25 203:7,13
204:23 206:11
207:7,10 208:4
209:13,18 210:16
210:21 211:8 212:4
213:6 215:5,9 217:9
218:16,18 236:22
238:22 244:1,3
255:5,7,20,22
257:15 261:9 266:1
266:4 272:1 288:18
289:6,18 290:1
301:23 302:25
320:14 327:13
332:15,23 333:2,8
**reported (3)**
1:24 15:14 242:22
**reporter (6)**
2:13 6:21 7:12 130:2
135:14 336:2
**reporting (6)**
6:18,22 38:22 39:3,6
50:7
**reports (44)**
19:19,24 70:12 71:7
101:13 113:6
170:24 181:22
182:8 183:13 201:3
201:17 202:7,7,14
202:15,21 203:16
203:19 208:22
209:2,11,11,14,16
210:4,5,8,13,14
211:1,11,11 212:5,9
212:16,18 214:19
220:24 231:14
238:22 280:8
297:19 328:7
**represent (10)**
45:21,23 102:8
178:20 219:22
261:8 278:18,19
280:11 311:20
**representation (1)**
135:7
**represented (1)**
279:17

**representing (3)**
7:4 21:12 103:11
**reputation (4)**
47:20 48:19 125:25
258:20
**reputational (1)**
258:19
**request (2)**
63:16 325:20
**requested (2)**
221:9 336:15
**requesting (1)**
321:5
**require (2)**
158:3 270:15
**required (3)**
16:16 53:9 158:5
**requirement (1)**
12:1
**requirements (1)**
52:24
**requires (1)**
180:12
**reread (4)**
63:12 111:17 126:12
134:16
**research (33)**
10:14,18 11:2 14:17
17:14 18:10,11
26:21 27:1,20 32:4
34:2,19 35:22 37:12
39:22 68:24 69:1
89:7 91:20 133:7,23
137:2 141:4,22
145:12 148:10
156:8,13 160:14
162:20 187:8
233:17
**reset (1)**
211:6
**resign (1)**
36:1
**resignation (4)**
107:23 194:4 195:7
252:5
**resignations (1)**
315:12
**resigned (5)**
303:1,3 312:11,14,18
**resigning (1)**
260:15
**respect (64)**
21:3 25:3 39:3,22
44:14,15 76:20
84:19 121:10,12,15
124:2,2,3 127:3,5

129:16 137:10
139:19 140:20
144:1,6 151:14
165:3 174:12
178:15,24 179:2
193:8 221:6 226:3
226:25 227:5 229:8
242:21,25 243:12
243:17 244:22
246:22,24 247:16
247:17,21 249:4
251:2,18,22 253:20
259:11 268:1
272:15,18 273:18
284:25 285:12
287:2 290:22
291:25 300:11
316:9 324:22
327:19 333:6
**respective (4)**
72:9 92:23 140:7
142:5
**respond (1)**
333:1
**responded (1)**
221:13
**responding (1)**
98:20
**response (1)**
107:13
**responsible (2)**
16:13,14
**responsive (2)**
11:5 188:23
**restate (6)**
97:15 126:15 248:24
251:17 293:4
313:11
**result (19)**
58:19 120:4,8 130:8
131:12 200:23
228:5,22 229:5
230:6 232:7 239:14
271:7 282:23
287:11 292:18,20
293:17 298:14
**resulted (1)**
28:18
**resulting (3)**
49:2 141:9 157:25
**results (18)**
119:22,25 120:3,6,15
122:9 125:9 198:1
231:1,5,7 281:21
285:20 287:8
290:20 291:10

293:21 299:9
**retain (1)**
331:6
**retained (3)**
59:4 60:9 61:8
**retaining (1)**
29:11
**retire (1)**
45:15
**retirement (2)**
140:12,13
**retiring (1)**
47:1
**return (27)**
77:13 80:23 112:19
128:14 133:10
156:9,24 158:24
215:20 218:23,24
219:2,23 263:2
265:23 266:14,23
275:5 303:25
304:21 311:23
312:6 315:14 319:8
322:7 330:2,23
**returned (1)**
181:15
**returns (16)**
73:12,12,24 80:24
129:5 134:3 138:17
145:18 217:16
225:21 230:3
286:14 300:22
305:2 307:1,3
**revealed (1)**
286:24
**reveals (1)**
303:12
**revelation (1)**
333:25
**revenue (1)**
59:5
**revenues (3)**
198:9 200:11 257:22
**reversal (1)**
54:22
**reversed (2)**
54:1,19
**review (7)**
19:20 54:22 66:7
203:15 237:6
297:15 336:14
**reviewed (10)**
133:13,14 156:3
201:2 236:23 250:5
250:7 265:19 302:5
302:9

**reviewing (1)**
209:10
**rhetorical (1)**
48:8
**Richard (3)**
139:12,13 140:9
**right (195)**
8:22 11:11 13:13,21
14:17 15:24 16:4,5
20:19 21:1 22:9
23:4,8,15 25:10
27:20 31:7 32:18
33:13 34:9 38:5
41:8 42:15,18,21
44:5 45:9 46:3,22
48:10 51:23 53:16
53:18,22 54:5,20
55:17 59:8 64:23
65:21 66:4 75:17
85:8 87:5,11 89:25
90:4 93:22 94:7
95:11 98:2 99:17
101:4,21 103:7,13
103:16 104:12,20
105:4,20 108:3,22
109:22 112:4,9
118:3 119:18
120:21 124:17
125:14 127:18
130:5,18 132:22
133:1 135:2 146:8
146:11,21 147:12
148:17 153:9 165:8
170:14 171:2,4,5,8
186:22 187:25
188:9 189:8 190:16
190:18 193:14,23
194:5 195:8,17
197:8,11 198:4
208:8,17 211:15
215:10 219:9,19,25
220:6,7,12,20 222:4
222:21,22 226:16
227:6,7 230:17
232:12 235:1,16,23
236:8,13,18 242:5
243:14 244:9 246:1
247:14 250:11
253:16,22 255:20
256:9 258:22 260:8
261:24 263:14
264:17 265:2,15,20
265:23 266:12,24
270:24 274:5,22
275:18 277:5,15
278:15 279:15

280:17 282:1 283:1
284:20 285:22
286:2,5,9 291:23
292:2 293:24
294:21 295:20
297:4 300:23
301:20,24 302:17
303:9,14 304:7
305:15 306:23
310:19 311:17
312:16 316:15
320:4 322:18,25
323:3 325:4,12
326:16 327:10
328:4 329:24
332:11
**ring (3)**
69:6 264:18,19
**rise (1)**
221:6
**riskiness (2)**
80:9 185:9
**riskless (2)**
87:17 88:5
**Robbins (4)**
1:20 2:10 3:14 60:6
**robust (2)**
241:10,14
**role (5)**
19:16,17 50:24,25
331:14
**root (2)**
330:25 331:1
**roughly (3)**
102:4 203:22 274:18
**round (1)**
272:5
**row (1)**
295:18
**Royal (2)**
139:16,20
**Rudman (3)**
1:20 2:10 3:14
**rule (5)**
5:18 52:19,22 53:9
153:2
**rules (1)**
53:10
**rumors (1)**
225:11
**run (12)**
120:7 130:23 137:4,5
148:4 216:23 218:1
232:15,21 233:14
254:21 277:11
**running (2)**

119:8 199:7
**runup (1)**
225:13
**Rutten (7)**
5:14 137:18,23
148:17 150:17
151:22 155:8
**Ryan (1)**
53:13

_____

**S**

**S (2)**
3:1 4:25
**S-I-D-A-K (1)**
294:17
**S&P (1)**
115:7
**sales (1)**
142:7
**sample (11)**
127:12 130:9 131:19
131:23 239:10
270:9 274:10,15
296:22,25 298:5
**samples (3)**
131:24 227:24 301:17
**San (16)**
1:21 2:11 3:19 6:1,14
12:4 15:8 16:14
18:15 22:23 27:9,14
28:20 34:24 68:23
68:25
**Santiago (7)**
90:7 91:2 92:3 95:10
220:25 221:8
222:24
**sat (1)**
182:16
**satisfied (10)**
65:1 108:1 113:14
114:24,25 140:23
186:21 187:2,6,21
**satisfy (3)**
13:8 100:19 189:21
**savings (1)**
95:13
**saw (4)**
28:11 30:16 201:4
207:5
**saying (54)**
12:18 21:21 22:10
26:4 29:7,10 43:9
45:23 46:1 62:10
83:1 85:15 86:1
100:7 103:6 104:13
105:8 109:6 120:13

