UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

MEGAN VILLELLA, Individually and on
Behalf of All Others Similarly Situated,

      Plaintiff,

  vs.

CHEMICAL AND MINING COMPANY OF
CHILE INC., et al.,

      Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:15-cv-02106-ER-GWG
(Consolidated)

<u>CLASS ACTION</u>

OPPOSITION TO DEFENDANT
CHEMICAL AND MINING COMPANY OF
CHILE, INC.'S MOTION TO EXCLUDE
THE TESTIMONY OF PLAINTIFF'S
EXPERT, BJORN I. STEINHOLT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   LEGAL STANDARD .........................................................................................4

III.  ARGUMENT ......................................................................................................6

    A.    Steinholt Is Qualified to Opine on Market Efficiency and Damages ....................6

        1.    Numerous Courts Have Found Steinholt Qualified to Opine on
            Market Efficiency and Damages.............................................................6

        2.    The Court Should Not Countenance SQM's Attempt to Disqualify
            Steinholt Due to Past Actions of Others in Which He Played No
            Part ........................................................................................................10

    B.    Steinholt's Market Efficiency Opinion Is Relevant and Reliable for
        Determining Whether the Market for SQM ADS During the Class Period
        Was Efficient ........................................................................................................13

        1.    Steinholt's Analysis of the Indirect *Cammer* and *Krogman* Factors
            Is Reliable ............................................................................................13

        2.    Steinholt's Analysis of *Cammer* 5's Cause-and-Effect Is Reliable ..........16

            a.    Steinholt's Financial Release Event Study Is Reliable .................19

            b.    SQM's Multiple Comparison Argument is Flawed ......................20

            c.    SQM Incorrectly Claims That Steinholt Failed to Test Non-
               Financial Allegation Related Information .....................................21

            d.    Analyzing the Last Day of the Class Period Is Proper...................22

            e.    SQM's Atomistic Criticisms Miss Steinholt's Holistic
               Analysis........................................................................................23

        3.    Steinholt Offers An Economic Opinion Grounded in the Governing
            Legal Framework ..................................................................................23

IV.   CONCLUSION..................................................................................................24

# TABLE OF AUTHORITIES

Page

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
   572 F.3d 221 (5th Cir. 2009) .................................................................................9

*Angley v. Uti Worldwide Inc.,*
   311 F. Supp. 3d 1117 (C.D. Cal. 2018) ...............................................................20

*Barrie v. Intervoice-Brite, Inc.,*
   2006 WL 2792199 (N.D. Tex. Sept. 26, 2006).......................................................9

*Boucher v. U.S. Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996) ....................................................................................18

*Brown v. China Integrated Energy Inc.,*
   2014 WL 12576643 (C.D. Cal. Aug. 4, 2014)......................................................12

*Cammer v. Bloom,*
   711 F. Supp. 1264 (D.N.J. 1989) ...................................................................*passim*

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
   310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................15, 17, 18, 20

*Chen-Oster v. Goldman, Sachs & Co.,*
   114 F. Supp. 3d 110 (S.D.N.Y. 2015)....................................................................5

*Chill v. Calamos Advisors LLC,*
   2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018)...........................................................6

*Cunha v. Hansen Nat. Corp*
   2013 WL 12124073 (C.D. Cal. June 20, 2013) ......................................................8

*Dandong v. Pinnacle Performance Ltd.,*
   2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)..........................................................5

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993).......................................................................................*passim*

*George v. China Auto. Sys., Inc.,*
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) .........................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.,*
   573 U.S. 258 ..................................................................................................*passim*

**Page**

*IBEW Local 90 Pension Fund v. Deutsche Bank AG,*
    2013 U.S. Dist. LEXIS 155136 (S.D.N.Y. Oct. 29, 2013) ....................................................18

*In re Accredo Health, Inc.,*
    2006 U.S. Dist. LEXIS 97621 ........................................................................................22

*In re BankAtlantic Bancorp, Inc. Sec. Litig.,*
    2010 WL 11426133 (S.D. Fla. Aug. 25, 2010)............................................................12

*In re Fed. Home Mortg. (Freddie Mac) Sec. Litig.,*
    281 F.R.D. 174 (S.D.N.Y. 2012) ...................................................................................18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    245 F.R.D. 147 (S.D.N.Y. 2007), *aff'd in part and vacated in part on other*
    *grounds,* 574 F.3d 29 (2d Cir. 2009) ...........................................................................17

*In re Groupon, Inc. Sec. Litig.,*
    2015 WL 1043321 (N.D. Ill. Mar. 5, 2015).........................................................12, 16, 21, 24

*In re Novatel Wireless Sec. Litig.,*
    2013 U.S. Dist. LEXIS 154599 (S.D. Cal. Oct. 25, 2013) .........................................8

*In re NII.Holdings, Inc. Sec. Litig.,*
    311 F.R.D. 401, 412 (E.D. Va. 2015) ......................................................................21, 22

*In re NYSE Specialists Sec. Litig.,*
    260 F.R.D. 55 (S.D.N.Y. 2009) .....................................................................................5

*In re Petrobras Sec. Litig.,*
    862 F.3d 250 (2d Cir. 2017)....................................................................................23, 24

*In re PolyMedica Corp. Sec. Litig.,*
    453 F. Supp. 2d 260 (D. Mass. 2006) .....................................................................18, 19

*King Cty., Wash. v. IKB Deutsche Industriebank AG,*
    916 F. Supp. 2d 442 (S.D.N.Y. 2013).............................................................................8

*Krogman v. Sterritt,*
    202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................... *passim*

*Liberty Media Corp. v. Vivendi Universal,*
    874 F. Supp. 2d 169 (S.D.N.Y. 2012)............................................................................5

**Page**

*Lumen v. Anderson,*
   280 F.R.D. 451 (W.D. Mo. 2012) ...........................................................................8

*Marcus v. J.C. Penney Co.,*
   2016 U.S. Dist. LEXIS 115795 (E.D. Tex. Aug. 29, 2016) ....................................8

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,*
   2012 WL 2568972 (S.D.N.Y. July 3, 2012) ............................................................5

*McCullock v. H.B. Fuller Co.,*
   61 F.3d 1038 (2d Cir. 1995) .................................................................................10

*McIntire v. China MediaExpress Holdings, Inc.,*
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................. *passim*

*Merryman v. Citigroup, Inc.,*
   2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) .......................................................18

*Nimely v. N.Y.C.,*
   414 F.3d 381 (2d Cir. 2005) ...................................................................................4

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.,*
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .....................................................20

*Petrie v. Elec. Game Card, Inc.,*
   308 F.R.D. 336 (C.D. Cal. 2015) ..........................................................................20

*Pirnik v. Fiat Chrysler Autos., N.V.,*
   327 F.R.D. 38 (S.D.N.Y. 2018) .............................................................................17

