UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN VILLELLA, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>    - against -<br><br>CHEMICAL AND MINING COMPANY OF CHILE INC.,<br><br>      Defendant. | **OPINION AND ORDER**<br><br>15 Civ. 2106 (ER) |

Ramos, D.J.:

   This is a putative federal securities class action brought on behalf of all individuals who purchased American Depository Shares in Chemical & Mining Company of Chile Inc. (also known as Sociedad Química y Minera de Chile S.A. and referred to here as "SQM") on the New York Stock Exchange between June 30, 2010 and June 18, 2015. Lead Plaintiff, the Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Tyne & Wear"), alleges that SQM violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

   Before the Court is Tyne & Wear's motion to certify a class, appoint itself as class representative, and appoint its law firm, Robbins Geller Rudman & Dowd LLP, as lead counsel pursuant to Federal Rule of Civil Procedure 23. It petitions the Court to adopt the following class definition:

     All persons who purchased or otherwise acquired SQM ADS traded on the NYSE between June 30, 2010 and March 18, 2015, inclusive (the "Class Period"). Excluded from the Class are: (i) SQM; (ii) any entity in which SQM has a controlling interest; (iii) officers and directors of SQM; and (iv)

the legal representatives, heirs, successors or assigns of any such excluded party.

Doc. 75 at 3.  Also before the Court is SQM's motion to disqualify Tyne & Wear's expert, Bjorn I. Steinholt.  Doc. 128.  For the reasons set forth below, Tyne & Wear's motion is GRANTED, with certain modifications.  SQM's motion is DENIED.

## I.  BACKGROUND

### A.  The Parties

SQM is a producer and worldwide distributor of specialty fertilizers and industrial chemicals, based in Chile.  Corrected Consolidated Compl. for Violation of the Securities Laws ("Consolidated Compl.") ¶ 18, Doc. 40.  SQM's Series B American Depository Shares ("ADS") have been listed on the New York Stock Exchange since 1993, under the ticker symbol "SQM." *Id.*  This class action is brought on behalf of all persons who purchased SQM's shares traded on the NYSE between June 30, 2010 and June 18, 2015 (the "Class Period").  *Id.* ¶ 1.  Tyne & Wear alleges that it purchased a total of 376,521 shares and suffered damages in excess of $4.4 million during the Class Period as a result of SQM's securities violations.  *Id.* ¶ 17.

### B.  Factual Background

On February 24, 2015, the Attorney General of Chile announced an investigation of a bribery and tax-evasion scandal involving the financial firm Grupo Penta, which embroiled numerous politicians across the country's political spectrum.  *Id.* ¶¶ 2, 5.  The scheme involved the creation of fake expense receipts used to lower Grupo Penta's taxable income, all for the purpose of funding illegal payments to political candidates.  *Id.*  Two days later, on February 26, 2015, SQM issued a press release divulging that an extraordinary board meeting had been held at the request of SQM's Chairman to "analyze" this escalating political scandal.  *Id.* ¶ 25.  The board resolved at the meeting to establish an ad-hoc committee, comprised of three SQM board

members and the New York office of the law firm Shearman & Sterling, to investigate. *Id.* ¶¶ 9 n.1, 25. Around the same time, the Attorney General was investigating SQM for misconduct similar to Grupo Penta's — using fake invoices and phony services to illegally bribe politicians. *Id.* ¶ 23.

On March 12, 2015, SQM disclosed that its board would evaluate a request from the Public Prosecutor that SQM deliver accounting records and other information in connection with the investigation into the political contributions scandal. *Id.* ¶¶ 26–27. SQM issued a press release stating that the board resolved: (1) to request an independent report with respect to a March 6, 2015 letter from the Attorney General requesting certain information from SQM; (2) to schedule another extraordinary board meeting on March 16 to analyze the independent report and decide whether to comply with the Attorney General's request; (3) to ratify its willingness to cooperate with the Public Prosecutor's investigation and request for information; and (4) to inform the Attorney General of the board's plan in response to his March 6, 2015 letter. *Id.* ¶ 27. Four days later, SQM issued a press release announcing that the board had unanimously voted to terminate its chief executive officer, Patricio Contesse, who had attempted to block the board's decision to turn information over to investigators. *Id.* ¶ 32. The board subsequently voted to designate Patricio Solminihac Tampier as the new CEO of SQM. *Id.*

On March 18 — just two days after the press release — SQM announced that three SQM board members appointed by SQM's largest noncontrolling shareholder, the Potash Corporation of Saskatchewan, Inc., had resigned from the board. *Id.* ¶¶ 210–11. SQM disclosed in a press release that day that the Potash directors had resigned because they could not ensure an adequate investigation of SQM and that their "emphatic requests" that SQM cooperate fully with the authorities had been rejected by a majority of the board. *Id.* ¶ 36. Tyne & Wear alleges that as a

result of SQM's disclosures, as of March 17, 2015, SQM shares dropped more than 15% from its price on February 25, 2015. *Id.* ¶ 11. SQM shares fell even more after the resignations of the Potash directors. *Id.*

In late March and early April 2015, both the Chilean tax regulatory agency and the securities regulator initiated criminal proceedings against several SQM board members and other representatives. Five individuals were criminally charged with, among other offenses, participation in tax fraud and "failure to provide the market with information that could be relevant for investment decisions" in violation of the Chilean Corporations Code. *Id.* ¶¶ 39, 45. The charges were based on numerous declarations from the recipients of SQM's payments, admitting that they had submitted invoices to SQM without having provided any services. *Id.* ¶¶ 47, 50, 56. The investigation also led to an admission by SQM's chief financial officer, Ricardo Andres Ramos Rodriguez, that SQM made one thousand payments to companies without any consideration of whether they were based on services rendered. *Id.* ¶ 57.

