UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

MEGAN VILLELLA, Individually and on : 
Behalf of All Others Similarly Situated, :
:
:
Plaintiff, :
:
vs. :   15-cv-2106-ER
:
CHEMICAL AND MINING COMPANY :   *Oral Argument Requested*
OF CHILE, INC., et al., :
:
:
Defendants. :

————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF SQM'S MOTION FOR SUMMARY JUDGMENT ON LOSS CAUSATION AND DAMAGES

**MILBANK LLP**

Scott A. Edelman (sedelman@milbank.com)
Grant R. Mainland (gmainland@milbank.com)
Alison M. Bonelli (abonelli@milbank.com)
55 Hudson Yards
New York, New York 10001
(212) 530-5000

*Attorneys for Defendant Chemical
and Mining Company of Chile, Inc.*

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 7

    A.    In January and February 2015, News Emerges Concerning SQM's Payments to Chilean Political Figures; No Statistically Significant Reaction in SQM's Share Price. ..................................................... 7

    B.    During March 2015, Information Continues to Emerge Concerning the Government Investigations and the Company's Response; No Statistically Significant Reaction in SQM's Share Price. ......................................... 10

    C.    During March 10-13, SQM Executives Participate in a "Road Show" to Present on the Fundamentals of the Company. ....................................... 12

    D.    On March 18, 2015, the PCS Directors' Resignations Are Announced, Resulting in a Sharp Decline in the Share Price. ................................. 14

    E.    PCS Reappoints Three Directors to the SQM Board, Eliminating the March 18 Losses. .............................................................................. 17

ARGUMENT ...................................................................................................... 18

I.    PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION OR DAMAGES FOR THE "CUMULATIVE" SHARE PRICE DECLINE FROM MARCH 11 THROUGH MARCH 17, 2015. ..................................................................... 18

    A.    Plaintiffs' Cumulative Model Measures an Incomplete Portion of the Total Information Disclosed to the Market Concerning the Alleged Fraud. ................. 19

    B.    The Subperiod Used in Plaintiffs' Cumulative Model Is Marred by Biased and Unprincipled Date Selection. ..................................................... 21

        1.    News Concerning SQM Board Disputes Was Not Corrective. ............... 22

        2.    News Immediately Preceding the March 11-17 Event Window Arguably Was Corrective and Should Have Been Included in Plaintiffs' Analysis. ................................................................... 24

    C.    Plaintiffs' Cumulative Model Does Not Account for Substantial Confounding Information Regarding Company Fundamentals. ........................... 25

II.    PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION OR DAMAGES
FOR THE SHARE PRICE DECLINE ON MARCH 18, 2015. ...................................... 29

    A.    The News Concerning the PCS Resignations Was Not Corrective of the
Alleged Misstatements. ........................................................................... 29

        1.    The News of the PCS Resignations Contained No Hard Facts
Concerning the Improper Payments or Internal Controls Over
Financial Reporting ............................................................... 29

        2.    Plaintiffs' Theory That the PCS Resignations Informed the Market of
the "Severity" of the Alleged Fraud During the Five-Year Class
Period Is Unavailing. ............................................................. 34

    B.    In Evaluating Loss Causation, the Court Should Consider the Post-March
18 Recovery in the Share Price. .............................................................. 38

CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)......................................................................29, 40

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................18

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017) ............................................................33

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)....................................................................18, 26

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2019).....................................................24, 35

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................22, 26

*Field v. Trump*,
    850 F.2d 938 (2d Cir. 1988)....................................................................34

*Finkelstein v. Liberty Digital, Inc.*,
    2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ..........................................3

*Fries v. N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018).....................................................34

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ..................................................................26, 28

*Gordon Partners v. Blumenthal*,
    2007 WL 1438753 (S.D.N.Y. May 16, 2007) .........................................28

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................30

*In re Invision Techs., Inc. Sec. Litig.*,
    2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ...........................................33

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................................................33

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................18, 22

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)..................................................................37

*Marsden v. Select Med. Corp.*,
    2007 WL 518556 (E.D. Pa. Feb. 12, 2007) .......................................................30

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)..................................................................24

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................18

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .................................................3

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)........................................................... *passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)..................................................22, 23, 24

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015) (Ramos, J.) ...........................................33

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)..................................................................33

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997)..................................................................26

*Rok v. Indentiv Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ..........................................................37

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    2016 WL 7117455 (M.D. Pa. Dec. 7, 2016)........................................................33

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................22

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ..............................................................................24

*In re Winstar Comms.*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)........................................................22

**Statutes**

Sarbanes-Oxley Act of 2002 ........................................................................................................32

**Other Authorities**

17 C.F.R. § 240.13a-15(f) ...........................................................................................................32

17 C.F.R. § 243.101(b)(2) ....................................................................................................14, 27

Defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or the "Company") submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This securities class action arises out of certain improper payments to Chilean politicians or political intermediaries made by SQM's former CEO, Patricio Contesse.  As SQM has disclosed and admitted, Contesse made these payments through invoices for services that were not in fact rendered; as a result, the payments were inaccurately recorded in SQM's books and records.  The amounts at issue were small for a company of SQM's size.  The invoices averaged approximately $10,000, and the aggregate amount over a six-year period was approximately $15 million, or $2.5 million per year.  That amounted to approximately one half of one percent of SQM's annual net income, which averaged over $400 million over the same period.  (56.1 ¶ 2.)[1]

Plaintiffs do not contend, nor could they, that the payments had a material effect on SQM's income statement or balance sheet.  Instead, plaintiffs focus their fraud allegations—and thus their allegations of loss causation—on routine disclosures in SQM's SEC filings concerning the Company's compliance with law and the effectiveness of its internal controls over financial reporting.  Plaintiffs allege that these routine disclosures inflated SQM's share price[2] by $5.32 per share for a nearly five-year period, which would translate to over $300 million in the aggregate if awarded for all SQM's shares that were traded during the class period.  As this motion will show, plaintiffs cannot establish that *any* losses were caused by the fraud they allege, much less losses that are twenty times greater than the quantum of payments at issue.

---

[1] "56.1" refers to the Statement of Undisputed Facts in Support of SQM's Motion for Summary Judgment.

[2] This class action is brought on behalf of holders of SQM's American Depositary Shares listed on the New York Stock Exchange.  For simplicity, this brief refers to the American Depositary Shares as "shares."

Plaintiffs in securities class actions typically seek to establish and measure loss causation and damages by pointing to a decline in a company's share price after a "corrective disclosure"—*i.e.*, a disclosure that reveals the falsity of an alleged misstatement made during the class period. Plaintiffs typically do so through the use of event studies that purport to isolate the impact of the alleged corrective information on the share price by controlling for market and industry factors that otherwise could have influenced the share price. Where corrective information is disclosed and the share price declines in a statistically significant manner (controlling for market and industry factors), plaintiffs contend that the decline was caused by the correction of the alleged misstatement, as opposed to random fluctuation, thereby establishing the amount by which the share price had been "inflated" by the alleged misstatements.

Here, there was ***not a single day*** on which SQM's share price reacted in a statistically significant way to any truly corrective disclosures concerning the payments. Beginning on January 9, 2015, and continuing through the ensuing weeks, the market was informed, *inter alia*:

- that Chilean tax and criminal authorities were investigating SQM for making payments to Chilean political figures through the use of "false invoices";

- that SQM had held an extraordinary board meeting to establish an independent committee of the board to investigate the payments;

- that prosecutors and uniformed agents had appeared unannounced at SQM's offices on two occasions to demand accounting information relating to the payments; and

- that the SQM board had abruptly terminated SQM's long-time CEO—a development that plaintiffs' expert opines "demonstrate[d] unequivocally the economic materiality" of the information that was allegedly withheld from investors. (Ex. 9 ¶ 113.)[3]

---

[3] "Ex." refers to exhibits to the Omnibus Declaration of Grant R. Mainland submitted contemporaneously herewith.

***Plaintiffs' own event study demonstrates that there was no statistically significant movement in SQM's share price on any of the days on which this new information about the improper payments was disclosed.***

Faced with this reality, plaintiffs, through their expert, Steven Feinstein, have advanced two alternative theories in an effort to establish loss causation and damages. As a threshold matter, and as set forth in SQM's *Daubert* motion, Feinstein's analysis should receive careful scrutiny. In *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364 (Del. Ch. Apr. 25, 2005), then-Vice Chancellor Strine (who later became Chief Judge of the Delaware Supreme Court) considered and rejected Feinstein's expert valuation testimony. Vice Chancellor Strine held that "Feinstein's assumptions [bore] no relationship to reality"; that "[t]he problems with his DCF analysis [were] so pervasive and numerous that it [was] impossible to describe all of them"; and that he "creat[ed] theoretical constructs too divorced from reality to be given credence." *Id.* at *14–15, *21; *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *2–7, *17–19 (N.D. Ohio Aug. 14, 2018) (excluding Feinstein's opinions as "unreliable" due to "numerous . . . fundamental design problems"). Feinstein's analysis in this case is equally flawed and unreliable.

