UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

MEGAN VILLELLA, Individually and on : 
Behalf of All Others Similarly Situated, : 
                 : 
         Plaintiff, : 
                 : 
      vs. :   15-cv-2106-ER 
                 : 
CHEMICAL AND MINING COMPANY :   ***Oral Argument Requested*** 
OF CHILE, INC., et al., : 
                 : 
                 : 
         Defendants. : 

———————————————————— x


# MEMORANDUM OF LAW IN SUPPORT OF SQM'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT, STEVEN FEINSTEIN


**MILBANK LLP**

Scott A. Edelman (sedelman@milbank.com)
Grant R. Mainland (gmainland@milbank.com)
Alison M. Bonelli (abonelli@milbank.com)
55 Hudson Yards
New York, New York 10001
(212) 530-5000

*Attorneys for Defendant Chemical
and Mining Company of Chile, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ....................................................................................................................... 6

I.     FEINSTEIN'S MARCH 11-17 CUMULATIVE EVENT STUDY IS
METHODOLOGICALLY FLAWED AND UNRELIABLE. .................................... 6

     A.    Flaw #1:  Feinstein's March 11-17 Cumulative Event Study Measures an
Incomplete Portion of the Total Corrective Information. ...................................... 7

     B.    Flaw #2:  Feinstein's March 11-17 Cumulative Event Study Includes
Non-Corrective Information. ............................................................................... 10

     C.    Flaw #3:  Feinstein's March 11-17 Cumulative Event Study Excludes
Arguably Corrective Information Disclosed Immediately Preceding the
Event Window .................................................................................................... 12

     D.    Flaw #4:  Feinstein's March 11-17 Cumulative Event Study Does Not
Take Into Account Substantial Confounding Information. .................................. 14

II.    FEINSTEIN'S ANALYSIS OF THE MARCH 18 DIRECTOR RESIGNATIONS
IS METHODOLOGICALLY FLAWED AND UNRELIABLE. .................................. 17

     A.    Feinstein's Opinion That the News of the PCS Resignations Was
Corrective Ignores the Facts That Were Actually Disclosed. ............................. 17

     B.    Feinstein's Opinion That the PCS Resignations Revealed the "Severity" of
the Improper Payments and Material Weaknesses in Internal Controls Is
Unscientific, Self-Contradictory, and Legally Irrelevant. .................................. 21

     C.    Feinstein Ignores the Recovery in the Share Price When the PCS Directors
Rejoined the Board ............................................................................................. 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China North East Petrol. Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ...........................................................................24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .....................................................................................18

*Brown v. China Integrated Energy Inc.*,
   2014 WL 12576643 (C.D. Cal. Aug. 4, 2014).............................................7, 9

*Celebrity Cruises Inc. v. Essef Corp.*,
   434 F. Supp. 2d 169 (S.D.N.Y. 2006) ...........................................................25

*Cutler v. Kirchner*,
   696 Fed. Appx. 809 (9th Cir. 2017) ...............................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ....................................................................... 1, 9, 21, 25

*Finkelstein v. Liberty Digital, Inc.*,
   2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ....................................................1

*GE v. Joiner*,
   522 U.S. 136 (1997) ...................................................................................9, 21

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) .........................................................................15

*In re Invision Techs., Inc. Sec. Litig.*,
   2006 WL 538752 (N.D. Cal. Jan. 24, 2006)...................................................20

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ............................................................................5

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ................................................1

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...........................................................15

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ........................................................... 4, 12, 22, 23

*In re PetroChina Co. Ltd. Sec. Litig.*,
   130 F. Supp. 3d 340 (S.D.N.Y. 2015) ................................................................................20

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
   2004 WL 345551 (S.D.N.Y. Feb. 23, 2004) ........................................................................5

*Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ....................................................................................6

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................................14

*Santoro v. Donnelly*,
   340 F. Supp. 2d 464 (S.D.N.Y. 2004) ..................................................................................5

*United States v. Ferguson*,
   584 F. Supp. 2d 447 (D. Conn. 2008) ................................................................................15

*United States v. Hatfield*,
   2014 WL 7271616 (E.D.N.Y. 2014) ....................................................................................8

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ..............................................................................................................5

**Statutes**

Sarbanes-Oxley Act of 2002 ....................................................................................................19

**Other Authorities**

17 CFR § 240.13a-15(f) ...........................................................................................................20

Fed. R. Evid. 702 ............................................................................................................*passim*

Defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or the "Company"), respectfully submits this memorandum of law in support of its motion to exclude the testimony of plaintiffs' expert, Steven Feinstein ("Feinstein"), pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT

A Section 10(b) plaintiff must establish not only that the defendant made a material misstatement with the intent to defraud investors, but also that the misstatement caused investors' losses.  Plaintiffs typically attempt to do so through event studies that purport to isolate the impact of the alleged fraud on the share price, controlling for market and industry factors.  To that end, plaintiffs have retained Steven Feinstein, ███████████████████████████████████████████████████████████████████████████████████████████████████████

Feinstein's testimony has been the subject of withering criticism.  In *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364 (Del. Ch. Apr. 25, 2005), then-Vice Chancellor Leo Strine (who went on to become Chief Judge of the Delaware Supreme Court) characterized Feinstein's testimony as taking a "Fantasy Island approach" in which he "pretend[ed]" inconvenient facts did not exist and provided opinions that, although "brimming [with] confidence," were "not . . . rational."  *Id.* at *12, 15–16.  The court excluded his testimony, finding that the problems with his opinions were so "pervasive and numerous that it [was] impossible to describe them all."  *Id.* at *15.  In *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018), a recent securities case, the court excluded Feinstein's opinions as "unreliable" due to "numerous . . . fundamental design problems."  *Id.* at *6.

