UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
MEGAN VILLELLA, Individually and on : Civil Action No. 1:15-cv-02106-ER-GWG
Behalf of All Others Similarly Situated, : (Consolidated)
 :
            Plaintiff, : CLASS ACTION
 :
     vs. : MEMORANDUM OF LAW IN SUPPORT
 : OF PLAINTIFF'S MOTION TO EXCLUDE
CHEMICAL AND MINING COMPANY OF : THE TESTIMONY OF GLENN HUBBARD,
CHILE INC., et al., : PH.D.
 :
            Defendants. :
 :
---------------------------------------------------------- x

## TABLE OF CONTENTS

                                                              **Page**

I. INTRODUCTION ....................................................................................................1

II. LEGAL STANDARD................................................................................................2

III. ARGUMENT..............................................................................................................3

       A.       Hubbard's Opinion that There Is No Evidence of Causation Absent a Statistically Significant Stock Price Decline Is Methodologically Flawed and Should Be Excluded...................................................................................3

       B.       Hubbard's Opinion that Certain Revelations Are Not Corrective Because They Did Not Reveal Anything New About Previously Undisclosed Payments Is Contrary to Law and Should be Excluded............................................6

IV. CONCLUSION.........................................................................................................10

## TABLE OF AUTHORITIES

Page

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)......................................................................................2, 7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................................................5

*Charney v. Wilkov*,
   734 F. App'x 6 (2d Cir. 2018) ..........................................................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...............................................................................................2, 3, 6

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 U.S. Dist. LEXIS 180895
   (S.D.N.Y. Oct. 18, 2019) ...................................................................................................5

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) .......................................................................................3

*In re Lehman Bros. Sec. and ERISA Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015)....................................................................7, 8, 9

*In re Novatel Wireless Sec. Litig.*,
   846 F. Supp. 2d 1104 (S.D. Cal. 2012)............................................................................7

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)..............................................................................9

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................................7

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017).............................................................................................5

*In re Vivendi, SA Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)................................................................................ *passim*

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................................3

**Page**

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ...................................................................................6, 8, 9

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..........................................................................................................4, 5

*Olin Corp. v. Lamorak Ins. Co.*,
    2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) ...........................................................7

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ........................................................................................3

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Evidence
    Rule 403 ................................................................................................................ i, 2, 3
    Rule 702 ............................................................................................................ i, 2, 3, 6

**SECONDARY AUTHORITIES**

Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation:*
    *Low Power, Confounding Effects, and Bias*,
    93 Wash. U.L. Rev. 583 (2015) ...................................................................................5

Ronald L. Wasserstein & Nicole A. Lazar,
    *The American Statistical Association's Statement on p-Values:*
    *Context, Process, and Purpose*,
    70 Am. Statistician 129 (2016) ...................................................................................4

Pursuant to Rules 403 and 702 of the Federal Rules of Evidence, Class Representative Council of the Borough of South Tyneside, Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff"), moves to exclude certain testimony of Glenn Hubbard, Ph.D. ("Hubbard"), a proposed expert whose report on loss causation and damages was submitted by defendant Chemical and Mining Company of Chile, Inc. (a/k/a Sociedad Quimica y Minera de Chile S.A.) ("SQM"). Specifically, Plaintiff moves to exclude of Hubbard's opinions that: (1) there is no evidence of loss causation absent a statistically significant stock price decline; and (2) certain revelations are not corrective because they did not reveal anything new about previously undisclosed payments.

**I.      INTRODUCTION**

Defendants have procured a report from Hubbard that concludes Plaintiff cannot establish loss causation and therefore cannot establish §10(b) damages in this action. Hubbard Rpt., ¶8.[1] Hubbard offered the following opinions in his report:

1.   An economist needs to assess whether the revelation of the allegedly concealed truth caused losses to investors.

2.   There is no evidence that information disclosed on certain dates caused price declines because the price declines on those dates were not statistically significant.

3.   Information released on certain other dates was not corrective of the alleged misrepresentations because the disclosures did not reveal anything new about the allegedly undisclosed truth.

