UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

MEGAN VILLELLA, Individually and on
Behalf of All Others Similarly Situated,

                       Plaintiff,

    vs.

CHEMICAL AND MINING COMPANY OF
CHILE INC., et al.,

                   Defendants.

———————————————————— x

: Civil Action No. 1:15-cv-02106-ER-GWG
: (Consolidated)
:
: <u>CLASS ACTION</u>
:
: MEMORANDUM IN SUPPORT OF
: PLAINTIFF'S MOTION TO EXCLUDE THE
: TESTIMONY OF DEFENDANT'S
: PROPOSED EXPERT GABRIEL BITRAN
:
:

**[REDACTED]**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................1

II.   LEGAL STANDARD......................................................................................4

III.  ARGUMENT ...................................................................................................5

    A.    Bitran Is Not Qualified to Provide the Opinions in His Report.............................5

    B.    None of Bitran's Opinions Is Based on a Reliable Methodology...........................7

        1.    Bitran's Two Opinions on the Causes of SQM's Stock Price
            Decline Are Not Based on Any Reliable Methodology...............................7

        2.    Bitran's Opinion that Illegal Payments to Politicians Were
            Common in Chile and Not Market-Moving Events Is Not the
            Product of a Reliable Methodology ...........................................................10

    C.    Bitran's Opinions Are Not Based on the Facts of This Case................................13

        1.    Bitran's Opinions on the Causes of SQM's Stock Price Decline
            Are Contradicted by the Facts and Based on Inadequate Factual
            Foundations and Assumptions ..................................................................13

        2.    Bitran's Opinion that Illegal Payments to Politicians Were
            Common and Not Market-Moving Events Is Based on Inadequate
            Factual Foundations and Assumptions .....................................................18

    D.    Bitran's Opinion Regarding Other Chilean Companies Is Not Proper
        Rebuttal Expert Testimony ...................................................................................20

    E.    Bitran's Opinions Will Not Help the Jury, and Their Probative Value Is
        Far Outweighed by Their Tendency to Mislead and Confuse .............................22

IV.   CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aidoo v. Cela*,
  2018 WL 6435650 (D. Conn. Dec. 7, 2018) .......................................................................20

*Allen v. Dairy Farmers of Am., Inc.*,
  2013 WL 211303 (D. Vt. Jan. 18, 2013) ............................................................................20

*Amorgianos v. Amtrak*,
  303 F.3d 256 (2d Cir. 2002) ...............................................................................................13

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...................................................................................................4, 5, 12

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ....................................................................13, 18, 20

*Deutsch v. Novartis Pharm. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................................................................13

*Ebbert v. Nassau Cty.*,
  2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ...................................................................20

*Estate of Jaquez v. City of New York*,
  104 F. Supp. 3d 414 (S.D.N.Y. 2015) ..................................................................................5

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014) ..................................................................................21

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ...........................................................................................8, 12

*Krueger v. Wyeth, Inc.*,
  2012 WL 12846086 (S.D. Cal. Oct. 1, 2012) ......................................................................9

*Lidle ex rel. Lidle v. Cirrus Design Corp.*,
  2010 WL 2674584 (S.D.N.Y. July 6, 2010) ................................................................23, 24

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) .................................................................................................4

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) .....................................................................................4, 13

Cases\4829-6356-0890.v2-4/16/20

**Page**

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir. 2004).................................................................5

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)..............................................................4

*Waggoner v. Barclays PLC,*
    875 F.3d 79 (2d Cir. 2017),
    *cert. denied,* ___ U.S. ___,
    138 S. Ct. 1702 (2018)...................................................................11

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
    Rule 26...............................................................................20
    Rule 26(a)(2)(D)(ii) ...............................................................20
    Rule 37...............................................................................20

Federal Rules of Evidence
    Rule 403........................................................................4, 5, 23
    Rule 702............................................................................ *passim*
    Rule 702(a)...........................................................................22
    Rule 702(c)...........................................................................10

Cases\4829-6356-0890.v2-4/16/20

## I.      INTRODUCTION

Plaintiff Tyne and Wear Pension Fund respectfully requests that the Court exercise its essential gatekeeping function and exclude from summary judgment and trial the opinions of Gabriel Bitran ("Bitran") contained in his August 16, 2019 rebuttal report and August 26, 2019 corrected rebuttal report, submitted by defendant Chemical & Mining Company of Chile, Inc. ("SQM"), to rebut the testimony of Plaintiff's expert, Dr. Steven Feinstein.[1]

Bitran proposes offering three opinions to the jury:

1.      "The SQM ADS price decline on March 18, 2015, following the resignation of the directors appointed by the Potash Corporation of Saskatchewan ('PCS'), was the market's reaction to learning that Mr. Julio Ponce Lerou would be in full control of SQM without the historical PCS counterbalance";

2.      "[T]he ADS price decline on March 18, 2015 was also, in part, a negative reaction to the news that the possibility of PCS making a bid to control the company became less likely"; and

3.      Unlawful payments to politicians "were a common practice among Chilean corporations, and disclosure of such payments was not a market-moving event in Chile."

Bitran Rpt., ¶¶15, 28, 31, 38.

Each of Bitran's opinions should be excluded for several reasons.  First, Bitran does not have the training or experience necessary to credibly opine on whether information affects the price of publicly traded securities.  Second, none of his opinions is the product of a reliable methodology.  Third, his opinions overwhelmingly ignored the evidence in this case (including evidence directly contrary to his opinions).  Fourth, his opinion about other companies is not proper rebuttal

---

[1]     "Bitran Rpt." refers to the Corrected Rebuttal Expert Report of Gabriel Bitran, attached as Ex. 1 to the Declaration of John H. George in Support of Plaintiff's Motion to Exclude the Testimony of Defendant's Proposed Expert Gabriel Bitran ("George Decl.").  All "Ex." references herein are to the George Decl.

testimony.  As a result of these failings, his testimony is, at best, useless to the fact finder and likely confusing and misleading.

