UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| MEGAN VILLELLA, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:15-cv-02106-ER-GWG (Consolidated) |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| | : | |
| vs. | : | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON (1) MISREPRESENTATION OR OMISSION AND (2) SCIENTER |
| | : | |
| CHEMICAL AND MINING COMPANY OF CHILE INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ———————————————— x | | |

**[REDACTED]**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT UNDISPUTED FACTUAL BACKGROUND............................................2

    A.      SQM Repeatedly Represented that Its Internal Controls Were Effective, It
            Believed Its Operations Were Compliant with Applicable Law, and Its
            Financial Reporting and Accounting Were Accurate ...............................................3

    B.      The Above Statements Were False When Made Because SQM's Top
            Executive Was Simultaneously Engaged in Political Corruption, Bribery,
            and Tax Evasion..............................................................................................................4

    C.      SQM Has Admitted the Misrepresentations Were Knowingly False When
            Made ...............................................................................................................................6

        1.      SQM Admitted, in Response to Governmental Investigations, that
                    the Misrepresentations Were Knowingly False When Made ....................6

        2.      SQM Admitted, in Response to Plaintiff's Requests for Admission,
                    that the Misrepresentations Were Knowingly False When Made ..............9

III.    LEGAL STANDARDS .........................................................................................11

    A.      Rule 56(a) of the Federal Rules of Civil Procedure................................................11

    B.      Exchange Act §10(b) ...........................................................................................12

        1.      Misrepresentation or Omission ................................................................13

        2.      Scienter ....................................................................................................13

IV.     ARGUMENT.....................................................................................................14

    A.      Undisputed Facts Establish SQM Knowingly Misrepresented Its Belief
            that It Was in Compliance with Applicable Law....................................................15

        1.      SQM Knowingly Violated SOX ...............................................................15

        2.      SQM Knowingly Violated the FCPA ........................................................17

        3.      SQM Knowingly Violated the Exchange Act............................................19

        4.      SQM Knowingly Violated Chilean Law....................................................19

- i -

**Page**

B.  Undisputed Facts Establish SQM Knowingly Misrepresented Its Internal Controls Were Effective ........................................................................21

C.  Undisputed Facts Establish SQM Knowingly Misrepresented Its Financial Statements Were Accurate and Complied with Accounting Standards ................23

V.  CONCLUSION ............................................................................................24

- ii -

# TABLE OF AUTHORITIES

Page

## CASES

*Anderson v. Liberty Lobby*,
   477 U.S. 242, 106 S. Ct. 2505,
   91 L. Ed. 2d 202 (1986) ...........................................................................12

*Brod v. Omya, Inc.*,
   653 F.3d 156 (2d Cir. 2011) .....................................................................12

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548,
   91 L. Ed. 2d 265 (1986) ...........................................................................12

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995) .........................................................................12

*Gould v. Winstar Commc'ns, Inc.*,
   692 F.3d 148 (2d Cir. 2012) ...............................................................14, 15

*H. Daya Int'l Co., Ltd. v. Arazi*,
   348 F. Supp. 3d 304 (S.D.N.Y. 2018) ......................................................12

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.*
   *Royal Bank of Scot. Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015) .....................................................................12

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...............................................................13, 15

*Jaramillo v. Weyerhaeuser Co.*,
   536 F.3d 140 (2d Cir. 2008) .....................................................................12

*Omnicare, Inc. v. Laborers Dist. Council*
   *Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................15, 21

*Saenger v. Montefiore Med. Ctr.*,
   706 F. Supp. 2d 494 (S.D.N.Y. 2010) ......................................................12

*SCR Joint Venture L.P. v. Warshawsky*,
   559 F.3d 133 (2d Cir. 2009) .....................................................................12

- iii -

Page

*Senno v. Elmsford Union Free Sch. Dist.*,
   812 F. Supp. 2d 454 (S.D.N.Y. 2011)................................................................11, 12

*Teamsters Local 445 Freight Div. Pension Fund v.*
   *Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)....................................................................................14

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)..............................................................................15, 21

*U.S. v. Litvak*,
   808 F.3d 160 (2d Cir. 2015)..............................................................................12, 13

*Williams v. R.H. Donnelley Corp.*,
   368 F.3d 123 (2d Cir. 2004)....................................................................................12

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78dd-1 *et seq.* ............................................................................... *passim*
   §78j ................................................................................................. *passim*
   §78m(b)(2) .................................................................................................19
   §78m(b)(2)(A) ...........................................................................................18
   §78m(b)(4) .................................................................................................18
   §78m(b)(5) .................................................................................................18
   §78ff(A) .....................................................................................................18
   §7201 *et seq.* .................................................................................15, 16, 17
   §7241(a)(1)-(2) ..........................................................................................16
   §7241(a)(1), (3)..........................................................................................16

Chilean Law No. 20,393 ...............................................................................10, 20

Federal Rules of Civil Procedure
   Rule 30(b)(6)..............................................................................................18
   Rule 56(a)..........................................................................................1, 2, 11

Local Rule 56.1 .............................................................................2, 15, 21, 24

17 C.F.R.
   §240.10b-5 ........................................................................................1, 2, 13, 25
   §240.10b-5(b)..............................................................................................13

**Page**

**SECONDARY AUTHORITIES**

Pascale Bonnefoy, *As Graft Cases in Chile Multiply, a 'Gag Law' Angers Journalists*, The New York Times (Apr. 7, 2016), available at https://www.nytimes.com/2016/04/08/world/americas/chile-corruption-press-gag-law.html ........................................................................................................................20

Class Representative the Council of the Borough of South Tyneside Acting in Its Capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff"), on behalf of a certified Class of similarly situated investors,[1] hereby moves for partial summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, against Defendant Chemical and Mining Company of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM," the "Company," or "Defendant"), which Plaintiff alleges violated §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j, and Rule 10b-5, 17 C.F.R. §240.10b-5. Specifically, Plaintiff moves for partial summary judgment on two elements of its claim: (i) falsity, *i.e.*, that SQM made misrepresentations or omissions during the Class Period; and (ii) scienter, *i.e.*, that SQM did so with conscious misbehavior or recklessness. SQM has admitted both.