124:15,20 126:1
139:6 141:25
142:11 164:19
168:8,12 172:6,8
178:4 185:18 186:1
187:14,22 213:19
218:2 222:10
226:23 244:11
252:7 256:2 262:2
263:5 281:24
282:15 283:2 284:6
284:17 307:12
308:6,14 317:10
333:20
**says (25)**
14:19 23:7 72:4 88:11
92:17 107:15
149:12 151:20
153:1 154:3 165:11
173:10 180:12
181:16 210:8
220:24 221:1
222:14,21 242:16
246:11 266:13,15
314:21 333:11
**scandal (1)**
265:17
**scenario (2)**
186:7 317:19
**scheme (3)**
259:24 260:4,11
**scholarship (3)**
13:6 142:18 144:2
**school (2)**
10:3,16
**science (2)**
12:22,23
**scientific (1)**
309:4
**scientifically (1)**
310:25
**scientists (1)**
159:22
**scrutinized (1)**
291:10
**se (1)**
120:13
**search (4)**
209:25 210:1,6 212:5
**searches (1)**
206:15
**SEC (4)**
210:13 222:23 226:13
264:24
**second (18)**
11:25 45:4 124:24

147:20 154:3 173:7
177:16,17 181:10
181:11 193:25
196:14 203:17,20
210:7 212:25 244:1
246:12
**section (12)**
14:25 16:21 72:16
89:7 101:8 150:5
152:4 184:22,23,25
242:15 245:21
**securities (62)**
5:12,19 11:2 14:24
15:20,22 16:10,12
16:25 17:9,11 32:23
33:7 35:10 36:20
37:24 38:3,8 39:16
41:8,11,14 47:5
49:12 50:10,15,22
59:21,22 60:25 61:8
61:14,16,17,19
64:23 68:2 79:11
92:19 93:7 140:7
143:9 146:2 150:19
151:9,14 153:3
154:24 156:8,19
157:5,6 180:14
222:18 224:20
226:1 254:14,17,23
254:24 297:8
322:10
**security (10)**
41:2 74:7 93:20 97:1
97:5,7 146:3 153:5
242:17 245:25
**see (60)**
56:4,7 72:11 73:19
93:16 95:2 98:14
105:1 111:24
112:17 113:6
115:11,15 121:24
122:9 126:2 133:10
135:8,23 136:18
151:18 181:5 196:7
199:20 200:17
201:19 202:11,22
202:25 203:21
204:3,7 207:20
208:13 215:25
218:22 231:18
233:10 237:16
239:14 243:3 270:2
275:8 276:5,14
282:13 288:7,16
299:14 300:21
301:12 304:9,15,18

305:3 306:13 307:1
307:25 309:21
334:8
**seeing (3)**
36:25 297:3 311:21
**seen (2)**
221:17 297:7
**seldom (1)**
289:7
**selected (2)**
282:4,7
**selection (1)**
165:13
**self-study (3)**
13:15,16 14:5
**self-taught (5)**
68:5,8,15 69:6,13
**sell (2)**
72:9 145:25
**selling (3)**
75:25 117:18 156:10
**semi-strong (10)**
72:24 74:6,12,20
75:11 76:21,24
77:14,20 84:21
**send (2)**
25:25 26:3
**sense (30)**
28:5,6 76:11 132:8
134:1 144:8,14
145:15 152:7
154:22 167:4
171:21 191:22
194:24 207:13
208:11 223:16,25
224:5 225:7 227:12
229:7 237:8 239:7
253:5 256:9 260:23
278:24 298:21
314:22
**sentence (28)**
92:17,24 129:5
135:20 147:20
148:23 149:12
151:23 152:25
153:16 181:15,23
182:2,4,17,20
186:17 196:14,18
196:19 242:16
246:5,13 273:24
274:4,5 277:19
279:10
**sentenced (1)**
20:18
**separate (2)**
46:4 156:1

separately (1)
193:25
September (3)
12:14 23:9 264:24
serial (2)
116:23,24
series (2)
221:3 236:5
services (11)
26:23 27:3 30:1 31:6
31:13,22,24 32:6,17
33:1 50:22
serving (1)
51:12
session (1)
269:5
set (12)
14:7 73:23 97:2 99:3
110:6 142:8 143:7
189:12 229:15
255:12 300:17
336:5
sets (5)
139:21,24 140:5
143:24 246:13
setting (4)
30:2 211:6 282:14
300:16
settled (1)
258:13
severe (9)
258:3,4,4,24,24 259:1
260:25 261:3,4
severity (4)
257:25 259:12 261:5
328:23
Shanghai (1)
38:13
share (37)
17:9 34:5 74:21 75:17
84:22 85:17 86:16
87:15 97:13 126:2
146:20,24 147:13
163:15 170:13,17
218:5 219:1,18
221:8 222:2 223:1
223:10 224:21
225:17 241:11
257:21 263:14
267:19 276:19
283:4,12 289:2
302:15 306:23
315:17 333:23
shareholder (3)
14:20,22 32:16
shares (38)

40:15 61:3 64:14 65:7
65:19 66:13 78:2
83:4 89:15,17,19
90:20 92:20 93:3
97:20 121:19
122:21 126:4
128:15 138:7
139:22 140:23
143:24 145:25
147:3,8,10 148:24
149:10 221:4
223:18,22 224:6,12
225:10,12 251:22
326:20
sharp (1)
315:3
SHEET (1)
337:1
sheets (2)
25:25 31:2
Shell (2)
139:16,20
shifted (2)
15:19 33:3
shingles (1)
33:6
short (4)
83:8 220:22 224:7,9
shorter (2)
103:18 104:12
shorthand (3)
2:13 336:2,7
show (7)
24:22 135:9 192:24
197:6 228:14
285:16 286:13
showing (7)
14:6 131:11 134:23
136:2 158:2 186:3
190:3
shown (2)
133:23 163:7
shows (1)
317:11
shut (1)
27:23
Sidak (3)
293:19 294:15,18
side (9)
17:12,17,20,23 35:23
62:12 167:5 230:23
299:21
sides (1)
300:24
sign (1)
19:21

Signature (1)
337:21
signed (1)
20:15
significance (14)
202:6 219:12 230:6
252:22 253:1 270:5
271:8 276:6 277:10
280:6 287:19 315:9
321:20 330:12
significant (111)
47:3,9,12 112:19
115:25 122:6
128:14 129:4
130:22 131:9
139:20 199:4,22
201:14 203:3,4
204:2 207:2,3
208:12,15 215:20
215:25 216:21
217:16 218:6,12
219:6,18,23 221:12
222:2 223:10,17
224:21 228:6,12,23
229:5,21 230:2
261:12 265:23
266:14,23 267:19
268:22 269:2
270:11,14 272:21
274:2,11,17 275:6
276:19,24 278:1,23
280:13 281:12
282:24 284:1,17
285:22 286:14
287:8,11,25 288:12
288:23 289:3,9
290:20 298:1 299:1
300:22 302:16
303:25 304:4,23
305:2,25 307:3,24
308:20 309:11,20
311:2,15,23 312:6,8
312:16,18 313:1,15
315:3,11,14 319:8
320:7 321:19 322:7
322:12 325:12
326:19 328:14
330:2 331:2,19
significantly (2)
276:25 278:2
similar (12)
31:21 41:14 163:15
182:9 194:8 227:12
256:2 293:19
295:15 296:18
300:12 325:17

Similarly (1)
1:5
simple (6)
31:22 105:6 108:23
110:17 111:16
125:7
simpler (2)
62:19 319:4
simplified (1)
169:20
simplify (1)
77:14
simply (21)
66:11 104:13 109:11
141:24 179:4 216:1
216:5 217:2,20
244:8 245:16
273:15 276:25
278:2 291:24 298:2
301:5 319:20 320:9
333:15 334:3
single (15)
32:10 36:24 98:11
122:15 126:1
210:22 214:24
236:24 271:7 299:7
299:7 312:5 315:14
319:7,15
sir (3)
71:22 171:16 296:17
sit (19)
22:9 25:10 36:9 44:25
95:11 111:18
200:25 220:12
222:8 223:13
224:14 225:16
236:18 242:11
247:13 265:2,14,19
294:20
sitting (2)
84:4 319:17
Situated (1)
1:5
situation (8)
34:14 40:22 62:4
138:7 140:4 224:19
274:21 327:9
situations (2)
139:17 267:18
Sivillingenior (1)
13:8
size (3)
127:12 129:15,17
skeptical (1)
282:13
skilled (1)