*Restivo v. Hessemann,*
   846 F.3d 547 (2d Cir. 2017),
   *cert. denied* __U.S.__, 138 S. Ct. 644 (2018) ......................................................17

*Ret. Fund v. J.P. Morgan Chase & Co.,*
   301 F.R.D. 116 (S.D.N.Y. 2014) .............................................................................4

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.,*
   2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018) ...................................................13, 18

*Ryan v. Flowserve Corp.,*
   245 F.R.D. 560 (N.D. Tex. 2007),
   *rev'd in part and vacated in part*, 572 F.3d 221 (5th Cir. 2009) ............................9

**Page**

*Scott v. Chipotle Mexican Grill., Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................................5

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)........................................................................................5

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017),
    *cert. denied*, __ U.S. __, 138 S. Ct. 79 (2018) ............................................. *passim*

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) .............................................................................17

*Willis v. Big Lots, Inc.*,
    2017 U.S. Dist. LEXIS 38933 (S.D. Ohio 2017).................................8, 10, 16, 23

*Wilson v. LSB Indus.*,
    2018 U.S. Dist. LEXIS 138832 (S.D.N.Y. Aug. 13, 2018)....................................22

**RULES**

Federal Rules of Evidence
    702.................................................................................................................. *passim*

Fed. R. Civ. P.
    Rule 23 .........................................................................................................................5
    Rule 23(b)(3)...............................................................................................................18

**OTHER AUTHORITIES**

Grigori Erenburg, Janet Kiholm Smith, and Richard L. Smith, , *The Paradox of
"Fraud on-the-Market" Theory: Who Relies On the Efficiency of Market Prices?* ,
8 J. Empirical Legal Stud. 260 (2011). .......................................................................15

Mukesh Bajaj, Sumon C. Mazumdar and Daniel A. McLaughlin, *Assessing
Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine After Wal-
Mart and Amgen* ...........................................................................................................15

*Brad M. Barber, Paul A. Griffin and Baruch Lev, The Fraud-on-the-Market
Theory and the Indicators of Common Stocks' Efficiency, 19 J. Corp. L. 285, 285-
286 (1994)*.....................................................................................................................16

## I.   INTRODUCTION[1]

SQM sets forth three arguments for disqualifying Plaintiffs' expert Bjorn I. Steinholt's ("Steinholt") opinions on market efficiency and damages related to his qualifications, his associations and his methodology.  Not one is persuasive.

First, Steinholt is eminently qualified to offer the opinions at issue.  He has consistently withstood opposing parties' attempts to exclude his opinions during the more than 15 years he has proffered expert testimony.  He is plainly qualified by virtue of his education and experience to testify on market efficiency and damages, and numerous courts have so held.  Steinholt used the same generally accepted methodologies routinely endorsed by courts in assessing market efficiency and damages.  His conclusions that the market for SQM ADS[2] was efficient during the Class Period,[3] and that damages may be measured on a classwide basis are both relevant and reliable.

Second, SQM's attempt to disqualify Steinholt by linking him to the misconduct of the president of the first company he worked at more than two decades ago is completely untenable. Steinholt testified clearly that he had no involvement, or even knowledge, of the wrongdoing until well after he had left the firm.  He neither reported directly to him, nor worked in the same office. SQM's attempted character assassination based on guilt-by-association should not be countenanced. Nor does the fact that Steinholt's former partner had two expert opinions deemed unreliable have any bearing on anything at issue here.  Steinholt had nothing to do with the reports in question.  Such unfounded attacks have no appropriate place in a motion to exclude.

---

[1]   The "Defendant" "SQM" is The Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Quimica y Minera de Chile S.A.).

[2]   "ADS" refers to SQM American Depository Shares.

[3]   The "Class Period" refers to SQM's ADS traded between June 30, 2010 and March 18, 2015.

Finally, SQM contends that Steinholt's methodology for examining market efficiency is unsound. But what SQM is truly taking issue with is the long-settled doctrine that frames a market efficiency analysis at the class certification stage of a securities fraud case, *i.e.*, the factors articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*"), and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) ("*Krogman*"). Like courts throughout the country, the Second Circuit considers the *Cammer* and *Krogman* factors as relevant and reliable means for proving market efficiency.[4]  *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 79 (2018) ("*Waggoner*").

Neither SQM nor its expert, Walter N. Torous, Ph.D., ("Torous"), challenge Steinholt's analysis of 7 of the 8 *Cammer* and *Krogman* factors, which all evidence market efficiency.[5]  Nor could they; the analysis of each factor is objective and overwhelming. Nor do they challenge Steinholt's regression results. In fact, SQM's expert relies on them. SQM challenges only Steinholt's interpretation of the regression results relating to the 19 financial releases and the corrective disclosure ending the Class Period, *i.e.*, Steinholt's event studies under a single *Cammer* factor (*Cammer* 5). But its challenge provides no ground for exclusion. SQM's challenge to Steinholt's conclusions rests on a strict interpretation of perfect market efficiency inapplicable in the reliance context, as has been explained repeatedly by the Supreme Court. Most recently, in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 ("*Halliburton II*"), the Court stated it would decline to enter "the debate among economists about the degree to which the market price of a

---

[4]   The five *Cammer* factors are: (1) the average weekly trading volume; (2) the number of securities; (3) the extent of market-maker trading; (4) Form S-3 eligibility; and (5) direct evidence of a cause-and-effect relationship ("*Cammer* 5"). The three *Krogman* factors are: (1) market capitalization; (2) the bid-ask spread; and (3) the float. *Waggoner*, 875 F.3d at 94.

[5]   SQM and its expert do not challenge: (1) the average weekly trading volume; (2) the number of securities; (3) the extent of market-maker trading; (4) Form S-3 eligibility, under *Cammer*; (5) market capitalization; (6) the bid-ask spread; and (7) the float, under *Krogman*.

company's stock reflects public information about the company" because "*Basic*'s presumption of reliance . . . does not rest on a 'binary' view of market efficiency" but rather "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[6] *Id.* at 71-272.

Although SQM attempts to legitimize its attack on settled doctrine by reference to economic literature, the *Halliburton II* Court's reliance on the Brief of Financial Economists as *Amici Curiae* in Support of Respondents shows that economists support Steinholt's analysis.  That *amicus* brief, joined by prominent economists including Nobel Laureate Eugene Fama, regarded as the "'father' of the efficient markets hypothesis," and two of Torous' faculty colleagues, makes clear that contemporary economists overwhelmingly agree that securities traded on markets such as the New York Stock Exchange ("NYSE") (on which SQM's ADS traded) respond promptly to material information.[7]  Baig Decl., Ex. C at 4, 6.  In other words, the *amicus* brief continued, "economists generally do not disagree about whether markets respond to material information.  Indeed, even leading economists who dispute that markets are perfectly efficient, such as Professor Shiller, agree that "'[o]f course, prices reflect available information.'"  *Id.* at 9.  The Court in *Halliburton II* relied on this *amicus* brief to reiterate that the *Basic*  presumption did not "'conclusively . . . adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'"  *Halliburton II*, 573 U.S. at 271-272.  As *Halliburton II* concluded, "the debate among economists about the degree to which the market price of a company's stock reflects public information about the company – and thus the degree to which an investor can earn an abnormal,

---

[6]   Citations are omitted and emphasis is added throughout unless otherwise noted.