On December 15, 2015, SQM filed a Form 6-K with the Securities Exchange Commission ("SEC") summarizing the findings of the ad-hoc committee's investigation. The committee found that payments were made on invoices that lacked supporting documentation, that SQM's books did not accurately reflect questioned transactions, and that SQM lacked sufficient controls over expenses managed by Contesse. *Id.* ¶ 75. The committee also stated that it found no evidence demonstrating that the payments were made in order to induce a public official to act or refrain from acting. *Id.* ¶ 76. Tyne & Wear nevertheless claims that the "illegal acts perpetrated by SQM's top executives acting on [SQM's] behalf[] extended its sphere of influence throughout Chile's political system." *Id.* at ¶ 78.

## C. The Allegedly Misleading Statements

Throughout the Class Period, SQM filed financial reports with the SEC and issued press releases detailing the company's financial performance, including its revenue, gross margins, and earnings per share. *Id.* ¶ 80. In its annual reports filed during the Class Period, SQM also made the following representations:

**Legal Compliance**

There are currently no material legal or administrative proceedings pending against the Company with respect to any regulatory matter, except as discussed under "Safety, Health and Environmental Regulations" below, and we believe that we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business.

**Internal Controls and Procedures**

Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)–15(b), as of the end of the period covered by this Annual Report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported.

*Id.* ¶¶ 82, 83. The annual reports further assured SQM's shareholders that its financial statements were prepared in accordance with Chilean Generally Accepted Accounting Principles and reported net and paid income tax pursuant to U.S. GAAP. *See, e.g.*, *id.* ¶¶ 86, 87.

Tyne & Wear alleges that SQM's disclosures were materially false, misleading, or both because it failed to disclose: (1) that money from SQM was illegally channeled to bribe Chilean politicians and political parties; (2) that SQM had filed fictitious tax receipts in order to conceal these bribe payments; (3) that SQM lacked adequate internal controls over its financial reporting;

and (4) that, as a result, SQM's financial statements were materially false and misleading and not prepared in accordance with applicable accounting principles. *Id.* ¶¶ 2–12.

On January 13, 2017, SQM agreed to pay a $15 million criminal penalty and $15 million civil penalty to resolve parallel criminal and civil cases brought by the U.S. Department of Justice and SEC, respectively. Letter from Tyne & Wear's Counsel Aele M. Baig to Judge Edgardo Ramos, Exs. B, E, Doc. 64. In the deferred prosecution agreement with the Department of Justice, SQM admitted that it "knowingly and willfully failed to maintain internal accounting controls," that Contesse authorized and directly paid funds to Chilean politicians and candidates in violation of "Chilean tax law and/or campaign finance limits, and caused payments of those funds to be falsely recorded in the SQM's books and records." *Id.* Ex. B at A-2, A-3. The SEC Order similarly stated that SQM made improper payments to Chilean politicians and political candidates and that the "payments were not supported by documentation that those third party vendors provided services to SQM. Virtually all of the improper payments . . . were directed and authorized by a senior SQM executive." *Id.* Ex. E ¶ 1.

A complaint in this case was first filed in March 2015. Doc. 1. This Court consolidated related cases and appointed Tyne & Wear as lead plaintiff in October 2015. Doc. 31. Tyne & Wear filed its consolidated complaint in February 2016. Doc. 40. In a March 2017 opinion and order, this Court granted SQM's motion to dismiss some of Tyne & Wear's claims in the consolidated complaint, but it denied SQM's motion to "dismiss Plaintiff's claims that SQM made material misstatements in its SEC filings regarding its (1) compliance with applicable law, (2) effectiveness of internal controls, and (3) financial reporting and accounting," as well as its motion to dismiss for *forum non conveniens*. *See Villella v. Chemical & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629, at *15 (S.D.N.Y. Mar. 28, 2017).

**D. Sarasin and Partners LLP**

Tyne & Wear filed the instant motion in January 2018.  That June, this Court authorized the issuance of letters rogatory to the United Kingdom to gain British assistance in obtaining discovery related to Tyne & Wear's suitability as a class representative.  *See Villella v. Chemical & Mining Co. of Chile*, No. 15 Civ. 2106 (ER), 2018 WL 2958361 (S.D.N.Y. June 18, 2018).  Afterwards, SQM deposed Henry Boucher, the deputy chief investment officer of Sarasin and Partners LLP, Tyne & Wear's London-based investment manager.  SQM received document discovery from Sarasin, as well.

The investment management agreement between Tyne & Wear and Sarasin in effect during the Class Period (that is, June 2010 to June 2015) gave Sarasin "full authority" and "complete discretion to buy, sell, retain, exchange or otherwise deal" in investments.  Omnibus Decl. of Grant R. Mainland ("Mainland Decl.") Ex. 4 at TW0000009, Doc. 130.  Sarasin uses ████
████████████████████████████████████████████████████
████████████████  *Id.* Ex. 5 at SARASIN_0000715.  In other words, the manager identifies undervalued securities based on views about the future needs of the global market and holds them as they grow.  In SQM's case, Sarasin initially acquired the SQM ADS expecting they would substantially appreciate as the price of lithium — a key component in electric cars and a major SQM product — increased with the growth of emerging markets.  *Id.* Ex. 3 ("Boucher Dep.") at 33:3–34:20.