***The March 11 to March 17 "Cumulative" Event Study.*** Feinstein dismisses the lack of a statistically significant change in the share price on any trading day during the March 11 to 17 time period, opining that plaintiffs should be able to recover $1.63 per share based on the "cumulative" decline in SQM's share price over that period. But there is no economic basis for measuring the effect of the disclosure of the improper payments by looking only at those five trading days.

First, there is no dispute that the market started to learn about the payments well before March 11, 2015. When the broader period is included, there is no evidence of a statistically significant decline in the share price. Even assuming *arguendo* that damages can be measured

using a multi-day window, it makes no sense to measure the effect of the previously undisclosed information on the share price by reference to a small subperiod of time over which the information was disclosed.  (*See infra* Point I.A.)

Second, even if it made sense to focus on a subperiod, the one chosen by Feinstein is plainly biased.  For example, Feinstein begins his cumulative analysis on March 11—when information emerged concerning SQM's response to the Chilean Public Prosecutor's information demands. Yet Feinstein excludes the prior day, March 10, when the market absorbed news that a team of prosecutors had appeared unannounced at SQM's offices, accompanied by uniformed agents, to make an in-person demand for information about the payments.  Feinstein absurdly opines that the prosecutors' demand for information was not corrective at all, but the board's deliberations about how to respond to the Public Prosecutor revealed the alleged falsity of SQM's prior disclosures over a five-year period.  Why would Feinstein take such inconsistent positions?  Because including March 10 in his event window changes the results; even on a cumulative basis, there is no statistically significant price decline over the March 10-17 window.  (*See infra* Point I.B.)

Finally, even if the March 11-17 event window were a valid period to measure the impact of the improper payments, Feinstein fails to account for the likelihood that SQM's share price was affected by substantial confounding information that was disclosed to investors during this period concerning business fundamentals having nothing to do with the payments.  During more than half of Feinstein's five-day cumulative event window (March 11-13), SQM executives were participating in a "road show" that included numerous one-on-one meetings with at least twenty-two institutional investors concerning the Company's mining concessions, pressure on key commodity prices, and other topics.  Contemporaneous notes of those meetings reflect that, at least on March 11 and 12, investor inquiries were focused on business issues, ***not*** the improper

payments.  Feinstein concedes that these institutional investors could have made trading decisions about SQM on the basis of these meetings.  Without any basis, however, he categorically rejects the possibility that the information about the Company imparted at those meetings could have contributed to any downward movement in the share price.  (*See infra* Point I.C.)

***The March 18 Director Resignations.***  Feinstein also opines that plaintiffs should be able to recover an additional $3.69 per share based on the decline in SQM's share price on March 18, 2015, when SQM announced before the open of trading that three directors had resigned from the SQM board.  The directors were appointees of Potash Corporation of Saskatchewan ("PCS"), SQM's then second-largest shareholder, which explained in a contemporaneous press release that the resignations were due to disagreements over SQM's dealings with the Public Prosecutor and the Company's management of its internal investigation into the payments.  The share price dropped sharply after the news; the parties agree that the decline was statistically significant.  But there is no triable issue as to whether the March 18 decline was caused by fraud.

The information disclosed on that day was objectively non-corrective; it told the market nothing about the truth or falsity of SQM's prior disclosures concerning legal compliance or internal controls over financial reporting.  The resignation of the PCS directors was news in and of itself.  SQM shareholders viewed the PCS directors as a positive influence on SQM, and PCS as a potential acquirer of SQM shares at a premium price.  The resignations upended that reality, handing control of the Company to Julio Ponce, SQM's controversial chairman and former son-in-law of General Augusto Pinochet, who had recently been fined $70 million by Chile's securities regulator for securities law violations in connection with his holdings of SQM shares.  The board disputes and eventual director resignations were disclosed without delay and could not have been disclosed any earlier.  Thus, the resignations and their surrounding circumstances did not reveal to

investors that they had been deceived *at all* about matters of legal compliance and internal controls over financial reporting, much less over a five-year class period.  (*See infra* Point I.A.1.)

Plaintiffs' effort to recover the decline that resulted from the PCS resignations should be foreclosed by the Second Circuit's decision in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010).  There, the plaintiffs sought to establish loss causation and damages based on a director's resignation over concerns about the accounting treatment of a controversial transaction.  *Id.* at 505, 511.  The plaintiffs alleged that the resignation and related news commentary—none of which contained new facts regarding the allegedly fraudulent accounting— indicated the potential severity of the problems with the company's accounting.  *See id.* at 512. The Second Circuit rejected the argument, holding that a share price decline in response to directors' "resignation[s] and resulting negative press" did not establish loss causation in the absence of new disclosure of "hard fact[s]" about the fraud that is the subject of the plaintiffs' complaint.  *Id.* at 512, 514.  Here, no such "hard facts" were disclosed on March 18; the record is indisputable on this point.  Indeed, the only resigning director with testimony in the record has explained that, in deciding whether to resign, the PCS directors had no new information regarding—and did not even *discuss*—the payments themselves or the effectiveness of SQM's internal controls over financial reporting.  (*See infra* Point II.A.2.)

In any event, even if one were to accept the proposition that the PCS resignations were corrective, one would then also have to accept the proposition that the subsequent disclosure weeks later that PCS was rejoining the SQM board was corrective as well.  Notably, the news that PCS was rejoining the board of directors resulted in a statistically significant positive price reaction that erased the entire decline that had resulted when the PCS resignations were announced.  There is no basis to measure the damages resulting from the resignations without also taking into

consideration the reversal of those resignations only a few weeks later. Doing so wipes out plaintiffs' damages based on the resignations in their entirety. (*See infra* Point II.B.)

In sum, there is no triable issue on loss causation and damages. The undisputed facts, and the testimony of plaintiffs' own expert, show that plaintiffs cannot meet their burden of proving that any investment losses were caused by fraud. SQM is entitled to summary judgment.

## FACTUAL BACKGROUND

A.     **In January and February 2015, News Emerges Concerning SQM's Payments to Chilean Political Figures; No Statistically Significant Reaction in SQM's Share Price.**

This case arises out of a political scandal that engulfed Chile in late 2014 and early 2015. During the course of the scandal, over twenty large Chilean companies, including SQM, reported to the Chilean internal revenue service, the Servicio de Impuestos Internos ("SII"), that they had made improper payments to Chilean political figures. (56.1 ¶ 50; Ex. 5 ¶¶ 39–41.)

Specifically, in late 2014, news emerged that a prominent Chilean financial institution, Grupo Penta ("Penta"), was being investigated for making payments to Chilean political figures through the issuance of false invoices—that is, invoices for which services had apparently not been rendered. (56.1 ¶ 15.) On January 9, 2015, SQM was implicated in the payment scandal by an article in *La Tercera*, a well-known Chilean newspaper. (*Id.* ¶ 16.) The article reported that Pablo Wagner, Chile's former undersecretary of mining, and his sister-in-law, both under criminal investigation, had issued false invoices not only to Penta, but also to SQM. (*Id.*)

In the following days, news reports revealed that Chilean investigators had become increasingly focused on questionable payments made by SQM, with an emphasis on potential tax fraud. (*Id.* ¶¶ 18–38.) On January 11, 2015, it was reported that the SII sought information from SQM concerning the Company's payments to Mr. Wagner. (*Id.* ¶ 18.) On January 15, 2015, an

article in *La Tercera* stated that the SII had sought all of SQM's accounting documentation for 2009 to 2014.  (*Id.* ¶ 20.)  The next day, on January 16, 2015, Chilean media outlets reported that officers from the "Economic Crimes Brigade" of the Policía de Investigaciones de Chile ("PDI") and prosecutors from the Chilean Public Prosecutor's office had "raided" SQM's offices, confiscating documents and computers containing accounting information.  (*Id.* ¶¶ 20–27.)

Further information concerning the nature and extent of the Chilean government investigations into SQM continued to emerge throughout February 2015.  On February 17, 2015, Chilean newspapers reported that the Public Prosecutor sought information concerning nineteen political figures who issued questionable invoices to SQM in July 2009.  (*Id.* ¶ 29.)  On February 18, 2015, it was reported that the PDI was prepared to interrogate those individuals, and that the Public Prosecutor's office was weighing its legal options to seize SQM's accounting information from 2009 to 2014.  (*Id.* ¶¶ 32–33.)  On the same day, the Public Prosecutor announced that, due to the "complexity and extent" of the SQM investigation, it was being separated from the Penta case and assigned to its own lead prosecutor.  (*Id.* ¶ 35.)  On February 24, 2015, Chile's National Public Prosecutor (the equivalent of the U.S. Attorney General) announced that he was taking over the Penta case and all its "aspects," including the SQM investigation.  (*Id.* ¶ 37.)

The growing number of political figures connected to SQM's payments, and the expansion of the Public Prosecutor's investigation, culminated in SQM's announcement, on February 26, 2015, that it had held an "extraordinary board meeting . . . to analyze the matters that have been divulged by the press in recent weeks and are the subject of ongoing public cases," and formed a "special committee" to investigate the payments.  (*Id.* ¶ 39.)  The same day, it was reported that investigators had identified payments by SQM to more than forty political figures.  (*Id.* ¶ 40.)