Feinstein has produced an equally flawed study here—one in which he takes great pains to deliver the desired result for his client at the expense of intellectual rigor.  As set forth in the factual recitation in SQM's accompanying summary judgment motion and statement of material undisputed facts (both of which are incorporated by reference herein), plaintiffs' Section 10(b) claim arises out of certain improper payments to Chilean political figures made by SQM's former CEO, Patricio Contesse.  As SQM has disclosed and admitted, Contesse made those payments through invoices for services that were not rendered; as a result, the payments were inaccurately recorded in SQM's books and records.  The payments totaled $15 million over a period of six years, or approximately one half of one percent of SQM's net income during the same period.  Plaintiffs do not claim that the payments had a material impact on SQM's income statement or balance sheet.  Rather, they allege that SQM's share price[1] was inflated at all times during the class period because the payments supposedly contradicted statements in SQM's SEC filings concerning the Company's compliance with law and the effectiveness of its internal controls.

The key question here is whether these alleged misstatements caused investors' losses.  Feinstein claims that they did, effectively transforming $15 million in payments into a $300 million aggregate damages award (if awarded for all shares traded during the class period).  But he is tasked with making this showing on a forbidding factual record.  Feinstein admits that news about the payments emerged over a period of more than two months, including that Chilean tax and criminal authorities were investigating SQM for making payments to Chilean political figures through the use of "false invoices"; that SQM had established an independent committee of the board to investigate the payments; that prosecutors and uniformed agents had appeared at SQM's

---

[1] SQM has American Depositary Shares listed on the New York Stock Exchange.  For simplicity, this brief refers to the American Depositary Shares as "shares."

offices on two occasions to demand accounting information relating to the payments; and that the SQM board had abruptly terminated Contesse's employment after 25 years as the Company's CEO.  And yet Feinstein's ***own event study*** confirms that there was not a single day on which SQM's share price reacted in a statistically significant way to any of these disclosures.

Feinstein attempts to resolve this dilemma for plaintiffs in two ways.  First, he selects an "event window" spanning March 11 to March 17, 2015, and concludes that, although there was no statistically significant change in the share price on any day during that window, the overall change was "cumulatively" significant, such that plaintiffs should be able to recover $1.63 per share for the cumulative decline.  Second, he claims that the news on March 18, 2015 that three directors had resigned from SQM's board was corrective of the alleged fraud—even though that news conveyed no facts concerning the improper payments or internal controls over financial reporting—such that plaintiffs should be able to recover $3.69 per share for the share price decline on that day (which both sides agree was statistically significant).  Each component of Feinstein's analysis is unreliable and inadmissible under Rule 702.

***The March 11 to March 17 "Cumulative" Event Study.***  Feinstein's March 11-17 analysis suffers from multiple defects.  The analysis simply ignores, without any economic justification, the more than two months of disclosures concerning the improper payments that preceded March 11.  Even if a subperiod made economic sense (it does not), the subperiod selected by Feinstein is plainly gerrymandered, excluding dates that were corrective according to his own standards (such as the Chilean Public Prosecutor's unannounced visit to SQM's headquarters accompanied by law enforcement agents), and including ones that clearly were not corrective (such as board disputes and media commentary characterizing them).  When either flaw is corrected, Feinstein's finding of cumulative statistical significance disappears.  Moreover, Feinstein disregards the substantial

confounding information concerning business fundamentals that was disclosed during one-on-one meetings with investors at a multi-day conference during the same window, notwithstanding his ignorance of what SQM executives discussed during those meetings (which were not, contrary to Feinstein's mistaken assumption, subject to Regulation FD).

***The March 18 Director Resignations.***   Feinstein's effort to establish loss causation and damages with respect to the share price decline following the director resignations on March 18 fares no better.  The directors in question were appointees of Potash Corporation of Saskatchewan ("<u>PCS</u>"), SQM's second largest shareholder at the time.  Their stated reason for resigning was that they disagreed with the SQM board's handling of information requests from the Public Prosecutor and management of an internal investigation into the improper payments—a disagreement that had been disclosed to the market days earlier.  The PCS resignations were objectively non-corrective; they contained no new information concerning legal compliance or internal controls over financial reporting.  To the extent Feinstein believes that the PCS resignations were corrective because they supposedly indicated the "severity" of the underlying misconduct or weaknesses in the internal controls, such a conclusion is legally foreclosed by the Second Circuit's decision in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), and thus cannot be helpful to the trier of fact (even if it were factually accurate).  In any event, even if the PCS resignations were corrective, it follows that the decision by PCS to rejoin the SQM board weeks later was likewise corrective.  That news caused a statistically significant increase in SQM's share price—erasing the decline that occurred on March 18—yet Feinstein completely ignores it.

To be admissible, expert testimony must be reliable, which requires that the testimony be "'based upon sufficient facts or data,'" that "'the testimony is the product of reliable principles and methods,'" and that the expert "'has applied the principles and methods reliably to the facts of

the case.'"  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (quoting Fed. R. Evid.

702); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) (reliability is an "exacting

standard[]").  Because none of that is the case here, Feinstein's testimony should be excluded.

To the extent that the Court has questions based on the parties' written submissions, SQM

respectfully submits that this motion is appropriate for an evidentiary hearing, and is confident that

such a hearing would result in the exclusion of Feinstein's testimony.

## **LEGAL STANDARD**

This Court has a "'gatekeeping' obligation" to "'ensur[e] that an expert's testimony rests

both on a reliable foundation and is relevant to the task at hand.'"  *Point Prods. A.G. v. Sony Music*

*Entm't, Inc.*, 2004 WL 345551, at *3 (S.D.N.Y. Feb. 23, 2004) (quoting *Daubert*, 509 U.S. at 597).