---

[1] "Hubbard Rpt." refers to the Expert Report of Professor Glenn Hubbard, dated July 1, 2019, attached as Ex. 1 to the Declaration of Armen Zohrabian in Support of Plaintiff's Motion to Exclude the Testimony of Glenn Hubbard, Ph.D. ("Zohrabian Decl."). "Hubbard Rbtl." refers to the Rebuttal Expert Report of Glenn Hubbard, dated August 16, 2019, attached as Ex. 2 to the Zohrabian Decl. "Feinstein Rpt." refers to the Correct Report on Market Efficiency, Loss Causation, and Damages by Professor Steven P. Feinstein, Ph.D., CFA, dated August 13, 2019, attached as Ex. 3 to the Zohrabian Decl. "Feinstein Rbtl." refers to the Expert Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA, dated August 16, 2019, attached as Ex. 4 to the Zohrabian Decl. All "Ex. __" references are to the Zohrabian Decl. unless otherwise indicated.

- 1 -

      4.      Because loss causation cannot be established, neither can damages.

*See, e.g.*, *id.*

Plaintiff moves pursuant to Rules 403 and 702 of the Federal Rules of Evidence to exclude Hubbard's second and third opinions. The second opinion is methodologically flawed because it relies on an unscientific and bright-line statistical significance test rejected in the literature and by courts, including the Supreme Court. The third opinion is based on a misapplication of the law on corrective disclosures, including those that occurred on March 11, 12, 13 and 18, 2015.[2]

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002).[3] Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Additional indicia of reliability include whether a theory or technique: (a) "can be (and has been) tested"; (b) "has been subjected to peer review and publication"; (c) has a "known or potential rate of error"; (d) comports with "standards controlling the technique's operation"; and (e) has "'general acceptance'" within a "'relevant scientific community.'" *See Daubert v. Merrell Dow Pharm., Inc.*,

---

[2]    To be clear, Plaintiff disagrees with several of Hubbard's opinions, which it anticipates addressing in opposition to SQM's summary judgment motion and at trial.

[3]    All citations and footnotes are omitted and emphasis is added unless otherwise indicated.

509 U.S. 579, 593-94 (1993).  This list is merely illustrative.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do ***not*** constitute a 'definitive checklist or test.'") (emphasis in original) (quoting *Daubert*, 509 U.S. at 593).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

To be admissible, the court must find that the expert's "reasoning or methodology properly can be applied to the facts in issue."  *See Daubert*, 509 U.S. at 593.  As a gatekeeper, district courts are charged under Rule 702 to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *Williams*, 506 F.3d at 160.  Even if a methodology is sound, expert testimony may be excluded when there is too great an analytical gap between the data and the opinion offered.  *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012).

Expert testimony is also subject to exclusion under Rule 403 where its probative value is substantially outweighed by being unfairly prejudicial, confusing the issues or misleading the jury. Fed. R. Evid. 403.

### III.     ARGUMENT

#### A.     Hubbard's Opinion that There Is No Evidence of Causation Absent a Statistically Significant Stock Price Decline Is Methodologically Flawed and Should Be Excluded

Hubbard opines incorrectly that a stock price movement must be statistically significant in order to be probative of causation: "In the context of assessing loss causation, if the abnormal return is not both negative and different from zero to a statistically significant degree, then there is no evidence that the information released on that date caused any losses suffered by shareholders."

Hubbard Rpt., ¶25; *see also id.*, ¶¶8, 27-28, 40, 55. The evidence here shows that the $5.32 in artificial inflation from SQM's ADS's dissipated between March 11 and March 18 was statistically significant. Feinstein Rpt., ¶¶155-156, 164; Feinstein Rbtl., ¶¶39-40. Indeed, Hubbard concedes that the March 18, 2015 decline was statistically significant. Hubbard Rpt., ¶8. And a cumulative event study shows that the March 11 through March 17 events precipitated a statistically significant residual decline of $1.63 per ADS at the 95% level, even excluding the March 18 residual decline of $3.69 per ADS – which was statistically significant at the 99% level. Feinstein Rpt., ¶¶150-151, 155-156; Feinstein Rbtl., ¶¶39-40. Irrespective, Hubbard's opinion that a stock price decline needs to be statistically significant to constitute evidence of loss causation runs counter to the academic literature and the law, both of which recognize that, while the presence of statistical significance demonstrates causation, the inverse is not true – the absence of statistical significance does ***not*** prove the absence of causation. The American Statistical Association has made clear that bright-line tests of statistical significance, such as the one used by Hubbard, distort the scientific process:

> Practices that reduce data analysis or scientific inferences to mechanical "bright-line" rules (such as "$p < 0.05$") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. . . . The widespread use of "statistical significance" (generally interpreted as "$p \geq 0.05$") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.