A review of Bitran's education, training and experience establishes that he is unqualified to provide opinions on whether certain information caused the price of publicly traded securities to decline.  In the several decades since graduating with a general business degree, Bitran has focused almost exclusively on antitrust and related competition issues and advised companies in mergers, acquisitions and similar transactions.  None of that experience qualifies him to provide the causation opinions he proposes offering.

Consistent with his lack of qualifications, not one of Bitran's opinions is based on a reliable methodology.  As he testified several times, Bitran did not conduct any statistical analysis whatsoever to reach his two opinions concerning the March 18 price decline.  His opinions about that decline are based on no more than his say-so.  His opinion that unlawful payments were a "common practice" and did not affect the stock prices of Chilean companies is no better.  Bitran only examined three of the seven public companies he characterized as having made comparable payments, yet he used that unscientific sampling as the basis for a sweeping conclusion about *all* Chilean companies.  And, as Bitran readily acknowledged, his selective analysis did not use an event study (the accepted standard for causation analyses) and took zero precautions to account for and exclude the effects of other relevant industry information or general market movement.

In addition to his lack of qualifications and reliable methodology, Bitran based his opinions on cherry-picked information and ignored documents and facts that contradict his conclusions.  For example, Bitran concluded that the March 18 decline was caused by investor concern that Potash would no longer buy a controlling stake of SQM, but he testified that he did not know that doing so was nearly impossible under SQM's bylaws – a fact well known to SQM's investors and analysts.

- 2 -

To reach his conclusion that the March 18 decline was caused by concern that Julio Ponce Lerou ("Ponce") would now have control of SQM, Bitran relied primarily on a few communications from one large SQM investor, but he ignored that the same investor directly contradicted his opinion when it concluded that the decline in March 2015 (including March 18, 2015) was caused by ████ ██████████████████████████ These are just a few examples of Bitran's selective use of the record.

Although his testimony is offered to rebut Plaintiff's expert, Dr. Feinstein, Bitran's opinion that illegal payments to politicians were common knowledge and not market moving is entirely improper as rebuttal testimony. This opinion does not refute or contradict any of Dr. Feinstein's opinions. In fact, as Bitran testified, his report does not cite Dr. Feinstein's report once, let alone describe how it undermines the opinions actually contained in that report. SQM should have disclosed this opinion when initial expert reports were exchanged, and its failure to do so should prohibit it from relying on that opinion now.

Because Bitran's opinions do not rely on accepted expertise and instead amount to his personal impressions after a review of a handful of documents, his testimony will not assist the jury. Further, given the unreliability of Bitran's opinions, their probative value is far outweighed by the danger of misleading the jury or confusing the issues – especially his opinion that illegal payments were a common practice, which gives jurors the impression that illegality is acceptable and cannot lead to liability.

Accordingly, the Court should exclude Bitran's testimony concerning each of the opinions offered in his report.

## II.     LEGAL STANDARD

"Under *Daubert*, 'the District Court functions as the gatekeeper for expert testimony,' whether proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).[2]   Rule 702 of the Federal Rules of Evidence ("Rule 702") requires that expert testimony be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).   "Rule 702 sets forth the overarching requirement of reliability, and an analysis of the sufficiency of the expert's basis cannot be divorced from the ultimate reliability of the expert's opinion."   Fed. R. Evid. 702 advisory committee's note to 2000 amendments.   "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."   *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Before allowing an expert's testimony, Rule 702 requires the court to ensure the testimony: (i) is "based on sufficient facts or data"; (ii) is "the product of reliable principles and methods"; and (iii) applies "the principles and methods to the facts of the case."   The same requirements apply when the expert's opinions are contained in a rebuttal report.   *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("[R]ebuttal experts must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony.").   Unless these prerequisites are satisfied, the court must exclude the expert's testimony.

The court should also exclude an expert's proffered testimony under Rule 403 if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury."   Fed. R. Evid. 403.   "'Expert evidence can

---

[2]     Citations are omitted and emphasis is added throughout unless otherwise indicated.

be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'"  *Daubert*, 509 U.S. at 595.

## III.   ARGUMENT

### A.   Bitran Is Not Qualified to Provide the Opinions in His Report

To testify as an expert witness, an individual must be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "Inquiry into a proposed expert's qualifications is a threshold question that seeks to determine whether the proposed expert is, in fact, an expert at all in the area in which he or she intends to testify."  *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015).  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  Here, Bitran lacks the "knowledge, skill, experience, training, or education" to provide reliable opinions on the cause of the SQM price decline on March 18, 2015 or whether the illegal conduct to which SQM has admitted was common in Chile and disregarded by investors.  *See Jaquez*, 104 F. Supp. 3d at 426-27 ("Put simply, without the requisite qualifications, the reliability of a proposed expert's testimony is in serious doubt.").

Bitran's Report and testimony make clear that though he may be an expert in antitrust issues, he has no experience analyzing the causes of price movements in publicly traded securities.  Bitran's Report identifies approximately 20 companies for which he has provided advisory services, and he testified that his work for these companies was representative of his work at his advisory firm, which he founded in 1995.  Bitran Rpt., ¶3; Ex. 2 at 141:5-14 ("Q. Is the list of companies in paragraph 3

representative of the type of engagements that you have at GBA? . . . [A.] I think that pretty much they are. Yeah."). None of that work concerns loss causation.

According to Bitran, his professional experience is instead comprised of valuing assets in commercial transactions using discounted cash flow models, analyzing comparable assets or growth and risk projections;[3] analyzing whether certain actions are anticompetitive[4]; assisting in setting competitive prices and terms in regulated industries[5]; communicating with government regulators regarding rate setting and other competition issues[6]; and assisting in gaining antitrust approval for mergers or acquisitions.[7] None of this is pertinent to the opinions Bitran offers – the cause of SQM's stock price decline on March 18, 2015 and the market's reaction to supposedly similar illegal activity at other Chilean companies.