## I.    INTRODUCTION

The facts underlying this action are not contested. Throughout the Class Period, SQM repeatedly assured investors that it maintained sufficient internal controls, believed it was in compliance with applicable laws, and issued truthful financial statements consistent with governing accounting principles. The evidence conclusively establishes that SQM knew each of these assurances was false when made. Indeed, SQM has since acknowledged that, starting before and continuing through the end of the Class Period, it knowingly and willfully lacked sufficient internal controls, knowingly and willfully operated in violation of U.S. and Chilean law, and knowingly and willfully issued false financial statements that did not comply with applicable accounting standards. Unbeknownst to investors, SQM, through its former CEO, Patricio Contesse ("Contesse"), and employees who assisted him, engaged in a continuous course of

---

[1]    The definition of the Class is set forth in ECF No. 161 at 27-28 ("Class Certification Order"). The Class Period is June 30, 2010 through March 18, 2015, inclusive. *Id.*

- 1 -

making secret, unlawful payments on fraudulent invoices worth millions of dollars to Chilean politicians and political actors, their families, and their foundations.[2]

Summary judgment is a stringent standard, requiring a showing that "there is **no** genuine issue as to **any** material fact." Fed. R. Civ. P. 56(a).[3] Here, that standard is met. There is no genuine issue as to any material fact concerning whether SQM made misrepresentations regarding the effectiveness of its internal controls, its belief in its compliance with applicable law, and its financial reporting and accounting; nor is there a genuine issue as to any material fact concerning whether it made these misrepresentations knowingly or recklessly – because SQM has admitted as much. Accordingly, the Court should enter a partial summary judgment order finding that Plaintiff has established the elements of falsity and scienter required for its claim for violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## II.     RELEVANT UNDISPUTED FACTUAL BACKGROUND

SQM is a chemicals and mining company based in Chile with a current market capitalization of approximately $2.76 billion. 56.1 ¶1. It has sold Series B American Depositary Shares ("ADS") on the New York Stock Exchange since 1993, where more than 120 million ADS were available as of December 31, 2014. 56.1 ¶¶2-3.[4] SQM is therefore obligated to accurately report financial and non-financial information under the Exchange Act. *See, e.g.*, 56.1 ¶¶12, 101.

---

[2]   Unless provided otherwise, all denominations herein are U.S. dollars.

[3]   All citations and footnotes are omitted and emphasis is added unless otherwise indicated.

[4]   All "56.1 ¶_" references are to the Local Rule 56.1 Statement of Material Facts, filed concurrently herewith. All "Ex._" references are to the Declaration of Matthew S. Melamed in Support of Plaintiff's Motion for Partial Summary Judgment on (1) Misrepresentation or Omission; and (2) Scienter, filed concurrently herewith.

A.   **SQM Repeatedly Represented that Its Internal Controls Were
Effective, It Believed Its Operations Were Compliant with Applicable
Law, and Its Financial Reporting and Accounting Were Accurate**

There are three categories of misrepresentations at issue in this action: "(1) compliance
with applicable law, (2) effectiveness of internal controls, and (3) financial reporting and
accounting."  ECF No. 67 ("MTD Order") at 30.

Regarding legal compliance, Plaintiff alleges that, during the Class Period, SQM
repeatedly and knowingly misrepresented its belief that it was fully compliant with governing legal
and regulatory standards: "[W]e believe that we are in compliance in all material respects with all
applicable statutory and administrative regulations with respect to our business."  56.1 ¶6.[5]

Regarding internal controls, Plaintiff alleges that, during the Class Period, SQM repeatedly
and knowingly misrepresented that:

> The procedures associated to our internal controls are designed to provide
> reasonable assurance that our transactions are properly authorized, assets are
> safeguarded against unauthorized or improper use, and transactions are properly
> recorded and reported.
>
> *          *          *
>
> SQM Management is responsible for establishing and maintaining adequate
> internal control over financial reporting.  The Company's internal control over
> financial reporting is designed to provide reasonable assurance regarding the
> reliability of financial reporting and the preparation of the financial statements for
> external purposes in accordance with generally accepted accounting principles.
>
> *          *          *
>
> SQM management has concluded that as of December 31, 2009, the
> Company's internal control over financial reporting was effective.

56.1 ¶7.[6]

---

[5]   *See also* 56.1 ¶¶18, 30, 42, 47, 58, 63.

[6]   *See also* 56.1 ¶¶19, 31, 43, 47, 59, 63.

Cases\4826-4157-4329.v1-4/16/20

And regarding financial statements, during the Class Period, Plaintiff alleges that SQM repeatedly and knowingly misrepresented that such statements reflect fairly the Company's financial position and were prepared in accordance with applicable financial standards:

> Interim and annual consolidated financial statements of Sociedad Química y Minera de Chile S.A. and Subsidiaries, have been prepared in accordance with International Financial Reporting Standards (hereinafter "IFRS") and requirements of the Superintendence of Securities and Insurance.
>
> These interim and annual consolidated financial statements reflect fairly the Company's equity and financial position and the results of its operations, changes in the statement of recognized income and expenses and cash flows, which have occurred during the periods then ended.