15:10
skim (2)
212:24 221:23
skimmed (1)
213:13
skip (2)
8:20,21
slightly (3)
72:2 102:7 274:12
slow (3)
81:4 243:12,14
slowly (7)
242:23 243:16,17
244:3 245:7,16,17
small (6)
51:13 84:1 98:16
99:25 131:24 216:3
smaller (3)
130:8 131:19,23
so-called (1)
298:6
social (1)
159:21
Sociedad (1)
210:6
sold (1)
15:16
solely (1)
254:21
solve (1)
142:3
somebody (9)
19:9 25:7 36:23 74:2
224:5,11 231:15
258:6 300:3
somewhat (3)
109:14 214:20 245:7
soon (3)
124:11 132:7 221:10
sophisticated (5)
144:9 145:17 151:12
156:23 159:23
sorry (32)
12:19 25:1 56:2,21
66:17 94:11 103:3
110:25 111:1
129:21 131:5
134:21 135:20
137:17 138:3 149:4
184:1 189:24
196:19 210:11
212:12,13 213:19
226:17 246:2,4
272:2,7 290:3
299:19 314:18
322:21

**sort (8)**
11:10 53:8 120:23
256:1 266:7 277:8
277:19 287:22
**sorts (3)**
58:5 162:19 177:9
**sound (3)**
204:16 205:1,16
**sounded (1)**
210:24
**sounds (7)**
16:4,5 31:20 36:3
81:13 230:25
318:20
**Southern (2)**
1:2 6:11
**space (2)**
36:21 68:14
**Spanish (1)**
221:1
**speak (4)**
9:18 154:5,6 281:6
**speaking (5)**
11:14 32:3 171:2
217:2 226:11
**speaks (1)**
100:25
**special (2)**
221:10 321:20
**specialist (1)**
6:18
**specialized (1)**
37:13
**specific (38)**
16:1 17:21 18:1 21:23
23:2 38:23 41:10
44:14,21 96:11
100:17,21 116:10
116:12,14,17
117:23,25 118:6,12
129:8 130:14
131:16 137:6
152:14,20 157:18
184:15,17 221:21
226:6 269:14
274:21 277:21
278:7 281:25
285:18 334:5
**specifically (10)**
10:21 22:14 50:10
107:11 157:4
194:16 196:5
238:19 252:2
330:20
**specifics (5)**
36:5 44:15 64:5,8

70:20
**speculate (2)**
28:1 136:13
**speculating (1)**
225:17
**speculation (2)**
224:10 225:15
**spell (1)**
294:16
**spend (4)**
58:17 69:15 82:20
212:25
**spending (1)**
49:18
**spent (8)**
16:19 24:10,11 50:9
69:17 212:23
213:18 258:13
**spinoff (1)**
140:20
**spit (2)**
277:12,13
**spoke (1)**
193:12
**spoken (4)**
22:17 32:8,11,14
**spread (2)**
98:23 99:16
**spreads (1)**
100:1
**SQM (37)**
7:8 25:6 78:17 90:6
90:20 105:19 107:6
114:4 116:1 181:2
193:22 206:23
210:9 220:20,24
221:2,4,9,12 222:23
223:18 226:15,25
229:15 237:23,24
238:23 250:11
251:22 259:15
264:16 301:2,2
303:1 323:1 325:20
328:2
**SQM's (27)**
65:6 89:25 90:4 92:2
92:4 101:2 106:11
115:11,18,22 116:6
120:20 123:13
129:9 130:15 195:8
236:23 257:1,6
265:8 272:7,12
276:18 277:22
279:4 302:15 319:6
**square (2)**
330:25 331:1

**squeeze (1)**
224:9
**St (1)**
297:15
**staff (1)**
70:10
**stage (3)**
158:6 256:16,20
**stages (1)**
63:21
**stake (2)**
60:5 125:25
**standard (13)**
40:2 53:25 54:3,11
55:2,6,11,22 56:11
56:13 160:23
284:20 330:24
**standards (3)**
48:3,4 144:25
**start (9)**
6:5 12:7,10 37:6 47:1
84:6 126:17 225:16
306:25
**started (10)**
8:18 12:12,14,17
15:16 31:16,18
75:24 106:19 109:6
**starting (2)**
45:15 246:10
**state (14)**
71:25 92:16 98:19
134:20,22 147:20
147:21 185:3
196:13,15 236:22
273:22,25 336:2
**stated (5)**
91:19 124:12 170:4
222:23,23
**statement (14)**
175:15,17 176:15
239:3 243:5 246:1
246:15 247:4
249:11 250:1,22
315:7,10 321:16
**statements (11)**
151:16 154:25 155:6
160:10 241:6
248:17 251:12
252:17 253:5,9,25
**states (7)**
1:1 6:10 89:12 96:6
96:14 115:7 196:5
**statistic (3)**
113:4 202:11 204:7
**statistical (18)**
101:11 128:25 129:6

130:5 159:23 202:6
219:12 222:1 230:6
252:22,25 270:5
275:2 276:6 277:20
279:2 293:21 311:8
**statistically (92)**
112:19 115:25 122:6
128:13 129:4
130:22 131:9
199:21 203:2,3
207:1,3 215:20,24
216:20 217:16
218:6,12 219:18,23
222:2 223:10 228:6
228:12,23 229:5,20
230:1 261:12
265:23 266:14,23
268:22 269:2
270:10,13 271:8
272:21 274:2,11,17
275:6 276:11,19,24
277:9 278:1,23
280:6,13 281:12
282:23 284:1
285:22 286:13
287:7,11,19,25
288:12,22 289:3,9
290:20 298:1,25
300:22 303:25
304:4,22 305:2,25
307:2,24 308:20
309:20 311:2,15,22
312:5,8 315:14
319:8 320:7 321:18
322:7,12 329:14
330:1,12 331:2,19
**statistician (1)**
120:18
**statistician's (1)**
281:23
**statisticians (2)**
293:7 294:7
**statistics (5)**
10:19 11:3 294:12
299:18 300:12
**Steinhold (1)**
5:3
**Steinholt (29)**
1:13 2:9 6:7 7:13 9:2
71:14,19 103:7
132:12,17,20
135:15 150:12,15
183:5,10,13 220:15
239:22 240:2,5
241:25 242:2 296:9
296:14 334:14,19

334:22 335:3
**Steinholt's (2)**
255:20,21
**stemmed (2)**
42:10,10
**step (1)**
276:15
**stick (2)**
182:11,12
**sticks (1)**
214:25
**Stiglitz (1)**
161:17
**stock (141)**
64:14 65:8,10,23,25
66:3,14,22 67:1
72:8,22 73:1 76:2
76:12 77:12 79:20
81:3 82:24 83:23
84:11 85:19,23 86:7
87:21 88:6,7,10,20
89:13,20 90:7,7,13
90:21 91:2,3,23
92:2,3,5 96:18
99:13,21 101:17
103:24 104:2,3,4,6
105:2 106:23 107:3
107:7,14,17 113:11
113:12 115:18,22
116:4,9 117:8,12,15
117:18,20 118:11
122:7 123:2 124:4
131:18 136:19,24
141:6,23 142:14
149:9,10,11 154:12
156:20 157:7,25
160:11 161:8 162:5
162:6,25 163:8,16
166:21 170:11
171:25 172:2,14
173:11 174:15
177:15 199:16,17
199:20,22 208:14
220:25 221:9
222:24 224:6
225:13 237:23
240:6,14 246:21
252:16 253:7,21
257:10 262:19
263:2,6,25 267:21
267:24,25 272:17
272:18 273:10
285:17 298:22,24
304:18 307:20
308:23 310:23
311:16 314:9

315:24 317:17,18
317:23 318:18
328:16
**stock's (1)**
171:17
**stocks (19)**
5:6 89:12 100:2
133:16,21,24
134:10 135:1 136:4
136:8,16 137:8,12
142:6 145:14
148:11 156:10
161:23 174:15
**stop (3)**
67:5 104:5 267:21
**stopped (1)**
111:22
**stopping (2)**
60:18 67:4
**story (1)**
98:10
**straight (2)**
86:13 259:6
**straightforward (2)**
126:13 212:20
**strategic (1)**
247:2
**strategies (1)**
73:24
**Street (5)**
1:20 2:11 3:7,18 6:14
**stretching (1)**
144:21
**strictly (1)**
305:19
**strike (1)**
265:6
**strong (18)**
72:24 75:14 76:6,20
128:15 129:1,7
130:25 131:2
277:20 278:6,9,14
279:2,23 280:2,6,16
**structure (4)**
119:6 147:18 155:22
314:7
**studied (1)**
90:9
**studies (8)**
119:17,18 137:25
138:5,13,16 164:13
193:4
**study (99)**
104:18 109:21,25
111:10 112:4,7,8,8
112:11,17 114:1