[7]   Declaration of Aelish M. Baig in Support of Plaintiff's Reply in Support of Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel and Opposition to Defendant Chemical of Chile, Inc.'s Motion to Exclude the Testimony of Plaintiff's Expert, Bjorn I. Steinholt ("Baig Decl."), filed concurrently herewith.

above-market return by trading on such information" – does not refute "the modest premise underlying the presumption of reliance."  573 U.S. at 271-72.

Regardless, even if Steinholt's event study conclusions underlying his *Cammer* 5 analysis are flawed (they're not), the Second Circuit has made clear that an event study is not even required to establish market efficiency for heavily traded ADS listed on the NYSE and followed by analysts. *Waggoner*, 875 F.3d at 97-99.  As mentioned above, neither SQM nor Torous takes issue with Steinholt's conclusion that SQM ADS were listed on the NYSE and widely followed by analysts.

At best, SQM's criticisms of Steinholt's event study affect the weight afforded to, not the admissibility of, his opinions.  Steinholt's qualifications and methodology meet every requirement of the Federal Rules of Evidence 702 ("Rule 702").  SQM's motion should be denied.  ECF No. 128.

## II.   LEGAL STANDARD

Rule 702 governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

It is "'a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions.'"  *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 127 (S.D.N.Y. 2014) (quoting *Nimely v. N.Y.C.*, 414 F.3d 381, 395 (2d Cir. 2005)).  As such, expert evidence is presumptively admissible.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). A district court's role is limited to "ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). So long as an expert employs "'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field,'" he satisfies the *Daubert* requirements and his testimony should be admitted. *Liberty Media Corp. v. Vivendi Universal*, 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012).

Only "serious flaws" in an expert's reasoning or methodology warrant exclusion. *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09 Civ. 3255, 2012 WL 2568972, at *16 (S.D.N.Y. July 3, 2012); *see also Scott v. Chipotle Mexican Grill., Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016). As such, exclusion of expert testimony is intended to be "the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see also NYSE Specialists*, 260 F.R.D. at 65 (same). Accordingly, the appropriate means of challenge is not exclusion but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

In the context of a class certification motion, courts in the Second Circuit limit the *Daubert* inquiry to whether or not the expert's testimony is admissible to establish the requirements of Rule 23. *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013); *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009) (same). "'When the fact-finder is the court,' as is the case here, 'expert evidence should be quite freely admitted'" and questions of qualifications and reliability should go to the weight afforded the expert's opinion. *Chill v. Calamos Advisors LLC*, No. 15 Civ. 1014 (ER), 2018 WL 4778912, at *7 (S.D.N.Y. Oct. 3, 2018).

### III.   ARGUMENT

#### A.   Steinholt Is Qualified to Opine on Market Efficiency and Damages

##### 1.   Numerous Courts Have Found Steinholt Qualified to Opine on Market Efficiency and Damages

Steinholt is eminently "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 428 (S.D.N.Y. 2014). He holds a graduate business degree from the University of San Diego. ECF No. 75-4 ("Steinholt Rpt."), Ex. A at 2; ECF No. 130-1 ("Steinholt Depo.") at 9:5-18. During his graduate studies, Steinholt "was a research assistant to the investment professor at University of San Diego [and] did investment research under his guidance for a year and a half," "was trained in finance, in investment research, in evaluation, in statistics, econometrics," and worked as a graduate fellow analyzing international equity markets and developing computer programs for portfolio optimization and risk minimization. Steinholt Rpt., Ex. A at 2; Steinholt Depo. at 9:5-18, 10:16-11:3, 68:22-69:2.

Further, Steinholt is a Chartered Financial Analyst ("CFA") – the preeminent designation for finance and investment professionals focusing on investment management and financial analyses of common stock and other investments. Steinholt Rpt., Ex. A at 2; Steinholt Depo. at 10:24-11:3. The CFA qualification "is roughly equivalent to a specialized postgraduate finance degree." *Free degrees to fly – Higher Education Special Report*, The Economist.com (Feb. 24, 2005) https://www.economist.com/special-report/2005/02/24/free-degrees-to-fly; *see also* Will Kenton, *Chartered Financial Analyst (CFA)*, https://www.investopedia.com/terms/c/cfa.asp (Dec. 21, 2018) ("The CFA charter is one of the most respected designations in finance and is widely considered to be the gold standard in the field of investment analysis."). Since receiving his CFA, Steinholt has for the last 20 years participated in the CFA Institute's continuing education program, and attended

CFA conferences including one in May 2018 where Nobel Laureate Daniel Kahneman and other experts discussed topics in finance and investment management. Steinholt Depo. at 69:3-11.

Currently, Steinholt is a managing director at Caliber Advisors, Inc., a full-service valuation and economic consulting firm. Steinholt Rpt., Ex. A at 1. In this capacity, Steinholt has provided a range of financial and economic analyses for a variety of litigation and non-litigation purposes. *Id.* Prior to Caliber Advisors, Steinholt was a principal at Financial Markets Analysis, LLC for 14 years, where he provided similar capital markets consulting, valuation services and litigation consulting. *Id.* Before that, Steinholt was a principal at Business Valuation Services, Inc., a national, full-service financial valuation firm, where he provided valuations of businesses and financial securities, as well as litigation support. *Id.* Steinholt began his career at Princeton Venture Research, Inc. as a financial analyst before rising to the level of senior vice president. Steinholt Rpt., Ex. A at 2. While at Princeton Venture Research, Steinholt provided financial and economic analyses relating to venture capital, investment banking and litigation consulting. *Id.* All told, Steinholt has over 25 years of experience providing capital markets consulting, which includes providing financial and economic analysis in securities litigation as well as in connection with mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure, securities analysis and financial valuations. Steinholt Rpt., ¶¶1-2.