During the time it held the ADS but before the disclosures related to investigations into the alleged bribes, Sarasin indicated it was aware of and had considered a number of corporate governance issues at SQM.  For example, analysts at Sarasin had reviewed a report giving SQM a grade of "D" in governance.  *Id.* Ex. 17 at SARASIN_0001171–72.  Sarasin also had declined

to add SQM to its list of "socially responsible funds," which gives clients the opportunity to avoid assets with the potential for "high profile sort of governance or other issues." Boucher Dep. at 110:7–21. Sarasin, in some ways, viewed the governance issues at SQM as an opportunity for long-term holders of the security, like itself, to purchase the ADS at a lower price. *See id.* at 100:6–21.

Sarasin also had knowledge of the SQM officials at the heart of the bribery scandal and broader governance concerns. Employees of Sarasin discussed the connection between former Chilean President Augusto Pinochet and Julio Ponce Lerou, a "dominant shareholder . . . who perhaps wielded, or gained [his] position through political influence." *Id.* at 48:21–49:6. They noted the increasing pressure Chilean law enforcement and regulators were putting on SQM officials, including the son of the then-CEO. *See* Mainland Decl. Exs. 9–11. Nevertheless, Sarasin increased Tyne & Wear's holdings of SQM ADS and rated SQM a "strong buy." *See id.* Exs. 12, 13.

Once the media began reporting on the bribes themselves (rather than general governance concerns) in early 2015, Sarasin did not increase Tyne & Wear's holdings in SQM, although it did not dump the stock, either. Boucher Dep. 203:19–204:13. Based on discovery produced by Sarasin, there were only a few comments about the bribes among Sarasin employees. *Id.* Ex. 30 at 2. The market did not react much to the initial disclosure of the bribes. *Id.* at 1–2.

But the situation changed drastically when the three Potash directors resigned from SQM's board in reaction to its failure to cooperate with government investigations. *Id.* Exs. 23, 24. Sarasin viewed the directors as a check against any underlying governance issues and undue influence by SQM's largest shareholder, Ponce. *Id.* Ex. 25. On the day SQM announced the resignations, March 18, 2015, the price of the ADS fell by the most it had during the relevant

period:  more than 15%.  Decl. of Aelish M. Baig ("Baig Decl.") Ex. C ("Steinholt Rep.") ¶ 45,

Doc. 75.  Sarasin responded in part by working with one of SQM's outside investors to add a

director with expertise in corporate governance to SQM's board.  *See* Boucher Dep. at 129:3–11.

## II.    STANDARD

One or more members of a class are permitted to sue on behalf of the class if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "Rule 23(a) ensures that the named plaintiffs are appropriate

representatives of the class whose claims they wish to litigate."  *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 349 (2011).  The four requirements "effectively limit the class claims to those

fairly encompassed by the named plaintiff's claims."  *Id.* (internal quotation marks omitted).

The putative class must also satisfy at least one of the three requirements listed in Rule

23(b).  Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires them to

demonstrate, in addition to the prerequisites of Rule 23(a), that "the questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action would be superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

In appointing class counsel under Rule 23(g), this Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g).

"A party seeking class certification must affirmatively demonstrate its compliance with Rule 23." *Wal-Mart*, 564 U.S. at 350. In other words, the Rule "does not set forth a mere pleading standard." *Id.* A district court must undertake a "rigorous analysis" in order to determine whether the requirements have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). In making such determinations, the court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (quoting *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)). The court's analysis, however, will inevitably "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

## III.     SQM'S OPPOSITION TO CLASS CERTIFICATION

SQM argues against class certification on two grounds. First, it argues that the class does not meet the predominance requirement of Rule 23(b) because the market in which the ADS traded was not efficient. Then, it argues that Tyne & Wear specifically has not met the typicality requirement of Rule 23(a). Finally, in the alternative, it suggests three limitations on the proposed class.

### A.  Rule 23(b) and Market Efficiency

Plaintiffs alleging claims under Section 10(b) of the Exchange Act must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 267 (2014) (citation omitted).

"On its face, the reliance element would appear to preclude class certification on predominance grounds:  [e]ach plaintiff would have to prove reliance individually, with the result that common issues would not 'predominate' over individual ones." *In re Petrobras Sec.*,

862 F.3d 250, 275 (2d Cir. 2017) (quoting *Halliburton II*, 573 U.S. at 281–82) (quotation marks removed).  But the Supreme Court provided a way for the certification of such classes in *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).  According to the *Basic* Court, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." 485 U.S. at 247.  So, "an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action." *Id.*; *see also Petrobras*, 862 F.3d at 275.

"In 2014, the Court affirmed the continued vitality of the 'fraud on the market' theory, and clarified that the so-called '*Basic* presumption' actually incorporates two constituent presumptions.'" *Petrobras*, 862 F.3d at 275 (quoting *Halliburton II*, 573 U.S. at 279).  They are:

> First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation.

*Halliburton II*, 573 U.S. at 279.

To establish that the market for SQM ADS during the Class Period was "generally efficient," entitling the class members to the *Basic* presumption, courts routinely consider the following non-exhaustive list of factors, commonly referred to as the *Cammer* factors:

> (1) [A] large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (internal citations removed); *accord Petrobras*, 862 F.3d at 276.  Courts also frequently consider three additional factors, referred to as the *Krogman* factors, to determine efficiency:

> (1) the company's market capitalization; (2) the relative size of the bid-ask
> spread for the security; and (3) the company's float, or the degree to which
> shares of the security are held by the public, rather than insiders.

*McIntire*, 38 F. Supp. 3d at 431; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 94–95 (2d

Cir. 2017).