The parties agree that SQM's share price did not decline in a statistically significant manner on any of the days on which the foregoing news was disclosed; indeed, Feinstein shows that, on the first date, SQM's share price *increased* by a statistically significant amount.  To summarize:

| Effective Trading Date[4] | News Event | Statistically Significant Price Movement? |
|---|---|---|
| 1/9/2015 | Report that Chile's former undersecretary of mining directed sister-in-law to submit false invoice to SQM | Yes, but price went up, not down. |
| 1/12/2015 | Report that SII and Public Prosecutor investigating invoice to SQM from former undersecretary of mining; related accounting information sought from Company | No |
| 1/15/2015 | Report that funds paid on invoice submitted by former undersecretary of mining were intended for Chilean politician's congressional campaign | No |
| 1/16/2015 | SQM is raided by prosecutors and law enforcement agents in Penta case; accounting information is surrendered | No |
| 2/17/2015 | Report that Public Prosecutor gathering information on individuals who submitted invoices to SQM in July 2009, including several politically-linked persons | No |
| 2/18/2015 | Report that investigators pursuing testimony on whether invoices reflected services provided to SQM; additional political figures are identified | No |
| 2/19/2015 | Report that Public Prosecutor separates the SQM investigation from Penta case due to "complexity and extent" | No |
| 2/24/2015 | Chilean National Public Prosecutor personally takes over Penta case and investigation of SQM | No |
| 2/27/2015 | SQM forms committee to investigate payments; report suggests SQM payments to more than forty political figures | No |

---

[4] The term "effective trading date" refers to the date on which the market had the opportunity to absorb the information.

**B.**      **During March 2015, Information Continues to Emerge Concerning the Government Investigations and the Company's Response; No Statistically Significant Reaction in SQM's Share Price.**

In March 2015, there were additional news reports about the Chilean investigations and the actions taken in response by SQM.  On March 9, 2015, a team of prosecutors, again accompanied by agents of the Economic Crimes Brigade of the PDI, visited SQM's headquarters to obtain all of SQM's accounting information for 2009 to 2014.[5]  (56.1 ¶ 42.)  As reported by Chilean media, prosecutors met with SQM's lawyers, who "agreed to voluntary submission" of the information, and the Company's general counsel stated that SQM was "willing to cooperate with the prosecution."  (*Id.*; Ex. 9 ¶ 53.)  The parties agree that the share price did not react in a statistically significant manner on March 10, 2015, the effective trading date of this news.  (56.1 ¶ 44.)

On March 11, 2015, Mr. Contesse sued to block the Public Prosecutor's seizure of documents from SQM.  (*Id.* ¶ 45.)  Shortly thereafter, SQM stated in a press release that the Company itself "had not presented any request to avoid delivery of information to the Public Prosecutor," but would meet the next day "to evaluate the request by the Public Prosecutor."  (*Id.* ¶ 46.)  The press release also stated that SQM had informed the Public Prosecutor that it was "analyzing the legal appropriateness of such request."  (*Id.*)  The parties agree that the share price did not react in a statistically significant manner on this day.  (*Id.* ¶ 48.)

On March 12, 2015, media outlets reported that the Chilean court had denied Mr. Contesse's effort to prevent the seizure of documents from SQM.  (*Id.* ¶ 49.)  After market close, SQM announced that, at the extraordinary board meeting held that day, a majority of the directors voted to seek an independent legal opinion with respect to the Public Prosecutor's request for

---

[5] Although the amended complaint and the Feinstein Report describe the Public Prosecutor's appearance at SQM's headquarters as occurring on March 10, the record is clear that it occurred on March 9.  (56.1 ¶ 42.)  Because it is unclear, however, when and to what extent the news of the appearance was publicly reported on March 9, SQM's expert and this motion use March 10 as the "effective trading date" for this news.

documents, and resolved to hold an additional extraordinary board meeting on March 16, 2015 (the following Monday) to decide whether to voluntarily produce the documents. (*Id.* ¶ 52.) The Company also disclosed that the three directors appointed by PCS disagreed with the decision to seek an independent legal opinion, and instead were "in favor of providing the information requested by the [Public Prosecutor] voluntarily and as soon as possible." (*Id.*) SQM further noted that, in light of the board's resolution, José María Eyzaguirre, one of the PCS directors, resigned from the special committee created to investigate the payments. (*Id.*) The parties agree that the share price did not react in a statistically significant manner on March 12 or March 13, 2015, the effective trading date of this news. (*Id.* ¶ 53.)

Plaintiffs' expert identifies two articles that commented on these developments over the weekend (March 14-15). (Ex. 9 ¶¶ 61–62.) The first repeated the already-disclosed news that SQM had opted to seek a legal opinion and would hold an additional board meeting on March 16 to review it, describing the situation as "a 'tug-of-war' with the representatives of the Public Prosecutor's Office." (*Id.* ¶ 61.) The second quoted an unnamed "connoisseur of the process" who opined that "[i]ndependence was lost" when one of the PCS directors resigned from the board committee investigating the payments—a fact that had been disclosed days earlier. (*Id.* ¶ 62; 56.1 ¶ 52.) The parties agree that the share price did not react in a statistically significant manner on Monday, March 16, 2015, the effective trading date of this news. (56.1 ¶ 67.)

On the evening of March 16, 2015, SQM announced that the board had terminated Mr. Contesse's employment as CEO. (*Id.* ¶ 62.) ██████████████████████████████████ ████████████████████████████████████████████████████ Feinstein contends that Contesse's firing "demonstrate[d] unequivocally the economic materiality of the conduct and conditions" that were allegedly concealed from investors. (*Id.* ¶ 65.) SQM also announced that it

had decided to provide the requested accounting documents only to the SII, not the Public Prosecutor. (*Id.* ¶¶ 66, 69.)  The next morning, Chilean media outlets reported that the Public Prosecutor had requested court authorization to seize SQM's accounting information from 2009 to 2014. (*Id.* ¶ 68.)  The Public Prosecutor argued that the seizure could be justified not only by tax fraud, but also by bribery and other crimes outside of the purview of the SII. (*Id.*)  The parties agree that the share price did not react in a statistically significant manner on March 17, 2015, the effective trading date of this news. (*Id.* ¶ 70.)  To summarize:

| Effective Trading Date | News Event | Statistically Significant Price Movement? |
|---|---|---|
| 3/10/2015 | Report that prosecutors and law enforcement agents appear unannounced at SQM headquarters to request accounting information for 2009-2014 | No |
| 3/11/2015 | Report that Contesse sues to block Public Prosecutor from seizing information; SQM will hold board meeting to evaluate Public Prosecutor's request | No |
| 3/12/2015 | Chilean court denies Contesse's request for injunction blocking seizure of information | No |
| 3/13/2015 | SQM seeks report on propriety of Public Prosecutor's request and sets further board meeting for March 16; PCS director resigns from special committee investigating payments due to decision not to immediately comply with Public Prosecutor's request | No |
| 3/17/2015 | Contesse terminated by SQM board | No |

  **C.**  **During March 10-13, SQM Executives Participate in a "Road Show" to Present on the Fundamentals of the Company.**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████        The investors at the 2015 meetings asked numerous questions about the

fundamentals of the Company that were unrelated to the improper payments.  (Illanes Decl. ¶¶ 16–

17.)[6]  SQM's management provided information and answered detailed questions about prices of

iodine and potassium nitrate (two key commodities for SQM), the Company's mining concessions

with the Chilean government and the status of a related arbitration, SQM's shareholder structure,

potential new laws or regulations governing the mining of lithium (another important commodity),

and more.  (Id.)  Mr. Illanes and Ms. O'Brien did their best to answer the questions posed by

investors fully and candidly, as was their general practice in such road shows.  (Id. ¶¶ 10–11, 16.)

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  ██████████  ████████

████████████████████████████████████████████████

████████████████████████████████████████  ██████████

████████████████████████[7]

        Feinstein also acknowledged that, in an efficient market, conversations between a company

and numerous institutional investors would be incorporated into the share price.  (Tr. 55:4–12.)

---

[6] "Illanes Decl." refers to the Declaration of Gerardo Illanes submitted contemporaneously herewith.

[7] For brevity's sake, the transcript of Feinstein's deposition is cited as "Tr." for the remainder of this motion.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ (*See id.* at 129:6–24, 136:18–137:13, 144:4–6, 144:11–19.)  Yet, he concluded that none of the information discussed in these meetings had a material impact on SQM's share price. (*See id.* at 139:8–23, 154:5–18.)  Feinstein based that opinion on his reading of certain analyst reports that were issued during the same period.  (*See id.* at 137:14–18, 140:24–141:9, 151:11–22.)  But no analysts were present in the one-on-one meetings with investors.  (Illanes Decl. ¶ 11.)