Rule 702 provides that expert testimony is admissible only if:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Fed. R. Evid. 702.  In other words, this Court must determine that (i) the expert is qualified, (ii) the

expert's testimony is reliable, and (iii) the testimony is relevant and helpful to the trier of fact.  *See*

*Nimely*, 414 F.3d at 396-97.  The proponent bears the burden of showing by a preponderance that

the testimony satisfies these requirements.  *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 472

(S.D.N.Y. 2004).  When evaluating the reliability of an expert's testimony, this Court must

"undertake a rigorous examination of the facts on which the expert relies, the method by which

the expert draws an opinion from those facts, and how the expert applies the facts and methods to

the case at hand."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

**ARGUMENT**

**I.   FEINSTEIN'S MARCH 11-17 CUMULATIVE EVENT STUDY IS METHODOLOGICALLY FLAWED AND UNRELIABLE.**

An event study is a well-established statistical tool used to evaluate whether particular information disclosed on a particular day or set of days caused a decline in a company's share price.  In securities class actions such as this one, expert witnesses typically identify dates on which "corrective" information is disclosed—*i.e.*, information revealing the falsity of prior disclosures— and then measure the degree to which the share price changed following the disclosure, controlling for market and industry factors.  Economists refer to that change in price as the "abnormal return."  Where the abnormal return is statistically significant, economists conclude that it is reasonably certain the change in the share price was caused by the information that was disclosed, as opposed to the innumerable other factors that can affect the price of a security.  In the securities context, the overall exercise is aimed at determining whether the alleged fraud caused inflation in the share price, and if so, in what amount.  *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014).

Feinstein's "cumulative" event study does not undertake this inquiry in good faith; rather, the full record, including Feinstein's deposition, compels a clear inference that Feinstein chose and sought to justify particular dates as having corrective disclosures about the improper payments, while excluding other dates as revealing no corrective information, for the purpose of creating a study that would show a statistically significant change in SQM's share price.  Courts have excluded experts whose opinions are based on event studies affected by similar methodological flaws.  *See Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd* 638 F. App'x 43 (2d Cir. 2016) ("[W]here, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently

robust . . . .  Scientific conclusions cannot depend upon the arbitrary choice of parameters."); *see also Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *8 (C.D. Cal. Aug. 4, 2014) (plaintiffs' event study "d[id] not use objective criteria to determine what kind of information should be included" and omitted dates that did not support expert's conclusion).

### A.  Flaw #1:  Feinstein's March 11-17 Cumulative Event Study Measures an Incomplete Portion of the Total Corrective Information.

The first and perhaps most obvious flaw in Feinstein's March 11-17 cumulative event study is that, by beginning on March 11, it completely ignores two months of disclosures concerning the improper payments.  These earlier disclosures were not murky tidbits of information that required fine parsing of a financial statement; they were highly salient events that received substantial media and market attention during the two months preceding March 11.  Even Feinstein himself states in his report that certain of these disclosures were corrective (Ex. 9 ¶ 126)—*e.g.*, January 15 (when it was reported that the Chilean authorities were pursuing all of SQM's accounting information for the 2009 to 2014, followed by a raid on the Company's headquarters the next day that was broadcast on television news (56.1 ¶¶ 20–28)) and February 26 (when the Company announced the formation of a special committee of the SQM board to conduct an internal investigation into the payments (*id.* ¶ 39)).  And indeed, the academic literature relied upon by Feinstein emphasizes the importance of an event window beginning far enough in advance to capture all potentially relevant information.  (Ex. 9 ¶ 132 (citing Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 906 (1990)).)

Feinstein omits these dates from his event window—as well as many other dates on which corrective information was disclosed (*see id.* ¶ 131)—contradicting the very literature he cites and failing to truly measure any inflation, which requires accounting for ***all*** of the fraud-related information that may have impacted the share price, not an arbitrarily selected subcomponent of

such information.  *See, e.g.*, *United States v. Hatfield*, 2014 WL 7271616, at *12 (E.D.N.Y. 2014) (event window should capture "the entirety of the market's reaction to the information released"). **It is undisputed by the parties' experts that, when the multi-day analysis includes the January and February disclosures, the finding of statistical significance is eliminated.**

Feinstein marshals two basic defenses of this design decision:  (1) that not until March 11 did the information that was disclosed begin to convey the "severity" of the underlying misconduct and material weaknesses in SQM's internal controls (Ex. 9 ¶ 131); and (2) that including the payment-related information disclosed in January and February would be statistically unworkable because using a longer event window would interpose confounding information unrelated to the alleged fraud (Ex. 40, Feinstein Tr. 119:12–120:18).[2]  Neither rationale withstands scrutiny.

As to the first, "severity"—a term Feinstein uses over twenty times in his reports—is not an economically or statistically meaningful concept.  In his reports, Feinstein does not explain what he means by that term (notwithstanding his prolific use of it).  At his deposition, Feinstein offered a definition so exceedingly vague that it would allow Feinstein to pick and choose which dates to include in his event window on the basis of his own subjective determinations:

> Q. What do you mean by the term "severity" as you use it in your report?
>
> A. **It's a number of dimensions.  The probability that the wrongdoing actually did occur, the extent of the wrongdoing and the magnitude of the damage to the firm from the wrongdoing** and the – and as reflected in analysts and investors, who wrote about intensifying concerns.

(*Id.* at 93:2–10.)  This is not a concept that is susceptible to rigorous or principled application. Feinstein identifies no foothold in the academic literature for the notion that an economist should select event dates based on a subjective view as to which ones revealed a "severe" problem and which ones uncovered a merely moderate one.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

---

[2] For brevity's sake, the transcript of Feinstein's deposition is cited as "Tr." for the remainder of this motion.