Ronald L. Wasserstein & Nicole A. Lazar, *The American Statistical Association's Statement on p-Values: Context, Process, and Purpose*, 70 Am. Statistician 129-133, 131 (2016).

Courts have come to the same conclusion in the context of causation. Indeed, the Supreme Court has addressed this issue directly, stating: "A lack of statistically significant data does not mean that . . . [there is] no reliable basis for inferring a causal link." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011). The Court added that "the premise that statistical significance is the only reliable indication of causation . . . is flawed." *Matrixx*, 563 U.S. at 40. Just as "regulators

- 4 -

act on the basis of evidence of causation that is not statistically significant, it stands to reason that in certain cases reasonable investors would as well." *Id*. at 43.

In *In re Petrobras Sec.*, 862 F.3d 250, 279 n.30 (2d Cir. 2017), the Second Circuit cautioned against the precise mistake Hubbard makes here:

> Brav and Heaton caution courts against misinterpreting studies that fail to find statistically significant price changes: "[W]hile a statistically significant reaction to a firm-specific news event is evidence that information was reflected in the price (absent confounding effects), the converse is ***not true*** – the failure of the price to react so extremely as to be [detectable] does ***not*** establish that the market is inefficient; it may mean only that the" effect size was not large enough to be detected in the available sample.

(Emphasis in original) (quoting Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U.L. Rev. 583, 602 (2015)). The Brav & Heaton article quoted in the above passage further illuminates Hubbard's methodological flaw: "It is crucial to understand that statistical significance is simply describing a set of returns that would be unusual to observe if there was no price impact. ***Lack of statistical significance does not tell us that it is more probable than not that there was no price impact***." *Id*. at 593. Courts that hold otherwise are in error. *Id.* at 587.[4]

---

[4] *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) ("[T]he failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price."); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 U.S. Dist. LEXIS 180895, at *39 n.91 (S.D.N.Y. Oct. 18, 2019) ("'A conclusion does not immediately become "true" on one side of the divide and "false" on the other. . . . Pragmatic considerations often require binary, "yes -no" decisions, but this does not mean that *p*-values alone can ensure that a decision is correct or incorrect.'") (quoting Wasserstein & Lazar at 129); *see also* Feinstein Rpt., ¶149 & n.126; Feinstein Rbtl., ¶¶41-48.

- 5 -

Hubbard's opinion that there is no evidence of causation absent a statistically significant price decline should be excluded under Rule 702 for resting on a methodologically flawed bright-line test of statistical significance that has been rejected by the courts.[5]

> **B.     Hubbard's Opinion that Certain Revelations Are Not Corrective Because They Did Not Reveal Anything New About Previously Undisclosed Payments Is Contrary to Law and Should be Excluded**

Hubbard "dismissed outright as non-corrective" certain dates during the Proposed Class Period (*e.g.*, March 11, 12, 13 and 18, 2015), claiming they did not reveal "new, previously undisclosed information about the Contesse Payments that had previously been unknown to the market." Hubbard Rpt., ¶¶17, 27, 37, 41; Hubbard Rbtl., ¶¶50. His outright dismissal of these event dates as purportedly non-corrective conflicts with governing case law by improperly imposing a more stringent standard than appropriate.

The Second Circuit holds "that proof of loss causation requires demonstrating that 'the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered.'" *In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). There is no requirement that a "specific corrective disclosure . . .