In fact, Bitran could not recall ever providing an expert opinion concerning the reason that a publicly traded company's stock price increased or decreased. *Id*. at 94:18-95:1. Reviewing the numerous expert engagements listed in his Report, Bitran could only identify one – a banking

---

[3]    Ex. 2 at 103:5-104:15 (describing valuation work for ED&F MAN), 105:22-106:7 (same for Endesa), 118:6-119:12 (Canada's Pension Plan Investment Board), 121:9-18 (Morgan Stanley Infrastructure Fund), 135:19-22 (Grupo Briones).

[4]    Ex. 2 at 108:15-109:20 (describing antitrust testimony for ING Bank), 126:11-24 (same for Nextel), 130:25-131:7 (same for Aguas Andinas), 139:23-141:4 (describing testimony in telephone rate setting case for Telefònica).

[5]    Ex. 2 at 123:15-124:4 (describing competitive price-setting work for D&S), 124:8-21 (same for VTR), 125:2-126:1 (ENAP), 132:2-12 (SUEZ Energy).

[6]    Ex. 2 at 112:21-113:17 (describing presentation to antitrust regulator for Lafarge), 114:18-115:14 (presentation to power-company regulator for Hydro-Quèbec), 128:22-129:24 (presentation to water-rate regulator for Aguas Andinas), 134:8-135:1 (assist in case against antitrust regulator for Principal Financial Group), 137:5-14 (communications with regulator for Colbùn), 139:2-18 (assist deregulation of phone rates for Telefònica).

[7]    Ex. 2 at 130:13-24 (negotiating acquisition terms for Aguas Andinas), 133:17-134:4 (describing antitrust advice in merger for Principal Financial Group), 135:23-136:13 (same for Cristalerias de Chile and Liberty Media).

regulation enforcement action – that had anything to do with "share prices and analysis"; but he did not know if the company involved was public, and he admitted his opinion likely did not concern whether public information caused an effect on the company's stock price. *See id*. at 93:13-94:7.

The gap between Bitran's experience and opinions is not bridged by education, training, knowledge or skill. He has no graduate education; and his undergraduate degree is in civil engineering, which he explained is the equivalent of management science or a general business degree. *Id*. at 49:1-50:24. He holds no certifications or licenses from any professional bodies. *Id*. at 50:18-21. Even though he claims to have had classes in statistics and finance as part of his undergraduate education (over 25 years ago), his employees performed all the mathematical analysis in his Report, as well as in prior engagements. *Id*. at 27:25-28:16, 103:15-23, 110:25-111:9. Bitran simply has no experience or education that would allow him to credibly opine on the reasons why SQM's stock price declined on March 18, 2015 or whether unlawful payments caused no price reaction at other companies.

### B.  None of Bitran's Opinions Is Based on a Reliable Methodology

None of Bitran's three opinions is the product of a reliable methodology. His two opinions about the causes of SQM's March 18 share price decline are based on nothing more than his say-so after a review of just a handful of documents, and his "analysis" regarding illegal conduct at other companies and its effect on share prices is deeply flawed and cannot support his sweeping conclusion.

### 1.  Bitran's Two Opinions on the Causes of SQM's Stock Price Decline Are Not Based on Any Reliable Methodology

Bitran, in no uncertain terms, concluded that SQM's March 18, 2015 ADS price decline was due to: (1) "the market's reaction to learning that Mr. Julio Ponce Lerou would be in full control of SQM without the historical PCS counterbalance"; and (2) "a negative reaction to the news that the

- 7 -

possibility of PCS making a bid to control the company became less likely." Bitran Rpt., ¶¶15, 31. But these conclusions are not based on any recognizable expert methodology. As he stated multiple times in his deposition, Bitran did not conduct an event study or any other statistical analysis to arrive at his two opinions concerning the cause of the March 18 price decline. *See* Ex. 2 at 189:11-16, 198:8-15. In fact, his "methodology" amounts to a cursory review of a few documents and news articles, followed by his assertion that the price decline had nothing to do with Plaintiff's allegations and instead was due to Ponce taking control and Potash no longer seeking to buy the company at a premium. This is entirely inadequate. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (noting event studies are "'standard operating procedure in federal securities litigation,' . . . [to] help an expert determine whether, and the extent to which, the release of certain information caused a stock price to fall").

A review of the Report shows the total absence of any reliable expert methodology. The Report begins with several pages of background on Ponce, a 32% owner and former chairman of SQM, as well as Potash's 32% ownership of SQM. *See* Bitran Rpt., ¶¶17-26. None of this provides any expert analysis; it merely recounts the well-known history of controversy surrounding Ponce and the details of Potash's investment in SQM.

Bitran's Report then cites two documents: a letter concerning Board independence and a follow-up e-mail from late 2014 and early 2015, respectively, to SQM's Board from Sailingstone Capital, an investor with a large stake in SQM. *Id.*, ¶27. After citing those documents, Bitran concludes:

> The stock market's reaction to the resignation of the PCS Board members must be understood with the above history of both Mr. Ponce and PCS in mind. It is my opinion that the SQM ADS price decline on March 18, 2015 was driven not by news of the Contesse Payments themselves. Instead, it was driven by uncertainty among investors regarding the fate of PCS's nearly 15-year investment in SQM, which called into question whether the controversial Mr. Ponce would thereafter take full

> control of the company, without the counterbalance of a large, sophisticated investor
> like PCS.

*Id.*, ¶28.  This is the extent of his "analysis."  There is no event study and no explanation of how he

arrived at his opinion or how another expert could replicate his causation methodology.  It amounts

to no more than Bitran's say-so, which must be excluded.  *See* Fed. R. Evid. 702 advisory

committee's note to 2000 amendments ("The trial court's gatekeeping function requires more than

simply 'taking the expert's word for it.'").

Bitran follows this methodology-free opinion with a conclusion that a rebuttal expert has no

business making – an explicit endorsement of Dr. Hubbard's affirmative opinion.  Bitran Rpt., ¶29

("I agree with Dr. Hubbard that analyst reports from March 18, 2015 support the view that the ADS

price decline was motivated by uncertainty regarding PCS's future involvement in SQM . . . .").