56.1 ¶11.[7]

**B.      The Above Statements Were False When Made Because SQM's Top Executive Was Simultaneously Engaged in Political Corruption, Bribery, and Tax Evasion**

SQM has admitted that, since at least 2008 and continuing through 2015, its longtime CEO, ███████████, directed payments of approximately $14.75 million in SQM funds to Chilean politicians, political candidates, and people connected to them.  56.1 ¶106.  Many of these payments violated Chilean laws pertaining to Chilean taxes and campaign finance limits.  *Id.* ███████ concealed these unlawful payments by causing them to be falsely recorded in SQM's books and records as payments for services rendered, but such services were never provided.  *Id.*

For example, from January 2008 through March 2015, SQM made illegitimate monthly payments totaling more than █████ to people and entities linked to ██████████ ██████████████████████████.  56.1 ¶¶91-93, 153-154, 157-160.  Similarly, SQM paid ██████ in phony invoices for services never rendered to individuals and entities connected to ██████████████████████

---

[7]    *See also* 56.1 ¶¶13, 15, 20, 23, 25, 27, 32, 35, 37, 39, 44, 47, 50, 53, 56, 60, 63, 66, 69, 72.

███████████████████████████████████████████████. 56.1 ¶94; *see also* Ex. 25 at SQM-TW0000078.  SQM intentionally falsified its books and records by recording such payments (and many others) as being for "'communications advice'" or "'consulting services'" despite knowing that they were not.  56.1 ¶¶110-115.[8]

In 2014, an internal SQM audit identified "'high risk'" payments from CEO ██████ discretionary fund to vendors associated with Chilean politicians.  *Id.* at 56.1 ¶116.  Nevertheless, the payments persisted.  The only changes made reflected ██████ attempt to further cover up the scheme by switching the recipient of certain payments to someone less obviously tied to the politician.  *Id.* at 56.1 ¶117.

The possibility that SQM was engaged in an illegal payment scheme first became publicly known in early 2015.  During an investigation by Chilean prosecutors into Groupo Penta ("Penta"), one of Chile's largest financial firms, for illegally funding a Chilean right-wing political party, the prosecutors uncovered evidence that SQM was engaged in a similar but broader scheme.  During early 2015, the Chilean Public Prosecutor and tax authority (Servicio de Impuestos Internos, the "SII") commenced an investigation into potentially unsupported invoices paid by SQM.  56.1 ¶¶74-75.  In response to these investigations, SQM established an *ad hoc* committee (the "*Ad Hoc* Committee") on February 26, 2015 to conduct an internal investigation into its potentially illicit payments.  56.1 ¶76.  Evidence acquired during discovery in this action establishes that, on March 3, 2015, ████████████████████████████████████████████%,

---

[8]   SQM also purposefully disguised the destination of the payments, creating, for example, "a fake service contract for a fictitious vendor for the sole purpose of funneling SQM funds to a foundation controlled by" one Chilean politician (*id.* at 56.1 ¶113) and paid numerous invoices in return for purported services it knew had not been received (*id.* at ¶113).

██████████████████████████████████████████████

████ 56.1 ¶192.

### C. SQM Has Admitted the Misrepresentations Were Knowingly False When Made

#### 1. SQM Admitted, in Response to Governmental Investigations, that the Misrepresentations Were Knowingly False When Made

Chilean authorities instituted a series of criminal actions against SQM executives arising out of the Company's payment of illicit and illegal invoices.  On March 23, 2015, the SII filed a criminal claim against fired CEO Contesse, new CEO Patricio de Solminihac ("de Solminihac"), and then-CFO Ricardo Ramos ("Ramos"), in their capacities as the Company's tax representatives, relating to the Company's payment of millions in unsupported invoices between 2009 and 2014.  56.1 ¶82.  On March 31, 2015, Chile's securities regulator filed an administrative claim against five members of SQM's board for failing to release material information relating to the illicit and illegal payments in a timely manner.  *Id.* at ¶83.  Shortly thereafter, Chile's Public Prosecutor formalized a criminal investigation against Contesse for authorizing unsupported payments and engaging in fraud to conceal them.  *Id*. at ¶¶86-87.  The Public Prosecutor charged Contesse with bribery in connection with the payments, summarized above, that SQM made to Longueira.  56.1 ¶177.

On January 7, 2016, ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

- 6 -



Ex. 25 at SQM-TW0000054. ███████████████████████████████████████████. *Id.*  In this action, however,

---

Contesse's son, SQM board member Patricio Contesse Fica ("Contesse Fica"), testified that ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ■ 56.1

¶186.

On January 13, 2017, the U.S. Department of Justice filed a Deferred Prosecution Agreement ("DPA") with SQM concerning a two-count criminal information for violations of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §78dd-1 *et seq.* ("FCPA").  56.1 ¶98.  As part of the DPA, SQM admitted that it is responsible under U.S. law for the actions of its executives and further admitted that the allegations described in the Information and set forth in the Statement of Facts "are true and accurate."[11] 56.1 ¶101.  Among other things, the Statement of Facts provides that, from 2008 through 2015:

> ████████████ used the CEO's discretionary fund to direct payments totaling approximately US \$14.75 million in SQM funds to Chilean politicians, political candidates, and individuals connected to them . . . , many of which violated Chilean tax law and/or campaign finance limits, and caused payments of those funds to be falsely recorded in SQM's books and records.