118:19 119:5,6,8,14
119:20 122:9,14
124:16,17 125:4,14
125:19,21 126:21
126:24 127:14,16
128:9 137:5,8
164:21 165:18,25
166:6,18,19 167:2
167:21 168:9,13,24
170:3 183:15,21
184:2,4,6,24 185:4
185:13,19,22,25
186:1,6,11,14
187:23 189:20
190:3,5,6,24,25
191:1,7,12,13,18,24
191:25 192:4,8,12
192:14,20,24 193:1
193:6,13 194:8,9,13
194:15 196:2
201:17,22,24,25
218:17 261:9
287:17 299:7
304:25 306:19
311:1,21
**stuff (2)**
108:12 325:19
**subgroup (2)**
282:4,7
**subject (2)**
57:23 61:20
**subjective (4)**
163:4 199:15 214:4
290:23
**subjectively (1)**
291:7
**subjectivity (14)**
173:1,5,18 174:7
177:10,18,24 206:8
289:24 290:11,18
290:25 291:3,9
**submit (2)**
62:1,9
**submitted (12)**
8:3 9:6,8 19:24 24:1
51:17,21 52:16
105:22 183:19
192:14 238:23
**subscribed (2)**
336:21 337:22
**subsection (1)**
211:8
**subsequent (8)**
58:7 83:18 85:21 86:2
182:11,12 268:14
297:19

**subset (1)**
235:7
**substance (2)**
8:22 234:4
**substantial (6)**
51:19 65:11,12,13
140:22 311:23
**substantive (1)**
166:10
**sudden (2)**
104:3 308:10
**sue (1)**
320:24
**suffered (1)**
256:11
**sufficient (24)**
29:2,4 40:8 67:2
100:19 105:17
106:10 109:21
110:19 111:7 112:3
113:25 114:19
124:14 146:4
147:23 149:14
156:6 159:2 181:18
185:13 186:19
192:1 298:1
**sufficiently (1)**
303:5
**suggest (1)**
182:20
**suggesting (2)**
203:7 211:5
**summarized (1)**
297:20
**summarizing (1)**
113:18
**summary (2)**
169:17,20
**sums (1)**
165:15
**supervisor (1)**
20:9
**support (8)**
19:9,17 32:16 91:9
148:15 253:13
271:22 332:14
**supported (5)**
69:21 128:23 145:1,8
145:12
**supporting (1)**
237:23
**supports (1)**
91:24
**suppose (2)**
240:17 241:21
**Supreme (7)**

117:1,4 159:15,17
160:22 255:9,14
**sure (26)**
42:13 58:4 60:20
105:7 143:20
160:17 166:15
183:18 185:17,21
213:2 226:19
236:10,12 240:17
241:15,22,25
243:22 246:17
277:17 290:6 297:6
326:17 333:4,19
**surprise (9)**
102:19,22 220:1,2,3
287:23 311:19,24
331:21
**surprised (2)**
261:7 328:1
**surrounding (1)**
45:12
**suspected (1)**
304:3
**SVS (1)**
264:22
**swear (1)**
7:12
**sworn (2)**
7:14 337:22
**synopsis (1)**
31:2
**systematic (5)**
133:13 134:22 135:3
136:1,6
**systematically (1)**
168:24
**systemic (1)**
103:22

_____
**T**

**T (7)**
4:1,25 296:18,20,23
296:24 300:12
**T-statistic (13)**
202:4,16,25 204:1,2
204:17 205:8,17,25
218:25 219:8,11
329:24
**T-statistics (2)**
203:16,20
**Tabak (1)**
297:20
**tabs (1)**
9:11
**take (45)**
11:24 13:7,17,20,23

13:24 20:14 25:24
40:2 45:3 56:9 60:4
70:19 71:11 72:1
80:18 81:23 82:1,22
83:6,21 84:13,20
85:16 99:17 106:1
117:3 120:18
124:10,21 132:4
135:6 152:18
153:22 165:13
183:2 184:15
239:18 242:7
244:21 245:3 248:3
280:1 296:5 334:7
**taken (8)**
13:4 71:16 132:14
183:7 239:24
296:11 334:16
336:5
**takes (8)**
80:17 88:22 244:4,10
244:13,15 247:10
247:24
**talk (7)**
25:5 65:15 100:23
171:13 201:25
243:15 260:13
**talked (5)**
46:20 74:16 186:18
269:4 311:13
**talking (36)**
17:13 36:10 46:18
51:1 61:5 69:11
83:8 86:9 98:16
107:9 119:5 123:20
125:3 129:23 140:3
144:8 149:8 152:3
168:10 190:3 195:4
202:1 210:25
235:25 236:11
243:8,23 252:17
269:16 298:9
300:14 307:7 325:3
325:5 327:22 330:5
**talks (3)**
107:12 133:19 149:1
**tandem (4)**
92:20 93:7,11 94:5
**tapering (1)**
15:8
**target (1)**
277:8
**tasks (1)**
154:19
**taught (3)**
67:17,20,25

**teachers (1)**
13:20
**team (1)**
69:21
**tell (18)**
11:17 111:18 121:7,9
121:14,18,21 127:2
188:11 189:6
205:19 263:23
291:17 293:4 306:6
307:3 310:5 331:16
**telling (3)**
180:23 232:18 309:22
**tells (1)**
98:9
**template (2)**
70:20 168:24
**ten (3)**
18:25 22:5 24:10 25:7
34:4 70:11 179:14
179:17 295:20
**tend (2)**
265:7 282:16
**tenure (1)**
33:4
**term (13)**
20:18 57:3 74:15 87:4
116:8 171:1,14
178:7,12 210:1,6
279:22 300:1
**termed (1)**
74:15
**terminated (6)**
27:10,13 28:24
325:24 327:10
328:3
**termination (1)**
28:19
**terminologically (1)**
11:14
**terminology (6)**
47:16 86:13 87:6
128:8 280:22,23
**terms (57)**
22:15 28:10,11,12,15
34:17,25 39:7 40:20
44:13 47:17 53:9
54:10 55:10,19 57:2
58:6 63:11,20 67:7
68:17 76:18 77:17
85:25 97:13,19 98:5
113:14 116:7,17,23
127:7,7,13 143:8,19
148:23 174:14,18
175:5 181:9,12
192:17 200:21

205:11 209:25
216:22 225:17
232:24 270:16
276:16 288:10
292:23 295:16
305:15 318:16
328:22
**test (59)**
13:20 14:1 120:2,24
122:1,8 128:10,24
130:18 154:9
171:17,22 193:15
195:24 198:25
205:4,6,11 215:21
216:12 218:1,4
231:13 232:20
233:14 238:4 241:8
241:9 251:21 253:8
257:8 268:14,15
286:8 296:1,17,18
296:20,21,23,24,24
297:2,3,8,16,22
299:13,25 300:3,8
300:11,12,15,17,25
301:10 304:9
306:19
**tested (9)**
126:1 215:12 216:12
252:4,22,25 265:21
286:2,13
**testified (15)**
7:14 36:18 49:15
51:14 52:2,15,25
53:18 60:24 61:6,7
175:5 270:7 319:14
319:22
**testifies (1)**
49:12
**testify (2)**
49:17 155:18
**testifying (8)**
19:8,22 43:25 44:3,9
47:4 50:25 51:12
**testimony (31)**
19:9 24:17 36:3 41:17
41:25 43:3,13,14
44:7,16 45:3,18
64:22 77:16 121:17
122:13 153:24
155:7 176:2,4,5,6
179:21 190:10,12
190:14 202:13
213:9 230:8 248:10
336:10
**testing (4)**
121:7 270:23 271:2

295:24
**tests (11)**
13:17 73:11 74:6,20
75:14 87:1 137:6
177:20 191:24
299:14,22
**Texas (1)**
53:16
**text (1)**
151:5
**textbook (1)**
280:24
**Thaler (3)**
139:12,13 140:9
**thank (5)**
113:18 255:19 314:16
334:21,23
**the-Market (1)**
5:5
**theoretical (3)**
76:7,10 77:4
**theoretically (1)**
268:20
**theory (11)**
5:5 54:5,24 134:9
159:24 160:2
165:12 176:17
263:25 264:5,12
**Thereabouts (1)**
286:4
**thing (25)**
9:10 11:8,15 13:5
30:21 79:18 89:3
95:15 97:1 100:16
115:13 116:22
140:21 167:2
170:23 173:22
233:9 254:5 256:2
270:20 272:24
274:23 293:3 297:1
331:17
**things (36)**
11:4 27:6 34:6 44:5
81:25 96:3 97:12
99:24 104:8,11
106:1 114:17
126:20 140:8 164:6
172:10 173:14
182:9 191:7 225:8
231:11 233:15
239:7 241:8,9
244:21 248:14
258:19,20 260:3
270:20 273:17
297:12 305:23
316:13 330:8