These qualifications are more than sufficient to meet the Rule 702 standard. Steinholt's report identifies 14 cases during the last 15 years where he submitted an expert report analyzing market efficiency in a reliance context. *Id.* In none of these cases was his testimony excluded. To the contrary, courts routinely vet his qualifications and opinions and find him qualified and his opinions admissible. *See, e.g., Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2017 U.S. Dist. LEXIS 38933, 652, 654-55 (S.D. Ohio 2017) ("Plaintiffs have shown by a preponderance of the evidence

that Steinholt is qualified and that his opinions are both relevant and reliable."); *In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB), 2013 U.S. Dist. LEXIS 154599, at *44 (S.D. Cal. Oct. 25, 2013) (denying *Daubert* challenge: "The Court concludes that Steinholt's testimony on loss causation and damages, based on his event study analysis, is reasonable and reliable."); *Marcus v. J.C. Penney Co.*, No. 6:13-cv-736-MHS-KNM, 2016 U.S. Dist. LEXIS 115795, at *19-*23 (E.D. Tex. Aug. 29, 2016) (relying on Steinholt's event study analysis in finding the market efficient); *Lumen v. Anderson*, 280 F.R.D. 451, 461 (W.D. Mo. 2012) (finding Steinholt's opinions on market efficiency "helpful"); *see King Cty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 453 n.67 (S.D.N.Y. 2013) (finding Steinholt's loss causation opinion "[o]f particular relevance" at summary judgment).  In fact, despite the numerous times he has submitted expert opinions and provided expert testimony, no court has ever sustained a *Daubert* challenge to Steinholt.  Steinholt Depo. at 58:9-11.

SQM relies on three out-of-circuit, pre-*Waggoner* opinions to support its contention that Steinholt is not sufficiently qualified, but even these cases counsel that Steinholt should not be excluded.  First, SQM relies on *Cunha v. Hansen Nat. Corp.*, but the court there "reject[ed] any effort—*Daubert*-based or otherwise—to have either side's expert reports and testimony excluded."[8] No. 08-1249-GW(JCx), 2013 WL 12124073, at *7 (C.D. Cal. June 20, 2013).  Moreover, the court noted that its decision denying class certification hinged on the notion that a sufficient showing under the first four *Cammer* factors could not overcome an insufficient showing under *Cammer* 5, which predates and conflicts with *Waggoner*.  *Id.* at *8.

---

[8]   The denial of class certification in *Cunha* was without prejudice, and the court noted that "the evidence does not suggest that the market is clearly inefficient or that a showing of market efficiency would be impossible."  Baig Decl., Ex. E.

Second, SQM relies on *Barrie v. Intervoice-Brite, Inc.*, but that court accepted Steinholt's expert testimony that the market was efficient.  No. 3:01-CV-1071-K, 2006 WL 2792199, at *8-*9 (N.D. Tex. Sept. 26, 2006).

Third, SQM relies on *Ryan v. Flowserve Corp.*, 245 F.R.D. 560 (N.D. Tex. 2007), *rev'd in part and vacated in part*, 572 F.3d 221 (5th Cir. 2009), which is unconvincing here for two reasons. First, Steinholt's opinion in that case concerned loss causation, not market efficiency, in a pre-*Halliburton* context where loss causation was part of the class certification analysis in the Fifth Circuit. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230, 232 (5th Cir. 2009). While the district court faulted Steinholt's loss causation analysis, it made no criticism of his qualifications. *Ryan*, 245 F.R.D. at 573.  Second, the Fifth Circuit reversed, vacated, and remanded the district court's opinion. *Alaska Elec. Pension Fund*, 572 F.3d at 221.  The panel, which included Justice O'Connor (who sat by designation), issued a *per curiam* opinion  holding that the district court's analysis of loss causation opinion was improper. *Id.* at 231.  Far from criticizing Steinholt, the panel credited his opinion: "Alaska introduced expert testimony to show that statistically significant proportions of those declines in share price were attributable to company-specific factors, not to market-wide factors." *Id.* at 226.  While loss causation is not at issue here, the Fifth Circuit's reliance on Steinholt's testimony undermines SQM's assertion that he is unqualified.

SQM also repeats assertions previously raised and flatly rejected by labeling Steinholt a "serial litigation consultant."  ECF No. 129 ("Mot.") at 1, 6. SQM's assertion ignores Steinholt's extensive experience in valuing securities and assessing efficiency.   The same assertion was compellingly rejected in a recent opinion:

> Defendants critique Steinholt's *curriculum vitae*, arguing that he is not affiliated with an academic or research institution, that he does not hold a degree in economics, and that he has not authored any academic publications, made any presentations to academic conferences, or performed any research in the field of

> financial economics. Rather, Defendants label Steinholt as a "professional litigation consultant." . . .
>
> Defendants' argument is not well taken. . . . Steinholt's *curriculum vitae* shows that, although he may not qualify as an expert under the "education" portion of Rule 702, he qualifies as an expert due to his experience in the areas of market efficiency and damages.
>
> . . . Steinholt is a Chartered Financial Analyst ("CFA"), has worked for several financial valuation and economic consulting firms since 1990, and has, in that work, conducted various financial and economic analyses. Additionally, he has provided expert testimony specifically regarding market efficiency or damages in over twenty other cases and no court has ever excluded his testimony. This experience is sufficient to qualify Steinholt as an expert under Rule 702.

*Willis*, 2017 U.S. Dist. LEXIS 38933, at *5-*7; *see McIntire*, 38 F. Supp. 3d at 428 (finding an expert with an MBA and CFA qualified to opine on market efficiency and rejecting a *Daubert* challenge).

Steinholt's academic background, training, credentials, and vast professional experience demonstrate he is qualified to opine as an expert on market efficiency and damages. To the extent SQM has expressed any sincere concern with Steinholt's credentials (it hasn't), that concern goes to the weight and credibility of his testimony, not its admissibility: "Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony." *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

### 2. The Court Should Not Countenance SQM's Attempt to Disqualify Steinholt Due to Past Actions of Others in Which He Played No Part

SQM resorts to guilt-by-association in a desperate attempt to impugn Steinholt for the wrongs committed over a decade ago by John Torkelsen ("Torkelsen"), founder of the first firm Steinholt worked at, and the purported expert report mistakes made by Michael Marek ("Marek"), a former business partner of Steinholt. There is no evidence that Steinholt had any involvement in

either situation.  SQM's attempt to sow "serious doubts" about Steinholt's "dubious ethics" based on

these associations is specious.  Mot. at 7-8.

First, SQM contends that Steinholt is tainted by crimes Torkelsen pleaded guilty to more than

ten years ago, but the only connection SQM draws is that Steinholt worked at and was not fired from

Torkelsen's company, Princeton Venture Research.  Steinholt unequivocally disclaimed knowledge

of, or involvement in, Torkelsen's crime.[9]  Steinholt further testified that: more than 50 employees

worked at Princeton Venture Research at the time; he worked in San Diego while Torkelsen worked

---

[9]    Steinholt's testimony undermines any involvement with Torkelsen's crime.  *See* Steinholt Depo.
at 30:2-31:3:

>    Q.    Setting aside discussions about the volume of work that was available, did
>          you have any discussions with Mr. Torkelsen in or around 1998 about the
>          firm not being paid by the plaintiffs' lawyers?
>
>    A.    No.
>
>    Q.    Did you have any discussions with anyone else at Princeton Venture about
>          the firm not being paid by the plaintiffs' lawyers?
>
>    A.    No.
>
>    Q.    Was that – were you in any way involved during that time period in Princeton
>          Venture receiving or billing or receiving fees from the plaintiffs' lawyers?
>
>    A.    I never saw a check.  It was all done in the Princeton office.
>
>    Q.    Did you prepare any bills?
>
>    A.    No, that was all done by the accounting department in Princeton.  The only
>          thing that we would do would be write up the work that was performed in a
>          particular – in a particular engagement.
>
>    Q.    Why would you write off work?
>
>    A.    Write up.
>
>    Q.    Oh, write up work.
>
>    A.    Like time sheets or a synopsis of the work that was done.