### 1. The Indirect Factors

Tyne & Wear, through the report of its expert, Bjorn I. Steinholt, presented the Court

with an unrebutted showing that indicates *Cammer* factors 1 through 4 and all of the *Krogman*

factors (otherwise collectively known as the "indirect" factors, *see Petrobras*, 862 F.3d at 276)

are met here. Specifically:

- *Cammer* **1**: "SQM ADS traded on the NYSE during the Class Period. . . . The weekly trading volume during the Class Period represented approximately 4.4% of SQM's outstanding ADS . . . ." Lead Pl.'s Mot. for Class Cert. at 14, Doc. 75.

- *Cammer* **2**: "[A]pproximately 15 firms followed SQM, and they published more than 200 analyst reports concerning [SQM] during the Class Period. . . . [M]ajor news sources publicly published 400 articles concerning SQM during the Class Period." *Id.* at 15.

- *Cammer* **3**: "Transactions in NYSE-listed securities, such as SQM ADS, . . . go through a designated market maker. . . . More than 700 sophisticated institutional investors . . . invested in SQM ADS during the Class Period." *Id*. at 16.

- *Cammer* **4**: "SQM was eligible to file Form F-3 registration statements during the class period." *Id.* at 17. Form F-3 is the functional equivalent of Form S-3 for foreign companies. *See* Steinholt Rep. ¶ 35.

- *Krogman* **1**: "During the Class Period, SQM ADS had an average market capitalization of more than $1 billion . . . ." Lead Pl.'s Mot. for Class Cert. at 19.

- *Krogman* **2**: "SQM ADS had tight bid-ask spreads during the Class Period, averaging approximately $0.015 per share . . . ." *Id.* at 20.

- *Krogman* **3**: "During the Class Period, the average float of SQM ADS was over $1 billion and averaged approximately 52 million ADS." *Id*. at 20.

*2.* Cammer *5*

At greater issue is whether the direct factor — whether the security has "a history of immediate movement of stock price caused by unexpected corporate events or financial releases," — weighs in favor of SQM or Tyne & Wear.

Tyne & Wear provides three pieces of evidence for the proposition that the SQM ADS' price quickly incorporated unexpected information: (1) that its ADS price was more than five times as likely to have a statistically significant movement on a day on which SQM released a financial document than on any other day, *see* Steinholt Rep. ¶ 40; (2) that the day of the corrective disclosure, that is, the resignation of the Potash directors and the rationale behind the move, showcased one of the largest price movements the security had seen, *id.* ¶ 45; and (3) that the ADS price movements were positively correlated with the broader market, as well as those of SQM's peer group, and therefore incorporated market-level information, *id.* ¶ 39. Tyne & Wear's expert collected this evidence through review of public documents and by conducting an event study. This event study examined the set of days on which SQM made a financial release and compared the number of statistically significant price changes in that set of days with the Class Period at large. *Id.* ¶ 40. Tyne & Wear argues that, collectively, this evidence proves that *Cammer* 5 cuts in its favor.

The Court will review SQM's objections to each portion of the evidence,[1] before reviewing their impact on *Cammer* 5 as a whole.

---

[1] SQM objects to the qualifications of Steinholt in a separately filed motion. Doc. 129. After its own independent review and evaluation of the expert's qualifications, the Court joins the vast majority of other courts in finding Steinholt's qualifications sufficient. *See, e.g.*, *King Cty., Wash. v. IKB Deutsche IndustriebankAG*, 916 F. Supp. 2d 442, 453 n.67 (S.D.N.Y. 2013), *Willis v. Big Lots, Inc.*, No. 12 Civ. 604 (MHW), 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017); *In re Novatel Wireless Sec. Litig.*, No. 08 Civ. 1689 (AJB) (RBB), 2013 WL 12144150, at *3 (S.D. Cal. Oct. 25, 2013); *see also Cunha v. Hansen Natural Corp.*, 2013 WL 12124073, at *7 (C.D. Cal. 2013)

*First*, although SQM does not challenge the proposition that the ADS incorporated market-level evidence, it *does* challenge the strength of the event study's finding that the market incorporated SQM-specific information into the ADS price. SQM's expert, Dr. Walter Torous, claims that Steinholt failed to correct for what is known as the "multiple comparisons" problem. Mainland Decl. Ex 30 ("Torous Rep.") ¶ 53. Torous believes that only three of the release days should count as statistically significant, rather than five. *Id.* ¶ 55. In Steinholt's estimation, this would be "some evidence" rather than "strong evidence" of *Cammer* 5, although he disputes that this problem affects his analysis at all. *Id.* Regardless, in light of the other *Cammer* and *Krogman* factors being in Tyne & Wear's favor, even "some evidence" is enough for the Court on this point. Therefore, the Court does not make a finding on whether Torous or Steinholt have the better of this methodological argument.

*Second*, Torous challenges the choice of financial release days as the proper set of days to examine in the event study. Torous Rep. ¶ 42. He suggests that a different set of releases, specifically the release of 6-K filings, should be used since those releases contain qualitative data more similar to the corrective disclosures at issue here. *Id.* ¶ 47. Torous claims that a review of these other measures would result in a finding of no evidence for an efficient market. *Id.* ¶ 49.

While it may be true that other types of releases are better suited for an economic finding of efficiency, the use of financial releases is the proper one for a *legal* finding in the context of *Cammer* and its progeny. The *Cammer* court specifically called out financial release dates in its opinion, making a study of those dates particularly relevant to this Court. *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989) ("[I]t would be helpful to a plaintiff seeking to allege an

("[C]ourts often consider expert reports and testimony in the course of considering [*Cammer* 5], even if such evidence is not necessary or required. The Court rejects any effort — *Daubert*-based or otherwise — to have either side's expert reports and testimony excluded here." (citations removed)).

efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or *financial releases* and an immediate response in the stock price.") (emphasis added). Insofar as Torous suggests that other variations of Steinholt's event study would yield different, inconclusive results, the Court does not find that cutting against a finding of *Cammer* 5, but rather as a lack of evidence in either party's favor.