Feinstein further testified that none of the information conveyed during these investor meetings could have been material because SQM was subject to Regulation FD, which limits an issuer's ability to disclose material information to some parties without making public disclosure. (*Id.* at 151:23–152:14, 155:6–13.)   But Feinstein's premise for his conclusion was wrong; Regulation FD does not apply to foreign private issuers like SQM.  *See* 17 C.F.R. § 243.101(b)(2).

### D.   On March 18, 2015, the PCS Directors' Resignations Are Announced, Resulting in a Sharp Decline in the Share Price.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In contrast to the payment-related disclosures through that date (including the news of Mr. Contesse's termination), news of the director resignations had an immediate and significant adverse impact on SQM's trading price.  (*Id.* ¶ 76.) While none of the payment-related disclosures over the prior two-plus months had resulted in a statistically significant share price decline on any single day, by 11:34 a.m. on March 18, SQM's share price had fallen by 30% from the previous day's closing price.  (*Id.* ¶ 78.)

It is undisputed that the disclosures concerning the resignations did not include any new information concerning the payments or the state of SQM's internal controls over financial reporting.  SQM's announcement did not disclose the reasons for the resignations; it simply

announced the fact thereof.  (*Id.* ¶ 73.)  Shortly thereafter, PCS issued a press release indicating

that the directors had resigned because they were "unable to ensure either that an appropriate

[internal] investigation is conducted or that SQM collaborate effectively with the Public

Prosecutor" (*id.* ¶ 77), a dispute that had been disclosed to the market days earlier (*id.* ¶ 52). ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex.

61 at 133:17–136:3, 167:3–9, 167:21–168:8; 56.1 ¶ 83.)  As Mr. Brownlee testified:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮

▮▮▮▮▮▮▮▮▮▮▮

(Ex. 61 at 133:17–134:19; *id.* at 134:20–136:3, 146:24–147:10, 167:3–168:8; 56.1 ¶¶ 83–86.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ (56.1 ¶ 83.)  But SQM's share price did decline in response to the resignations for other

reasons.  Market participants immediately speculated that the resignations could be a prelude to PCS selling its 32% stake in SQM.  (*Id.* ¶¶ 74–75.)  This concern was partly alleviated during intraday trading when, at 12:20 p.m., *Bloomberg* quoted a PCS spokesperson as saying that PCS had not yet decided whether to sell its stake, causing the share price to recover more than half of the decline that had occurred earlier in the day.  (*Id.* ¶¶ 78–80.)  Nonetheless, at close of trading, SQM's share price remained down more than 15% from the prior day's close, a decline that both parties agree was statistically significant.  (*Id.* ¶ 81.)

The resignations also exacerbated long-running market concerns regarding the influence of Julio Ponce, SQM's then-chairman and controlling shareholder, over the Company.  (*See id.* ¶¶ 9–10.)  The resignations put Mr. Ponce in complete control of SQM.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████     (*Id.* ¶ 72.)  Mr. Ponce, the former son-in-law of Augusto Pinochet, had long been a controversial figure in Chile and had only recently been fined $70 million by the Chilean authorities for securities law violations in connection with his SQM investment.  (*Id.* ¶¶ 5–6.)  The PCS directors had been viewed as a salutary check on Mr. Ponce's influence.  (*Id.* ¶ 10.)  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████   █████████████████   ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████    Even Feinstein

acknowledged, albeit reluctantly, that PCS's presence on the board was a positive, and that Ponce's

increased control after the resignations was a negative.  (Tr. 196:4–21.)

### E.  PCS Reappoints Three Directors to the SQM Board, Eliminating the March 18 Losses.

On March 25, 2015, SQM disclosed for the first time the amount of payments it had

identified to date:  approximately $11 million over the 2009-2014 time period.  (56.1 ¶ 93.)  SQM's

share price did not respond in a statistically significant manner to the announcement.  (*Id.* ¶ 94.)[8]

On April 14, 2015, after market close, SQM announced that Mr. Ponce had nominated a

new director to SQM's board who was an expert in corporate governance and was unaffiliated

with either SQM or Mr. Ponce's companies.  (*Id.* ¶ 98.)  On April 16, 2015, it was reported that

Mr. Ponce would be willing to vacate his chairmanship and potentially his position on SQM's

board.  (*Id.* ¶ 100.)  Finally, on April 22, 2015, after market close, SQM confirmed Mr. Ponce's

decision to step down when it identified the full slate of director nominees in advance of its annual

shareholders' meeting, and neither Mr. Ponce himself nor Patricio Contesse Fica (the son of the

former CEO and a ████████████ of independence concerns) was among them.  (*Id.* ¶¶ 102–04.)

████████████████████████████████████████████████████████████.  (*Id.* ¶ 100;

Ex. 61 at 149:16–150:13, 151:23–152:13.)  Thus, SQM simultaneously announced that PCS had

nominated three candidates to replace the directors who had resigned on March 18.  (56.1 ¶ 102.)

In response to each of these disclosures, SQM's share price increased in a statistically significant

manner, erasing the decline that followed the PCS resignations.  (*Id.* ¶¶ 99, 101, 107.)

---

[8] SQM later disclosed additional payments totaling approximately $4 million.  (56.1 ¶ 94.)  The share price did not react in a statistically significant manner to these disclosures.  (*Id.*)

## ARGUMENT

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To prevail under Section 10(b), plaintiffs must establish a materially false or misleading statement, made with scienter, that caused their alleged losses, as well as the amount of any such damages. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). Plaintiffs' failure to prove any one of these elements "'necessarily renders all other facts immaterial'" and entitles SQM to judgment as a matter of law. *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (quoting *Celotex*, 477 U.S. at 323). Here, because there is no triable issue of fact on loss causation or damages, summary judgment should be entered in SQM's favor. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (affirming summary judgment for defendant on loss causation grounds); *Omnicom*, 597 F.3d at 514 (same).

## I.   PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION OR DAMAGES FOR THE "CUMULATIVE" SHARE PRICE DECLINE FROM MARCH 11 THROUGH MARCH 17, 2015.

Plaintiffs seek to recover the entire decline in SQM's share price from March 11 to March 17, 2015 as purported securities fraud damages under Section 10(b). (Ex. 9 ¶ 155.) In support of that goal, Feinstein offers two basic opinions: (1) that although there was no statistically significant change in the share price on any one of those dates, plaintiffs should be able to recover the decline over that particular window because it was "cumulatively" statistically significant; and (2) that a review of public disclosures during the same period rules out any alternative explanation for the decline in the share price. (*Id.* ¶¶ 131, 155–57.) Neither opinion withstands scrutiny.

First, Feinstein's cumulative event window, which includes five trading days (March 11, 12, 13, 16, and 17), measures only a small portion of the more than two-month period during which

Feinstein concedes disclosures about the improper payments were made to investors, and thus does not accurately measure the "inflation" caused by the alleged fraud (which requires accounting for *all* of the information that may have impacted the price). Second, even if it were proper to focus on such a subperiod, the one chosen by Feinstein is marred by unprincipled date selection, including dates on which no corrective information was revealed and excluding another on which corrective information arguably *was* revealed (if Feinstein were being consistent in his determinations of what is "corrective"). Third, as he conceded at his deposition, Feinstein has no ability to account for the confounding information that was disclosed to investors during the March 10-13 road show, which related to business topics that were of greater concern to investors than the improper payments on a number of the days that Feinstein includes in his cumulative event window. Given these fundamental flaws in Feinstein's cumulative model, plaintiffs cannot establish loss causation during the March 11-17 window, and SQM is entitled to summary judgment with respect to plaintiffs' claim for loss causation and damages during that time period.

### A. Plaintiffs' Cumulative Model Measures an Incomplete Portion of the Total Information Disclosed to the Market Concerning the Alleged Fraud.

Feinstein's cumulative model fails at the outset because it fundamentally misapprehends the nature of the loss causation analysis—*i.e.*, to ascertain the amount by which the share price was inflated by the alleged misstatements that gave rise to the complaint.[9] It makes no sense to undertake that analysis by plucking five trading dates out of a much larger stream of information that stretches back more than two months prior to the narrow window that Feinstein has selected. The exclusion of this earlier information is all the more egregious for how salient the information

---

[9] Feinstein's use of a cumulative multi-day model to show statistical significance when no single day was itself statistically significant is itself unusual. Feinstein could point to only one other case—out of hundreds of cases in which he has testified—where he claimed to have used such a methodology. (Tr. 271:16–273:2.)

was—the excluded dates include January 9 (when the market first learned of SQM's connection to the Penta case), January 15 (when it was reported that the Chilean authorities were pursuing all of SQM's accounting information for the 2009 to 2014, followed by a raid on the Company's headquarters the next day that was broadcast on television news), and February 26 (when SQM announced the formation of a board committee to conduct an internal investigation).  Feinstein himself claims that two of these disclosures (January 15 and February 26) were corrective.  (Ex. 9 ¶ 126.)  Mr. Feinstein did not consider the January 9 disclosure—which tied SQM to the Penta case, followed by a statistically significant *increase* in the share price—to be corrective.  (*Id.*; 56.1 ¶¶ 16–17.)[10]  His failure to include these three dates in the multi-day window necessarily means that he cannot possibly be measuring the impact of the alleged fraud on SQM's share price because he is measuring the impact of only some of the corrective disclosures.