(1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").[3]

Even if one were to accept the premise that "severity" is a meaningful metric for selecting event dates, Feinstein's application of that metric is internally inconsistent.  As noted, Feinstein accepts that the disclosures on January 15 and February 26 were corrective.  (Ex. 9 ¶ 126.)  And that conclusion is hardly disputable:  On one date, it was reported that the Chilean authorities were pursuing SQM's accounting information for 2009 to 2014, followed by a televised raid on the Company's headquarters the next day; on the other, SQM announced it had formed a special board committee to investigate the payments, amid news reports that day that SQM had been tied to payments to at least forty Chilean political figures.  (56.1 ¶¶ 20–28, 39–40.)  Feinstein himself testified that these disclosures "informed the market that the problem [of the payments] ***was more severe than previously believed***."  (Ex. 40, Tr. 96:8–97:5 (emphasis added).)  Feinstein also testified that the news on those dates "informed the marketplace of a greater probability that there had been improper payments . . . and deficient internal controls and deficient accounting."  (*Id.* at 68:7–22.)  Feinstein has nowhere explained why the March dates pass his purported "severity" test for inclusion in his event window but these earlier disclosures do not, and it is difficult to escape the conclusion that the distinction was entirely results-driven.  This alone is a basis for excluding Feinstein's cumulative model.  *See, e.g.*, *Brown*, 2014 WL 12576643, at *8 (excluding expert testimony as unreliable where "it appear[ed the expert did] not use objective criteria to determine what kind of information should be included as an event in his study").

---

[3] In his rebuttal report, Feinstein also maintains that the events of March 2015, even if not themselves corrective, were the "inextricable ramifications" of the alleged fraud.  (Ex. 79 ¶ 77.)  Feinstein does not cite any academic or other support for this concept, nor is it clear why his training as an economist equips him to determine which ramifications are inextricable and which are extricable—an inquiry that facially lacks any scientific grounding.

As for Feinstein's contention that an event window consisting of dates drawn from a longer time period would have been unworkable (Ex. 40, Tr. 119:12–120:18), that opinion likewise lacks grounding in sound economics.  Feinstein's position appears to be premised on the view that a truly cumulative event study—*i.e.*, one that selects for testing every single trading date between, say, January 15 and March 17—would combine "event dates with nonevent days," thereby weakening the test.  (*Id.*)  But even if true, that rejoinder assumes that a "cumulative" model is the only one that works over a longer time period.  As SQM's expert explains, Feinstein could have conducted an alternative statistical test (known as an *f*-test) to determine whether the sum of each of the share price movements on the individual disclosure dates identified by Feinstein between January 9 and March 17, as opposed to the cumulative return over the entire period, was statistically significant.  (Ex. 8 ¶ 48, Exhibit 2.)  It was not.  (*Id.*)  Feinstein conceded at deposition that he had no reason to disagree with Hubbard's calculations.  (Ex. 40, Tr. 120:15–18.)

In any event, even if Feinstein were right that there is no statistical model capable of measuring the impact of the ***entire*** quantum of corrective information, the fact remains that plaintiffs have the burden of proof on loss causation and damages.  If accepted, Feinstein's position would mean only that plaintiffs are unable to establish loss causation and damages; his inability to test the correct period does not justify a substitute test of a narrower (and incorrect) period.

## B.    Flaw #2:  Feinstein's March 11-17 Cumulative Event Study Includes Non-Corrective Information.

The second flaw in Feinstein's March 11-17 cumulative event study is that the information that was disclosed during that window was largely non-corrective.  As set forth in more detail in SQM's summary judgment papers, the news on four of the five trading days in Feinstein's March 11-17 window (March 11, 12, 13, and 16) was related to disputes among SQM's board concerning SQM's response to the Public Prosecutor's request for accounting information and the handling of

SQM's internal investigation into the payments.  Specifically, from March 11-13, the market learned of:  Contesse's request for an injunction from the Chilean court blocking the Public Prosecutor's request (March 11); an extraordinary session of the board to discuss the same request (March 12); and the board's decision to reconvene on March 16 to decide whether to provide the requested information (March 12-13).  (Ex. 9 ¶¶ 54–60; 56.1 ¶¶ 45–53.)  None of these disclosures in any way added to the known facts concerning the payments themselves—whether the quantum, the length of time in which they were made, or the manner in which they were effected—much less SQM's internal controls over financial reporting (which simply were not germane to the issues the board was addressing).  ***It is undisputed by the parties' experts that, when one removes these dates from the cumulative window, the finding of statistical significance is eliminated.***

It is likewise apparent that on Monday, March 16—the fourth day of Feinstein's five-day cumulative model—nothing new was disclosed.  Feinstein points to two articles that were published over the preceding weekend.  (Ex. 9 ¶¶ 61–62.)  The first merely repeated the already disclosed news that SQM had opted to seek a legal opinion and would hold an additional board meeting on March 16 to review it, describing the situation as "a 'tug-of-war' with the representatives of the Public Prosecutor's Office."  (*Id.* ¶ 61.)  The second quoted an unnamed "connoisseur of the process" who opined that "[i]ndependence was lost" when one of the PCS directors resigned from the board committee investigating the payments—a fact that had been disclosed days earlier.  (*Id.* ¶ 62; 56.1 ¶ 52.)  These articles did not reveal anything new at all; they were mere commentary on already disclosed facts concerning the board disputes over the preceding three trading days.  Such commentary is non-corrective as a matter of law.  *See, e.g.*,

*Omnicom*, 597 F.3d at 512 ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").[4]

### C.   Flaw #3:  Feinstein's March 11-17 Cumulative Event Study Excludes Arguably Corrective Information Disclosed Immediately Preceding the Event Window.