---

[5]   Not only does Hubbard incorrectly opine that a lack of statistical significance means there is no evidence causation, but the methodology Hubbard used to conduct his event study has a high likelihood of generating false negatives, *i.e.*, deeming events that actually caused stock price declines as not statistically significant. The power of an event study is "the ability to detect a true effect (*e.g.*, a price impact due to fraud) when it exists." Brav & Heaton at 593. Brav & Heaton have detailed a methodology for measuring the power of event study. *Id*. at 593-94. Applying that methodology, Feinstein's Rebuttal Report shows that Hubbard's event study will fail to detect a true effect when it exists approximately 80% of the time when the true negative impact is -2% and almost 86% when the true negative impact reaction is -1.5%. Feinstein Rbtl., ¶¶46-47. Accordingly, Hubbard's event study methodology has a serious and unaccounted risk of making Type II errors (*i.e.*, generating false negatives) by failing to detect events that actually caused stock price declines. *Daubert*, 509 U.S. at 593-94 (asserting that known or potential rate of error is an indicia of reliability).

expose[] the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth." *Vivendi*, 838 F.3d at 262.[6]

Thus, the question in this case is whether the alleged corrective disclosures revealed, in part or in whole, the ***subject*** of SQM's misrepresentations. Accordingly, Hubbard's opinion that the events on March 11-13 and 18 were non-corrective because they did not provide "new, previously undisclosed information about the Contesse Payments that had previously been unknown to the market" is premised on the wrong legal standard and should be excluded. *Amorgianos*, 303 F.3d at 266; *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) (citing cases); *see also In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (excluding defendants' loss causation expert for applying incorrect legal standard).

In fact, Hubbard acknowledges that the March 11-13 and 18 disclosures in fact relate to the subject matter of the misrepresentations, effectively conceding that they revealed information concerning the subject of the misrepresentation. Hubbard Rpt., ¶¶47, 54 ("The information disclosed on these dates generally relates to SQM's handling of internal and government investigations. . . ."); *id*., Ex. 2; Hubbard Rbtl., ¶50 ("over these three trading days, the market learned of disagreements among SQM's Board members concerning the handling of the internal investigation into the Contesse Payments and compliance with the Public Prosecutor's request for information."); *id*. ¶88 ("The PCS directors stated that they resigned over concerns that they could not ensure that SQM would conduct an appropriate investigation regarding the Contesse Payments"). Under the governing case law summarized above, that means that those disclosures ***are*** causally

---

[6] *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) ("loss causation does not, as the defendants would have it, require a corrective disclosure followed by a decline in price"). Indeed, "the relationship between the 'concealed risk' and the consequences of its 'materialization' need not be one-to-one." *In re Lehman Bros. Sec. and ERISA Litig.*, 131 F. Supp. 3d 241, 264 (S.D.N.Y. 2015).

connected to the misrepresentations in the context of loss causation. *Vivendi*, 838 F.3d at 261. "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* at 262; *see also Charney v. Wilkov*, 734 F. App'x 6, 10 (2d Cir. 2018) (summary order) (citing *Lentell*, 396 F.3d at 173); *Lehman Bros*, 131 F. Supp. 3d at 265.

By restricting corrective events to those that disclose directly the truth of the underlying misrepresentation, Hubbard applies a correctiveness criterion that is not only contrary to law but also to common sense. The events Hubbard dismisses outright as non-corrective (including March 18, 2015, when investors learned that all of the Potash-nominated board members resigned because they could not ensure a transparent and independent investigation into the "serious allegations of wrongdoing by SQM and its management" and voluntarily deliver information to the Public Prosecutor) provided market participants information about the probability and magnitude of the risks stemming from, and the likelihood that the Company had in fact made, illegal payments to politicians, as well as the magnitude of the risks stemming therefrom. Ex. 5. Analysts recognized that the dissonance on the Board resulting in the resignations flowed directly from the illegal payments and amplified the risks SQM faced. For example, analysts from Citi tied the resignations to the allegedly illegal payments, stating that board departures "occurred in the context of allegedly illegal political donations with a tax evasion angle by the company," and indicated that "both the resignations and the statement from Potash Corp represent an ***intensification of growing concerns related to corporate governance at SQM***." Ex. 6. Market participants also drew the reasonable inference that SQM's refusal to cooperate and conduct a thorough investigation heightened the likelihood that the Company had something to hide. For example, Scotiabank recognized that Potash "is 100% correct to remove itself from SQM's board, given the board's unwillingness to

authorize an independent investigation into allegations of bribery. ***If there is nothing to hide, there is nothing to worry about***." Ex. 7.