Bitran simply paraphrases Dr. Hubbard's initial report (curiously, without citation) and says he

agrees.  *Compare id.*, ¶¶29-30, *with* Zohrabian Decl., Ex. 1, ¶¶49-50.[8]  The same is true of Bitran's

discussion of Ponce's decision to not stand for reelection to SQM's Board and Potash's decision to

nominate three new directors.  *Compare* Bitran Rpt., ¶¶32-33, *with* Zohrabian Decl., Ex. 1, ¶51.

Bitran is offered as a rebuttal expert to Dr. Feinstein; SQM cannot offer him to parrot, and thereby

reinforce, its affirmative expert's opinions.  *Krueger v. Wyeth, Inc.*, 2012 WL 12846086, at *1 (S.D.

Cal. Oct. 1, 2012) (rebuttal testimony inappropriate where "opinions merely repeat the opinions of

[the] initial experts").  Accordingly, his affirmance and repetition of Dr. Hubbard's opinions and

report must be excluded.

As with his first opinion, Bitran applied no reliable methodology to arrive at his opinion that

the March 18, 2015 price decline was "a negative reaction to the news that the possibility of PCS

---

[8]   "Zohrabian Decl." refers to the Declaration of Armen Zohrabian in Support of Plaintiff's Motion
to Exclude the Testimony of Glenn Hubbard, Ph.D., filed concurrently herewith.

making a bid to control the company became less likely." Bitran Rpt., ¶¶15, 31.  This opinion, like the first one, is admittedly not based on an event study or any other recognized analysis for determining the impact of information on a security's price.  Ex. 2 at 198:8-15.  Instead, Bitran yet again just says, without any recognized expert methodology (as any lawyer could do at trial or in a brief), that Potash announced it intended to take control of SQM, the Company's share price[9] rose 9% in February 2014 (no specific date is given), and SQM's ADS declined on March 18, 2015 because this potential premium decreased.  Bitran Rpt., ¶31.  In addition to misstating Potash's announcement and ignoring substantial contrary evidence about Potash's ability to gain control and other more likely drivers of the 9% increase (as discussed in detail *infra* at §I.C.), Bitran's opinion is based on nothing more than his assertion and should be excluded.

### 2.    Bitran's Opinion that Illegal Payments to Politicians Were Common in Chile and Not Market-Moving Events Is Not the Product of a Reliable Methodology

Bitran's report concludes that the "lack of a statistically significant decline in SQM's ADS price in response to the Contesse Payments themselves is not surprising" because "such payments were a common practice among Chilean corporations, and disclosure of such payments was not a market-moving event in Chile."  Bitran Rpt., ¶38.  Like his opinions about what caused the March 18, 2015 SQM ADS price decline, Bitran did not use a reliable methodology to arrive at his conclusion.  As such, this opinion, too, should be excluded.  Fed. R. Evid. 702(c).

To reach this opinion, Bitran identified seven publicly traded Chilean companies that made unlawful payments to politicians and then, for three of the seven companies, compared the stock price movements on days in 2015 with supposed news of the payments to the average price

---

[9]    As with other statements in his report, Mr. Bitran does not specify whether he is discussing SQM's NYSE-traded ADS price or the shares traded in Santiago.

movement for 2015 to see if they were statistically significant at the 95% threshold.  *See* Bitran Rpt., ¶44.  When Bitran's analysis is examined with any scrutiny, its unreliability is quickly revealed.

First, Bitran's broad opinion that illegal payments to politicians were not market-moving events in Chile was based on an analysis of only three (Corpbanca, Endesa and BCI) of the seven Chilean public companies that he identified.[10]  Bitran testified that he had no idea "one way or the other whether the market had a reaction" to news of illegal payments at four of the seven companies.  Ex. 2 at 223:23-224:2.  And he was quick to diminish the importance of his own analysis when asked why he did not examine price reactions for those companies.  *Id*. at 223:8-12 ("Q. Why did you not provide analysis for Ripley, Copec, Aguas Andinas or Siemel . . . ?  A. Yes.  Well, let's first say that it was not the main objective of the report to do this analysis.").  Even if his analysis of the three he did consider were reliable (it is not, as explained below), Bitran's failure to even consider whether the market reacted to news about illegal payments at four of the seven companies he identified renders unreliable his conclusion that "disclosure of such payments was not a market-moving event in Chile."  Bitran Rpt., ¶38.

For those companies that he did examine, Bitran's conclusions are unreliable due to several fatal flaws in his analysis.  As he testified, Bitran did not determine whether the market for shares of Corpbanca, Endesa or BCI efficiently incorporated all public information, describing a market efficiency analysis as "far beyond the scope of my work."  Ex. 2 at 227:2-15.  Without a determination regarding efficiency, there is no basis to conclude that the market did or did not incorporate public information about unlawful payments.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 1702 (2018).  Bitran also failed to take

---

[10]    Bitran identified Corpbanca, Endesa, BCI, Ripley, Copec, Aguas Andinas and Siemel as having made unlawful payments to politicians.  Bitran Rpt., ¶41.

into account any market or index information when examining the price reactions of the three companies. Ex. 2 at 241:2-6. He also did not analyze confounding information about the three companies. *Id.* 241:7-10. By failing to account for market and index movements, as well as ignoring any company-specific confounding information that may have come out on the news days he selected, Bitran's analysis cannot say with any credibility that the news that came out did or did not have an impact on the companies' stock prices. *See Vivendi*, 838 F.3d at 253-54. Accordingly, his opinion about the Chilean market's lack of reaction to news of unlawful payments is unreliable.

Finally, Bitran's report has absolutely no information about what information was contained in the news articles for the days that he analyzed. *See* Bitran Rpt. at 23-25 (each chart merely stating "News on: [dates]"). None of the charts in his report that identify news days has citations to news articles or any other indication of what was disclosed that day. Even Bitran could not determine what information came from which articles cited in the one footnote that contains the various news articles on which he relied. Ex. 2 at 231:25-232:8. The lack of explanation or analysis of what was revealed in the news articles supporting each chart is not surprising given Bitran's admission that he only "read some of them." *Id.* at 45:16-21.[11] Without even a cursory explanation of what information was revealed to the market on the dates selected for analysis, there is no way for Bitran to conclude that the market did or did not react to certain information. Given these analytical failures, Bitran's opinion should be excluded.