56.1 ¶106.  On the same date, the U.S. Securities and Exchange Commission ("SEC") entered a cease-and-desist order against SQM.  56.1 ¶119.  The order held that SQM's illicit and illegal payment scheme, summarized above, "violated the books and records provisions of the FCPA."  56.1 ¶121.  SQM paid \$15 million to the SEC (56.1 ¶125) and \$15.4875 million to the DOJ (56.1 ¶118) to resolve the civil and criminal FCPA charges, respectively.

---

[10]  Like his father, Contesse Fica had also ████████████████████████████
████████████  (Ex. 25 at SQM-TW0000005.)

[11]  The Information is Ex. 26.  The Statement of Facts is Attachment A to Ex. 27.

On September 25, 2018, the SEC entered a cease-and-desist order against Contesse for his "role in causing his employer, [SQM], to violate the books and records and internal accounting control provisions of the [FCPA], and his circumvention of internal accounting controls, falsification of SQM's books and records, and misleading of SQM's accountants."  56.1 ¶¶126-127.  These violations arose out of his conduct as SQM's CEO, when he "caused SQM to make approximately US $14.75 million in improper payments to Chilean politicians, political candidates, and individuals and entities connected to them."  *Id.* at ¶127.  The order provides that Contesse caused SQM's FCPA violations, personally caused the creation of fictitious contracts, signed false certifications filed with SQM's Forms 20-F, and personally caused SQM's internal accounting controls violations, which he "knowingly circumvented" in violation of "rules that prohibit falsifying a public company's books and records and omitting material facts to an accountant in connection with an audit."  56.1 ¶¶128-130.

> ### 2. SQM Admitted, in Response to Plaintiff's Requests for Admission, that the Misrepresentations Were Knowingly False When Made

SQM's admissions in discovery in this action, in response to Plaintiff's Requests for Admission, constitute undisputed facts as to the falsity and scienter of the alleged misrepresentations.  *See generally* Ex. 29.

<u>Compliance With Applicable Law</u>: In direct contrast to SQM's representations that it believed it was in compliance with applicable laws and regulations, SQM admitted in its responses that its CEO disguised and directed (connoting intent) the falsification of documents, and that he "knowingly and willfully … falsified records" related to the payment scheme:

- ███████ "sought and received assistance from SQM employees to **disguise** some of the payments by directing them to create **fictitious** invoices and contracts for services that were not rendered, pay invoices for which there was no evidence of services being

performed to justify the payments and *falsely* record some of the payments in SQM's books and ledgers" (56.1 ¶¶145-146);

- "[D]uring the relevant period," *i.e.*, from 2008 through 2015 (56.1 ¶¶141-142, 151-152, 173-176), ▮▮▮▮▮ *directed* millions "in SQM funds to PEPs such as Chilean politicians, political candidates and individuals connected to them, many of which violated Chilean tax law and campaign finance limits" (56.1 ¶¶147-148) and "caused payments to PEPs to be *falsely* recorded in SQM's books and records" (56.1 ¶¶149-150);

- SQM "did not conduct due diligence on or obtain anti-corruption representations from its vendors" (56.1 ¶¶155-156);[12]

- SQM paid vendor invoices that "were simply created to disguise payments to PEPs" (56.1 ¶¶159-160; *see, e.g., id.* at ¶161);

- ▮▮▮▮▮ signed financial certifications in SQM's filings for fiscal years 2008 through 2013 "*that he knew to be false*" (56.1 ¶¶165-166); and

- SQM "*knowingly and willfully* falsified and caused to be falsified its books, records and accounts," including that it "knowingly falsified records relating to payments to PEPs, and entities associated with PEPs, in order to conceal the true purpose of those payments" (56.1 ¶¶175-176).

<u>Internal Controls</u>: In direct contrast to SQM's representations that it established and maintained sufficient internal controls, SQM admitted in its responses precisely the opposite:

- SQM "*knowingly and willfully failed to maintain internal accounting controls*" (56.1 ¶¶143-144);

- Between 2008 and 2015, SQM made millions in payments "to PEPs and related parties *without effective internal accounting controls*, such as appropriate due diligence, documentation or oversight" (56.1 ¶¶151-152);[13]

---

[12] Such representations were required by Chilean Law No. 20,393. *See* 56.1 ¶190 ("In the event that there are ties to politically exposed persons (PEPs), all supporting evidence necessary to ensure said transaction is not related to the crimes described in Law No. 20,393 must be provided").

[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 56.1 ¶¶139-140.

- When, in 2014, SQM personnel became aware of internal control failure related to these payments, they "nevertheless failed to take adequate steps to prevent further such payments" (56.1 ¶¶166-167; 56.1 ¶¶169-172); and

- From 2008 through 2015, SQM's knowing and willful internal controls failures included the failure "to implement a system of internal controls sufficient to provide reasonable assurances that . . . transactions were recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles" and "the fail[ure] to implement, among other internal accounting controls, controls that required: (a) due diligence for the retention of third party consultants; (b) documentation or other proof that services had been rendered by third party consultants before payment could be made to them; [and] (c) review of payments to government officials, candidates for office, and political party officials to determine such payments' legality" (56.1 ¶¶173-174).