**think (201)**
8:4,18 17:16 19:2
22:13 24:21,23,25
25:23 27:7,25 28:1
32:13 39:2 41:21
42:6,9 43:22 47:8
48:1,25 49:5,17
51:15 55:9 58:14
63:18,22 64:18,18
64:24 66:10,21,22
69:17 79:17,21,24
87:3 88:16 91:16
94:24 95:12,13 98:4
98:9,13,21,23 100:9
100:22,24,24 110:1
111:21 115:20
118:22 129:13
130:2 133:20
134:19 135:10
136:11,13,21 137:2
137:3,16 140:11
141:25 148:18,19
151:25 152:2,5
153:15 155:20
157:13 158:9,12,14
159:5 161:3,8,10,25
162:1,3 164:13,17
164:17 165:18,24
166:4,16 167:8
169:19,21 170:23
171:12 172:1,22,22
172:24,25 173:3,17
173:19,21,22,25
174:6,11,17 175:4
179:24 180:1
188:25 192:13
193:14 194:7 198:5
199:16,17 200:25
205:15 206:16
207:17,23 208:1
210:16,23 211:18
216:8,10 222:12,14
224:23 226:17
227:21,23 228:1,9
228:17,20 232:19
232:23,25 233:2,3
236:1,25 237:24
238:5 239:9 243:6
245:13,14,15 248:2
252:21 257:2
258:22 259:21,23
259:24 260:17
264:20 265:14
268:3,17 269:16
270:6,19 279:17
280:23 283:1,2,19

288:11 291:2 292:9
292:10 294:1,5
295:8 298:15 300:4
305:12 312:1,17
317:10 319:25
320:2,3 322:19
327:15 328:9,13
329:23 333:20
**thinking (2)**
182:3 191:16
**thinks (1)**
227:8
**third (4)**
6:19 152:22 273:24
312:10
**Thirty-five (2)**
8:9 18:25
**thought (24)**
20:13 27:1 28:6 94:8
105:9,10,17 106:8,9
182:17 189:15
190:21 202:8 207:4
211:25 214:5,12,17
214:18 215:6 217:3
231:1 237:12
241:16
**thousand (1)**
101:9
**three (12)**
8:15 13:17 77:4
129:11 188:16
246:9 280:12 303:1
312:14,15 314:15
330:16
**three-year (1)**
10:25
**threshold (6)**
154:15 233:5 298:7
298:16,19,25
**throw (2)**
292:18,19
**thumb (1)**
84:5
**Thursday (1)**
284:12
**tied (2)**
47:21 334:5
**time (140)**
1:19 8:3 13:4 14:2
15:4,5,21 16:2,19
17:6,7,8,23 18:21
19:12 23:11 24:2
25:14,24 26:6,9
28:7 30:13 31:2
32:10,25 33:5 34:2
34:8,23 35:21 37:16

38:8,15 41:12 44:20
46:3,8,19,20,22
48:24 49:9,19 50:9
51:14 58:18 69:15
70:6 71:14,19 80:17
80:19 81:24 82:2,15
82:20,20 83:6,7,9
83:22 84:14,20
88:22 95:8,9,13
97:11,17 101:4,14
103:18 104:10
111:22 123:8
132:12,17 133:24
133:24 152:18
153:22 157:23
162:11 179:9 182:9
183:5,10 190:11,13
190:15 201:2
203:25 210:1
212:23 213:18
214:17 218:13
225:8 235:2 236:6
236:19 237:10
239:22 240:2 242:8
242:17 244:4,10,12
244:13,21 245:3
247:9,25 248:3
262:18 264:1,16
265:3 267:1,16
270:21 271:9
274:10 279:21
288:13 292:17
296:9,14 299:10,23
302:6 305:24
330:19,21 334:14
334:19 335:3 336:5
**timely (1)**
26:15
**times (29)**
7:22,25 8:1,7,9,14,15
18:23,25,25 19:1
47:6 50:21 60:9,24
64:1,11 102:14,15
132:21 169:22
181:16 211:2
217:23 276:2 278:4
292:20 295:17,20
**timing (8)**
46:13 94:17 99:22
234:1,9 235:5,12,17
**tinker (1)**
278:17
**tinkering (1)**
281:9
**today (14)**
45:1 48:6 72:14 77:6

77:16 89:22 242:5
244:12 276:21
289:25 290:12
332:16,23 333:21
**today's (1)**
335:2
**toe (1)**
14:12
**told (4)**
22:3 27:18 222:24
319:16
**Tony (1)**
3:24
**tools (2)**
184:7 185:6
**top (4)**
95:2 135:19,21 230:2
**topic (1)**
135:4
**topics (1)**
257:18
**Torkelsen (19)**
18:8,9,17 19:5 20:14
20:17 23:23 24:12
25:16 27:10 28:3,12
28:16 29:1,6,9,10
30:4 32:2
**Torkelsen's (2)**
31:9,11
**total (9)**
104:20 111:6 112:2
200:1,20 212:17
217:12 227:18
269:1
**totality (4)**
152:1 261:20 263:7
288:24
**totally (2)**
199:13 312:13
**touchstone (1)**
197:21
**track (4)**
90:22 91:21 92:10
208:17
**trade (18)**
64:15 81:2,22 99:25
100:4 124:5 133:24
133:25 136:16
137:12 138:8
145:15 146:5
148:24 155:24
174:15 264:1 314:5
**traded (44)**
40:21 41:3 64:14 65:7
65:25 66:25,25 83:4
89:11,19 90:13

91:23 92:20 93:7
101:2 117:15 126:4
128:16 133:22
136:24 137:12
139:2,3,22 145:14
146:2,3 147:8 148:3
148:11 149:10
151:9 153:3 154:13
155:25 156:11
157:6,6 174:15
246:21 267:24,25
285:9 326:20
**trading (24)**
66:22 83:13 84:6
86:16,23 87:4,4,8,9
90:20 97:6,7,8
100:1 101:9 102:2,4
105:14 126:2
128:23 146:5 147:3
305:1 332:5
**traditionally (1)**
229:9
**trained (2)**
10:17 180:19
**training (2)**
10:19,24
**transactions (1)**
221:4
**transcribed (1)**
336:8
**transcript (3)**
336:9,12,14
**transition (1)**
267:23
**transitioned (1)**
16:10
**trap (1)**
282:14
**treated (1)**
61:20
**trial (1)**
19:10
**trials (1)**
52:2
**Trondheim (1)**
13:2
**trouble (1)**
257:12
**true (23)**
45:22 54:5 69:6 76:14
76:20 81:5,9 88:12
106:5 139:19
141:22,23 142:6
161:15 169:4
183:18 196:25
197:3 304:10

316:24 318:1 319:3
336:9
**truly (1)**
94:5
**trust (2)**
65:16 175:9
**trusted (1)**
176:1
**truth (10)**
57:4 76:23 105:3
253:8,11 260:8
303:19,20 318:13
333:13
**try (16)**
54:16 55:18 70:22
71:6 73:19 88:25
92:9 141:5 177:20
182:8 189:11 191:8
233:17 261:20
273:9 329:5
**trying (37)**
39:2 54:13 55:5 56:3
56:4,8,10,12,14,18
57:6,8,10 78:2,7
79:17 85:14 88:2
120:19 125:12
156:9 159:11
172:12 180:22
191:4 205:22
209:23 224:23
236:25 243:7
253:12 255:10
262:5 276:4 292:24
317:13 319:5
**TSG (2)**
6:18,22
**Tuesday (1)**
221:7
**turn (5)**
142:7 192:3 245:20
301:19 314:19
**turning (2)**
193:11 273:21
**turns (1)**
111:3
**TW0008399-426 (1)**
5:9
**TW0008494-522 (1)**
5:15
**Tweed (2)**
3:4 7:7
**twiddling (1)**
84:4
**twisting (1)**
111:15
**two (66)**

8:2,4,14 12:17 16:7
23:18,20 25:23
32:13 33:24 35:3
42:24 44:4 46:4
47:5 48:16 69:22
70:3 79:25 82:22,25
92:19 93:6 94:2,19
95:14 98:23 102:20
104:21 105:8
112:24 129:12
130:21 131:8
139:21,24 140:5,6
143:7,23 144:11,13
144:14,16,20
176:10 184:10
193:3 227:24
231:11 281:10,11
281:18,19 294:22
294:22 295:19
298:8,12,18 301:12
305:23 309:24
310:7 311:11
330:16
**two-year (5)**
12:9,13,19 33:4 270:8
**type (19)**
59:20 67:22 173:20
180:18 187:10
200:21,22 206:7,18
237:21,24 263:15
281:19 293:20,24
299:5 311:9 315:9
332:7
**typed (1)**
182:18
**types (6)**
15:1 83:4 245:6
314:25 317:19
328:11
**typical (1)**
73:5
**typically (36)**
20:8,9 39:6 72:20,21
76:3 79:10 84:18
126:25 136:22
155:10 171:13,14
191:1 202:18 228:5
228:22 234:14
238:25 249:18
254:1 280:5,7,21,22
281:20 294:10
300:4 302:10
305:16 306:4,6,17
309:1 315:23 320:8