- 11 -

in Princeton, New Jersey; Steinholt only worked directly with Torkelsen on a handful of occasions; and Steinholt was not fired because he had non-litigation venture capital experience but resigned because his colleagues were fired.[10]  Steinholt Depo. at 18:9-20:15, 27:6-27:20, 29:14-30:1.  SQM's scurrilous attempt to impugn Steinholt in this manner is devoid of any evidentiary support.

Indeed, several opinions have criticized the attempt to impugh other experts who used to work for Torkelsen.  In *Brown v. China Integrated Energy Inc.*, the court found another of Torkelsen's former employees "qualified to offer his opinion," despite the attempt to malign his qualifications and identify his former work for Torkelsen at Princeton Venture Research – precisely the contentions SQM raises here.  2014 WL 12576643, at *5 (C.D. Cal. Aug. 4, 2014).  And in *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, the court granted a motion *in limine* prohibiting defendants from eliciting "testimony concerning improper conduct by John Torkelsen or Princeton Venture Research" in light of its decision to permit the opinion testimony of another expert who formerly worked for Torkelsen.  No. 07-61542-CIV-UNGARO, 2010 WL 11426133, at *1 (S.D. Fla. Aug. 25, 2010).

Second, SQM contends that two sustained *Daubert* motions against his former business partner Marek somehow tars Steinholt's qualifications here.  Again, SQM provides no evidence that Steinholt had anything to do with the excluded reports.  The *McIntire v. China MediaExpress Holdings, Inc.* court's rejection of what it labeled the "theory of disqualification by association" is instructive.  The court criticized defendant's attempt to disqualify an expert (Cynthia Jones) supervised by Marek, who had been disqualified in *Deutsche Bank*, because "the Court is reviewing and must pass on Cynthia Jones's ("Jones") qualifications, not Marek's.  The Court is persuaded that Jones's qualifications are sufficient to permit her to testify as an expert in market efficiency."  38 F.

---

[10]   SQM faults Steinholt for not knowing details about Torkelsen's crimes.  Mot. at 7.  But not knowing details of Torkelsen's crimes further evidences Steinholt's lack of involvement.

Supp. 3d at 428.[11]  Steinholt, like Jones, should be evaluated on his own qualifications, not those of anyone else.

**B.     Steinholt's Market Efficiency Opinion Is Relevant and Reliable for Determining Whether the Market for SQM ADS During the Class Period Was Efficient**

**1.     Steinholt's Analysis of the Indirect *Cammer* and *Krogman* Factors Is Reliable**

Steinholt assessed the efficiency of the market for SQM ADS traded during the Class Period by examining each of the five factors set forth in *Cammer* alongside the three factors set forth in *Krogman*.  Steinholt Rpt. §§IV.A.-J; Baig Decl., Ex. B, §§II.A-C.  In addition to the fact that SQM's ADS trade on the NYSE – the largest and most sophisticated securities market in the world – Steinholt's Report sets forth unrebutted evidence that four of the five *Cammer* factors and all three of the *Krogman* factors support a finding of market efficiency.  Steinholt Rpt., ¶¶19-35, 47-52. Specifically, SQM does not dispute that during the Class Period:

> *Cammer* 1: SQM ADS traded at a high weekly volume of more than 4.4%, exceeding the 2% benchmark that *Cammer* held justified a strong presumption of market efficiency;[12]
>
> *Cammer* 2: At least 15 firms had securities analysts that covered and reported on SQM, above the average of 5-analyst average for other publicly traded companies;[13]

---

[11]   Indeed, *McIntire* notes that while Marek was once disqualified, numerous other courts have concluded that he is qualified.  38 F. Supp. 3d at 428 n.4.

[12]   Steinholt Rpt., ¶¶21-23; Baig Decl., Ex. B at ¶¶22-23; *Cammer*, 711 F. Supp. at 1286 ("The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.").

[13]   Steinholt Rpt., ¶¶24-27; Baig Decl., Ex. B at ¶¶24-25; *Cammer*, 711 F. Supp. at 1286 ("existence of such analysts would imply, for example, the [defendant's] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors. In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [defendant's] reports, as interpreted by the securities analysts").

*Cammer* 3: Since SQM ADS traded on the NYSE, a designated market maker was responsible for maintaining orderly trading.  Further market participants, including 700 institutional investors, owned at least 39.6 million SQM ADS during the Class Period;[14] and

*Cammer* 4: SQM was eligible to use a Form S-3 Registration Statement;[15]

*Krogman* 1: SQM's market capitalization exceeded $5.6 billion;[16]

*Krogman* 2: SQM's average bid-ask spread for shares traded on the NYSE was approximately $0.015 per share, or roughly 0.06% of the closing price;[17] and

*Krogman* 3: SQM's public float for the SQM ADS (as determined by the ADS outstanding) ranged from a low of 42 million shares in 2012 to a high of more than 61 million in 2014, averaging roughly 52 million shares, translating into a market value of the public float of at least $1 billion or more throughout the entire Class Period.[18]

SQM concedes that the evidence establishes these factors, asserting only that the evidence does not support *Cammer* 5.  As shown in §III.B.2 (*infra*), this assertion is incorrect.  Regardless, a challenge to an expert opinion that "focuses almost exclusively on the event studies he performed in

---

[14]   Steinholt Rpt., ¶32; Baig Decl., Ex. B at ¶¶26-27; *Cammer*, 711 F. Supp. at 1286-87 ("The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.").

[15]   Steinholt Rpt., ¶¶34-35; Baig Decl., Ex. B at ¶28; *Cammer*, 711 F. Supp. at 1287 ("it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency").

[16]   Steinholt Rpt., ¶¶47-48; Baig Decl., Ex. B at ¶29; *Krogman*, 202 F.R.D. at 478 ("Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.").

[17]   Steinholt Rpt., ¶¶49-50; Baig Decl., Ex. B at ¶30; *Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

[18]   Steinholt Rpt., ¶¶51-52; Baig Decl., Ex. B at ¶31; *Krogman*, 202 F.R.D. at 478 ("'Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.'").

connection with *Cammer* 5" is "too narrow." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 87 (S.D.N.Y. 2015); *see Waggoner*, 875 F.3d at 97 (it is not necessary to present direct evidence of price impact – *Cammer* 5 – to demonstrate market efficiency). "Because there is no serious disagreement concerning [Steinholt's] methodology with respect to" four of the five *Cammer* factors, "there is no basis to reject [Steinholt's] opinion that the market is efficient." *Carpenters*, 310 F.R.D. at 87.