*Third*, SQM objects to an analysis of the ADS price change on the day after SQM announced the resignation of the Potash-appointed directors. Steinholt notes that the ADS price fell more than 15% in the day after the news broke, "a result that is only expected to occur randomly 1% of the time." Steinholt Rep. ¶ 45. SQM claims that the analysis of this day in particular is cherry-picking data. The Court agrees.

The task before the Court is to determine whether there is "a *history* of immediate movement of stock price." It does not find a single data point from one of SQM's most turbulent trading days as highly persuasive. *See* Torous Rep. ¶ 60 (quoting Bradford Cornell & James C. Rutten, *Market Efficiency, Crashes, and Securities Litigation*, 81 Tul. L. Rev. 457, 443 (2006) ("[E]ven a grossly inefficient market will incorporate to some degree news about extremely significant events.")). Therefore, the Court takes the test of March 18 as a neutral sign, not weighing in favor of either party.

In a review of the evidence presented to this Court, it finds that the event study, in combination with the unrebutted assertion that the ADS incorporates market-level information into its price, provides at least "some evidence" for "a history of immediate movement of stock price caused by unexpected corporate events or financial releases."

*3.  Review of the Factors*

SQM points to a body of academic literature marshalled by Torous in urging the Court to find that the market for SQM's ADS was inefficient in light of the weak showing on *Cammer* 5 and despite the other factors being in Tyne & Wear's favor.  *See* Torous Rep. ¶¶ 18–24.  But the Court sees no reason to step away from the number of courts in this circuit that have used *all* of the *Cammer* and *Krogman* factors in their analysis, especially given the Second Circuit's failure to question that practice.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017).  Indeed, the *Waggoner* court explicitly held that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies."  *Id.* at 97; *see also In re Petrobras Secs. Litig.*, 862 F.3d 250, 276–77 (2d Cir. 2017) ("The district court properly declined to view direct and indirect evidence as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 88 (S.D.N.Y. 2015) ("[D]efendants' attack on Dr. Finnerty's opinion focuses almost exclusively on the event studies he performed in connection with *Cammer* 5.  This challenge is too narrow.").  *Waggoner* indicated that direct evidence may be most necessary when there are indirect factors indicating that the market in question is inefficient.  *See* 875 F.3d at 97.

But that is not the case here.  In favor of *Cammer* 1 is the fact SQM ADS traded on the New York Stock Exchange, which by itself is a strong indication of efficiency.  *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).  And the ADS weekly trading volume of 4.4% exceeds the 2% found sufficient in *Cammer* itself.  *See* 711 F. Supp. at 1286.  For *Cammer* 2, fifteen firms provided analyst coverage for the ADS, surpassing the three analysts found sufficient in *In re Winstar Commc'ns Secs. Litig.*, 38 F. Supp. 3d 415, 431

(S.D.N.Y. 2014). There is a designated market maker that executes ADS transactions, satisfying *Cammer* 3. SQM was eligible to file a Form F-3, the foreign equivalent of the Form S-3 cited in *Cammer* 4. Plus, it had a market cap of $1 billion (*Krogman* 1); a bid-ask spread of only 0.06% (*Krogran* 2); and a market float of between 65% and 95% (*Krogman* 3). There is no indication from any of these factors that the market in SQM ADS is anything but efficient. Given that the results of the event study do not indicate anything to the contrary, the Court finds that the plaintiff class may enjoy the *Basic* presumption.[2]

With the burden of persuading the Court to the contrary now placed on it, *see Waggoner*, 875 F.3d at 95, SQM argues that evidence of "serial correlation" in the trading of the ADS proves the market's inefficiency. In an efficient market, the price change for one day has no predictive power for an investor attempting to determine what the next day's price change will be. Torous Rep. ¶ 63. This phenomenon is called a "random walk." When the changes from one day *do* have predictive power for the next, they are said to be "serially correlated." *Id.* Serial correlation can be an indicator of market inefficiency. *See, e.g.*, *In re PolyMedica Corp. Secs. Litig.*, 453 F. Supp. 2d 260, 276–78 (D. Mass. 2006).

According to Torous, the market for ADS exhibited serial correlation, Torous Rep. ¶ 67; Tyne & Ware does not dispute this finding. SQM, however, does not point the Court to any authority indicating that there is a threshold amount of serial correlation whereby a market is no

_____

[2] SQM points to several cases where courts found a weak event study dispositive against a plaintiff. None of them are on point. In *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *10 (S.D.N.Y July 3, 2013), the expert used different tests than used by Steinholt here. Additionally, the court did not discuss the extent to which the indirect evidence did or did not point in favor of efficiency. In *Cunha v. Hansen Nat. Corp.*, No. 08 Civ. 1249 (GW)(JCx), 2013 WL 12124073, at *7 (C.D. Cal. June 20, 2013), the event study in question had fewer data points than Steinholt's and the rebuttal expert evidence was more extensive. And in *In re PolyMedica Corp. Secs. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006), the district court was limited by the First Circuit's command to focus on whether information was "fully" and "quickly" incorporated into the stock price. *See PolyMedica Corp. Secs. Litig.*, 432 F.3d 1, 19 (1st Cir. 2005).

longer efficient for purposes of applying the *Basic* presumption. Indeed, serial correlation is common. For example, Steinholt noted that the returns of more than a quarter of the companies making up the Dow Jones Industrial Average were serially correlated during the class period. Decl. of Aelish M. Baig in Supp. of Pl.'s Reply, Ex. B. ¶ 79, Doc. 146. And, although it may theoretically be possible for a trader to make above-market returns by exploiting the serial correlation in the ADS' return, the Court does not find that this evidence alone meets SQM's burden of persuasion to rebut the *Basic* presumption. *See Waggoner*, 875 F.3d at 100 (noting that *Basic*'s presumption could be too easily overcome if a defendant could present "some evidence" of inefficiency).