Why is Feinstein loathe to measure the impact of all of the corrective disclosures?  Because when one assesses the market's *overall* reaction to the disclosures concerning the payments— including the information excluded by Feinstein's cumulative model—there is no evidence of a statistically significant reaction in the share price.  As explained by SQM's expert, Glenn Hubbard, if Feinstein had constructed his model starting with what he himself views as the first corrective disclosure (January 15), he would have found that the decline through March 17 was not statistically significant.  (Ex. 8 ¶ 48.)  Feinstein does not dispute this point.  (*See* Tr. 117:21– 118:18, 119:12–120:6, 120:15–18.)  It is no answer to contend (as Feinstein did at his deposition) that a cumulative model is unworkable over a longer period due to confounding information on intervening days.  (*See id.* at 119:12–120:11, 159:12–160:7.)  Feinstein could have tested whether

---

[10] Feinstein claims that he did not do an event study for January 9 as part of his initial report.  But he concedes that there was a statistically significant increase in SQM's share price on that date, and that he could not identify any news other than the payment issue that would have explained that change.  (Tr. 101:24–103:12.)

the **sum** of the share price returns on the individual dates, as opposed to the **cumulative** return over the entire period, was statistically significant. Hubbard considered this possible approach by conducting an alternative statistical test (known as an *f*-test) to determine whether the sum of each of the share price movements on the disclosure dates identified by Feinstein between January 9 and March 17 was statistically significant. (Ex. 8 ¶ 48.) It was not. (*Id.*) Feinstein offered no alternative methodology to establish statistical significance for the longer period.

The only possible rationale for Feinstein to have focused on a subperiod of disclosures, rather than the full suite of them, was to achieve the finding of statistical significance necessary to support a claim. That may be good business for an expert witness (if he can get away with it), but it is not good science for an expert economist.

### B.   The Subperiod Used in Plaintiffs' Cumulative Model Is Marred by Biased and Unprincipled Date Selection.

Even if it were appropriate to measure the impact of the alleged fraud on the share price by reference to a subperiod, the actual subperiod chosen by Feinstein is improperly gerrymandered to achieve plaintiffs' desired finding of statistical significance. The errors fall into two categories. First, the March 11-17 event window includes dates on which the news was not corrective. Second, the March 11-17 event window omits disclosures immediately preceding it that were clearly corrective (to the extent that Feinstein was being consistent in determining what was or was not corrective) and thus should have been selected for testing. It is undisputed that when either of these errors is corrected, the finding of cumulative statistical significance is eliminated.

A corrective disclosure is one that alerts the market, at least in part, to the falsity of an alleged fraudulent statement—here, SQM's alleged misstatements concerning legal compliance and internal controls over financial reporting. *See Lentell*, 396 F.3d at 175 n.4. Even where a plaintiff alleges a series of partial corrective disclosures, each such disclosure must "reveal some

then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint[.]" *Omnicom*, 597 F.3d at 511; *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008). Although there is no "requirement that the disclosure take a particular form or be of a particular quality," *In re Winstar Comms.*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006), it must establish a "sufficiently direct" relationship between the alleged fraud and the claimed loss. *Lentell*, 396 F.3d at 174. A disclosure that reveals an "attenuated" link between the fraud and the loss, or one that merely "touches upon" the alleged fraud, is not sufficient. *Id.*; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.") (citation omitted) (emphasis in original). Where the undisputed facts establish that the alleged corrective disclosures did not in fact uncover any information showing the falsity of the challenged statements, summary judgment should be granted in the defendant's favor. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (granting summary judgment on ground that corrective disclosures alleged by plaintiffs were not in fact corrective), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

### 1. News Concerning SQM Board Disputes Was Not Corrective.

The news on four of the five trading dates in the March 11-17 window (March 11, 12, 13, and 16) related to disputes among SQM's directors concerning the Company's response to the Public Prosecutor's request for accounting information. As set forth above (at 10-12), on March 11-13, investors learned that Mr. Contesse had sought an injunction blocking the Public Prosecutor's request; that the board had held a meeting to address the request; and that the board had resolved to obtain a legal opinion concerning the propriety of the request, over the objection of the PCS directors, one of whom resigned from the board committee tasked with conducting the internal investigation into the payments. Feinstein contends that this information was corrective

insofar as it indicated the "severity" of the alleged misconduct and material weaknesses in the Company's "internal controls" (a term he leaves undefined).  (Ex. 9 ¶ 131.)

But the news regarding the board disputes did not address either topic.  The existence of a dispute among directors over the appropriate response to a regulator's information request told investors *nothing* about the underlying conduct, whether the amount of the payments or any other details.  Indeed, Feinstein acknowledged that, even today, he does not know which faction of SQM's board was right or wrong about whether SQM was required to provide additional information to the Public Prosecutor.  (Tr. 176:18–177:10.)  Nor did the existence of that dispute indicate anything regarding the internal controls over financial reporting at any time, much less for the entire five-year period that preceded the board dispute; board-level discussions concerning legal strategy in a government investigation simply do not implicate that topic.  "[W]here a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective.'"  *Omnicom*, 541 F. Supp. 2d at 552.

March 16 is an even less appropriate candidate for inclusion in the cumulative event window.  March 16 was a Monday, meaning that it was the first trading date on which the share price could digest news from the preceding weekend (March 14-15).  But the supposed "news" that was published over that weekend merely repackaged information that had already been disclosed to the market in the March 11-13 disclosures.  Such information is not corrective for two reasons.  First, to the extent it merely repackaged and republished the March 11-13 disclosures, it was not corrective for the same reason the March 11-13 disclosures themselves were not corrective (as explained above).  Second, even assuming *arguendo* that the information that emerged during March 11-13 was corrective, the articles Feinstein references that were published during the

weekend preceding March 16 were mere commentary on already disclosed facts.[11]   Such

commentary is non-corrective as a matter of law.  *See Omnicom*, 541 F. Supp. 2d at 552 ("A

recharacterization of previously disclosed facts cannot qualify as a corrective disclosure.");

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) (same); *In re Merck & Co.

Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (same); *DoubleLine Capital LP v. Odebrecht Fin.,

Ltd.*, 323 F. Supp. 3d 393, 459 (S.D.N.Y. 2019) (reports of CEO's arrest and proof tying defendant

to bribery scheme "let the cat out of the bag"; subsequent disclosures "merely confirmed what the

market already knew" and therefore "were not corrective disclosures").[12]

> ## 2.   News Immediately Preceding the March 11-17 Event Window Arguably Was Corrective and Should Have Been Included in Plaintiffs' Analysis.

Feinstein also ***excludes*** at least one date immediately preceding the March 11-17 window

that, consistent with Feinstein's approach, should have been classified by him as corrective.  That

date is March 10,[13] when the market learned that a team of prosecutors accompanied by agents of

---

[11] Feinstein claims that two articles from the weekend of March 14-15 contained corrective information.  (*See supra* at 11.)  Not so.  The first merely repeated the already disclosed news that SQM had opted to seek a legal opinion and would hold an additional board meeting on March 16 to review it, describing the situation as "a 'tug-of-war' with the representatives of the Public Prosecutor's Office.  (Ex. 9 ¶ 61.)  The second quoted an unnamed "connoisseur of the process" who opined that "[i]ndependence was lost" when one of the PCS directors resigned from the board committee investigating the payments—a fact that had been disclosed days earlier.  (*Id.* ¶ 62.)

[12] As Hubbard explains, March 17—the effective trading date following the news of Contesse's termination—was likewise an inappropriate candidate for inclusion in the cumulative event window, albeit for a different reason.  (Ex. 8 ¶¶ 63–69.)  The news of Contesse's termination was arguably corrective insofar as it suggested that the underlying misconduct was real.  (56.1 ¶¶ 62–64.)  The inclusion of March 17 in the event window, however, is fundamentally at odds with Feinstein's rationale for his "cumulative" approach—that the news during March 11-17 only "partially correct[ed] the alleged misrepresentations and omissions."  (Ex. 9 ¶ 131.)  Feinstein himself states that the board's decision to "fire the man who had served as CEO for over 25 years . . . ***demonstrates unequivocally the economic materiality*** of the conduct and conditions that Plaintiff alleges was concealed from investors with misrepresentations." (*Id.* ¶ 113 (emphasis added); 56.1 ¶ 65.)  In other words, by Feinstein's own admission, there was nothing "partial" about this news; it "unequivocally" revealed the alleged fraud.  (*See* Ex. 8 ¶ 64.)  Accordingly, Feinstein should have treated March 17 as its own event and confronted the reality that, with the entire trading day to digest this salient news, the share price did not respond in a statistically significant manner.  Nonetheless, the Court need not reach this issue given the obviously non-corrective nature of the information that emerged on March 11-13 and 16.