The third flaw in Feinstein's March 11-17 cumulative event study is its exclusion of the day immediately preceding his chosen window, March 10, when the market learned that a team of prosecutors accompanied by law enforcement agents had appeared unannounced at SQM's offices demanding production of accounting information from 2009 to 2014.[5] ***It is undisputed by the parties' experts that, when one expands the cumulative window to include March 10, the finding of statistical significance is eliminated.***

Given Feinstein's own criteria for what constitutes corrective information—including information about dealings with the Chilean Public Prosecutor and board disputes concerning the same—one would have expected him to have included this date in the event window.  Indeed, Feinstein himself identifies this date as part of the "Timeline of Events" undergirding his loss causation analysis.  (Ex. 9 ¶ 53.)  Yet inexplicably, Feinstein omits it from his cumulative event

---

[4] As Hubbard explains, March 17—the effective trading date following the news of Contesse's termination—was likewise an inappropriate candidate for inclusion in the cumulative event window, albeit for a different reason.  (Ex. 8 ¶¶ 63–67.)  That news of Contesse's termination was arguably corrective insofar as it suggested that the underlying misconduct was real.  (56.1 ¶¶ 62–65.)  The inclusion of March 17 in the event window, however, is fundamentally at odds with Feinstein's rationale for his "cumulative" approach—*i.e.*, that the news during March 11-17 only "partially correct[ed] the alleged misrepresentations and omissions."  (Ex. 9 ¶ 131.)  Feinstein himself states that the board's decision to "fire the man who had served as CEO for over 25 years . . . ***demonstrates unequivocally the economic materiality*** of the conduct and conditions that Plaintiff alleges was concealed from investors with misrepresentations."  (*Id.* ¶ 113 (emphasis added).)  In other words, by Feinstein's own admission, there was nothing "partial" about this news; it "unequivocally" revealed the alleged fraud.  Accordingly, Feinstein should have treated March 17 as its own event and confronted the reality (reflected in his own event study) that, with the entire trading day to digest this salient news, the share price did not respond in a statistically significant manner.

[5] As explained in SQM's parallel summary judgment motion and statement of material undisputed facts, the record is clear that the Public Prosecutor's visit to SQM's headquarters occurred on March 9, not March 10, contrary to the amended complaint and Feinstein Report.  (56.1 ¶ 42.)  However, because it is unclear precisely when the news of that visit emerged on March 9, and to be conservative, Hubbard and SQM's motion papers use March 10 as the effective trading date (*i.e.*, the date on which the share price would have impounded that information).

window, asserting that a "series of events beginning on 11 March 2015" informed the market of the "severity" of the alleged misconduct and weaknesses in internal controls, without explaining why this series of events began on March 11 rather than the day before.  (Ex. 79 ¶ 25.iii.)

To accept the distinction Feinstein draws here, one would have to agree that a company's response to a prosecutor's information request is corrective, but the request itself is not.  To state the distinction at that level of generality is to refute it, yet the infirmities in the distinction become only greater upon closer factual inspection.  The news that emerged on March 10 was not that an informal "request" had been sent to SQM by mail; it was a show of force in which a team of prosecutors and law enforcement agents tasked with investigating "economic crimes" appeared, with no advance notice, at SQM's corporate headquarters demanding documents covering a period of many years.  By contrast, on the next day, March 11, SQM stated by press release that the board would "meet tomorrow to evaluate the request by the Public Prosecutor for delivery of information."  (56.1 ¶ 46.)  And yet Feinstein's view is that the latter news was somehow earth-shattering and certainly corrective of investors' previously benighted view of the Company's compliance with law and the effectiveness of its internal controls, whereas the former was a humdrum event to which no reasonable investor would have ascribed much significance.

At deposition, Feinstein only doubled down on this topsy-turvy analysis in an exchange that squelches any faith in his reliability as an expert witness, and arguably raises serious questions as to his good faith and candor.  When asked why the prosecutors' visit to SQM was not corrective, Feinstein testified that it simply reflected a "prosecutor doing what a prosecutor would naturally do."  (Ex. 40, Tr. 83:13–84:6.)  When asked about the presence of law enforcement agents, Feinstein sarcastically responded that he "would not have expected the Public Prosecutor in the United States or Chile to show up alone."  (*Id.* at 114:17–25.)  In contrast, he contended that the

Company's bland disclosure on March 11 that it was "evaluating" the Public Prosecutor's request revealed that the Company was "stonewall[ing] and stall[ing]" and therefore "had something to hide." (*Id.* at 67:20–69:13.)  This reasoning is nonsensical.  It is like saying that the following Wall Street Journal headline—***"Department of Justice Opens Probe into Company X's Accounting Practices, Raids Company X's Headquarters for Evidence"***—is not corrective because that is just what a prosecutor would do.  But Company X's press statement the following day—***"Company X has received the DOJ's request for information and intends to respond to the DOJ in short order and after consultation with its advisors"***—is corrective because the failure to immediately hand over the information, and the decision to spend four days considering whether DOJ's request was legally authorized, amount to "stonewalling and stalling."

In any event, even if the foregoing distinction were rational, nothing in Feinstein's training as an economist gives him a basis to offer that opinion, on which his entire analysis depends, to a jury.  *See In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 542–43 (S.D.N.Y. 2004) (opinions "do not meet the core requirement of Rule 702" when "based on [expert's] personal, subjective views" of the evidence) (internal quotations omitted).  To do so would merely dress up the subjective opinion of a far-from-disinterested individual in the garb of a Ph.D.

### D.   Flaw #4:  Feinstein's March 11-17 Cumulative Event Study Does Not Take Into Account Substantial Confounding Information.

Finally, setting aside Feinstein's transparent gerrymandering of his cumulative event window, the entire enterprise of his cumulative analysis is fatally undercut by his failure even to consider—much less to control for—the substantial confounding information concerning business fundamentals that was communicated to investors during more than half of the five-day cumulative event window.  Even if that event window were properly constructed (it is not), this failure to grapple with confounding factors renders the cumulative event study unreliable.