Hubbard's opinion that there is no evidence of loss causation from the March 11, 12, 13 and 18 disclosures is also contrary to law for a second, independent reason: it fails to analyze whether the loss the Class suffered was a foreseeable one caused by the materialization of risks defendants concealed. *Vivendi*, 838 F.3d at 261; *Lentell*, 396 F.3d at 173. Hubbard's opinion that "any estimated abnormal decline must be caused by a corrective disclosure (*i.e.*, there must be loss causation)" (Hubbard Rpt., ¶44) contravenes Second Circuit authority, which makes clear that a corrective disclosure is unnecessary to prove loss causation. *Vivendi*, 838 F.3d at 261.

As the *Lehman Bros.* court explained, the Second Circuit's directive to consider a "zone of risk" means that proof of loss causation does not require a perfect connection between the false statements and the precise risk that materialized. *Lehman Bros.*, 131 F. Supp. 3d at 265. Nor is a corrective disclosure necessary "where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005). Indeed, the Second Circuit has recognized that a strict corrective disclosure requirement "would have the effect of insulating companies from securities-fraud liability whenever the thing concealed in a material misstatement never ripens from a mere risk to an out-and-out disaster – unless a specific corrective disclosure issues." *Vivendi*, 838 F.3d at 262.

Hubbard's report lacks any analysis of whether there exists evidence showing that stock price declines between March 11 and 18, 2015, were the direct and ultimate consequence or within the zone of risks that SQM concealed by misrepresenting: that it maintained effective internal controls; believed itself to be in compliance with applicable laws; and issued accurate financial statements prepared under accepted accounting principles; and whether the materialization of the risks SQM

concealed caused losses. *Id.* at 261. In the absence of such an analysis, Hubbard's opinion that the March 11-13 and 18 events were not corrective is methodologically and legally improper.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court exclude Hubbard's opinions contained in his opening and rebuttal reports that there is no evidence of loss causation absent a statistically significant price decline and that the March 11-13 and 18 disclosures are not corrective.

DATED: April 16, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
AELISH M. BAIG
MATTHEW S. MELAMED
ARMEN ZOHRABIAN
JOHN H. GEORGE

s/Aelish M. Baig
AELISH M. BAIG

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
mmelamed@rgrdlaw.com
azohrabian@rgrdlaw.com
jgeorge@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

- 10 -

>ROBBINS GELLER RUDMAN
>   & DOWD LLP
>SABRINA E. TIRABASSI
>120 East Palmetto Park Road, Suite 500
>Boca Raton, FL  33432
>Telephone:  561/750-3000
>561/750-3364 (fax)
>stirabassi@rgrdlaw.com
>
>Lead Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 16, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

    s/ Aelish M. Baig
    AELISH M. BAIG

    ROBBINS GELLER RUDMAN
        & DOWD LLP
    Post Montgomery Center
    One Montgomery Street, Suite 1800
    San Francisco, CA  94104
    Telephone:  415/288-4545
    415/288-4534 (fax)
    E-mail:  aelishb@rgrdlaw.com

# Mailing Information for a Case 1:15-cv-02106-ER Villella et al v. Chemical & Mining Co. of Chile Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@rgrdlaw.com,kmccarty@rgrdlaw.com,inavarrete@rgrdlaw.com

- **Alison Bonelli**
  AutoDocketECF@milbank.com,GHolland@milbank.com,alison-bonelli-1496@ecf.pacerpro.com,JDaSilva@milbank.com,AMarkowitz@milbank.com

- **Brian E Cochran**
  bcochran@rgrdlaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **John H. George**
  jgeorge@rgrdlaw.com,kmccarty@rgrdlaw.com,sbloyd@ecf.courtdrive.com,sbloyd@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Grant Richard Mainland**
  gmainland@milbank.com,grant-mainland-3169@ecf.pacerpro.com,DMcCracken@milbank.com,AutoDocketECF@milbank.com,calipio@milbank.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,aelishb@rgrdlaw.com,mmelamed@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **Sabrina Elsa Tirabassi**
  stirabassi@rgrdlaw.com,evanyi@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,STirabassi@ecf.courtdrive.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com,azohrabian@ecf.courtdrive.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,lisal@hbsslaw.com,ceciliah@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Scott          Alexander Edelman
Milbank LLP
55 Hudson Yards
New York City, NY 10001-2163

Richard Gielata
,
```