In sum, none of Bitran's opinions is the product of a reliable methodology and therefore must be excluded under Rule 702 and *Daubert*.

---

[11] Bitran's inattention to what the news articles actually revealed may also explain his inclusion of BCI's stock price movement on August 29, 2015, despite the fact that August 29, 2015 was a Saturday and markets were not open for trading.

Cases\4829-6356-0890.v2-4/16/20

### C.   Bitran's Opinions Are Not Based on the Facts of This Case

When "expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702." *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013). Each of these failings applies to Bitran's opinions and requires exclusion of his testimony.[12] *See Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002) (if the "flaw is large enough that the expert lacks 'good grounds' for his or her conclusions," those conclusions are inadmissible).

#### 1.   Bitran's Opinions on the Causes of SQM's Stock Price Decline Are Contradicted by the Facts and Based on Inadequate Factual Foundations and Assumptions

To reach his affirmative opinion that the March 18, 2015 SQM ADS price decline was caused by "a negative reaction to the news that the possibility of PCS making a bid to control the company became less likely," Bitran did not review any evidence in the voluminous discovery record, misconstrued the information on which he did rely, and ignored substantial evidence that contradicts his assumptions and conclusion.

In support of his claim that Potash "had publicly announced its intent to make a bid to control SQM," Bitran relied on a December 5, 2014 Chilean news article titled, "Amidst rumors about what Potash will do with SQM, its CEO comes to Chile for the first time to meet his partner, Julio Ponce." Bitran Rpt., ¶31 n.30; Ex. 3. But, as the headline indicates, it does not contain a public declaration of Potash's intent to take control of SQM. Ex. 3. In fact, it makes clear that Potash was reviewing what to do with its SQM stake and states Potash "might even decide to sell" its SQM shares. *Id.*

---

[12]   Because Bitran offers his own affirmative opinions, as opposed to only critiquing those opinions offered by Dr. Feinstein, he is held to the same standards as any other expert and must have a sufficient factual basis for his opinions. *Scott*, 315 F.R.D. at 44; *see Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 447 (E.D.N.Y. 2011) (excluding rebuttal expert's opinions for failing to apply a "particular methodology beyond observation").

When faced with the discrepancy between his claim and the article, Bitran referred to the only other article he cited concerning Potash's control of SQM.  Ex. 2 at 201:20-25; *see* Bitran Rpt., ¶31 n.31 (citing February 28, 2014 article).  But, as Bitran had to admit that article did not report Potash's intent to take control of SQM either, instead quoting Potash as saying it would "like" to have control and viewed it as a "possibility."  Ex. 4; Ex. 2 at 202:1-7.

In fact, the February 28, 2014 article noted a major obstacle to Potash taking control of SQM; before Potash could buy any additional shares, it would have to amend SQM's bylaws to allow for an investor to own more than 32% of the company, a limit Potash had reached years earlier.  Ex. 4. Such an amendment, according to the article, "does not seem viable."  *Id.*  Investors were well aware of this limitation and agreed that a change in bylaws was highly unlikely given that 75% of the shares would have to vote in favor of the change, giving Ponce an effective veto over any change with his 32% stake.   *See* Ex. 5 at SQM-TW0436781 ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ Ex. 6 at SAILINGSTONE-045632 ██████████

████████████████████████████████████████

████████████████████

Bitran was not only ignorant of these readily accessible facts, he did not know what percentage of votes was required to change the 32% ownership limitation and "just assumed that it's not a quorum difficult to reach" because Chilean bylaw amendments generally require a "simple majority."  Ex. 2 at 204:13-205:11.  Bitran, unlike SQM investors and analysts, wrongly assumed that the highest majority required to amend SQM's bylaws was 66.6%; and therefore Potash could

gain control even if Ponce refused to amend the bylaws or sell his shares. *See id.* at 205:12-24.[13] These incorrect assumptions alone make Bitran's testimony excludable.

Despite the equivocal statements from Potash regarding future control of SQM and the fact that the necessary bylaw reform "did not seem viable," Bitran – again without performing an event study or any other analysis – attributed a 9% increase in the price of SQM shares on February 27, 2014 to the "news" of Potash's bid for control. Bitran Rpt., ¶31. To do so, he ignored a much more likely reason for the price increase discussed at length in the February 28 article – Tesla's announcement of its plan to build the world's largest battery factory, thus requiring enormous amounts of lithium, a key SQM product. *See* Ex. 2 at 202:16-19 ("Q. Did you look for any other news that was announced that day in February 2014 that may have affected SQM's stock price? A. No, we didn't – no, I did not."); Ex. 4 ("That wasn't the only beneficial announcement for SQM yesterday. Tesla motors . . . announced plans to build the largest lithium battery factory in the world . . . . The market welcomed this information . . . ."). Other than his own attribution, Bitran does not rely on any evidence to support his conclusion that the price of SQM shares increased because of a plan by Potash to take control.

---

[13]          Q.       . . . [I]f SQM's bylaws required greater than a simple majority in order to amend the bylaws, would that make it harder for Potash to amass more than a 32 percent stake?

        A.       It would.

        Q.       Could it potentially make it impossible if Mr. Ponce was unwilling to sell his shares to Potash?

        A.       Impossible, not. Because the highest quorum needed for any corporate action under Chilean law is two-thirds of the share. So impossible, not. Hard, but not impossible if two-thirds were required.

*Id*. at 205:12-24.

Cases\4829-6356-0890.v2-4/16/20

Had Bitran reviewed the evidence produced in this case, he would have discovered numerous analysts and investors explaining the February 27, 2014 price increase as enthusiasm about Tesla's lithium-dependent battery factory.  *See, e.g.*, Exs. 7-8.  He would have also discovered numerous analyst reports and other documents attributing the price decline to SQM's █████████████ ████████   *See, e.g.*, Ex. 6 at SAILINGSTONE-045630 ██████████████████ ████████████████████████████████); Zohrabian Decl., Ex. 6 at SARASIN0001451.  Bitran entirely ignored these facts and, unsurprisingly given the overwhelming evidence to the contrary, did not rely on a single analyst report, news article or any other document attributing the March 18, 2015 price decline to concern that Potash would no longer take control of SQM.