Financial Statements and Accounting: In direct contrast to SQM's representation that its

reported financial statements were accurate and prepared in accordance with accounting standards,

SQM admitted that such statements were "intentionally falsified":

- "[D]uring the relevant period," *i.e.*, from 2008 through 2015, ███████ "caused payments to PEPs to be falsely recorded in SQM's books and records" (56.1 ¶¶149-150);

- "[F]rom 2008 to 2013, at the end of each fiscal year, SQM's books and records, including those that ███████ and others *intentionally falsified* to justify payments to vendors connected to PEPs, were used for the purpose of preparing SQM's *financial statements*" (56.1 ¶¶163-164); and

- From 2008 through 2015, "SQM knowingly and willfully falsified and caused to be falsified its books, records and accounts" because it "*knowingly falsified* records relating to PEPs, and entities associated with PEPs, in order to conceal the true purpose of those payments" (56.1 ¶¶175-176).

## III.   LEGAL STANDARDS

### A.     Rule 56(a) of the Federal Rules of Civil Procedure

A movant is entitled to summary judgment where it "shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). As the Court has explained:

> "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch.*

*Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

*H. Daya Int'l Co., Ltd. v. Arazi*, 348 F. Supp. 3d 304, 308-09 (S.D.N.Y. 2018).

## B.    Exchange Act §10(b)

To prevail on a §10(b) claim, a plaintiff must prove six elements: "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  Plaintiffs move for summary judgment as to the existence of a "misrepresentation or omission" made "with scienter."[14]

---

[14]    While a §10(b) plaintiff must prove the defendant made a material misrepresentation or omission, materiality is a question best left to the jury.  *See U.S. v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015).  *Litvak*, which separates the falsity discussion from that of materiality, supports that Plaintiff here may move for summary judgment as to whether SQM made misrepresentations or omissions while leaving the question of the materiality of the misrepresentations or omissions for

- 12 -

### 1.    Misrepresentation or Omission

Rule 10b-5 makes it unlawful either to "'make any untrue statement of material fact'" or to "'omit to state a material fact necessary in order to make the statements made . . . not misleading.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (alteration in original) (quoting 17 C.F.R. §240.10b-5(b)).  "Thus, to support a finding of liability, Rule 10b-5 expressly requires an actual ***statement***, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state."  *Id.* (emphasis in original).

Half-truths – "statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose" – also support a finding of liability as misrepresentations.  *Id.* at 239-40.  "The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which 'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'"  *Id.*at 240.[15]

### 2.    Scienter

Scienter is shown through evidence that defendants acted with "a state of mind demonstrating 'an intent to deceive, manipulate or defraud.'"  MTD Order at 27 (citing cases).  A plaintiff may prove scienter by (1) showing that the defendant had both the motive and opportunity to commit the fraud or (2) showing conscious misbehavior or recklessness.  *Id.*

---

trial.  *See id.* at 175-78 (accepting that the jury properly found the existence of misrepresentations and considering solely whether they were immaterial as a matter of law).

[15]  "'Pure omissions'" can also be actionable under Rule 10b-5 when a defendant is "'subject to a duty to disclose the omitted facts.'"  *Vivendi*, 838 F.3d at 239.  This case, however, does not concern pure omissions.

- 13 -

"Scienter based on conscious misbehavior . . . requires a showing of 'deliberate illegal behavior,' a standard met 'when it is clear that a scheme, viewed broadly, is necessarily going to injure.'" *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). "Scienter based on recklessness may be demonstrated where a defendant has engaged in conduct that was 'highly unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 158-59. Evidence that "a defendant 'failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud'" may demonstrate recklessness sufficient to establish scienter. *Id.* at 159.

"To prove liability against a corporation, . . . a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Here, SQM has acknowledged that ███████ actions (and accompanying mental state) concerning the unsupported and illegal payments he directed to be made from the CEO cost center between 2008 and 2015 are attributable to the Company. 56.1 ¶¶101, 135-136, 184.

## IV.   ARGUMENT

In denying in part SQM's motion to dismiss, the Court upheld as actionable three categories of misrepresentations: "(1) compliance with applicable law, (2) effectiveness of internal controls, and (3) financial reporting and accounting." MTD Order at 30. Now that discovery is complete, the evidence establishes there is no genuine dispute that each of the Class Period statements concerning SQM's compliance with applicable law, the effectiveness of its internal controls, and its financial reporting were "'untrue' outright or 'misleading' by virtue of what [they] omit[] to

- 14 -

state," *Vivendi*, 838 F.3d at 239, and were made with "conscious misbehavior or recklessness." MTD Order at 27; *Gould*, 692 F.3d at 158-59.  The Court should enter summary judgment on falsity and scienter.

### A.  Undisputed Facts Establish SQM Knowingly Misrepresented Its Belief that It Was in Compliance with Applicable Law

On an annual basis throughout the Class Period, SQM told investors it believed it was "in compliance in all material respects" with applicable law.  For example, in its Form 20-F Annual Report for the fiscal year ended December 31, 2009, filed June 30, 2010, SQM stated: "we believe that we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business."  56.1 ¶6.[16]  Because this is a statement of opinion, Plaintiff must show either that SQM did not sincerely hold the belief or that the belief did not "'fairly align[] with the information in the issuer's possession at the time.'"  MTD Order at 20 (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016), and citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015)).  The evidence shows both.  SQM has since admitted that it ***knew*** it was ***not*** in compliance with applicable statutory and administrative regulations, and that it was in fact in violation of the Sarbanes-Oxley Act ("SOX"), the FCPA, the Exchange Act, and Chilean law throughout the Class Period.

### 1.  SQM Knowingly Violated SOX

SQM's responses to Plaintiff's Requests for Admission and the Statement of Facts accompanying the Deferred Prosecution Agreement SQM entered into with the DOJ provides that,

---

[16]  As set forth above in §II.A and in the Local Rule 56.1 Statement of Material Facts ("56.1") accompanying this brief, SQM made identical statements on an annual basis throughout the Class Period, each constituting a knowing misrepresentation for the same reasons explained herein.  56.1 ¶¶18, 30, 42, 58.