_____
**U**

**U.S (12)**
92:19 93:2,4 94:18
149:9,9,10 174:15
227:13 228:4,21
255:9
**ultimate (2)**
78:1 171:17
**ultimately (7)**
19:24 28:18 82:1 83:5
178:4 287:2 309:8
**unable (1)**
89:9
**unanimous (1)**
174:14
**unanticipated (1)**
235:10
**unaware (1)**
21:11
**unbiased (7)**
166:17,20 167:4
238:8 239:6,10
254:24
**unbiasedly (1)**
246:23
**unclarity (1)**
85:24
**unclear (7)**
45:18 81:19 82:3
84:13 85:7,15 234:4
**uncommon (2)**
204:6,15
**uncovered (2)**
212:6 267:7
**undergrad (1)**
12:21
**undergraduate (1)**
12:22
**understand (34)**
11:6 85:14 88:2,18,19
88:21,22 109:18
143:15 152:15
155:14 158:11
172:12 192:6
193:18 219:20
230:22 232:3
233:21 243:6
256:13,15 262:5
275:23 276:4
277:17 278:13
283:8,11 293:5
299:17 317:9 326:9
333:19
**understanding (32)**
20:20 21:2,16 25:13
25:19 26:6,8,13
52:18,21,23 53:8

56:13,16 71:7 82:5
84:14 142:17
155:21 162:11
180:25 222:20
223:6 244:20 249:3
253:2 254:11 264:6
264:7 326:16
333:10,12
**understood (7)**
53:11 154:8 158:10
168:11 228:18
236:10 303:2
**unexpected (12)**
114:5 118:2 171:18
197:7,12,20 198:8
200:14 202:23
235:9 286:25 315:3
**unexpectedly (1)**
312:13
**unfair (1)**
165:14
**unfolding (1)**
325:25
**unique (1)**
174:23
**United (6)**
1:1 6:10 89:12 96:5
96:14 115:7
**universe (1)**
73:4
**university (5)**
12:4 13:2 67:17 68:23
68:25
**unnecessary (1)**
178:5
**unqualified (1)**
41:19
**unquote (1)**
160:5
**unrealistic (1)**
161:13
**unreliable (8)**
41:18 44:8 124:17
186:2,8,15 191:20
191:22
**untouched (1)**
9:16
**unusual (5)**
201:20 202:23 225:5
225:7,8
**update (1)**
70:20
**upstart (1)**
15:10
**USCN (1)**
210:9

**use (46)**
26:2 40:3,5 41:4 56:9
70:19,24 79:15
133:9 159:22
162:12 164:17,23
165:13 173:5
178:24 184:16
190:24 192:3,14,18
195:25 196:3 205:7
216:23 219:14
227:11 229:7,23,24
230:4,10 238:10
247:25 268:9,13
280:22 281:20
292:3,6 294:7,10
300:2,4 303:23
331:24
**useful (1)**
132:25
**uses (1)**
300:4
**usually (3)**
204:10 280:4 289:9
**utilize (1)**
15:9

_____

**V**

**v (6)**
43:19 45:19 53:13
135:23 158:20
180:6
**vague (2)**
17:25 269:13
**valid (1)**
193:8
**validity (1)**
170:2
**valuable (1)**
229:11
**valuation (30)**
11:2 26:22,23 27:2
30:1 31:6,12,14,19
31:22,24 32:6,17
33:1 37:17 38:12,14
38:17 39:22 40:1,12
40:17 50:7 140:6
141:19 143:12
148:5 157:9 184:7
185:6
**valuations (1)**
40:11
**value (38)**
40:4,9 79:13 80:3,8,8
80:8 94:1 119:2
120:10 141:2 142:6
143:8 148:7 185:7

208:6 216:3,4 218:9
218:11 230:22
233:12 240:7,22
254:25 266:11,13
276:12 279:14,16
286:22 305:21
307:23 308:5,15,25
309:9 310:17
**valuing (2)**
38:18 39:25
**variability (1)**
71:8
**variation (2)**
221:12,16
**variety (1)**
259:9
**various (6)**
16:17 132:21 135:25
297:17,18 328:11
**vary (3)**
241:19 242:18 267:16
**vast (3)**
17:17 38:7 103:9
**venture (36)**
14:17,20 15:4 17:14
18:10,11,18 23:3,14
23:18 24:2,11 25:14
25:20 26:4,11,19,21
27:1,5,11,16,20
30:9,14 31:4 32:4
33:16 34:2,7,12,18
35:7,22 37:10,12
**Venture's (1)**
27:22
**version (1)**
98:10
**versus (2)**
6:8 143:18
**video (2)**
6:6,18
**Videographer (18)**
3:24 6:5 7:11,16
71:12,17 132:10,15
183:3,8 239:17,20
239:25 296:7,12
334:12,17 335:1
**VIDEOTAPED (1)**
1:13
**view (34)**
39:6 54:8 55:3,4 65:2
142:6,17 147:21
148:9 149:13 153:7
156:4,14 160:21
165:21 174:5,14,21
179:3 181:12,17
191:25 194:8

198:13 248:9
262:12 270:16
290:10 291:19
292:23 296:1 309:5
316:18 326:18
**viewed (13)**
36:19 49:1 55:1
119:13 144:7
147:23 148:1,2
149:14 159:2
181:18 227:14
323:12
**viewing (1)**
49:2
**views (4)**
82:16 140:7 143:8
163:16
**Villella (2)**
1:4 6:8
**virtually (1)**
182:4
**virtue (1)**
104:13
**vocabulary (1)**
300:3
**volume (21)**
30:3 65:11 71:13,18
113:5 124:2 132:11
132:16 146:4,24
147:11 183:4,9
239:21 240:1 285:5
296:8,13 334:13,18
335:2
**vs (1)**
1:7

_____

**W**

**Waggoner (1)**
180:6
**waited (1)**
26:16
**waiting (1)**
190:20
**walk (1)**
327:1
**Walmart (2)**
258:12,13
**want (76)**
26:24,25 27:4 36:24
50:14 57:15 64:4
66:6,23 70:23 79:22
80:2 81:24 85:11
86:2,5 93:15 94:11
97:16 106:5 118:13
119:20 121:22
124:16,21 125:5,13

126:7 127:9,21
146:5 166:23 176:6
180:21 184:14,15
184:16 186:9 188:8
188:10 193:17
197:18 205:5,6,23
206:1 230:4 233:17
236:10 237:8,13
238:9,10 242:11
252:10 254:5
260:24 261:18
268:18 269:7 270:9
271:21 272:25
277:17 297:6
304:19 310:14,14
315:23 316:3 317:8
317:8 325:1 330:19
333:7,19
**wanted (14)**
26:22 29:15 36:18,22
36:23 45:15 79:8
91:8 133:11 208:13
237:16 306:17,18
330:14
**wanting (1)**
46:16
**wants (2)**
174:25 320:12
**wasn't (15)**
24:8 65:15 79:1
113:23 121:4 124:8
135:11 179:10
201:12 204:25
207:6 223:9,24
262:22 323:20
**way (54)**
18:1 22:11 24:18
30:12 37:6 42:3
51:14 70:17 80:16
81:21 84:2 93:22
99:19 117:18
120:16 125:6
136:12 143:21
146:10 152:5,6
155:19 164:9 178:4
193:14,16 197:18
208:14 222:7 225:4
231:13 232:16
233:13 237:23
241:15 256:2
261:22 262:2 280:7
281:23 282:12
283:1 284:17,25
289:3 294:9 297:13
303:16 307:14,15
309:4 310:13 320:9

332:4
**ways (7)**
79:25 157:21 172:19
218:6 294:3,22
307:21
**we'll (8)**
10:9 65:17 77:13
86:25 135:6 158:24
334:8,9
**we're (21)**
51:1 71:14,20 83:8
86:9 98:16 116:15
122:20 128:7 132:6
132:12 183:5,11
185:22 239:22
240:3 266:2 283:2
325:3,5 334:14
**we've (11)**
9:10,11 32:21 51:19
60:14 102:20 103:9
182:25 186:17
276:21 288:10
**weak (8)**
72:23 73:11,13,16,21
75:10 76:21,24
**weakness (3)**
259:17 260:18 261:11
**wearing (1)**
231:16
**Wednesday (1)**
221:3
**week (2)**
13:25 25:24
**weekly (1)**
33:19
**weeks (3)**
25:23 82:22,25
**weigh (1)**
187:13
**weight (1)**
320:12
**went (17)**
8:25 10:2,16 15:14,15
31:5 34:16 93:19,20
109:15 181:21
208:21,22 225:9
287:15 289:20
290:6
**weren't (1)**
48:17
**WHEREOF (1)**
336:20
**white (1)**
99:1
**wide (1)**
259:9