Although SQM concedes that the evidence establishes *Cammer* factors 1-4 and the three *Krogman* factors, it contends that the "economic literature" doesn't support their use in evaluating market efficiency. Mot. at 10. The case law, however, does. In fact, the same "economic literature" Defendant relies on here failed to convince the Supreme Court in either *Halliburton II* or in the Barclays defendants' failed bid for certiorari in *Waggoner*.[19] As a court recently explained, "It may be that many financial economists . . . dispute the relevancy of the first four *Cammer* factors to a determination of market efficiency, but the *Cammer* factors nonetheless reflect the legal standard for market efficiency." *Willis*, 2017 U.S. Dist. LEXIS 38933, at *9. More importantly, the Second

---

[19]   SQM's expert criticizes the *Cammer* factors using the same articles raised in *Halliburton II*. *Compare, e.g.*, ECF No. 130-31, ¶¶19-21 *with* Halliburton's Brief for Petitioners at 23 (each citing Barber et al.), *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 285-286 (1994), and Erenburg et al., *The Paradox of "Fraud on-the-Market" Theory: Who Relies On the Efficiency of Market Prices?*, 8 J. Empirical Legal Stud. 260 (2011). The same articles were also raised in Barclays' failed bid for *certiorari*. *Compare, e.g.*, ECF No. 130-31, ¶¶19 n.18, ¶20 *with* Barclays Petition for a Writ of *Certiorari* at 25 (citing Brad M. Barber, et al., The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, 19 J. Corp. L. 285 (1994), and Mukesh Bajaj, et al., *Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine After Wal-Mart and Amgen*, 26 Law & Econ. of Class Actions 161,190 (2014). However, unlike the Halliburton defendants who acknowledged that Barber et al. found that average volume and the number of analysts systematically differentiate between efficient and inefficient stocks (Halliburton's Brief for Petitioners at 23), Dr. Torous states that the Barber et al. article's authors "acknowledges that they 'know of no systematic body of evidence showing that [the *Cammer* and *Krogman* factors] or any other criteria distinguish efficient and inefficient stocks.'" ECF No. 130-31, ¶19. This characterization is misleading. Indeed, their paper "'provid[es] evidence on the factors that systematically distinguish between efficiently and inefficiently traded stocks.'" Baig Decl., Ex. B at ¶32 (quoting *Barber et al.*, at 293).

Circuit upheld certification of class where only the "indirect" factors evidenced efficiency, holding that "direct evidence of price impact is not always necessary to demonstrate market efficiency, as required to invoke the *Basic* presumption of reliance." *Waggoner*, 875 F.3d at 85.

Despite the economic literature SQM cites, a number of financial economists submitted an *amicus* brief in *Halliburton II* detailing the broad agreement of economists that stock prices in developed markets respond to material public information:

> Economists' debates about the efficiency of securities markets are interesting and important, and they have significant implications for government regulatory policy as well as strategies that investors should pursue. But it is important to be clear that economists generally agree that stock prices respond to material information in a predictable direction.

Baig Decl., Ex. C at 9. This modest proposition is all that market efficiency requires. *Halliburton II*, 573 U.S. at 271-72 (noting that the *Basic* presumption does not rest on a particular economic theory of how quickly and completely publicly available information is reflected in market price).

It is clear that SQM's criticisms rest on a "'different conception of an efficient market than is used by the law.'" *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015) (distinguishing between analyzing market efficiency in the context of whether unexpected information quickly affected share prices, not whether the price of shares accurately reflects all information). SQM's suggestion that the Court should ignore the standard for market efficiency embraced by the Supreme Court (in *Halliburton II*), and the Second Circuit (in *Waggoner*), in favor of one espoused by Dr. Torous lacks merit.

### 2. Steinholt's Analysis of *Cammer* 5's Cause-and-Effect Is Reliable

In any event, Steinholt's cause-and-effect analysis under *Cammer* 5 is methodologically sound and reliable. *Cammer* 5 assesses the "cause and effect relationship between unexpected corporate events [such as] financial releases and an immediate response in the stock price."

*Cammer*, 711 F. Supp. at 1287.  The event study is the accepted method of proving a cause-and-effect relationship under *Cammer* 5.  Steinholt Rpt., ¶¶37, 55; Baig Decl., Ex. B at ¶38; *see, e.g.*, *Carpenters*, 310 F.R.D. at 80 ("*Cammer* 5 is often proven with an event study."); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 n.7 (S.D.N.Y. 2008) ("'[N]umerous courts have held that an event study is a reliable method for determining market efficiency and the market's responsiveness to certain events or information.'") (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 170 (S.D.N.Y. 2007), *aff'd in part and vacated in part on other grounds*, 574 F.3d 29 (2d Cir. 2009)).  Importantly, SQM's expert uses the results of Steinholt's underlying regression analysis. Baig Decl., Ex. B at ¶¶38-40; *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) ("Notably, however, Defendant did not conduct, or submit, their own event study to show the absence of price impact; instead, they rely on, and criticize, the event study conducted by Plaintiffs' expert, Dr. Zachary Nye. That alone would arguably support rejection of Defendants' arguments at this stage of the proceedings.").

Because Steinholt applies a proven and accepted method typically employed by experts in securities fraud class actions, SQM is left to contend that his assumptions are flawed.  But the contentions that the expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017), *cert. denied* __U.S.__, 138 S. Ct. 644 (2018) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2018 WL 1750595, at *8 (S.D.N.Y. Apr. 11, 2018) (admitting expert testimony even where "the flaws identified . . . can (and here, do) unde[rm]ine how much weight the Court can place on his expert opinions when it comes to . . . establishing predominance and superiority under Rule 23(b)(3).");

- 17 -

*Merryman v. Citigroup, Inc.*, No. 15 Civ. 9185 (CM), 2018 WL 1621495, at *20 (S.D.N.Y. Mar. 22, 2018) (attacks on expert assumptions go to weight, not admissibility).

In support of its motion, SQM relies extensively on *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 155136 (S.D.N.Y. Oct. 29, 2013), and *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006). Mot. at 2-3, 5-8, 14-15. But both cases are inapt for the reasons Judge Marrero has detailed in *McIntire*: *Deutsche Bank* because of the unique constraints on short-sellers there; and *PolyMedica* because of the expert's woefully deficient market efficiency analysis study.[20] 38 F. Supp. 3d at 432.