"*Basic*'s presumption of reliance . . . does not rest on a 'binary' view of market efficiency"; rather it is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton II*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247 n.24). Therefore, given the strength of the indirect factors and the "some evidence" presented by *Cammer* 5, the Court finds that the market was efficient and thus questions of law and fact predominate over the class, satisfying the requirement of Federal Rule of Civil Procedure 23(b)(3).

### B. Rule 23(a) and Typicality

SQM focuses its Rule 23 argument on whether Tyne & Wear is typical of the putative class. *See* Fed. R. Civ. Proc. 23(a)(3). The typicality requirement is "not demanding." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006–A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)). It "does not require factual identity between the named plaintiffs and the class members, only that the

disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *MF Glob. Holdings*, 310 F.R.D. at 208 (quoting *Penn. Ave. Funds v. Inyx Inc.*, No. 08 Civ. 2732544 (PKC), 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011)). Nor does typicality "require that damages be identical among class members." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (citing *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 337 (E.D.N.Y. 2013)).

Although typicality may be defeated "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990)), "the unique defense rule . . . is not rigidly applied in this Circuit," *In re Pfizer Inc. Secs. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012) (quoting *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008)). A unique defense will only render a putative class representative's claims atypical when the defense "threaten[s] to become the focus of the litigation." *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)). "[The rule] is intended to protect [the] plaintiff class — not to shield defendants from potentially meritorious suit . . . ." *Pfizer*, 282 F.R.D. at 45 (quoting *Parmalat*, 2008 WL 3895539, at *5).

SQM argues that it can raise the following "unique defense" to Tyne & Wear's claim: its investment manager, Sarasin & Partners LLP, did not rely on the alleged false disclosures when it chose to purchase SQM's ADS.

As discussed in Part III.A, *supra*, reliance is an "essential element" of proving a Section 10(b) securities fraud case. *Halliburton II*, 573 U.S. 258, 287 (2014) ("'Reliance by the plaintiff

upon the defendant's deceptive acts is an essential element' of the implied 10b-5 private cause of action.") (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008)). Although an individual securities fraud plaintiff may invoke the *Basic* presumption of reliance, "which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" that presumption may be rebutted. *Halliburton II*, 573 U.S. at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.

In practical terms, the *Basic* presumption may be rebutted in one of two ways. A defendant may show "that the alleged misrepresentation did not . . . actually affect the market price" or, in other words, that the fraud had no price impact. *Halliburton II*, 573 U.S. at 269. Alternatively, and more pertinent here, a defendant may provide direct evidence that "an individual plaintiff . . . did not rely on the integrity of the market price in trading stock," *id.* at 276, by showing that "plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud," *id.* at 269; *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 432 (7th Cir. 2015) ("*Basic* was very clear that the way to rebut the presumption is to show that the investor would have paid the same price.") (emphasis removed). In either event, the defendant bears the burden of rebutting the presumption of reliance. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 102 (2d Cir. 2017) ("[D]efendants bear the burden of persuasion to rebut the *Basic* presumption of reliance at the class certification stage.").

As its first attempt at showing that Sarasin, and therefore Tyne & Wear, did not rely on the market price, SQM argues that, as a value investor, Sarasin by definition did not rely on the

market price.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 436 (S.D.N.Y. 2015).  As SQM argues, Sarasin's investment strategy was based on the premise that the current market price for SQM was unnaturally low.  If Sarasin purchased the ADS and held them, Sarasin would earn above-market returns for its client as the price approached Sarasin's calculation of the ADS' true value.  SQM argues that this investment strategy precludes Tyne & Wear from taking advantage of *Basic*.

Unfortunately for SQM, the Supreme Court addressed this situation in *Halliburton II*. For a value investor to be afforded the *Basic* presumption of reliance, it "need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton II*, 573 U.S. at 273–74.  Sarasin's investment plans fit that model — it believed that SQM's shares were undervalued and would reach their true value with the rise of the price of lithium due to increasing demand for electric cars.  *See* Boucher Dep. at 33:3–34:20.

SQM next argues that Sarasin's specific actions in response to its knowledge of SQM's governance issues show that Sarasin was indifferent to the alleged fraud.  *See Vivendi*, 123 F. Supp. 3d at 436 (turning to an "individualized rebuttal" after finding plaintiff's status as a value investor was insufficient to rebut *Basic* presumption).  In short, SQM contends that, had Sarasin known of the underlying fraud — that is, that SQM officials were bribing individuals from the government and not disclosing those payments to the market — it *still* would have purchased the SQM ADS.  If this were true, then Sarasin did not rely on the allegedly fraudulent disclosures and therefore cannot rely on the *Basic* presumption.  After a review of the discovery from Sarasin, the Court disagrees.