[13] As noted above (at n.5), the record is clear that the prosecutors' visit occurred on March 9.  Because it is unclear when on March 9 the news of that visit emerged, Hubbard uses March 10 as the effective trading date.

the Economic Crimes Brigade of the PDI had appeared at SQM's offices demanding accounting information from 2009 to 2014.  (56.1 ¶ 42–43.)  Feinstein himself identifies this date as part of the "Timeline of Events" undergirding his loss causation analysis (Ex. 9 ¶ 53), but nonetheless omits it from his cumulative window, asserting that a "[f]rom 11-17 March 2015, a series of events" informed the market of the "severity" of the alleged misconduct and weaknesses in internal controls, without explaining why this series of events began on March 11 (*id.* ¶ 131).

Feinstein's methodology is clearly biased to obtain a result that would support plaintiffs' position.  Feinstein contends that the board's debate over how to respond to a government inquiry was corrective, but news of the government inquiry itself was not.[14]  This was apparently so obvious to him that he never even ran an event study for March 10.  (Tr. 71:20–72:4.)  When asked about this glaring inconsistency at his deposition—including the fact that the prosecutors appeared at SQM's offices with law enforcement agents—Feinstein sarcastically responded that it was not notable information because, in his words, "I would not have expected the public prosecutor in the United States or Chile to show up alone."  (*Id.* at 114:17–24.)  As Hubbard explains, this omission has no principled basis and can only be seen as results-driven:  When March 10 is included in the window, "the cumulative abnormal change in SQM's ADS price from March 10 through March 17 is not statistically significantly different from zero."  (Ex. 8 ¶ 47.)

### C.   Plaintiffs' Cumulative Model Does Not Account for Substantial Confounding Information Regarding Company Fundamentals.

Finally, plaintiffs' cumulative event study cannot show loss causation or damages for a third, independent reason—its failure to distinguish the effect (if any) of the alleged fraud on the

---

[14] To the extent the March 11 news that SQM's board would evaluate the Public Prosecutor's request rather than immediately comply with it was corrective of anything, it would have been corrective of news reports on March 9 that SQM's lawyers had "agreed to voluntary submission of [the requested information]."  (56.1 ¶ 42.)  But as noted, that "correction" did not provoke any discernible response in the share price.

share price from the "tangle of [other] factors" that may have affected the price, including industry- or firm-specific information unrelated to the alleged misstatements. *See Dura Pharms.*, 544 U.S. at 343. This requirement is front and center on summary judgment. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014) ("An expert may be entitled to his opinion, but he is not entitled to a conclusion that his view of the facts necessarily precludes summary judgment."); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment."). If plaintiffs cannot account for "confounding" information, they cannot establish that their losses were caused by fraud, and SQM is entitled to judgment as a matter of law. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015) ("[I]n order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors.").

Feinstein contends that, based on his purported review of all ***public*** information concerning SQM during the March 11-17 window, no information other than the allegedly corrective information could have contributed to the share price decline. (Ex. 9 ¶ 157; Tr. 273:9–19.) By Feinstein's own admission, however, he ignores the ***private*** information that was shared with SQM investors during the March 10-13 road show relating to important topics having nothing to do with the alleged fraud. (*See* Tr. 154:5–18, 273:20–274:7.) ███████████

████████████████████████████████████

████████████████████████████████████

███████████████ ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████   As Mr. Illanes explains, he
and Ms. O'Brien provided their best and most accurate answers to the investors' questions on these
topics.  (Illanes Decl. ¶¶ 10–11, 16.)  At deposition, Feinstein admitted that, in writing his report,
he was not aware that these one-on-one meetings had occurred.  (*See* Tr. 126:5–16.)  He
nonetheless testified that the information conveyed was unlikely to be material because SQM
executives would have been restrained by Reg FD in sharing any material information that had not
been more broadly disseminated.  (*Id.* at 155:6–13.)  Feinstein's assumption was incorrect. *See* 17
C.F.R. § 243.101(b)(2) (foreign private issuers exempt from Reg FD).

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████  ███████████████

█████████  (Tr. 132:10–20.)  Given that concession, Feinstein has no basis for his opinion that
any movement in SQM's share price on those days is attributable solely to new information about
the improper payments.

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████  (*Id.* at 129:13–24.)  And he also did not dispute that investor meetings such as the
March 10-13 road show can impact stock prices (*id.* at 44:4–15, 136:18–138:7), ████████████

████████████████████████████████████ (*id.* at 144:4–14).

These concessions likewise render baseless his assertion that any movement in SQM's share price on those days is attributable solely to new information about the payments.[15]

Feinstein's failure to account for the confounding information disclosed at the March 10-13 road show is fatal. As the Seventh Circuit explained in the *Household* litigation, where a defendant is able to identify "some significant, firm-specific, nonfraud related information that could have affected the stock price," the burden shifts back to the plaintiff to "account for that specific information or provide a loss-causation model that doesn't suffer from the same problem[.]" 787 F.3d at 422. Where a plaintiff cannot do so, it cannot establish loss causation. *See id.* at 422–23. Here, as in *Household*, there is unrebutted evidence of "significant, firm-specific, nonfraud related information" that surely "could have" affected SQM's share price. *Id.* at 422. Feinstein makes no effort to "account for that specific information," *id.*; his event study merely controls for market and industry factors, as any statistical regression would. On this ground alone, plaintiffs' theory of "cumulative" loss causation during the March 11-17 window must fail. *See Gordon Partners v. Blumenthal*, 2007 WL 1438753, at *2-3 (S.D.N.Y. May 16, 2007) (granting summary judgment where plaintiff did not "show whether any loss (and if so how much) was caused by defendants' conduct as opposed to other market factors").[16]

---

[15] After admitting that he had been unaware of the one-on-one nature of SQM's investor meetings, Feinstein sought to dismiss their relevance on the basis of his supposed expert analysis of certain analyst reports. But the analysts were not present at the one-on-one meetings. (Illanes Decl. ¶ 11.) Neither Feinstein nor the analysts have any idea whether investors asked different questions, received different information, or reacted negatively to the information received.

[16] At a minimum, March 11 and 12—dates on which Feinstein concedes investors were ***not*** focused on the payments—must be removed. That change eliminates the finding of cumulative statistical significance. (*See* Ex. 9, Exhibit 10; Tr. 132:10–133:2.)

## II.     PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION OR DAMAGES FOR THE SHARE PRICE DECLINE ON MARCH 18, 2015.

Plaintiffs likewise cannot establish that the decline in SQM's share price on March 18, 2015, in the wake of the PCS director resignations, was caused by fraud.  First, the information learned by investors on that day told them nothing about the underlying misconduct or the state of SQM's internal controls over financial reporting during the five-year class period—the actual subjects of the alleged misstatements.  Second, to the extent plaintiffs' theory is that the PCS resignations indicated the "severity" of the situation surrounding the improper payments (as their expert contends), that theory is foreclosed by governing Second Circuit precedent.  *See Omnicom*, 597 F.3d at 512, 514.  Finally, even assuming *arguendo* that the news of the PCS resignations was corrective, to evaluate the full "correction" associated with the resignations, the Court must consider the full story concerning those resignations, including the directly related fact that PCS reappointed three directors to the SQM board weeks later, erasing the decline that occurred on March 18.  *Cf. Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012).

### A.     The News Concerning the PCS Resignations Was Not Corrective of the Alleged Misstatements.

#### 1.     The News of the PCS Resignations Contained No Hard Facts Concerning the Improper Payments or Internal Controls Over Financial Reporting.

In determining whether the disclosures of the PCS resignations on March 18 were corrective, such that the share price decline on that day can be attributed to the alleged fraud, the Court's inquiry should begin and end with the objective, undisputed fact of what those disclosures said.  SQM's announcement stated nothing more than the fact and effective timing of the resignations themselves (56.1 ¶ 73), and PCS's press release stated that the directors had resigned due to disagreements concerning the handling of the internal investigation and the decision whether to voluntarily provide information to the Public Prosecutor (*id.* ¶ 77).  Equally important

is what these two disclosures did ***not*** say. Neither of them contained information about the particulars of the payments, whether the amounts paid, the duration of the conduct, or the manner in which the payments were effected. Nor did they contain information concerning the state of SQM's internal controls over financial reporting at any time, much less over the five-year class period; that subject matter was simply not addressed. Accordingly, nothing in these disclosures could have "corrected" the Company's prior statements relating to those topics. *See Marsden v. Select Med. Corp.*, 2007 WL 518556, *4 (E.D. Pa. Feb. 12, 2007) ("There is not a single reference in the press release to either Select's past revenue practices or the adequacy of its internal controls.") (emphasis omitted); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 335 (D.N.J. 2007) ("[T]he Press Release language must be read as stating no more and no less than what it actually states, namely, that . . . Intelligroup detected a series of past financial mistakes," ***not*** that its internal controls over financial reporting were ineffective.).