It is a bedrock principle that for an event study to be viable, it must address confounding information that entered the market on the alleged corrective disclosure dates and untangle fraud-related losses from non-fraud related losses. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (noting that "the law requires the disaggregation of confounding factors"); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015) ("In order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors."); *United States v. Ferguson*, 584 F. Supp. 2d 447, 453 (D. Conn. 2008) ("Because [the expert]'s leakage study attributes all non-market and non-industry related decline in [the security at issue]'s stock price to the [alleged] fraud without accounting for other factors that may have contributed to that decline, it is not a reasonable estimate of the loss."). Feinstein does not dispute this principle. (Ex. 9 ¶ 40.) Indeed, one of the articles he relies upon notes, "[f]ailing to distinguish fraud versus non-fraud causes of a price decline is generally fatal, especially where there are obvious confounding events occurring on the same day." *See* Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, And Bias*, 93 WASH. U. L.R. 583, 606 (2015).

Inconveniently for plaintiffs, the fact pattern in this case is unusually rich in confounding information. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████        ████████████████████████▪

---

[6] "Illanes Decl." refers to the Declaration of Gerardo Illanes submitted contemporaneously herewith.



(Ex. 40, Tr. 132:10–20.)

Feinstein utterly fails to grapple with these confounding factors.  He is prepared to opine to a jury that the downward movement in SQM's share price during the cumulative event window can only be explained by the news flow concerning board disputes over the Public Prosecutor's requests and the Company's management of its internal investigation.  As he states in his report and acknowledged at deposition, he reached this view solely by reviewing public information, principally analyst reports.  (Ex. 9 ¶ 99, 157; Ex. 40, Tr. 137:14–138:7, 140:14–141:11, 142:23–144:3.) ████████████████████████████████████████████████████ (56.1 ¶¶ 57, 59.)  Although he conceded that information learned in such meetings may affect stock prices (Ex. 40, Tr. 152:25–155:13; 157:15–158:9), ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (*Id.* at 129:13–24, 144:15–19.)  Feinstein apparently took

comfort in Regulation FD, which limits issuers' ability to share material information with some investors but not others. (*Id.* at 151:23–152:9.) But that assumption was erroneous—Regulation FD does not apply to foreign private issuers such as SQM. *See* 17 C.F.R. § 243.101(b).

## II.   FEINSTEIN'S ANALYSIS OF THE MARCH 18 DIRECTOR RESIGNATIONS IS METHODOLOGICALLY FLAWED AND UNRELIABLE.

Feinstein also opines that plaintiffs should be able to recover an additional $3.69 per share based on the decline in SQM's share price that occurred on March 18, 2015. (Ex. 9 ¶ 153.) On that day, before the market opened, investors learned that the PCS directors had resigned from the SQM board. (56.1 ¶ 73.) The news had an immediate and significant adverse impact on SQM's share price. Both sides agree that the decline was statistically significant. (*Id.* ¶ 81.) But Feinstein's attempt to tether that decline to news about the payments—even though more than two months of disclosures on that topic did not result in a statistically significant reaction on a single trading day—is belied by the facts and foreclosed by the law. As in *Liberty Digital*, the problems with his analysis "are so pervasive and numerous that it is impossible to describe all of them." 2005 WL 1074364, at *15. His testimony here should suffer the same fate as it did there.

### A.   Feinstein's Opinion That the News of the PCS Resignations Was Corrective Ignores the Facts That Were Actually Disclosed.

Any analysis of whether the news of the PCS resignations was corrective must begin with the words of the disclosures themselves. Feinstein, however, looks past them, as even a cursory review of the two relevant disclosures on that day shows that they did not convey any new facts concerning the subjects of the alleged fraud—*i.e.*, the improper payments and state of the internal controls over financial reporting. Before the open of trading on March 18, SQM announced the simple fact of the resignations; no details were provided. (56.1 ¶ 73.) Later that morning, PCS issued a press release stating that the directors had resigned because they disagreed with the board's handling of the internal investigation and the decision whether to provide information

voluntarily to the Public Prosecutor.  (*Id.* ¶ 77.)  Given the absence of any facts in these disclosures concerning the payments (whether their quantum, scope, or duration) or the internal controls over financial reporting (a topic that was far afield from the board disputes), there is no way the disclosures could have "corrected" the alleged misstatements relating to these topics.

This fundamental flaw in Feinstein's opinion has become even more glaring in light of discovery post-dating Feinstein's reports and deposition.  As Wayne Brownlee, the former CFO of PCS who was one of the three directors who resigned, testified:



(Ex. 61, Brownlee Tr. 133:17–134:19; *see also id.* at 134:20–136:3, 146:24–147:10, 167:3–168:8.) Mr. Brownlee's testimony—the only record testimony by any of the directors who resigned— belies Feinstein's analysis of March 18.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to

validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Feinstein also ignores the key differentiator of March 18—namely, the fundamental shift in corporate control that resulted from the PCS resignations.  (56.1 ¶ 72; Ex. 5 ¶¶ 15, 28, 30.) Feinstein conceded at deposition that SQM shareholders generally viewed the PCS directors as a positive influence on SQM, and conversely had a negative view of Julio Ponce, SQM's controversial chairman and former son-in-law of General Augusto Pinochet. (Ex. 40, Tr. 196:4–7.)  The PCS resignations removed any real check on Mr. Ponce's influence.  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 5 ¶¶ 15, 29, 31.)[7]

To make matters worse, Feinstein's opinion that the March 18 news of the PCS resignations was corrective because it "informed the market about . . . material weaknesses in internal controls" (Ex. 9 ¶ 19) is based on a mistaken view of what "internal controls" are at issue in this case.  When asked what he meant by "internal controls," Feinstein testified that "the way 'internal controls' has been defined in this case . . . broadly encompasses all internal controls at the company that are designed to detect, deter, and prevent fraud and illegal activity."  (Ex. 40, Tr. 162:21–163:10.)[8]

But Feinstein was dead wrong.  The statement about "internal controls" at issue in this case is a certification required by the Sarbanes-Oxley Act of 2002 and related SEC regulations that management had evaluated the Company's internal control over financial reporting and

---

[7] This far better explanation for the March 18 decline is further underscored by the significant intraday jump that occurred when *Reuters* reported that PCS had not decided whether to sell its SQM stake. (56.1 ¶¶ 79–80.) The share price quickly recovered half of its losses on that news.  (*Id.*)

[8] Feinstein was clear on this point at his deposition:  "[E]very time I encountered the term 'internal controls,' I interpreted it to mean and include internal controls to prevent illegal activity."  (Tr. 185:7–21.)

determined that it was effective.  (*E.g.*, Am. Compl. (Dkt. No. 39) ¶¶ 83, 104, 126, 148, 173.)