In short, Bitran relied on almost nothing to reach his conclusion regarding Potash's bid for control, misconstrued or selectively read what he did rely on, and wholly failed to consider evidence contradicting his opinion and the assumptions underlying it, *i.e.*, that Potash could get control without Ponce's cooperation and that SQM's price rose by 9% on news of Potash's discussion of getting control.  His opinion should therefore be excluded.

Similarly, to reach his affirmative opinion that the March 18, 2015 SQM ADS price decline was caused by "the market's reaction to learning that Mr. Julio Ponce Lerou would be in full control of SQM without the historical PCS counterbalance," Bitran primarily relied on just three communications from one of SQM's large investors, Sailingstone Capital.[14]  *See* Bitran Rpt., ¶¶15, 27-28, 30.  But Bitran ignored that Sailingstone itself attributed the March 2015 price decline to the █████████████████ not Ponce's supposed control.

---

[14]   While Bitran considered various news articles describing Ponce's background and his and Potash's ownership of SQM, the paragraphs in his report that contain his analysis of the March 18 price decline only cite Sailingstone's communications.  *See* Bitran Rpt., ¶¶15, 27-28, 30.

In an April 15, 2015 presentation, Sailingstone reported that  ” Ex. 6
at SAILINGSTONE-045630.[15]  In fact, just one line above its conclusion that the payments scandal
caused SQM's ADS price decline, Sailingstone wrote about the March 26, 2015 letter on which
Bitran relies in his report.  *See* Bitran Rpt., ¶30; Ex. 6 at SAILINGSTONE-045630

Contrary to Bitran's opinion that Ponce's "full
control" over SQM sent the price down on March 18, Sailingstone, which was fully aware of its
March 26 letter and had extensive knowledge of and participation in the market for SQM's
securities, attributed the decline to                               .

As Bitran recognized, Potash would have had to sell its shares for Ponce to have "full
control" of SQM.  *See* Bitran Rpt., ¶¶28-29.  But Bitran's assumption that investors believed Potash
would sell its SQM stake relies on and misquotes an analyst report, which he admitted he never saw
and which contradicts his assumption.

Apart from repeating Hubbard's opinion, stating that he agreed, and citing an analyst report
on which Hubbard relied, Bitran primarily relied on a Bloomberg article that described a BMO
Markets analyst report issued on March 18, 2015.  Bitran Rpt., ¶29 ("[A] BMO analyst noted that
'[PCS] directors quitting SQM's board may be the first step in selling [PCS]'s 32% stake.'").  But
Bitran did not rely on the actual report and, as he testified, had actually never seen the BMO Markets
analyst report.  Ex. 2 at 197:19-23 ("Q.  Did you ask Milbank or anyone else to provide you that

---

[15]   In 2015, SQM's ADS price fell below $20 for the first time on March 18.  Zohrabian Decl., Ex. 3
at 285.

analyst report?  A.  I don't recall, frankly, but I do recall that we at GBA tried to find the report and didn't find it.").  The report, which was produced in this litigation by BMO Markets, SQM and Sailingstone, does not contain the quote Bitran included in his report and actually highlighted significant barriers to a sale, including that because of ████████████████████████████ ████████████████████████████████████████████████████ Exs. 9-11.

As with his opinion concerning Potash's bid for control, Bitran's opinion that the March 18, 2015 decline was caused by fear that Ponce would have full control of SQM is based on a sparse and highly selective read of the available record and contradicted by documents from the very sources on which Bitran relied, and it should therefore be excluded.

> ### 2.     Bitran's Opinion that Illegal Payments to Politicians Were Common and Not Market-Moving Events Is Based on Inadequate Factual Foundations and Assumptions

Bitran's final opinion that illegal payments to politicians "were a common practice among Chilean corporations, and disclosure of such payments was not a market-moving event in Chile" (Bitran Rpt., ¶38) also rests on "inadequate factual foundations, problematic assumptions, [and] a misleadingly partial selection of relevant facts" and should be excluded.  *Davis*, 937 F. Supp. 2d at 418.

As discussed above, Bitran based his sweeping conclusion on an analysis on only three of the seven public companies that he identified as having made unlawful payments.  *See* §II.B.2; *compare* Bitran Rpt. at 20 (listing seven public companies), *with id.* at 23-25 (only analyzing BCI, Endesa and Corpbanca).  Bitran admitted that he did not "know one way or the other whether the market had a reaction to news of payments at" the companies he did not analyze, yet he had no problem concluding that "disclosure of such payments was not a market-moving event in Chile."  Ex. 2 at

- 18 -

223:23-224:2.  This is preposterous.  Without knowing whether the market reacted to the disclosure of unlawful activity at a majority of the listed companies he identified, he cannot possibly reliably conclude that it was "not a market-moving event in Chile."

Because he did not do an event study or otherwise attempt to control for confounding information or market movements, Bitran's opinion also assumes that nothing else affected the stock price of the companies he did analyze on the days he identified.  Had he actually identified the news that came out on those days, Bitran's conclusion that they contained disclosures about unlawful payments could be scrutinized.  But Bitran entirely failed to cite the articles, let alone describe what was revealed.  This failure to show his work renders his opinion unreliable, especially given his tendency to ignore facts contradicting his opinions (including, for example, the Tesla information in the article he *did* cite).  Even worse, at least one of the days he analyzed for BCI price movements was a Saturday (August 29, 2015), and the markets were not open that day.  Bitran Rpt. at 23.  Bitran makes no mention of this and failed to look at whether the price moved on the following Monday.