- 15 -

"during each of the[] years from 2008 to 2013, SQM Executive" – ███████████ – "signed financial certifications as part of SQM's securities filings that *he knew* to be false."[17]  56.1 ¶¶139-140, 165-166; 56.1 ¶115; *see also* 56.1 ¶¶130, 132-133.

Among other requirements, SOX requires that, when public companies file periodic reports such as the Forms 20-F filed by SQM, signing officers must review the report and verify, based on their knowledge, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading."  15 U.S.C. §7241(a)(1)-(2).  SOX also requires that signing officers verify that the Company's financial statements and information "fairly present in all material respects the financial condition and results of operation of the issuer."  15 U.S.C. §7241(a)(1), (3).

By signing "financial certifications . . . that he knew to be false," SQM's ███████████ ████████, violated these provisions of SOX.  56.1 ¶¶139-140, 165-166; 56.1 ¶115; 56.1 ¶¶130, 132-133; *see* 56.1 ¶96.  Ramos, SQM's current CEO and the CFO throughout the Class Period, confirmed during his deposition that ███████████████████████████████

███  ███████████████████████████

███  ████████████████

███  ██████████████████████████████

███  ██████████████

---

[17]   The dates referenced – 2008 to 2013 – reference fiscal years.  As such, the books and records that were intentionally falsified in each such fiscal year were incorporated into the Form 20-F for that year, which was filed in spring of the following year.  *E.g.*, 56.1 ¶¶57, 63; Exs. 20-21 (Form 20-F and Amended Form 20-F for the fiscal year 2013, filed on April 28, 2014 and April 29, 2014, respectively).

- 16 -



56.1 ¶182; *see also* 56.1 ¶185 ████████████████████████████████

Undisputed evidence thus shows SQM violated SOX in each Form 20-F filed during the Class Period and that SQM's repeated Class Period statements of belief that it was in compliance with all relevant laws were therefore knowingly false when made.

**2.      SQM Knowingly Violated the FCPA**

The United States filed an Information charging SQM with knowingly and willfully violating the internal controls and the false books and records provisions of the FCPA from 2008 through 2015.  56.1 ¶¶96-97.  In its responses to Plaintiff's Requests for Admission, SQM admitted all of the facts underlying the FCPA claims (56.1 ¶¶173-176).  Moreover, SQM's corporate designee testified in this case that ███████████████████████████████████ 56.1 ¶179.

Concerning the internal controls violations of the FCPA, the Information alleged that, between 2008 and 2015, SQM "knowingly and willfully failed to implement a system of internal accounting controls" that: (i) "provided reasonable assurances that . . . transactions were recorded as necessary . . . to permit preparation of financial statements in conformity with" accounting

- 17 -

principles;  (ii) required "documentation or other proof that services had been rendered by third

party consultants before payment could be made to them"; (iii) required "review of payments to

government officials, candidates for office, and political party officials to ensure such payments'

legality"; and (iv) provided "oversight of the payment process to ensure payments were made

pursuant to appropriate controls."  56.1 ¶96.

And, concerning the false books and records violations of the FCPA, the Information

alleged that, from 2008 through 2015, SQM "knowingly and willfully falsified and caused to be

falsified its books, records, and accounts" by "knowingly falsif[ying] records relating to payments

to PEPs, and entities associated with PEPs, in order to conceal the true purpose of those payments."

56.1 ¶97.  SQM's responses to Plaintiff's Requests for Admission admit that each of the allegations

underlying the FCPA violations is true.  56.1 ¶¶173-176.

The SEC's cease-and-desist order provides that SQM "acknowledges responsibility for . . .

violating the books and records provisions" and "internal controls provision" of the FCPA.  *See*

56.1 ¶124.  Testimony by SQM's Rule 30(b)(6) designee bolsters this admission.  SQM's General

Counsel, Gonzalo Aguirre, testified, on behalf of the Company,



56.1 ¶179.  The designee also agreed that the factual allegations that SQM admitted to be true

████████████████████████████████████████████████████████████

████████████████████  56.1 ¶178.

Because SQM was knowingly and willfully in violation of the FCPA throughout the Class

Period, there is no genuine issue of material fact that SQM's repeated Class Period statements of

belief that it was in compliance with all relevant laws were knowingly false when made.

### 3.    SQM Knowingly Violated the Exchange Act

Relatedly, the SEC's cease-and-desist order establishes that SQM's FCPA violations also

violated §13(b)(2) of the Exchange Act.  Specifically, SQM violated §13(b)(2)(A) "because its

books and records did not accurately reflect the purpose of the transactions and disposition of

assets from the CEO Account" and violated §13(b)(2)(B) "because it did not devise and maintain

an effective system of internal accounting controls over the CEO Account."  56.1 ¶123.  These

findings were based on SQM's acknowledgment of "knowing and willful" "criminal conduct" in

the DPA.  56.1 ¶124; *see supra* §IV.B.2.

Because SQM was knowingly and willfully in violation of the Exchange Act throughout

the Class Period, there is no genuine issue of material fact that SQM's repeated Class Period

statements of belief that it was in compliance with all relevant laws were knowingly false each

time made during the Class Period.

### 4.    SQM Knowingly Violated Chilean Law

SQM has also admitted that "many" of ████████ payments "violated Chilean tax law and

campaign finance limits."  56.1 ¶¶147-148; *see also* Class Certification Order at 6; 56.1 ¶106.