**widely (2)**
242:21 285:8
**wider (1)**
98:14
**withdraw (6)**
97:15 167:9 215:15
248:23 252:9 272:8
**withdrawn (7)**
39:10 60:23 87:13
106:8 149:4 183:23
299:20
**withholding (1)**
135:12
**witness (228)**
7:1,3,5,12 20:7 22:24
24:5 36:8 39:19
40:19 43:2 44:12,23
46:7,13 47:8,23
48:22 53:6,24 56:23
60:13,20 63:2 64:10
64:17 66:6,17 68:7
68:22 74:25 75:23
76:10 78:7 80:6
81:9,16 82:11 83:16
85:5 86:19 87:19
90:12 91:5,16 92:7
93:9 94:7,14 97:22
101:6 106:15 108:5
108:17 109:3 110:3
110:21 112:7
114:13 118:5,21
119:16 121:9,21
122:24 123:16,22
124:19 125:16
126:7 127:16
128:20 129:1 130:3
131:7 133:18
136:11 138:11
141:1,16 142:23
144:6 145:4,11
146:23 151:25
153:19 157:17
159:13 161:3
162:18 163:21
165:17 166:15
167:16 169:19
170:16 171:21
172:22 174:11
175:4,11,22 176:5
176:19 177:5 178:7
178:18 179:18
180:16 182:7
185:17 186:6 188:2
189:24 192:6 193:3
194:12,23 195:10
195:19 197:25

202:18 203:19
204:5,21 205:3,21
207:9,17 213:10
217:18 222:6,14
223:5,13,21 224:4
225:25 226:24
227:21 228:17
229:4 230:9,19
231:5 234:1 235:12
235:25 236:16
238:18 240:10,17
241:1,14,21 246:17
247:20 248:19
249:3,15,25 250:13
250:18 251:15
252:1 253:24
257:12,24 259:8,23
260:22 261:14
262:24 263:18
265:10 267:10
268:16 270:4
275:11 276:9
278:11 282:10,20
283:8 284:11,22
285:24 286:16
288:2 289:15 290:3
290:14 293:13
299:25 303:16
304:2 305:6 306:9
307:6,19 308:18
310:1 311:7 312:1
312:21 313:3,18,24
315:22 317:15
319:13 320:20
321:25 322:22
323:9 324:14 326:6
326:13 328:6
329:11,17 331:9,10
333:1 334:11,23
336:20
**won (1)**
139:13
**wondering (4)**
70:15 201:13 257:3
324:10
**word (12)**
54:6 79:16 87:25
172:12 178:11,14
178:15,24 197:11
210:22 280:2
309:13
**wording (2)**
70:13,15
**words (31)**
19:18 26:16 50:14
54:14 70:23 72:23

110:7 128:18 134:4
145:18 147:2
156:24 159:8,11
160:12 162:12
166:17 167:23
168:10 199:11,14
205:24 209:20,20
227:25 230:2 254:8
262:11 299:3 301:4
305:24
**work (42)**
14:19 16:25 17:9,11
18:17 19:7,12,15
25:21 26:25 27:4,15
28:15,16 29:2,4,11
29:16,25 30:3,22,24
34:21 35:25 36:23
37:9,12 38:2,7 39:1
39:4,4,7,21 41:14
49:7 59:13 299:18
**workable (3)**
186:4 189:22 192:4
**worked (18)**
18:5,19,20 19:14 23:3
23:9,14 25:8,15
29:25 32:2 33:17
42:20 48:24 69:25
103:10 224:17
269:18
**workforce (1)**
15:10
**working (8)**
19:5 25:17 35:9 50:13
50:15 60:4 62:14
70:21
**workload (2)**
28:11,12
**world (2)**
69:13 248:14
**worried (1)**
48:17
**worth (3)**
117:4 214:2,10
**wouldn't (24)**
47:12 100:21 102:22
112:16 125:19
204:6 205:16 219:6
230:19 241:8,9
261:22 265:1
268:10 270:4,14
280:16 281:15
283:4,14 306:5,6
307:22 308:4
**wow (1)**
204:1

**write (13)**
20:12 30:21,24,25
31:1 56:6 62:17
63:16 67:12,13
245:22 280:8
288:19
**writing (1)**
67:11
**written (7)**
21:4 54:8,8 63:17
64:22 150:10
169:15
**wrong (15)**
31:17 142:10 158:13
164:17 185:18
186:11 192:7,12
205:19 239:12
279:13,15,20
282:12 306:10
**wrongly (1)**
322:2
**wrote (6)**
54:10 57:4 88:16
291:21 297:14,20

_____
**X**
_____
**x (7)**
1:3,11 4:1,1,25,25
336:15

_____
**Y**
_____
**Yeah (1)**
284:15
**year (21)**
8:15 12:15 20:22 21:4
21:10,18 22:6 32:12
41:25 42:25 43:12
46:5 47:6 48:17
69:2 95:22 102:5
138:25 199:5
204:12 265:19
**years (34)**
8:17,19 12:17 15:13
15:16 16:7,8 17:3
18:18 21:22 22:5,17
23:4,8 24:10,11
25:7,9 32:14 33:20
35:3 36:11,14 38:5
52:20 67:9 69:5
101:25 102:1,5
134:15,19 181:22
182:1
**yesterday (1)**
221:7
**York (24)**
1:2 3:8,8 6:11,20,20

37:18 65:8,10,23
66:13,22 67:1 89:12
89:20 90:13,21
91:23 92:5 95:10
96:19 149:11
156:19 157:7

_____
**Z**
_____
**Z (12)**
296:17,20,24 297:2,3
297:8 299:13,14,22
299:25 300:11,17
**zebra (1)**
297:3
**zero (3)**
263:1,2 308:4
**Zohrabian (266)**
3:15 6:25,25 20:6
24:4 36:7 39:18
40:18 43:1 44:11,22
45:5 46:6,12 47:7
47:22 48:20 52:6
53:1,23 55:15 56:21
57:15,21 60:12,14
63:1 64:3,16 66:5
66:16 68:6,21 74:24
75:22 76:9 78:6
80:5 81:8,15 82:10
83:15 84:24 85:4
86:18 87:18 90:11
91:4,15 92:6 93:8
94:6,10 95:3 97:21
101:5 103:3 106:14
108:4,16 109:2
110:2,20 111:11
112:5 114:12 118:4
118:20 119:11,15
121:8,20 122:18,23
123:15,21 124:18
124:23 125:15,22
126:6 127:15
128:17 129:21
131:5 132:6 133:17
135:5 136:9 138:9
140:15,25 141:15
142:21 144:5 145:3
145:10 146:22
151:24 152:12
153:18 157:16
159:12 161:2
162:16 163:20
165:16 166:14
167:15 169:1,18
170:15 171:20
172:21 174:3,10
175:3,10,21 176:3

176:12,18 177:4
178:6,17 179:5,16
180:15 182:6,22
185:16 186:5,23
188:1 189:23 190:8
192:5 193:2 194:11
194:22 195:9,18
197:13,24 202:17
203:18 204:4,20
205:2,20 207:8,16
209:17,23 210:11
210:19,24 213:8
217:5,17 222:5,13
223:4,12,20 224:3
225:24 226:17,22
227:20 228:16
229:3 230:7,18
231:3 232:10
233:25 234:6
235:11,24 236:15
238:17 240:9,16,25
241:13,20 246:16
247:19 248:18
249:2,14,24 250:12
250:17 251:14,25
253:23 255:17,21
256:6 257:11,23
259:22 260:21
261:13 262:23
263:17 265:9 267:9
268:15 269:11
270:3 275:10 276:8
278:10 282:9,19
283:7 284:10,21
285:23 286:15
288:1 289:14 290:2
290:13 293:12
299:24 303:15
304:1 305:5 306:8
307:5,18 308:17
309:25 311:6,25
312:20 313:2,17,23
315:21 317:14
319:12 320:19
321:2,7,11,23
322:21 323:8
324:13 325:13
326:5,12 327:3
328:5 329:10,16
331:8,10 332:19,25
334:24
**zone (4)**
95:8,9 97:11,17