Rather than using an event study based on a statistical regression for *Cammer* 5, the expert in *PolyMedica* merely presented an unscientific side-by-side comparison of PolyMedica's 10 largest stock price moves by percentage to the price movements by peer firms and the NASDAQ on those days. 453 F. Supp. 2d at 269, n.8 (noting that courts assessing *Cammer* 5 benefit from event studies). The statistical rigor of Steinholt's event study bears no relationship to the expert's analysis in *PolyMedica*, which Judge William G. Young likened to "Yogi Berra" commenting on market efficiency. *Id.* at 270. Moreover, there were also significant impediments to short selling in *PolyMedica*. *Id.* at 273. Nevertheless, the court in *PolyMedica* acknowledged that listing on national "exchange undisputably improves the market structure for trading in a particular stock" and "that one would be hard-pressed to deny the relevance of this fact in an efficiency analysis." *Id.* at 266. Steinholt's event study is far more rigorous than the one in *PolyMedica* and is consistent with

---

[20] Further, as Judge Scheindlin has noted, the securities in *Deutsche Bank* did not involve common stock or ADS. *Carpenters*, 310 F.R.D. at 81-82. Similarly, *In re Fed. Home Mortg. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174 (S.D.N.Y. 2012), is inapt because it involved unusual securities. Mot. at 5. "In *Deutsche Bank*, the stock at issue was a global registered share, which unlike common stock or ADS, trade globally on various markets, and only a small percentage of those shares traded on the NYSE. And in *Freddie Mac*, the securities were 'a limited series of preferred shares, which are traded in patterns significantly different from the trading patterns typical of common shares.'" *Carpenters*, 310 F.R.D. at 81-82.

*Cammer*'s directive to examine evidence showing the cause and effect between "financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287.

        **a.**        **Steinholt's Financial Release Event Study Is Reliable**

As part of his event study, Steinholt analyzed the nineteen days during the Class Period on which SQM issued financial releases. Steinholt Rpt., ¶¶40-41; Baig Decl., Ex. B at ¶¶48-60. After accounting for market and industry movements on those days, Steinholt determined that five out of SQM's nineteen financial releases preceded statistically significant price movements at the 5% level. Steinholt Rpt., ¶40; Baig Decl., Ex. B at ¶¶49-50. At the 5% level of statistical significance, one would expect one return out of twenty to be statistically significant absent a cause-and-effect relationship. Steinholt Rpt., ¶40; Baig Decl., Ex. B at ¶48 n.78. Using the binomial distribution, he found the cumulative probability of five or more days out of nineteen being statistically significant at the 5% level, simply by chance, to be significantly less than 1%.[21] Steinholt Rpt., ¶40; Baig Decl., Ex. B at ¶51. Consistent with his financial release event study, the proportion of statistically significant returns following financial releases (5/19: approximately 26%) was almost six times higher than on the non-financial release days during the Class Period (53/1,168: approximately 4.5%). Baig Decl., Ex. B at ¶48 n.78.

Steinholt's analysis clearly shows that there was a cause and effect relationship between SQM's "financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. Courts have found similar analyses evidence of market efficiency. *See, e.g., Angley v. Uti Worldwide Inc.*, 311 F. Supp. 3d 1117, 1123 (C.D. Cal. 2018) (accepting event study that found statistically significant excess return on only 11.1% of news days versus 2.6% for non-news days as

---

[21]   As detailed in Steinholt's rebuttal report, the statistical significance of these results remain even if improper multiple comparison adjustments SQM's expert proposes were made. Baig Decl., Ex. B at ¶¶59-60.

supporting market efficiency in the reliance context); *Carpenters*, 310 F.R.D. at 94-95 (finding market efficiency based on an event study demonstrating price reaction on 5 out of 15 event days, but noting that the court would have found efficiency regardless of the fifth *Cammer* factor showing); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 354 (C.D. Cal. 2015) (certifying class because of strong showing on other *Cammer* factors, even though expert only found statistically significant price movement on 8 of 50 days).[22]

### b.  SQM's Multiple Comparison Argument is Flawed

SQM charges Steinholt with misunderstanding the multiple comparisons adjustment, but that argument rests on the flawed notion that Steinholt conducted multiple tests when he did not.  Mot. at 11-12; ECF No. 127 at 23; Baig Decl., Ex. B at ¶¶52-60.  As the Reference Manual on Scientific Evidence makes clear, a multiple-comparison issue arises when "Making several statistical tests on the same dataset."  *Reference Manual on Scientific Evidence* (Third) at 290 (2011).  Here Steinholt conducted a single statistical test to determine whether the number of statistically significant price movements following the nineteen different financial releases were significantly greater than for days without financial releases.  Baig Decl., Ex. B at ¶¶52-53; *see also* Steinholt Depo. at 295:8-296:4.  Additionally, the binominal analysis used by Steinholt fully accounts for the fact that nineteen financial releases were analyzed, rendering any additional adjustment for "multiple comparisons" erroneous.  Steinholt Report, ¶¶52-59.  Even assuming Steinholt's analysis of 19

---

[22]  *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013), another pre-*Waggoner* decision, is inapt.  Unlike Steinholt's analysis, the expert there did not apply the generally accepted event study analysis.  Of the five tests conducted to show efficiency, only one was "akin to an event study" – and even that test merely analyzed the top 10 days with the biggest statistical movement for corresponding news. *Id.* at *10, *12.  Additionally, of those top-10 days, four had no company specific news, two had news only for the industry, while the other four did have company specific news. *Id.* at *12.  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, also contravenes *Waggoner* by holding that the *Cammer* factor 5 is necessary and dispositive.  No. 4:08CV0160, 2018 WL 3861840, *17 (N.D. Ohio Aug. 14, 2018).

financial releases didn't account for multiple comparisons – it does – as detailed by the court in *In re NII Holdings, Inc. Sec. Litig.*, a multiple-comparison adjustment correction (the same Holm-Bonferroni correction Defendant raises here) need not be made "because of the relatively small sample size here" (sixteen earnings announcement dates) and because "study results with a confidence interval of 99%" like Steinholt's here "are not required to show price impact in this context."  311 F.R.D. 401, 412 (E.D. Va. 2015).

### c.   SQM Incorrectly Claims That Steinholt Failed to Test Non-Financial Allegation Related Information

SQM's criticism that Steinholt's test of earnings releases does not test share price reaction to non-financial information rests on the flawed assumption that earnings release dates disclose only financial information.  Mot. at 12.  Steinholt's rebuttal makes clear that financial release dates contain both quantitative and qualitative information including the quality of earnings:

> Determining earnings quality and its implications for firm value is complex. Understanding a company's quality of earnings requires expertise in finance, accounting, and corporate strategy and a strong knowledge of the industry in which the company operates and the governance mechanisms monitoring and rewarding employees and managers.

Baig Decl., Ex. B at ¶¶69 n.98 (quoting Patricia M. Dechow & Catherine M. Schrand, *Earnings Quality*, The Research Foundation of CFA Institute (2004)).