First of all, SQM has not established that Sarasin knew of the fraud.  The record shows that Sarasin was indeed aware that SQM's efforts at corporate governance were far from ideal;

SQM argues that this knowledge makes any additional revelations regarding bribes immaterial to Sarasin's investment case. But Sarasin's concerns were focused on potential actions by Ponce to act in ways prejudicial to the minority shareholders. Boucher Dep. at 48:11–49:21. The bribes SQM's CEO, Contesse, paid to political allies and the resulting firestorm of an investigation were altogether different from the governance issues and were apparently uncontemplated by Sarasin and its analysts. In short, Sarasin did not "expect[] bribes to politicians to be part of [SQM's] governance issues." Boucher Dep. at 195:22–196:23.

If Sarasin *had* known of the fraud, the Sarasin discovery indicates that it would not have purchased the ADS at the price it did. For example, counsel for SQM asked Sarasin's deputy investment manager, Boucher, a series of hypotheticals regarding what Sarasin would have done if it had known of various underlying problems with SQM's management, up to and including material misstatements by its CEO regarding illegal activity. Boucher Dep. 238:21–253:5. Boucher's response each time was simple: Sarasin would have factored those disclosures into the investment case and most likely not purchased the ADS at the price inflated by the fraud. *Id.* at 241:10–18.

Its behavior after discovering the fraud confirms Boucher's analysis. Sarasin did not buy any ADS after discovering the fraud, Boucher Dep. 204:9–21, even though it expressed the view that, ██████████████████████████████████████████████████████████ ████████████████████████ Mainland Decl. Ex. 28 at SARASIN_0001278. Instead, it expended resources to shore up the company through the election of a corporate governance expert to SQM's board. If Sarasin were truly indifferent to the fraud, it would have jumped on the opportunity to increase its holdings at fire-sale prices. It did not, and so illustrated that it relied on the integrity of the market price and thus SQM's statements.

On this point, SQM contends that the question to be asked is different. It urges the Court to ask instead whether Sarasin would have bought at *any* price, rather than whether Sarasin would have bought at the then-market price allegedly inflated by fraud. The Second Circuit has declined to directly explore this question. *See GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 218 (2d Cir. 2016). But a panel of the Seventh Circuit has, and the Court is persuaded by that analysis. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 432 (7th Cir. 2015).

The *Glickenhaus* court noted that *Halliburton II* indicated defendants can rebut the Basic presumption by showing "'a plaintiff would have bought or sold the stock even had he been aware that the *stock's price was tainted by fraud* . . . .'" *Id.* (quoting *Halliburton II*, 573 U.S. at 269) (emphasis added by the *Glickenhaus* court). The court found that reading this passage to imply a focus that the possibility a plaintiff would purchase tainted stock at *any* price would be too broad. Rather, it found that "*Basic* was very clear that the way to rebut the presumption is to show that the investor would have paid the same *price*." *Glickenhaus*, 787 F.3d at 432 (citing *Basic*, 485 U.S. at 248–49 ("Any showing that servers the link between the alleged misrepresentation and either the price received . . . by the plaintiff, or his decision to trade at a fair market prices, will be sufficient to rebut the presumption . . . .")). This Court agrees, and it adds that the invocation of the "price received" and the "decision to trade at a fair market price" both indicate that the appropriate scope for analysis is the actual price used in the plaintiff's transactions.[3]

---

[3]    At least two courts in this circuit have interpreted *Basic* in a similar way. *See Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (The "presumption can be rebutted, for example, if defendant can show that plaintiff would have purchased the stock at the same price even if he had known the non-disclosed information."); *Lawrence v. Philip Morris Cos., Inc.*, No. 94 Civ. 1494 (JG), 1999 WL 51845, at *4

SQM primarily points to *GAMCO Investors, Inc. v. Vivendi Universal, S.A.* to support the idea that this Court should be looking at whether Sarasin would have purchased *at all*, rather than at the same price. 927 F. Supp. 2d 88, 103–04 (S.D.N.Y. 2013) *aff'd* 838 F.3d 214 (2d Cir. 2016). In its opinion, the *GAMCO* court indicated that *Basic* and *Halliburton II* "stand for the proposition that a plaintiff's willingness to trade at the same price, even knowing of the fraud, is *one way* that the presumption may be rebutted, not for the proposition that it is the *only* way." *Id.* at 104. That may be true. But the case of *GAMCO* is different from the case at hand in a manner that indicates *its* way is not applicable here.

In *GAMCO*, the investment firm was a value investor, looking for companies that trade below their intrinsic value as determined by the firm. *See id.* at 94. The company calculated the target security's intrinsic value as being much higher than the then-current market price. *Id.* at 95. The gap between the calculated intrinsic value and the price widened when the target company made corrective disclosures, and the firm bought more of the security. *Id.* The *GAMCO* court, rejecting the idea that plaintiffs had to prove they would have purchased the security at the same price, ultimately found that "had [the company's] fraud been known to the market, the Plaintiffs would have been all the more eager to invest — which indeed they did . . . ." *Id.* at 103.

Like the *GAMCO* firm, Sarasin is a value investor. And, as in *GAMCO*, Sarasin calculated that SQM was undervalued, leading it to increase its stake even in the face of concerns over governance. Mainland Decl. Ex. 12. Indeed, Sarasin indicated that the governance concerns gave Sarasin, as a "long-term shareholder[]," an "opportunity" to buy lower-priced

_____

(E.D.N.Y. Jan. 9, 1997) ("[I]f defendant can show that plaintiff would have purchased the stock at the same price even if he had [ ] known the non-disclosed information, defendant will successfully rebut the 'market reliance' presumption and escape liability.").

stock. Boucher Dep. 100:6–21. But there is a crucial difference: Sarasin did not buy any *additional* shares of the ADS after the fraud was revealed and its impact felt. Boucher Dep. 204:9–21. Unlike in *GAMCO*, the information discovered did not make the ADS more attractive; rather, as Boucher testified, Sarasin's behavior suggests that the news of the fraud made the ADS *less* attractive. *See* Boucher Dep. at 240:8–16. Therefore, the Court reads *GAMCO* to be inapposite to the case at hand and the appropriate rule to be whether Sarasin would have purchased the ADS at the then-market price, not *any* price.