These undisputed facts should end the inquiry. But were there any doubt on the matter, the testimony of Wayne Brownlee, the sole resigning director with testimony in the record, should put it to rest. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████  █████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

What, then, explains the severity of the drop on March 18?  The fundamental shift in corporate control that resulted from the PCS resignations—a development that could not have been disclosed any earlier.  It is undisputed that SQM shareholders generally viewed the PCS directors as a positive influence on SQM.  (56.1 ¶ 10; Ex. 5 ¶¶ 15, 30; Ex. 61 at 148:21–149:15.)  It is likewise undisputed that investors generally had a negative view of Julio Ponce, SQM's controversial chairman and former son-in-law of General Augusto Pinochet, who had been dogged by well-publicized legal troubles with the Chilean authorities.  (56.1 ¶¶ 5–7, 9; Ex. 61 at 150:23–151:22.)  The PCS resignations removed any real check on Mr. Ponce's influence; the remaining directors were either his appointees or an independent director whom Mr. Ponce had nonetheless nominated.  (56.1 ¶ 72; Ex. 5 ¶¶ 15, 30.)  The resignations also undercut the prospect that PCS would buy the Company for a control premium—a possibility that had been entertained by investors for years.  (Ex. 5 ¶¶ 15, 31.)  If anything, they suggested that PCS might sell its investment, ceding control to Mr. Ponce.  (56.1 ¶¶ 74–75; Ex. 5 ¶ 29.)[17]

Moreover, Feinstein's opinion that the news of the PCS resignations "informed the market about . . . material weaknesses in internal controls" (Ex. 9 ¶ 19) is based on a fundamental error concerning the nature of the controls at issue.  Feinstein testified: "[T]he way 'internal controls'

---

[17] This far better explanation for the March 18 decline is further underscored by the significant intraday jump that occurred when *Reuters* reported that PCS had not decided whether to sell its SQM stake.  (56.1 ¶¶ 79–80.)  The share price quickly recovered half of its losses on that news.  (*Id.*)  As Hubbard explains, the fact that the share price did not fully recover makes sense given PCS did not express any firm plan to stick with its investment.  (Ex. 10 ¶ 50 n.109.)

has been defined in this case . . . broadly encompasses all internal controls at the company that are designed to detect, deter, and prevent fraud and illegal activity." (Tr. 162:21–163:10.)[18]  Feinstein further testified that the board disputes concerning the internal investigation and dealings with the Public Prosecutor reflected poor "controls" (using his erroneous definition) because those disputes supposedly showed an unwillingness to get to the bottom of the suspected misconduct.  (*Id.* at 177:11–178:18, 181:15–182:9.)  But even if that interpretation had merit, it misunderstands the nature of the internal controls representations that the complaint alleges were fraudulent.

Specifically, as required by the Sarbanes-Oxley Act of 2002 and related SEC regulations, SQM stated in Item 15 of its Form 20-F filings during the class period that "the Company's internal control over financial reporting was effective."  (56.1 ¶ 13.)  Contrary to Feinstein's assumption, the SEC's definition is much narrower than controls designed to detect, deter, or prevent fraud or illegal activity. *See* 17 C.F.R. § 240.13a-15(f) (defining "internal control over financial reporting" as a process "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles").  Indeed, the SEC has clarified that "***we do not believe that compliance with all laws fits within the definition***."  U.S. Sec. Exch. Comm'n, *Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Frequently Asked Questions*, available at www.sec.gov/info/accountants/controlfaq1004.htm#P2_245 (emphasis added).  Thus, even if the March 18 disclosures could be construed as bearing on controls of any sort, the controls at issue in the alleged misstatements

---

[18] Feinstein was clear on this point at his deposition:  "[E]very time I encountered the term 'internal controls,' I interpreted it to mean and include internal controls to prevent illegal activity." (Tr. 185:7–21.)  Feinstein claimed to have arrived at his definition through his own research. (*Id.* at 163:11–15.)  When questioned about that research, he said he had asked Robbins Geller. (*Id.* at 163:11–18.)  And when asked what he had learned from Robbins Geller, Feinstein was directed not to answer the question. (*Id.* at 163:20–164:11.)

relate solely to management's financial reporting function—a topic that was not at issue on March 18. For an alleged corrective disclosure to reveal as false a prior statement on internal controls over financial reporting, the corrective information must in fact relate to financial reporting. *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (Ramos, J.) ("Even if PetroChina officials were engaging in bribery, the [plaintiffs] do[] not make any allegations that would imply that the Company had flawed internal controls over *financial reporting*.") (emphasis in original), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016).[19]

At bottom, plaintiffs' attempt to obtain Section 10(b) damages as a result of the "revelation" of the board dispute regarding the internal investigation and government inquiries is a classic "corporate mismanagement" theory of liability that is foreclosed by long-standing Supreme Court jurisprudence. As this Court has noted, "allegations of corporate mismanagement cannot form the basis of a securities fraud claim." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 655 (S.D.N.Y. 2015) (Ramos, J.) (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977)). That is precisely the gravamen of plaintiffs' theory concerning the PCS resignations— *i.e.*, that the resignations revealed poor decision-making by the SQM board relating to cooperation with the Public Prosecutor or alleged conflicts clouding its internal investigation. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 61 at

---

[19] *See also Cutler v. Kirchner*, 696 F. App'x 809, 811–12 (9th Cir. 2017) ("'Internal control over financial reporting' is a defined term in the SEC's regulations [that] . . . go[es] to a company's *accounting* practices—its ability to accurately track revenues as they are realized and cash as it comes in the door." (emphasis in original)); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *11 n.4 (M.D. Pa. Dec. 7, 2016) ("[O]nly facts pertaining to internal controls designed to insure the reliability of financial reporting are implicated by this definition."); *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 868 (S.D. Tex. 2016) ("'[I]nternal control over financial reporting' do[es] not relate to FCPA compliance policies and procedure and do[es] not make any statements about the adequacy of systems designed to ensure compliance with the FCPA."); *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at *6 n.2 (N.D. Cal. Jan. 24, 2006) ("Under Plaintiffs' apparent reading, the Court would have to read Defendants' statement to say that Defendants warranted the presence of systems which were adequate to uncover any and all improper conduct, even conduct outside the realm of financial reporting. Defendants said no such thing.").

168:9–169:9; 56.1 ¶¶ 89–90.)   This allegedly "omitted mismanagement" is not "sufficiently connected to defendants' existing disclosures." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 719 (S.D.N.Y. 2018) (Ramos, J.) (citation and internal quotation marks omitted).   Plaintiffs' mismanagement theory amounts to nothing more than "[a]llegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties," which "ordinarily do not state a claim under the federal securities laws." *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988); *see also Fries*, 285 F. Supp. 3d at 718 ("Allegations that defendants concealed corporate mismanagement . . . are not actionable unless the non-disclosures render other statements by the defendants misleading.").

### 2. Plaintiffs' Theory That the PCS Resignations Informed the Market of the "Severity" of the Alleged Fraud During the Five-Year Class Period Is Unavailing.

Forced to admit that the March 18 disclosures of the PCS resignations contained no actual facts concerning the payments, Feinstein contends that the news was nonetheless corrective because it "informed the market about the severity of the alleged misconduct"—a phrase he uses no fewer than twenty times in his two reports. (*E.g.*, Ex. 9 ¶¶ 19, 43, 118, 131 n.118; *see also* Tr. 207:16–208:13.)   Feinstein's "severity" rhetoric, however, is unavailing in at least two respects.

For starters, to the extent Feinstein's "severity" theory is premised on the view that the market did not appreciate the seriousness of the payments situation until the PCS resignations, that view is at war with Feinstein's own opinion that the termination of SQM's CEO—the person who directed the payments and personally acted to block the Public Prosecutor from obtaining information about them—"demonstrate[d] unequivocally the economic materiality of the conduct and conditions that Plaintiff alleges was concealed from investors with misrepresentations." (Ex. 9 ¶ 113.)   The termination of Contesse occurred more than a day before the news of the PCS resignations broke and was immediately covered by analysts (56.1 ¶ 62); the market for SQM's

shares, which plaintiffs contend rapidly incorporates all publicly available information, had a full trading day to digest the news, and the share price did not show a statistically significant reaction. (*Id.* ¶ 70.)  It is thus self-contradictory at best for plaintiffs to assert that investors, already on "unequivocal" notice of the "economic materiality of the conduct," sold their shares on March 18 because the PCS resignations indicated the severity of the misconduct.  *See Odebrecht*, 323 F. Supp. 3d at 459 ("[T]he existence of proof tying Odebrecht officials to the Petrobras scheme let the cat out of the bag.  Subsequent reports merely confirmed what the market already knew.").

More fundamentally, even assuming *arguendo* that the decline in SQM's share price following the PCS resignations was driven by investor concerns over the potential scale of the underlying misconduct, Second Circuit precedent precludes the recovery of such losses as 10b-5 damages.  The *Omnicom* decision is directly on point.  *See Omnicom*, 597 F.3d at 512–13.  There, the plaintiffs alleged that the company had engaged in fraudulent accounting for a transaction in which Omnicom transferred certain deteriorating internet companies to a newly formed entity called "Seneca."  *Id.* at 504.  News reports from the time of the transaction suggested that Omnicom used the Seneca transaction as an accounting method to move the Internet companies' losses off its books, but the company's shares did not react.  *Id.* at 505.