Contrary to Feinstein's assumption, the SEC's definition is much narrower than controls designed

to detect, deter, or prevent fraud or illegal activity; rather, the SEC defines "internal control over

financial reporting" as "a process designed . . . to provide reasonable assurance regarding the

reliability of financial reporting and the preparation of financial statements for external purposes

in accordance with generally accepted accounting principles."  17 CFR § 240.13a-15(f).  The

SEC's definition says nothing about the detection or prevention of fraud or other forms of illegal

activity, and indeed the SEC has expressly clarified that "***we do not believe that compliance with

all laws fits within the definition***."  U.S. Sec. Exch. Comm'n, *Management's Report on Internal

Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic

Reports, Frequently Asked Questions*, available at www.sec.gov/info/accountants/control

faq1004.htm#P2_245 (emphasis added).  For an alleged corrective disclosure to render false or

misleading a prior statement on internal controls over financial reporting, the corrective

information must in fact relate to financial reporting.  *See In re PetroChina Co. Ltd. Sec. Litig.*,

120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (Ramos, J.) ("Even if PetroChina officials were

engaging in bribery, the [plaintiffs] do[] not make any allegations that would imply that the

Company had flawed internal controls over *financial reporting*." (emphasis in original)), *aff'd sub

nom. Klein v. PetroChina Co. Ltd.*, 644 F. App'x 13 (2d Cir. 2016).[9]

---

[9] *See also Cutler v. Kirchner*, 696 F. App'x 809, 811–12 (9th Cir. 2017) ("'Internal control over financial reporting'
is a defined term in the SEC's regulations [that] . . . go[es] to a company's *accounting* processes—its ability to
accurately track revenues as they are realized and cash as it comes in the door." (emphasis in original)); *S.E. Penn.
Trans. Auth. v. Orrstown Fin. Servs., Inc*., 2016 WL 7117455, at *11 n.4 (M.D. Pa. Dec. 7, 2016) ("[O]nly facts
pertaining to internal controls designed to insure the reliability of financial reporting are implicated by this
definition."); *In re Key Energy Servs., Inc. Sec. Litig*., 166 F. Supp. 3d 822, 868 (S.D. Tex. 2016) ("'[I]nternal control
over financial reporting' do[es] not relate to FCPA compliance policies and procedure and do[es] not make any
statements about the adequacy of systems designed to ensure compliance with the FCPA."); *In re Invision Techs., Inc.
Sec. Litig*., 2006 WL 538752, at *6  n.2 (N.D. Cal. Jan. 24, 2006) ("Under Plaintiffs' apparent reading, the Court
would have to read Defendants' statement to say that Defendants warranted the presence of systems which were

**B.    Feinstein's Opinion That the PCS Resignations Revealed the "Severity" of the Improper Payments and Material Weaknesses in Internal Controls Is Unscientific, Self-Contradictory, and Legally Irrelevant.**

Faced with the objective fact that the March 18 disclosures of the PCS resignations did not convey new facts about the actual subjects of the alleged fraud, Feinstein again resorts to his catch-all "severity" theory—that the fact of the resignations "informed the market about the severity of the alleged misconduct and material weaknesses in internal controls," even though the disclosures contained no facts addressing either topic.  (Ex. 9 ¶ 118.)  Here, too, Feinstein's severity theory only underscores the unreliability of his analysis, for at least three reasons.

First, Feinstein's severity theory lacks any scientific grounding.  Feinstein certainly points to no academic support for the idea that a disclosure can be deemed corrective on the basis of an economist's subjective intuition that investors inferred a "severe" problem.  *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

Second, Feinstein's severity theory as it relates to the PCS resignations is contradicted by his own opinion that the termination of SQM's CEO, the person responsible for the payments, "demonstrate[d] unequivocally the economic materiality of the conduct and conditions that Plaintiff alleges was concealed from investors with misrepresentations."  (Ex. 9 ¶ 113.)  The termination of Contesse was announced on the evening of March 16, more than a day before the news of the PCS resignations broke, and was immediately covered by analysts.  (56.1 ¶¶ 62–64.)  The market for SQM's shares had a full trading day to digest the news, and the share price did not show a statistically significant reaction.  (*Id.* ¶ 70.)  It makes no sense for Feinstein to conclude

---

adequate to uncover any and all improper conduct, even conduct outside the realm of financial reporting.  Defendants said no such thing.").

that the CEO's firing put investors on "unequivocal" notice of the "economic materiality of the conduct," but then to explain the March 18 sell-off following the PCS resignations as a reaction to the severity of the misconduct.  *See, e.g.*, *Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (no loss causation where allegedly corrective information had already been disclosed).