To determine that the market did not react to unlawful payments, Bitran necessarily assumed that the markets for the three stocks he examined incorporated all material information on the day that information was disclosed, or, in other words, the markets were efficient.  As he acknowledged, Bitran did not analyze market efficiency.  Ex. 2 at 227:2-15 (describing market efficiency as "far beyond the scope of my work").[16]  Market efficiency cannot just be reliably assumed for each of the three securities analyzed.  For example, on the days he identified for BCI (other than Saturday, August 19, 2015), the highest trading volume was 41,591 shares on October 30, 2015, which was nearly twice the volume for the other days in  his report.  Ex. 12.  By contrast, during the Class

---

[16]   Considering how stridently SQM argued against Plaintiff's market efficiency evidence and expert at class certification, it is particularly unacceptable that Bitran just waves the entire concept away and yet makes definitive causation conclusions.  *See* ECF Nos. 127, 129.

Period, the average weekly trading volume of SQM ADS was 2.8 million.  Zohrabian Decl., Ex. 3, ¶33.

Because Bitran's opinion concerning the market reaction to unlawful payments at Chilean companies is not based on reliable evidence, adequate factual foundations or sound assumptions, it should be excluded.  *See Davis*, 937 F. Supp. 2d at 418.

### D. Bitran's Opinion Regarding Other Chilean Companies Is Not Proper Rebuttal Expert Testimony

Rule 26 of the Federal Rules of Civil Procedure allows a party to submit rebuttal expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "The scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report."  *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013); *accord Aidoo v. Cela*, 2018 WL 6435650, at *8 (D. Conn. Dec. 7, 2018).  "'A rebuttal expert report is not the proper 'place for presenting new [legal] arguments, unless presenting those arguments is substantially justified and causes no prejudice.'"  *Ebbert v. Nassau Cty.*, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008).  Courts may exclude expert testimony that is disclosed after the deadline for expert disclosures, including improper "rebuttal" testimony.  Fed. R. Civ. P. 37; *Ebbert*, 2008 WL 4443238 at *13.  Four factors guide the decision to exclude improper rebuttal testimony: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  *Aidoo*, 2018 WL 6435650, at *8.

Here, Bitran's opinion regarding the "common practice" of illegally paying politicians and the supposed lack of market reaction to their disclosure does not rebut any of Dr. Feinstein's

opinions and goes well beyond the subject matter of Dr. Feinstein's report and is therefore not proper rebuttal testimony.

With respect to loss causation, Dr. Feinstein concluded that corrective events from March 11 to March 18, 2015, "including the resignation of the three PotashCorp representatives on SQM's Board of Directors, informed the market about the severity of the alleged misconduct and material weaknesses in internal controls" and "dissipated artificial inflation in the price of SQM ADRs, thereby causing investor losses."  Zohrabian Decl., Ex. 3, ¶19.  Bitran's opinion that illegal payments were common and their disclosure not market moving is an entirely new argument and does not "explain, repel, counteract or disprove" Dr. Feinstein's opinion. *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014).  In an attempt to tie his novel argument about other companies to Dr. Feinstein's opinion, Bitran mischaracterizes Dr. Feinstein's report as "assum[ing] that SQM was the only company involved in the controversies surrounding such payments."  Bitran Rpt., ¶15.  Dr. Feinstein's analysis relies on no such assumption; and, unsurprisingly, Bitran has no explanation or citation that supports this statement.  In fact, as Bitran has acknowledged, there are *zero* citations to Dr. Feinstein's report in Bitran's purported rebuttal report.  Ex. 2 at 173:11-18.

Instead of responding to Dr. Feinstein's testimony, Bitran's report appears to be offered to support Dr. Hubbard's opinion from his opening report.  Bitran, again attempting to link his distinct opinion to Dr. Feinstein's report, wrote "I further understand from my review of the Feinstein and Hubbard Reports that SQM's share price did not experience a statistically significant decline on any of the dates on which new information about the Contesse Payments was revealed to the market."  Bitran Rpt., ¶38 n.44 (citing "Hubbard Opening Report, ¶40").  While this is nearly identical to what

Dr. Hubbard wrote in the paragraph that Bitran cites[17] – even adopting Dr. Hubbard's term "Contesse Payments" – Dr. Feinstein gave no such opinion and, in his own rebuttal report, strongly criticized Dr. Hubbard's opinion (including the narrow definition of "Contesse Payments").  *See* Zohrabian Decl., Ex. 4, ¶¶9, 16.

Because Bitran's opinion about other Chilean companies' payments is far beyond the subject matter of Dr. Feinstein's report, SQM should have disclosed it on July 1, 2019, the deadline for opening expert reports.  *See* ECF No. 155.  By disclosing Bitran's new opinion on the date for rebuttal reports, SQM deprived Plaintiff of the opportunity to prepare its own rebuttal, which is critical given the substandard methodology and dearth of information about the companies analyzed and the supposed revelations.[18]  This prejudice to Plaintiff far outweighs the importance of Bitran's testimony, which merely bolsters SQM's loss causation expert's opinion, is based on a flawed methodology and involves no expertise (even if Bitran were qualified to give it).  Accordingly, the Court should exclude his proposed testimony.

### E.   Bitran's Opinions Will Not Help the Jury, and Their Probative Value Is Far Outweighed by Their Tendency to Mislead and Confuse

Even if Bitran was qualified to provide opinions on what caused SQM's stock price to decline on March 18, 2015, his proposed testimony is no more than lay opinion, which will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a). While evidence other than event studies or similar econometric analysis can be relevant to causation,

---

[17]   Paragraph 40 of Dr. Hubbard's opening report states: "To summarize, none of the event dates that I considered as potentially corrective of the alleged securities fraud (eight during the Proposed Class Period, and three after the Proposed Class Period) is associated with statistically significant abnormal returns."  Zohrabian Decl., Ex. 1, ¶40.

[18]   As explained above, there is no way to tell from Bitran's Report what unlawful-payment-related information was disclosed about any of the companies discussed.