Again, deposition testimony further cements the conclusion that the payments at issue

violated Chilean law.  According to de Solminihac, who was the Chief Operating Officer for the



substantial majority of the Class Period and was named CEO when Contesse was dismissed,

████████████████████████████████████████████████████████████████████

████████████████████████████  56.1 ¶180.  That, however, is precisely what SQM admits happened: "In

fact, ████████sought and received assistance from SQM employees to disguise some of the

payments by directing them to create fictitious invoices and contracts for services that were not

rendered."   56.1 ¶¶145-146;  56.1 ¶105;  (Ex. 25 at SQM-TW0000038) (chart reflecting

unsupported payments on an annual basis from 2008 through 2015); 56.1 ¶¶108-109, 113; MTD

Order at 20 ("Ramos admitted that SQM made 1,000 payments to political campaigns 'without

any consideration of whether they were based on any services rendered'").

In addition, SQM's current general counsel testified (as the Company's corporate designee)

that █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.   56.1 ¶177.

According to testimony by SQM board member Contesse Fica, who is CEO Contesse's son, the

former CEO ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████[18]

56.1 ¶186.  This violates the anti-bribery provision of Chilean Law No. 20,393.  *See* 56.1 ¶¶188-

189.

---

[18]   For example, according to an article in *The New York Times*, leaked e-mails between Contesse and then-senator Pablo Longueira "show them discussing changes to a mining royalty bill, and how Mr. Contesse drafted modifications that benefited the company that were later introduced by Mr. Longueira.   The law passed when Mr. Longueira was minister of economy."   Pascale Bonnefoy, *As Graft Cases in Chile Multiply, a 'Gag Law' Angers Journalists*, The New York Times (Apr. 7, 2016), available at https://www.nytimes.com/2016/04/08/world/americas/chile-corruption-press-gag-law.html.

- 20 -

Because SQM was knowingly and willfully in violation of Chilean tax, campaign finance, and bribery laws throughout the Class Period, there is no genuine issue of material fact that SQM's repeated Class Period statements of belief that it was in compliance with all relevant laws were knowingly false when made during the Class Period.

In sum, there is no genuine issue of material fact that SQM's repeated Class Period representations of its belief in its "compliance in all material respects with all applicable statutory and administrative regulations with respect to our business" (56.1 ¶¶6, 18, 30, 42, 58) were knowingly false when made.  The undisputed evidence set forth above establishes that SQM did not "believe[] the opinion" that it was in compliance in all material respects with applicable law and that the opinion did not "fairly align[] with the information in [SQM's] possession at the time." *Omnicare*, 575 U.S. at 188-89; *Tongue*, 816 F.3d at 210; MTD Order at 20.

### B.    Undisputed Facts Establish SQM Knowingly Misrepresented Its Internal Controls Were Effective

On an annual basis throughout the Class Period, SQM informed investors that it had effective internal controls.  For example, in its Form 20-F Annual Report for the fiscal year ended December 31, 2009, filed June 30, 2010, SQM stated, among other things, that its internal controls procedures were "designed to provide reasonable assurance that . . . assets are safeguarded against . . . improper use," that "transactions are properly recorded and reported," and that "financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles" was reasonably assured, concluding that "the Company's internal control over financial reporting was effective."  56.1 ¶7.[19]

---

[19]   As set forth above in §II.A and in the Local Rule 56.1 Statement of Material Facts accompanying this brief, SQM made a substantially identical statement on an annual basis

SQM has since admitted it **_knew_** it did **_not_** have effective internal controls from 2008, before the first alleged internal controls misrepresentation, through 2015, after the date of the last alleged internal controls misrepresentation.  Thus, each time during the Class Period that the Company represented it maintained effective internal controls, the representation was knowingly false.

In response to Plaintiff's Requests for Admission, SQM admitted that, "[f]rom in or around 2008 to 2015," "SQM knowingly and willfully failed to maintain internal accounting controls":

> Despite providing for a discretionary fund, SQM **_knowingly and willfully failed_** to maintain internal accounting controls that were adequate to ensure that the CEO's discretionary funds were used for their intended purposes, were used in accordance with the law, and were properly recorded in SQM's books and records.

> SQM Executive[20] sought and received assistance from SQM employees to disguise some of the payments by directing them to create fictitious invoices and contracts for services that were not rendered, pay invoices for which there was no evidence of services being performed to justify the payments, and falsely record some of the payments in SQM's books and ledgers.

56.1 ¶¶143-146; *see also id.* ¶¶104-105; Class Certification Order at 6.  Among the knowing and willful failures were the failure to implement: "due diligence for the retention of third party consultants"; "documentation or other proof that services had been rendered by third party consultants before payment could be made to them"; and "review of payments to government officials, candidates for office, and political party officials to determine such payments' legality." 56.1 ¶96; ¶¶173-174 (admitting the factual allegations as true); *see id.* ¶¶178-179 (testimony of corporate designee affirming that ██████████████████████████████████████████

---

throughout the Class Period, each constituting a knowing misrepresentation for the same reasons explained herein.  56.1 ¶¶7, 19, 31, 43, 59.

[20]  SQM admits that "SQM Executive is Patricio Contesse, the former CEO of SQM."   56.1 ¶¶139-140.



███████████████████████████; *cf. id.* ¶¶181-182 █████████

███████████████████████████████████████████

███████████████████████████; MTD Order at 20 (Ramos admitted

SQM made 1,000 payments to Chilean political campaigns "'without any consideration of whether

they were based on any services rendered'").