_____
**0**
_____

_____
**1**
_____
**1 (37)**
5:2 6:6 9:2,3 71:13,13
71:18 113:16
123:17,24 124:1
130:12 132:11,16
183:4,9 203:5 216:5
217:1 229:23
239:21 240:1 273:5
277:1,14 278:3,11
278:14 279:6,7
280:5 293:24 296:8
296:13 334:13,18
335:2
**1,186 (1)**
126:5
**1,187 (7)**
102:9 105:13 106:9
118:18 121:6 126:1
304:25
**1,187-day (1)**
121:19
**1.19 (1)**
329:24
**1.3 (4)**
278:24 279:18,19,21
**1.5 (2)**
279:13,16
**1.66 (1)**
218:24
**1.96 (3)**
219:9,13,14
**1/10/18 (1)**
5:3
**1:04 (1)**
132:18
**1:15-cv-02106-ER (1)**
6:12
**10 (10)**
71:25 203:4 229:23
273:1,4 280:21,25
281:3,4,5
**10-K (1)**
227:25
**10:19 (1)**
71:14
**10:36 (1)**
71:20
**100 (12)**
51:5 93:10,18,19,21
94:1,1,16,21,22
99:6 289:8
**10005 (1)**
3:8
**1024 (1)**
295:21

**10b-5 (2)**
14:25 16:21
**10th (1)**
9:8
**11 (2)**
14:25 16:21
**11:47 (1)**
132:12
**11th (1)**
325:17
**12 (1)**
163:5
**1200 (1)**
102:7
**1200-day (1)**
323:23
**1250 (1)**
102:5
**13 (6)**
255:3,6,7,9,18,18
**13-a16 (1)**
5:18
**13,897 (1)**
221:8
**135 (1)**
5:9
**13th (2)**
219:22 325:21
**14 (17)**
38:5 42:25 103:15
149:23 150:17
151:4 157:2,3
159:16 221:7 267:3
269:9 272:11
273:18 288:11
289:2,11
**14-month (4)**
267:8 268:1 269:21
271:8
**14,919 (1)**
221:5
**149397 (1)**
1:25
**15 (5)**
8:19 34:4 180:7 183:1
304:19
**15-cv-02106-ER-G...**
1:7
**150 (1)**
5:15
**157 (3)**
40:2,20 148:6
**15d-16 (1)**
5:19
**15th (5)**
218:22 221:2,3,13

302:18
**16 (3)**
295:19,20 310:8
**16th (2)**
220:23 325:23
**17 (2)**
147:19 158:25
**17th (1)**
329:22
**18 (4)**
178:2 194:13 196:10
301:19
**18th (16)**
101:21 104:19 194:2
194:15,19 195:7,16
195:22 215:3
302:16,19 311:13
315:13 326:10
328:8 333:11
**19 (52)**
87:2 104:19,23
107:18 108:17,24
109:12 110:14
111:3 112:15
113:24,25 128:11
128:12 129:3,11,18
193:20 195:25
198:21 201:9,15
214:25 215:13,17
216:25 217:3,23
229:16 238:3
265:21 274:1,12
275:5,25 276:4,18
276:23 277:8 278:3
278:22 280:13
281:10,11 282:3,6
283:14 284:15
285:21 286:5
287:25 289:2
**1934 (1)**
5:20
**1980 (2)**
88:17 161:18
**1990 (2)**
23:7,9
**1992 (1)**
15:23
**1997 (6)**
12:12,14,16,18 27:7,8
**1998 (6)**
23:7,10 26:20,22
27:22 30:5
**1999 (2)**
12:12,15
**1st (1)**
96:3

---

**2**

**2 (15)**
5:4 71:18 105:14
113:16 123:18,24
124:1 132:11
135:15,16 142:2
220:23 241:25
242:2 299:5
**2,000 (1)**
69:9
**2,500 (1)**
212:11
**2,900 (2)**
212:9,12
**2:07 (1)**
183:5
**2:30 (1)**
183:11
**20 (34)**
21:22 22:17 25:9
32:14 36:11,14
59:17,19 69:5
104:20 105:4,13
106:8,9 108:3,19,21
108:25,25 109:7,17
109:19,20,25
110:18 111:6 112:2
113:23 134:19
274:12,13,14
279:12 286:4
**20-F (4)**
227:1 259:14 261:17
262:4
**2000 (1)**
33:9
**2000s (1)**
23:22
**2003 (1)**
8:18
**2005 (1)**
38:12
**2008 (2)**
20:20 38:13
**2010 (8)**
101:21 209:15,16
210:5,8 266:19
267:2 268:2
**2011 (3)**
266:24 267:3 268:2
**2013 (4)**
41:16 42:25 49:15
264:24
**2014 (10)**
41:24 42:21 45:9
46:22 49:16 218:22
220:24 221:2,3,13

---

**2015 (13)**
101:21 104:19 194:2
195:16 209:15,16
210:5,9 236:5
259:15 301:19
302:17,19
**2018 (7)**
1:18 2:4 6:2,15 9:8
336:22 337:23
**21 (2)**
134:7 218:17
**220 (1)**
5:20
**24 (1)**
70:9
**24.5 (1)**
281:13
**25 (3)**
100:3,3 103:11
**250 (1)**
102:4
**2500 (3)**
212:5,12,16
**26 (1)**
212:4
**27th (3)**
323:1 324:11 325:8
**28 (1)**
3:7
**289 (1)**
135:23
**29 (1)**
329:21
**290 (6)**
134:20 135:19,21,24
242:14,16
**2900 (2)**
212:17,18
**294 (2)**
245:20 246:3

---

**3**

**3 (14)**
5:10 89:7 100:20
113:16 123:18,24
124:1 132:16
150:12,13,16 183:4
237:24 314:16
**3:40 (1)**
239:22
**30 (6)**
92:14,16 101:20
266:19 267:1 268:2
**31st (3)**
266:4 267:3 268:2
**32 (2)**

---

310:8,8
**35 (1)**
51:15
**36 (2)**
196:11,22
**38 (2)**
106:25 115:23
**3Com (1)**
140:21

---

**4**

**4 (16)**
5:16 99:16,24 100:5
113:16 123:18
158:18,21 178:15
178:18,21,25 183:9
220:15,16 239:21
**4.01 (2)**
218:25 219:16
**4:03 (1)**
240:3
**40 (10)**
8:9 51:15 129:2
196:13,15 199:24
271:25 273:21,25
288:17
**400 (3)**
212:6,12,16
**41 (1)**
333:8
**44 (1)**
288:15
**451 (2)**
152:10,21
**455 (1)**
154:2
**457 (4)**
151:6 153:17,25
314:19
**46 (2)**
99:15 333:8

---

**5**

**5 (68)**
106:18 107:11 108:1
109:7 110:23
113:14 114:23
116:13,16 123:23
123:25 135:10
151:23 156:1
157:14,19 158:10
170:7 171:3 173:5
175:9,15 176:16
177:21 178:3,22
179:4,23 180:1
181:9,13 184:22

---

187:10 190:4 196:4
203:4 218:11,13
219:13,15 229:22
229:24 230:3 233:5
238:20 240:1
265:24,25 266:15
272:22 273:5 274:2
274:10,12 275:7
276:12,20,24
277:11 278:1,23
279:5,7,24 280:14
281:6 296:8 306:21
**5.77 (1)**
218:25
**5:16 (1)**
296:9
**5:35 (1)**
296:15
**50 (4)**
18:12 99:13,14
115:21
**500 (1)**
115:7
**55 (2)**
298:4 314:20
**56 (2)**
101:23 185:5
**58 (1)**
103:1

---

**6**

**6 (5)**
158:8 255:18 296:13
318:6 334:13
**6-K (19)**
5:20 220:18,23
221:17,21 222:21
223:3 225:19
226:11,11 227:11
233:10 235:20,22
236:13,17,23,24
238:2
**6-Ks (17)**
221:22,23 227:2,4,17
228:1,13 229:8,15
229:25 232:6 233:8
233:20 234:24
235:8 237:6 238:11
**6.6 (1)**
280:14
**6:21 (1)**
334:14
**6:23 (1)**
334:20
**6:24 (2)**
335:4,5

---

**6811 (3)**
1:24 2:13 336:25

---
**7**
---

**7 (3)**
4:3 334:18 335:2
**7.35 (1)**
221:6
**7.5 (1)**
219:2
**70 (2)**
102:25 287:20
**747 (1)**
6:19
**75 (1)**
17:6

---
**8**
---

**8-K (1)**
227:12
**8-Ks (4)**
228:4,13,21 238:11
**80 (2)**
58:18,20
**87.5 (1)**
287:21
**89 (1)**
12:19

---
**9**
---

**9 (4)**
1:18 2:4 5:3 6:2
**9:05 (4)**
1:19 2:5 6:3,16
**90 (2)**
17:7,18
**90s (2)**
42:21 99:7
**92 (6)**
93:5 94:23 98:1 99:4
99:12,14
**94104 (1)**
3:19
**95 (1)**
17:18
**98 (2)**
69:17,24
**99 (2)**
12:17,18
**9th (2)**
6:15 336:22