Additionally, as Steinholt explained during his deposition, he chose financial release dates because the *Cammer* court specifically identified those as appropriate and because those dates provide a non-subjective dataset.  Steinholt Depo. at 198:21-199:23; *see also NII Holdings*, 311 F.R.D. at 412 ("Lead Plaintiffs persuasively rebut this attack, arguing that [the event] study avoids bias by using objective measures of event days, namely those days on which [the defendant company's] earnings announcements were made.").  Steinholt's rebuttal report details the problems with SQM's alternative test based on Form 6-K including that a majority of the Forms 6-K do not

contain new, material information, and thus shed little light on whether the market for its ADS was efficient.  Baig Decl., Ex. B at ¶¶68-72.  *Id.* at ¶70.

### d.      Analyzing the Last Day of the Class Period Is Proper

Defendant also takes issue with Steinholt's analysis of the price reaction following the March 18, 2015 disclosure ending the Class Period and his determination that the price of SQM's ADS reacted to the information as one would expect in an efficient market.  Steinholt Rpt., ¶¶38-39, 41-46.  As Steinholt's rebuttal makes clear, he selected the date because of Plaintiff's allegations, not because it was associated with a highly statistically significant SQM price decline.  Steinholt Rpt. ¶41; *see also* ¶¶42-47.  Regardless, Steinholt's analysis does not just consider one date, but considers many, and SQM's effort to isolate and attack this single date merely affects the weight.  *Wilson v. LSB Indus.*, No. 15 Civ. 7614 (RA)(GWG) 2018 U.S. Dist. LEXIS 138832, at *40-*42 (S.D.N.Y. Aug. 13, 2018) (event study favors market efficiency even where defendants criticized analysis of dates only at the end of class period).

In any event, courts have found market efficiency based on the analysis of a single corrective disclosure date.  *E.g.*, *In re Accredo Health, Inc.*, No. 03-2216 DP, 2006 U.S. Dist. LEXIS 97621, at *7-*8 n.1, *24.  Similarly, courts have rejected the charge that doing so is biased and flawed.  For example, the court in *Willis* rejected the argument that including two corrective disclosure dates (in addition to four financial release dates) introduces bias because Steinholt knew of associated price declines: "Defendants' argument is not well taken.  Steinholt chose an objective criterion for event dates – Big Lots' 2012 financial releases.  He considered every financial release date during 2012, not just the corrective disclosure dates.  That the objective criterion incorporated corrective disclosure dates does not undermine the reliability of the methodology employed in the event study." 2017 U.S. Dist. LEXIS 38933, at *12.

### e.   SQM's Atomistic Criticisms Miss Steinholt's Holistic Analysis

SQM claims that Steinholt ignores the lack of direct evidence of market efficiency during the first half of the Class Period, attempting to distract from his holistic analysis of the *Cammer* and *Krogman* factors in determining market efficiency.  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) ("The district court properly declined to view direct and indirect evidence as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented.").  As detailed in his rebuttal report, Steinholt reviewed approximately 200 analyst reports, 3,000 media report and numerous SEC filings throughout the Class Period, and based on that review found no evidence of market inefficiency.  Baig Decl., Ex. B at ¶62.  That SQM is able to point to only two examples, out of the 1,187 days during the Class Period, to suggest that the market may not have reacted to new and material information as expected proves the point.  *Id.*; *see also id.* at ¶¶63-67 (explaining that SQM's stock price reacted on those two days in a manner consistent with market efficiency).

### 3.   Steinholt Offers An Economic Opinion Grounded in the Governing Legal Framework

Finally, Steinholt offers an economic opinion that the market for SQM ADS was efficient.  That Steinholt analyzed market efficiency in the framework of the *Cammer* and *Krogman* factors does not mean that he is offering legal opinions.  Mot. at 9 n.6.  Instead, Steinholt uses the framework articulated in *Cammer* and *Krogman* because that methodology is proper when analyzing market efficiency for securities litigation.  *Waggoner*, 875 F.3d at 94; *Petrobras*, 862 F.3d at 276; *Groupon*, 2015 WL 1043321, at *3 ("Thus, to determine whether a stock trades in an efficient market, experts conduct a *Cammer* factor analysis.").  In so doing, Steinholt established with a high degree of certainty that SQM's ADS price quickly incorporated new material market, industry, and company-specific information.   Steinholt Rpt. ¶¶19-53, 58.  Thus, Steinholt's "event study

methodology not only 'rests on a reliable foundation' but is also directly 'relevant to the task at hand.'" *Groupon*, 2015 WL 1043321, at *37 (quoting *Daubert*, 509 U.S. at 597).

## IV.    CONCLUSION

Steinholt is qualified to opine on market efficiency and damages methodology, and his testimony on these topics is methodologically sound and consistent with governing case law. Accordingly, SQM's motion to exclude his opinion should be denied.

DATED:  January 25, 2019                    Respectfully Submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            AELISH M. BAIG
                                            MATTHEW S. MELAMED
                                            ARMEN ZOHRABIAN
                                            JOHN H. GEORGE


                                                    s/ Aelish M. Baig
                                            ————————————————
                                                AELISH M. BAIG

                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)
                                            aelishb@rgrdlaw.com
                                            mmelamed@rgrdlaw.com
                                            azohrabian@rgrdlaw.com
                                            jgeorge@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
stirabassi@rgrdlaw.com

Lead Counsel for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 25, 2019, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Aelish M. Baig
AELISH M. BAIG

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  aelishb@rgrdlaw.com

## Mailing Information for a Case 1:15-cv-02106-ER Villella et al v. Chemical & Mining Co. of Chile Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@rgrdlaw.com,kmccarty@rgrdlaw.com,inavarrete@rgrdlaw.com

- **Alison Bonelli**
  abonelli@milbank.com,GHolland@milbank.com,JDaSilva@milbank.com,AutoDocketECF@milbank.com,AMarkowitz@milbank.com

- **Brian E Cochran**
  bcochran@rgrdlaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **John H. George**
  jgeorge@rgrdlaw.com,kmccarty@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,jsnematzadeh@pomlaw.com

- **Grant Richard Mainland**
  gmainland@milbank.com,DMcCracken@milbank.com,AutoDocketECF@milbank.com,calipio@milbank.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,aelishb@rgrdlaw.com,2879289420@filings.docketbird.com,mmelamed@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,scott.foglietta@blbglaw.com,managingclerk@blbglaw.com,ross@blbglaw.com

- **Sabrina Elsa Tirabassi**
  stirabassi@rgrdlaw.com,3872386420@filings.docketbird.com,evanyi@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,chavayh@hbsslaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Scott            Alexander Edelman
Milbank, Tweed, Hadley & McCloy LLP (NYC)
1 Chase Manhattan Plaza
New York, NY 10005

Richard Gielata
,
```