Defendants have failed to make a showing that Tyne & Wear did not rely on the allegedly fraudulent disclosures. The record shows that Tyne & Wear, through its investment adviser, did "rely on the integrity of the market price in trading stock" and would not have "bought or sold the stock . . . had [it] been aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269. Tyne & Wear therefore meets the typicality requirements of Rule 23(a).

### C. Alterations to the Class Definition

SQM suggests three changes to the class definition. *First*, it suggests that the class period should be reduced because none of the statistically significant financial releases identified by Steinholt occurred in the first half of the class period as now defined. Torous Rep. ¶ 52. If there were some indication that the indirect factors also varied over the class period — thereby suggesting the structural factors supporting efficiency had changed over time — then SQM's argument might have force. As it is, there was no change in the structural factors over time, leading the Court to accept that the market remained efficient throughout the entire class period. The proposal to shrink the class period is denied.

*Second*, SQM suggests excluding foreign members of the putative class because their home countries might not give preclusive effect to any judgment of this Court. SQM does not,

however, propose which countries would refuse or why. The burden to do so rests on SQM, and it has failed to meet it. *See In re Petrobras Secs. Litig.*, 312 F.R.D. 354, 363 (S.D.N.Y. 2016) *aff'd in relevant part* 862 F.3d 250 (2d Cir. 2017). The proposal to exclude foreign claimants is denied.

*Third*, and finally, SQM seeks to have "in-and-out traders" removed from the class. These are the traders who, based on SQM's definition, sold their stock before January 2015, the first date Tyne & Wear alleges SQM made a corrective disclosure, causing the ADS price to drop. Consolidated Compl. ¶ 204, Doc. 40. If these traders had bought and sold before the fraud was revealed to the market, they could not have been harmed by the subsequent price drop. It is Tyne & Wear's responsibility to prove to the Court that all of the groups in its recommended class meet the requirements of Rule 23. *See In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 38 (2d Cir. 2009). Instead, it has presented *no* evidence that in-and-out traders could have suffered *any* harm from the actions of SQM. Because Tyne & Wear has failed to meet its burden, the Court shall exclude any person who sold the entirety of their position in SQM ADS before January 11, 2015 from the class definition. *See id.* at 40–41.

## IV. UNOPPOSED REQUIREMENTS OF RULE 23

SQM does not argue against the numerosity, Fed. R. Civ. P. 23(a)(1), or commonality, *id.* 23(a)(2), of the class. Nor does it argue that Tyne & Wear would not protect the interests of the class as lead plaintiff, *id.* 23(a)(4). Accordingly, the Court makes the following findings:

(1) There are more than forty members of the class because more than 700 major institutions owned the security. *See* Steinholt Rep. ¶ 33. Therefore, the numerosity requirement is presumptively satisfied. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

(2) There are questions of fact and law common to the class because each class member will have allegedly suffered injury from the same representations by SQM. *See*

> *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014).

(3) Tyne & Wear and its counsel will vigorously pursue the claims of the class and are not antagonistic to the other class members' interests. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016). To wit, Tyne & Wear has served as lead plaintiff since October 2015, and its counsel, Robbins Geller, has extensive experience in and knowledge of securities class actions, *see* Baig Decl. Ex. D.

Therefore, the Court finds that Tyne & Wear has met these requirements of Rule 23(a). Given that it meets the requirement of Rule 23(a)(3), as well, the Court concludes that a class may be certified with Tyne & Wear as the class representative.

Additionally, the Court finds that Tyne & Wear's law firm, Robbins Geller Rudman & Dowd, meets the requirements of Rule 23(g), and it appoints the firm as class counsel. Robbins Geller has been lead counsel in this case for nearly four years. It has extensive experience in securities class actions and complex litigation, as well, indicating its ability to manage this litigation and ably apply the applicable law. *See* Baig. Decl. Ex D; *see also, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015) ("Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."); *In re Sanofi-Aventis Securities Litigation*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013) (appointing Robbins Geller as class counsel in securities litigation). SQM does not oppose the appointment

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Tyne & Wear's motion to appoint itself as lead plaintiff, to appoint Robbins Geller Rudman & Dowd as lead counsel, and to certify a class using the following class definition, as modified:

All persons who purchased or otherwise acquired SQM ADS traded on the NYSE between June 30, 2010 and March 18, 2015, inclusive (the "Class Period"). Excluded from the Class are: (i) SQM; (ii) any entity in which

SQM has a controlling interest; (iii) officers and directors of SQM; (iv) the legal representatives, heirs, successors or assigns of any such excluded party; and (v) any person who sold the entirety of their position in SQM ADS before January 11, 2015.

(additions underlined).

The Court DENIES SQM's motion to exclude the testimony of Tyne & Wear's expert.

The parties are directed to appear for a status conference on October 11, 2019 at 11:00 a.m. The clerk is respectfully directed to terminate the motions, Docs. 75, 128, and 147.[4]

It is SO ORDERED.

Dated:    September 23, 2019
        New York, New York

                                        Edgardo Ramos, U.S.D.J.

---

[4] Tyne & Wear's motion for oral argument on its motion is DENIED as moot.