Later, one of Omnicom's outside directors (the chair of Omnicom's audit committee) resigned.  *Id.*  In the ensuing days, the company's share price declined as news reports suggested that the director had resigned due to concerns over the propriety of the Seneca transaction, in addition to more general concerns about corporate governance.  *Id.* at 505–06.  The commentary on the resignation culminated in an article in The Wall Street Journal ("WSJ"), which reported that the director had resigned "'amid questions about how the company handled a series of soured Internet investments,' that '[h]e questioned whether something wasn't being disclosed to the board

about the initial off-loading of the problematic investments and the proposal to buy two Internet firms,' that 'he had voiced doubts about Seneca's purpose for months,' and that he had concerns that management 'had engaged in transactions without running it through the board.'"  *Id.* at 506. The article also "raised questions about Omnicom's general accounting practices."  *Id.* at 507.

Omnicom's share price fell dramatically in response to the WSJ article, although it later "increased substantially" when the company's auditor reviewed and signed off on the accounting for the Seneca transaction.  *Id.* at 508.  The plaintiffs nonetheless sought to recover the loss that followed the resignation.  *Id.*  As with Feinstein here, the plaintiffs' expert opined that the director resignation and related negative commentary was "tied to the news of Omnicom's inappropriate accounting for investments in Internet-related entities and not to other news during that time period," and that investors "legitimately feared that Omnicom's transfers of its Internet investments created the potential for losses and hidden liabilities[.]"  *Id.* at 508.  Thus, the expert concluded, the director resignation and related commentary constituted "corrective" information that revealed the allegedly fraudulent accounting, causing investors' losses.  *See id.* at 509.

The Second Circuit disagreed, concluding that "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint concerning the Seneca transaction."  *Id.* at 511 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009)).  "At best," the Second Circuit explained, "[plaintiffs had] shown that the market may have reacted as it did because of concerns that [the director's] resignation and the negative tone of the June 12 article implied accounting or other problems in addition to the known Seneca transaction"—*i.e.*, that the "severity" of the accounting issues at Omnicom was, perhaps, greater than what previous disclosures had indicated.  *Id.* at 512. The Court concluded that, given the absence of any new information concerning the alleged fraud

(the Seneca transaction), the plaintiffs had "failed to show a [share] price decline due to a corrective disclosure." *Id.* at 513.  The Court went on to note that, although "[f]raud may lead to a director's resignation . . . it is generally the facts underlying the fraud and resignation that causes a compensable investor's loss." *Id.* at 513–14.  Because no such facts were disclosed in connection with the director's resignation and resulting press, the record could not support a finding of loss causation or damages.  *Id.*; *see also Rok v. Indentiv Inc.*, 2017 WL 35496, at *19–20 (N.D. Cal. Jan. 4, 2017) (resignation of company's auditor was, at most, "an ominous event" that "put[] investors on notice of a potential future disclosure of fraudulent conduct" but did not itself "reveal any fraud" and therefore could not "establish a causal connection to any economic loss") (citation and internal quotation marks omitted); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300 (S.D.N.Y. 2014) (disclosure of dispute with and dismissal of company's auditor over differences in accounting treatment "disclosed nothing new [about internal controls issues]" such that it was "not plausible based on such an allegation, as required to plead loss causation, that the 'share price fell significantly after the truth became known.'" (quoting *Dura*, 544 U.S. at 347)).

The *Omnicom* reasoning applies with full force here.  As explained in detail above, ████

████████████████████████████████████████████████████

████████████████████████████ ██ ████████████████

████████████████████████████████████████████████████

████████████████████████████

---

[20] In this regard, the *Omnicom* reasoning applies here *a fortiori*.  In *Omnicom*, the WSJ article indicated that the director had resigned, at least in part, due to his doubts that the accounting for the Seneca transaction was proper. *Omnicom*, 597 F.3d at 506. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

████████████████

████████████████

(56.1 ¶ 91 (emphasis added).)  Thus, even if plaintiffs could establish at trial that the share price

decline on March 18 was due to investors' fears as to what the PCS resignations might suggest

regarding the "severity" of the underlying misconduct (as Feinstein contends), that would not

establish loss causation or damages in the absence of new "hard facts" relating to that misconduct.

*See Omnicom*, 597 F.3d at 512.  This is so even if, as the *Omnicom* court observed, plaintiffs could

show that the underlying fraud in some sense led to the PCS resignations.  *Id.* at 513 ("Fraud may

lead to a director's resignation — to escape personal liability, if for no other reason . . . .").  And

it is so even if, as in *Omnicom*, the market speculation flowing out of the director resignations

resulted in a "temporary drop in share price," *id.* at 514, albeit one that was later corrected once

the speculation was shown by later-disclosed facts to be overblown, *id.* at 508.

### B.      In Evaluating Loss Causation, the Court Should Consider the Post-March 18 Recovery in the Share Price.

Plaintiffs would have this Court believe that the story relating to SQM's improper

payments ended on March 18—not coincidentally, the date of the share price's nadir during the

time period in question.  But in the weeks that followed, SQM's share price recovered on news

that PCS was rejoining the SQM board and Mr. Ponce was stepping down.  (56.1 ¶¶ 95–107.)  At

his deposition, Feinstein was initially unaware when PCS rejoined the SQM board or that SQM's

shares rebounded in response.  (Tr. 210:16–211:2.)  Later, Feinstein claimed to recall that six

months had passed between the resignations and the decision to rejoin—as opposed to the actual

five weeks that elapsed.  (*See id.* at 211:3–211:15.)  Feinstein said such facts were irrelevant to his

analysis in any event.  (*Id.* at 212:7–17, 220:2–221:5, 228:2–229:4.)  But in *Omnicom*, the Second

Circuit took into account the share price recovery following the director resignation insofar as it

showed that the losses following the director resignation were caused not by fraud, but rather by panic or speculation that was later shown to be baseless or overblown.  597 F.3d at 508.  The Court should do the same here in evaluating whether plaintiffs can prove loss causation and damages.

First, the subsequent recovery in the share price shows that the March 18 decline was not caused by the alleged fraud, but rather by new facts concerning the composition of the board and the status of PCS's investment that could not have been disclosed earlier.  Through three different disclosures in April 2015, investors learned that PCS would be rejoining the SQM board and that Mr. Ponce and his associates would be stepping down.  As Hubbard's unrebutted event study shows, on each of the three dates on which this information emerged, the share price showed a statistically significant increase, ultimately erasing (in aggregate) the decline that occurred on March 18.  (Ex. 8 ¶¶ 105–06.)  Had the March 18 decline been a result of information concerning the "severity of the alleged misconduct and material weaknesses in the internal controls," as Feinstein contends, why would the share price have rebounded in response to these developments regarding board composition?  After all, nothing about PCS rejoining or Mr. Ponce stepping down changed the facts concerning the underlying misconduct or the effectiveness of the internal controls over financial reporting at the time the payments were made—those facts were what they were.  The only reasonable inference is that the March 18 decline was caused not by the alleged fraud, but by the new fact that PCS was no longer present on the SQM board and might be abandoning the Company to the unpopular Mr. Ponce.

Second, even if the Court were to conclude that the news of the PCS resignations on March 18 was corrective, it follows that the post-March 18 news that PCS was rejoining the board and Mr. Ponce was stepping down was likewise corrective, and must be included in the calculation of any inflation in the share price caused by the alleged fraud.  As noted, plaintiffs' theory is that the

PCS resignations informed the market of the "severity" of the improper payments and material weaknesses in the internal controls.  If true, then PCS's decision to rejoin provided further information on the same topic—this time, the *lack of severity* of the conduct and material weakness in the internal controls.  Put differently, if a decision to resign conveys information that the situation is "bad" (as Feinstein argues), a decision to rejoin by the same token conveys information that the situation is "not bad" (or at least "less bad").  Plaintiffs cannot simply focus on negative information while ignoring positive information and claim to be measuring the overall impact of the disclosures on the share price.  Indeed, the Second Circuit has recognized as much, observing that where a price rebound after a corrective disclosure represents the market's reaction to information concerning the alleged fraud—and not a reaction to an unrelated, intervening development—then it is proper to offset the price recovery in determining that plaintiff's economic loss.  *See Acticon*, 692 F.3d at 41.  Doing so here would erase any economic loss suffered as a result of the share price decline on March 18, eliminating their ability to establish loss causation or damages.  (Ex. 10 ¶¶ 50–51; Ex. 8 ¶¶ 104–09.)

## CONCLUSION

For the foregoing reasons, SQM respectfully requests that the Court grant this motion for summary judgment.

Date:  April 16, 2020
New York, New York

**MILBANK LLP**

By: /s/ Scott A. Edelman
Scott A. Edelman
Grant R. Mainland
Alison M. Bonelli
55 Hudson Yards
New York, New York 10001
Tel:  (212) 530-5000

*Attorneys for Defendant Chemical and Mining Company of Chile, Inc.*