Third, and most important, even if Feinstein were correct in opining that the March 18 sell-off reflected investors' fears about the potential severity of the payments issue, that opinion is not "helpful to the trier of fact"—and therefore inadmissible—because it is foreclosed by governing precedent.  *See Malletier v. Dooney & Bourke*, 525 F. Supp. 2d 558, 572–73 (S.D.N.Y. 2007) (excluding expert's testimony where it was inconsistent with the substantive law governing the case).  In *In re Omnicom Group, Inc. Securities Litigation*, the plaintiffs alleged that the company had engaged in fraudulent accounting for a transaction in which Omnicom transferred certain deteriorating internet companies to a newly formed entity called "Seneca."  597 F.3d 501, 504 (2d Cir. 2010).  News reports raised questions about the transaction, but the company's shares did not react in a statistically significant way.  *Id.* at 505.  Later, one of Omnicom's outside directors (the chair of Omnicom's audit committee) resigned.  *Id.*  In the ensuing days, the company's share price declined as several news reports connected the resignation to the Seneca transaction.  *Id.* at 506–08.  The plaintiffs' expert opined that investors "legitimately feared that Omnicom's transfers of its Internet investments created the potential for losses and hidden liabilities," and thus that the director resignation and related commentary constituted "corrective" information.  *Id.* at 508–09.

The Second Circuit disagreed, holding that "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint concerning the Seneca transaction."  *Id.* at 511 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009)).  "At best," the Second Circuit explained, "[plaintiffs

had] shown that the market may have reacted as it did because of concerns that [the director's] resignation and the negative tone of the June 12 article implied accounting or other problems in addition to the known Seneca transaction"—*i.e.*, that the "severity" of the accounting issues at Omnicom was, perhaps, greater than what previous disclosures had indicated.  *Id.* at 512.  The Court concluded that, given the absence of any new information concerning the alleged fraud, the plaintiffs had "failed to show a price decline due to a corrective disclosure."  *Id.* at 513.

*Omnicom* is an insurmountable barrier to Feinstein's theory that the PCS resignations were corrective because they revealed the "severity" of the payments issue.  As noted, the news of the resignations was utterly devoid of facts underlying the alleged fraud (the improper payments).  █████ ████████████████████████████████████████████████████████████████ (Ex. 61, Brownlee Tr. 134:13–19.)  Thus, even if Feinstein were correct that investors feared what the PCS resignations might suggest regarding the "severity" of the underlying misconduct, that was mere market speculation and thus would not establish loss causation or damages in the absence of new "hard facts" relating to that misconduct.  *Omnicom*, 597 F.3d at 512.

### C. Feinstein Ignores the Recovery in the Share Price When the PCS Directors Rejoined the Board.

Finally, and consistent with his generally blinkered approach to inconvenient facts, Feinstein ignores key factual developments in the weeks following the PCS resignations that powerfully undercut his opinion that the share price decline on March 18 was caused by fraud. Through a series of three disclosures on April 14, 16, and 22, it was revealed that Julio Ponce and Patricio Contesse Fica, a then-board member and the son of the disgraced CEO, would be stepping down from the SQM board.  (56.1 ¶¶ 5, 98–102.)  ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  (56.1 ¶ 97;

Ex. 61, Brownlee Tr. 150:3–151:22.)  Immediately after this development, PCS nominated three new directors to the SQM board.  (56.1 ¶¶ 99–100; Ex. 61, Brownlee Tr. 152:19–153:8.)  In response to each of these disclosures, the share price increased in a statistically significant manner, collectively erasing the March 18 decline.  (56.1 ¶¶ 99, 101, 107.)

The statistically significant recovery in the share price in response to these developments fatally undercuts Feinstein's opinion in two ways.  First, it shows that the March 18 decline was caused not by the alleged fraud, but rather by new facts concerning the composition of the board and the status of PCS's investment.  Nothing about PCS rejoining or Mr. Ponce stepping down changed the facts concerning the underlying misconduct or the effectiveness of the internal controls over financial reporting at the time the payments were made.

Second, even if Feinstein were correct that the news of the PCS resignations indicated the severity of the underlying misconduct and material weaknesses in internal controls, then PCS's decision to rejoin provided further information on the same topic—this time, the ***lack of severity*** of those issues.  In other words, both pieces of information were corrective.  Here, as in so many other aspects of his analysis, Feinstein cannot credibly claim to be measuring the overall impact of the disclosures on the share price by focusing only on negative information and ignoring positive information.  The Second Circuit has recognized as much, observing that where a price rebound after a corrective disclosure represents the market's reaction to information concerning the alleged fraud, then it is proper to offset the price recovery against a plaintiff's alleged losses.  *See Acticon AG v. China North East Petrol. Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012).

At his deposition, Feinstein could not coherently defend his failure to consider these post-March 18 events, testifying emptily that they "[d]idn't bear on [his] loss causation analysis." (Ex.

40, Tr. 211:16–212:12.)  When pressed, he only amplified his ignorance of the facts.  He testified that PCS rejoined the board "subsequent to September of 2015"—six months off.  (*Id.* at 210:16–211:15.)  He asserted that SQM prompted PCS to return to the board by undertaking a "remediation" of its internal controls—also wrong.  (*Id.* at 210:16–211:2.)  And he could not explain how or when the Company's internal controls were purportedly remediated.  (*Id.* at 212:18–214:23.)  That is because there was no such remediation at the time—the changes in board composition occurred a mere four-to-five weeks after the PCS resignations, when the Company was still figuring out what had occurred with regard to the payments.  It was not until May 18, 2015 that SQM reported it had "identified a material weakness in our internal controls over payments directed by the office of the former Chief Executive Officer," and that the Company "ha[d] initiated, or [wa]s planning to initiate," remediation measures.  (56.1 ¶ 108.)  Of course, there could be no remediation of any weakness in the controls before the weakness was identified. *See Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 178 (S.D.N.Y. 2006) (finding expert report unreliable and inadmissible when report "contain[ed] critical analytical gaps").

## CONCLUSION

SQM respectfully requests that the Court exclude Feinstein's testimony as unreliable pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

Dated: April 16, 2020
      New York, New York

MILBANK LLP

/s/ Scott A. Edelman
Scott A. Edelman
Grant R. Mainland
Alison M. Bonelli
55 Hudson Yards
New York, New York 10001
Tel:  (212) 530-5000

*Attorneys for Defendant Chemical and Mining Company of Chile, Inc.*