***expert testimony*** regarding causation must actually apply expertise that jurors, as laypersons, lack. *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010) ("In order to be relevant, '[e]xpert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations.'")  Here, Bitran's opinions concerning SQM's March 18, 2015 price decline are not based on any expertise jurors do not have, and his opinion regarding unlawful payments at other Chilean companies is both misleading and confuses the issues actually in dispute.  *See* Fed. R. Evid. 403 (evidence is excludable "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury").

As discussed above, Bitran's first and second opinions concerning the reasons for the March 18 price decline are based on no more than his say-so after a brief review of news articles and, for only the first opinion, a few documents from the record.  *Supra* at §II.B.1.  And, as Bitran repeated throughout his deposition, none of his opinions was based on event studies, and his first two involved no statistical analysis at all.  Ex. 2 at 189:11-16, 198:8-15, 241:2-6.  For example, the entirety of Bitran's analysis supporting his second opinion is contained in one paragraph that cites SQM's bylaws and two news articles and then declares, based on no more than an inference, that "when the PCS-appointed Board members resigned, the possibility of investors receiving a premium as a result of a PCS-buyout decreased, further pressuring the ADS price to decline."  Bitran Rpt., ¶31.  Any layperson can do the same "analysis" – make an inference after reviewing articles and documents – no expert assistance is necessary or even helpful.  The same is true of Bitran's first opinion concerning the price decline on March 18, which similarly amounts to no more than an inference based on a review of articles and a few communications. *See id.*, ¶¶27-28.  Both opinions

concerning the price decline on March 18 should accordingly be excluded.  *Lidle*, 2010 WL 2674584, at *4.

Bitran's opinion that illegal payments to politicians "were a common practice among Chilean corporations" is also entirely unhelpful to the jury, and its total absence of probative value is easily outweighed by its tendency to confuse and mislead jurors.  Bitran Rpt., ¶38.  Bitran testified that by "common," he merely meant that "many companies had the same practice" based on his review of the news in Chile.  Ex. 2 at 215:17-21.  As with his first two opinions, this involves no expertise a layperson lacks.  Further, by lending his expert imprimatur to what is essentially an argument that "everyone else is doing it" – an excuse familiar to parents everywhere and just as ineffective here – Bitran's testimony risks misleading the jury that such conduct is condoned or that other companies' actions are at issue here.  Because this opinion does not bear on any issue in the case, its probative value is outweighed by such risks and should be excluded.

Bitran's sweeping opinion that the "disclosure of [illegal] payments was not a market-moving event in Chile" also presents a clear danger of misleading and confusing the jury.  As more fully described above, *see* §II.B.2., Bitran's opinion is based on a flawed analysis of just ***three*** companies.  And, as Bitran acknowledged, none of those three companies or the four other public companies mentioned in his report "disclose[d] a material weakness in internal controls relating to the payments," "fire[d] their CEO for his or her role in the payments" or had their "board members . . . fined by the [Chilean securities regulator] for not disclosing essential information that concerned the payments."  Ex. 2 at 242:4-20.  Further, none of the companies he identified in his report was prosecuted for making unlawful payments.  *Id.* at 220:19-221:13.  SQM, by contrast, disclosed a material weakness in internal controls over the payments, fired its CEO, three of its eight directors resigned, the Chilean securities regulator fined the remaining directors for not disclosing information

- 24 -

related to the unlawful payments, and the Company was prosecuted in Chile and the United States. Ex. 13 at 5-6, 102-04.

Because of its unsound analysis and distance from the facts in this case, Bitran's opinion is not probative of loss causation or any other issue here.  Yet, because Bitran's opinion would have the veneer of legitimacy due to his identity as a purported expert, it risks misleading and confusing jurors by improperly arguing that investors did not care about illegal activity at Chilean companies and therefore must not have cared about illegality at SQM.  These dangers substantially outweigh the probative value of Bitran's opinion, and it should thus be excluded.

## IV.    CONCLUSION

For the reasons set out above, the Court should exclude the proposed testimony of SQM's expert, Gabriel Bitran.

DATED:  April 16, 2020                             Respectfully submitted,

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   AELISH M. BAIG
                                                   MATTHEW S. MELAMED
                                                   ARMEN ZOHRABIAN
                                                   JOHN H. GEORGE


                                                          s/ Aelish M. Baig
                                                   AELISH M. BAIG

                                                   Post Montgomery Center
                                                   One Montgomery Street, Suite 1800
                                                   San Francisco, CA  94104
                                                   Telephone:  415/288-4545
                                                   415/288-4534 (fax)
                                                   aelishb@rgrdlaw.com
                                                   mmelamed@rgrdlaw.com
                                                   azohrabian@rgrdlaw.com
                                                   jgeorge@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
stirabassi@rgrdlaw.com

Lead Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 16, 2020, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Aelish M. Baig
AELISH M. BAIG

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  aelishb@rgrdlaw.com

# Mailing Information for a Case 1:15-cv-02106-ER Villella et al v. Chemical & Mining Co. of Chile Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@rgrdlaw.com,kmccarty@rgrdlaw.com,inavarrete@rgrdlaw.com

- **Alison Bonelli**
  AutoDocketECF@milbank.com,GHolland@milbank.com,alison-bonelli-1496@ecf.pacerpro.com,JDaSilva@milbank.com,AMarkowitz@milbank.com

- **Brian E Cochran**
  bcochran@rgrdlaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **John H. George**
  jgeorge@rgrdlaw.com,kmccarty@rgrdlaw.com,sbloyd@ecf.courtdrive.com,sbloyd@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Grant Richard Mainland**
  gmainland@milbank.com,grant-mainland-3169@ecf.pacerpro.com,DMcCracken@milbank.com,AutoDocketECF@milbank.com,calipio@milbank.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,aelishb@rgrdlaw.com,mmelamed@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **Sabrina Elsa Tirabassi**
  stirabassi@rgrdlaw.com,evanyi@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,STirabassi@ecf.courtdrive.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com,azohrabian@ecf.courtdrive.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,lisal@hbsslaw.com,ceciliah@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Scott            Alexander Edelman
Milbank LLP
55 Hudson Yards
New York City, NY 10001-2163


Richard Gielata
,
```