The foregoing facts establish conclusively that each of SQM's internal controls

representations was knowingly false when made:

- SQM *knew* "that the Company's disclosure controls and procedures" had *not*, at any time during the Class Period, been "effective in providing reasonable assurance that . . . non-financial information is properly recorded, processed, summarized and reported" (*see* 56.1 ¶¶7, 19, 31, 43, 59);

- SQM *knew* that "[t]he procedures associated to our internal controls" were *not*, at any time during the Class Period, "designed to provide reasonable assurance that our transactions are properly authorized, assets are safeguarded against unauthorized or improper use, and transactions are properly recorded and reported" (*see id.*);

- SQM *knew* that "[t]he Company's internal control over financial reporting" had *not*, at any time during the Class Period, been "designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles" (*see id.* ¶¶7-8, 19, 21, 31, 33, 43, 45); *and*

- SQM *knew* that "the Company's internal control over financial reporting" had *not*, at any time during the Class Period, been "effective" (*see id.* ¶¶7, 19, 31, 43, 59).

There is no genuine issue of material fact that SQM's repeated Class Period assurances

concerning the effectiveness of its internal controls were knowingly false when made.

### C. Undisputed Facts Establish SQM Knowingly Misrepresented Its Financial Statements Were Accurate and Complied with Accounting Standards

With each Class Period financial statement, CEO Contesse and CFO Ramos attested to

their accuracy and compliance with industry-standard accounting rules.  For example, SQM's first

quarter 2010 financial statements assured investors they "have been prepared in accordance with

- 23 -

International Financial Reporting Standards" and "reflect fairly the Company's equity and financial position and the results of its operations." 56.1 ¶11.[21]

But, as SQM would subsequently admit, SQM's financial statements concerning the fiscal years 2008 through 2013 were prepared using books and records that ████████ and others had "intentionally falsified," and ████████ knowingly signed false financial certifications attesting to the accuracy of the financial statements. 56.1 ¶¶163-166; *see also id.* ¶¶115, 130, 133. Further, SQM also acknowledged that it "knowingly and willfully failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that" financial statements were prepared "in conformity with generally accepted accounting principles or any other criteria applicable to such statements." 56.1 ¶96; *id.* ¶¶173-174 (admitting the factual allegations).

As such, there is no genuine dispute as to any material fact that SQM's Class Period financial statements were, in fact, intentionally falsified and that they were knowingly or recklessly non-compliant with applicable accounting standards.[22]

## V.    CONCLUSION

When the Court denied in substantial part SQM's motion to dismiss the complaint in this case, it found that "allegations [such as those set forth above] are sufficient to show that Defendant did not believe its statements regarding compliance with all relevant regulations and that its

---

[21]   As set forth above in §II.A. and in the Local Rule 56.1 Statement of Material Facts accompanying this brief, SQM made substantial statements on a quarterly basis throughout the Class Period, each constituting a knowing misrepresentation for the same reasons explained herein. 56.1 ¶¶13, 15, 20, 23, 25, 27, 32, 35, 37, 39, 44, 50, 53, 56, 60, 66, 69, 72.

[22]   The fact SQM issued knowingly false financial statements is also an independent basis for finding that it knew it was not in compliance with applicable statutes and regulations. *See* §IV.A. As Macarena Briseño, SQM's employee in charge of internal auditing and controls, testified, the accuracy of such statements are "what the law demands." 56.1 ¶177.

disclosure controls were effective in ensuring that 'financial and non-financial information [was] properly recorded . . . and reported.'" MTD Order at 21. The evidence set forth herein establishes precisely these allegations. There is no genuine issue of material fact concerning the knowing falsity of SQM's Class Period representations regarding compliance with applicable law, internal controls and accurate and compliant financial statements. As such, the Court should enter summary judgment in Plaintiff's favor on two elements of its claim under Exchange Act §10(b) and Rule 10b-5: falsity and scienter.

DATED: April 16, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
AELISH M. BAIG
MATTHEW S. MELAMED
JOHN H. GEORGE

s/ Aelish M. Baig
AELISH M. BAIG

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
mmelamed@rgrdlaw.com
jgeorge@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)
stirabassi@rgrdlaw.com

Lead Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 16, 2020, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and

I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Aelish M. Baig
_____
AELISH M. BAIG

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  aelishb@rgrdlaw.com

## Mailing Information for a Case 1:15-cv-02106-ER Villella et al v. Chemical & Mining Co. of Chile Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@rgrdlaw.com,kmccarty@rgrdlaw.com,inavarrete@rgrdlaw.com

- **Alison Bonelli**
  AutoDocketECF@milbank.com,GHolland@milbank.com,alison-bonelli-1496@ecf.pacerpro.com,JDaSilva@milbank.com,AMarkowitz@milbank.com

- **Brian E Cochran**
  bcochran@rgrdlaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **John H. George**
  jgeorge@rgrdlaw.com,kmccarty@rgrdlaw.com,sbloyd@ecf.courtdrive.com,sbloyd@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Grant Richard Mainland**
  gmainland@milbank.com,grant-mainland-3169@ecf.pacerpro.com,DMcCracken@milbank.com,AutoDocketECF@milbank.com,calipio@milbank.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,aelishb@rgrdlaw.com,mmelamed@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **Sabrina Elsa Tirabassi**
  stirabassi@rgrdlaw.com,evanyi@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,STirabassi@ecf.courtdrive.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com,azohrabian@ecf.courtdrive.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,lisal@hbsslaw.com,ceciliah@hbsslaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Scott              Alexander Edelman
Milbank LLP
55 Hudson Yards
New York City, NY 10001-2163


Richard Gielata
,
```